## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JOHN NOAKES<br>c/o Engel & Martin, LLC<br>4660 Duke Dr., Suite 101<br>Mason, OH  45040, | Case No.<br><br>Judge: |
| Plaintiff, | VERIFIED COMPLAINT |
| v. | AND |
| CASE WESTERN RESERVE<br>UNIVERSITY,<br>9501 Euclid Ave<br>Cleveland, OH 44106 | JURY DEMAND |
| and | |
| CASE WESTERN RESERVE<br>UNIVERSITY SCHOOL OF MEDICINE<br>10900 Euclid Ave<br>Cleveland, OH 44106 | |
| Defendants | |

## INTRODUCTION

1. Plaintiff John Noakes[1] brings this action for violation of the deliberate indifference and anti-retaliation provisions of Title IX, as well as breach of contract.

2. This case arises out of the efforts of administrators at the Case Western Reserve University and Case Western Reserve University School of Medicine (collectively "CWRU") to retaliate against

---

[1] Plaintiff has chosen the pseudonym "John Noakes" instead of the more commonly used "John Doe" in order to avoid confusion with a prior case titled *Doe v. Case Western Reserve Univ.*, N.D. Ohio No. 1:17 CV 414.  The pseudonym "John Noakes" was used in English Law.  *See https://www.merriam-webster.com/dictionary/John-a-Nokes.*

1

John Noakes after he was found "not responsible" for allegations of sexual misconduct against a fellow student, identified here as "Jane Roe."

3. Jane Roe had alleged that John Noakes had engaged in non-consensual sexual activity. The matter was reported to the CWRU Office of Equity, the office charged with enforcement of the University's non-discrimination and sexual harassment policies. CWRU investigated the matter and, following a hearing, John Noakes was cleared of all charges.

4. After John Noakes was cleared of the charges, CWRU officials – including the Title IX Coordinator and a Dean in the Medical school – who were unhappy with the outcome began a campaign of intimidation and harassment against John Noakes. This campaign culminated in threats from school administrators that John Noakes could be expelled if he continued to assert his own rights under Title IX or pursue retaliation complaints against administrators.

## PARTIES

5. John Noakes is a medical student at Case Western Reserve University School of Medicine (the "School of Medicine").

   a. Plaintiff is an Ohio resident with a residence in [REDACTED].

   b. Plaintiff has paid a significant amount of money to CWRU in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

   c. The disclosure of Plaintiff' identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34  CFR Part 99.

6. Defendants Case Western Reserve University and Case Western Reserve University School of Medicine are private educational institutions.

    a.   Case Western Reserve University School of Medicine is a part of Case Western Reserve University and follows university-wide policies and procedures

    b.   CWRU voluntarily participates in federal spending programs.

## JURISDICTION AND VENUE

7.  This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq.*  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

8.  This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.  This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

10.  This case is one of many amidst a continuing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses.  The response of colleges and universities to this problem arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*,

## THE RESPONSE OF CWRU TO PRESSURES TO CRACK DOWN ON SEXUAL MISCONDUCT

11.  CWRU has adopted various policies and procedures to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.

3

12. On April 11, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures in a manner that, while not completely ignoring due process concerns, shifted the focus more on victim advocacy.

13. The Obama administration, through OCR, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

    a. The "Dear Colleague" letter was a step in the increased enforcement of Title IX on colleges and universities. NPR described the Dear Colleague Letter as the government's "first warning shot." Source: *How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014.

    b. In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." Source: *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

    c. Lhamon was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

14. Colleges and Universities, including CWRU, were scared of being investigated or sanctioned by the Department of Education and/or of potential Title lawsuits by the Department of Justice.

4

a. The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

b. Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014. In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

c. Other news reports suggested that the threat to withdraw federal funding from schools was credible. MSNBC reports:

> Speaking at a conference on campus sexual assault held at Dartmouth College, Assistant Secretary for Civil Rights at the Department of Education Catherine Lhamon said that despite the fact it has never been done before, she is prepared to cut off federal funding to schools that violate Title IX, the 1972 gender equity law.

> Calling that one enforcement mechanism part of a set of "very, very effective tools," Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

> In her 10-month tenure at the Department of Education, Lhamon has threatened to withdraw federal funding from four schools. "It's not surprising to me that we haven't gone to the last step," she said. "It means that so far the process has been working."

Meredith Clark, *Official to colleges: Fix sexual assault or lose funding*, July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college#51832)

d. The White House issued a report entitled "Not Alone" in April 2014, which includes a warning that if the OCR finds that a Title IX violation, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

e. In June 2014, Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ."  She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

    f.    Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." Source: *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

    g.    In 2015, the Office's director, Catherine Lhamon, told a national media publication that "[w]e don't treat rape and sexual assault as seriously as we should," citing data "about the rate of unwanted sexual activity experienced specifically by college women." Lhamon had also recently warned university administrators that they could lose all their federal funding if they did not heed the Office's mandates, and elsewhere cited "a need to push the country forward."

    h.    In July 2016, then-Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. Source: *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

15.  On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf )

    a.    In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.

    b.    OCR further said: "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental

fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *Quoting Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

16. On May 6, 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972.  The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses.  The Final Rule carried the force and effect of law as of August 14, 2020.

17. The Biden Administration had indicated that it intends to initiate a new rulemaking in an effort to repeal the 2020 rules.  During the presidential campaign, President Biden vowed to scrap the Trump administration's new regulation on campus sexual misconduct; in March 2021, the President signed an executive order directing Education Secretary Miguel Cardona to review and consider rewriting the regulation.

18. On information and belief, CWRU, like other schools nationwide, was scared of being investigated or sanctioned by the Department of Education for not taking seriously complaints of female students alleging sexual assault by male students.  Sanctions would include the loss of eligibility for all federal funding.  Upon information and belief, CWRU annually receives millions of dollars in government grants and contracts, and students depend on federal financial aid.

19. In the year preceding the disciplinary actions against John Noakes, there was substantial criticism of CWRU, both in the student body and in the public media, accusing CWRU of not taking seriously complaints of female students alleging sexual assault by male students.  This has included adverse news coverage and, campus meetings or protests, and enforcement actions concerning CWRU. This criticism included criticism of the manner in which CWRU handled Title IX investigations.

