Exhibit B

# INTERIM SEXUAL HARASSMENT POLICY AND PROCEDURES FOR ALL FACULTY, STUDENTS, EMPLOYEES, AND THIRD PARTIES

Case Western Reserve University

**Title:** Interim Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties

**Effective date:** August 14, 2020

**Responsible Official:** Senior Associate Vice President for Equity

**Responsible University Office:** Office of Equity

**Revision History:** 2014, 2016

**Related legislation and University policies:** Title IX of the Education Amendments of 1972

**Review Period:** 5 Years

**Date of Last Review:** 2020

**Relates to:** All Faculty, Students, Employees, and Third-Parties

# Table of Contents

| | |
|---|---|
| Table of Contents | 3 |
| I.    INTERIM POLICY | 8 |
| A. Application | 8 |
| B. The Title IX Coordinator | 9 |
| C. Terminology | 10 |
| D. Independence and Conflict-of-Interest | 12 |
| E. Supportive Measures | 12 |
| F. Emergency Removal | 13 |
| G. Jurisdiction of CWRU | 14 |
| H. Promptness | 15 |
| I. Time Limits on Reporting | 16 |
| J. Online Harassment and Misconduct | 16 |
| K. Sexual Harassment | 16 |
| L. Consent, Coercion, and Incapacitation | 20 |
| M. Relationships Involving Authority or Power | 21 |
| N. Retaliation | 22 |
| O. Mandated Reporting | 22 |
| 1. Confidential Resources | 23 |
| 2. Mandated Reporters and Formal Notice/Complaints | 23 |
| P. When a Complainant Does Not Wish to Proceed | 24 |
| Q. Federal Timely Warning Obligations | 25 |
| R. False Allegations and Evidence | 26 |
| S. Amnesty for Complainants and Witnesses | 26 |
| T. Federal Statistical Reporting Obligations | 27 |
| U. Academic Freedom | 27 |
| II. INTERIM RESOLUTION PROCESS FOR ALLEGED VIOLATIONS OF THE POLICY ON SEXUAL HARASSMENT (KNOWN AS PROCESS "A") | 28 |
| A. Notice/Complaint | 28 |
| B. Initial Assessment | 29 |
| 1.    Violence Risk Assessment | 30 |
| 2.    Dismissal (Mandatory and Discretionary) | 30 |
| C. Counterclaims | 31 |

D. Right to an Advisor                                                                      32

   1. Who Can Serve as an Advisor                                              32

   2. Advisor's Role in Meetings and Interviews                               32

   3. Advisors in Hearings/University-Appointed Advisor                       33

   4. Pre-Interview Meetings                                                  33

   5. Advisor Violations of Recipient Policy                                  33

   6. Sharing Information with the Advisor                                    34

   7. Privacy of Records Shared with Advisor                                  34

   8. Expectations of an Advisor                                              34

   9.  Expectations of the Parties with Respect to Advisors                   34

   11. Assistance in Securing an Advisor                                      35

E. Resolution Processes                                                                    35

   1. Informal Resolution                                                     35

     a. Alternate Resolution                                           36

     b. Respondent Accepts Responsibility for Alleged Violations       36

     c. Negotiated Resolution                                          37

F. Grievance Process Pool                                                                   37

   2. Investigator, Panel Member Appointment, and Advisor                     38

   3. Pool Member Training                                                    38

G. Formal Grievance Process: Notice of Investigation and Allegations                        39

H. Resolution Timeline                                                                      40

I. Appointment of Investigators                                                             40

J. Ensuring Impartiality                                                                    40

K. Investigation Timeline                                                                   41

L. Delays in the Investigation Process and Interactions with Law Enforcement                41

M. Steps in the Investigation Process                                                       41

N. Role and Participation of Witnesses in the Investigation                                 43

O. Recording of Interviews                                                                  43

P. Evidentiary Considerations in the Investigation                                          44

Q. Referral for Hearing                                                                     44

R. Hearing Decision-maker Composition                                                       44

S. Evidentiary Considerations in the Hearing                                                44

T. Notice of Hearing                                                                        45

4

U. Alternative Hearing Participation Options — 46

V. Pre-Hearing Preparation — 46

X. Pre-Hearing Meetings — 47

Y. Hearing Procedures — 48

Z. Joint Hearings — 48

AA. The Order of the Hearing – Introductions and Explanation of Procedure — 49

AB. Investigator Presents the Final Investigation Report — 49

AC. Testimony and Questioning — 49

AD. Refusal to Submit to Cross-Examination and Inferences — 50

AE. Recording Hearings — 50

AF. Deliberation, Decision-making, and Standard of Proof — 51

AG. Notice of Outcome — 51

AH. Sanctions — 52

AI. Sanctioning Guidelines — 53

AJ. Withdrawal or Resignation While Charges Pending — 54

AK. Appeals — 55

   1. Grounds for Appeal — 55

   2. Sanctions Status During the Appeal — 56

   3. Appeal Considerations — 57

AL. Long-Term Remedies/Other Actions — 57

AM. Failure to Comply with Sanctions and/or Interim and Long-term Remedies and/or Responsive Actions — 58

AN. Recordkeeping — 58

AO. Statement of the Rights of the Parties — 59

See Appendix A. — 59

AP. Disabilities Accommodations in the Resolution Process — 59

AQ. Revision of this Policy and Procedures — 59

III. INTERIM RESOLUTION PROCESS FOR ALLEGED VIOLATIONS OF THE POLICY ON SEXUAL HARASSMENT WHERE PROCESS "A" IS NOT APPLICABLE (KNOWN AS PROCESS "B") — 61

A. Initial Assessment — 61

B. Resolution Process Pool — 63

C. Counterclaims — 63

D. Advisors — 63

1. Expectations of an Advisor                                                                    63

2. Expectations of the Parties with Respect to Advisors                         64

3. Assistance in Securing an Advisor                                                        64

E. Resolution Options                                                                                 64

1. Informal Resolution                                                                               65

a. Alternate Resolution                                                                            65

b. Respondent Accepts Responsibility for Alleged Violations            65

c. Negotiated Resolution                                                                        66

2. Administrative Resolution                                                                   66

F. Investigation                                                                                          68

G. Determination                                                                                       69

H. Additional Details of the Investigation Process                                70

1. Witness responsibilities                                                                      70

2. Remote processes                                                                              71

3. Recording                                                                                            71

4. Evidence                                                                                             71

5. Sexual history/patterns                                                                      71

6. Previous allegations/violations                                                          71

7. Character witnesses                                                                           71

8. Notification of outcome                                                                      72

I. Sanctions                                                                                              72

J. Sanctioning Guidelines                                                                        74

K. Withdrawal or Resignation While Charges Pending                          74

L. Appeals                                                                                               75

1. Grounds for Appeal                                                                             75

2. Sanctions Status During the Appeal                                                   76

3. Appeal Considerations                                                                       77

M. Long-Term Remedies/Other Actions                                                 77

N. Failure to Comply with Sanctions and/or Interim and Long-term Remedies and/or
Responsive Actions                                                                                78

O. Recordkeeping                                                                                    78

P. Statement of the Rights of the Parties                                               78

Q. Disabilities Accommodations in the Resolution Process                   79

R. Revision of this Procedure                                    79

Appendix A: Statement of Rights of the Parties                  80

# I.   INTERIM POLICY

## A. Application

The core purpose of this policy is the prohibition of all forms of sex-based discrimination. Sometimes, discrimination involves exclusion from or different treatment in activities, such as admission, athletics, or employment. Other times, discrimination takes the form of harassment or, in the case of sex-based discrimination, can encompass sexual harassment, sexual assault, stalking, sexual exploitation, dating violence or domestic violence. When an alleged violation of this anti-discrimination policy is reported, the allegations are subject to resolution using Recipient's "Process A" or "Process B," as determined by the Title IX Coordinator, and as detailed below.

When the Respondent is a member of the Recipient community, a grievance process may be available regardless of the status of the Complainant, who may or may not be a member of the Recipient community. This community includes, but is not limited to, students, student organizations, faculty, administrators, staff, and third parties such as guests, visitors, volunteers, invitees, and campers. The procedures below may be applied to incidents, to patterns, and/or to the campus climate, all of which may be addressed and investigated in accordance with this policy.

8

## B. The Title IX Coordinator

Inquiries concerning the application of Title IX may be directed to the Title IX Coordinator for the university or to the Assistant Secretary for the Office of Civil Rights of the Department of Education. The Title IX Coordinator is:

Darnell T. Parker, Ed.D.
Senior Associate Vice President for Equity
University Title IX Coordinator
Section 504 Coordinator
Adelbert Hall 110
10900 Euclid Avenue
Cleveland, Ohio  44106
216-368-3066
darnell.parker@case.edu
http://www.case.edu/equity/

Reports may be directed to the Office of Civil Rights, United States Department of Education, http://www.ed.gov/about/offices/list/ocr/index.html. Individuals experiencing harassment or discrimination also always have the right to file a formal grievance with the government authorities;

Office of Civil Rights (OCR)
400 Maryland Avenue, SW
Washington, DC 20202-1100
Customer Service Hotline#: 1-800-421-3481
Fax: (202) 453-6012
TDD: (877) 521-2172
Email: OCR@ed.gov/ocr

Cleveland Office
Office of Civil Rights
U.S. Department of Education
1350 Euclid Avenue, Suite 325
Cleveland, OH 44115-1812
Telephone: (216) 522-4970
Fax: (216) 522-2573;
TDD: (800) 877- 8339
Email: OCR.Cleveland@ed.gov

9

## C. Terminology

- *Advisor* means a person chosen by a party or appointed by the institution to accompany the party to meetings related to the resolution process, to advise the party on that process, and to conduct cross-examination for the party at the Process "A" hearing, if any.

- *Complainant* means an individual who is alleged to be the victim of conduct that could constitute sexual harassment or retaliation for engaging in a protected activity.

- *Complaint (formal)* means a document submitted or signed by a Complainant or signed by the Title IX Coordinator alleging sexual harassment or retaliation for engaging in a protected activity against a Respondent and requesting that the recipient investigate the allegation.

- *Confidential Resource* means an employee who is not a Mandated Reporter of notice of sexual harassment or retaliation (irrespective of Clery Act Campus Security Authority status).

- *Days* means business days

- *Directly Related Evidence* is evidence connected to the complaint, but is neither inculpatory (tending to prove a violation) nor exculpatory (tending to disprove a violation) and will not be relied upon by the investigative report.

- *Education Program or Activity* means locations, events, or circumstances where CWRU exercises substantial control over both the Respondent and the context in which the sexual harassment occurs and also includes any building owned or controlled by a student organization that is officially recognized by CWRU.

- *Final Determination*: A conclusion by the preponderance of the evidence that the alleged conduct occurred and whether it did or did not violate policy.

- *Finding*: A conclusion by preponderance of the evidence that the conduct did or did not occur as alleged as in a finding of fact.

- *Formal Grievance Process* means a method of formal resolution designated by the CWRU to address conduct that falls within the policies included below, and which complies with the requirements of the Title IX regulations (34 §CFR Part 106.45).

- *Grievance Process Pool* includes any hearing officers, appeal officers, and Advisors who may perform any or all of these roles (though not at the same time or with respect to the same case).

- *Hearing Decision Panel* refers to those who have decision-making and sanctioning authority within the Recipient's Formal Grievance process.

- *Investigator* means the person or persons charged by the Office of Equity at CWRU with gathering facts about an alleged violation of this Policy, assessing relevance and credibility, synthesizing the evidence, and compiling this information into an investigation report and file of directly related evidence.

- *Mandated Reporter* means an employee of the CWRU who is obligated by policy to share knowledge, notice, and/or reports of sexual harassment or retaliation with the Title IX Coordinator.

- *Notice* means that an employee, student, or third party informs the Title IX Coordinator or other Official with Authority of the alleged occurrence of harassing, discriminatory, and/or retaliatory conduct.

- *Official with Authority (OWA)* means an employee of CWRU explicitly vested with the responsibility to implement corrective measures for sexual harassment, or retaliation on behalf of the Recipient.

- *Parties* include the Complainant(s) and Respondent(s), collectively.

- *Formal Grievance Process* detailed in the policy.

- *Informal Alternative Resolution* procedures detailed in this policy.

- *Remedies* are post-finding actions directed to the Complainant and/or the community as mechanisms to address safety, prevent recurrence, and restore access to the Recipient's educational program.

- *Respondent* means an individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment or retaliation for engaging in a protected activity.

- *Resolution* means the result of an Informal or Formal Grievance Process.

- *Sanction* means a consequence imposed by CWRU on a Respondent who is found to have violated this policy.

- *Sexual Harassment* is the umbrella category including the offenses of sexual harassment, sexual assault, stalking, and dating violence and domestic violence.

11

- *Title IX Coordinator* is at least one official designated by CWRU to ensure compliance with Title IX and the Recipient's Title IX program. References to the Coordinator throughout this policy may also encompass a designee of the Coordinator for specific tasks.

- *Title IX Team* refers to the Title IX Coordinator, investigators, and any member designated that is trained. (This includes external investigators)

## D. Independence and Conflict-of-Interest

The Title IX Coordinator manages the Title IX process and acts with independence and authority free from bias and conflicts of interest. The Title IX Coordinator oversees all resolutions under this policy and these procedures. The members of the Office of Equity or designees are vetted and trained to ensure they are not biased for or against any party in a specific case, or for or against Complainants and/or Respondents, generally.

To raise any concern involving bias or conflict of interest by the Title IX Coordinator or designee, contact the Office of General Counsel. Concerns of bias or a potential conflict of interest by any other member in the process should be raised with the Title IX Coordinator.

## E. Supportive Measures

CWRU will offer and implement appropriate and reasonable supportive measures to the parties upon notice of alleged sexual harassment, or retaliation.

Supportive measures are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the parties to restore or preserve access to the university's education program or activity, including measures designed to protect the safety of all parties or the university's educational environment, and/or deter harassment, discrimination, and/or retaliation.

The Title IX Coordinator or designee promptly makes supportive measures available to the parties upon receiving notice or a complaint. At the time that supportive measures are offered, the university will inform the Complainant, in writing, that they may file a formal complaint with the university either at that time or in the future, if they have not done so already. The Title IX Coordinator or designee works with the Complainant to ensure that their wishes are taken into account with respect to the supportive measures that are planned and implemented.

The university will maintain the privacy of the supportive measures, provided that privacy does not impair the University's ability to provide the supportive measures. CWRU will act to ensure as minimal an academic/occupational impact on the parties as possible. The Recipient will implement measures in a way that does not unreasonably burden the other party.

12

These actions may include, but are not limited to:

- Referral to counseling, medical, and/or other healthcare services
- Referral to the Employee Assistance Program Impact Solutions
- Referral to community-based service providers
- Visa and immigration assistance
- Student financial aid counseling
- Education to the community or community subgroup(s)
- Altering campus housing assignment(s)
- Altering work arrangements for employees or student-employees
- Safety planning
- Providing campus safety escorts
- Providing transportation accommodations
- Implementing contact limitations (no contact orders) between the parties
- Academic support, extensions of deadlines, or other course/program-related adjustments
- Persona Non Grata (PNG)
- Timely Warnings
- Class schedule modifications, withdrawals, or leaves of absence
- Increased security and monitoring of certain areas of the campus
- Any other actions deemed appropriate by the Title IX Coordinator or designee

Violations of no contact orders will be referred to appropriate student or employee conduct processes for enforcement.

# F. Emergency Removal

CWRU can act to remove a student Respondent entirely or partially from its education program or activities on an emergency basis when an individualized safety and risk analysis has determined that an immediate threat to the physical health or safety of any student or other individual justifies removal. This risk analysis is performed by the Title IX Coordinator in conjunction with the Behavioral Intervention Team using its standard objective violence risk assessment procedures.

In all cases in which an emergency removal is imposed, the student, two (2) representatives from a student organization, will be given notice of the action and the option to request to meet with the Title IX Coordinator prior to such action/removal being imposed, or as soon thereafter as reasonably possible, to show cause why the action/removal should not be implemented or should be modified.

This meeting is not a hearing on the merits of the allegation(s), but rather is an administrative process intended to determine solely whether the emergency removal is appropriate. When this meeting is not requested within 48 hours, objections to the emergency removal will be deemed waived. A Complainant and their Advisor may be permitted to participate in this meeting if the Title IX Coordinator determines it is equitable to do so. This section also applies to any restrictions that a coach

13

or athletic administrator may place on a student-athlete arising from allegations related to Title IX. There is no appeal process for emergency removal decisions.

A Respondent may be accompanied by an Advisor of their choice when meeting with the Title IX Coordinator for the show cause meeting. The Respondent will be given access to a written summary of the basis for the emergency removal prior to the meeting to allow for adequate preparation.

The Title IX Coordinator has sole discretion under this policy to implement or stay an emergency removal and to determine the conditions and duration. Violation of an emergency removal under this policy will be grounds for discipline, which may include expulsion.

The Recipient will implement the least restrictive emergency actions possible in light of the circumstances and safety concerns. As determined by the Title IX Coordinator, these actions could include, but are not limited to: removing a student from a residence hall, temporarily re-assigning an employee, restricting a student's or employee's access to or use of facilities or equipment, allowing a student to withdraw or take grades of incomplete without financial penalty, authorizing an administrative leave, and suspending a student's participation in extracurricular activities, student employment, student organizational leadership, or intercollegiate/intramural athletics.

At the discretion of the Title IX Coordinator, alternative coursework options may be pursued to ensure as minimal an academic impact as possible on the parties.

Where the Respondent is an employee, existing provisions for interim action are applicable.

