# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JOHN NOAKES | Case No.   **1:21-cv-01776** |
| Plaintiff | Judge: |
| v. | MOTION FOR PRELIMINARY INJUNCTION |
| CASE WESTERN RESERVE UNIVERSITY, | |
| Defendant | |

Pursuant to Fed. R. Civ. Proc. 65, Plaintiff John Noakes requests an Order of this Court prohibiting defendants Case Western Reserve University and Case Western Reserve University School of Medicine ("CWRU") from imposing discipline on John Noakes in in retaliation for John Noakes successfully defending himself against a Title IX sexual harassment complaint and asserting claims against his accuser and her faculty defenders for retaliation.  This Motion is supported by the Complaint and the Affidavit of John Noakes.

John Noakes seeks the following Order:

Defendants, including the parties' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with anyone described herein, are prohibited from intimidating, threatening, coercing, harassing, or discriminating against Plaintiff because he has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under any CWRU Policy adopted pursuant to Title IX.[1]

---

[1] This proposed Order matches the anti-retaliation language in the CWRU Title IX Policy.

**TABLE OF CONTENTS**

FACTS ........................................................................................................................... 1

    A.    Background ................................................................................................... 1

    B.    The CWRU Title Ix Policy ........................................................................ 3

    C.    The (Unproven) Allegations Against John Noakes And Subsequent Retaliation ............... 4

ARGUMENT ................................................................................................................. 8

    A.    The Standard For Resolution Of This Motion .......................................... 8

    B.    Plaintiff Has A Substantial Likelihood Of Success On His Retaliation Claim ................ 9

        1.    Protected Conduct And Defendant's Knowledge ........................ 9

        2.    Adverse Action ............................................................................ 10

        3.    Causation .................................................................................... 13

    C.    Irreparable Harm ..................................................................................... 15

    D.    Public Interest And Harm To Third Parties ........................................... 19

    E.    Nominal Bond Should Be Imposed ........................................................ 19

CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

### CASES

*Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938-39 (9th Cir. 1987)..........................18

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53  (2006) ..........................................11

*City of Pontiac Retired Employees Ass'n v. Schimmel,* 751 F.3d 427 (6th Cir. 2014) ....................8

*Cohen v. Brown Univ.*, 991 F.2d 888 (1st Cir.1993) .........................................................19

*Dodds v. United States Dept. of Edn.*, 845 F.3d 217 (6th Cir. 2016)...................................19

*Doe v. Belmont Univ.*, 367 F. Supp. 3d 732 (M.D.Tenn. 2019).........................................9

*Doe v. Cummins*, 662 F.App'x 437 (6th Cir. 2016) ........................................................17

*Doe v. Middlebury College*, D.Vt. No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540 (Sep. 16, 2015).....................................................................................................15, 16

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881 (S.D.Ohio 2018) ........................................2

*Doe v. Penn. State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18, 2017)......................................................................................................16

*Doe v. Rector & Visitors*, 179 F. Supp. 3d 583, 587 (E.D.Va.2016) ....................................17

*Doe v. Rector & Visitors*, W.D.Va. Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990 (June 28, 2019).................................................................................16

*Doe v. Rhodes College*, W.D.Tenn. No. 2:16-cv-02308, 2016 U.S. Dist. LEXIS 201165 (Oct. 25, 2016)......................................................................................................17

*Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio 2016), aff'd 872 F.3d 393 (6th Cir. 2017)...................................................................................................16, 19

*Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064 (D.Colo. 2017) ......................................2

*Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821 (E.D.Mich. 2018) ..................................16

*Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017)......................................................................................................16

*Du Bois v. Bd. of Regents of the Univ. of Minnesota*, 439 F. Supp. 3d 1128 (D.Minn.2020) ..........9

*EEOC v. Anchor Hocking Corp.*, 666 F. 2d 1037 (6th Cir. 1981)......................................18

*Federoff v. Walden,* S.D.Ohio No. C-2-78-181, 1978 U.S. Dist. LEXIS 18820 (Mar. 24, 1978) ...........18

*Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668 (6th Cir. 2013)..........................................9

*Garcia v. Lawn*, 805 F.2d 1400 (9th Cir.1986) ..........................................................18

*Gordon v. Traverse City Area Public Schools*, 182 F. Supp. 3d 715 (W.D. Mich. 2016) .................................9

*Griffin v. Berghuis*, 563 F. App'x 411 (6th Cir. 2014) ...................................................................................14

*Henry v. Abbott Labs.*, 6th Cir. No. 15-4165, 2016 U.S. App. LEXIS 10604 (June 10, 2016)...............13

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ...............................................................9, 13

*King v. Curtis*, W.D.Mich. No. 1:14-cv-403, 2016 U.S. Dist. LEXIS 184737 (Nov. 1, 2016) .................9

*King v. DePauw Univ.*, S.D. Ind. No. 2:14-cv- 70, 2014 U.S. Dist. LEXIS 117075 (Aug. 22, 2014)..............................................................................................................................................15, 16, 17

*Kunkle v. Ohio Dept. of Rehab. & Corr.*, N.D.Ohio No. 1:09 CV 1760, 2010 U.S. Dist. LEXIS 69805 (July 13, 2010) ......................................................................................................................18

*Marshall v. Ohio University*, S.D.Ohio No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 31272 (Mar. 13, 2015)..............................................................................................................................................17

