# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **John Noakes,** | **CASE NO. 1:21-cv-1776** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Case Western Reserve University, Et al.,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendants.** | |

Currently pending is Plaintiff John Noakes'[1] Emergency Motion for Temporary Restraining Order.  (Doc. No. 10.)  Defendants Case Western Reserve University and Case Western Reserve University School of Medicine filed a Brief in Opposition on September 24, 2021.[2]  (Doc. No. 15.) For the following reasons, Plaintiff's Motion is DENIED.

## I.      Factual Allegations[3]

Plaintiff John Noakes ("Plaintiff" or "Noakes") is a medical student at Defendant Case Western Reserve University ("CWRU") School of Medicine.  (Doc. No. 1 at ¶ 5.)  Defendants CWRU

---

[1] Plaintiff has requested leave to proceed under the pseudonym John Noakes.  (Doc. No. 5.)  The Court has not ruled on Plaintiff's Motion, as it is not yet ripe.  However, for purposes of the instant Opinion and in the absence of any objection from Defendants, the Court will refer to Plaintiff as John Noakes herein.

[2] In its Brief in Opposition, Defendant CWRU stated that CWRU's School of Medicine is not a separate legal entity and, therefore, "no response on behalf of 'Case Western Reserve Univ. School of Medicine' is necessary or appropriate." (Doc. No. 15 at p. 1, fn. 1.)

[3] The following factual allegations are taken from the Verified Complaint filed September 15, 2021, as well as the affidavits and other evidentiary material attached as Exhibits to Plaintiff's Emergency Motion for Temporary Restraining Order; Plaintiff's Motion for Preliminary Injunction; and Defendant CWRU's Brief in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order. (Doc. Nos. 1, 2, 10, 16.)

and CWRU School of Medicine are private educational institutions that participate in federal spending programs.  (*Id.* at ¶ 6.)

Beginning in August/September 2020, Noakes began dating fellow student, Jane Roe ("Roe"). (*Id.* at ¶ 47.)  Noakes alleges they broke up shortly thereafter, on October 22, 2020 but that Roe quickly changed her mind and, on October 23, 2020, asked Noakes to restart the relationship.  (*Id.* at ¶¶ 49-50.)  After having an argument on October 26, 2020, Noakes suggested to Roe that they needed to "take a break." (*Id.* at ¶ 53.)  Roe then threatened to report Noakes to the Title IX Office for allegedly sexually assaulting her on October 20, 2020.  (*Id.*)  According to Noakes, he asked Roe to stop contacting him but she continued to threaten to report him to the Title IX Office.  (*Id.* at ¶ 54, 55.)

On November 7, 2020, Noakes reported to CWRU's Office of Equity that he was being threatened and harassed by Roe.  (*Id.* at ¶ 56.)  Several hours later, Dr. Steven Ricanati (CWRU's Associate Dean for Student Affairs for the School of Medicine) reported to the Office of Equity that Roe had reported she had been sexually assaulted by Noakes on October 20, 2020.  (*Id.* at ¶ 56-57.)

On January 7, 2021, Roe signed a formal complaint against Noakes for sexual assault.  (*Id.* at ¶ 60.)  An investigation was subsequently conducted by the Office of Equity, which included an interview of Noakes by Title IX investigators on January 19, 2021.[4]  (*Id.* at ¶¶ 62-63.)  During the pendency of the investigation, Noakes informed the investigators that he was being harassed and

---

[4] This investigation was conducted pursuant to the procedures set forth in Defendant CWRU's Title IX policy.  During the 2020-2021 academic year, CWRU maintained an "Interim Sexual Harassment Policy and Procedures" for Title IX matters, a copy of which is attached to the Verified Complaint as Exhibit B. (Doc. No. 1-3.)  Defendants state that, effective September 13, 2021, CWRU adopted its current version of this policy, titled "Sexual Harassment Policy and Procedures for Faculty, Students, Employers and Third Parties," which can be found on the website for CWRU's Office of Equity.  (Doc. No. 16 at fn 2.)  *See* https://case.edu/equity/sexual-harassment-title-ix/sexual-harassment-policy.

retaliated against and requested interim supportive measures.  (*Id*. at ¶ 64-65.)  Noakes alleges that the Office of Equity failed to take any action.  (*Id*. at ¶ 65.)

On March 19, 2021, Noakes was provided with a "Final Investigation Report."  (*Id*. at ¶ 66.) A hearing was subsequently conducted by CWRU on April 8, 2021, at which Noakes, Roe, and five witnesses were present.  (*Id*. at ¶ 67.)  On April 15, 2021, Noakes received a letter informing him that the panel found that he was "not responsible" for violating the Title IX Policy.  (*Id*. at ¶ 68.)  Roe appealed the decision.  (*Id*. at ¶ 70.)  The Appeal Panel subsequently denied the appeal.  (*Id*.)

Meanwhile, immediately after learning of the results of the hearing on April 15, 2021, Noakes posted the following on a GroupMe chat used by the School of Medicine: "All glory and honor to the Most High, who is my refuge and fortress. That's all, thanks." (*Id*. at ¶ 71.)  Noakes also changed his handle to "[John Noakes] (1-0)."  (*Id*.)  Over thirty (30) students submitted complaints to the School of Medicine regarding Noakes' post.  (*Id*.)  On the same evening of his GroupMe post, Noakes received an email from Senior Vice President for Equity Darnell Parker requesting an "urgent conversation." (*Id*. at ¶ 72.)  Noakes claims that, during a Zoom call that night, Dr. Parker "sought to intimidate" him and told him to "watch himself."  (*Id*.)

