IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN NOAKES, ) | Case No. 1:21-cv-01776 |
| ) | |
| Plaintiff, ) | Judge Pamela A. Barker |
| ) | |
| v. ) | **DEFENDANT'S OPPOSITION TO** |
| ) | **PLAINTIFF'S MOTIONS FOR** |
| CASE WESTERN RESERVE UNIVERSITY, ) | **PRELIMINARY INJUNCTION AND** |
| *et al.*, ) | **EXPEDITED DISCOVERY** |
| ) | |
| Defendants. ) | |

Plaintiff, a medical student at Defendant Case Western Reserve University ("CWRU" or "Defendant" or the "University"),[1] is asking this Court to *preemptively* insulate him from any and all proceedings and/or processes that *could potentially* lead to negative consequences for him. Although Plaintiff's request for injunctive relief is unclear as to the relief sought, Plaintiff seemingly seeks an order from this Court: (1) foreclosing CWRU from investigating a complaint of retaliation involving cyberbullying made by a female student who previously complained of sexual assault (the "Retaliation Investigation"); and (2) prohibiting CWRU's School of Medicine from addressing concerns submitted about Plaintiff's professionalism (the "Professionalism Proceedings"). Plaintiff's request for injunctive relief is premature and this matter is not yet ripe for adjudication. The Retaliation Investigation is just beginning, and there has been no hearing, findings, or sanctions. Similarly, the Professionalism Proceedings are midstream, and the School of Medicine has not issued any discipline or sanctions or otherwise taken any actions that would negatively impact a medical student's academic transcript and/or permanent record.

---

[1] The Complaint improperly names "Case Western Reserve University School of Medicine" as a defendant. CWRU's School of Medicine is not a separate legal entity. The corporate entity subject to suit is CWRU and, therefore, no response on behalf of "Case Western Reserve University School of Medicine" is necessary or appropriate.

1

It is well-established that universities and colleges must be afforded "deference in their disciplinary decisions and processes" as well as deference in their academic decisions, especially where medical students are concerned. *See, e.g., Marshall v. Ohio Univ.*, Case No. 2:15-cv-775, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) (holding universities and colleges must be afforded "deference in their disciplinary decisions and processes" and "[i]ssuing a temporary restraining order in this case, and in others similar to it, would likely interfere with [the University]'s ability to enforce its disciplinary standards"); *Hajjar-Nejad v. George Washington Univ.*, No. CV 10-626 (CKK), 2014 WL 1280228, at *18 (D.D.C. Mar. 31, 2014) ("particularly for medical students, professional comportment issues fall under the umbrella of deference to academic decisions"). Courts routinely decline to interfere with university disciplinary and academic decisions and processes – especially where such proceedings are ongoing – and Defendant respectfully requests that this Court do so here. *See id. See also Regents of the Univ. of Mich. v. Ewing*, 435 U.S. 214, n.14 (1985) (the school was "uniquely positioned to observe [the student's] judgment, self-discipline, and ability to handle stress, and thus especially well situated to make the necessary subjective judgment of [his] prospects for success in the medical profession.").

## STATEMENT OF FACTS

### I. Jane Roe's Complaint Of Sexual Assault Against Plaintiff.

On November 7, 2020, Jane Roe[2] reported to the Office of Equity that Plaintiff sexually assaulted her on October 20, 2020. (Affidavit of Rachel Lutner, at ¶ 4d, attached as Exhibit A.) Following an investigation and a hearing, and based on the evidence gathered during its

---

[2] The female student complainant is referred to in Plaintiff's Complaint as Jane Roe.

2

investigation, CWRU found that Plaintiff did not violate the Sexual Harassment Policy ("the Policy"). (Ex. A at ¶ 4d.) On April 15, 2021, CWRU notified Plaintiff of the outcome of its investigation. (Ex. A at ¶ 4e.) Later that same day, Plaintiff posted the following message on a GroupMe chat to all CWRU first year medical students, including Ms. Roe: "All glory and honor to the Most High, who is my refuge and fortress. That's all, thanks." (Ex. A at ¶ 4e.) Plaintiff also changed his GroupMe handle from "[Plaintiff]" to "[Plaintiff (1-0)]."[3] (Ex. A at ¶ 4e.)