20. In the summer of 2020, a group of CWRU students, "CWRU Survivors," established the @cwru.survivors Instagram page so students could anonymously share their experiences with sexual assault, violence, harassment and discrimination on CWRU's campus, as well as experiences with the Title IX office. In a matter of days, there were over 600 posts.

    a. The Instagram page attracted national media attention, including coverage by NPR and CBS News.  According to the Cleveland Scene, "In many cases, these posts also describe a profound lack of institutional support for survivors of assault, and university systems of reporting and discipline so ineffectual that they have exacerbated trauma."

    b. CWRU Survivors said in an open letter to the college posted on July 29, 2020:  "A massive cultural change about how the CWRU community views consent, accountability, and respect for others is integral in combatting the prevalence of sexual violence at Case Western Reserve University."

    c. A September 11, 2020 editorial in the student newspaper, the Observer, criticized the changes in the Title IX regulations.  The editorial accused the Trump Administration of "promot[ing] sexism and violence on a nearly daily basis" and added, "Respect for women surely does not exist in this administration."   The editorial suggested that, in response to the new Title IX regulations, "…it's time to go farther and stand in complete solidarity with survivors."

9

    d.  A change.org petition created in the following weeks (https://www.change.org/p/case-western-reserve-university-hold-cwru-accountable) has received hundreds of signatures for a statement that is highly critical of the CWRU response to allegations of sexual misconduct: "As an institution conceived to be a place of safety and refuge for survivors, Title IX has shown to be unhelpful, victim blaming, and made seemingly inaccessible to students and those who need it most."  In particular, the petition demanded that CWRU take action against those accused of misconduct regardless of the results of the investigatory and hearing process.  The petition demands that CWRU release "a statement condemning the assaulters who have been accused, and that believing survivors, taking concrete action against the accused, and ensuring the culture on campus is drastically altered, is the school's priority. [sic]"

21. In the Fall of 2020, partly in response to the Instagram page, a task force made up of volunteer undergraduate, graduate, and transfer students, along with advisors, lawyers, and CWRU alumni, met regularly to discuss sexual misconduct on CWRU's campus.  In a report to the Board of Trustees (https://case.edu/provost/sites/case.edu.provost/files/2020-11/Sexual%20Misconduct_Draft.pdf), the Task Force wrote, "The student body and alumni alike are calling for action. A massive culture change has already begun on our campus, and the University must ask itself one simple question: 'Will we be aiding in this change or standing by?'"

    a.  The Task Force was critical of the Title IX Process.  The presentation states, "one thing has been made clear: We are, unfortunately, not supporting nor educating the CWRU community enough in terms of sexual misconduct. Sexual assault survivors and the accused alike are subjected to an inconsistent, unfair, and problematic process in place to address allegations. A change must be made."

b. The Task Force collected quotes from students that were critical of the Title IX process at CWRU:

# Supporting Survivors of Sexual Misconduct

## Student Quotes

"I told the Title IX director repeatedly that I did not want to report the incident [..] It took involving my own mother to get her to leave me alone" - CWRU Alum

"CWRU needs to address sexual misconduct by their staff, not just their students" -CWRU Student

"He graduated despite committing criminal harrassment and stalking. CWRU's Title IX office does not support victims." - CWRU Alum

"This university does not care about survivors [...] It's not entirely the administration's fault either- the student culture is problematic too" -'20

"My Title IX experience was somehow more traumatic than the actual incident" -'22

"Nothing ever went past the reporting phase and there was nothing done to make us feel safer or less violated" -'23

"I honestly think it's the first time at CWRU I've had hope these things could change" -'22

"There were people around me who knew I was drunk [...] I wish someone had intervened" -'22

"I have been brutally raped multiple times at case [...] The saddest part is I probably have had the average amount of sexual trauma for a girl at Case" - CWRU student

" Even my rapist knew people get off scott-free at this school, he told his friends 'my parents are rich, I'll be chilling'. Guess he was right." -CWRU student

"The guy who raped me was on the student board for title IX. He has had numerous other encounters with other girls on campus" - '21

"Nothing gets done because of money" -'21

"My RA was gossiping [...] I heard her say 'just because it wasn't good sex doesnt mean it was assault' [...] I felt that I couldn't trust my RA" -'18

"The first question the Title IX investigator asked me was if I had previously consented to sex with my rapist before, which made me feel like I was lying about my experience." -'22

    c. The Task Force indicated a belief that "survivors often do not feel supported or understood by CWRU, citing inadequate resources, [and] unhelpful or unaccommodating staff and faculty…"

22. In Fall 2020, the CWRU Title IX coordinator sent out a message to all students. A CWRU statement said that "Education and prevention programs certainly can help reduce the number [of sexual assaults] on campus, but more meaningful change requires earlier and deeper initiatives to engage and address these cultural issues [including long-standing societal attitudes towards women and members of underrepresented groups] on a broad[er] scale."

23. CWRU has been critical of the 2020 regulations. The CWRU web page includes this statement: "the new regulations have raised concerns across many in higher education, and our organizational representatives have been active in articulating them." (https://case.edu/equity/sexual-harassment-title-ix/information-2020-title-ix-regulations)

24. The Medical School, in particular, has received scrutiny for the manner in which it handles allegations of sexual assault on campus. In 2018, the Office of Civil Rights for the Department of Health and Human Services completed an evaluation of the School of Medicine's compliance with Title IX. HHS reviewed the school's nondiscrimination policies and procedures, including its Sexual Misconduct Policy, Title IX grievance procedure, and the extent to which CWRU School of Medicine's Title IX Coordinator implements the School's Title IX compliance program. A copy of the April 2018 Letter is Attached as Exhibit _A_.

25. CWRU's Title IX Coordinator leads CWRU's centralized Title IX Office and oversees all aspects of Title IX investigations and prevention and education programs university-wide, including investigating grievances involving the School of Medicine.

26. CWRU maintains a website which provides instructions for filing a Title IX complaint against any student at CWRU, including medical students. CWRU's Title IX investigative procedures include

interviews with the complainant, the respondent and witnesses, as well as reviewing relevant records such as phone records emails and social media. Following the investigation, a hearing panel determines whether a student is "responsible" or not responsible" for a violation of the school's policies.

27. CWRU has adopted a "Interim Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties." This is referred to as the "Title IX Policy." (A copy of the Title IX Policy is attached as Exhibit B.)