# G. Jurisdiction of CWRU

This policy applies to the education program and activities of CWRU, to conduct that takes place on the campus or on property owned or controlled by CWRU, at CWRU-sponsored events, or in buildings owned or controlled by CWRU's recognized student organizations. The Respondent must be a member of CWRU's community in order for its policies to apply.

This policy can also be applicable to the effects of off-campus misconduct that effectively deprive someone of access to the university's educational program. The university may also extend jurisdiction to off-campus and/or to online conduct when the Title IX Coordinator determines that the conduct affects a substantial university interest.

Regardless of where the conduct occurred, the university will address notice/complaints to determine whether the conduct occurred in the context of its employment or educational program or activity and/or has continuing effects on campus or in an off-campus sponsored program or activity. A substantial university interest includes:

A. Any action that constitutes a criminal offense as defined by law. This includes, but is not limited to, single or repeat violations of any local, state, or federal law;

B. Any situation in which it is determined that the Respondent poses an immediate threat to the physical health or safety of any student or other individual;

C. Any situation that significantly impinges upon the rights, property, or achievements of oneself or others or significantly breaches the peace and/or causes social disorder; and/or

D. Any situation that is detrimental to the educational interests or mission of the university.

If the Respondent is unknown or is not a member of the university community, the Title IX Coordinator will assist the Complainant in identifying appropriate campus and local resources and support options and/or, when criminal conduct is alleged, in contacting local or campus law enforcement if the individual would like to file a police report.

Further, even when the Respondent is not a member of the university community, supportive measures, remedies, and resources may be accessible to the Complainant by contacting the Title IX Coordinator.

In addition, the university may take other actions as appropriate to protect the Complainant against third parties, such as barring individuals from university property and/or events.

All vendors serving the university through third-party contracts are subject to the policies and procedures of their employers

When the Respondent is enrolled in or employed by another institution, the Title IX Coordinator can assist the Complainant in liaising with the appropriate individual at that institution, as it may be possible to allege violations through that institution's policies.

Similarly, the Title IX Coordinator may be able to **assist and support** a student or employee Complainant who experiences discrimination in an externship, study abroad program, or other environment external to the university where sexual harassment or nondiscrimination policies and procedures of the facilitating or host organization may give recourse to the Complainant.

## H. Promptness

All allegations are acted upon promptly the university once it has received notice or a formal complaint. Complaints can take **60-75** business days to resolve, typically. There are always exceptions and extenuating circumstances that can cause a resolution to take longer, but the Recipient will avoid all undue delays within its control.

Any time the general timeframes for resolution outlined in the university's procedures will be delayed, the university will provide written notice to the parties of the delay, the cause of the delay, and an estimate of the anticipated additional time that will be needed as a result of the delay.

15

# I. Time Limits on Reporting

There is no time limitation on providing notice/complaints to the Title IX Coordinator. However, if the Respondent is no longer subject to the university's jurisdiction and/or significant time has passed, the ability to investigate, respond, and provide remedies may be more limited or impossible.

Acting on notice/complaints significantly impacted by the passage of time (including, but not limited to, the rescission or revision of policy) is at the discretion of the Title IX Coordinator, who may document allegations for future reference, offer supportive measures and/or remedies, and/or engage in informal or formal action, as appropriate.

When notice/complaint is affected by significant time delay, the university will typically apply the policy in place at the time of the alleged misconduct and the procedures in place at the time of notice/complaint.

# J. Online Harassment and Misconduct

The policies of CWRU are written and interpreted broadly to include online manifestations of any of the behaviors prohibited below, when those behaviors occur in or have an effect on the university's education program and activities or use Recipient networks, technology, or equipment.

Although CWRU may not control websites, social media, and other venues in which harassing communications are made, when such communications are reported to university, it will engage in a variety of means to address and mitigate the effects.

Members of the community are encouraged to be good digital citizens and to refrain from online misconduct, such as feeding anonymous gossip sites, sharing inappropriate content via social media, unwelcome sexual or sex-based messaging, distributing or threatening to distribute revenge pornography, breaches of privacy, or otherwise using the ease of transmission and/or anonymity of the Internet or other technology to harm another member of the university community.

# K. Sexual Harassment

Case Western Reserve University has adopted the following definition of Sexual Harassment in order to address the unique environment of an academic community, which consists not only of employer and employees, but of students as well.

Acts of sexual harassment may be committed by any person upon any other person, regardless of the sex, sexual orientation, and/or gender identity of those involved.

All policies encompass actual and/or attempted offenses.

16

Sexual Harassment, as an umbrella category, includes the offenses of sexual harassment, sexual assault, domestic violence, dating violence, and stalking, and is defined as:

Conduct on the basis of sex/gender or that is sexual that satisfies one or more of the following:

1) Quid Pro Quo:
    a) an employee of the recipient,
    b) conditions the provision of an aid, benefit, or service of the recipient,
    c) on an individual's participation in unwelcome sexual conduct.

2) Sexual Harassment:
    a) unwelcome conduct,
    b) determined by a reasonable person,
    c) to be so severe, and
    d) pervasive, and,
    e) objectively offensive,
    f) that it effectively denies a person equal access to the CWRU's education program or activity.[1]

3) Sexual assault, defined as:

    a) Sex Offenses, Forcible:
        i) Any sexual act[2] directed against another person,

---

[1] Unwelcomeness is subjective and determined by the Complainant(except when the Complainant is below the age of consent).Severity, pervasiveness, and objective offensiveness are evaluated based on the totality of the circumstances from the perspective of a reasonable person in the same or similar circumstances ("in the shoes of the Complainant"), including the context in which the alleged incident occurred and any similar, previous patterns that may be evidenced.

[2] Sexual acts include:
    1) Forcible Rape:
        a) Penetration,
        b) no matter how slight,
        c) of the vagina or anus with any body part or object, or
        d) oral penetration by a sex organ of another person,
        e) without the consent of the Complainant.
    2) Forcible Sodomy:
        a) Oral or anal sexual intercourse with another person,
        b) Forcibly,
        c) and/or against that person's will (non-consensually), or
        d) not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    3) Sexual Assault with an Object:
        a) The use of an object or instrument to penetrate,
        b) however slightly,
        c) the genital or anal opening of the body of another person,
        d) forcibly,
        e) and/or against that person's will (non-consensually),
        f) or not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.
    4) Forcible Fondling:
        a) The touching of the private body parts of another person (buttocks, groin, breasts),
        b) for the purpose of sexual gratification,
        c) Forcibly,
        d) and/or against that person's will (non-consensually),

17

       ii)   without the consent of the Complainant,

       iii)  including instances in which the Complainant is incapable of giving consent.

  b)  Sex Offenses, Non-forcible:

       i)   Incest:

         (1)  Non-forcible sexual intercourse,

         (2)  between persons who are related to each other,

         (3)  within the degrees wherein marriage is prohibited by Ohio State law.

       ii)  Statutory Rape

         (1)  Non-forcible sexual intercourse,

         (2)  with a person who is under the statutory age of consent of 16 years of age.

4)  Dating Violence, defined as:

  a)  Violence,

  b)  on the basis of sex,

  c)  committed by a person,

  d)  who is in or has been in a social relationship of a romantic or intimate nature with the Complainant.

       i)   The existence of such a relationship shall be determined based on the Complainant's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. For the purposes of this definition—

         (1)  Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.

         (2)  Dating violence does not include acts covered under the definition of domestic violence.

5)  Domestic Violence[3], defined as:

  a)  Violence,

  b)  on the basis of sex,

  c)  committed by a current or former spouse or intimate partner of the Complainant,

  d)  by a person with whom the Complainant shares a child in common, or

---

       e)  or not forcibly or against the person's will in instances in which the Complainant is incapable of giving consent because of age or because of temporary or permanent mental or physical incapacity.

[3] To categorize an incident as Domestic Violence, the relationship between the Respondent and the Complainant must be more than just two people living together as roommates. The people cohabitating must be current or former spouses or have an intimate relationship.

    e) by a person who is cohabitating with, or has cohabited with, the Complainant as a spouse or intimate partner, or

    f) by a person similarly situated to a spouse of the Complainant under the domestic or family violence laws of State of Ohio, or

    g) by any other person against an adult or youth Complainant who is protected from that person's acts under the domestic or family violence laws of the State of Ohio.

6) **Stalking**, defined as:

    a) engaging in a course of conduct[4],

    b) on the basis of sex,

    c) directed at a specific person, that

        i) would cause a reasonable person[5] to fear for the person's safety, or

        ii) the safety of others; or

        iii) Suffer substantial emotional distress[6].

Other Civil Rights Offenses

7) **Sexual Exploitation**, defined as:

    a) Taking non-consensual or abusive sexual advantage of another,

    b) for their own benefit, or

    c) for the benefit of anyone other than the person being exploited, and

    d) that conduct does not otherwise constitute sexual harassment under this policy.

Examples of Sexual Exploitation include, but are not limited to:

- Sexual voyeurism (such as observing or allowing others to observe a person undressing or using the bathroom or engaging in sexual acts, without the consent of the person being observed)
- Invasion of sexual privacy.
- Taking pictures, video, or audio recording of another in a sexual act, or in any other sexually-related activity when there is a reasonable expectation of privacy during the activity, without the consent of all involved in the activity, or exceeding the boundaries of consent (such as allowing another person to hide in a closet and observe sexual

---

[4] Course of conduct means two or more acts, including, but not limited to, acts in which the Respondent directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

[5] Reasonable person means a reasonable person under similar circumstances and with similar identities to the Complainant.

[6] Substantial emotional distress means significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling.

activity, or disseminating sexual pictures without the photographed person's consent), including the making or posting of revenge pornography

- Prostituting another person
- Engaging in sexual activity with another person while knowingly infected with human immunodeficiency virus (HIV) or a sexually-transmitted disease (STD) or infection (STI), without informing the other person of the infection
- Causing or attempting to cause the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give consent to sexual activity, or for the purpose of making that person vulnerable to non-consensual sexual activity
- Misappropriation of another person's identity on apps, websites, or other venues designed for dating or sexual connections
- Forcing a person to take an action against that person's will by threatening to show, post, or share information, video, audio, or an image that depicts the person's nudity or sexual activity
- Knowingly soliciting a minor for sexual activity
- Engaging in sex trafficking
- Creation, possession, or dissemination or child pornography

## L. Consent, Coercion, and Incapacitation

**Consent** is knowing, voluntary, and clear permission by word or action to engage in sexual activity. Since individuals may experience the same interaction in different ways, it is the responsibility of each party to determine that the other has consented before engaging in the activity.

If consent is not clearly provided prior to engaging in the activity, consent may be ratified by word or action at some point during the interaction or thereafter, but clear communication from the outset is strongly encouraged.

For consent to be valid there must be a clear expression in words or actions that the other individual consented to the specific sexual conduct. Reasonable reciprocation can be implied. For example, if someone kisses you, you can kiss them back (if you want to) without the need to explicitly obtain their consent to being kissed back. Consent can also be withdrawn once given, as long as the withdrawal is reasonably and clearly communicated. If consent is withdrawn, that sexual activity should cease within a reasonable time.

Consent to some sexual contact (such as kissing or fondling) cannot be presumed to be consent for other sexual activity (such as intercourse). A current or previous intimate relationship is not sufficient to constitute consent.

Proof of consent or non-consent is not a burden placed on either party involved in an incident. Instead, the burden remains on Case Western Reserve University to determine whether its policy has been violated. The existence of consent is based on the totality of the circumstances evaluated from the

20

perspective of a reasonable person in the same or similar circumstances, including the context in which the alleged incident occurred and any similar previous patterns that may be evidenced.

Consent CANNOT be given if a person's ability to resist or consent is incapacitated because of a mental illness  or physical condition or if there is a significant age or perceived power differential.

**Incapacitation** is a state in which someone cannot make rational, reasonable decisions because the person lacks the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction).  Incapacitation is determined through consideration of all relevant indicators of an individual's state and is not synonymous with intoxication, impairment, blackout, and/or being drunk. This policy also covers a person who incapacity results from a temporary or permanent physical or mental health condition, involuntary physical restraint, and/or the consumption of incapacitating drugs.

It is a defense to a sexual assault policy violation that the Respondent neither knew nor should have known the Complainant to be physically or mentally incapacitated. "Should have known" is an objective, reasonable person standard, which assumes that a reasonable person is both sober and exercising sound judgment

It is not an excuse that the responding party was intoxicated and, therefore, did not realize the incapacity of the reporting party. The question of whether the responding party should have known the incapacity is an objective question about what a reasonable person, exercising sober, good judgment, would have known, in the same or similar circumstances.

**Coercion** is underlined pressure for sexual activity. Coercive conduct differs from seductive conduct based on factors such as the type and/or extent of the pressure used to obtain consent. When someone makes clear to you that they do not want sex, that they want to stop, or that they do not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

## M. Relationships Involving Authority or Power

When one party has any professional responsibility for another's academic, job performance, or professional future, the university considers sexual relationships between the two individuals to be a basic violation of professional ethics and responsibility.  This includes but is not limited to sexual relationships between faculty (including teaching assistants and laboratory supervisors) and their students or between supervisors and their employees, even if deemed mutually consenting relationships.  Because of the asymmetry of these relationships, "consent" may be difficult to assess, may be deemed not possible, and may be construed as coercive.  Such relationships also may have the potential to result in claims of sexual harassment.  For more information, see Consensual Relationship Policy at http://www.case.edu/equity.

# N. Retaliation

Protected activity under this policy includes reporting an incident that may implicate this policy, participating in the grievance process, supporting a Complainant or Respondent, assisting in providing information relevant to an investigation, and/or acting in good faith to oppose conduct that constitutes a violation of this Policy.

Acts of alleged retaliation should be reported immediately to the Title IX Coordinator and will be promptly investigated. CWRU will take all appropriate and available steps to protect individuals who fear that they may be subjected to retaliation.

It is prohibited for CWRU or any member of the community to take or attempt to create adverse action by intimidating, threatening, coercing, harassing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by law or policy, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure.

Charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX, constitutes retaliation.

The exercise of rights protected under the First Amendment does not constitute retaliation. Charging an individual with a code of conduct violation for making a materially false statement in bad faith in the course of a grievance proceeding under this policy and procedure does not constitute retaliation, provided that a determination regarding responsibility, alone, is not sufficient to conclude that any party has made a materially false statement in bad faith.

# O. Mandated Reporting

All Case Western Reserve University employees (faculty, staff, administrators, resident assistants, teaching assistants and orientation leaders) are required to report actual or suspected discrimination or harassment to appropriate officials immediately, though there are some limited exceptions.

In order to make informed choices, it is important to be aware of confidentiality and mandatory reporting requirements when consulting campus resources. On campus, some resources may maintain confidentiality and are not required to report actual or suspected discrimination or harassment. They may offer options and resources without any obligation to inform an outside agency or campus official unless a Complainant has requested the information be shared.

If a Complainant expects formal action in response to their allegations, reporting to any Mandated Reporter can connect them with resources to report crimes and/or policy violations, and these

employees will immediately pass reports to the Title IX Coordinator (and/or police, if desired by the Complainant), who will take action when an incident is reported to them.

The following sections describe the reporting options at CWRU for a Complainant or third party (including parents/guardians when appropriate):

## 1. Confidential Resources

If a Complainant would like the details of an incident to be kept confidential, the Complainant may speak with:

- Licensed professional in University Health and Counseling Services
- Student Advocate for Gender Based Violence Prevention, Education, and Advocacy
- Inter-religious Council on-campus members of the clergy/chaplains working within the scope of their license or ordination
- Off-campus (non-employees):
  - Licensed professional counselors and other medical providers
  - Local Cleveland Rape Crisis Center
  - Domestic Violence Center
  - Local or state assistance agencies
  - Clergy/Chaplains
  - Attorneys

All of the above-listed individuals will maintain confidentiality when acting under the scope of their licensure, professional ethics, and/or professional credentials, except in extreme cases of immediacy of threat or danger or abuse of a minor or individual with a disability, or when required to disclose by law or court order.

Employees: For confidential resources for faculty and staff, the Employee Assistance and Work Life Program (IMPACT Solutions) is a confidential resource.

CWRU employees who are confidential and who receive reports within the scope of their confidential roles will timely submit anonymous statistical information for Clery Act purposes unless they believe it would be harmful to their client, or patient.

## 2. Mandated Reporters and Formal Notice/Complaints

All employees of CWRU (including resident assistants, teaching assistants, and orientation leaders), with the exception of those who are designated as Confidential Resources, are Mandated Reporters and must promptly share with the Title IX Coordinator all known details of a report made to them in the course of their employment.

Mandated reporters must also promptly share <u>all</u> details of behaviors under this policy that they observe or have knowledge of, even if not reported to them by a Complainant or third party.

Complainants may want to carefully consider whether they share personally identifiable details with non-confidential Mandated Reporters, as those details must be shared with the Title IX Coordinator.

Generally, disclosures in climate surveys, classroom writing assignments or discussions, human subjects research, or at events such as "Take Back the Night" marches or speak-outs do not provide notice that must be reported to the Coordinator by employees, unless the Complainant clearly indicates that they desire a report to be made or a seek a specific response from Case Western Reserve University.

Supportive measures may be offered as the result of such disclosures without formal action by CWRU.

Failure of a Mandated Reporter, as described above in this section, to report an incident of harassment or discrimination of which they become aware is a violation of CWRU policy and can be subject to disciplinary action for failure to comply.

Though this may seem obvious, when a Mandated Reporter is engaged in harassment or other violations of this policy, they still have a duty to report their own misconduct, though CWRU is technically not on notice when a harasser is also a Mandated Reporter unless the harasser does in fact report themselves.

Finally, it is important to clarify that a Mandated Reporter who is themselves a target of harassment or other misconduct under this policy is not required to report their own experience, though they are, of course, encouraged to do so.