*McClain v. Nw. Cmty. Corrs. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320 (6th Cir. 2006)....................................13

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) .................................................................14

*Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497 (6th Cir. 2014) .......................................................14

*Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) ...........................................................................18

*Nelson v. Christian Bros. Univ.*, 226 F. App'x 448 (6th Cir. 2008) .............................................................9

*Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017)..............................................................................................................................................16

*Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524 (6th Cir. 2014).......................................................8

*Ponce v. Socorro Indep. Sch. Dist.*, 432 F. Supp. 2d 682 (W.D. Tex. 2006)...................................................19

*Prim v. Jackson,* S.D.Ohio No. 2:14-cv-1219, 2015 U.S. Dist. LEXIS 48970 (Apr. 14, 2015) ..............19

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996)......................................................8

*Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016)...........................................................................................................................................16, 19

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)...........................................................................................9

*Roe v. Adams- Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018)..............................................................................................................................................16

*Wilkerson v. Univ. of N. Tex.*, 223 F. Supp. 3d 592 (E.D. Tex. 2016).........................................................9

**OTHER AUTHORITIES**

*Presumed Guilty: College men accused of rape say the scales are tipped against them*, Chronicle of Higher Education, September 1, 2014 ...............................................................................................................1

Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011).........................................................................................................................1

*How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014............................1

B. Schlei & P. Grossman, Employment Discrimination Law 1063 (2d ed. 1983) .................................18

**FACTS**

John Noakes is a medical student at Case Western Reserve University School of Medicine (the "School of Medicine").

**A.    Background**

This case is one of many amidst a continuing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses.  After years of criticism for being too lax on campus sexual assault, on April 11, 2011, the U.S. Education Department's Office of Civil Rights ("OCR") sent a Dear Colleague Letter (the "DCL") to colleges and universities encouraging school to become more aggressive in the investigation and adjudication of sexual violence complaints.[2] The DCL, as well as subsequent guidance and statements provided by OCR, compelled colleges and universities to change their former policies drastically out of fear that the Department of Education would pursue violations of Title IX that could lead to the revocation of all federal funding.   The Director of OCR told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds."  *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.  The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  *Presumed Guilty: College men accused of rape say the scales are tipped against them*, Chronicle of Higher Education, September 1, 2014.

OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt.  Judge Martinez, in commenting on the "wave" of litigation about this issue, observed that the DCL, in part, "generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention

---

[2] Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

to sexual assault accusations." *Doe v. Univ. of Colorado*, 255 F. Supp. 3d 1064, 1067 (D.Colo. 2017).

Judge Graham observed that the procedures adopted by schools in response to the DCL were often geared towards finding accused students 'responsible' and imposing discipline:

> Universities have perhaps, in their zeal to end the scourge of campus sexual assaults, turned a blind eye to the rights of accused students. Put another way, the snake might be eating its own tail. Joe Dryden et. al., *Title IX Violations Arising from Title IX Investigations: The Snake Is Eating Its Own Tail*, 53 Idaho L. Rev. 639 (2017).

*Doe v. Ohio State Univ.*, 311 F. Supp. 3d 881, 892-893 (S.D.Ohio 2018).

On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf  )  On May 6, 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972.  The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses.  The Final Rule carried the force and effect of law as of August 14, 2020.

In the year preceding the disciplinary actions against John Noakes, there was substantial criticism of CWRU, both in the student body and in the public media, accusing CWRU of not taking seriously complaints of female students alleging sexual assault by male students.  This has included adverse news coverage and, campus meetings or protests, and enforcement actions concerning CWRU. This criticism included criticism of the manner in which CWRU handled Title IX investigations.   Most notably, in the summer of 2020, a group of CWRU students, "CWRU Survivors," established the @cwru.survivors Instagram page so students could anonymously share their experiences with sexual assault, violence, harassment and discrimination on CWRU's campus, as well as experiences with the Title IX office.  The Instagram page attracted national media attention,

2

including coverage by NPR and CBS News.  CWRU's practices were also criticized in the student newspaper on online.  (Verified Complaint ¶¶18-23.)  The Medical School, in particular, has received scrutiny for the manner in which it handles allegations of sexual assault on campus.  In 2018, the Office of Civil Rights for the Department of Health and Human Services completed an evaluation of the School of Medicine's compliance with Title IX.  HHS reviewed the school's nondiscrimination policies and procedures, including its Sexual Misconduct Policy, Title IX grievance procedure, and the extent to which CWRU School of Medicine's Title IX Coordinator implements the School's Title IX compliance program.  (Verified Complaint ¶24.)

## B.  The CWRU Title IX Policy

CWRU has adopted a "Interim Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties."  This is referred to as the "Title IX Policy."[3]  (A copy of the Title IX Policy is attached to the Verified Complaint.)  The Title IX Policy prohibits all forms of sexual harassment, which is defined (page 17) to include, "the offenses of sexual harassment, sexual assault, domestic violence, dating violence, and stalking."  (Verified Complaint ¶28.)  The Title IX Policy provides that CWRU will provide benefits and accommodations to students who allege that they are the victims of sexual misconduct and retaliation.  The investigation and grievance process outlined in the Title IX Policy determines whether or not the Policy has been violated.  (Verified Complaint ¶¶30-34.)  The ultimate determination of whether a respondent has violated the CWRU Title IX Policy is made by a hearing panel.  Nothing in the Title IX Policy requires that student keep the process confidential.  (Verified Complaint ¶36.)