Noakes claims that, following the panel decision, he continued to be the subject of harassment from other students.[5]  (*Id*. at ¶ 73.)  Noakes claims that he reported this harassment to the School of Medicine but Dr. Ricanati refused to take disciplinary action against the students involved.  (*Id*.) Rather, on April 19, 2021, Dr Ricanati called Noakes, "interrogated" him about the GroupMe post,

---

[5] According to Noakes, this harassment included the following: "a. One of Jane Roe's friends referred to John Noakes as 'scum of the earth' while John Noakes was attempting to lead a group discussion. b. Students circulated a 'petition' encouraging their classmates to refuse to work with John Noakes and demanding that 'the School of Medicine ought to take clear and decisive action by expelling [him].'" (*Id*. at ¶ 73.)

and threatened him with institutional discipline.  (*Id*. at ¶ 75.)  On that same date, Noakes submitted a retaliation complaint against Dr. Ricanati and Dr. Parker with the Office of Equity.  (*Id*. at ¶ 78.) CWRU retained outside counsel to conduct an investigation.  (*Id*.)

Meanwhile, Noakes was informed that the complaints regarding the GroupMe post would be referred to the School of Medicine's Committee on Students ("COS")[6] for disciplinary action, including possible dismissal.  (*Id*. at ¶ 81.)  Noakes repeatedly objected that the COS process was retaliatory and requested that it be stayed, as an interim measure, while his retaliation complaints were investigated.  (*Id*. at ¶ 82, 83.)  He claims that "[n]o actions were taken."  (*Id*.)

On May 6, 2021, Noakes met with Dr. Marjorie Greenfield, a Professor at the School of Medicine and a "subordinate" of Dr. Ricanati.  (*Id*. at ¶¶ 79, 83.)  During this meeting, Dr. Greenfield informed Noakes that the School of Medicine would be conducting a review of his Title IX decision to determine if any additional disciplinary sanctions need to be issued.  (*Id*.)  Dr. Greenfield allegedly accused Noakes of not having "empathy" regarding his dispute with Jane Roe and his GroupMe post and advised him that, if he could show empathy for other people, then the COS "will not kick you out of school." (*Id*.)  Noakes appeared before the COS on May 13, 2021.  (*Id*. at ¶ 84.)  He was ordered to undergo "empathy coaching" and provide a letter from a behavioral therapist stating that he is receiving therapy.  (*Id*.)  Noakes alleges that, in the months that followed, Dr. Greenfield "attempted to coerce and pressure" him to take the next year off "in order to accommodate the desires of Jane Roe."  (*Id*. at ¶ 85.)  The COS conducted another hearing on August 19, 2021, at which time

---

[6] The School of Medicine's Student Handbook includes a section entitled "Committee on Students."  (Doc. No. 10-4 at PageID# 193.)  That section explains the purpose of the COS as follows: "The Committee on Students conducts detailed reviews of the total performance of any student referred to it. The COS also makes decisions regarding promotion and graduation, including reviewing the needs for alternative schedules." (*Id*.)  Students may be referred to the COS for a variety of reasons, including for "concern of violation of any of the University's Standards of Conduct." (*Id*.)

it determined that Noakes should continue with "coaching for the remediation of professional lapses and present a new reflection at the November COS meeting."  (*Id*. at ¶ 86.)

Noakes claims that, when school started in early August 2021, Roe and her friends "engaged in a pattern of harassing and intimidating behavior" towards him.  (*Id*. at ¶ 90.)  On August 25, 2021, CWRU's new Title IX Director, Rachel Lutner,[7] sent Noakes a letter, informing him that CWRU was imposing a new "No Contact Directive" at the request of Jane Roe.  (*Id*. at ¶ 88.)  Noakes claims that this Directive "imposed onerous and punitive restrictions" on him and interfered with his ability to participate fully in his education.  (*Id*.) Specifically, he alleges that his movement was restricted to the southwest sections of the medical school campus and all classrooms, and he was "barred from posting on social media about his Title IX case." (*Id*.)  Similar restrictions were also placed on Roe. (*Id*.)

In late August 2021, Noakes reported two alleged violations of the No Contact Directive by Roe.  (*Id*. at ¶ 89.)  Ms. Lutner informed Noakes that CWRU would not be taking any action regarding any of the actions that he reported and, further, that Roe had made similar allegations that Noakes had violated the No Contact Directive.  (*Id*.)  Although Noakes requested details of Roe's allegations, Ms. Lutner allegedly refused to provide them.  (*Id*.)

On August 31, 2021, Noakes emailed Ms. Lutner about continuing harassment from Roe and retaliation from others.  (*Id*. at ¶ 92.) Noakes indicated that he wanted CWRU to investigate (1) his initial complaint against Jane Roe; (2) the pattern of harassment and intimidation by Jane Roe; and (3) retaliation against him as a result of his participating in the Title IX process. (*Id*.)  The following

---

[7] Ms. Lutner began her employment at CWRU as Senior Associate Vic President—Equity and University Title IX Coordinator in June 2021.  (Doc. No. 16-1 at ¶¶ 1, 6.)

5

day, Dr. Greenfield met with Noakes and allegedly warned him "that bad things could happen to [him] if he pursues his Title IX complaint against Jane Roe."  (*Id.* at ¶ 93.)  She suggested that he take a year off.  (*Id.*) On September 3, 2021, Noakes and his advisor spoke with Ms. Lutner and indicated his desire to move forward with his Title IX complaint. (*Id.* at ¶ 94.)