## II. Professionalism Proceedings Regarding Concerns Related To Plaintiff's GroupMe Activities In Reaction To Title IX Outcome.

Medical students are expected to adhere to high standards of conduct and demonstrate professional behaviors throughout their medical school education. (Affidavit of Dr. Lia Logio, at ¶ 4, attached as Exhibit B; School of Medicine Student Handbook, at p. 55, attached as Ex. 1 to Ex. B.) "Medical professionalism incorporates three essential characteristics: expert knowledge, self-regulation, and fiduciary responsibility to place the needs of the patient ahead of the physician's self-interest." (Ex. B at Ex. 1, p. 54.) CWRU's School of Medicine utilizes an Early Concerns Reporting process to allow any individual to report times when a student's actions suggest a lapse in professionalism. (Ex. B at ¶ 5, Ex. 1.) When an Early Concern is submitted, CWRU invites the student at issue to provide a response to the Early Concern. (Ex. B at ¶ 6.) CWRU's Professionalism Working Group (the "PWG"), which is comprised of School of Medicine faculty and staff, reviews the Early Concern and the student's response (with the student de-identified), and "identifies a plan to support the student in meeting professional standards in a constructive framework." (Ex. B at ¶ 7 and Ex. 1, p. 55.) Specifically, "PWG supports students in

---

[3] Ms. Roe and other students reported to CWRU that they understood this (1-0) notation to represent the "score," *i.e.* Plaintiff had won round 1, while Ms. Roe had lost this time. (Ex. A at ¶ 4f.)

their professional development towards becoming a physician and develops an individualized plan for coaching the students." (Ex. B at Ex. 1, p. 55.) Successful coaching requires that the student be a willing participant in the process. (Ex. B at ¶ 8 and Ex. 1.) If a student refuses to respond to the Early Concern and/or is non-cooperative in the Early Concerns Reporting process, coaching is likely to be unsuccessful and so the student is referred to the Committee on Students (the "COS"), a standing committee of the Faculty of Medicine charged with the responsibility of reviewing the total performance of all students in the School of Medicine. (Ex. B at ¶ 8.)

In response to Plaintiff's GroupMe activities, more than 30 first-year medical students submitted Early Concerns, reporting that Plaintiff's conduct following the outcome of the Title IX proceedings was unprofessional and inappropriate, created an unsafe environment, was retaliatory and bullying in nature, and raised concerns about his judgment as a future physician. (Ex. B at ¶ 11c.) Plaintiff refused to submit a response to the 30+ Early Concerns and, at least initially, refused coaching; accordingly, the matter was referred to the COS. (Ex. B at ¶ 11d.) On May 13, 2021, the COS reviewed the Early Concerns submitted and discussed the matter with Plaintiff. (Ex. B at ¶ 11e.) At the COS meeting, Plaintiff stated that, although he initially refused coaching, he was willing to engage with PWG in the coaching process. (Ex. B at ¶ 11e.) Plaintiff also acknowledged that he caused emotional pain to other students. (Ex. B at ¶ 11e.) Based on its review of the matter, the COS referred Plaintiff to the PWG for professionalism coaching, to specifically address empathy (and any other issues identified by the assigned coach). (Ex. B at ¶ 11f.) Plaintiff participated in a few coaching sessions during the summer of 2021, but in September 2021, he notified his coaches that he was exploring litigation against CWRU and would not continue with coaching sessions or the Professionalism Proceedings. (Ex. B at ¶ 11f.) Because Plaintiff had not yet successfully completed coaching and refused to continue in the Professionalism Proceedings,

4

the matter was referred back to the COS. (Ex. B at ¶ 11g.) The COS has yet to meet to discuss the Professionalism Proceedings. (Ex. B at ¶ 11g.)

### III. The Retaliation Investigation Into Jane Roe's Complaint That Tumblr Posts Were In Retaliation For Her Prior Title IX Matter.