28. The Title IX Policy prohibits all forms of sexual harassment, which is defined (page 17) to include, "the offenses of sexual harassment, sexual assault, domestic violence, dating violence, and stalking."

29. The Title IX Policy provides that CWRU will provide benefits and accommodations to students who allege that they are the victims of sexual misconduct. These benefits and accommodations would not available to students but for the fact that the students claimed to have been a victim of sexual misconduct, and are provided without regard to any investigation. Interim measures can include "no contact" orders and changes in academic, employment or living arrangements.

30. The investigation and grievance process outlined in the Title IX Policy determines whether or not the Policy has been violated.

31. Upon receipt of a complaint, a pair of investigators with the Office for Equity will review cases in pairs, interview the Complainant, Respondent and witnesses, and gather relevant evidence. As part of the investigatory process, each interviewed party and witness is provided an opportunity to review and verify the Investigator's summary notes of the interview. Each party has the opportunity to suggest witnesses and questions they wish the Investigator(s) to ask of the other party and witnesses.

13

32. The Investigators gather, assess, and synthesize evidence, but make no conclusions, engage in no policy analysis, and render no recommendations as part of their report

33. Prior to the conclusion of the investigation, the parties are provided access to a draft investigation report as well as an opportunity to inspect, review, and respond to all of the evidence obtained as part of the investigation.

34. The determination of whether a respondent has violated the CWRU Title IX Policy is made by a hearing panel. At the hearing, the Investigators present a summary of the final investigation report. The parties and witnesses may provide information. Each side may question the adverse party and witnesses either through an advisor or through the submission of written questions.

35. Each side is permitted to appeal the decision of the hearing panel on certain limited grounds.

36. Nothing in the Title IX Policy requires that student keep the process confidential. In fact, the opposite is true. CWRU adminstrators have acknowledged that students are free to disclose any information obtained in the investigative or administrative process. The CWRU Title IX Coordinator admitted that students would be free, for example, 'to print information about the outcome of hearings in an ad in the Plain Dealer.'

37. The Title IX Policy (page 22) has certain provisions designed to prevent retaliation against individuals who engage in "protected activity" related to the Title IX process.

    a. Protected activity is defined by the Title IX Policy to include "participating in the grievance process."

    b. The Title IX Policy requires CWRU to "take all appropriate and available steps to protect individuals who fear that they may be subjected to retaliation."

    c. The Title IX Policy prohibits "intimidating, threatening, coercing, harassing, or discriminating against any individual… because the individual has made a report or

complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure."

d.  The Title IX Policy provides that "charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint of sex discrimination…" may constitute retaliation.

38. The Title IX Policy (page 12) also provides that students should be provided with supportive measures "to protect the safety of all parties or the university's educational environment, and/or deter harassment, discrimination, and/or retaliation."  The provision of supportive measures is mandatory, not optional:

a.  The Title IX Policy provides that "CWRU *will offer and implement* appropriate and reasonable supportive measures to the parties upon notice of alleged sexual harassment, or retaliation."  (Emphasis supplied.)

b.  The Title IX Policy provides, "The Title IX Coordinator or designee *promptly makes supportive measures available* to the parties upon receiving notice or a complaint."  (Emphasis supplied.)

39. The School of Medicine has a separate "Student Handbook."  (A copy of the Student Handbook Policy is attached as Exhibit C.)

40. The Student Handbook (page 7) indicates that "The School of Medicine is obligated to follow federal guidelines (Title IX) for reporting sexual misconduct."  The Student Handbook (page 7) further indicates that "If appropriate" reports of sexual harassment and misconduct are "redirected to University (i.e. Title IX)."

41. The Student Handbook (page 59) describes a Committee on Students ("COS").  The purpose of the COS is to review "the total performance of any student referred to it."  The Student Handbook

15

indicates that "Review of student performance within the curriculum may include… compliance with the university's Student Code of Conduct."

42. The COS reviews the student's complete academic record and any information provided by the Society Dean and student."  The COS may also "question the student on… Student Code of Conduct violations…"  The COS may make determinations about "promotion and graduation, repetition of a portion of the curriculum, and any sanctions including dismissal from the School."

43. The Student Handbook (page 60-61) provides that students have the right to request an appeal hearing for reconsideration of a decision made by the COS.

44. The Student Handbook permits the student only to have a faculty advocate.  "No other advisor or advocate, other than the CWRU faculty member designated by the student, is permitted to accompany the student to the Committee hearing."

45. The Student Handbook (page 61) provides that a student "may make one further appeal to the Dean of the School of Medicine only on the basis of the use of inappropriate procedures."

46. The COS process does not contain many of the procedural protections included in the Title IX Policy, including the ability to confront adverse witnesses and be accompanied by an advisor of the student's choice.

**THE DISCIPLINARY PROCEEDINGS AGAINST JOHN NOAKES**

47. Beginning in August/September 2020 John Noakes and Jane Roe began dating.

48. Jane Roe alleges that John Noakes sexually assaulted her on October 20, 2020 (the "Incident").  Jane Roe alleged that John Noakes engaged in rough sex beyond her consent.  John Noakes unequivocally denies Jane Roe's allegations and unequivocally denies any sexual misconduct (related to the Incident or otherwise).

16

49. On October 22, 2020 – two days after the Incident – John Noakes and Jane Roe mutually decided to break up.

50. On October 23, 2020, Jane Roe asked John Noakes to re-start the relationship. She said that she made a mistake by breaking up. She texted him, "I just know you're right for me and I think I really really like you and I messed up and I dumped you just because you weren't into nutrition but that's not fair that's not a good reason. You're just so good for me other than that I'm just so f**ked up with my eating disorder and anxiety that I thought it was a good idea to push you away."

51. On October 24, 2020 – four days after the Incident – John Noakes and Jane Roe engaged in consensual sex.

52. On October 25th, 2020 – five days after the Incident – John Noakes and Jane Roe exchanged text messages. In one text, Jane Roe writes, "Goodnight [John Noakes] <3. You mean so much to me…"

53. On October 26, 2020 – six days after the Incident – John Noakes and Jane Roe had an argument about an unrelated matter. John Noakes suggests that they need to "take a break." Jane Roe responded by threatening John Noakes. She specifically stated that she would report him to the Title IX Office "for the lying the sex for everything it was all a lie." Jane Roe continued these threats the next day before apologizing for the "meltdowns" and attempts "to fix this."