## P. When a Complainant Does Not Wish to Proceed

If a Complainant does not wish for their name to be shared, does not wish for an investigation to take place, or does not want a formal complaint to be pursued, they may make such a request to the Title IX Coordinator, who will evaluate that request in light of the duty to ensure the safety of the campus and to comply with state or federal law.

The Title IX Coordinator has ultimate discretion over whether the report proceeds when the Complainant does not wish to do so, and the Title IX Coordinator may sign a formal complaint to initiate a grievance process upon completion of an appropriate violence risk assessment.

The Title IX Coordinator's decision should be based on results of the violence risk assessment that show a compelling risk to health and/or safety that requires the CWRU to pursue formal action to protect the community.

A compelling risk to health and/or safety may result from evidence of patterns of misconduct, predatory conduct, threats, abuse of minors, use of weapons, and/or violence. Recipients may be compelled to act on alleged employee misconduct irrespective of a Complainant's wishes.

The Title IX Coordinator must also consider the effect that non-participation by the Complainant may have on the availability of evidence and the CWRU's ability to pursue a Formal Grievance Process fairly and effectively.

When the Title IX Coordinator executes the written complaint, they do not become the Complainant. The Complainant is the individual who is alleged to be the victim of conduct that could constitute a violation of this policy.

When the report proceeds, the Complainant (or their Advisor) may have as much or as little involvement in the process as they wish. The Complainant retains all rights of a Complainant under this Policy irrespective of their level of participation. Typically, when the Complainant chooses not to participate, the Advisor may be appointed as proxy for the Complainant throughout the process, acting to ensure and protect the rights of the Complainant, though this does not extend to the provision of evidence or testimony.

Note that CWRU's ability to remedy and respond to notice may be limited if the Complainant does not want the University to proceed with an investigation and/or grievance process. The goal is to provide the Complainant with as much control over the process as possible, while balancing CWRU's obligation to protect its community.

In cases in which the Complainant requests confidentiality/no formal action and the circumstances allow CWRU to honor that request, the University will offer informal resolution options, supportive measures, and remedies to the Complainant and the community, but will not otherwise pursue formal action.

If the Complainant elects to take no action, they can change that decision if they decide to pursue a formal complaint at a later date. Upon making a formal complaint, a Complainant has the right, and can expect, to have allegations taken seriously by the University and to have the incidents investigated and properly resolved through these procedures. Please consider that delays may cause limitations on access to evidence, or present issues with respect to the status of the parties.

## Q. Federal Timely Warning Obligations

Parties reporting sexual assault, domestic violence, dating violence, and/or stalking should be aware that under the Clery Act, CWRU must issue timely warnings for incidents reported to them that pose a serious or continuing threat of bodily harm or danger to members of the campus community.

The University will ensure that a Complainant's name and other identifying information is not disclosed, while still providing enough information for community members to make safety decisions in light of the potential danger.

# R. False Allegations and Evidence

Intentional false and/or malicious accusations under this policy are a serious offense and will be subject to appropriate disciplinary action.  This does not include allegations that are made in good faith but are ultimately shown to be erroneous or do not result in a policy violation determination.

Additionally, witnesses and parties knowingly providing false evidence, tampering with or destroying evidence after being directed to preserve such evidence, or deliberately misleading an official conducting an investigation can be subject to discipline under the appropriate University policies for faculty, staff, and students.

# S. Amnesty for Complainants and Witnesses

Case Western Reserve University encourages the reporting of misconduct and crimes by Complainants and witnesses. Sometimes, Complainants or witnesses are hesitant to report to University officials or participate in grievance processes because they fear that they themselves may be in violation of certain policies, such as underage drinking or use of illicit drugs at the time of the incident. Respondents may hesitate to be forthcoming during the process for the same reasons.

It is in the best interests of the University community that Complainants choose to report misconduct to University officials, that witnesses come forward to share what they know, and that all parties be forthcoming during the process.

To encourage reporting and participation in the process, CWRU maintains a policy of offering parties and witnesses amnesty from minor policy violations – such as underage consumption of alcohol or the use of illicit drugs – related to the incident.

Amnesty does not apply to more serious allegations such as physical abuse of another or illicit drug distribution. The decision not to offer amnesty to a Respondent is based on neither sex nor gender, but on the fact that collateral misconduct is typically addressed for all students within a progressive discipline system, and the rationale for amnesty – the incentive to report serious misconduct – is rarely applicable to Respondent with respect to a Complainant.

**Students:** Sometimes, students are hesitant to assist others for fear that they may get in trouble themselves (for example, an underage student who has been drinking or using marijuana might hesitate to help take an individual who has experienced sexual misconduct to the University of campus police).

CWRU maintains a policy of amnesty for students who offer help to others in need.

**Employees:**  Sometimes, employees are hesitant to report harassment or discrimination they have experienced for fear that they may get in trouble themselves.

CWRU maintains a policy of amnesty for employees who offer help to others in need.

## T. Federal Statistical Reporting Obligations

In compliance with the Clery Act (Campus Crime Statistics Act), Designated Reporting Representatives are required to report to CWRU Police sexual misconduct that constitutes a crime (i.e. anything not defined in this policy as sexual harassment).  In addition, anonymous reports and de-identified reports of crimes from confidential support resources received by the CWRU Police are also included in the Clery Act Report.   Typically, the following information is included: crime, date, location, and status (i.e. student, faculty, staff, stranger, etc.) of the individuals involved in the crime.  The university never includes the names of the Reporting Party or the Responding Party in crime statistics.

When a complaint of sexual misconduct is made that may also constitute a criminal act, the Title IX Coordinator or designee will inform the Reporting Party of the right to file a criminal complaint.

Campus Security Authorities include student affairs/student conduct staff, campus security and police, coaches, athletic directors, residence life staff, student activities staff, human resources staff, advisors to student organizations, and any other official with significant responsibility for student and campus activities.

## U. Academic Freedom

Case Western Reserve University adheres to the principles and traditions of academic freedom.  As stated in the Faculty Handbook section Academic Freedom, Chapter 3, Part One, Article I, Paragraph D. Academic freedom is a right of all members of the university faculty and applies to university activities including teaching and research.  See the faculty handbook.  Each faculty member may consider in their classes any topic relevant to the subject matter of the course as defined by the appropriate educational unit.

Case Western Reserve University also recognizes, however, that these freedoms must be in balance with the rights of others not to be sexually harassed. It is therefore understood that the principles of academic freedom permit topics of all types, including those with sexual content, to be part of courses, lectures, and other academic pursuits. If there are questions about whether the course material or the manner in which it is presented falls within the definition of sexual harassment, the concerned party(s) should contact the Title IX Coordinator.

27

# II. INTERIM RESOLUTION PROCESS FOR ALLEGED VIOLATIONS OF THE POLICY ON SEXUAL HARASSMENT (KNOWN AS PROCESS "A")

The procedures below applies <u>only</u> to qualifying allegations of sexual harassment (including sexual assault, dating violence, domestic violence, and stalking, as defined above) involving students, staff, administrator, or faculty members.

"Process B" can apply to sexual harassment (including sexual assault, dating violence, domestic violence, and stalking, as defined above) when jurisdiction does not fall within Process A, as determined by the Title IX Coordinator.

The procedures below may be used to address collateral misconduct arising from the investigation of or occurring in conjunction with reported misconduct (e.g., vandalism, physical abuse of another). All other allegations of misconduct unrelated to incidents covered by the Policy will be addressed through procedures elaborated in the student, faculty, and staff handbooks.

## A. Notice/Complaint

Upon receipt of a complaint or notice to the Title IX Coordinator of an alleged violation of the Policy, The Office of Equity or designee initiates a prompt initial assessment to determine the next steps the Recipient needs to take.

The Title IX Coordinator or designee will initiate at least one of three responses:

1. Offering supportive measures because the Complainant does not want to proceed formally; and/or
2. An informal resolution upon submission of a formal complaint; and/or
3. A Formal Grievance Process including an investigation and a hearing.

The investigation and grievance process will determine whether or not the Policy has been violated. If so, the University will promptly implement effective remedies designed to ensure that it is not deliberately indifferent to harassment or discrimination, their potential recurrence, or their effects.

## B. Initial Assessment

Following receipt of notice or a complaint of an alleged violation of this Policy, the Title IX Coordinator or designee engages in an initial assessment, typically within one to five business days in duration. The steps in an initial assessment can include:

1) If notice is given, the Title IX Coordinator or designee seeks to determine whether the person impacted wishes to make a formal complaint, and will assist them to do so, if desired.
   a) If they do not wish to do so, the Title IX Coordinator or designee determines whether to initiate a complaint because a violence risk assessment indicates a compelling threat to health and/or safety.
2) If a formal complaint is received, the Title IX Coordinator or designee assesses its sufficiency and works with the Complainant to make sure it is correctly completed.
3) The Title IX Coordinator or designee reaches out to the Complainant to offer supportive measures.
4) The Title IX Coordinator or designee works with the Complainant to ensure they are aware of the right to have an Advisor.
5) The Title IX Coordinator or designee works with the Complainant to determine whether the Complainant prefers a supportive and remedial response, an informal resolution option, or a formal investigation and grievance process.
   a) If a supportive and remedial response is preferred, the Title IX Coordinator or designee works with the Complainant to identify their wishes, assesses the request, and implements accordingly. No Formal Grievance Process is initiated, though the Complainant can elect to initiate one later, if desired.
   b) If an informal resolution option is preferred, the Title IX Coordinator or designee assesses whether the complaint is suitable for informal resolution, and may seek to determine if the Respondent is also willing to engage in informal resolution.
   c) If a Formal Grievance Process is preferred, the Title IX Coordinator or designee determines if the misconduct alleged falls within the scope of Title IX:
      i) If it does, the Title IX Coordinator or designee will initiate the formal investigation and grievance process, directing the investigation to address:
         (1) an incident, and/or
         (2) a pattern of alleged misconduct, and/or
         (3) a culture/climate issue, based on the nature of the complaint.
      ii) If it does not, the Title IX Coordinator or designee determines that Title IX does not apply (and will "dismiss" that aspect of the complaint, if any), assesses which policies may apply and will refer the matter accordingly or refers the matter for resolution under Process B. Please note that dismissing a complaint under Title IX is solely a procedural requirement under Title IX and does not limit the CWRU's authority to address a complaint with an appropriate process and remedies.

## 1.  Violence Risk Assessment

In many cases, the Title IX Coordinator or designee may determine that a Violence Risk Assessment (VRA) should be conducted by the Threat Assessment Behavioral Intervention Team (TABIT) as part of the initial assessment. A VRA can aid in ten critical and/or required determinations, including:

- Emergency removal of a Respondent on the basis of immediate threat to physical health/safety;
- Whether the Title IX Coordinator or designee should pursue/sign a formal complaint absent a willing/able Complainant;
- Whether to put the investigation on the footing of incident and/or pattern and/or climate;
- To help identify potential predatory conduct;
- To help assess/identify grooming behaviors;
- Whether it is reasonable to try to resolve a complaint through informal resolution, and what modality may be most successful;
- Whether to permit a voluntary withdrawal by the Respondent;
- Whether to impose transcript notation or communicate with a transfer Recipient about a Respondent;
- Assessment of appropriate sanctions/remedies (to be applied post-hearing); and/or
- Whether a Clery Act Timely Warning/Trespass order/Persona-non-grata is needed.

Threat assessment is the process of evaluating the action ability of violence by an individual against another person or group following the issuance of a direct or conditional threat. A VRA is a broader term used to assess any potential violence or danger, regardless of the presence of a vague, conditional, or direct threat.

VRAs require specific training and are typically conducted by psychologists, clinical counselors, social workers, case managers, law enforcement officers, student conduct officers, or other Behavioral Intervention Team "(BIT)/CARE" team members. A VRA authorized by the Title IX Coordinator or designee should occur in collaboration with the BIT/CARE or threat assessment team. Where a VRA is required by the Title IX Coordinator, a Respondent refusing to cooperate may result in a charge of failure to comply within the appropriate student, employee, faculty conduct process.

## 2.  Dismissal (Mandatory and Discretionary)

Case Western Reserve University must dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing, it is determined that:

1. The conduct alleged in the formal complaint would not constitute sexual harassment as defined in the Policy herein above, even if proved; and/or

2. The conduct did not occur in an educational program or activity controlled by the CWRU (including buildings or property controlled by recognized student organizations), and/or CWRU does not have control of the Respondent; and/or
3. The conduct did not occur against a person in the United States; and/or
4. At the time of filing a formal complaint, a complainant is not participating in or attempting to participate in the education program or activity of the recipient.

CWRU may dismiss a formal complaint or any allegations therein if, at any time during the investigation or hearing:

1. A Complainant notifies the Title IX Coordinator or designee in writing that the Complainant would like to withdraw the formal complaint or any allegations therein; or
2. The Respondent is no longer enrolled in or employed by the recipient; or
3. Specific circumstances prevent CWRU from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein.

Upon any dismissal, the University will promptly send written notice of the dismissal and the rationale for doing so simultaneously to the parties.

This dismissal decision is appealable by any party under the procedures in the appeal section of this policy.

Please note that dismissing a complaint under this section for not meeting Title IX regulation is just procedural, and does not limit the CWRU's authority to address a complaint with an appropriate process and remedies, such as Process B.

A Complainant who decides to withdraw a complaint may later request to reinstate it or refile it.

## C. Counterclaims

CWRU is obligated to ensure that the grievance process is not abused for retaliatory purposes. The University permits the filing of counterclaims but uses an initial assessment, described above, to assess whether the allegations in the counterclaim are made in good faith. Counterclaims by a Respondent may be made in good faith, but are, on occasion, also made for purposes of retaliation instead. Counterclaims made with retaliatory intent will not be permitted.

Counterclaims determined to have been reported in good faith will be processed using the grievance procedures below. Investigation of such claims may take place after resolution of the underlying initial allegation, in which case a delay may occur.

31

Counterclaims may also be resolved through the same investigation as the underlying allegation, at the discretion of the Title IX Coordinator or designee. When counterclaims are <u>not</u> made in good faith, they will be considered retaliatory and may constitute a violation of this policy.

# D. Right to an Advisor

The parties may each have an Advisor of their choice present with them for all meetings, interviews, and hearings within the resolution process, if they so choose. The parties may select whomever they wish to serve as their Advisor as long as the Advisor is eligible and available.

Choosing an Advisor who is also a witness in the process creates potential for bias and conflict-of-interest. A party who chooses an Advisor who is also a witness can anticipate that issues of potential bias will be explored by the hearing panel.

The Recipient may permit parties to have more than one Advisor upon special request to the Title IX Coordinator. The decision to grant this request is at the sole discretion of the Title IX Coordinator and will be granted equitably to all parties.

## 1. Who Can Serve as an Advisor

The Advisor may be a friend, mentor, family member, attorney, or any other individual a party chooses to advise, support, and/or consult with them throughout the resolution process. The parties may choose Advisors from inside or outside of the University.

The Title IX Coordinator or designee will also offer to assign a trained Advisor for any party if the party so chooses. If the parties choose an Advisor from the pool available from the University, the Advisor will be trained by the Office of Equity and be familiar with the University's resolution process.

If the parties choose an Advisor from outside the pool of those identified by the University, the Advisor may not have been trained by the University and may not be familiar with Case Western Reserve's policies and procedures.

Parties also have the right to choose not to have an Advisor in the initial stages of the resolution process, prior to a hearing.

## 2. Advisor's Role in Meetings and Interviews

The parties may be accompanied by their Advisor in all meetings and interviews at which the party is entitled to be present, including intake and interviews. Advisors should help the parties prepare for each meeting and are expected to advise ethically, with integrity, and in good faith.

The university cannot guarantee equal Advisory rights, meaning that if one party selects an Advisor who is an attorney, but the other party does not or cannot afford an attorney, the university is not obligated to provide an attorney.

## 3. Advisors in Hearings/University-Appointed Advisor

Under U.S. Department of Education regulations under Title IX, a form of cross-examination is required during the hearing, but must be conducted by the parties' Advisors. The parties are not permitted to directly question each other or any witnesses. If a party does not have an Advisor for a hearing, CWRU will appoint a trained Advisor for the limited purpose of conducting any questioning of the other party and witnesses.

The Complainant and Respondent may reject this appointment and choose their own Advisor, but they may not proceed without an Advisor. If the party's Advisor will not conduct cross-examination, the University will appoint an Advisor who will do so thoroughly, regardless of the participation or non-participation of the advised party in the hearing itself. Extensive questioning of the parties and witnesses will also be conducted by the Decision-maker(s) during the hearing.

## 4. Pre-Interview Meetings

Advisors may request to meet with the administrative officials conducting interviews/meetings in advance of these interviews or meetings. This pre-meeting allows Advisors to clarify and understand their role and the University's policies and procedures.

## 5. Advisor Violations of Recipient Policy

All Advisors are subject to the same University policies and procedures, whether they are attorneys or not. Advisors are expected to advise their advisees without disrupting proceedings. Advisors should not address University officials in a meeting or interview unless invited to (e.g., asking procedural questions).

The Advisor may not make a presentation or represent their advisee during any meeting or proceeding and may not speak on behalf of the advisee to the Investigator(s) or other Decision-maker(s) except during a hearing proceeding, during cross-examination.

The Complainant and Respondent are expected to ask and respond to questions on their own behalf throughout the investigation phase of the resolution process. Although the Advisor generally may not speak on behalf of their advisee, the Advisor may consult with their advisee, either privately as needed, or by conferring or passing notes during any resolution process meeting or interview. For longer or more involved discussions, the parties and their Advisors should ask for breaks to allow for private consultation.