---

[3] The School of Medicine has a separate "Student Handbook."  The Student Handbook (page 7) indicates that "The School of Medicine is obligated to follow federal guidelines (Title IX) for reporting sexual misconduct."  The Student Handbook further indicates that "If appropriate" reports of sexual harassment and misconduct are "redirected to University (i.e. Title IX)." (Verified Complaint ¶¶39-45.)

The Title IX Policy (page 22) has certain provisions designed to prevent retaliation against individuals who engage in "protected activity" related to the Title IX process.  Protected activity is defined by the Title IX Policy to include "participating in the grievance process."  The Title IX Policy prohibits "intimidating, threatening, coercing, harassing, or discriminating against any individual… because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure."

The Medical School has a Committee on Students ("COS").  The purpose of the COS is to review "the total performance of any student referred to it."  The Student Handbook indicates that "Review of student performance within the curriculum may include… compliance with the university's Student Code of Conduct."   The COS does not typically handle matters related to Title IX.  The COS may make determinations about "promotion and graduation, repetition of a portion of the curriculum, and any sanctions including dismissal from the School."  (Verified Complaint ¶¶41-45.)

## C.    The (Unproven) Allegations Against John Noakes And Subsequent Retaliation

Beginning in August/September 2020 John Noakes started dating another medical student, identified here as Jane Roe.  They broke up in October 2020.  It was a bad break-up.  Jane Roe accused John Noakes of sexually assaulting her (even though they continued to engage in what Jane Roe acknowledged was consensual sexual activity after the alleged assault) – an allegation John Noakes denies.  Text messages around the time of the break-up indicated that Jane Roe wished to continue the relationship.  When John Noakes suggested that they need to "take a break,"  Jane Roe responded by threatening to report John Noakes to the Title IX Office "for the lying the sex for everything it was all a lie."  (Verified Complaint ¶¶47-55.)  These threats continued until November 7, 2020, when John Noakes reported to CWRU that he was being threatened and harassed by Jane Roe. (Verified Complaint ¶56.)    A few hours later, Jane Roe reported to an associate dean at the Medical School,

4

Dr. Steven Ricanati, that she was the victim of a sexual assault.  Dr Ricanati, who is a mandatory reporter, passed on that information on to the Title IX Office.  Dr. Ricanati refers to Jane Roe's report as an "incident posted to Instagram," apparently referring to the Instagram page regarding CWRU's Title IX problems. (Verified Complaint ¶57.)

Both John Noakes and Jane Roe initially told the Title IX office that they did not wish to move forward with a formal process but were content with a mutual No Contact Directive.  However, in late December, 2020, Jane Roe decided she wished to move forward with a formal complaint. (Verified Complaint ¶¶58-61.)

CWRU conducted an investigation and hearing into Jane Roe's allegations.  During the investigative process, John Noakes, on a number of occasions, complained that he faced harassment from other students.  CWRU ignored these complaints.  (Verified Complaint ¶64.)

On April 15, 2021 John Noakes was told that the hearing panel had found him "not responsible." (Verified Complaint ¶¶66-68.)  Immediately after he learned of the result of the hearing panel, John Noakes posted on a GroupMe group chat used by the Medical School for class discussions and other school-related activities.  He posted, "All glory and honor to the Most High, who is my refuge and fortress. That's all, thanks."  John Noakes also changed his name to "[John Noakes] (1-0)."   John Noakes was immediately removed from the GroupMe chat group by another student who acted as a group moderator.  A number of students submitted complaints to the School of Medicine, suggesting that John Noakes was "bragg[ing] about winning a sexual assault case blatantly in front of the entire class on GroupMe."  The general sentiment was summed up by this comment:  "It should not matter if [Jane Roe] could not prove it. I know something bad happened."  (Verified Complaint ¶71.)  That evening, John Doe was contacted by the Title IX Coordinator, Darnell Parker.  Parker was, he suggested, acting at the direction of Dr. Ricanati.  Parker sought to intimidate John Noakes.  Parker admitted that John Noakes had not violated any school rules or policies in his posts and that he was

free to discuss the Title IX process with anyone. Parker told John Noakes that he needed to "watch himself." (Verified Complaint ¶72.)

The next day, April 16, 2021 Dr. Ricanati sent a whole-school email stating that, "your words have consequences" and warning that students could face discipline for "gloating over the misfortune of others." A few days later, during a phone call, Dr. Ricanati appeared to be upset about outcome the Title IX process and threatened John Noakes with institutional discipline for undisclosed inappropriate conduct. A few days after that, Dr. Ricanati invited students (but not John Noakes) to a meeting to discuss various topics, including "the CWRU Title IX process" and "Identify[ing] potential action items." (Verified Complaint ¶¶73-80.) On April 27, 2021 John Noakes was informed that his matter would be referred to the COS for disciplinary action, including possible dismissal. John Noakes was informed by Dr. Marjorie Greenfield, who had replaced Dr. Ricanati as responsible for the matter, that the School of Medicine will be conducting a review of John Noakes's Title IX decision to determine if any additional disciplinary sanctions need to be issued. Over the next several weeks, John Noakes objected to a number of CWRU officials that the COS process was retaliatory. John Noakes requested that the COS process be stayed as an interim, supportive, measure while his retaliation complaints were investigated. No action was taken. (Verified Complaint ¶81.)