Shortly thereafter, on September 7, 2021, Roe complained to Ms. Lutner about a Tumblr website[8] that contained content that she believed was in retaliation for her prior Title IX complaint against Noakes.  (Doc. No. 16-1 at ¶ 7.)  Ms. Lutner reviewed the Tumblr posts and met with Roe to obtain information as to why she believed Noakes was involved.  (*Id.*)

On that same date, Noakes was contacted by Dr. Greenfield about the Tumblr website.  (Doc. No. 1 at ¶ 96.)  Noakes advised Dr. Greenfield that he had "no specific knowledge of any Tumblr post (other than a brief and nondescript mention by another medical student)."  (*Id.*)  According to Noakes, Dr. Greenfield advised him that it was his responsibility to de-escalate the situation and threatened that he could get in trouble for the Tumblr post, even if it was done without his knowledge. (*Id.*)  Dr. Greenfield also allegedly again tried to convince Noakes not to pursue his Title IX complaint against Roe and, instead, to take a year off of medical school. (*Id.*)

Noakes alleges that, on September 10, 2021, Ms. Lutner sent him an email in which she indicated that the Tumblr website was authored by a "person who described him/herself as very close to you."  (*Id.* at ¶ 98.)  Ms. Lutner allegedly stated that John Noakes must "investigate who might be responsible for these Tumblr posts and ask them to stop."  (*Id.*)  Noakes responded as follows: "I have no knowledge of who is making the Tumblr posts and have not directed anyone to make such

---

[8] A copy of postings from the Tumblr website was filed by CWRU, under seal.  (Doc. No. 16-1 at PageID#s 364-489.)

posts. I am under no obligation to investigate the conduct of other people. Nor can I be held responsible for the conduct of others." (*Id*.)

Later that day, Ms. Lutner informed Roe that there was insufficient information to connect Noakes to the Tumblr posts and that CWRU would not be further investigating. (Doc. No. 16-1 at ¶ 7.) On that same date, Ms. Lutner advised Noakes that CWRU would not be investigating or taking any action in response to his complaints about Roe. (Doc. No. 1 at ¶ 99.) She also informed him that Roe's complaints about Noakes related to the GroupMe post would not be pursued by the Title IX Office. (*Id*. at ¶ 100.)

On September 12, 2021, Roe complained to Ms. Lutner about "the increasingly harassing and intimidating nature" of the posts on the Tumblr website. (Doc. No. 16-1 at ¶ 7.) Specifically, Ms. Roe expressed concern that "the posts included accusations that Ms. Roe was not clear-headed and fabricated lies about Plaintiff, that she engaged in self-destructive behaviors, that she believes she can get away with anything, and that she follows Plaintiff around and carries pepper spray with her." (*Id*.) Ms. Lutner reviewed the additional posts and determined that:

> The posts … disclosed details only accessible to Plaintiff, including for example, screenshots originated from Plaintiff's phone depicting text messages between Plaintiff and Ms. Roe, information regarding Plaintiff's private discussions with his mother, a description of how "people have looked at him prompt[ing] him to go to his top secret anxiety attack bathroom," details about "his first sleep paralysis episode," specific details about Plaintiff's involvement in the Title IX proceedings and how it affected Plaintiff from his perspective, communications between Plaintiff and the Office of Equity, communications between Plaintiff and the School of Medicine administrators, a description of how Plaintiff feels in class while interacting with others, and how Ms. Roe and others apparently look at Plaintiff when walking down the stairs.

(*Id*.)

7

Based on her review, Ms. Lutner decided, on September 14, 2021, that, at that point, "there was a reasonable basis to believe that Plaintiff, or someone on his behalf or working with him, may be sharing or posting information on Tumblr to intimidate, embarrass, harass, or punish Ms. Roe for filing a Title IX complaint against Plaintiff." (*Id.* at ¶ 10.)  Ms. Lutner scheduled a meeting with Roe for 9:00 a.m. on September 15, 2021, to notify her that CWRU would be proceeding with an investigation of her retaliation complaint.  (*Id.*)

## II.    Procedural History

On September 15, 2021, Noakes filed a Verified Complaint in this Court against Defendants CWRU and CWRU School of Medicine, in which he asserted claims for retaliation and deliberate indifference under Title IX (Counts I and II) and breach of contract (Count III).  (*Id.*)  On that same date, Noakes filed Motions for Preliminary Injunction, Expedited Discovery, and for Leave to Proceed Anonymously.  (Doc. Nos. 2, 3, and 5.)

On September 21, 2021, Noakes filed an Emergency Motion for Temporary Restraining Order ("TRO").  (Doc. No. 10.)  The basis for Noakes' Motion is a letter from Ms. Lutner to Noakes dated September 21, 2021, advising him that Roe had filed a formal complaint with CWRU's Office of Equity alleging misconduct by Noakes relating to the Tumblr website.  (Doc. No. 10-1.)  The letter explains, in pertinent part, as follows:

> The basis for this formal complaint of retaliation is (1) the level of detail in the Tumblr Account about your situation in the Medical School and how it affects you from your perspective, (2) the access that the Tumblr Account has to screenshots that came originally from your phone, (3) the self-description of the person controlling the Tumblr Account and his/her close relationship to you, (4) the promptness by which the Tumblr Account learned of the litigation filed by John Noakes and posted it to the Tumblr account, (5) the references in the Tumblr Account to the Office of Equity's communications with you since August 2021 (including, but not limited to examples such as the No Contact Directive, the withdrawal of the No Contact Directive, the reaction of [Ms. Roe] to seeing your mother in class and the outcome of your

8

complaints to the Office of Equity regarding [Ms. Roe]) and (6) the references in the Tumblr Account to the Medical School's recent communications to you regarding empathy.