On September 7-12, 2021, Ms. Roe complained to Ms. Lutner that a Tumblr website contained content that she believed was in retaliation for her prior Title IX complaint. (Ex. A at ¶ 7.) Specifically, Ms. Roe complained that the content of the posts about Ms. Roe on Tumblr were harassing and intimidating and contained specific information about Ms. Roe and her prior Title IX complaint against Plaintiff, including accusations that Ms. Roe was not clear-headed and fabricated lies about Plaintiff, that she engaged in self-destructive behaviors, that she believes she can get away with anything, and that she follows Plaintiff around and carries pepper spray with her. (Ex. A at ¶ 7; ECF 16.) The posts also disclosed details only accessible to Plaintiff, including, for example, screenshots originating from Plaintiff's phone depicting text messages between Plaintiff and Ms. Roe, information regarding Plaintiff's private discussions with his mother, specific details about Plaintiff's involvement in the Title IX proceedings and how it affected Plaintiff from his perspective, up to date references to communications between Plaintiff and the Office of Equity, communications between Plaintiff and the School of Medicine administrators, a description of how Plaintiff feels in class and while interacting with others, and how Ms. Roe and others apparently look at Plaintiff when walking down the stairs. (Ex. A at ¶ 7; ECF 16.) In the days that followed, the posts attacked and harassed others, including student leaders in the medical school (*e.g.* "I can't think of a better example of what an adult teacher's pet looks like"). (Ex. A at ¶ 8; ECF 16.) In addition, members of the School of Medicine community, including CWRU employees, began receiving invitations to a new Instagram account, which posted a link to the

Tumblr content. (Ex. A at ¶ 9.) Ms. Lutner reviewed the posts and, on September 14, 2021, before Plaintiff filed the Complaint (and without any knowledge that Plaintiff may be filing a lawsuit), determined that, at that point, there was a reasonable basis to believe that Plaintiff, or someone on his behalf or working with him, may be sharing or posting information on Tumblr to intimidate, embarrass, harass, or punish Ms. Roe for filing a Title IX complaint against Plaintiff, which may implicate the Policy.[4] (Ex. A at ¶ 10; ECF 16.) On September 14, 2021, before Plaintiff filed the Complaint, Ms. Lutner scheduled a meeting for September 15, 2021 at 9 a.m. to notify Ms. Roe that CWRU would be proceeding with the Retaliation Investigation. (Ex. A at ¶¶ 10, 14.) The Retaliation Investigation was stayed pending this Court's ruling on Plaintiff's Emergency Motion for Temporary Restraining Order ("TRO Motion"). (Ex. A at ¶ 11.) After this Court denied Plaintiff's TRO Motion (ECF 17), CWRU resumed the Retaliation Investigation. (Ex. A at ¶ 12.) The Retaliation Investigation is ongoing. (Ex. A at ¶ 12.) To date, no hearing has been set, and no findings have been made. (Ex. A at ¶ 12.)

**IV.  Professionalism Proceedings Regarding Tumblr Posts.**

Separate from the Retaliation Investigation, on September 13, 2021, a medical student submitted an Early Concern regarding professionalism related to the Tumblr and Instagram posts. (Ex. B at ¶ 13.) Because Plaintiff refuses to engage in coaching with the PWG (see above), the PWG referred this matter to the COS. (Ex. B at ¶ 13.) The COS has yet to meet to discuss the Professionalism Proceedings. (Ex. B at ¶ 13.)

---

[4] As the public Tumblr posts identify Plaintiff by name, CWRU is not including the website address or a copy of the voluminous posts with this Opposition. A full copy of the Tumblr posts was previously filed under seal as ECF 16.

**STANDARD OF REVIEW**

The factors to be considered in determining whether to issue a preliminary injunction are: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether the requested injunction will cause substantial harm to others; and (4) whether the public interest would be served by issuing a preliminary injunction. *Déjà vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001). Courts caution that "[a]n injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Reid v. Hood*, No. 10CV2842, 2011 WL 251437, at *2 (N.D. Ohio Jan. 26, 2011) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)). As noted by the Supreme Court, a motion for injunctive relief requires "substantial proof" and the standard is "much higher" than that on summary judgment. *Mazurek*, 520 U.S. at 972. *See also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion").