54. John Noakes asked Jane Roe to stop contacting him. Jane Roe continued to attempt to contact him and threatened to report him for "non-consensual sex."

55. Jane Roe's threats were repeated during an argument between her and John Noakes on November 6, 2020. During that argument she threatened to file a report with the Title IX Office and claimed she is "a victim of rape." In the same conversation, she texted him about continuing the relationship: "my feelings never went away, yours just disappeared in a day. Just like everyone else's do."

56. On November 7, 2020 at 6:34 am John Noakes reported to the the Office of Equity that he is being threatened and harassed by Jane Roe.  A few hours later, at 1:29 pm, Dr. Steven Ricanati reported to the Office of Equity that Jane Roe had been sexually assaulted by John Noakes.

57. Dr. Steven Ricanati is the associate dean for student affairs for the School of Medicine.

    a. On information and belief, Jane Roe had indicated to Dr. Ricanati that she was the victim of sexual assault.  Dr. Ricanati is a "mandatory reporter" and would be required to pass that information on to the Title IX Office.

    b. Dr. Ricanati refers to Jane Roe's report as an "incident posted to Instagram."  On information and belief, he was referring to the Instagram page regarding CWRU's Title IX problems described *supra*.

58. On November 11, 2020, Jane Roe indicated to the Title IX investigators that she did not want to move forward with a formal complaint, but simply wanted a no-contact directive.

59. On November 12, 2021, John Noakes indicated to the Title IX Office that he did not wish to proceed with an investigation against Jane Roe.  However, John Noakes was clear that he may choose to move forward at a later date.  John Noakes requested the imposition of a No Contact Directive.

60. On December 24, 2020, Jane Roe sent an email to the Office of Equity indicating that she now wished to move forward with a formal complaint.  On January 7, 2021, Jane Roe signed a formal complaint against John Noakes.

61. John Noakes was notified of the formal complaint on January 11, 2021.  The reason for the delay is unexplained.

62. The Title IX investigator indicated that the alleged sexual misconduct would not strictly fall under the Title IX Policy because, consistent with the federal regulations, it occurred off-campus.  However, the investigation was conducted by the Office of Equity.  On information and belief,

CWRU made the determination that the Title IX process did not apply in an effort to avoid many of the due process guarantees contained in the 2020 federal regulation.

63. On January 19, 2021, John Noakes was interviewed by the Title IX investigators. During that interview, he indicated that he was being excluded from educational opportunities because of the allegations and harassment from other students. John Noakes expressed similar concerns to Dr. Ricanati and other faculty members later that month. Dr. Ricanati told John Noakes that he should get therapy, and that to suggest that therapy is unnecessary is "medically uninformed" and "toxic masculinity."

64. On February 8, 2021 John Noakes again informed the investigators that he was being harassed and retaliated against and requested interim supportive measures.

   a. On information and belief, most of the medical school class and faculty was aware of Jane Roe's allegations against John Noakes. John Noakes generally did not discuss the matter. However, on information and belief, Jane Roe and her friends continued to disparage John Noakes and suggest that he had engaged in sexual misconduct.

   b. John Noakes indicated to the CWRU investigators that the conduct of Jane Roe and her friends has resulted in his exclusion from the curriculum and that he is unable to participate fully in his education.

   c. Faculty at the Medical School, with the knowledge of Dr. Ricanati, made efforts to ostracize John Noakes. For example, in February 2021 John Noakes was not to be paired with another medical student for ultrasound, as was the practice for every other medical student.

65. On February 19, 2021, Jane Roe violated the no contact directive by attempting to FaceTime John Noakes. John Noakes immediately reported this violation to the Office of Equity. The Office of Equity decided that the contact was an "accident" and took no further action.

19

66. On March 19, 2021, John Noakes was provided with a "Final Investigation Report."  This report included three additional pages of statements by Jane Roe.

67. On April 8, 2021 CWRU held a hearing.  At the hearing Jane Roe, John Noakes, and five witnesses were present.

68. The panel found John Noakes "not responsible" for violating the Title IX Policy.

69. On April 15, 2021 John Noakes was provided with a letter describing the outcome of the hearing.  The Panel found that John Noakes's was "genuine and honest" and that the panel "had no reason to believe [John Noakes] was being deceptive or dishonest."  The Panel added, "[John Noakes] provided to reason for the Board to question his credibility."

70. Jane Roe appealed the decision.  Jane Roe argued that the panel "failed to take into account the trauma" she experienced because of the Incident and that the panel failed to recognize that John Noakes had "a reason to lie."  That appeal was denied.  Notably, the Appeal Panel remarked that the "Respondent's responses seemed genuine and honest [and] there was no reason to believe that [John Noakes was] being dishonest or deceptive or had a reason to lie."

**THE RETALIATION AGAINST JOHN NOAKES**

71. Immediately after he learned of the result of the hearing panel, on April 15, 2021 at 4:38 pm, John Noakes posted on a GroupMe group chat used by the Medical School.  He posted, "All glory and honor to the Most High, who is my refuge and fortress. That's all, thanks."  John Noakes also changed his name to "[John Noakes] (1-0)."

    a. John Noakes was immediately removed from the GroupMe chat group by another student who acted as a group moderator.  This had the effect of excluding John Noakes from class discussions and the vast majority of communication from class student representatives regarding curricular activities.

20

b.   Other students responded with comments critical of John Noakes, including "God don't like ugly."

c.   A copy of the GroupMe Chat set forth here:



a.   Two students submitted complaints to the School of Medicine.  Both complaints criticized John Noakes for participating in the grievance process and constituting harassment against John Noakes because he had defended himself in the Title IX process.

d.   One complaint said, "The student bragged about winning a sexual assault case blatantly in front of the entire class on GroupMe. He showed zero regard for public decency and his facts/his motives seem to be directed toward rubbing it in the face of his accusers."

    e. Another complaint said, "Following the decision for an institutional sexual assault case in favor of this student, they posted in the class GroupMe in a retaliatory, bullying, and unprofessional manner…. Given that this statement was made after an institutional case was decided in his favor, I am concerned that he will act in an even more erratic and unprofessional way."

    f. Additional complaints – as many as 30 – followed. On information and belief, Jane Roe encouraged students to submit complaints about John Noakes. One of the complaints allegedly said, "It should not matter if [Jane Roe] could not prove it. I know something bad happened."