Any Advisor who oversteps their role as defined by this policy will be warned only once. If the Advisor continues to disrupt or otherwise fails to respect the limits of the Advisor role, the meeting will be ended, or other appropriate measures implemented. Subsequently, the Title IX Coordinator or designee will determine how to address the Advisor's non-compliance and future role.

## 6. Sharing Information with the Advisor

CWRU expects that the parties may wish to have the university share documentation and evidence related to the allegations with their Advisors. Parties may share this information directly with their Advisor or other individuals if they wish. Doing so may help the parties participate more meaningfully in the resolution process.

CWRU also provides a consent form that authorizes the university to share such information directly with their Advisor. The parties must either complete and submit this form to the Office of Equity or provide similar documentation demonstrating consent to a release of information to the Advisor before the university is able to share records with an Advisor.

## 7. Privacy of Records Shared with Advisor

Advisors are expected to maintain the privacy of the records shared with them. These records may not be shared with third parties, disclosed publicly, or used for purposes not explicitly authorized by CWRU. CWUR may seek to restrict the role of any Advisor who does not respect the sensitive nature of the process or who fails to abide by the university's privacy expectations.

## 8. Expectations of an Advisor

CWRU generally expects an Advisor to adjust their schedule to allow them to attend university meetings when planned, but may change scheduled meetings to accommodate an Advisor's inability to attend, if doing so does not cause an unreasonable delay.

The university may also make reasonable provisions to allow an Advisor who cannot attend in person to attend a meeting by telephone, video conferencing, or other similar technologies as may be convenient and available.

## 9.  Expectations of the Parties with Respect to Advisors

The Complainant and Respondent may elect to change Advisors during the process and is neither obligated to use the same Advisor throughout. The parties are expected to inform the Investigator(s) of the identity of their Advisor at least two (2) business days before the date of their first meeting with Investigators (or as soon as possible if a more expeditious meeting is necessary or desired).

The parties are expected to provide timely notice to the Title IX Coordinator or designee if they change Advisors at any time. It is assumed that if a party changes Advisors, consent to share information with the previous Advisor is terminated, and a release for the new Advisor must be secured. Parties are expected to inform the Title IX Coordinator or designee of the identity of their hearing Advisor at least two (2) business days before the hearing.

## 11. Assistance in Securing an Advisor

The Office of Equity will work with the Complainant and Respondent in securing an advisor through the process.

# E. Resolution Processes

Resolution proceedings are private. All persons present at any time during the resolution process are expected to maintain the privacy of the proceedings in accordance with university policy. Although there is an expectation of privacy around what Investigators share with parties during interviews, the parties have discretion to share their own knowledge and evidence with others if they so choose, with the exception of information the parties agree not to disclose related to informal resolution, discussed below. The university encourages parties to discuss any sharing of information with their Advisors before doing so.

## 1. Informal Resolution

Informal Resolution can include three different approaches:

1. When the parties agree to resolve the matter through an alternate resolution process, usually before a formal investigation takes place;
2. When the Respondent accepts responsibility for violating policy, and desires to accept a sanction and end the resolution process; or
3. When the Title IX Coordinator or designee can resolve the matter informally by providing supportive measures (only) to remedy the situation.

To initiate Informal Resolution, a Complainant needs to submit a formal complaint, as defined above. If a Respondent wishes to initiate Informal Resolution, they should contact the Title IX Coordinator or designee to indicate.

It is not necessary to pursue Informal Resolution first in order to pursue a Formal Grievance Process, and any party participating in Informal Resolution can stop the process at any time and begin or resume the Formal Grievance Process.

Prior to implementing Informal Resolution, CWRU will provide the parties with written notice of the reported misconduct and any sanctions or measures that may result from participating in such a process, including information regarding any records that will be maintained or shared by the university.

The university will obtain voluntary, written confirmation that all parties wish to resolve the matter through Informal Resolution before proceeding and will not pressure the parties to participate in Informal Resolution.

Informal Resolution process is prohibited when it is between a student and employee (Faculty, Staff, Teaching Assistant, and Research Assistant)

## a. Alternate Resolution

Alternate Resolution is an informal process by which a mutually agreed upon resolution of an allegation is reached. All parties must consent to the use of Alternate Resolution.

The Title IX Coordinator or designee may look to the following factors to assess whether Alternate Resolution is appropriate, or which form of Alternate Resolution may be most successful for the parties:

- The parties' amenability to Alternate Resolution;
- Likelihood of potential resolution, taking into account any power dynamics between the parties;
- The parties' motivation to participate;
- Civility of the parties;
- Results of a violence risk assessment/ongoing risk analysis;
- Disciplinary history;
- Whether an emergency removal is needed;
- Skill of the Alternate Resolution facilitator with this type of complaint;
- Complaint complexity;
- Emotional investment/intelligence of the parties;
- Rationality of the parties;
- Goals of the parties;
- Adequate resources to invest in Alternate Resolution (time, staff, etc.)

The ultimate determination of whether Alternate Resolution is available or successful is to be made by the Title IX Coordinator or designee. The Title IX Coordinator or designee maintains records of any resolution that is reached, and failure to abide by the resolution agreement may result in appropriate disciplinary actions. Results of complaints resolved by Informal Resolution or Alternate Resolution are not appealable.

## b. Respondent Accepts Responsibility for Alleged Violations

The Respondent may accept responsibility for all or part of the alleged policy violations at any point during the resolution process. If the Respondent indicates an intent to accept responsibility for all of the alleged misconduct, the formal process will be paused, and the Title IX Coordinator or designee will determine whether Informal Resolution can be used according to the criteria in that section above.

36

If Informal Resolution is applicable, the Title IX Coordinator or designee will determine whether all parties and the university are able to agree on responsibility, sanctions, and/or remedies. If so, the Title IX Coordinator or designee implements the accepted finding that the Respondent is in violation of the sexual harassment policy and implements agreed-upon sanctions and/or remedies, in coordination with other appropriate administrator(s), as necessary.

This result is not subject to appeal once all parties indicate their written assent to all agreed upon terms of resolution. When the parties cannot agree on all terms of resolution, the Formal Grievance Process will resume at the same point where it was paused.

When a resolution is accomplished, the appropriate sanction or responsive actions are promptly implemented in order to effectively stop the harassment or discrimination, prevent its recurrence, and remedy the effects of the discriminatory conduct, both on the Complainant and the community.

## c. Negotiated Resolution

The Title IX Coordinator or designee, with the consent of the parties, may negotiate and implement an agreement to resolve the allegations that satisfies all parties and the university. Negotiated Resolutions are not appealable.

# F. Grievance Process Pool

The Formal Grievance Process relies on a pool of faculty, staff, and students ("the pool") to carry out the process. Panel members will consist of faculty, staff, and students. Investigators in the Office of Equity conduct all investigations. The university reserves the right to use trained external investigators. Members of the Pool are announced in an annual distribution of this policy to all students, parents/guardians of students, employees, prospective students, and prospective employees. They are also listed on the Office of Equity website.

The list of Investigators and Pool members and a description of the Pool can be found at https://case.edu/equity/sexual-harassment-title-ix/file-report/grievance-process-pool

## 1. Pool Member Roles

Members of the Pool are trained annually, and can serve in in the following roles, at the direction of the Title IX Coordinator:

1. To provide appropriate intake of and initial guidance pertaining to complaints
2. To act as an Advisor to the parties
3. To perform or assist with initial assessment
4. To investigate complaints
5. To serve as a hearing facilitator (process administrator, no decision-making role)
6. To serve as a Decision-maker regarding the complaint
7. To serve as an Appeal Decision-maker

## 2. Investigator, Panel Member Appointment, and Advisor

The Title IX Coordinator or designee appoints the investigators, panel members, and advisors, which acts with independence and impartiality. While members of the Pool are typically trained in a variety of skill sets and can rotate amongst the different roles listed above in different cases, the university can also designate permanent roles for individuals in the Pool, using others as substitutes or to provide greater depth of experience when necessary. This process of role assignment may be the result of particular skills, aptitudes, or talents identified in members of the Pool that make them best suited to particular roles.

## 3. Pool Member Training

The Pool members receive annual training. This training includes, but is not limited to:

1. The scope of the University's Discrimination and Harassment Policy and Procedures
2. How to conduct investigations and hearings that protect the safety of Complainants and Respondents, and promote accountability
3. Implicit bias
4. Disparate treatment and impact
5. Reporting, confidentiality, and privacy requirements
6. Applicable laws, regulations, and federal regulatory guidance
7. How to implement appropriate and situation-specific remedies
8. How to investigate in a thorough, reliable, and impartial manner
9. How to uphold fairness, equity, and due process
10. How to weigh evidence
11. How to conduct questioning
12. How to assess credibility
13. Impartiality and objectivity
14. How to render findings and generate clear, concise, evidence-based rationales
15. The definitions of all offenses
16. How to apply definitions used by the recipient with respect to consent (or the absence or negation of consent) consistently, impartially, and in accordance with policy
17. How to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes
18. How to serve impartially by avoiding prejudgment of the facts at issue, conflicts of interest, and bias
19. Any technology to be used at a live hearing
20. Issues of relevance of questions and evidence
21. Issues of relevance to create an investigation report that fairly summarizes relevant evidence
22. How to determine appropriate sanctions in reference to all forms of harassment, discrimination, and/or retaliation allegations

38

Specific training is also provided for Appeal Decision-makers, intake personnel, Advisors (who are employees), and Chairs. All Pool members are required to attend these trainings annually. The materials used to train all members of the Pool are publicly posted here: [Will insert link later].

# G. Formal Grievance Process: Notice of Investigation and Allegations

The Title IX Coordinator or designee will provide written Notice Of the Investigation and Allegations (the "NOIA") to the Respondent upon commencement of the Formal Grievance Process. This facilitates the Respondent's ability to prepare for the interview and to identify and choose an Advisor to accompany them. The NOIA is also copied to the Complainant, who is to be given advance notice of when the NOIA will be delivered to the Respondent.

The NOIA will include:

1. A meaningful summary of all of allegations,
2. The identity of the involved parties (if known),
3. The precise misconduct being alleged,
4. The date and location of the alleged incident(s) (if known),
5. The specific policies implicated,
6. A description of the applicable procedures,
7. A statement of the potential sanctions/responsive actions that could result,
8. A statement that the university presumes the Respondent is not responsible for the reported misconduct unless and until the evidence supports a different determination,
9. A statement that determinations of responsibility are made at the conclusion of the process and that the parties will be given an opportunity to inspect and review all directly related and/or relevant evidence obtained during the review and comment period,
10. A statement about the university's policy on retaliation,
11. Information about the privacy of the process,
12. Information on the need for each party to have an Advisor of their choosing and suggestions for ways to identify an Advisor,
13. A statement informing the parties that the Recipient's Policy prohibits knowingly making false statements, including knowingly submitting false information during the resolution process,
14. Detail on how the party may request disability accommodations during the interview process,
15. A link to the Recipient's VAWA Brochure,
16. The name(s) of the Investigator(s), along with a process to identify, in advance of the interview process, to the Title IX Coordinator any conflict of interest that the Investigator(s) may have, and
17. An instruction to preserve any evidence that is directly related to the allegations.

Amendments and updates to the NOIA may be made as the investigation progresses and more information becomes available regarding the addition or dismissal of various charges.

Notice will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official university records, or emailed to the parties' Recipient-issued email or designated accounts. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

## H. Resolution Timeline

The University will make a good faith effort to complete the resolution process within a sixty-to-seventy five (60-75) business day time period, including appeal, which can be extended as necessary for appropriate cause by the Title IX Coordinator or designee, who will provide notice and rationale for any extensions or delays to the parties as appropriate, as well as an estimate of how much additional time will be needed to complete the process.

## I. Appointment of Investigators

Once the decision to commence a formal investigation is made, the Title IX Coordinator or designee appoints an investigator to conduct the investigation (typically using a team of two Investigators), usually within two (2) business days of determining that an investigation should proceed.

## J. Ensuring Impartiality

Any individual materially involved in the administration of the resolution process including the Title IX Coordinator, Investigator(s), and Decision-maker(s) may neither have nor demonstrate a conflict of interest or bias for a party generally, or for a specific Complainant or Respondent.

The Title IX Coordinator or designee will vet the assigned Investigator(s) to ensure impartiality by ensuring there are no actual or apparent conflicts of interest or disqualifying biases. The parties may, at any time during the resolution process, raise a concern regarding bias or conflict of interest, and the Title IX Coordinator or designee will determine whether the concern is reasonable and supportable. If so, another investigator will be assigned and the impact of the bias or conflict, if any, will be remedied. If the source of the conflict of interest or bias is the Title IX Coordinator, concerns should be raised with the Office of General Counsel.

The Formal Grievance Process involves an objective evaluation of all relevant evidence obtained, including evidence, which supports that the Respondent engaged in a policy violation, and evidence, which supports that the Respondent did not engage in a policy violation. Credibility determinations may not be based solely on an individual's status or participation as a Complainant, Respondent, or witness.

The Recipient operates with the presumption that the Respondent is not responsible for the reported misconduct unless and until the Respondent is determined to be responsible for a policy violation by the applicable standard of proof.

# K. Investigation Timeline

Investigations are completed expeditiously, normally within sixty (60) business days, though some investigations may take weeks or even months, depending on the nature, extent, and complexity of the allegations, availability of witnesses, police involvement, etc.

The university will make a good faith effort to complete investigations as promptly as circumstances permit and will communicate regularly with the parties to update them on the progress and timing of the investigation.

# L. Delays in the Investigation Process and Interactions with Law Enforcement

The university may undertake a short delay in its investigation (several days to a few weeks) if circumstances require. Such circumstances include, but are not limited to a request from law enforcement to temporarily delay the investigation, the need for language assistance, the absence of parties and/or witnesses, and/or accommodations for disabilities or health conditions.

The university will communicate in writing the anticipated duration of the delay and reason to the parties and provide the parties with status updates if necessary. The university will promptly resume its investigation and resolution process as soon as feasible. During such a delay, the university will implement supportive measures as deemed appropriate.

University action(s) or processes are not typically altered or precluded on the grounds that civil or criminal charges involving the underlying incident(s) have been filed or that criminal charges have been dismissed or reduced.

# M. Steps in the Investigation Process

All investigations are thorough, reliable, impartial, prompt, and fair. Investigations involve interviews with all relevant parties and witnesses; obtaining available, relevant evidence; and identifying sources of expert information, as necessary.

All parties shall have a full and fair opportunity, through the investigation process, to suggest witnesses and questions, to provide evidence and expert witnesses, and to fully review and respond to all evidence on the record.

41

The Investigator(s) typically take(s) the following steps, if not already completed (not necessarily in this order):

1. Determine the identity and contact information of the Complainant
2. In coordination with campus partners (e.g., the Title IX Coordinator), initiate or assist with any necessary supportive measures
3. Identify all policies implicated by the alleged misconduct and notify the Complainant and Respondent of all of the specific policies implicated
4. Assist the Title IX Coordinator with conducting a prompt initial assessment to determine if the allegations indicate a potential policy violation
5. Commence a thorough, reliable, and impartial investigation by identifying issues and developing a strategic investigation plan, including a witness list, evidence list, intended investigation timeframe, and order of interviews for all witnesses and the parties
6. Meet with the Complainant to finalize their interview/statement, if necessary
7. Prepare the initial Notice of Investigation and Allegation (NOIA). The NOIA may be amended with any additional or dismissed allegations
   a. Notice should inform the parties of their right to have the assistance of an Advisor, who could be a member of the Pool or an Advisor of their choosing present for all meetings attended by the party
8. Provide each interviewed party and witness an opportunity to review and verify the Investigator's summary notes of the relevant evidence/testimony from their respective interviews and meetings
9. Make good faith efforts to notify the parties of any meeting or interview involving the other party, in advance when possible
10. When participation of a party is expected, provide that party with written notice of the date, time, and location of the meeting, as well as the expected participants and purpose
11. Interview all available, relevant witnesses and conduct follow-up interviews as necessary
12. Allow each party the opportunity to suggest witnesses and questions they wish the Investigator(s) to ask of the other party and witnesses, and document in the report which questions were asked, with a rationale for any changes or omissions
13. Complete the investigation promptly and without unreasonable deviation from the intended timeline
14. Provide regular status updates to the parties throughout the investigation.
15. Prior to the conclusion of the investigation, provide the parties and their respective Advisors (if so desired by the parties) with a list of witnesses whose information will be used to render a finding
16. Write a comprehensive investigation report fully summarizing the investigation; all witness interviews, and addressing all relevant evidence. Appendices including relevant physical or documentary evidence will be included
17. The Investigator(s) gather, assess, and synthesize evidence, but make no conclusions, engage in no policy analysis, and render no recommendations as part of their report

18. Prior to the conclusion of the investigation, provide the parties and their respective Advisors (if so desired by the parties) a secured electronic or hard copy of the draft investigation report as well as an opportunity to inspect and review all of the evidence obtained as part of the investigation that is directly related to the reported misconduct, including evidence upon which the Recipient does not intend to rely in reaching a determination, for a ten (10) business day review and comment period so that each party may meaningfully respond to the evidence. The parties may elect to waive the full ten days. Each copy of the materials shared will be watermarked on each page with the role of the person receiving it (e.g., Complainant, Respondent, Complainant's Advisor, and Respondent's Advisor).