In May 2021, the COS imposed sanctions on John Doe. The COS did not expel John Noakes. However, John Noakes was ordered to undergo empathy coaching and provide a letter from a behavioral therapist stating that he is receiving therapy. Dr. Greenfield subsequently attempted to coerce and pressure John Noakes to take the next year off in order to accommodate the desires of Jane Roe. (Verified Complaint ¶¶82-85.)

The harassment and intimidation of John Noakes continued when students returned to school in August 2021. CWRU attempted to impose an onerous and punitive new No Contact Directive, "at the request of [Jane Roe]." This No Contact Directive was eventually removed when it proved

6

unworkable – but not before CWRU ignored John Noakes' complaints that Jane Roe had violated the No Contact Directive and Jane Roe submitted false and retaliatory allegations that John Noakes had violated the No Contact Directive.  John Noakes complained to Lutner about that the harassment from Jane Roe and others was interfering in his ability to complete his education and requested interim supportive measures; he was told that CWRU would not be taking any action to assist him.  (Verified Complaint ¶¶87-91.)

John Noakes recounted the persistent violations, stalking, and intimidating behavior to his empathy coaches.  John Noakes was so distraught by the situation that he was in tears.  (Verified Complaint ¶90.)  On August 31, 2021, John Noakes submitted a formal complaint about the harassment and retaliation.  He specifically asked CWRU to investigate his original complaint against Jane Roe, the pattern of harassment and intimidation by Jane Roe, and his retaliation complaint. (Verified Complaint ¶91.)  CWRU did not react well.  During a September 1, 2021, John Noakes was told by Dr. Greenfield that he should take a year off and that he should not pursue Title IX complaint or consult lawyers.  Dr. Greenfield indicated that even though "this is unfair" to John Noakes, in the end Title IX "only creates a toxic environment" and that that bad things could happen to John Noakes if he pursued his Title IX complaints.  (Verified Complaint ¶92.)  A few days later, during a phone call, Dr. Greenfield again tried to convince John Noakes to not pursue his complaints and threatened him with discipline if he did not comply.  She said, "you need to not make your own Title IX report… You need to just hunker down and do your own stuff if you're going to stay in the class."  She said, "You're digging yourself a hole, honey," and "I can't protect you.  You know, you have to make a decision about how you're going to behave through this, and I think you are making some poor decisions…."  (Verified Complaint ¶95.)

John Noakes submitted a complaint to CWRU indicating that Dr. Greenfield had engaged in retaliatory conduct.  (Verified Complaint ¶96.)  CWRU responded not by providing any support, but

by threatening John Noakes with further discipline.  John Noakes was told that he could be held responsible for a series of blog posts about his matter written by another person.  John Noakes was also told that while his GroupMe posts did not violate any CWRU policies or rules, the matter would be referred to the COS for disciplinary action.  (Verified Complaint ¶¶97-99.)

This litigation followed.

**ARGUMENT**

Usually, retaliation cases require this Court to draw an inference of retaliatory intent from the surrounding facts and circumstances.  Not this case.  In this case, John Doe was told that he needed to stop looking like he was "causing problems" by pursuing Title IX complaints and that if he persisted in asserting his rights under Title IX, he would face discipline, including expulsion from medical school.  This Court should issue a preliminary injunction to stop this retaliation and prevent the accompanying irreparable harm to Plaintiff's academic reputation and standing.

**A.     The Standard For Resolution Of This Motion**

The purpose of a preliminary injunction is to preserve the *status quo*.[4]  *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996).  In considering a preliminary injunction, the court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest.  *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014); *Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 532-533 (6th Cir. 2014).

---

[4] In this case, the *status quo* is that John Noakes is a student in good standing at CWRU not subject to retaliatory disciplinary proceedings.

**B.      Plaintiff Has A Substantial Likelihood Of Success On His Retaliation Claim**

Retaliation claims under Title IX are analyzed using the same standards as Title VII retaliation claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013); *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2008).  The Supreme Court has explained that the primary purpose of the antiretaliation provisions of such laws is, "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, (1997).  Plaintiff can establish a prima facie case of retaliation by demonstrating: (1) he engaged in protected conduct; (2) the defendant had knowledge of the protected conduct; (3) he suffered adverse school-related action; and (4) there exists a causal connection between his protected conduct and the adverse action. *King v. Curtis*, W.D.Mich. No. 1:14-cv-403, 2016 U.S. Dist. LEXIS 184737, at *35 (Nov. 1, 2016), *citing Gordon v. Traverse City Area Public Schools*, 182 F. Supp. 3d 715 (W.D. Mich. 2016).

**1.      Protected Conduct And Defendant's Knowledge**

Plaintiff engaged in three forms of protected conduct; CWRU is aware of his actions.