Specifically, it is alleged that you retaliated against [Ms. Roe] by:

• Sharing confidential information from the hearing on [Ms. Roe's] 2020 Title IX complaint against you for nonconsensual sexual contact.

• Posting information, including screenshots of your communications with [Ms. Roe] in 2020, to the Tumblr Account that is designed to embarrass, harass or punish [Ms. Roe] for complaining to the CWRU Office for Equity that you subjected her to nonconsensual sexual contact.

• Sharing information, including screenshots of your communications with [Ms. Roe] in 2020 and correspondence between you and the Office for Equity in September 2021, with someone who you knew or reasonably should have known would then post some or all of that information to the Tumblr Account in a manner that is designed to embarrass, harass or punish [Ms. Roe] for complaining to the CWRU Office for Equity that you subjected her to nonconsensual sexual contact.

• Declining on and after September 10, 2021, to cease sharing information including screenshots of your communications with [Ms. Roe] in 2020 and correspondence between you and the Office for Equity in September 2021, with someone who you knew or reasonably should have known would then post some or all of that information to the Tumblr Account in a manner that is designed to embarrass, harass or punish [Ms. Roe] for complaining to the CWRU Office for Equity that you subjected her to nonconsensual sexual contact.

• Taking steps, on your own or in conjunction with one or more others, to publicize the Tumblr Account as much as possible in the CWRU Medical School, including by using an Instagram account to follow numerous persons in the Medical School, specifically, your entire class, as well as faculty and staff in the Medical School, to increase the number of views of the material posted to the Tumblr Account.

• Declining on and after September 10, 2021, to take steps to stop the person who is posting information to the Tumblr Account when directed to do so by the Title IX Coordinator.

• Declining on and after September 10, 2021, to identify for the Title IX Coordinator the name of the person who is posting to the Tumblr Account when

9

the level of detail in the information posted to the Tumblr account indicates that the account is controlled by you or someone very close to you.

This letter serves as formal notice that CWRU will be conducting a prompt, thorough, and impartial investigation of these allegations pursuant to the procedures applicable to retaliation claims and which are detailed in the Sexual Harassment Policy . . .

(Doc. No. 10-1 at PageID#s 310-311.)

The following morning, the Court conducted a telephonic status conference with counsel for Plaintiff and Defendants regarding Noakes' Emergency Motion.  After hearing argument from counsel, the Court provided Defendants the opportunity to file a brief in opposition to Noakes' Motion by September 23, 2021, which was later extended to September 24, 2021.   Defendants agreed to maintain the *status quo* (i.e., to not proceed with the investigation that is the subject of the September 21, 2021 letter) pending this Court's ruling on Noakes' Motion.  *See* Minutes of Proceeding dated September 22, 2021; Doc. No. 12.  The Court indicated that it would issue its ruling by no later than September 29, 2021.

Defendants thereafter filed their Brief in Opposition, which includes the Affidavit of Ms. Lutner and a sealed copy of the content of the Tumblr website.  (Doc. Nos. 15, 16.)

### III.    Legal Standard

"A Temporary Restraining Order ('TRO') is an emergency measure."  *Hartman v. Acton*, --- F.Supp.3d---, 2020 WL 1932896 at * 1 (S.D. Ohio April 21, 2020) (citing *McGirr v. Rehme*, 2017 WL 1426456 at * 1 (S.D. Ohio Apr. 21, 2017)).  Federal Rule of Civil Procedure 65(b) requires a Court to examine, on application for a temporary restraining order, whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant."  Fed. R. Civ. P. 65(b)(1)(A).  A temporary restraining order is meant "to prevent immediate and irreparable harm to the complaining party during the period necessary to

10

conduct a hearing on a preliminary injunction." *Dow Chemical Co. v. Blum,* 469 F. Supp. 892, 901

(E.D. Mich. 1979).  *See also Hartman*, 2020 WL 1426456 at * 1.

In determining whether to impose a TRO, the Court considers the same four factors that are

considered for a preliminary injunction: (1) whether plaintiff has a substantial likelihood or

probability of success on the merits; (2) whether plaintiff will suffer irreparable injury if the relief is

not granted; (3) whether the injunctive relief would unjustifiably harm a third party; and (4) whether

the public interest would be served by issuing the injunctive relief.  *See Frisch's Restaurant, Inc. v.*

*Shoney's Inc*., 759 F.2d 1261, 1263 (6th Cir. 1985); *Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp.2d

682, 687 (N.D. Ohio 2002).  The test is a flexible one and the factors are not prerequisites to be met

but considerations that must be balanced against each other.  *See Leary v. Daeschner*, 228 F.3d 729,

736 (6th Cir. 2000) (citing cases); *In re DeLorean Motor Co*., 755 F.2d 1223, 1229 (6th Cir. 1985).

The plaintiff bears the burden of establishing entitlement to the extraordinary remedy of a temporary

restraining order.  *See Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citations omitted).

While no single factor is determinative, "a finding that there is simply no likelihood of success

on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir.