**LAW AND ARGUMENT**

**I.      Plaintiff Cannot Establish That He Is Likely To Succeed On The Merits Of His Title IX Retaliation Claim.**

As outlined in Defendant's Opposition to Plaintiff's TRO Motion (ECF 15), which is incorporated by reference, to establish a *prima facie* case of Title IX retaliation, Plaintiff must prove that: (1) he engaged in protected activity; (2) CWRU knew of the protected activity; (3) he suffered an adverse school-related action; and (4) a causal connection exists between the protected activity and the adverse action. *Bose v. Bea*, 947 F.3d 983, 992 (6th Cir. 2020). Plaintiff cannot

meet the high standard required for injunctive relief as to the third and fourth elements of the *prima facie* case.

### A. Plaintiff Cannot Establish That He Suffered An Adverse School-Related Action.

#### i. Retaliation Investigation.

As referenced in this Court's Order (ECF 17), and as more fully discussed in Defendant's Opposition to Plaintiff's TRO Motion (ECF 15), "mere investigations… do not constitute an adverse… action." (PAGEID #504.) CWRU has only just begun the Retaliation Investigation. (ECF 10-1, PAGEID #310-14.) CWRU has yet to schedule a hearing or make any findings. (Ex. A at ¶ 12.) Thus, Plaintiff cannot establish an "adverse action" in connection with the Retaliation Investigation as no outcome has been reached or is even likely to be reached. *See, e.g., Bivins v. U.S. Pipe & Foundry Co.*, 48 Fed.Appx. 570, 572 (6th Cir. 2002) (applying Title VII retaliation analysis); *Ludlow v Northwestern Univ.*, 79 F. Supp.3d 824, fn. 5 (N.D. Ill. 2015) (*quoting Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885–86 (7th Cir. 2012) (interpreting Title VII: "no adverse action of any kind was taken against [the plaintiff] as a result of the investigation and the investigation itself was not an adverse action")).

#### ii. Professionalism Proceedings.

As to the Professionalism Proceedings, Plaintiff contends that his participation in coaching sessions constitutes adverse action. (Motion, pp. 10-13.) In support of this argument, Plaintiff included affidavits of himself, a retired faculty who had no involvement with the PWG or COS,[5] and a few unidentified students who share their conclusory perceptions of the potential impact of

---

[5] Dr. Firouz Daneshgari did not serve on the PWG or COS. (Ex. B at ¶ 12.) As such, it is unclear upon what Dr. Daneshgari bases his conclusory perceptions as outlined in his Affidavit. (ECF 2-2.)

participating in the Professionalism Proceedings. Despite Plaintiff's improper characterization of the coaching sessions as "discipline by the COS," coaching is utilized by the School of Medicine as a way to "support the student in meeting professional standards in a constructive framework." (Ex. B at ¶ 7 and Ex. 1.) The fact that a student engages in coaching sessions, and the content of those coaching discussions, are not included in a medical student's academic transcript or permanent record and, as a result, are not communicated by CWRU to a medical student's potential residency programs or future employers. (Ex. B at ¶ 9.) Moreover, to the extent Plaintiff asserts that participation in the Professionalism Proceedings somehow constitutes adverse action, the vast majority of COS proceedings do not result in discipline, suspension, or expulsion. (Ex. B at ¶ 11a.) Indeed, during the entire 2020-2021 academic year, none of the COS proceedings resulted in any discipline, suspension, or expulsion. (Ex. B at ¶ 11a.) There is no evidence that participation in coaching sessions or COS proceedings generally constitutes an adverse action (let alone irreparable harm).