72. At 6:43 pm, John Noakes received an email from Darnell Parker, the Senior Associate Vice President for Equity requesting an "urgent conversation" this evening.

    a. John Noakes and his advisors participated in a Zoom call with Parker.

    b. Parker was visibly upset with the outcome of the hearing panel.

    c. Parker said that he had received "complaints" but would not disclose the sources. On information and belief, Parker was acting after consulting with, and at the behest of, Dr. Ricanati.

    d. During the Zoom call, Parker sought to intimidate John Noakes. Parker admitted that John Noakes had not violated any school rules or policies in his posts and that he was free to discuss the Title IX process with anyone. Parker told John Noakes that he needed to "watch himself." Parker then hung up on John Noakes and his attorneys.

73. Following the panel decision, John Noakes continued to be the subject of harassment from other students as a result of his participation in the Title IX process which interfered with his education.

    a. One of Jane Roe's friends referred to John Noakes as "scum of the earth" while John Noakes was attempting to lead a group discussion.

      b.   Students circulated a "petition" encouraging their classmates to refuse to work with John Noakes and demanding that "the School of Medicine ought to take clear and decisive action by expelling [John Noakes]." When John Noakes reported this to the School of Medicine, Dr. Ricanati spoke with one involved student but refused to take disciplinary action.

74. On April 16, 2021 Dr. Ricanati and other administrators sent a whole-school email stating that, "your words have consequences."  He stated that students could face discipline for "gloating over the misfortune of others."

75. On April 19, 2021, Dr. Ricanati called John Noakes.  Dr. Ricanati appeared to be upset about outcome the Title IX process and threatened John Noakes with institutional discipline for undisclosed inappropriate conduct.  Dr. Ricanati attempted to interrogate John Noakes about his GroupMe post but refused to tell John Noakes which, if any, rules were broken. Dr. Ricanati then abruptly hung up this phone call after John Noakes sought to conference in his advisor.  Dr. Ricanati stated that he was "not interested" in talking with John Noakes in the presence of an advisor.

76.

77. After this phone call ended, Dr. Ricanati emailed John Noakes and requested a meeting that same day outside of the presence of an advisor.  In this email, Dr. Ricanati continued to threaten John Noakes with disciplinary action, stating that "the [disciplinary] process will move forward without your initial input".

78. On April 19, 2021 John Noakes submitted a retaliation complaint against Dr. Ricanati and Dr. Parker with the Office of Equity.

a.  When John Noakes suggested that Dr. Ricanati should not be involved in his matter following the retaliation complaint, Dr. Ricanati refused to remove himself from the situation but, instead, told John Noakes to call the Office of General Counsel.

b.  The retaliation complaint was forwarded to another Vice President and, ultimately, CWRU retained outside counsel to conduct an investigation.

c.  John Noakes requested, but was not provided with, interim supportive measures.  In particular, he requested that any disciplinary process put in motion by Dr. Ricanati be stayed pending the results of the retaliation investigation; this request was not granted.

79.  On April 21, 2021, Dr. Ricanati informed John Noakes that Dr. Marjorie Greenfield, his subordinate, would be in touch about the disciplinary process.  Dr. Greenfield subsequently interrogated John Noakes about his GroupMe post.  She referenced the finding of the Title IX Panel and accused John Noakes of "purposefully misinterpreting why people are upset."

80.  On April 21, 2021 Dr. Ricanati sent an email to a close friend of Jane Roe.  This student later shared the email with the entire medical school class, except John Noakes.  Dr. Ricanati referenced the Title IX case against John Noakes and encouraged the student to invite other students to a meeting to discuss various topics, including "the CWRU Title IX process" and "Identify[ing] potential action items."  John Noakes was not informed of the meeting by Dr. Ricanati or any other CWRU faculty.  A copy of the message is here:



81. On April 27, 2021 John Noakes was informed that his matter would be referred to the COS for disciplinary action, including possible dismissal.  The previous day, John Noakes had complained to Dr. Greenfield that the actions of Parker and Ricanati may be retaliatory in nature and specifically objected that review by the COS appeared to be retaliatory.  He was told by that "the medical school will proceed with the process without your active participation."

82. Over the next several weeks, John Noakes objected to a number of CWRU officials that the COS process was retaliatory.  John Noakes requested that the COS process be stayed as an interim, supportive, measure while his retaliation complaints were investigated.  No action was taken.

    a. On April 27, 2021, John Noakes reached out to Shirley Mosley, Dean of Students, to halt the retaliatory activity. Shirley Mosley took note of this concern, but no action was taken.

b. On April 28, 2021, John Noakes reached out to CWRU Vice President Robert Solomon. John Noakes was notified that Solomon was on vacation and that he would address John Noakes's request upon return. John Noakes never received a response.

c. On April 30, 2021, John Noakes reached out to Parker.  Parker replied that "all questions and concerns should be directed to [the external investigators]."  John Noakes proceeded to reach out to the investigators by email.  His requests were ignored.  During a subsequent interview related to the retaliation complaint against Dr. Parker and Dr. Ricanati, John Noakes requested that the investigators intervene to halt the COS process on an interim basis. No action was taken.

83. On May 6, 2021, John Noakes met with Dr. Greenfield.  During this meeting, Dr. Greenfield indicated that that she was acting at the direction of Dr. Ricanati, stating, "he's my boss".

a. Dr. Greenfield informed John Noakes that the School of Medicine will be conducting a review of John Noakes's Title IX decision to determine if any additional disciplinary sanctions need to be issued.

b. John Noakes attempted to conference in his advisor.  Dr. Greenfield informed John Noakes that she was barred from discussing this matter with his advisor because his advisor was an attorney.

c. Dr. Greenfield accused John Noakes of not having "empathy" in regards to his dispute with Jane Roe and his GroupMe post.  She told John Noakes that "if you can show insight into how other people may have been affected, and you can show empathy for other people, then [the COS] will not kick you out of school."  Dr. Greenfield acknowledged that the COS would not be reviewing his matter had there been no Title IX proceedings.

84. On May 13, 2021, John Noakes appeared before the COS.  The committee interrogated John Noakes and asked him how he expects to finish his medical school curriculum in light of the

dispute with Jane Roe.  The COS did not expel John Noakes.  However, John Noakes was ordered to undergo empathy coaching and provide a letter from a behavioral therapist stating that he is receiving therapy.