19. The Investigator(s) may elect to respond in writing in the investigation report to the parties' submitted responses and/or to share the responses between the parties for additional responses

20. The Investigator(s) will incorporate relevant elements of the parties' written responses into the final investigation report, include any additional relevant evidence, make any necessary revisions, and finalize the report. The Investigator(s) should document all rationales for any changes made after the review and comment period

21. The Investigator(s) shares the report with the Title IX Coordinator and/or legal counsel for their review and feedback

22. The Investigator will incorporate any relevant feedback, and the final report is then shared with all parties and their Advisors through secure electronic transmission or hard copy at least ten (10) business days prior to a hearing. The parties are also provided with a file of any directly related evidence that was not included in the report

## N. Role and Participation of Witnesses in the Investigation

Witnesses (as distinguished from the parties) who are employees of the university are expected to cooperate with and participate in the university's investigation and resolution process. Failure of such witnesses to cooperate with and/or participate in the investigation or resolution process constitutes a violation of policy and may warrant disciplinary review.

Although in-person interviews for parties and all potential witnesses are ideal, circumstances (e.g., study abroad, summer break, or remote learning) may require individuals to be interviewed remotely. Skype, Zoom, FaceTime, WebEx, or similar technologies may be used for interviews if the Investigator(s) determine that timeliness or efficiency dictate a need for remote interviewing. The university will take appropriate steps to reasonably ensure the security/privacy of remote interviews.

## O. Recording of Interviews

No unauthorized audio or video recording of any kind is permitted during investigation meetings. If Investigator(s) elect to audio and/or video record interviews, all involved parties must be made aware of audio and/or video recording.

## P. Evidentiary Considerations in the Investigation

The investigation does not consider: 1) incidents not directly related to the possible violation, unless they evidence a pattern; 2) the character of the parties; or 3) questions and evidence about the Complainant's sexual predisposition or prior sexual behavior, unless such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant, or if the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

## Q. Referral for Hearing

Provided that the complaint is not resolved through Informal Resolution, once the final investigation report is shared with the parties, the Title IX Coordinator or designee will refer the matter for a hearing.

The hearing cannot be fewer than ten (10) business days from the conclusion of the investigation – when the final investigation report is transmitted to the parties and the Decision-maker—unless all parties and the Decision-maker agree to an expedited timeline.

The Title IX Coordinator or designee will select appropriate panel members from the Pool.

## R. Hearing Decision-maker Composition

The university will designate a three-member panel from the Pool of adjudicators, at the discretion of the Title IX Coordinator or designee. With a panel, the Title IX Coordinator or designee will appoint one of the three members as Chair.

The panel will not have had any previous involvement with the investigation. The Title IX Coordinator or designee may elect to have an alternate sit in throughout the hearing process in the event that a substitute is needed for any reason.

Those who have served as Investigators will be witnesses in the hearing and therefore may not serve on the panel. Those who are serving as Advisors for any party may not serve on the panel.

The Title IX Coordinator or designee may not serve on a panel in the matter but may serve as an administrative facilitator of the hearing if their previous role(s) in the matter do not create a conflict of interest. Otherwise, a designee may fulfill this role. The hearing will convene at a time determined by the Chair or designee.

## S. Evidentiary Considerations in the Hearing

Any evidence that the Decision-maker(s) determine(s) is relevant and credible may be considered. The hearing does not consider: 1) incidents not directly related to the possible violation, unless they

44

evidence a pattern; 2) the character of the parties; or 3) questions and evidence about the Complainant's prior sexual predisposition or prior sexual behavior, unless such questions and evidence about the Complainant's prior sexual behavior are offered to prove that someone other than the Respondent committed the conduct alleged by the Complainant, or if the questions and evidence concern specific incidents of the Complainant's prior sexual behavior with respect to the Respondent and are offered to prove consent.

Previous disciplinary action of any kind involving the Respondent may be considered in determining an appropriate sanction upon a determination of responsibility, assuming the University uses a progressive discipline system. This information is only considered at the sanction stage of the process, and is not shared until then.

The parties may each submit a written impact statement prior to the hearing for the consideration of the panel at the sanction stage of the process when a determination of responsibility is reached.

After post-hearing deliberation, the panel renders a determination based on the preponderance of the evidence; whether it is more likely than not that, the Respondent violated the Policy as alleged.  The determination will be rendered within five (5) business days at the conclusion of the hearing.

## T. Notice of Hearing

No less than ten (10) business days prior to the hearing, the Title IX Coordinator or the Chair will send notice of the hearing to the parties. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

The notice will contain:
1.  A description of the alleged violation(s), a list of all policies allegedly violated, a description of the applicable procedures, and a statement of the potential sanctions/responsive actions that could result.
2.  The time, date, and location of the hearing and a reminder that attendance is mandatory, superseding all other campus activities.
3.  Any technology that will be used to facilitate the hearing.
4.  Information about the option for the live hearing to occur with the parties located in separate rooms using technology that enables the panel and parties to see and hear a party or witness answering questions. Such a request must be raised with the Title IX Coordinator or designee at least five (5) business days prior to the hearing.
5.  A list of all those who will attend the hearing, along with an invitation to object to any panel member on the basis of demonstrated bias. This must be raised with the Title IX Coordinator or designee at least two (5) business days prior to the hearing.
6.  Information on how the hearing will be recorded and on access to the recording for the parties after the hearing.
7.  A statement that if any party or witness does not appear at the scheduled hearing, the hearing may be held in their absence and the party's or witness's testimony and any statements given

prior to the hearing will not be considered by the panel. For compelling reasons, the Chair may reschedule the hearing.

8. Notification that the parties may have the assistance of an Advisor of their choosing at the hearing and will be required to have one present for any questions they may desire to ask. The party must notify the Title IX Coordinator or designee if they do not have an Advisor, and the Office of Equity will appoint one. Each party must have an Advisor present. There are no exceptions.

9. A copy of all the materials provided to the panel about the matter, unless they have been provided already.

10. An invitation to each party to submit to the Chair an impact statement pre-hearing that the panel  will review during any sanction determination.

11. An invitation to contact the Title IX Coordinator or designee to arrange any disability accommodations, language assistance, and/or interpretation services that may be needed at the hearing, at least seven (7) business days prior to the hearing.

12. Whether parties can/cannot bring mobile phones/devices into the hearing.

Hearings for possible violations that occur near or after the end of an academic term (assuming the Respondent is still subject to this Policy) and are unable to be resolved prior to the end of term will typically be held immediately after the end of the term or during the summer, as needed, to meet the resolution timeline followed by CWRU and remain within the 60-75 business day goal for resolution.

In these cases, if the Respondent is a graduating student, a hold may be placed on graduation and/or official transcripts until the matter is fully resolved (including any appeal). A student facing charges under this Policy is not in good standing to graduate.

## U. Alternative Hearing Participation Options

If the Complainant or Respondent prefer not to attend or cannot attend the hearing in person, the party should request alternative arrangements from the Title IX Coordinator or the Chair at least five (5) business days prior to the hearing.

The Title IX Coordinator or the Chair can arrange to use technology to allow remote testimony without compromising the fairness of the hearing. Remote options may also be needed for witnesses who cannot appear in person. Any witness who cannot attend in person should let the Title IX Coordinator or the Chair know at least five (5) business days prior to the hearing so that appropriate arrangements can be made.

## V. Pre-Hearing Preparation

The Chair, after any necessary consultation with the parties, Investigator(s) and/or Title IX Coordinator, will provide the names of persons who will be participating in the hearing, all pertinent documentary

evidence, and the final investigation report to the parties at least ten (10) business days prior to the hearing.

Any witness scheduled to participate in the hearing must have been first interviewed by the Investigator(s) unless all parties and the Chair assent to the witness's participation in the hearing. The same holds for any evidence that is first offered at the hearing. If the parties and Chair do not assent to the admission of evidence newly offered at the hearing, the Chair will delay the hearing and instruct that the investigation needs to be re-opened to consider that evidence.

The parties will be given a list of the names of the panel at least five (5) business days in advance of the hearing. All objections to any panel member must be raised in writing, detailing the rationale for the objection, and must be submitted to the Title IX Coordinator or designee as soon as possible and no later than one day prior to the hearing. Panel members will only be removed if the Title IX Coordinator or designee concludes that their bias or conflict of interest precludes an impartial hearing of the allegation(s).

The Title IX Coordinator or designee will give the panel members a list of the names of all parties, witnesses, and Advisors at least five (5) business days in advance of the hearing. Any panel member who cannot make an objective determination must recuse themselves from the proceedings when notified of the identity of the parties, witnesses, and Advisors in advance of the hearing. If a panel member is unsure of whether a bias or conflict of interest exists, they must raise the concern to the Title IX Coordinator or designee as soon as possible.

During the ten (10) business day period prior to the hearing, the parties have the opportunity for continued review and comment on the final investigation report and available evidence. That review and comment can be shared with the Chair at the pre-hearing meeting or at the hearing and will be exchanged between each party by the Chair.

# X. Pre-Hearing Meetings

The Chair may convene a pre-hearing meeting(s) with the parties and/or their Advisors to invite them to submit the questions or topics they (the parties and/or their Advisors) wish to ask or discuss at the hearing, so that the Chair can rule on their relevance ahead of time to avoid any improper evidentiary introduction in the hearing or provide recommendations for more appropriate phrasing. However, this advance review opportunity does not preclude the Advisors from asking at the hearing for a reconsideration based on any new information or testimony offered at the hearing. The Chair must document and share their rationale for any exclusion or inclusion at this pre-hearing meeting.

The Chair, **only** with full agreement of the parties, may decide in advance of the hearing that certain witnesses do not need to be present if their testimony can be adequately summarized by the Investigator(s) in the investigation report or during the hearing.

At each pre-hearing meeting with a party and their Advisor, the Chair will consider arguments that evidence identified in the final investigation report as relevant is, in fact, not relevant. Similarly, evidence identified as directly related but not relevant by the Investigator(s) may be argued to be relevant. The Chair may rule on these arguments pre-hearing and will exchange those rulings between the parties prior to the hearing to assist in preparation for the hearing. The Chair may consult with the Office of General Counsel and/or the Title IX Coordinator, or ask either or both to attend pre-hearing meetings.

The pre-hearing meeting(s) will not be recorded.

## Y. Hearing Procedures

At the hearing, the panel has the authority to hear and make determinations on all allegations of discrimination, harassment, and/or retaliation and may also hear and make determinations on any additional alleged policy violations that have occurred in concert with the discrimination, harassment, and/or retaliation, even though those collateral allegations may not specifically fall within this  policy.

Participants at the hearing will include the Chair, any additional panelists, the Investigator(s) who conducted the investigation, the parties (or three (3) organizational representatives when an organization is the Respondent), Advisors to the parties, any called witnesses, CWRU General Counsel may be present, and anyone providing authorized accommodations or assistive services.

The Chair of the panel will answer all questions of procedure. Anyone appearing at the hearing to provide information will respond to questions on their own behalf.

The Chair of the panel will allow witnesses who have relevant information to appear at a portion of the hearing in order to respond to specific questions from the panel, and the parties and will then be excused.

## Z. Joint Hearings

In hearings involving more than one Respondent or in which two (2) or more Complainants have accused the same individual of substantially similar conduct; the default procedure will be to hear the allegations jointly.

However, the Title IX Coordinator or designee may permit the investigation and/or hearings pertinent to each Respondent to be conducted separately if there is a compelling reason to do so. In joint hearings, separate determinations of responsibility will be made for each Respondent with respect to each alleged policy violation.

## AA. The Order of the Hearing – Introductions and Explanation of Procedure

The Chair of the panel will explain the procedures and introduce the participants. This may include a final opportunity for challenge or recusal of panel members on the basis of bias or conflict of interest. The Chair will rule on any such challenge unless the Chair is the individual who is the subject of the challenge, in which case the Title IX Coordinator will review and decide the challenge.

The Chair of the panel conducts the hearing according to the hearing script. At the hearing, recording, witness logistics, party logistics, collection of documents, separation of the parties, and other administrative elements of the hearing process are managed by a non-voting hearing facilitator appointed by the Title IX Coordinator. The hearing facilitator may attend to: logistics of rooms for various parties/witnesses as they wait; flow of parties/witnesses in and out of the hearing space; ensuring recording and/or virtual conferencing technology is working as intended; copying and distributing materials to participants, as appropriate, etc.

## AB. Investigator Presents the Final Investigation Report

The Investigator(s) will then present a summary of the final investigation report, including items that are contested and those that are not, and will be subject to questioning by the panel and the parties (through their Advisors). The Investigator(s) will be present during the entire hearing process, but not during deliberations.

Neither the parties nor the panel should ask the Investigator(s) their opinions on credibility, recommended findings, or determinations, and the Investigators, Advisors, and parties will refrain from discussion of or questions about these assessments. If such information is introduced, the Chair of the panel will direct that it be disregarded.

## AC. Testimony and Questioning

Once the Investigator(s) present their report and are questioned, the parties and witnesses may provide relevant information in turn, beginning with the Complainant, and then in the order determined by the Chair of the panel. The parties/witnesses will submit to questioning by the panel and then by the parties through their Advisors ("cross-examination").

All questions are subject to a relevance determination by the Chair of the panel. The Advisor, who will remain seated during questioning, will pose the proposed question orally, electronically, or in writing (orally is the default, but other means of submission may be permitted by the Chair of the panel upon request or agreed to by the parties and the Chair), the proceeding will pause to allow the Chair of the panel to consider it, and the Chair will determine whether the question will be permitted, disallowed, or rephrased.

49

The Chair of the panel may explore arguments regarding relevance with the Advisors, if the Chair of the panel so chooses. The Chair will then state their decision on the question for the record and advise the party/witness to whom the question was directed, accordingly. The Chair will explain any decision to exclude a question as not relevant, or to reframe it for relevance.

The Chair will limit or disallow questions on the basis that they are irrelevant, unduly repetitious (and thus irrelevant), or abusive. The Chair has final say on all questions and determinations of relevance, subject to any appeal. The Chair may consult with legal counsel on any questions of admissibility. The Chair may ask advisors to frame why a question is or is not relevant from their perspective but will not entertain argument from the advisors on relevance once the Chair has ruled on a question.

If the parties raise an issue of bias or conflict of interest of an Investigator or panel member at the hearing, the Chair may elect to address those issues, consult with legal counsel, and/or refer them to the Title IX Coordinator or designee, and/or preserve them for appeal. If bias is not in issue at the hearing, the Chair should not permit irrelevant questions that probe for bias.

## AD. Refusal to Submit to Cross-Examination and Inferences

Cross-examination is an all or nothing proposition, meaning that if any question is refused, no statements of that party or witness are admissible. Only if a party or witness is willing to submit to cross-examination, and answers all questions, will their statements prior to or at the hearing be fully admissible. If a party or witness chooses not to submit to cross-examination at the hearing, either because they do not attend the meeting, or they attend but refuse to participate in questioning, then the Decision-maker(s) may not rely on any prior statement made by that party or witness at the hearing (including those contained in the investigation report) in the ultimate determination of responsibility. The Decision-maker(s) must disregard all statements. Evidence provided that is something other than a statement by the party or witness may be considered.

Whether a party or witness does or does not answer questions from the Decision-maker, their statements will be admissible as long as they are willing to submit to cross-examination questions, even if they are not asked such questions. The Decision-maker(s) may not draw any inference solely from a party's or witness's absence from the hearing or refusal to answer cross-examination or other questions.

If a party's Advisor of choice refuses to comply with the CWRU's established rules of decorum for the hearing, the Recipient may require the party to use a different Advisor. If a CWRU provided Advisor refuses to comply with the rules of decorum, the CWRU may provide that party with a different Advisor to conduct cross-examination on behalf of that party.

## AE. Recording Hearings

Hearings (but not deliberations) are recorded by CWRU for purposes of review in the event of an appeal. The parties may not record the proceedings and no other unauthorized recordings are permitted.

The panel, the parties, their Advisors, and appropriate administrators of CWRU will be permitted to listen to the recording in a controlled environment determined by the Title IX Coordinator or designee. No person will be given or be allowed to make a copy of the recording without permission of the Title IX Coordinator or designee.

# AF. Deliberation, Decision-making, and Standard of Proof

The Panel will deliberate in closed session to determine whether the Respondent is responsible or not responsible for the policy violation(s) in question.   A simple majority vote is required to determine the finding. The preponderance of the evidence standard of proof is used. The hearing facilitator may be invited to attend the deliberation by the Chair, but is there only to facilitate procedurally, not to address the substance of the allegations.

When there is a finding of responsibility on one or more of the allegations, the panel may then consider the previously submitted party impact statements in determining appropriate sanction(s).

The Chair will ensure that each of the parties has an opportunity to review any impact statement submitted by the other party. The panel may at their discretion consider the statements, but they are not binding.

The panel will review the statements and any pertinent conduct history provided by the Title IX Coordinator of designee and will determine the appropriate sanction(s) in consultation with the Provost or designee for faculty, Vice President for Student of Affairs or designee for students, and Vice President for Human Resources or designee for staff.

The Chair will then prepare a written deliberation statement and deliver it to the Title IX Coordinator or designee detailing the determination, rationale, the evidence used in support of its determination; the evidence not relied upon in its determination, credibility assessments, and any sanctions.

This report is typically three (3) to five (5) pages in length and must be submitted to the Title IX Coordinator within two (3) business days of the end of deliberations, unless the Title IX Coordinator grants an extension. If an extension is granted, the Title IX Coordinator will notify the parties.

# AG. Notice of Outcome

Using the deliberation statement, the Title IX Coordinator or designee will work with the Chair to prepare a Notice of Outcome. The Notice of Outcome will then be reviewed by the Office of General Counsel. The Title IX Coordinator or designee will then share the letter, including the final determination, rationale, and any applicable sanction(s) with the parties and their Advisors within 5 business days of receiving the Decision-maker(s)' deliberation statement.

The Notice of Outcome will then be shared with the parties simultaneously. Notification will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official CWRU records, or emailed to the parties' CWRU-issued email or otherwise approved account. Once mailed, emailed, and/or received in-person, notice will be presumptively delivered.