First, John Doe participated in the investigation and adjudication of Jane Roe's claims against him.  In *Wilkerson v. Univ. of N. Tex.*, 223 F. Supp. 3d 592, 602-603 (E.D. Tex. 2016), a court concluded that an accused in a Title IX investigation who participated in the investigation by defending himself and providing evidence in his favor was engaged in protected activity under Title IX.[5]  A finding that

---

[5] *Du Bois v. Bd. of Regents of the Univ. of Minnesota*, 439 F. Supp. 3d 1128 (D.Minn.2020), and *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 757 (M.D.Tenn. 2019), which reached the opposite conclusion, are inapposite.  These decisions are contrary to the broad remedial reading of Title IX adopted by the Supreme Court in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005), and the regulations adopted by the Department of Education.  And, these cases are factually distinguishable.  The Plaintiff in *Du Bois*, for example, unlike Plaintiff here, "never reported, complained of, or otherwise opposed any practice made unlawful by Title IX."  439 F. Supp. 3d at 1138.

a student defending himself in a Title IX proceedings is consistent with the definition of retaliation in

CWRU's Title IX Policy.  The Title IX Policy (page 22), prohibits:

> intimidating, threatening, coercing, harassing, or discriminating against any individual… because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure.

This is also consistent with Title IX regulations promulgated by the Department of Education which

applies Title VII's broad retaliation provisions to Title IX. 34 C.F.R. § 100.7(e) (incorporated by

reference by 34 C.F.R. § 106.71).

Second, John Doe submitted multiple complaints alleging that Jane Roe had violated the

CWRU Title IX policy.  (Verified Complaint ¶¶ 56, 62, 63, 74, 89, 91, 98.)

Third, John Doe submitted multiple complaints alleging that he was the subject of unlawful

retaliation.  (Verified Complaint ¶¶ ¶¶ 77, 81, 90, 91, 96.)

### 2.     Adverse Action

The discipline by the COS – even if limited to counseling – is an adverse action.   Dr.

Daneshgari explains:

> A review by the COS can have a significant adverse impact on the career of a medical student.  By suggesting that John Noakes engaged in unprofessional conduct, the sanctions imposed by the COS are far from *de minimis*.  While some may see a requirement that John Noakes undergo 'coaching' and counseling as not a big deal, in realty these actions by the COS may affect his ability to work with professors at the medical school and obtain recommendations for residency programs.  These actions can fairly be described as "adverse actions." The actions by the COS so far have likely already resulted in damage to John Noakes' academic reputation and a harm to future employment prospects.

(Daneshgari Aff. ¶6.)  Noakes explains the how the COS process is an adverse outcome:

> The COS action is likely to damage my reputation and future employment prospects. By suggesting that I engaged in unprofessional conduct, the COS may affect my ability to work with professors.

10

(Noakes Aff. ¶13(a).)  The fact that COS review – by itself, regardless of the ultimate outcome – damages a student's reputation is confirmed by the Affidavits of Students submitted in support of the Motion.  (Student 1 Aff., ¶7; Student 2 Aff. ¶7; Student 3 Aff. ¶6.)

The Supreme Court has explained that in the retaliation context, an actionable employment action is any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68  (2006).  Threatening retaliation through a COS review certainly may "dissuade" students like John Noakes from pursuing complaints – particularly complaints about conduct by faculty or about the CWRU process.  Noakes states,

> Even the threat of being hauled before the COS – with the risk of expulsion – is likely to deter my fellow students from complaining about the CWRU Title IX process, defending themselves in a Title IX process, or challenging retaliatory actions.

(Noakes Aff. ¶ 17.)  Dr. Daneshgari agrees.  After describing the statement by CWRU administrators as "inappropriate" he explains how it would affect students:

> The threat of being forced to appear before the COS is likely to deter CWRU students from complaining about the CWRU Title IX process, defending themselves in a Title IX process, or challenging retaliatory actions.  Medical students are very concerned with maintaining good relations with professors and administrators in order to preserve the chance for placement in top residency programs.  Few students are likely to risk doing anything that might result in a review by the COS, as such a review could result in adverse sanctions ranging from counseling to expulsion.

(Daneshgari Aff. ¶8.)  This is not speculative, but already has had a chilling effect on the CWRU campus.  One medical student submitted an Affidavit stating,

> This retaliatory campaign has had the effect of chilling students speech on campus – other medical students are afraid to speak out about how CWRU handles Title IX matters.

(Student 3 Aff. ¶3.)  Another describes how the conduct of CWRU administrators in this case discourages students from commenting on Title IX issues:

> The fact that John Noakes was subjected to investigations and disciplinary action by the [COS] … has served to discourage other students from criticizing the CWRU Title

IX process or speaking out on the issue of how CWRU responds to allegations of sexual assault on campus.

(Student 2 Aff. ¶4.)  And another medical student supports the conclusion that COS review and sanctions are serious enough to create a deterrent effect:

> Medical students are not willing to risk a review by the COS.  Such a review can have a significant adverse impact on the career of a medical student.  The COS process risks damaging a student's chances to obtain a residency through the match program following medical school.  As a result, the threat of being forced to appear before the COS is likely to deter other CWRU students from complaining about the CWRU Title IX process, defending themselves in a Title IX process, or challenging retaliatory actions.

(Student 1 Aff. ¶7.)