2000).  In addition, in the context of a temporary restraining order, there is emphasis on consideration

of irreparable harm in order to preserve the *status quo*.  *See Just Funky, LLC v. Boom Trendz, LLC,*

2021 WL 2635377 at * 2 (N.D. Ohio June 25, 2021); *Procter & Gamble Co. v. Bankers Trust Co*.,

78 F.3d 219, 226 (6th Cir. 1996) ("[T]he purpose of a TRO under Rule 65 is to preserve the *status*

*quo* so that a reasoned resolution of a dispute may be had.").  Indeed, the Sixth Circuit recently

explained that the irreparable harm factor is dispositive and, therefore, a district court is "well within

its province" when it denies emergency injunctive relief based solely on the lack of an irreparable

11

injury.  *See D.T. v. Sumner County Schools*, 942 F.3d 324, 326-327 (6th Cir. 2019) (quoting *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991)).

Finally, because the purpose of a temporary restraining order is simply to preserve the *status quo*, the Court's findings of fact and conclusions of law are not conclusive for later proceedings.  *See Rover Pipeline, LLC v. Zwick*, 2019 WL 5632514 at * 1 (S.D. Ohio Oct. 31, 2019); *Women's Med. Prof'l Corp. v. Baird*, 2008 WL 545015 at *1 (S.D. Ohio Feb. 27, 2008).

## IV.  Analysis

In his Emergency Motion, Noakes seeks an Order prohibiting Defendants from (1) "intimidating, threatening, coercing, harassing, or discriminating against [him] because he has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under any CWRU Policy adopted pursuant to Title IX;" and (2) pursuing any investigation or disciplinary actions against John Noakes related to the events described in the September 21, 2021 letter.  (Doc. No. 10 at p. 2.)  Defendants oppose the Motion, arguing that all four of the Rule 65 factors weigh heavily against the granting of emergency injunctive relief.  (Doc. No. 16.)

### A.  Likelihood of Success on the Merits

Noakes argues that he has a strong likelihood of success on the merits with respect to his Title IX retaliation claim.[9]  Title IX provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

---

[9] Noakes does not argue that he is likely to succeed on the merits of his Title IX deliberate indifference and/or breach of contract claims and, therefore, the Court does not consider the Rule 65 factors in the context of those claims.

Though the statute contains no express private right of action, the Supreme Court has held that individuals may sue funding recipients for violating Title IX. *See Jackson v. Birmingham Bd. of Educ*., 544 U.S. 167, 173 (2005) (collecting cases). The Supreme Court has further held that this implied right of action includes retaliation claims, explaining that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Id*. at 174.

In several recent decisions, the Sixth Circuit has analogized Title IX retaliation claims to Title VII retaliation claims. *See Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020); *Gordon v. Traverse City Area Pub. Schs*., 686 Fed. Appx 315, 320 (6th Cir. 2017); *Fuhr v. Hazel Park Sch. Dist.,* 710 F.3d 668, 673 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013); *Nelson v. Christian Bros. Univ*., 226 Fed. Appx 448, 454 (6th Cir. 2007) ("Generally, the courts have looked to Title VII as an analog for the legal standards in both Title IX discrimination and retaliation claims.") *See also Doe v. Belmont University*, 367 F.Supp.3d 732, 756 (M.D. Tenn. 2019); *Goldblum v. University of Cincinnati*, 415 F.Supp.3d 799, 803-803 (S.D. Ohio 2019).

Thus, like a Title VII retaliation claim, a Title IX retaliation claim can be established either through direct evidence of retaliation or circumstantial evidence that would support an inference of retaliation. *See Belmont University,* 367 F.Supp.3d at 756 (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010)). Where, as here, a plaintiff relies on indirect (i.e., circumstantial) evidence,[10] the familiar *McDonnell Douglas* burden-shifting framework applies. *See Gordon,* 686

---

[10] In his Emergency Motion for TRO, Noakes does not clearly state whether he is relying on direct or circumstantial evidence of retaliation. The Court construes Noakes' Motion as relying on circumstantial evidence for the following reasons. In his Motion, Noakes incorporates the elements of a *prima facie* case of retaliation, which implies the burden-

13

Fed. Appx. at 319-320; *Belmont University*, 367 F.Supp.3d at 756.  Under that framework, to establish a *prima facie* case of retaliation, a Title IX plaintiff must show "that (1) he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Bose*, 947 F.3d at 988.  *See also Gordon*, 686 Fed. Appx at 320.  If a plaintiff succeeds, the defendant may rebut that presumption by "articulating some legitimate, nondiscriminatory reason for its action." *Gordon,* 686 Fed. Appx. at 320.  *See also Belmont University*, 367 F.Supp.3d at 756.  Should the defendant do so, the burden shifts back to the plaintiff to undermine the defendant's proffered reason as pretextual.  *See Gordon*, 686 Fed. Appx. at 320; *Belmont University*, 367 F.Supp.3d at 756.

Here, Defendants do not dispute that Noakes can establish the first and second elements of his *prima facie* case.  The parties do, however, dispute the third element, i.e., whether Noakes is likely to succeed in demonstrating that he has suffered an adverse action. "To qualify as 'adverse,' an educational action must be sufficiently severe to dissuade a 'reasonable person' from engaging in the protected activity." *Gordon*, 686 Fed. Appx. at 320 (quoting *Burlington North. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) and *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728–29 (7th Cir. 2009) (applying *Burlington Northern's* "adverse action" standard to a Title IX retaliation claim)).