### B. Plaintiff Cannot Establish That There Is A Causal Connection Between Protected Activity And Adverse Action.

Plaintiff contends that Darnell Parker, Steven Ricanati, and Marjorie Greenfield threatened him, and, in retaliation for Plaintiff's participation in the prior sexual assault matter and/or Plaintiff's filing of his own retaliation complaint against Mr. Parker and Dr. Ricanati, CWRU initiated the Retaliation Investigation and Professionalism Proceedings against him.

#### *i.* Retaliation Investigation.

As referenced in this Court's Order (ECF 17), Plaintiff cannot establish a causal connection between the alleged conduct and the Retaliation Investigation. (PAGEID #505-506.) Ms. Lutner made the decision to proceed with the Retaliation Investigation, and CWRU has retained outside

9

investigators to conduct the Retaliation Investigation. (Ex. A at ¶¶ 5, 10, 14, 15.) Mr. Parker and Drs. Ricanati and Greenfield have not been involved in the Retaliation Investigation. (Ex. A at ¶¶ 17-18; Declaration of Steven Ricanati, at ¶ 8, attached as Exhibit C; Declaration of Marjorie Greenfield, at ¶ 13, attached as Exhibit D.) There is no evidence whatsoever that the Retaliation Investigation is in retaliation for Plaintiff's participation in the prior sexual assault matter and/or Plaintiff's filing of his own retaliation complaint against Mr. Parker and Dr. Ricanati.

### ii. Professionalism Proceedings.

As to the Professionalism Proceedings, as an initial matter, Mr. Parker left CWRU in July 2021 and therefore could not have been involved in any alleged conduct after that time. (Ex. B at ¶ 11h; Ex. A at ¶ 17.) In addition, during his tenure with CWRU, Mr. Parker served as Senior Associate Vice President of Equity. (Ex. A at ¶ 19.) Mr. Parker had no role or involvement with the PWG or the COS. (Ex. B at ¶ 11h.) Drs. Ricanati and Greenfield deny that they threatened Plaintiff. (Ex. C at ¶ 4; Ex. D at ¶¶ 10-12.) Even if they had threatened Plaintiff (which they did not), neither are voting members of the PWG or the COS. (Ex. C at ¶¶ 9-10; Ex. D at ¶¶ 14-15; Ex. B at ¶ 11i-j.) There is no evidence to support that the Professionalism Proceedings or coaching sessions are in retaliation for Plaintiff's participation in the prior sexual assault matter and/or Plaintiff's filing of his own retaliation complaint against Mr. Parker and Dr. Ricanati. Plaintiff, a couple of his friends from medical school, and a retired faculty member opine that the Professionalism Proceedings will be damaging to Plaintiff's career, and that the COS typically does not evaluate such professionalism concerns. None of these individuals have any experience serving on the COS or are otherwise knowledgeable regarding the policies and procedures of the

COS and PWG.[6] Pure speculation by individuals who had no involvement in the Retaliation Investigation or the Professionalism Proceedings is insufficient to support injunctive relief in this case. *See, e.g., Green v. Fidelity Investments*, 374 Fed.Appx. 573, 579 (6th Cir. 2010) ("In order to survive summary judgment, Plaintiff cannot rely on conjecture or conclusory accusations."); *Carson v. Ford Motor Co.*, 413 Fed. Appx. 820, 824 (6th Cir. 2011) ("[The plaintiff's] subjective belief… is not sufficient to withstand summary judgment").

### C. Even If Plaintiff Could Establish A Prima Facie Case Of Retaliation (Which He Cannot), CWRU Has Legitimate, Non-Retaliatory Reasons For The Retaliation Investigation And Professionalism Proceedings.