85. Dr. Greenfield attempted to coerce and pressure John Noakes to take the next year off in order to accommodate the desires of Jane Roe.  On July 28, 2021, Dr. Greenfield asked via email about his decision, stating, "once it is definite please let me know if it is OK to tell [Jane Roe]. She has been asking about her assignments this year."  When John Noakes informed Dr. Greenfield that he did not wish to delay his education, Dr. Greenfield responded that, "It seemed like a great opportunity! … and would naturally separate you from [Jane Roe]. If people are advising not to do it because it seems like 'caving' or like admitting something, I would totally disagree. You have a terrific opportunity, AND we can't predict how inflamed the class is."

86. On August 19, 2021 the COS again had a hearing concerning John Noakes.  John Noakes did not participate in this meeting.  John Noakes was required to continue with "coaching for the remediation of professionalism lapses and present a new reflection at the November COS meeting."

87. During the summer of 2021, Parker left CWRU.  He was replaced as CWRU Title IX Coordinator by Rachel Lutner.

88. On August 25, 2021, John Noakes was informed by Lutner that CWRU was imposing a new No Contact Directive, "at the request of [Jane Roe]".

   a. This new No Contact Directive imposed onerous and punitive restrictions on John Noakes and interfered with his ability to participate fully in his education.  John Noakes's movement was restricted to the southwest sections of the medical school campus and all classrooms; he was only permitted to use the southwest stairwell.  John Noakes was also barred from posting on social media about his Title IX case.

27

    b.   Similar restrictions were placed on Jane Roe.

89. On August 27, 2021, and August 30, 2021, John Noakes reported two violations of the No Contact Directive by Jane Roe.  John Noakes subsequently submitted evidence and photographs proving that Jane Roe was not complying with the No Contact Directive and suggested that she was deliberately attempting to provoke him.

    a.   On August 30, 2021, Lutner informed John Noakes that CWRU would not be taking any action regarding the violations that he reported.  Lutner decided to revoke the updates to the NCD, stating only that CWRU expected John Noakes and Jane Roe to "stay as far away from each other as possible."

    b.   Lutner informed John Noakes that Jane Roe had alleged that John Noakes had committed multiple violations.  John Noakes denied any violations and suggested that the allegations were false and retaliatory.  John Noakes requested details of the allegations so he could provide evidence that they were fabricated; Lutner refused to tell John Noakes the details of the alleged violations.

90. Beginning in early August 2021, when school re-started, Jane Roe and her friends engaged in a pattern of harassing and intimidating behavior.  John Noakes complained to Lutner about that this conduct was interfering in his ability to complete his education and requested interim supportive measures.  Lutner informed John Noakes that CWRU would not be taking any action related to these alleged violations.

91. John Noakes recounted the persistent violations, stalking, and intimidating behavior to his empathy coaches.  John Noakes was so distraught by the situation that he was in tears.  He was informed that he should accept the situation and not expect the situation to change in the next year.  John Noakes was told that CWRU would not help him but that, instead, he should instead "put his blinders on" while on campus.

28

92. On August 31, 2021, John Noakes emailed Lutner about the harassment from Jane Roe and retaliation from others.

    a. John Noakes indicated that he wished for CWRU to investigate his initial complaint against Jane Roe.

    b. John Noakes indicated that he wished for CWRU to investigate the pattern of harassment and intimidation by Jane Roe.

    c. John Noakes indicated that he wished CWRU to investigate retaliation against him as a result of his participating in the Title IX process.

    d. John Noakes indicated that he wanted interim supportive measures.

93. On September 1, 2021, John Noakes again met with Dr. Greenfield.  She informed them that she had been talking to Doe's empathy coaches and that she hears that "things are not going well."

    a. John Noakes recounted the persistent violations, stalking, and intimidating behavior by Jane Roe to Dr. Greenfield.  In response, Dr. Greenfield said that she feels sorry that John Noakes did not take a year off; she suggested that taking a year off was the "only solution."

    b. Dr. Greenfield stated that Title IX only makes things worse, and even though it is the "legal thing to do," that John Noakes should not pursue Title IX or consult lawyers.  Dr. Greenfield indicated that even though "this is unfair" to John Noakes, in the end Title IX "only creates a toxic environment." She warned that bad things could happen to John Noakes if he pursues his Title IX complaint against Jane Roe.

94. On September 3, 2021, John Noakes and his advisor spoke with Lutner.  John Noakes indicated his desire to move forward with his Title IX complaint against Jane Roe.

95. On September 3, 2021, John Noakes received a copy of the report on his allegations of retaliation by Parker.  The investigation was woefully incomplete and unduly delayed.  The delay likely has caused memories to fade and evidence to disappear.

a.   The investigator focused exclusively on the Zoom conference between Parker, John Noakes, and John Noakes' advisors and did not investigate the broader pattern of retaliation.

b.   Even though the investigator believed that the Zoom conference was important (and it was), the investigators never interviewed all of the participants on the conference.

c.   The investigator failed to obtain evidence that would confirm or dispel Parker's claimed motivation.  In particular, the investigator does not appear to have sought evidence related to communications between Parker and Ricanati that resulted in the decision to reach out to the John Noakes. Parker and Ricanati were not interviewed about any conversations and any electronic communications between the two on that evening was not requested.

d.   The investigator never verified whether any complaints from students actually existed or sought to determine whether any such complaints (if they did exist) may have been motivated by an improper retaliatory purpose.

96. On September 7, 2021 John Noakes spoke with Dr. Greenfield.

a.   Dr. Greenfield wanted to discuss information an unidentified person has posted about Jane Roe on 'Tumblr,' a practically defunct microblogging website.  John Noakes had no specific knowledge of any Tumblr post (other than a brief and nondescript mention by another medical student) and initially thought Dr. Greenfield was referring to yet another petition from Jane Roe and her friends to have him removed from the school.

i.   Dr. Greenfield did not provide any further information about the alleged Tumblr post (such as a link) nor did Dr. Greenfield explain how the posts would violate any CWRU rule or policy.  Dr. Greenfield told John Noakes that even if someone else was posting information online, it was his responsibility to "de-escalate" the situation.

     ii. Dr. Greenfield threatened that John Noakes could get in trouble for the Tumblr post, even if was done without his knowledge, suggesting that it was "yet another assault on [Jane Roe]."