The Notice of Outcome will identify the specific policies reported to have been violated, including the relevant policy section, and will contain a description of the procedural steps taken by the CWRU from the receipt of the misconduct report to the determination, including any and all notifications to the parties, interviews with parties and witnesses, site visits, methods used to obtain evidence, and hearings held.

The Notice of Outcome will specify the finding on each alleged policy violation; the findings of fact that support the determination; conclusions regarding the application of the relevant policy to the facts at issue; a statement of, and rationale for, the result of each allegation to the extent the Recipient is permitted to share such information under state or federal law; any sanctions issued which the CWRU is permitted to share according to state or federal law; and any remedies provided to the Complainant designed to ensure access to CWRU's educational or employment program or activity, to the extent the university is permitted to share such information under state or federal law (this detail is not typically shared with the Respondent unless the remedy directly relates to the Respondent).

The Notice of Outcome will also include information on when the results are considered by the university to be final, any changes that occur prior to finalization, and the relevant procedures and bases for any available appeal options.

# AH. Sanctions

Factors considered when determining a sanction/responsive action may include, but are not limited to:
   A.  The nature, severity of, and circumstances surrounding the violation(s)
   B.  The Respondent's disciplinary history
   C.  Previous allegations or allegations involving similar conduct
   D.  The need for sanctions/responsive actions to bring an end to the discrimination,
   E.  harassment, and/or retaliation
   F.  The need for sanctions/responsive actions to prevent the future recurrence of
   G.  discrimination, harassment, and/or retaliation
   H.  The need to remedy the effects of the discrimination, harassment, and/or
   I.  retaliation on the Complainant and the community
   J.  The impact on the parties
   K.  Any other information deemed relevant by the Decision-maker(s)

The sanctions will be implemented as soon as is feasible, either upon the outcome of any appeal or the expiration of the window to appeal without an appeal being requested.

The sanctions described in this policy are not exclusive of, and may be in addition to, other actions taken or sanctions imposed by external authorities.

The following sanctions may be imposed upon any member of the community found to have violated this policy. Typical sanctions that may be imposed upon students, employees, or organizations, but not limited to:

Student/Organization Sanctions

- Disciplinary Warning
- Disciplinary Probation
- Separation from the University
- Expulsion from the University
- Required Education and Training
- Organizational Sanctions
- Withholding Diploma
- Revocation of Degree

Employee Sanctions:

- Warning: Written or Verbal
- Performance Improvement Plan
- Demotion
- Required Counseling
- Probation
- Loss of oversight or Supervisory Responsibility
- Required Education and Training
- Loss of Annual Pay Increase
- Suspension with  pay
- Suspension without pay
- Termination
- Other Actions: In addition to or in place of the above sanctions, CWRU may assign any other sanctions as deemed appropriate.

# AI. Sanctioning Guidelines

Any person found responsible for violating Sexual Assault section of the policy will likely receive a sanction ranging from separation to expulsion (student) or suspension to termination (employee), taking into account the severity of the incident, any previous disciplinary violations, and other considerations.

53

Any person found responsible for violation of the Sexual Exploitation or Sexual Harassment section of this policy will likely receive a sanction ranging from warning to expulsion (student) or warning to termination (employee), taking into account the severity of the incident, any previous disciplinary violations, and other considerations.

Any person found responsible for dating violence, domestic violence or stalking will likely receive a sanction ranging from disciplinary probation to expulsion (student),  probation suspension, or termination (employee) from the university, taking into account the severity of the incident, any previous disciplinary violations, and other considerations.

The Sexual Misconduct Panel or administrator reserves the right to broaden or lessen any range of sanctions in the case of serious mitigating circumstances or egregiously offensive behavior. Neither the initial hearing panel nor any appeals panel will deviate from the range of recommended sanctions unless compelling justification exists to do so.

# AJ. Withdrawal or Resignation While Charges Pending

*Students:*  Should a student decide to not participate in the resolution process, the process proceeds absent their participation to a reasonable resolution. Should a student Respondent permanently withdraw from the university, the resolution process ends, as the university no longer has disciplinary jurisdiction over the withdrawn student.

However, the university will continue to address and remedy any systemic issues, variables that may have contributed to the alleged violation(s), and any ongoing effects of the alleged harassment, discrimination, and/or retaliation. The student who withdraws or leaves while the process is pending may not return to the university. Such exclusion applies to all campuses/programs of CWRU. Admissions and the Registrar will be notified that they cannot be readmitted. They may also be barred from university property and/or events.

If the student Respondent only withdraws or takes a leave for a specified period of time (e.g., one semester or term), the resolution process may continue remotely and that student is not permitted to return to the university unless and until all sanctions have been satisfied.

*Employees:* Should an employee Respondent resign with unresolved allegations pending, the resolution process ends, as the university no longer has disciplinary jurisdiction over the resigned employee.

However, the university will continue to address and remedy any systemic issues, variables that contributed to the alleged violation(s), and any ongoing effects of the alleged harassment or discrimination.

54

The employee who resigns with unresolved allegations pending is not eligible for rehire with any university programs or campuses, and the records retained by the Title IX Coordinator will reflect that status.

All university responses to future inquiries regarding employment references for that individual will include that the former employee resigned during a pending disciplinary matter.

# AK. Appeals

Any party may file a request for appeal ("Request for Appeal"), but it must be submitted in writing to the Title IX Coordinator or designee within three (3) business days of the delivery of the Notice of Outcome.

The Title IX Coordinator will designate a three-member appeal panel chosen from the Pool of panel members. No appeal panelists will have been involved in the process previously, including any dismissal appeal that may have been heard earlier in the process. A voting Chair of the Appeal panel will be designated.

The Request for Appeal will be forwarded to the Appeal Chair for consideration to determine if the request meets the grounds for appeal (a Review for Standing).

This review is not a review of the merits of the appeal, but solely a determination as to whether the request meets the grounds and is timely filed.

## 1. Grounds for Appeal

Appeals are limited to the following grounds:

1. Procedural irregularity that affected the outcome of the matter;
2. New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter; and
3. The Title IX Coordinator, Investigator(s), or Decision-maker(s) had a conflict of interest or bias for or against Complainants or Respondents generally or the specific Complainant or Respondent that affected the outcome of the matter.

If any of the grounds in the Request for Appeal do not meet the grounds in this Policy, that request will be denied by the Chair, and the parties and their Advisors will be notified in writing of the denial and the rationale.

If any of the grounds in the Request for Appeal meet the grounds listed above, then the Appeal Chair will notify the other parties and their Advisors, the Title IX Coordinator, and, when appropriate, the Investigators and/or the original panel.

The other parties and their Advisors, the Title IX Coordinator, and, when appropriate, the Investigators and/or panel will be emailed, and/or provided a hard copy of the request with the approved grounds and then be given 3 business days to submit a response to the portion of the appeal that was approved and involves them. All responses will be forwarded by the Chair to all parties for review and comment.

The non-appealing party (if any) may also choose to raise a new ground for appeal at this time. If so, that will be reviewed for standing by the Appeal Chair and either denied or approved. If approved, it will be forwarded to the party who initially requested an appeal, the Investigator(s) and/or original Decision-maker(s), as necessary, who will submit their responses in 3 business days, which will be circulated for review and comment by all parties.

Neither party may submit any new requests for appeal after this period. The Appeal Chair will collect any additional information needed and all documentation regarding the approved grounds and the subsequent responses will be shared with the Appeal Panel, and the Chair of the panel will render a decision in no more than five (5) business days, barring exigent circumstances.

A Notice of Appeal Outcome will be sent to all parties simultaneously including the decision on each approved ground and rationale for each decision. The Notice of Appeal Outcome will specify the finding on each ground for appeal, any specific instructions for remand or reconsideration, any sanctions that may result which the university is permitted to share according to state or federal law, and the rationale supporting the essential findings to the extent the university is permitted to share under state or federal law.


Notification will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official institutional records, or emailed to the parties' university-issued email or otherwise approved account. Once mailed, emailed and/or received in-person, notice will be presumptively delivered.

## 2. Sanctions Status During the Appeal

Any sanctions imposed as a result of the hearing are stayed during the appeal process. Supportive measures may be reinstated, subject to the same supportive measure procedures above.

If any of the sanctions are to be implemented immediately post-hearing, then emergency removal procedures detailed in section for a hearing on the justification for doing so must be permitted within 48 hours of implementation.

The university may still place holds on official transcripts, diplomas, graduations, and course registration pending the outcome of an appeal when the original sanctions included separation.

### 3. Appeal Considerations

1. Decisions on appeal are to be deferential to the original decision, making changes to the finding only when there is clear error and to the sanction(s)/responsive action(s) only if there is a compelling justification to do so.
2. Appeals are not intended to provide for a full re-hearing (de novo) of the allegation(s). In most cases, appeals are confined to a review of the written documentation or record of the original hearing and pertinent documentation regarding the specific grounds for appeal.
3. An appeal is not an opportunity for an Appeal panel to substitute their judgment for that of the original panel merely because they disagree with the finding and/or sanction(s).
4. The Appeal Chair/Panel may consult with the Title IX Coordinator or designee on questions of procedure or rationale, for clarification, if needed. Documentation of all such consultation will be maintained.
5. Appeals granted based on new evidence should normally be remanded to the original Investigator(s) and panel for reconsideration. Other appeals may be remanded at the discretion of the Title IX Coordinator or, in limited circumstances, decided on appeal.
6. Once an appeal is decided, the outcome is final: further appeals are not permitted, even if a decision or sanction is changed on remand (except in the case of a new hearing).
7. In rare cases where a procedural error cannot be cured by the original panel (as in cases of bias), the appeal may order a new hearing with a new panel.
8. The results of a remand to a panel cannot be appealed. The results of a new hearing can be appealed, once, on any of the three available appeal grounds.
9. In cases in which the appeal results in reinstatement to the university or resumption of privileges, all reasonable attempts will be made to restore the Respondent to their prior status, recognizing that some opportunities lost may be irreparable in the short term.

## AL. Long-Term Remedies/Other Actions

Following the conclusion of the resolution process, and in addition to any sanctions implemented, the Title IX Coordinator may implement additional long-term remedies or actions with respect to the parties and/or the campus community that are intended to stop the harassment, discrimination, and/or retaliation, remedy the effects, and prevent reoccurrence.

These remedies/actions may include, but are not limited to:

- Referral to counseling and health services
- Referral to the Employee Assistance Program Impact Solutions
- Education to the individual and/or the community
- Permanent alteration of housing assignments
- Permanent alteration of work arrangements for employees

- Provision of campus safety escorts
- Climate surveys
- Policy modification and/or training
- Provision of transportation accommodations
- Implementation of long-term contact limitations between the parties
- Implementation of adjustments to academic deadlines, course schedules, etc.

At the discretion of the Title IX Coordinator or designee, certain long-term support or measures may also be provided to the parties even if no policy violation is found.

When no policy violation is found, the Title IX Coordinator will address any remedies owed by the university to the Respondent to ensure no effective denial of educational access.

The university will maintain the privacy of any long-term remedies/actions/measures, provided privacy does not impair the Recipient's ability to provide these services.

# AM. Failure to Comply with Sanctions and/or Interim and Long-term Remedies and/or Responsive Actions

All Respondents are expected to comply with the assigned sanctions, responsive actions, and/or corrective actions within the timeframe specified by the final panel (including the Appeal Chair/Panel).

Failure to abide by the sanction(s)/action(s) imposed by the date specified, whether by refusal, neglect, or any other reason, may result in additional sanction(s)/action(s), including suspension, expulsion, and/or termination from the university and may be noted on a student's official transcript.

A suspension will only be lifted when compliance is achieved to the satisfaction of the Title IX Coordinator.

# AN. Recordkeeping

CWRU will maintain for a period of at least seven years records of:

1. Each sexual harassment investigation including any determination regarding responsibility and any audio or audiovisual recording or transcript required under federal regulation;
2. Any disciplinary sanctions imposed on the Respondent;
3. Any remedies provided to the Complainant designed to restore or preserve equal access to the university's educational program or activity;
4. Any appeal and the result therefrom;
5. Any Informal Resolution and the result therefrom;

58

6. All materials used to train Title IX Coordinators, Investigators, Decision-makers, and any person who facilitates an Informal Resolution process. The university will make these training materials publicly available on Recipient's website.

7. Any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment, including:

    1. The basis for all conclusions that the response was not deliberately indifferent;

    2. Any measures designed to restore or preserve equal access to the university's education program or activity; and

    3. If no supportive measures were provided to the Complainant, document the reasons why such a response was not clearly unreasonable in light of the known circumstances.

The university will also maintain any and all records in accordance with state and federal laws.

# AO. Statement of the Rights of the Parties

See Appendix A.

# AP. Disabilities Accommodations in the Resolution Process

CWRU is committed to providing reasonable accommodations and support to qualified students, employees, or others with disabilities to ensure equal access to the university's resolution process.

Anyone needing such accommodations or support should contact the Office of Disability Resources for students and Office of Equity for employees who will review the request and, in consultation with the person requesting the accommodation and the Title IX Coordinator, determine which accommodations are appropriate and necessary for full participation in the process.

# AQ. Revision of this Policy and Procedures

This Policy and procedures supersede any previous policies addressing harassment, sexual misconduct, discrimination, and/or retaliation and will be reviewed and updated annually by the Title IX Coordinator. The university reserves the right to make changes to this document as necessary, and once those changes are posted online, they are in effect.

During the resolution process, the Title IX Coordinator may make minor modifications to procedures that do not materially jeopardize the fairness owed to any party, such as to accommodate summer schedules. The Title IX Coordinator may also vary procedures materially with notice (on the institutional website, with the appropriate effective date identified) upon determining that changes to law or regulation require policy or procedural alterations not reflected in this Policy and procedures.

If government laws or regulations change – or court decisions alter – the requirements in a way that impacts this document, this document will be construed to comply with the most recent government regulations or holdings.

# III. INTERIM RESOLUTION PROCESS FOR ALLEGED VIOLATIONS OF THE POLICY ON SEXUAL HARASSMENT WHERE PROCESS "A" IS NOT APPLICABLE (KNOWN AS PROCESS "B")

CWRU will act on any formal or informal allegation or notice of violation of the policy on Sexual Harassment  that is received by the Title IX Coordinator or designee or a mandate reporter (faculty, staff, resident assistants, orientation leaders, teaching assistants) , with the exception of confidential resources, as articulated in the Policy above.

The procedures described below apply to all allegations of sexual harassment involving students, staff, faculty members, or third parties when the Title IX Coordinator determines Process "A" is inapplicable due to mandatory dismissal in Section II (B)(b). If process "A" is applicable, Process "A" must be applied in lieu of Process "B".

These procedures may also be used to address collateral misconduct arising from the investigation of or occurring in conjunction with harassing or discriminatory conduct (e.g., vandalism, physical abuse of another). All other allegations of misconduct unrelated to incidents covered by this policy will be addressed through the procedures elaborated in the respective student, faculty, and staff handbooks.

## A. Initial Assessment

Following intake, receipt of notice, or a complaint of an alleged violation of the university's Sexual Harassment and non-discrimination Policy, the Title IX Coordinator or designee engages in an initial assessment, which is typically one to five business days in duration. The steps in an initial assessment can include:

1. The Title IX Coordinator or designee reaches out to the Complainant to offer supportive measures.
2. The Title IX Coordinator or designee works with the Complainant to ensure they have an Advisor.
3. The Title IX Coordinator or designee works with the Complainant to determine whether the Complainant prefers a supportive response or an Administrative Resolution.
   a. If a supportive and remedial response is preferred, the Title IX Coordinator works with the Complainant to identify their wishes and then seeks to facilitate implementation. The Administrative Resolution process is not initiated, though the Complainant can elect to initiate it later, if desired.

      b. If an Informal Resolution option is preferred, the Title IX Coordinator assesses whether the complaint is suitable for informal resolution, and may seek to determine if the Respondent is also willing to engage in Informal Resolution.

      c. If Administrative Resolution is preferred, the Title IX Coordinator initiates the investigation process and determines whether the scope of the investigation will address:

          i. Incident, and/or

          ii. A potential pattern of misconduct, and/or

          iii. A culture/climate issue.

4. In many cases, the Title IX Coordinator may determine that a Violence Risk Assessment (VRA) should be conducted by the Threat Assessment Behavioral Intervention Team (TABIT) as part of the initial assessment. A VRA can aid in ten critical and/or required determinations, including:

      a. Interim suspension of a Respondent who is a threat to health/safety;

      b. Whether the Title IX Coordinator should pursue Administrative Resolution absent a willing/able Complainant;

      c. Whether to put the investigation on the footing of incident and/or pattern and/or climate;

      a. To help identify potentially predatory conduct;

      b. To help assess/identify grooming behaviors;

      c. Whether a Complaint is amenable to Informal Resolution, and what modality may be most successful;

      d. Whether to permit a voluntary withdrawal by the Respondent;

      e. Whether to impose transcript notation or communicate with a transfer Recipient about a Respondent;

      f. Assessment of appropriate sanctions/remedies;

      g. Whether a Clery Act Timely Warning/Persona-non-grata is needed.

Based on the initial assessment, the university will initiate one of two responses:

1. Informal Resolution – typically used for less serious offenses and only when all parties agree to Alternate Resolution, or when the Respondent is willing to accept responsibility for violating policy. This can also include a remedies-only response.

2. Administrative Resolution – investigation of policy violation(s) and subject to a determination by the hearing panel and the opportunity to appeal to an Appeal Panel.

The investigation and the subsequent Administrative Resolution determine whether the sexual harassment and non-discrimination policy has been violated. If so, the university will promptly implement effective remedies designed to end the discrimination, prevent recurrence, and address the effects.