In this case, the threat is not remote.  John Noakes was already required to appear once before the COS and undergo "counseling."[6]   An assistant dean did not merely threaten retaliation, she *promised* retaliation, in the form of further academic discipline, if John Noakes continued with his Title IX complaints.  During the summer, Dr. Greenfield sought to coerce John Noakes to leave the school for a year.  (Verified Complaint ¶¶84, 92; Noakes Aff. ¶14(a).)   On September 1, 2021 she told John Noakes that he should not pursue Title IX or consult lawyers because Title IX "only creates a toxic environment."  (Verified Complaint ¶ 92; Noakes Aff. ¶14(c).)  Less than a week later, she told John

---

[6] The fact that John Noakes has once been referred to the COS and is facing a new referral distinguishes this case from the line of cases holding that an "unfilled threat of discipline" or a "threat of future discipline" that "result[] in no injury or harm greater than stress and worry" does not constitute an adverse employment action. *Lewis*, 909 F.3d at 870 (collecting cases); *see also Poullard v. McDonald*, 829 F.3d 844, 856-57, 857 n.3 (7th Cir. 2016) (finding, on a retaliation claim, that threats of unspecified disciplinary action did not constitute adverse actions where there was no effect on the employee's compensation or career prospects).  Dr. Daneshgari explains that the discipline imposed on John Noakes was pretextual:

> In my experience, this type of conduct would rarely if ever warrant review by the COS as it does not violate any CWRU policies or procedures.  Instead, it appears that the COS and others at CWRU are using this post as pretext for retaliatory actions against John Noakes because he sought to defend himself in a Title IX process and criticized the CWRU Title IX process.

(Daneshgari Aff. 4.)

Noakes that "the only way out of this" would be for him to take a year off. She told him explicitly "you need to not make your own Title IX report…" against Jane Roe and that his retaliation complaints were "ill advised." She could not be more explicit that John Noakes should not be "causing problems." She said: "You're digging yourself a hole, honey" and "I can't protect you." (Verified Complaint ¶85; Noakes Aff. ¶14(d).)

Title IXs anti-retaliation reach also independently covers anticipatory retaliation. Although the text of Title IX does not mention retaliation, the Supreme Court in *Jackson* made it clear that retaliation is prohibited by the statute. *Jackson*, 544 U.S. at 171-72. The Supreme Court said, "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Id.* at 173. In the analogous Title VII context, courts have held that the threat of retaliatory action would be actionable as retaliation. *See Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 624 (7th Cir. 2002) ("[I]f there were admissible evidence that [the employer] had threatened the [employee] with firing her if she sued… [s]uch a threat would be a form of anticipatory retaliation, actionable as retaliation"). Other courts have also found that threatening retaliation should not escape enforcement:

> If… threats of retaliation are not actionable… then a plaintiff or government enforcement body would have to wait until an employer actually retaliates before invoking the protections of [antiretaliation rules]. Where the threatened retaliation is clearly illegal, where it chills the redress of legal rights, however, such a conclusion can only be described as absurd.

*See, e.g., Massachusetts v. Bull HN Info. Sys., Inc.*, 16 F. Supp. 2d 90, 108 (D. Mass. 1998).

### 3. Causation

A plaintiffs' *prima facie* burden to show a "causal connection" is a burden "easily met." *See McClain v. Nw. Cmty. Corrs. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320, 335 (6th Cir. 2006); *Henry v. Abbott Labs.*, 6th Cir. No. 15-4165, 2016 U.S. App. LEXIS 10604, at *27-28 (June 10, 2016).

This is one of the rare cases with direct evidence of retaliatory intent.  *Compare Griffin v. Berghuis*, 563 F. App'x 411, 420 (6th Cir. 2014) ("Because direct evidence of retaliatory intent is rare, circumstantial evidence may be the only means of establishing the connection between a defendant's actions and the plaintiff's protected conduct.").  John Doe was specifically intimidated by the CWRU Title IX coordinator; he was told to watch himself.  (Verified Complaint ¶72(d); Noakes Aff. ¶10(c).)  An assistant dean attempted to coerce John Doe to take the next year off and not pursue any of his Title IX claims or else "bad things" would happen.  (Verified Compliant ¶92(b); Noakes Aff. ¶14(c).)  The September 7, 2021 phone call could not have been more clear.  John Noakes states in his Affidavit:

> On September 7, 2021 Dr. Greenfield told me that "you need to not make your own Title IX report… You need to just hunker down and do your own stuff if you're going to stay in the class."  She then threatened me if I complained about the CWRU process or retaliation.  She said, "You're digging yourself a hole, honey" and "I can't protect you."

(Noakes Aff. ¶14.  *See also* Verified complaint ¶95.)[7]  And, most disturbingly, the Title IX Coordinator recently acknowledged that John Noakes did not break any rules, but *still* referred him to the COS for "unprofessional" conduct and discipline.  (Noakes Aff. ¶15.)

Other students saw what was being done to John Noakes and took the statements from CWRU administrators as threats –

---

[7] In this case, John Doe was forced to appear before the COS shortly after he participated in the Title IX process.  This timing, alone, permits an inference of retaliatory intent.  In *Mickey v. Zeidler Tool & Die*, for example, the Sixth Circuit held that in situations where the protected activity and adverse action occur extremely close in time, temporal proximity alone may provide a causal inference. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation"). *See also Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.").

> Statements such as "You're digging yourself a hole, honey" and "I can't protect you" from CWRU faculty and administrators can only be interpreted as threats – and we hear those threats loud and clear.