Noakes argues that the September 21, 2021 letter advising him that CWRU will be conducting a Title IX investigation into his responsibility, if any, for the Tumblr website (hereinafter "the Tumblr investigation") constitutes an "adverse action."  (Doc. No. 10 at p. 5.)  Noakes maintains that "the

---

shifting framework set forth in *McDonnel-Douglas*.  (Doc. No. 10 at p. 4 incorporating Doc. No. 2 at p. 9.)  Further, in a footnote, Noakes argues that CWRU's "new investigation is clearly pre-textual," again indicating that he is applying the burden shifting framework associated with retaliation claims based on circumstantial evidence.  (Doc. No. 10 at fn 1.)

14

fact of a Title IX investigation- by itself, regardless of the outcome – damages a student's reputation and is likely to deter other students from criticizing the CWRU Title IX process."[11] (*Id.*) Defendants maintain that the September 21, 2021 letter does not constitute an "adverse action" because "[t]he investigation has not yet begun, no hearing has been set, and no findings have been made." (Doc. No. 16 at p. 10.)

Noakes cites no binding authority (either in his Emergency Motion for TRO or his Motion for Preliminary Injunction) that Defendants' commencement of an investigation regarding the Tumblr website, standing alone, is sufficient to constitute an "adverse action" for purposes of his Title IX retaliation claim. The Court notes that, in the context of a Title VII retaliation claim, the Sixth Circuit found in an unreported decision that "mere investigations by an employer do not constitute an adverse employment action." *Bivins v. U.S. Pipe & Foundry Co.*, 48 Fed. Appx. 570, 572 (6th Cir. 2002). *See also Keeton v. Morningstar, Inc.*, 667 F.3d 877, 886 (7th Cir. 2012) (finding that "no adverse action of any kind was taken against Keeton as a result of the investigation and the investigation itself was not an adverse action"). Rather, the determination of whether an alleged retaliatory action can be considered materially adverse "will often depend on the circumstances." *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68 (interpreting Title VII anti-retaliation provision). *See also Lester v.*

---

[11] In support of this argument, Noakes relies on the affidavit of Dr. Firouz Daneshgari, who is a Professor of Surgery/Urology at the School of Medicine and the 3rd Chairman of the Department of Urology at University Hospitals Case Medical Center. (Doc. No. 2-2.) Among other things, Dr. Daneshgari avers that: "The threat of being forced to appear before the COS is likely to deter CWRU students from complaining about the CWRU Title IX process, defending themselves in a Title IX process, or challenging retaliatory actions. Medical students are very concerned with maintaining good relations with professors and administrators in order to preserve the chance for placement in top residency programs. Few students are likely to risk doing anything that might result in a review by the COS, as such a review could result in adverse sanctions ranging from counseling to expulsion." (*Id.* at ¶ 8.) Noakes also relies on the Affidavits of three fellow medical students, each of whom aver that being subjected to investigation, and the threat of being forced to appear before the COS, has a chilling effect and is likely to deter other CWRU students from complaining about the CWRU's Title IX process. (Doc. Nos. 2-3, 2-4, and 2-5.)

*City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014); *Revennaugh v. United States Postal Service*, 2019 WL 4674250 at * 9 (S.D. Ohio Sept. 25, 2019).  As both the Supreme Court and the Sixth Circuit have noted, "context matters."  *See Burlington Northern and Santa Fe Ry. Co*., 548 U.S. at 68; *Lester*, 746 F.3d at 732.

Here, the Court finds that, for purposes of these expedited proceedings, Noakes has not carried his heavy burden of showing that the mere commencement of a Title IX investigation is sufficiently severe to dissuade a "reasonable person" from engaging in protected activity.  This issue is likely to be both factually and legally contested as these proceedings continue, with both sides presenting evidence and argument regarding whether a reasonable medical student would be dissuaded from engaging in Title IX protected activity under the circumstances presented.  While Noakes has submitted some limited evidentiary material in support of his position, the Court finds that the affidavits attached to his Motion for Preliminary Injunction, standing alone, are insufficient at this time to establish a substantial likelihood that he will prevail on the merits of this element of his *prima facie* case.

Moreover, even assuming *arguendo* that Noakes had sufficiently established that the Tumblr website investigation constitutes an "adverse action," the Court finds that he has failed to establish a substantial likelihood that he will successfully demonstrate a causal connection between his protected activity and that investigation.  Noakes argues that this element of his *prima facie* case is met because (1) the September 21, 2021 letter advising him of the commencement of the Tumblr website investigation was sent "within a week of the filing of this lawsuit;" and (2) he has provided "significant evidence of retaliatory intent."  (Doc. No. 10 at pp. 5-6.)  Defendants argue that there is no causal connection because (1) Ms. Lutner was not involved in the prior Title IX proceedings

16

involving Noakes and Roe; (2) she made the decision to commence the Tumblr investigation on September 14, 2021, one day prior to the filing of the instant lawsuit; and (3) at the time she made the decision to commence the investigation, she was not aware that Noakes planned to file the instant lawsuit. (Doc. No. 16 at p. 11; Doc. No. 16-1 at ¶¶ 5, 10, 13.)