Even if Plaintiff could establish a *prima facie* case of retaliation (which he cannot), he still cannot establish that he is likely to succeed on the merits of his Title IX retaliation claim. Plaintiff contends there is direct evidence of retaliatory intent. Direct evidence is "evidence [that], if believed, compels the conclusion that retaliatory animus played a part in the challenged decision." *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 383 (6th Cir. 2002). Evidence of retaliatory animus on the part of a non-decisionmaker does not constitute direct evidence unless a plaintiff can prove that the non-decisionmaker's retaliatory animus influenced the relevant decisionmaker. *Id.* Here, Plaintiff contends that Mr. Parker and Drs. Ricanati and Greenfield directly threatened him. Even if true (which it is not), this is not direct evidence, as Mr. Parker and Drs. Ricanati and Greenfield are not the relevant decisionmakers in connection with the Retaliation Investigation and the Professionalism Proceedings. Mr. Parker and Drs. Ricanati and Greenfield are not involved in either the Retaliation Investigation or the Professionalism Proceedings. (Ex. C

---

[6] Plaintiff submitted the Affidavit of Dr. Firouz Daneshgari in support of his Motion. Dr. Daneshgari, a retired faculty member, had no involvement in COS or PWG matters at the School of Medicine. (Ex. B at ¶ 12.)

11

at ¶¶ 8-10; Ex. D at ¶¶ 13-15; Ex. B at ¶ 11h-j; Ex. A at ¶¶ 15-18.) And, there is no evidence to support that their alleged retaliatory animus somehow influenced Ms. Lutner or the external investigators in connection with the Retaliation Investigation or the COS in connection with the Professionalism Proceedings.

Where there is no direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies. If a plaintiff can establish a *prima facie* case of retaliation, the defendant must then "articulat[e] some legitimate nondiscriminatory reason for its action." *Gordon v. Traverse City Area Pub. Schs.*, 686 Fed.Appx. 315, 320 (6th Cir. 2017). Should the defendant do so, the burden shifts back to the plaintiff to establish that the proffered reason is pretextual. *Id.*

As outlined above, in this Court's Order (ECF 17), and in Defendant's Opposition to Plaintiff's TRO Motion, CWRU is obligated by law and by its policies to conduct the Retaliation Investigation. (Ex. A at ¶ 4d; ECF 16.) And, the Professionalism Proceedings were initiated because of Early Concerns regarding Plaintiff's professionalism that were submitted by 30+ first-year medical students related to Plaintiff's GroupMe activities and the nature of the content being posted on Tumblr. (Ex. B at ¶¶ 11c, 13.) CWRU has met its burden of explaining the reasons for its actions. *See, e.g., Russell v. Geithner*, No. 2:09-CV-00975, 2012 WL 5497769, at *12 (S.D. Ohio Nov. 13, 2012) (holding the employer's "burden is satisfied if [it] simply explains what [it] has done or produces evidence of legitimate nondiscriminatory reason").

### D. Plaintiff Cannot Establish That The Reasons For The Retaliation Investigation And Professionalism Proceedings Are Pretextual.

Plaintiff cannot establish that the legitimate, non-retaliatory reasons proffered by CWRU: (1) had no basis in fact; (2) did not actually motivate CWRU's actions; or (3) were insufficient to motivate CWRU's actions, and thus, Plaintiff cannot establish these reasons were pretextual.

*Gordon, supra.* Plaintiff admitted to the GroupMe activities and there is no dispute as to what was actually posted on Tumblr. (ECF 2-1, PageID #254, ¶ 10; ECF 16.) CWRU is required by law and by its policies to take actions to prevent cyberbullying where such harassment is in retaliation for the filing of a sexual assault complaint. And, as outlined below, medical schools can and must address professionalism issues raised about their medical students. Plaintiff cannot establish that the reasons for the Retaliation Investigation or Professionalism Proceedings are pretextual and, therefore, Plaintiff fails to establish that he is likely to succeed on the merits of his Title IX retaliation claim.

## II. Plaintiff Cannot Establish Irreparable Harm As His Claim Is Not Ripe For Adjudication.

In *Doe v. The Ohio State University*, the court addressed a similarly pre-mature claim where a hearing was yet to be held and a decision was not yet made. The Court determined that the majority of claims were not ripe, and it refused to disrupt the process midway. *Supra* at 864-865. Because CWRU has just started the Retaliation Investigation, and there is no evidence as to the potential outcome of the Retaliation Investigation, Plaintiff's Motion is premature and not yet ripe, as he cannot establish irreparable harm. This same reasoning applies to the Professionalism Proceedings, as there is no evidence as to the potential outcome of the Professionalism Proceedings.