     iii. John Noakes was subsequently provided with a link to the Tumblr.  The Tumblr does not mention Jane Roe by name; the Tumblr includes information about the relationship between John Noakes and Jane Roe and is critical of the CWRU Title IX process.  The Tumblr claims to be directed "To the students in [John Noakes'] class, whether you remained silent or participated in the distortion campaign."  In a separate post, the author explains that "The medical school refused to accept the Title IX decision so they did an additional review of the investigation report of the title IX process."

b. During the phone call, John Noakes told Dr. Greenfield that he did not want to take a year off from his medical school studies. Dr. Greenfield responded to John Noakes, "the only way out of this for you… is… [to] step into a different class."

c. During the phone call, Dr. Greenfield tried to convince John Noakes to not pursue his Title IX Complaint against Jane Roe and threatened him with discipline if he did not comply.

     i. Dr. Greenfield told John Noakes, "you need to not make your own Title IX report… You need to just hunker down and do your own stuff if you're going to stay in the class."

     ii. Dr. Greenfield told John Noakes that in response to continued harassment from Jane Roe, he should "do the Martin Luther King approach, you know, just turn the other cheek."

31

    d.  During the phone call, Dr. Greenfield tried to convince John Noakes to not pursue his retaliation complaints.

        i.  Dr. Greenfield told John Noakes that the retaliation complaints were "ill advised."

        ii.  Dr. Greenfield told John Noakes, "Even if the unfairness of the situation is galling, I think what's going to be in your interest… to just say I'm just going to accept it as it is."

    e.  During the phone call, Dr. Greenfield threatened John Noakes with further disciplinary action if he continued with his Title IX complaints or continued to object to unfair and retaliatory treatment.

        i.  Dr. Greenfield told John Noakes, "You're digging yourself a hole, honey."

        ii.  Dr. Greenfield told John Noakes, "I can't protect you.  You know, you have to make a decision about how you're going to behave through this, and I think you are making some poor decisions…."

        iii.  Dr. Greenfield told John Noakes that he needed to stop "looking like you're causing problems."  She added, "I know it doesn't feel fair.  I know you feel like you know that things aren't being done in a fair way, but I'm just talking from a practical sense."

97. On September 8, 2021, John Noakes sent an email to Lutner.  In the email, John Noakes stated "I want to inform you that Dr. Greenfield, my society dean, has just called me and is attempting to coerce me into backing out of my Title IX complaint filed against [Jane Roe]."  John Noakes also requested more information about the alleged Tumblr post.  Lutner refused to investigate the Tumblr post.

98. On September 10, 2020 Lutner sent an email to John Noakes about the Tumblr.  She acknowledged that the Tumblr was not from John Noakes, but from a "person who described

him/herself as very close to you…" and suggested the Tumblr was from Noakes' current girlfriend.  Lutner said that John Noakes must "investigate who might be responsible for these Tumblr posts and ask them to stop."  She threatened him with discipline if the author of the Tumblr (who, again, is not John Noakes) did not stop.  John Noakes responded, "I have no knowledge of who is making the Tumblr posts and have not directed anyone to make such posts. I am under no obligation to investigate the conduct of other people. Nor can I be held responsible for the conduct of others."

99. On September 10, 2020 Lutner informed John Noakes that CWRU would not be investigating or taking any action in response to his complaints against Jane Roe.

    a.   Lutner claimed that Jane Roe's threats to file a Title IX complaint are not prohibited by the policy because she "subsequently filed a Title IX complaint which was sufficiently substantive to warrant an investigation and subsequent hearing."  Lutner also claimed that Jane Roe's pattern of conduct did "not constitute sexual harassment, which is the only kind of harassment prohibited by the Policy" because …. her communications "are based on the state of the relationship with you and her self-perception."

    b.   Lutner claimed that Jane Roe's pattern of harassment in August 2021 was not harassment "based on sex" and did not make John Noakes fearful, but failed to consider whether Jane Roe's conduct caused John Doe mental distress or was retaliatory.

    c.   John Noakes appealed this decision; no response has been received as of the date of the Complaint.

100. On September 10, 2020 Lutner also informed John Noakes that Jane Roe's complaints against John Noakes related to the Groupme post would not be pursued by the Title IX Office.

a. This decision was unduly delayed, considering that no investigation occurred and Parker had admitted during the Zoom conference that John Doe had not violated any CWRU policies.

b. Lutner determined that the post did not violate any No Contact Directive in place at the time.

c. Lutner determined that the Groupme post did not constitute prohibited retaliation.

d. Lutner indicated that the matter would be referred to the Medical School for disciplinary action. She wrote:

> Notwithstanding that the name change… neither violated the No Contact Directive nor the retaliation provisions of the Interim Sexual Harassment Policy, your conduct certainly could be interpreted as unprofessional and may violate other university professionalism requirements. Your conduct had the effect of violating your obligation to respect the confidentiality of the process, sharing private information with your class, and creating chatter about a manner which professionalism dictates you behave discreetly.

101. The failure of CWRU and the Medical School to adequately respond to the harassment from Jane Roe has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career. John Noakes's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages.

102. The failure of CWRU and the Medical School to adequately respond to the retaliation against John Noakes has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career. John Noakes's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including

attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages.

## COUNT I
## (VIOLATION OF TITLE IX – RETALIATION)

103.    Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

104.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

105.    The Title IX regulations promulgated by the Department of Education provide that "No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing…"

106.    Retaliation against a person because that person has complained of sex discrimination is a form of intentional sex discrimination encompassed by Title IX's private cause of action. When a funding recipient retaliates against a person because the person participates in the investigation of allegations of sexual misconduct, this constitutes intentional discrimination on the basis of sex in violation of Title IX.

107.    John Noakes engaged in protected activity in a number of ways:

    a.   John Noakes participated in various Title IX investigative and adjudicatory process.  Jane Roe had filed numerous sexual misconduct complaints against John Noakes.  John Noakes participated and provided evidence in the investigations and adjudication of Jane Roe complaints.

35

    b.   John Noakes submitted a complaint for retaliation with the Title IX Coordinator for the conduct of Ricanati and Parker in spring 2021.

    c.   John Noakes submitted a complaint of retaliation against Greenfield in fall 2021.

    d.   In Fall 2021, John Noakes requested that CWRU complete the investigation of his allegations against Jane Roe that had originally submitted in fall 2020.

    e.   John Noakes submitted a complaint that Jane Roe violated the terms of a No Contact Order.

    f.   John Noakes objected to various restrictions placed on his movements and activities as a result of complaints by Jane Roe.