The process followed considers the preference of the parties but is ultimately determined at the discretion of the Title IX Coordinator or designee. At any point during the initial assessment or formal

investigation, if the Title IX Coordinator or designee determines that reasonable cause does not support the conclusion that policy has been violated, the process will end, and the parties will be notified.

The Complainant may request that the Title IX Coordinator or designee review the reasonable cause determination and/or re-open the investigation. This decision lies in the sole discretion of the Title IX Coordinator, but the request is usually only granted in extraordinary circumstances.

# B. Resolution Process Pool

The Resolution Process relies on a pool of faculty, staff, and students ("the panel") to carry out the process. Panel members will consist of faculty, staff, and students. Investigators in the Office of Equity will conduct all investigations.  Members of the Pool are announced in an annual distribution of this policy to all students, parents/guardians of students, employees, prospective students, and prospective employees. They are also listed on the Office of Equity website.

Pool member roles, appointment, and training are described above in Section II(F) entitled Grievance Process Pool.

# C. Counterclaims

Counterclaims by the Respondent may be made in good faith but are also sometimes made for purposes of retaliation. The university is obligated to ensure that any process is not abused for retaliatory purposes.

The university permits the filing of counterclaims, but uses the initial assessment, described above in the Policy section, to assess whether the allegations are made in good faith. If they are, the allegations will be processed using the resolution procedures below, typically after resolution of the underlying allegation.

A delay in the processing of counterclaims is permitted, accordingly. Occasionally, allegations and counterclaims can be resolved through the same investigation, at the discretion of the Title Coordinator or designee. When counterclaims are not made in good faith, they will be considered retaliatory, and may constitute a violation of this Policy.

# D. Advisors

## 1. Expectations of an Advisor

The university generally expects an Advisor to adjust their schedule to allow them to attend university meetings when planned, but the university may change scheduled meetings to accommodate an Advisor's inability to attend, if doing so does not cause an unreasonable delay.

The university may also make reasonable provisions to allow an Advisor who cannot attend in person to attend a meeting by telephone, video conferencing, or other similar technologies as may be convenient and available.

Parties whose Advisors are disruptive or who do not abide by university policies and procedures may face the loss of that Advisor and/or possible Policy violations.

Advisors are expected to consult with their advisees without disrupting university meetings or interviews. Advisors do not represent parties in the process; their role is only to advise.

## 2. Expectations of the Parties with Respect to Advisors

Each party may choose an Advisor[7] who is eligible and available to accompany them throughout the process. The Advisor can be anyone, including an attorney, but should not be someone who is also a witness in the process. A party may elect to change Advisors during the process and is not obligated to use the same Advisor throughout.

The parties are expected to inform the Investigators of the identity of their Advisor at least two (2) business days before the date of their first meeting with the Investigator(s) (or as soon as possible if a more expeditious meeting is necessary or desired).

The parties are expected to provide timely notice to the Investigator(s) and/or the Title IX Coordinator if they change Advisors at any time.

## 3. Assistance in Securing an Advisor

The Office of Equity will work with the Complainant and Respondent in securing an advisor through the process.

# E. Resolution Options

Proceedings are private. All persons present at any time during the resolution process are expected to maintain the privacy of the proceedings in accord with university Policy.

While there is an expectation of privacy around what is discussed during interviews, the parties have discretion to share their own experiences with others if they so choose, but are encouraged to discuss with their Advisors first before doing so.

---

[7] This could include an attorney, advocate, or support person. Witnesses are not entitled to Advisors within the process, though they can be advised externally. If CWRU allows more than one Advisor for one party, they should do so for all parties.

## 1. Informal Resolution

Informal Resolution is applicable when the parties voluntarily agree to resolve the matter through Alternate Resolution or when the Respondent accepts responsibility for violating Policy, or when the Title IX Coordinator or designee can resolve the matter informally by providing remedies to resolve the situation.

It is not necessary to pursue Informal Resolution first in order to pursue Administrative Resolution, and any party participating in Informal Resolution can stop the process at any time and request the Administrative Resolution process. Further, if an Informal Resolution fails after the fact, Administrative Resolution may be pursued.

### a. Alternate Resolution

Alternate Resolution is an informal process, such as mediation or restorative practices, by which a mutually agreed upon resolution of an allegation is reached. It may be used for less serious, yet inappropriate, behaviors and is encouraged as an alternative to the Administrative Resolution process (described below) to resolve conflicts. The parties must consent to the use of Alternate Resolution.

The Title IX Coordinator or designee determines if Alternate Resolution is appropriate, based on the willingness of the parties, the nature of the conduct at issue, and the susceptibility of the conduct to Alternate Resolution.

In an Alternate Resolution meeting, a trained administrator facilitates a dialogue with the parties to an effective resolution, if possible. Institutionally-imposed sanctions are not possible as the result of an Alternate Resolution process, though the parties may agree to accept sanctions and/or appropriate remedies.

The Title IX Coordinator or designee maintains records of any resolution that is reached, and failure to abide by the resolution can result in appropriate enforcement actions.

Alternate Resolution is not typically the primary resolution mechanism used to address reports of violent behavior of any kind or in other cases of serious violations of policy, though it may be made available after the Administrative Resolution process is completed should the parties and the Title IX Coordinator or designee, believe it could be beneficial. The results of Alternate Resolution are not appealable.

### b. Respondent Accepts Responsibility for Alleged Violations

The Respondent may accept responsibility for all or part of the alleged policy violations at any point during the resolution process. If the Respondent accepts responsibility, the Title IX Coordinator makes a determination that the individual is in violation of university Policy.

65

The Title IX Coordinator or designee then determines appropriate sanction(s) or responsive actions, which are promptly implemented in order to effectively stop the harassment, discrimination, and/or retaliation; prevent its recurrence; and remedy the effects of the conduct, both on the Complainant and the community.

If the Respondent accepts responsibility for <u>all</u> of the alleged policy violations and the Title IX Coordinator or designee has determined appropriate sanction(s) or responsive actions, which are promptly implemented, the process is over. The Complainant will be informed of this outcome.

If the Respondent accepts responsibility for <u>some</u> of the alleged policy violations and the Title IX Coordinator or designee has determined appropriate sanction(s) or responsive actions, which are promptly implemented, for those violations, then the remaining allegations will continue to be investigated and resolved. The Complainant will be informed of this outcome. The parties are still able to seek Alternate Resolution on the remaining allegations, subject to the stipulations above.

## c. Negotiated Resolution

 The Title IX Coordinator or designee, with the consent of the parties, may negotiate and implement any agreement to resolve the allegations that satisfies all parties and the university.

# 2. Administrative Resolution

Administrative Resolution can be pursued for any behavior for which the Respondent has not accepted responsibility that constitutes conduct covered by the Sexual Harassment Policy at any time during the process. Administrative Resolution starts with a thorough, reliable, and impartial investigation.

If Administrative Resolution is initiated, the Title IX Coordinator or designee will provide written notification of the investigation to the parties at an appropriate time during the investigation. Typically, notice is given at least 48 hours in advance of an interview. Advanced notice facilitates the parties' ability to identify and choose an Advisor, if any, to accompany them to the interview.

Notification will include a meaningful summary of the allegations, will be made in writing, and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official university records, or emailed to the parties' university-issued or designated email account.

Once mailed, emailed, and/or received in-person, notice will be presumptively delivered. The notification should include the policies allegedly violated, if known at the time. Alternatively, the policies allegedly violated can be provided at a later date, in writing, as the investigation progresses, and details become clearer.

The university aims to complete all investigations within a sixty (60) business day time period, which can be extended as necessary for appropriate cause by the Title IX Coordinator or designee, with notice to the parties as appropriate.

Once the decision is made to commence an investigation, the Title IX Coordinator or designee appoints investigators to conduct the investigation (typically using a team of two Investigators), usually within two (2) business days of determining that an investigation should proceed.

The Title IX Coordinator or designee will vet the assigned Investigator(s) to ensure impartiality by ensuring there are no conflicts of interest or disqualifying bias.

The parties may, at any time during the resolution process, raise a concern regarding bias or conflict of interest, and the Title IX Coordinator or designee will determine whether the concern is reasonable and supportable. If so, another Investigator will be assigned and the impact of the bias or conflict, if any, will be remedied. If the bias or conflict relates to the Title IX Coordinator, concerns should be raised with the Office of General Counsel.

Investigations are completed expeditiously, normally within 60 business days, though some investigations take weeks or even months, depending on the nature, extent, and complexity of the allegations, availability of witnesses, police involvement, etc.

The university will make a good faith effort to complete investigations as promptly as circumstances permit and will communicate regularly with the parties to update them on the progress and timing of the investigation.

The university may undertake a short delay in its investigation (several days to weeks, to allow evidence collection) when criminal charges based on the same behaviors that invoke the Recipient's resolution process are being investigated by law enforcement. The university will promptly resume its investigation and resolution process once notified by law enforcement that the initial evidence collection process is complete.

University action(s) are not typically altered or precluded on the grounds that civil or criminal charges involving the underlying incident(s) have been filed or that criminal charges have been dismissed or reduced.

Investigations involve interviews with all relevant parties and witnesses, obtaining available, relevant evidence, and identifying sources of expert information, as necessary.

All parties have a full and fair opportunity, though the investigation process, to suggest witnesses and questions, to provide evidence, and to fully review and respond to all evidence, on the record.

67

## F. Investigation

The Investigators typically take the following steps, if not already completed (not necessarily in this order):

- Determine the identity and contact information of the Complainant.
- In coordination with campus partners (e.g., the Title IX Coordinator), initiate or assist with any necessary supportive measures.
- Identify all policies implicated by the alleged misconduct.
- Assist the Title IX Coordinator or designee with conducting an initial assessment to determine if there is reasonable cause to believe the Respondent has violated policy
- If there is insufficient evidence to support reasonable cause, the process is closed with no further action.
- Commence a thorough, reliable, and impartial investigation by developing a strategic investigation plan, including a witness list, evidence list, intended investigation timeframe, and order of interviews for all parties and witnesses.
- Meet with the Complainant to finalize their statement, if necessary
- Prepare the initial Notice of Investigation and Allegation (NOIA) on the basis of the initial assessment. Notice may be one-step or multiple steps, depending on how the investigation unfolds, and potential policy violations may be added or dropped as more is learned. Investigators will update the NOIA accordingly and provide it to the parties.
- Notice should inform the parties of their right to have the assistance of an advisor appointed by the university or other Advisor of their choosing present for all meetings attended by the advisee.
- When formal notice is being given, it should provide the parties with a written description of the alleged violation(s), a list of all policies allegedly violated, a description of the applicable procedures, and a statement of the potential sanctions/responsive actions that could result
- Give an instruction to the parties to preserve any evidence that is directly related to the allegations.
- Provide the parties and witnesses with an opportunity to review and verify the Investigator's summary notes from interviews and meetings with that specific party or witness
- Make good faith efforts to notify the parties of any meeting or interview involving the other party, in advance when possible.
- Interview all relevant individuals and conduct follow-up interviews as necessary
- Allow each party the opportunity to suggest questions they wish the Investigator(s) to ask of the other party and witnesses
- Complete the investigation promptly and without unreasonable deviation from the intended timeline
- Provide regular status updates to the parties throughout the investigation.

68

- Prior to the conclusion of the investigation, summarize for the parties the list of witnesses whose information will be used to render a finding.
- Write a comprehensive investigation report fully summarizing the investigation and all evidence
- Provide parties with a copy of the draft investigation report when it is completed
- Provide each party with a full and fair opportunity to respond to the report in writing within five (5) business days and incorporate that response into the report. Investigators may choose to respond in writing in the report to the responses of the parties, and/or to share the responses between the parties for their responses, while also ensuring that they do not create a never-ending feedback loop.
- Share the report with the Title IX Coordinator or legal counsel for review and feedback.
- Provide the final report to the Title IX Coordinator.

# G. Determination

Within two to three days of receiving the Investigator's report, the Title IX Coordinator will make the determination if the information should be forwarded to a hearing. The panel will make the final determination on the basis of the preponderance of the evidence.

If the record is incomplete, the Title IX Coordinator or designee may direct a re-opening of the investigation, or may direct or conduct any additional inquiry necessary, including informally meeting with the parties or any witnesses, if needed.

The Title IX Coordinator will provide a notice of hearing. Hearings will be held at minimum 10 days of receiving notification and final investigative report.

To ensure that the reporting party and responding party have information concerning all witnesses prior to the hearing, no witness interviews will be conducted 48 hours before a scheduled hearing date. If additional witnesses are identified or additional information is discovered, the hearing date will be rescheduled for a later date.

The hearing will be closed, but will generally include the Complainant, Respondent, their advisers, the Title IX personnel who conducted the investigation, general counsel, and the hearing representative(s).

The Complainant and Respondent will be able to ask questions through the panel chair of witnesses and of the parties. Questions are submitted to the panel chair in writing. The panel chair will determine if the questions are relevant. If the question is not allowed, it will be noted on the record.

The Title IX Coordinator or panel may invite and consider impact statements from the parties if and when determining appropriate sanction(s), if any.

If the complaint presents more than one allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying a preponderance of the evidence standard.

The parties will have the right to have an advisor of choice present at a hearing. However, this individual's role will be limited to advising the Complainant or Respondent. The advisor shall not address the panel or witnesses during the hearing.

Any conflicts of interest between a party and the fact-finder or decision-maker at a hearing must be disclosed.

If the Complainant or Respondent are aware of a defect during the procedure, they must call this to the attention of the hearing panel, chair or other institutional hearing authority.

The Title IX coordinator may, at his/her sole discretion, terminate proceedings and set them for a re-hearing upon: (a) receipt of new evidence not available prior to or  at time of the hearing that has potential to impact outcome; or (b) notice of procedural irregularity that has potential to impact the hearing's outcome.

The university will designate a three-member panel from the Pool of adjudicators, at the discretion of the Title IX Coordinator or designee. With a panel, one of the three members will be appointed as Chair by the Title IX Coordinator or designee.

The Chair, after consulting parties and Title IX Coordinator, may decide in advance of the hearing that certain witnesses do not need to be present if their testimony can be adequately summarized by the Investigator(s) in the investigation report or during the hearing or do not have relevant information.

The Title IX Coordinator or designee timely provides the parties with a written Notice of Outcome to include findings, any sanction(s), and a detailed rationale, delivered simultaneously (without undue delay) to the parties.

# H. Additional Details of the Investigation Process

## 1. Witness responsibilities

Witnesses (as distinguished from the parties) who are faculty or staff of the university are expected to cooperate with and participate in the university's investigation and resolution process. Failure of a witness to cooperate with and/or participate in the investigation or resolution process constitutes a violation of Policy and may be subject to discipline.

## 2. Remote processes

Parties and witnesses may be interviewed remotely by phone, video conferencing, or similar technologies if the Investigator(s) or Decision-maker determine that timeliness or efficiency dictates a need for remote interviewing. Witnesses may also provide written statements in lieu of interviews, or respond to questions in writing, if deemed appropriate by the Investigator(s), though this approach is not ideal. Where remote technologies are used, the Recipient makes reasonable efforts to ensure privacy, and that any technology does not work to the detriment of any party or subject them to unfairness.

## 3. Recording

No unauthorized audio or video recording of any kind is permitted during the resolution process. If Investigator(s) elect to audio and/or video record interviews, all involved parties must be made aware of audio and/or video recording.

## 4. Evidence

Any evidence that is relevant and credible may be considered, including an individual's prior misconduct history as well as evidence indicating a pattern of misconduct. The process should exclude irrelevant or immaterial evidence and may disregard evidence lacking in credibility or that is improperly prejudicial.

## 5. Sexual history/patterns

Unless the Title IX Coordinator determines it is appropriate, the investigation and the finding do not consider: (1) incidents not directly related to the possible violation, unless they evidence a pattern; (2) the sexual history of the parties (though there may be a limited exception made with regard to the sexual history between the parties); or (3) the character of the parties.

## 6. Previous allegations/violations

While previous conduct violations by the Respondent are not generally admissible as information supporting the current allegation, the Investigator(s) may supply the Title IX Coordinator or designee with information about previous good faith allegations and/or findings, when that information suggests potential pattern and/or predatory conduct.

Previous disciplinary action of any kind involving the Respondent may be considered in determining the appropriate sanction(s), if the Recipient uses a progressive discipline system.

## 7. Character witnesses

Neither the Title IX Coordinator nor the Investigator(s) will meet with character witnesses.

## 8. Notification of outcome

If the Respondent admits to the violation(s), or is found in violation, the Title IX Coordinator or panel determines sanction(s) and/or responsive actions, which are promptly implemented in order to effectively to stop the harassment, discrimination, and/or retaliation; prevent its recurrence; and remedy the effects of the discriminatory conduct, both on the Complainant and the community.

The Title IX Coordinator or designee informs the parties of the determination within two to three business days of the resolution, ideally simultaneously, but without significant time delay between notifications. Notifications are made in writing and may be delivered by one or more of the following methods: in person; mailed to the local or permanent address of the parties as indicated in official university records; or emailed to the parties' university-issued or designated email account. Once mailed, emailed, and/or received in-person, notice is presumptively delivered.

The Notification of Outcome specifies the finding for each alleged policy violation; any sanction(s) that may result which the university is permitted to share pursuant to state or federal law, and the rationale supporting the essential findings to the extent the university is permitted to share under state or federal law.

The notice will detail when the determination is considered final and will detail any changes that are made prior to finalization.

Unless based on an acceptance of violation by the Respondent, the determination may be appealed by either party. The Notification of Outcome also includes the grounds on which the parties may appeal and the steps the parties may take to request an appeal of the findings. More information about the appeal procedures can be found in the appeals section.