(Student 1 Aff. ¶6. *See also* Student 2 Aff. ¶6 ("I, and other students, interpret these statements as threats to stay quiet about Title IX issues or face severe consequences."); Student 3 Aff. ¶ 5 ("I, along with other students, interpret statements such as "You're digging yourself a hole, honey" and "I can't protect you" from CWRU faculty and administrators as threats.").)   A CWRU faculty member agrees that the statements to John Noakes were threats of retaliation:

> I am particularly troubled to learn that CWRU administrators told John Noakes to "watch himself," tried to coerce him to take a year off, and threatened him if he pursued Title IX complaints against fellow students or retaliation complaints against administrators. Statements suggesting that students should just endure misconduct and not pursue remedies are highly inappropriate. Statements such as "You're digging yourself a hole, honey" and "I can't protect you" from CWRU faculty and administrators can only be interpreted as threats.

(Daneshgari Aff. ¶5.)

## C.   Irreparable Harm

The Verified Complaint, Affidavit of John Noakes, and Affidavit of Dr. Daneshgari describe the irreparable harm John Noakes will suffer if a preliminary injunction is not granted.  The continued investigation and threat of discipline will damage his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career.[8]   John Noakes states:

---

[8] Courts have found that money damages are not sufficient to compensate a student for the damages to the student's career.  In *Middlebury Coll*, the court explained:

> While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career . . . Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.

*Doe v. Middlebury College*, D.Vt. No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540, *9 (Sep. 16, 2015), *citing King v. DePauw Univ.*, S.D. Ind. No. 2:14-cv- 70, 2014 U.S. Dist. LEXIS 117075 (Aug. 22, 2014) (finding irreparable harm where plaintiff would "forever have either a gap or a senior-year transfer on

> The COS action is likely to damage my reputation and future employment prospects. By suggesting that I engaged in unprofessional conduct, the COS may affect my ability to work with professors at the medical school and obtain recommendations for residency programs.

(Noakes Aff. ¶13(a).) Dr. Daneshgari similarly states:

> The actions by the COS so far have likely already resulted in damage to John Doe's academic reputation and a harm to future employment prospects.

> Future actions by the COS risk irreparable harm to John Noakes. The COS process risks damaging his chances to obtain a residency through the match program following medical school. This is likely to have a significant impact on his career.

(Daneshgari Aff. ¶¶6-7.) This can constitute irreparable harm. The Sixth Circuit has held that an action which puts an injured party's reputation at risk may lead to "irreparable harm." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377.381-382. (6th Cir. 2006). *See also United States v. Miami University*, 294 F.3d 797, 819. (6th Cir. 2002) ("An injury is not fully compensable by money damages if the nature of the plaintiffs loss would make damages difficult to calculate. In general, . . . . injury to reputation (is) difficult to calculate.").

Without immediate relief from the Court, Plaintiff faces immediate irreparable harm from the delay in his education.[9] An Affidavit from Dr. Daneshgari states:

---

his record," noting the inevitability of questions by future employers or graduate schools for which "any explanation is unlikely to fully erase the stigma").

[9] Federal courts have granted preliminary injunctive relief prohibiting private universities from implementing discipline against students accused of sexual misconduct. *See e.g. Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017); *Middlebury College, supra*; *King, supra*. Courts have similarly granted injunctive relief against public colleges and universities, finding that students faced irreparable harm from the imposition of school discipline. *See e.g. Doe v. Rector & Visitors*, W.D.Va. Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990 (June 28, 2019); *Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821, 826 (E.D.Mich. 2018); *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017); *Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016); *Doe v. Penn. State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18, 2017); *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704 (S.D. Ohio 2016), aff'd 872 F.3d 393 (6th Cir. 2017); *Roe v. Adams-Gaston*, S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697 (Apr. 17, 2018).

> If John Doe waited until he was expelled or suspended by the COS it would be too late. John Doe would have lost a year or more of time towards his medical degree and having to explain a gap in his medical school education record will inevitability lead to unpleasant and damaging questions form future employers and in the residency match system.

(Daneshgari Aff. ¶9.)

In particular, CWRU's efforts to force Plaintiff to take a leave of absence – after the school year has started – constitutes irreparable harm because it will disrupt his education. Courts have found actions delaying or disrupting a claimant's education to present irreparable harm. *See Doe v. Rhodes College*, W.D.Tenn. No. 2:16-cv-02308, 2016 U.S. Dist. LEXIS 201165, at *22 (Oct. 25, 2016), *citing Marshall v. Ohio University*, S.D.Ohio No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 31272, *9 (Mar. 13, 2015) ("[Plaintiff's] suspension effectively denied him the benefit of the work already performed in the classes this semester and delayed the completion of his degree."); *Doe v. Rector & Visitors of George Mason Univ.*, 179 F. Supp. 3d 583, 587 (E.D.Va.2016) ("there can be no doubt that plaintiff has suffered an irreparable injury… The clock cannot be turned back… to allow plaintiff to resume his course of study on his preferred schedule"); *King*, 2014 U.S. Dist. LEXIS 117075, at *13 (finding irreparable harm where plaintiff would "forever have either a gap or a senior-year transfer on his record," noting the inevitability of questions by future employers or graduate schools for which "any explanation is unlikely to fully erase the stigma"). Without immediate relief from the Court, Plaintiff also faces immediate irreparable harm from the pursuit of disciplinary charges. In *Doe v. Cummins*, 662 F.App'x 437, 445 (6th Cir. 2016), the Sixth Circuit observed that the "adverse disciplinary decision did, and continues to, impugn his reputation and integrity . . ." This is sufficient to satisfy the requirement of irreparable harm.