In the context of a Title VII retaliation claim, the Sixth Circuit has held that, "[i]n some circumstances, an inference of causation may arise solely from the closeness in time between the point at which an employer learns of an employee's protected activity and the point at which it takes an adverse action against that employee." *Kirilenko-Ison v. Board of Education of Danville Independent Schools*, 974 F.3d 652, 664 (6th Cir. 2020) (citing *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002)).  Here, the Court finds, based on the record before it at this time, that Noakes has not sufficiently demonstrated that he is likely to succeed in showing that the particular circumstances herein support an inference of causation based solely on the timing of the September 21, 2021 letter.  As noted above, Ms. Lutner submitted an Affidavit attesting that Roe complained about the content of the Tumblr website on September 7 and 10, 2021, several days prior to the filing of the instant lawsuit on September 15, 2021.  (Doc. No. 16-1 at ¶ 7.)  Ms. Lutner further avers that she made the decision to initiate an investigation before Noakes filed the instant lawsuit and without knowledge of his intent to do so.  (*Id*. at ¶¶ 10, 13.)  In light of the disputed factual issues relating to this element, the Court finds that Noakes has not carried his heavy burden of showing, at this time, that he is likely to succeed in establishing an inference of causation based on temporal proximity alone.

Finally, the Court notes that, even if Noakes had established a likelihood of success on the merits as to his *prima facie* case, the burden would then shift back to Defendants to rebut that

17

presumption by "articulating some legitimate, nondiscriminatory reason for its action." *Gordon,* 686 Fed. Appx. at 320. *See also Belmont University*, 367 F.Supp.3d at 756. Should Defendants do so, the burden would then shift back to Noakes to show pretext. *See Gordon*, 686 Fed. Appx. at 320; *Belmont University*, 367 F.Supp.3d at 756.

Noakes has not sufficiently argued or demonstrated that he is likely to succeed on the merits with respect to the remaining steps of this burden-shifting framework. Defendants have articulated legitimate, nondiscriminatory reasons for their decision to commence an investigation into Noakes' involvement in the Tumblr website, including that (1) CWRU is required under Title IX to investigate Roe's complaint of retaliation; and (2) CWRU had a reasonable basis to initiate the investigation based on Ms. Lutner's conclusion that "[t]he posts … disclosed details only accessible to Plaintiff."[12] (Doc. No. 16 at p. 8; Doc. No. 16-1 at ¶ 7.) Noakes argues, summarily and in a footnote that, "[t]his investigation is clearly pre-textual" because it "includes trumped-up charges that John Noakes shared information about the Title IX process and his relationship with Jane Roe – even though no CWRU policy or procedure requires John Noakes to keep this information confidential." (Doc. No. 10 at fn 1.)

Whether Defendants have legitimate, non-discriminatory reasons to commence the Tumblr investigation, and whether Noakes can demonstrate that those reasons are pretextual, are clearly contested issues of fact. The Court is unable to decide such strongly contested, fact-intensive issues

---

[12] According to Ms. Lutner, these details include the following: "screenshots originated from Plaintiff's phone depicting text messages between Plaintiff and Ms. Roe, information regarding Plaintiff's private discussions with his mother, a description of how 'people have looked at him prompt[ing] him to go to his top secret anxiety attack bathroom,' details about 'his first sleep paralysis episode,' specific details about Plaintiff's involvement in the Title IX proceedings and how it affected Plaintiff from his perspective, communications between Plaintiff and the Office of Equity, communications between Plaintiff and the School of Medicine administrators, a description of how Plaintiff feels in class while interacting with others, and how Ms. Roe and other apparently look at Plaintiff when walking down the stairs." (Doc. No. 16-1 at ¶ 7.)

on the basis of the limited briefing and evidence submitted in connection with Noakes' Emergency Motion for TRO. In light of the controverted facts, the Court finds that Noakes has not shown a substantial likelihood of success on the merits of his Title IX retaliation claim.

Accordingly, this factor weighs against the granting of a TRO.

## B. Irreparable Harm

The second factor in weighing whether to grant a preliminary injunction is whether the movant would suffer irreparable injury without an injunction. The key word in determining the extent of an injury sufficient to support the award of injunctive relief is "irreparable." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Mere injuries, however substantial, are not enough. *Id*. Rather, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id*. *See also D.T. v. Sumner County Schools,* 942 F.3d 324, 327 (6th Cir. 2019) ("To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'") (quoting *Griepentrog*, 945 F.2d at 154); *Abney v. Amgen, Inc.,* 443 F.3d 540, 552 (6th Cir. 2006) (finding that, to demonstrate irreparable harm, the movant must show that he "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated."); *Roe v. Director, Miami University, Office of Community Standards*, 2019 WL 1439585 at * 8 (S.D. Ohio April 1, 2019).

Here, relying on the affidavit of Dr. Daneshgari, Noakes argues that he will suffer irreparable harm if Defendants are not restrained from continuing the Tumblr investigation because "[t]he continued investigation and threat of discipline will damage his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career." (Doc. No. 2 at p 15.) He further maintains that, if he is expelled, suspended, or otherwise

forced to take a leave of absence, he will suffer irreparable harm because it will disrupt his education and create a "gap" in his academic record. (*Id.* at pp. 16-17.)