To establish irreparable harm, Plaintiff must show harm that is certain and immediate, rather than speculative or theoretical. *Coalition of Radioactive Materials Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Further, the possibility that adequate relief may be available at a later date weighs heavily against a claim of irreparable harm. *NACCO Materials Handling Group, Inc. v. Toyota Materials Handling USA, Inc*., 246 Fed. Appx. 929, 943 (6th Cir.

13

Tenn. 2007) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1984)). Because CWRU has just begun the Retaliation Investigation, the Professionalism Proceedings are midstream, and no discipline, findings, or sanctions have been issued through either process, Plaintiff has not and cannot make a clear showing that he is in danger of imminent and irreparable harm, as he has not been damaged. *See, e.g., Jackson v. Macalester College*, No. 16-cv-0448 (WMW/BRT), 2016 WL 3029932, at *4 (D. Minn. Mar. 11, 2016) (denying injunctive relief at outset of disciplinary process for lack of irreparable harm); *Doe v. The Ohio State Univ.*, *supra* (same); *Wiley v. Texas State Univ.,* No. 1:18-CV-930-RP, 2019 WL 317247, at *4 (W.D. Texas Jan. 24, 2019) (dismissing plaintiff's claim as unripe because any risk of irreparable harm to plaintiff's reputation and future career opportunities were "contingent future events that may not occur as anticipate, or indeed may not occur at all" because the University's administrative process had not concluded). *See also Doe v. The Univ. of Chicago*, No. 16 C 08298, 2017 WL 818859, at *5 (N.D. Ill. Mar. 2, 2017) (denying the respondent's request for injunctive relief where the lawsuit was filed in the early stages of the Title IX process and finding that "[i]f a hearing is eventually held, we do not know that harm will result; a tribunal might very well clear [the plaintiff] of any wrongdoing").

Here, Plaintiff seeks injunctive relief *before* CWRU applies its internal procedures and/or makes any determination(s). There is no imminent and irreparable harm sufficient to justify the requested injunctive relief, and Plaintiff's Motion for Preliminary Injunction should be denied. *See Marshall v. Ohio Univ.*, *supra*, at *10 (denying plaintiff's motion for injunctive relief because "the Court is reluctant to interfere with [the University's] disciplinary processes, which are specifically designed to 'provide an environment that facilitates learning.'"); *Jackson*, *supra*, at *2 (where the college had not yet interviewed the respondent – should he elect to participate – regarding the alleged sexual assault, "the Court will not speculate as to whether [the college] will determine that

14

[the respondent] is responsible for any violations of the Policy, or what sanction or remedy (if any) might be imposed" as such "speculative harm cannot justify the issuance of [injunctive relief]").

### III. Even if Plaintiff Could Establish Irreparable Harm (Which He Cannot), Or A Substantial Likelihood of Success On The Merits (Which He Cannot), The Potential Harm To Jane Roe And The University Community Weighs Heavily In Favor Of Denying Plaintiff's Motion As To The Retaliation Investigation.

As to the Retaliation Investigation, as discussed more fully in Defendant's Opposition to Plaintiff's TRO Motion, this Court must consider the harm to Jane Roe, the female complainant, and the University community if the Court were to halt the Retaliation Investigation. Allowing Plaintiff's request for judicial intervention in CWRU's internal Title IX process in this case, especially when that process is only beginning, would invite all respondents in sexual misconduct proceedings to preempt Title IX investigations by rushing to court as soon as they are notified that an allegation exists. Because granting Plaintiff's Motion in this case will cause substantial harm to the complainant Jane Roe and to CWRU's community as a whole, this Court should deny Plaintiff's Motion as to the Retaliation Investigation.

### IV. Even if Plaintiff Could Establish Irreparable Harm (Which He Cannot), Or A Substantial Likelihood of Success On The Merits (Which He Cannot), The Potential Impact Of The Requested Injunction On The Public Interest Weighs Heavily In Favor Of Denying Plaintiff's Motion.