108.   Despite the fact that the hearing panel exonerated John Noakes for claims that he violated the Title IX Policy, administrators at CWRU continue to treat John Noakes as 'guilty' and Jane Roe as a victim. Jane Roe's appeal was rejected, making the decision of the hearing panel final.

109.   John Noakes has been subjected to and threatened with diverse disciplinary or other adverse actions subsequent to or contemporaneous with the protected activity.

    a.   John Noakes was compelled to appear before the COS even though the COS process to review Title IX allegations is not described in the school's Title IX Procedure and, thus, constitutes clear procedural irregularities in CWRU's College's response to the allegations of sexual misconduct which will permit a plausible inference of sex discrimination.

    b.   John Noakes has been investigated for various patently frivolous and pretextual allegations of misconduct. Many of the allegations made against John Noakes, even if true, would not be violations of any CWRU rules or policies.

    c.   John Noakes was coerced to take a leave of absence from the school.

110.   The adverse actions against John Noakes are directly related to his participation in the Title IX process and was deigned to punish and intimidate John Noakes.

111.    As a direct and proximate result of defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

112.    CWRU is liable to John Noakes for his damages.

113.    Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## COUNT II
## (VIOLATION OF TITLE IX – DELIBERATE INDIFFERENCE)

114.    Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

*115.*    Title IX is enforceable through an implied private cause of action.

116.    John Noakes, as described *supra*, informed CWRU officials that he was the subject of discriminatory harassment from Jane Roe.

    a.   The conduct of Jane Roe constitutes 'stalking,' which is prohibited by the Title IX Policy.

    b.   The conduct of Jane Roe constitutes retaliation, which is prohibited by the Title IX Policy.

    c.   The conduct of Jane Roe constituted intentionally false and malicious allegations, which is prohibited by the Title IX Policy.

117.    John Noakes, as described *supra*, informed CWRU officials that he was the subject of retaliation from Parker, Ricanati, and Greenfield.

118.    CWRU officials who have the authority to address the alleged discrimination and to institute corrective measures on John Noakes' behalf had actual knowledge of Jane Roe's conduct and failed to correct such behavior in a timely manner that amounts to deliberate indifference.

119.    CWRU officials who have the authority to address the alleged retaliation and to institute corrective measures on John Noakes' behalf had actual knowledge of the retaliation and failed to correct such behavior in a timely manner that amounts to deliberate indifference.

120.    CWRU officials, including Dr. Ricanati and Parker, were disappointed in the result of the title IX process and believed that John Noakes was guilty.  CWRU permitted John Noakes to be harassed by other students because he defended himself in the school process.

121.    As a direct and proximate result of defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

122.    Particular circumstances suggest that gender bias was a motivating factor. These circumstances include:

    a.  Throughout the pendency of the disciplinary proceedings against John Noakes, the there was substantial criticism of CWRU, both in the student body and in the public media, accusing CWRU of not taking seriously complaints of female students alleging sexual assault by male students.  CWRU was under pressure from students and the community to combat vigorously sexual assault against women on and the severe potential punishment—loss of all federal funds—if CWRU was found to not be in compliance with federal mandates yields a reasonable inference" of sex discrimination. Dr. Ricanati, in

particular, referred to the Instagram page when he reported Jane Roe's claim to the Office of Equity.

b.  A general atmosphere at the School of Medicine where those who lodge a complaint of sexual assault are immediately treated as "survivors."  This general atmosphere is a direct result of pressure on CWRU from OCR, DOJ, student groups, and public opinion.

c.  The adjudication of the claims against John Noakes occurred at the time that CWRU officials were under pressure from students to adopt a more aggressive approach to issues of sexual assault on campus and to "believe survivors."

123.  CWRU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, CWRU and its agents demonstrated and acted on pervasive gender bias.

124.  John Noakes has been deprived of access to educational opportunities at CWRU.

125.  CWRU is liable to John Noakes for his damages.

126.  Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## COUNT III
## (BREACH OF CONTRACT)

127.  Plaintiffs repeat and incorporate the allegations contained in ¶¶ 9-44 of this Complaint, as if fully set forth herein

128.  The relationship between John Noakes and CWRU is governed by a number of policies and the Student Handbook.  By enrolling at CWRU, and paying his tuition and fees, and attending the school, John Noakes and CWRU had a relationship that may reasonably be construed as being contractual in nature.  The terms of the contract between John Noakes and CWRU are generally found in the Student Handbook as well as various CWRU policies and procedures.

129.   The alleged breaches concern the following contractual provisions:

    a.   The CWRU Title IX Policy provisions concerning retaliation.

    b.   The Code of Conduct provisions concerning retaliation.

    c.   The Title IX policy requiring supporting measures.

130.   CWRU has breached these contracts by failing to investigate and respond to allegations of sexual harassment and retaliation and failing to provide supportive measures.

131.   CWRU has breached these contracts by continuing investigations and imposing restrictions on John Noakes that are clearly retaliatory and baseless.

132.   The contract between John Noakes and CWRU contains an implied covenant of good faith and fair dealing.  This implied covenant prohibits CWRU from doing anything which will have the effect of destroying or injuring the right of John Noakes to receive the fruits of the contract.

133.   As a direct and proximate result of defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

134.   CWRU is liable to John Noakes for his damages.

***Wherefore***, Plaintiff seeks the following relief from the Court:

- Judgment in favor of John Noakes on all counts.
- Pursuant to Fed. R. Civ. P. 65, a Preliminary Injunction prohibiting further disciplinary proceedings in a manner that violates Title IX or the contract between the parties.
- A Permanent Injunction prohibiting further disciplinary proceedings in a manner that violates Title IX or the contract between the parties.
- Judgment in favor of John Noakes awarding damages in an amount to be determined at trial;

- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Anne Tamashasky (OH 0064393)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

41

## VERIFICATION

[John Noaakes], being duly sworn, does depose and state as follows:  I am the John Noakes identified in the Complaint.  I have reviewed this Complaint. I have personal knowledge of my actions and the action of CWRU in regard to the matters described in this Complaint.  The averments of the Complaint in regard to these matters are true and correct to the best of my knowledge.

Pursuant to 28 U..S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of September 2021.



[REDACTED] a/k/a John Doe

42