# I. Sanctions

Factors considered when determining a sanction/responsive action may include, but are not limited to:

- The nature, severity of, and circumstances surrounding the violation(s)
- The Respondent's disciplinary history
- Previous allegations or allegations involving similar conduct
- The need for sanctions/responsive actions to bring an end to the discrimination, harassment, and/or retaliation
- The need for sanctions/responsive actions to prevent the future recurrence of discrimination, harassment, and/or retaliation
- The need to remedy the effects of the discrimination, harassment, and/or retaliation on the Complainant and the community
- The impact on the parties
- Any other information deemed relevant by the Decision-maker(s)

The sanctions will be implemented as soon as is feasible, either upon the outcome of any appeal or the expiration of the window to appeal without an appeal being requested.

The sanctions described in this policy are not exclusive of, and may be in addition to, other actions taken or sanctions imposed by external authorities.

The following sanctions may be imposed upon any member of the community found to have violated this policy. Typical sanctions that may be imposed upon students, employees, or organizations, but not limited to:

Student/Organization Sanctions

- Disciplinary Warning
- Disciplinary Probation
- Separation from the University
- Expulsion from the University
- Required Education and Training
- Organizational Sanctions
- Withholding Diploma
- Revocation of Degree

Employee Sanctions:

- Warning: Written or Verbal
- Performance Improvement Plan
- Demotion
- Required Counseling
- Probation
- Loss of oversight or Supervisory Responsibility
- Required Education and Training
- Loss of Annual Pay Increase
- Suspension with  pay
- Suspension without pay
- Termination
- Other Actions: In addition to or in place of the above sanctions, CWRU may assign any other sanctions as deemed appropriate.

## J. Sanctioning Guidelines

Any person found responsible for violating Sexual Assault section of the policy will likely receive a sanction ranging from separation to expulsion (student) or suspension to termination (employee), taking into account the severity of the incident, any previous disciplinary violations, and other considerations.

Any person found responsible for violation of the Sexual Exploitation or Sexual Harassment section of this policy will likely receive a sanction ranging from warning to expulsion (student) or warning to termination (employee), taking into account the severity of the incident, any previous disciplinary violations, and other considerations.

Any person found responsible for dating violence, domestic violence or stalking will likely receive a sanction ranging from disciplinary probation to expulsion (student),  probation suspension, or termination (employee) from the university, taking into account the severity of the incident, any previous disciplinary violations, and other considerations.

The Sexual Misconduct Panel or administrator reserves the right to broaden or lessen any range of sanctions in the case of serious mitigating circumstances or egregiously offensive behavior. Neither the initial hearing panel nor any appeals panel will deviate from the range of recommended sanctions unless compelling justification exists to do so.

## K. Withdrawal or Resignation While Charges Pending

*Students:* If a student has an allegation pending for violation of the Policy on the university may place a hold on a student's ability to graduate or certify their degree and/or to receive an official transcript/diploma.

Should a student Respondent decide to not participate in the resolution process, the process proceeds absent their participation to a reasonable resolution.

Should a student Respondent permanently withdraw from the university, the resolution process ends, as the university no longer has disciplinary jurisdiction over the withdrawn student. However, the university  will continue to address and remedy any systemic issues, variables that may have contributed to the alleged violation(s), and any ongoing effects of the alleged harassment, discrimination, and/or retaliation. The student who withdraws or leaves while the process is pending may not return to the university. Such exclusion applies to all campuses/programs of CWRU. A hold will be placed on their ability to be readmitted. They may also be barred from university property and/or events.

If the student Respondent only withdraws or takes a leave for a specified period of time (e.g., one semester or term), the resolution process may continue remotely and that student is not permitted to return to the university unless and until all sanctions have been satisfied.

During the resolution process, the university may put a hold on a responding student's transcript or place a notation on a responding student's transcript or dean's disciplinary certification that a disciplinary matter is pending.

*Employees:* Should an employee Respondent resign with unresolved allegations pending, the resolution process ends, as the university no longer has disciplinary jurisdiction over the resigned employee. However, the university will continue to address and remedy any systemic issues, variables that contributed to the alleged violation(s), and any ongoing effects of the alleged harassment or discrimination.

The employee who resigns with unresolved allegations pending is not eligible for rehire with any university programs or campuses, and the records retained by the Title IX Coordinator will reflect that status.

All university responses to future inquiries regarding employment references for that individual will include that the former employee resigned during a pending disciplinary matter.

# L. Appeals

Any party may file a request for appeal ("Request for Appeal"), but it must be submitted in writing to the Title IX Coordinator or designee within three (3) business days of the delivery of the Notice of Outcome.

A three-member appeal panel chosen from the Pool of panel members will be designated by the Title IX Coordinator. No appeal panelists will have been involved in the process previously, including any dismissal appeal that may have been heard earlier in the process. A voting Chair of the Appeal panel will be designated.

The Request for Appeal will be forwarded to the Appeal Chair for consideration to determine if the request meets the grounds for appeal (a Review for Standing). This review is not a review of the merits of the appeal, but solely a determination as to whether the request meets the grounds and is timely filed.

## 1. Grounds for Appeal

Appeals are limited to the following grounds:

1. Procedural irregularity that affected the outcome of the matter;
2. New evidence that was not reasonably available at the time the determination regarding responsibility or dismissal was made, that could affect the outcome of the matter; and
3. The Title IX Coordinator, Investigator(s), or Decision-maker(s) had a conflict of interest or bias for or against Complainants or Respondents generally or the specific Complainant or Respondent that affected the outcome of the matter.

If any of the grounds in the Request for Appeal do not meet the grounds in this Policy, that request will be denied by the Chair and the parties and their Advisors will be notified in writing of the denial and the rationale.

If any of the grounds in the Request for Appeal meet the grounds listed above, then the Appeal Chair will notify the other party(ies) and their Advisors, the Title IX Coordinator, and, when appropriate, the Investigators and/or the original panel.

The other party(ies) and their Advisors, the Title IX Coordinator, and, when appropriate, the Investigators and/or panel will be emailed, and/or provided a hard copy of the request with the approved grounds and then be given 3 business days to submit a response to the portion of the appeal that was approved and involves them. All responses will be forwarded by the Chair to all parties for review and comment.

The non-appealing party (if any) may also choose to raise a new ground for appeal at this time. If so, that will be reviewed for standing by the Appeal Chair and either denied or approved. If approved, it will be forwarded to the party who initially requested an appeal, the Investigator(s) and/or original Decision-maker(s), as necessary, who will submit their responses in 3 business days, which will be circulated for review and comment by all parties.

Neither party may submit any new requests for appeal after this time period. The Appeal Chair will collect any additional information needed and all documentation regarding the approved grounds and the subsequent responses will be shared with the Appeal Panel, and the Chair of the panel will render a decision in no more than five (5) business days, barring exigent circumstances.

A Notice of Appeal Outcome will be sent to all parties simultaneously including the decision on each approved ground and rationale for each decision. The Notice of Appeal Outcome will specify the finding on each ground for appeal, any specific instructions for remand or reconsideration, any sanctions that may result which the university is permitted to share according to state or federal law, and the rationale supporting the essential findings to the extent the university is permitted to share under state or federal law.

Notification will be made in writing and may be delivered by one or more of the following methods: in person, mailed to the local or permanent address of the parties as indicated in official institutional records, or emailed to the parties' university-issued email or otherwise approved account. Once mailed, emailed and/or received in-person, notice will be presumptively delivered.

## 2. Sanctions Status During the Appeal

Any sanctions imposed as a result of the hearing are stayed during the appeal process. Supportive measures may be reinstated, subject to the same supportive measure procedures above. If any of the sanctions are to be implemented immediately post-hearing, then emergency removal procedures

detailed in section XX for a hearing on the justification for doing so must be permitted within 48 hours of implementation.

The university may still place holds on official transcripts, diplomas, graduations, and course registration pending the outcome of an appeal when the original sanctions included separation.

## 3. Appeal Considerations

1. Decisions on appeal are to be deferential to the original decision, making changes to the finding only when there is clear error and to the sanction(s)/responsive action(s) only if there is a compelling justification to do so.
2. Appeals are not intended to provide for a full re-hearing (de novo) of the allegation(s). In most cases, appeals are confined to a review of the written documentation or record of the original hearing and pertinent documentation regarding the specific grounds for appeal.
3. An appeal is not an opportunity for an Appeal panel to substitute their judgment for that of the original panel merely because they disagree with the finding and/or sanction(s).
4. The Appeal Chair/Panel may consult with the Title IX Coordinator or designee on questions of procedure or rationale, for clarification, if needed. Documentation of all such consultation will be maintained.
5. Appeals granted based on new evidence should normally be remanded to the original Investigator(s) and panel for reconsideration. Other appeals may be remanded at the discretion of the Title IX Coordinator or, in limited circumstances, decided on appeal.
6. Once an appeal is decided, the outcome is final: further appeals are not permitted, even if a decision or sanction is changed on remand (except in the case of a new hearing).
7. In rare cases where a procedural error cannot be cured by the original panel (as in cases of bias), the appeal may order a new hearing with a new panel.
8. The results of a remand to a panel cannot be appealed. The results of a new hearing can be appealed, once, on any of the three available appeal grounds.
9. In cases in which the appeal results in reinstatement to the university or resumption of privileges, all reasonable attempts will be made to restore the Respondent to their prior status, recognizing that some opportunities lost may be irreparable in the short term.

# M. Long-Term Remedies/Other Actions

Following the conclusion of the resolution process, and in addition to any sanctions implemented, the Title IX Coordinator may implement additional long-term remedies or actions with respect to the parties and/or the campus community that are intended to stop the harassment, discrimination, and/or retaliation, remedy the effects, and prevent reoccurrence.

These remedies/actions may include, but are not limited to:

- Referral to counseling and health services

- Referral to the Employee Assistance Program Impact Solutions
- Education to the individual and/or the community
- Permanent alteration of housing assignments
- Permanent alteration of work arrangements for employees
- Provision of campus safety escorts
- Climate surveys
- Policy modification and/or training
- Provision of transportation accommodations
- Implementation of long-term contact limitations between the parties
- Implementation of adjustments to academic deadlines, course schedules, etc.

At the discretion of the Title IX Coordinator or designee, certain long-term support or measures may also be provided to the parties even if no policy violation is found.

When no policy violation is found, the Title IX Coordinator will address any remedies owed by the university to the Respondent to ensure no effective denial of educational access.

The university will maintain the privacy of any long-term remedies/actions/measures, provided privacy does not impair the Recipient's ability to provide these services.

# N. Failure to Comply with Sanctions and/or Interim and Long-term Remedies and/or Responsive Actions

 All Respondents are expected to comply with the assigned sanctions, responsive actions, and/or corrective actions within the timeframe specified by the final panel (including the Appeal Chair/Panel).

Failure to abide by the sanction(s)/action(s) imposed by the date specified, whether by refusal, neglect, or any other reason, may result in additional sanction(s)/action(s), including suspension, expulsion, and/or termination from the university and may be noted on a student's official transcript.

A suspension will only be lifted when compliance is achieved to the satisfaction of the Title IX Coordinator.

# O. Recordkeeping

CWRU will maintain records as outlined above in Section II (AN).

# P. Statement of the Rights of the Parties

 See Appendix A.

78

## Q. Disabilities Accommodations in the Resolution Process

CWRU is committed to providing reasonable accommodations and support to qualified students, employees, or others with disabilities to ensure equal access to the university's resolution process.

Anyone needing such accommodations or support should contact the Office of Disability Resources for students and Office of Equity for employees who will review the request and, in consultation with the person requesting the accommodation and the Title IX Coordinator, determine which accommodations are appropriate and necessary for full participation in the process.

## R. Revision of this Procedure

The process for revisions of this procedure are described above in Section II (AQ).

# Appendix A: Statement of Rights of the Parties

1.  The right to an equitable investigation and resolution of all credible allegations of prohibited harassment or discrimination made in good faith to CWRU officials.

2.  The right to timely written notice of all alleged violations, including the identity of the parties involved (if known), the precise misconduct being alleged, the date and location of the alleged misconduct (if known), the implicated policies and procedures, and possible sanctions.

3.  The right to timely written notice of any material adjustments to the allegations (e.g., additional incidents or allegations, additional Complainants, unsubstantiated allegations) and any attendant adjustments needed to clarify potentially implicated policy violations.

4.  The right to be informed in advance of any public release of information regarding the allegation(s) or underlying incident(s), whenever possible.

5.  The right not to have any personally identifiable information released to the public without consent provided, except to the extent permitted by law.

6.  The right to be treated with respect by CWRU officials.

7.  The right to have Recipient policies and procedures followed without material deviation.

8.  The right not to be pressured to mediate or otherwise informally resolve any reported misconduct involving violence, including sexual violence.

9.  The right not to be discouraged by CWRU officials from reporting sexual misconduct or discrimination to both on-campus and off-campus authorities.

10. The right to be informed by CWRU officials of options to notify proper law enforcement authorities, including on-campus and local police, and the option(s) to be assisted by CWRU authorities in notifying such authorities, if the party so chooses. This also includes the right not to be pressured to report, as well.

11. The right to have allegations of violations of this Policy responded to promptly and with sensitivity by CWRU law enforcement and/or other CWRU officials.

12. The right to be informed of available interim actions and supportive measures, such as counseling; advocacy; health care; legal, student financial aid, visa, and immigration assistance; or other services, both on campus and in the community.

13. The right to a Recipient-implemented no-contact order [or a no-trespass order against a non-affiliated third party] when a person has engaged in or threatens to engage in

80

stalking, threatening, harassing, or other improper conduct that presents a danger to the welfare of the party or others.

14. The right to be informed of available assistance in changing academic, living, and/or working situations after an alleged incident of discrimination, harassment, and/or retaliation, if such changes are reasonably available. No formal report, or investigation, either campus or criminal, needs to occur before this option is available. Such actions may include, but are not limited to:
    a. Relocating an on-campus student's housing to a different on-campus location
    b. Assistance from CWRU staff in completing the relocation
    c. Changing an employee's work environment (e.g., reporting structure, office/workspace relocation)
    d. Transportation accommodations
    e. Visa/immigration assistance
    f. Arranging to dissolve a housing contract and a pro-rated refund
    g. Exam, paper, and/or assignment rescheduling or adjustment
    h. Receiving an incomplete in, or a withdrawal from, a class (may be retroactive)
    i. Transferring class sections
    j. Temporary withdrawal/leave of absence (may be retroactive)
    k. Campus safety escorts
    l. Alternative course completion options.

15. The right to have CWRU maintain such actions for as long as necessary and for supportive measures to remain private, provided privacy does not impair CWRU's ability to provide the supportive measures.

16. The right to receive sufficiently advanced, written notice of any meeting or interview involving the other party, when possible.

17. The right to ask the Investigator(s) and Decision-maker(s) to identify and question relevant witnesses, including expert witnesses.

18. The right to provide the Investigator(s)/Decision-maker(s) with a list of questions that, if deemed relevant by the Investigator(s)/Chair, may be asked of any party or witness.

19. The right not to have irrelevant prior sexual history or character admitted as evidence.

20. The right to know the relevant and directly related evidence obtained and to respond to that evidence.

21. The right to fair opportunity to provide the Investigator(s) with their account of the alleged misconduct and have that account be on the record.

22. The right to receive a copy of the investigation report, including all factual, policy, and/or credibility analyses performed, and all relevant and directly related evidence available and used to produce the investigation report, subject to the privacy limitations imposed by state and federal law, prior to the hearing, and the right to have at least ten (10) business days to review the report prior to the hearing.

23. The right to respond to the investigation report, including comments providing any additional relevant evidence after the opportunity to review the investigation report, and to have that response on the record.

24. The right to be informed of the names of all witnesses whose information will be used to make a finding, in advance of that finding, when relevant.

25. The right to regular updates on the status of the investigation and/or resolution.

26. The right to have reports of alleged Policy violations addressed by Investigators, Title IX Coordinators, and Decision-maker(s) who have received relevant annual training.

27. The right to a Hearing Panel that is not single-sex in its composition, if a panel is used.

28. The right to preservation of privacy, to the extent possible and permitted by law.

29. The right to meetings, interviews, and/or hearings that are closed to the public.

30. The right to petition that any CWRU representative in the process be recused on the basis of disqualifying bias and/or conflict of interest.

31. The right to have an Advisor of their choice to accompany and assist the party in all meetings and/or interviews associated with the resolution process.

32. The right to have the CWRU compel the participation of faculty, staff, and student witnesses.

33. The right to the use of the appropriate standard of evidence, preponderance of the evidence to make a finding after an objective evaluation of all relevant evidence.

34. The right to be present, including presence via remote technology, during all testimony given and evidence presented during any formal grievance hearing.

35. The right to have an impact statement considered by the Decision-maker(s) following a determination of responsibility for any allegation, but prior to sanctioning.

36. The right to be promptly informed in a written Notice of Outcome letter of the finding(s) and sanction(s) of the resolution process and a detailed rationale therefor (including an

explanation of how credibility was assessed), delivered simultaneously (without undue delay) to the parties.

37. The right to be informed in writing of when a decision by CWRU is considered final and any changes to the sanction(s) that occur before the decision is finalized.

38. The right to be informed of the opportunity to appeal the finding(s) and sanction(s) of the resolution process, and the procedures for doing so in accordance with the standards for appeal established by CWRU.

39. The right to a fundamentally fair resolution as defined in these procedures.

ATIXA 2020 ONE POLICY, TWO PROCEDURES MODEL
USE AND ADAPTATION OF THIS MODEL WITH CITATION TO ATIXA IS PERMITTED
THROUGH A LIMITED LICENSE
TO CASE WESTERN RESERVE UNIVERSITY.
ALL OTHER RIGHTS RESERVED.
©2020. ATIXA