Notably, Plaintiff's case involves a retaliation claim under a federal civil rights statute. Courts recognize that retaliatory actions deter those protected by Congress from vindicating their statutory rights and seeking access to courts, and that these injuries constitute irreparable harm. *See, e.g., Mullins*

17

*v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) ("Unchecked retaliation subverts the purpose of the FLSA" and "the resulting weakened enforcement of federal law can itself be irreparable harm in the context of a preliminary injunction application."); *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938-39 (9th Cir. 1987) ("[A]llegations of retaliation for the exercise of statutorily protected rights represent possible irreparable harm far beyond economic loss.").  One court explains, "'the courts will more readily grant [injunctive] relief where allegations of retaliation are involved, because such conduct is likely to cause irreparable harm to the public interest in enforcing the law by deterring others from filing charges'… The harm is a continuing one so long as the retaliation remains in effect.." *Garcia v. Lawn*, 805 F.2d 1400, 1405-1406 (9th Cir.1986), *quoting* B. Schlei & P. Grossman, Employment Discrimination Law 1063 (2d ed. 1983).[10]  Courts in this Circuit have, for years, granted injunctive relief to prevent retaliatory conduct under the civil rights laws.  One court observed, in the analogous Title VII employment context:

> This Court has concluded that in the narrow area of threatened immediate retaliation against employees involved either in filing a Title VII charged or giving evidence to administrative investigators injunctive relief is available if the normal prerequisites for such relief have been met. Most jurisdictions which have decided this question have reached the same conclusion.

*Federoff v. Walden*, S.D.Ohio No. C-2-78-181., 1978 U.S. Dist. LEXIS 18820, at *11 (Mar. 24, 1978) (collecting cases).  *Cf. Prim v. Jackson*, S.D.Ohio No. 2:14-cv-1219, 2015 U.S. Dist. LEXIS 48970, at

---

[10] *EEOC v. Anchor Hocking Corp.*, 666 F. 2d 1037 (6th Cir. 1981), is not to the contrary.  In that case, the Sixth Circuit acknowledged the possibility of a chilling effect from retaliatory actions in civil rights statutes could qualify as irreparable harm. *Id.* at 1043-44.  However, the affirmed a district court's denial of a preliminary injunction because, under the facts of that case, other statutory remedies and monetary damages were available.  In this case, the harm to Plaintiff's academic reputation distinguishes the case.

Similarly, this Court has noted that "the mere possibility of a chilling effect" of retaliation others is "not sufficient." *Kunkle v. Ohio Dept. of Rehab. & Corr.*, N.D.Ohio No. 1:09 CV 1760, 2010 U.S. Dist. LEXIS 69805, at *18 (July 13, 2010).  However, in this case Plaintiff faced more than a "possibility" – he was expressly told that he would face consequences if he pursued a Title IX Complaint.

*54 (Apr. 14, 2015), *adopted* 2015 U.S. Dist. LEXIS 72721 (June 4, 2015) (granting preliminary injunction ordering defendant "to stop retaliating against Plaintiff for filing complaints or grievances")

**D.      Public Interest And Harm To Third Parties**

In this case, an injunction will not cause any harm to third parties or CWRU.  CWRU remains able to enforce its rules and regulations in a manner consistent with the language in the Student Handbook.  The failure to grant an injunction would harm the public because it would permit an educational institution to violate the statutory rights of all current and future students on an ongoing basis while this case is resolved, which necessarily would cause substantial, irreparable harm to those students.  As one court observed, "it is always in the public's interest that a student be treated fairly before being disciplined." *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8.  Plaintiff also has a substantial likelihood of success on his Title IX claim. *See supra.* Courts have observed that the enforcement of Title IX, like other civil rights statutes, is in the public interest. *Dodds v. United States Dept. of Edn.*, 845 F.3d 217, 222 (6th Cir. 2016) ("The district court issued the injunction to protect Doe's… civil rights [under Title IX], a purpose that is always in the public interest."), *citing Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir.1993) ("the overriding public interest lay in the firm enforcement of Title IX").

**E.      Nominal Bond Should Be Imposed**

CWRU is an educational institution. Accordingly, because money is not an issue for the Defendant and the school is not likely to suffer any potential losses if an injunction is granted, this Court should set surety in the nominal amount of $1. *Doe v. Univ. of Cincinnati,* 223 F. Supp. 3d at 704 (S.D. Ohio 2016) (setting nominal bond of $1 for preliminary injunction against school); *Ponce v. Socorro Indep. Sch. Dist.,* 432 F. Supp. 2d 682, 707 (W.D. Tex. 2006) (setting a nominal bond of one hundred dollars because the evidence indicates that Defendant will suffer little, if any, damage by the issuance of the preliminary injunction), *rev'd on other grounds* 508 F.3d 765 (5th Cir. 2007); *Ritter*, 2016

U.S. Dist. LEXIS 60193, at *9 (granting injunction to student ; concluding "a bond is not required under the circumstances present here").

**CONCLUSION**

Pursuant to Fed. R. Civil P. 65, this Court should, following a hearing, grant a Preliminary Injunction prohibiting CWRU from pursuing retaliatory disciplinary actions against John Noakes.

Respectfully submitted,

_____/s/ Joshua Engel_____
Joshua Adam Engel (0075769)
Anne Tamashasky (0064393)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com