Defendants argue that Noakes cannot establish irreparable harm because CWRU has yet not begun its investigation and "there is no evidence as to the potential outcome of the investigation." (Doc. No. 16 at p. 11.) Thus, Defendants maintain Noakes "has not and cannot make a clear showing that he is in danger of imminent and irreparable harm, as he has not been damaged." (*Id.*)

The Court agrees with Defendants. While the Sixth Circuit has found that a plaintiff's suspension may constitute irreparable harm, *see Doe v. University of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017), no such disciplinary action has been imposed in this case. Indeed, it is undisputed that CWRU is in the very early stages of its investigation and has made no findings of wrongdoing or imposed any additional sanctions on Noakes at this time.[13] Notably, there is no indication in the record before this Court that Noakes has been barred from campus or that he has been restricted from attending his classes and/or taking exams. Rather, Noakes' concern is what *might* happen as a result of the investigation into Roe's complaint about the Tumblr website, i.e., that he *might* be found responsible and *might* then be suspended, expelled, or subject to some other form of discipline that *might* harm his academic reputation. At this time, however, the potential harms that Noakes fears are speculative, as the investigation has not yet begun and no findings have been made. In fact, it is

---

[13] The September 21, 2021 letter states, in pertinent part, that: "You are considered 'not responsible' for violating the Sexual Harassment Policy unless and until a preponderance of the evidence proves that a violation of Policy has occurred. The burden is on CWRU to gather evidence, investigate the allegations, follow the applicable procedures and make a fact-based determination, subject to appeal. No determination of responsibility will be made until the conclusion of the process and after the parties have been given an opportunity to inspect, review, and respond to all directly related and/or relevant evidence obtained by CWRU." (Doc. No. 10-1 at PageID# 312.)

possible that (as happened after the Title IX investigation of Roe's sexual assault complaint), CWRU's investigation will conclude that Noakes is not responsible and clear him of any wrongdoing.

Faced with similar situations, courts have found that plaintiffs failed to show irreparable harm. *See Doe v. University of Chicago*, 2017 WL 818859 at * 4-5 (N.D. Ill. March 2, 2017) (finding no irreparable harm to plaintiff's reputation and educational opportunities where "[t]he University has only recently begun its processing of the complaints"); *Jackson v. Macalester College*, 169 F. Supp. 3d 918 (D. Minn. 2016) (denying student's motion to restrain college from conducting any investigation or disciplinary proceeding for, among other things, lack of irreparable harm); *Doe v. Ohio State Univ.*, 136 F. Supp. 3d 854 (S.D. Ohio 2016) (same).

As noted above, "[t]o merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'"  *D.T.,* 942 F.3d at 327 (quoting *Griepentrog*, 945 F.2d at 154).   Here, Noakes has failed to demonstrate that he will suffer certain and immediate harm if Defendants are not enjoined from conducting an investigation into Roe's complaint regarding the Tumblr website.[14]  Accordingly, and for all the reasons set forth above, the Court finds that Noakes has failed to demonstrate he will suffer irreparable harm.   This factor weighs against granting a TRO.

---

[14] For this reason, the cases cited by Noakes in his Motion for Preliminary Injunction in support of his argument regarding irreparable harm are distinguishable because, in each of those cases, disciplinary sanctions had already been imposed at the time the plaintiffs filed for emergency injunctive relief.  *See, e.g., Doe v. Middlebury College,* 2015 U.S. Dist. Lexis 124540 (D. Vt. Sept. 16, 2015) (finding irreparable harm where plaintiff had been expelled and prevented from attending courses); *Doe v. Rector & Visitors*, 2019 U. S. Dist. Lexis 108990 (W.D. Va. June 28, 2019) (finding irreparable harm where plaintiff's degree was withheld pending disciplinary hearing); *Noakes v. Miami University*, 2017 U.S. Dist. Lexis 136880 (S.D. Ohio August 25, 2017) (finding irreparable harm where plaintiff had been suspended for two years); *Ritter v. Oklahoma*, 2016 U.S. Dist. Lexis 60193 (W.D. Ok. May 6, 2016) (finding irreparable harm where plaintiff had been expelled); *Doe v Pa. State University*, 276 F.Supp.3d 300 (M.D. Pa. 2017) (finding irreparable harm where plaintiff had been suspended for two years); *Roe v. Adams-Gaston*, 2018 U.S. Dist. Lexis 185697 (S.D. Ohio April 17, 2018) (finding irreparable harm where plaintiff had been expelled); *Doe v. Rhodes College*, 2016 U.S. Dist. Lexis 201165 (W.D. Tenn. Oct. 25, 2016) (same).

Having found that Noakes has failed to demonstrate either a likelihood of success on the merits or irreparable harm, the Court need not consider the remaining factors under Fed. R. Civ. P. 65.  *See D.T.,* 942 F.3d at 327 ("Was the district court wrong to stop the inquiry after finding no irreparable injury? No. When one factor is dispositive, a district court need not consider the others. And, as discussed above, this factor is dispositive; a plaintiff must present the existence of an irreparable injury to get a preliminary injunction. Thus, a district court is 'well within its province' when it denies a preliminary injunction based solely on the lack of an irreparable injury.") (internal citations omitted).  *See also McBride v. Michigan Dep't of Corrections*, 2020 WL 3723407 at * 4 (E.D. Mich. May 26, 2020) (noting that "a district court need not address all the preliminary injunction factors where fewer are dispositive of the issue"); *Rover Pipeline, LLC v. Zwick*, 2019 WL 5632514 at * 1 (S.D. Ohio Oct. 31, 2019) (noting that "although some courts would examine the four factors required for issuance of a preliminary injunction, a focus on the irreparability and immediacy of harm is all that is required") (quoting *ApplianceSmart, Inc. v. DeMatteo*, 2018 WL 6727094, at *2 (S.D. Ohio 12/21/18)).

## III.     Conclusion

For all the reasons set forth above, Plaintiff's Emergency Motion for Temporary Restraining Order (Doc. No. 10) is DENIED.

**IT IS SO ORDERED.**

 _s/Pamela A. Barker_
PAMELA A. BARKER
Date:  September 28, 2021                         U. S. DISTRICT JUDGE