Even if Plaintiff could establish irreparable harm (which he cannot) or a substantial likelihood of success on the merits (which he cannot), the potential impact of the requested injunction on the public interest weighs heavily in favor of denying Plaintiff's Motion. As to the Professionalism Proceedings, a court must "defer to the academic decisions of the college" unless there is such a substantial departure from accepted academic norms as to demonstrate a lack of professional judgment. *Tate v. Owens State Cmty. Coll.*, 10th Dist. Franklin No. 10AP-1201, 2011 WL 2685664, at *3 (July 12, 2011) (quoting *Bleicher v. Univ. of Cincinnati College of Med.*, 78

15

Ohio App.3d 302, 308 (Ohio App. 10 Dist. 1992)). "Judges must be sensitive to the effects on education of heavy-handed judicial intrusion into school disciplinary issues… Let us not forget that one component of academic freedom is the right of schools to a degree of autonomy in the management of their internal affairs." *Doe v. St. Francis School Dist.*, 694 F.3d 869, 873 (7th Cir. 2012). If CWRU, one of the top 25 ranked medical schools in the country, is prevented from addressing professionalism concerns raised about its medical students, it will be unable to maintain its high academic standards or even protect the integrity of medical professionalism. It is clearly in the public interest to preserve the high professionalism standards required of the medical profession. Accordingly, medical schools must be permitted to address professionalism issues. *See, e.g., accord, e.g., Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 463 (4th Cir. 2012) ("Adopting an appropriately deferential view, we find that professionalism was an essential requirement of the Medical School's program…").

As to the Retaliation Investigation, as discussed more fully in Defendant's Opposition to Plaintiff's TRO Motion, if this Court grants Plaintiff's Motion, and prevents CWRU from investigating allegations of retaliation, it would effectively sanction cyberbullying against individuals who filed sexual misconduct complaints under Title IX that did not result in findings against the respondents. Halting the Retaliation Investigation would have a chilling effect on the reporting of alleged sexual misconduct in the University community. It would send a loud and clear message: private colleges and universities have no authority to administer their disciplinary policies and procedures, thereby eviscerating Title IX and the well-established rights of private colleges and universities to establish and enforce rules of conduct.

## V.     For The Reasons Stated Above, Plaintiff's Motion For Expedited Discovery Should Also Be Denied.

Because Plaintiff cannot establish that this Court should issue a preliminary injunction in this case, his Motion for Expedited Discovery should similarly be denied. *See, e.g., Traster v. Ohio Northern Univ.*, No. 3:12 CV 2966, 2012 WL 12875964, at *3 (N.D. Ohio Dec. 14, 2012) (finding no need for expedited discovery because the court denied the preliminary inunction); *Doe v. Transylvania Univ.*, No. 5:20-145-DCR, 2020 WL 1860696 (E.D. Ky. Apr. 13, 2020) (denying request for injunctive relief to prevent university from proceeding with student disciplinary hearing and declining to "convert the school disciplinary proceeding into federal litigation by allowing expedited discovery"); *Doe v. Univ. of Chicago*, *supra*, at *7.

## CONCLUSION

For the reasons outlined above, Defendant respectfully requests that the Court deny Plaintiff's *Motion for Preliminary Injunction* and *Motion for Expedited Discovery*.

    Respectfully submitted,

*/s/ Amanda T. Quan*
John Gerak (#0075431)
Amanda T. Quan (#0086623)
Alexandria A. Gardella (#0100000)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
127 Public Square
4100 Key Tower
Cleveland, OH 44114
216.241.6100
216.357.4733 (FAX)
john.gerak@ogletree.com
amanda.quan@ogletree.com
alexandria.gardella@ogletree.com

*Attorneys for Defendant Case Western Reserve University*

## CERTIFICATE OF SERVICE

I hereby certify that on October 6th, 2021 a copy of the foregoing *Defendant's Opposition to Plaintiff's Motions for Preliminary Injunction and Expedited Discovery* was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

        */s/ Amanda T. Quan*
        *One of the Attorneys for Defendant*

48822675.6