<u>**EXHIBIT A**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NOAKES, | ) | Case No. 1:21-cv-01776 |
| | ) | |
| Plaintiff, | ) | Judge Pamela A. Barker |
| | ) | |
| v. | ) | **<u>DEFENDANT'S SURREPLY TO</u>** |
| | ) | **<u>PLAINTIFF'S MOTION FOR</u>** |
| CASE WESTERN RESERVE UNIVERSITY, | ) | **<u>EXPEDITED DISCOVERY</u>** |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff's Reply in Response to Motion for Expedited Discovery (ECF 19) does not

identify a single case supporting ***real time discovery of a university's ongoing Title IX***

***investigation and/or professionalism proceedings***.  Rather, Plaintiff relies solely on (1) situations

where the investigation was completed and/or the student was already removed/expelled, and (2)

cases unrelated to Title IX investigations or the university context generally. The two university-

related cases cited by Plaintiff are inapplicable as the students in those cases had already been

removed/expelled and/or the investigation was already complete.  *See Richmond v. Youngstown*

*State Univ.*, No. 4:17CV1927, 2017 WL 6502833, at * 1 (N.D. Ohio Sept. 14, 2017) (the university

already made its decision to remove the plaintiff from the football team); *Doe v. The Ohio State*

*Univ.*, No. 2:15-CV-2830, 2015 WL 6082606, at * 2 (S.D. Ohio Oct. 16, 2015) (the university

already completed its Title IX sexual assault investigation and expelled the student from the

university).[1]  The remaining cases fall outside of the Title IX context.  *See Concerned Pastors for*

*Soc. Action v. Khouri*, No. 16-10277, 2016 WL 3055624, at * 1 (E.D. Mich. May 31, 2016)

---

[1] Copies of the complaints and opinions from these two referenced cases are attached as <u>Exhibit 1</u>.

(lawsuit seeking relief under the Safe Drinking Water Act relating to contamination of water supplied by the Flint Water System); *JPMorgan Chase Bank, N.A. v. Clark*, No. 09-13815, 2009 WL 3190342, at * 1 (E.D. Mich. Sept. 29, 2009) (non-compete/trade secrets case); *Kentucky CVS Pharmacy v. McKinney*, No. 5:13-CV-25-KSF, 2013 WL 1644903, at * 1 (E.D. Ky. Apr. 16, 2013) (unfair competition and tortious interference case).

As outlined in Defendant's Opposition to Plaintiff's Motions for Preliminary Injunction and Expedited Discovery (the "Opposition"), which is incorporated by reference, CWRU just started the Retaliation Investigation, and the Professionalism Proceedings are similarly midstream. Accordingly, this case is not yet ripe for adjudication and expedited discovery is improper.  *See, e.g., Doe v. The Ohio State Univ.*, 136 F.Supp.3d 854, 864-65 (S.D. Ohio 2016) (denying student's motion for preliminary injunction where the plaintiff's claims were not yet ripe as "there has been no… hearing, no decision, no sanction"); *Traster v. Ohio Northern Univ.*, No. 3:12 CV 2966, 2012 WL 12875964, at *3 (N.D. Ohio Dec. 14, 2012) (finding no need for expedited discovery because the court denied the preliminary inunction); *Doe v. Transylvania Univ.*, No. 5:20-145-DCR, 2020 WL 1860696 (E.D. Ky. Apr. 13, 2020) (denying request for injunctive relief to prevent university from proceeding with student disciplinary hearing and declining to "convert the school disciplinary proceeding into federal litigation by allowing expedited discovery").

In *Doe v. Transylvania Univ.*, a student accused of violating the university's sexual misconduct policy filed a lawsuit after the university completed its investigation but before it conducted a hearing on the Title IX matter.  The student filed motions for a temporary restraining order and for expedited discovery, both of which the court denied.[2]  Similar to Plaintiff in this case, the plaintiff in *Doe v. Transylvania Univ.* sought to take the depositions of four witnesses and to

---

[2] A copy of the plaintiff's motion for expedited discovery in *Doe v. Transylvania Univ.* is attached as <u>Exhibit 2</u>.

obtain documents in connection with the university's Title IX investigation, for the purpose of obtaining evidence for an injunction hearing before the court.  In evaluating the plaintiff's motion for expedited discovery, the district court stated:

> Transylvania argues that this is an attempt to convert the administrative proceeding into federal litigation so the plaintiff can then leverage and use civil discovery in the administrative hearing. In this regard, the Court notes that "the Title IX adjudication process is not a civil lawsuit between the alleged victim and the respondent. Rather, it is a mechanism for universities to keep their campuses safe by responding to actions in violation of University sexual misconduct policies." *Doe v. University of Kentucky*, 361 F. Supp. 3d 687, 699 (E.D. Ky. 2019). The undersigned agrees and is not inclined to allow the broad use of civil discovery in federal litigation for John Doe's administrative proceeding before the University. His motion to expedite discovery will be denied.

*Id.* at * 13.  The court cautioned that the plaintiff and his attorneys should not "attempt[] to use this litigation [to] interfere with or chill the administrative matter from running its course."  *Id.* at * 5.

As the Retaliation Investigation and Professionalism Proceedings are ***not yet complete***, this Court should allow these processes to run their course, and deny Plaintiff's premature and improper request for ***real time discovery of the ongoing proceedings***.  *See, e.g., id.*  Accordingly, this Court should deny Plaintiff's Motion for Expedited Discovery.[3]

---

[3] If, for some reason, this Court determines that expedited discovery in this case is appropriate, then Defendant respectfully requests that it also be permitted to conduct expedited discovery, including, but not limited to, depositions of up to four witnesses, including Plaintiff, the individual who regularly sleeps beside or near Plaintiff and witnessed the episodes identified in the Tumblr posts at issue in the Retaliation Investigation (*i.e.* the self-identified author of at least one of the Tumblr posts), the individual who quit school to take care of and support Plaintiff, if different (*i.e.* the self-identified author of at least one of the Tumblr posts), and the individual who was with Plaintiff when he learned of the outcome of CWRU's investigation into Jane Roe's sexual assault complaint, if different (who is the self-identified author of at least one of the Tumblr posts), and written discovery and documents from Plaintiff identifying with whom he shared screenshots of his text messages with Jane Roe, a copy of his Complaint, information and documents relating to CWRU's Title IX investigations, Plaintiff's communications with CWRU's administrators, as well as copies of Plaintiff's text messages, emails, and other communications regarding the allegations in the Complaint, CWRU's Title IX investigations and/or Professionalism Proceedings, or any other information posted in the Tumblr posts, and related metadata from Plaintiff's smartphone, laptop, computer, and/or other devices.

Respectfully submitted,

_/s/ Amanda T. Quan_
John Gerak (#0075431)
Amanda T. Quan (#0086623)
Alexandria A. Gardella (#0100000)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
127 Public Square
4100 Key Tower
Cleveland, OH 44114
216.241.6100
216.357.4733 (FAX)
john.gerak@ogletree.com
amanda.quan@ogletree.com
alexandria.gardella@ogletree.com

_Attorneys for Defendant Case Western Reserve University_

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 11th, 2021 a copy of the foregoing *Defendant's Surreply to Plaintiff's Motion for Expedited Discovery Instanter* was electronically filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Amanda T. Quan*
*One of the Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MA'LIK RICHMOND | ) CASE NO.: |
| | ) |
| Plaintiff, | ) JUDGE: |
| | ) |
| -vs- | ) |
| | ) |
| YOUNGSTOWN STATE UNIVERSITY | ) **VERIFIED COMPLAINT** |
| | ) |
| Defendant. | ) **(Jury Trial Demanded)** |
| | ) |
| | ) |
| | ) |

**CIVIL ACTION COMPLAINT**

Plaintiff Ma'lik Richmond, by and through undersigned counsel, files this Complaint against Youngstown State University in support thereof, and alleges as follows:

**INTRODUCTION**

1.      This case arises out of biased, improper, and damaging actions taken by Defendant against Plaintiff Ma'lik Richmond ("Ma'lik"), a male student at Youngstown State University ("YSU"). These actions caused Ma'lik to suffer substantial harm in the form of demotion from the active player roster of YSU's Division I football team, the Youngstown State Penguins; the loss of one precious and irreplaceable year of NCAA eligibility; and future monetary damages and other consequences flowing from Defendant' punitive decisions. The actions of Defendant were taken arbitrarily and capriciously, without the existence of any wronged individual, without any evidence of wrongdoing or charges of misconduct, without the undertaking of any investigatory or disciplinary process, without an opportunity being provided to Ma'lik to even attempt to obtain due process, and ultimately, without any cause for discipline whatsoever.

EXHIBIT 1

## PARTIES

2.      Ma'lik Richmond resides in Steubenville, Ohio. At all times relevant herein, Ma'lik was a student at YSU.

3.      Defendant YSU is a public institution within the Ohio public university system. It is headquartered in Youngstown, Ohio and has a total undergraduate enrollment of approximately 13,000 students.

4.      At all times relevant to this complaint, YSU acted by and through its agents, servants, employees and representatives who were working in the course and scope of their respective agency or employment and/or in the promotion of YSU's business, mission and/or affairs.

## JURISDICTION AND VENUE

5.      Plaintiff invokes this Court's original jurisdiction under 42 U.S.C. § 1983 and under Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, et seq., (hereinafter referred to as "Title IX") and 28 U.S.C. § 1331.

6.      The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

7.      Venue in this action is proper under 28 U.S.C. § 1391.  The Defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

8.      Plaintiff also invokes this Court's jurisdiction over related state common law claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

EXHIBIT 1

## BACKGROUND FACTS

**A.  Plaintiff's Decision to Attend YSU.**

9.      Ma'lik transferred to YSU in 2016. He pays tuition to YSU, and YSU has accepted his tuition, enrolled him in classes, and designated him a student-athlete. Ma'lik is scheduled to graduate in 2019. He chose YSU both because it was close to home and because he believed, for reasons discussed below, that its head football coach and university president might be inclined to look beyond serious mistakes he had made and paid for as a juvenile and to help him to achieve his educational goals and, perhaps, achieve his dream of playing professional football.

**B.  Plaintiff's Interactions with Defendant**

10.      Ma'lik Richmond was a high school football star while a student at Steubenville High School. He was named Eastern District Player of the Year and was selected to the All-Ohio Division IV First-Team as a linebacker. As a high school freshman, he had drawn interest from major college football programs including Ohio State University and the University of Pittsburgh. He thus had enough talent to play college football at a high level and, with continued development, had a realistic possibility of eventually playing professional football.

11.      At age 16, Ma'lik was involved in a highly publicized case in which a female peer of similar age, incapacitated by alcohol, was sexually assaulted by a number of football players, including Ma'lik. He was tried as a juvenile, adjudicated "delinquent beyond reasonable doubt" (the juvenile equivalent of a guilty verdict) and sentenced to one year of juvenile detention. He was released from detention on January 5, 2014 after serving his one-year sentence. Ma'lik was genuinely remorseful and apologetic for what he did, took responsibility for it, and emerged from his detention a chastened and fully rehabilitated young man.

EXHIBIT 1

12.     Following his release, Ma'lik returned to high school and graduated. He then attended Potomac State College of West Virginia University and California University of Pennsylvania. Ma'lik completed his time at both schools without incident. He thereafter transferred to YSU in the fall of 2016 as a sophomore.

13.     Ma'lik hoped he would have the opportunity to play football at YSU. In August 2016, his legal guardians, Greg and Jennifer Agresta, initiated contact with persons they knew at YSU in order to determine whether Ma'lik might be permitted to play. Greg also attended an event at which YSU president Jim Tressel was a speaker. He introduced himself to President Tressel, gave him a business card, and indicated that they had a mutual acquaintance: Malik's high school coach, Reno Saccoccia.

14.     Thereafter, Coach Saccoccia initiated a call to President Tressel on Ma'lik's behalf. President Tressel said he was fine with Ma'lik playing football for YSU, but wanted the decision to be made by YSU head football coach Bo Pellini. Greg drove to YSU to meet with Coach Pellini, who indicated that he wanted to meet Ma'lik. Thereafter, Coach Pellini was fully supportive of Ma'lik and of his wish to play for the YSU Penguins.

15.     Ma'lik and his guardians were very enthused about Ma'lik's opportunity to attend and play for YSU for two reasons. First, YSU was close to home. Second, and more important, they saw YSU as a place where the coach and administrators understood the importance of second chances.

16.     In August 2016, Ma'lik and his guardians met with Coach Pellini in his office. He told them that he would stand by Ma'lik "no matter what," felt that Ma'lik had served his time for his mistake in high school, and wanted Ma'lik to be on the team. He offered Ma'lik the choice of joining the team immediately as a walk-on, *i.e.,* a non-recruited, non-scholarship

4

EXHIBIT 1

player, or waiting until the beginning of the 2017 season to walk on. Coach Pellini noted, however, that it was somewhat late to be starting with the team immediately, and that Ma'lik would benefit from a delay by having time to learn the playbook, work out, and get acclimated to his new school. Moreover, Coach Pellini offered to (and did) assign assistant coach Roland Smith to work with Ma'lik in preparation for the 2017 season. Thus, Ma'lik agreed to delay his play until the following season.

17.     In January 2017, Ma'lik sought a place on the YSU football team as a walk-on. He made the team, practiced with the team as a backup, excelled in the annual Spring Football Game, and was assigned some plays with the first-team players. Coach Pellini told Ma'lik that he would play a lot during the season and would be a big help to the team. Ma'lik also was accepted and well-liked by his teammates.

18.     On August 4, 2017, the *Youngstown Vindicator* ran a story in which it disclosed Ma'lik's background and reported that Ma'lik had made the team. The newspaper interviewed Coach Pellini, who explained that it was his own carefully considered decision to add Ma'lik to the football team. The article stated, in part,

> Pelini said he did his own investigation of Richmond's past and the decision to bring him on was his alone. He got a tip from someone in Steubenville that Richmond was on YSU's campus as a student during the 2016 season. He called Richmond's high school coach, Reno Saccoccia, to confirm it.
>
> "[Saccoccia] told me he was [at YSU], but that Ma'lik wasn't looking to play football at the time," Pelini said.
>
> Pelini said he took some time in 2016 to vet Richmond. Some of it involved reading up on the infamous case itself. It also involved speaking with some of his Steubenville contacts from his time recruiting in the area. Not long after YSU lost to James Madison in the Football Championship Subdivison national championship game, he met Richmond face to face.
>
> "The kid is humble and he wants to put [his past] behind him," Pelini said.

5

EXHIBIT 1

Pelini said he isn't always quick to hand out second chances.

"Every case is different. You have to listen to their story to see if they are genuine," Pelini said. "Gosh, when I was at Nebraska I got rid of a lot of kids. Some of them weren't even given a second chance."

 ***

"He's been going to school. He's been here as a student. He's proved he can be part of the student community," Pelini said.

19.     On August 5, 2017, immediately after publication of the *Younstown Vindicator* story, a female YSU student named Katelyn Davis started an online petition demanding removal of Ma'lik from the team. According to a notation on the website, the petition was to be sent to YSU President Jim Tressel and head football coach Bo Pelini. The petition (which was shared extensively on social media) stated:

In 2012, a 16-year-old girl was brutally raped by two high school football players, one of which is now a football player for Youngstown State University. Ma'lik Richmond was convicted of the rape of an unconscious young girl, which was also caught on camera and placed on social media to brag about the rape.

In 2013, Richmond was sentenced to a minimum of one year in a juvenile detention center, and ended up serving only one year; he was released in January of 2014.

Now, in 2017, as YSU students prepare to return to school and spend fall nights watching their football team play, there is a huge problem. That problem is that Richmond will be on the field, playing a game. He will be representing the university and all that it stands for. President Tressel and Coach Pelini, are you more concerned with your football team's status than the disgusting rape of a young girl?

For many years, athletes have constantly been given additional chances because they are athletes. What does this say about rape culture? That athletes can do no wrong; that they can get away with anything because of how they perform on the field or in the gym?

Does he deserve a second chance? Yes, he does, and he is receiving that second chance by furthering his education on YSU's campus. Does he deserve the privilege of playing on a football team and representing a university? Absolutely not. Education is a right, whereas playing on a sports team is not.

EXHIBIT 1

> As the voice of the students of Youngstown State University, I ask that Richmond be removed from the football team, and this privilege be revoked from someone who absolutely does not deserve it. Thank you.

20.     When Ma'lik learned of the petition, he became disheartened and wanted to quit school. But Ma'lik's coaches met with Ma'lik and offered encouragement. A number of his teammates also reached out to support him. Meanwhile, his guardians drove to Youngstown and met with YSU's Nicole Kent-Strollo, Director of Student Outreach and Support and wife of athletic director Ron Strollo. Ms. Strollo indicated that a satisfactory resolution to the public pressure might be for Ma'lik to have counseling and to do community outreach by speaking about sexual assault, a suggestion that ignored the fact that Ma'lik had not violated any YSU conduct rule and had not been implicated in sexual assault while at YSU.

21.     On or around August 9, 2017, Coach Pellini called Greg Agresta and advised him that there was a lot of pressure being exerted by the university Board of Trustees and that President Tressel was proposing that Ma'lik be restricted to participating as a practice player and wait until the following year to play in games. This suggestion greatly upset Greg, who said it was unfair to do that to Ma'lik and was not what Ma'lik, the Agrestas, and Coach Pellini had agreed to. Jen Agresta also was angered by the suggestion, rejected it, and insisted that she wanted to speak to President Tressel. She thereafter did meet with him and Ron Strollo and they suggested that Ma'lik be a "developmental redshirt," despite the fact that Ma'lik could not technically be redshirted (*i.e.,* held back from playing for a year without losing a year of eligibility) and did not require "development." Indeed, the Agrestas spoke with Coach Pellini later that day and he informed them that Ma'lik was practicing and performing better than ever and probably would be a starter at some point.

EXHIBIT 1

22.     That day, just a few days after Katelyn Davis had published her petition to have

Ma'lik removed from the team, Defendant YSU – without bothering to inform Coach Pellini,

Ma'lik, or the Agrestas – released the following official statement ("the Statement") which was

published campus-wide over the YSU email network:

> Youngstown State University takes the matter of sexual assault very seriously and
> continues to educate everyone within the campus community about the impact
> and prevention of sexual assault.
>
> The University is fully aware of the gravity of the situation and of petitions that
> are circulating on social media in protest and support of one of our students,
> Ma'lik Richmond. We value the input of the entire YSU community and are
> committed to providing a safe learning environment and growth opportunities for
> all students, faculty and staff.
>
> Ma'lik Richmond transferred to Youngstown State University in good standing
> from his prior institution for Fall 2016. After matriculating at YSU, he expressed
> a desire to try out for the football program. Ma'lik was advised by the coaching
> staff that if he integrated himself within the campus community academically and
> socially and completed the fall semester in good standing, further discussions
> could occur.
>
> In January, Ma'lik again inquired about trying out for the team. At this time, he
> was permitted to participate on a tryout basis with the team, for winter workouts.
> At the conclusion of winter workouts, he was permitted to practice with the team
> as a walk-on from February to April. Ma'lik Richmond earned a spot on the 105-
> man roster on August 2 as a walk-on and is not receiving an athletic scholarship.
> He continues to be in good standing on the YSU campus.
>
> YSU does not restrict any student's ability to take part in extracurricular activities
> as long as they are in good standing with the institution. YSU believes that
> extracurricular activities assist in a student's ability to succeed.
>
> For the Fall 2017 football season, Ma'lik will not be permitted to compete in any
> games, but will continue to be a part of the football program as a practice player,
> forfeiting a year of eligibility. He will be given the opportunity to benefit from
> group participation, the lessons of hard work and discipline, as well as the
> camaraderie and guidance of the staff and teammates. He will also continue to
> work with the University's director of student outreach and support who assists
> young men and women in becoming successful students and YSU graduates.
>
> As a state university, YSU is fully committed to complying with Title IX of the
> Education Amendments of 1972 which prohibits gender discrimination in

EXHIBIT 1

education programs and activities, including sexual assault. The University has increased its efforts in the past years to inform, educate and prevent sexual assault and to provide services to victims of sexual assault. YSU is committed to eradicating sexual assault and educating our students beyond the classroom in order to be productive members of society.

23.    Upon learning of the email that had been broadcast to the entire campus, Ma'lik became despondent, packed a bag, announced to his guardians that he was quitting, and walked out. Jen Agresta called Coach Pellini and Ron Strollo, angrily castigating them for letting Ma'lik down and expressing her concern about his immediate well-being.

24.    On August 10, 2017, when Ma'lik expressed unwillingness to return to practice, Jen called Coach Pellini who, together with Coach Roland Smith and three of Ma'lik's teammates, jumped in a car and drove to Steubenville to talk to Ma'lik. Coach Pellini apologized to Ma'lik for the situation and told him that he felt Ma'lik had the skill to play in the NFL if he applied himself, comparing Ma'lik's ability to that of a YSU player who had just been drafted by the New England Patriots.

25.    In releasing the Statement and enacting the restrictions announced therein, YSU humiliated and penalized Ma'lik Richmond (who had committed no sanctionable offense) and capitulated to the petition of Katelyn Davis, a female student who, without ever having had contact with Ma'lik and without alleging any conduct violation by him, demanded that he be sanctioned by YSU. [1] While Ms. Davis undoubtedly was entitled to exercise her right of free speech, YSU as a state university had no right to respond to her informal expression of opinion (or even the opinions of a group of unknown citizens) by penalizing Ma'lik in violation of his federal civil rights and state common law rights.

---

[1] While other persons purported to sign her petition and echo her demands, their existence and names were not vetted or confirmed and thus the only known and verified complainant was Ms. Davis.

EXHIBIT 1

26.     YSU and its administration were extremely sensitive to the criticisms being leveled against them, to the point that, to shield themselves and the University from accusations that they had failed to adequately respond to victims of sexual assault by supporting rape culture on campus, they discriminated against Ma'lik.

27.     YSU, through its wrongful exercise of state action, also has violated 42 U.S.C. § 1983 by depriving Ma'lik of his right to procedural due process as guaranteed by the 14th amendment to the Constitution; violated Title IX by depriving Ma'lik, on the basis of his sex, of his right to participate in and derive benefit from an education program or activity; breached an enforceable contract between Ma'lik and the university; and/or caused Ma'lik other damage for which YSU is liable.

### C. YSU's Policies and Procedures Governing General Student Misconduct Matters

28.     The general code of conduct applicable to the YSU student body is called *The Student Code of Conduct* ("the Code"). (A copy of the Code is attached hereto as Exhibit A.) Article II, Section A of the Code describes the "*Jurisdiction of The Student Code of Conduct*" and indicates that "students are responsible for their conduct *from the time of application for admission through the actual awarding of a degree.*" (Emphasis added.) Thus, Ma'lik's actions during high school were not within the jurisdiction of the Code and could not form a proper ground for discipline by YSU.

29.     Article III of the Code sets forth a wide variety of behaviors that will result in disciplinary action, ranging from Academic Dishonesty to Hazing to Violation of Law. Among the many sanctionable behaviors is Sexual Misconduct. However, Ma'lik has neither engaged in sexual misconduct at YSU nor been accused by Katelyn Davis or anyone else of engaging in sexual misconduct in violation of the Code.

EXHIBIT 1

30.     In fact, Ma'lik has not been accused by anyone of engaging in *any* misconduct in violation of the Code. Moreover, YSU admitted in the Statement, "He continues to be in good standing on the YSU campus."

31.     The Code, in Article IV *Student Conduct Procedures*, sets forth an extensive system of charging, notice, opportunity to be heard, sanctioning guidelines, and appeal procedures.  However, none of these due process safeguards was made available to Ma'lik, nor were they intended to apply to him since he was sanctioned without any complaint being lodged against him or any allegation that he had engaged in behavior identified as sanctionable under Article III of the Code.

**D.  YSU's Policies and Procedures Governing Student-Athletes**

32.     Rules, regulations, policies, and procedures pertaining specifically to student-athletes are set forth in the *Intercollegiate Athletics Department Student-Athlete Handbook* ("the Handbook"). (A copy of the Handbook is attached as Exhibit "B.")

33.     The Handbook makes clear that YSU deems participation in intercollegiate athletics to be part of the student-athlete's <u>education</u>. The section titled *Philosophy of Intercollegiate Athletics* sets forth a Mission Statement that reads in part: "A. The mission of the Department of Intercollegiate Athletics at Youngstown is to support the University's mission in nurturing *educational* and personal success of student-athletes through competitive athletic opportunities in a climate of mutual respect, integrity, and personal accountability." Under the section titled "*Student-Athlete Affairs*," YSU also states: "YSU and the NCAA missions are to maintain *intercollegiate athletics as an integral part of our campus educational program* and the athlete as an integral part of the student body." (Emphasis added.) Thus, according to these unambiguous representations, YSU deems participation in intercollegiate athletics to be "an

EXHIBIT 1

integral part of[its] campus educational program," meaning that a wrongful denial of Ma'lik's participation was also a wrongful denial or restriction upon his right to an education.

34.     The Handbook contains a section titled, "*Student-Athlete's Rights and Responsibilities.*" Section III, *Infraction of Rules*, states in part: "Failure to comply with any of the athletic responsibilities may subject the student-athlete to disciplinary action imposed by the coach or athletic department. These sanctions may include, but are not limited to, being denied the privilege of participation in varsity competition…." Thus, being demoted from the active squad and denied the ability to play in varsity competition is deemed a <u>sanction</u>, and such sanction is understood to constitute discipline meted out to a student-athlete who commits a rules infraction.

35.     Ma'lik has never been accused of any rules infraction. Indeed, on August 9, 2017, Coach Pellini was quoted in a *Dayton Daily News* article as stating, "I gave him some stipulations and some things he had to be able to do, and if he lived up to them, he'd be able to come out and see if he could be a member of our football team. He did those things and continues to do those things right now, and he's done a nice job for us." Thus, Ma'lik clearly has been subjected to a sanction in the form of being denied the privilege of participation in varsity competition, but as can be inferred from the words of his head coach, this sanction was not the result of any failure by Ma'lik to comply with athletic responsibilities.

36.     The Handbook makes clear that the Intercollegiate Athletics Department and personnel will follow rules and regulations of the university. Under the general section titled *Philosophy of Intercollegiate Athletics,* in a subsection identifying "*Critical Issues,*" the Handbook states, "K. **Ethical Integrity**-Intercollegiate Athletics is committed to the highest

EXHIBIT 1

ethical standards and *will always conduct activities in compliance with the rules and regulations of the University*, member conferences, and the NCAA."  (Emphasis added.)

37.     Under the section of the Handbook titled, "*Student-Athlete's Rights and Responsibilities,*" subsection "*II Student-Athlete Responsibilities*" states, "All coaches are expected to be respectful, professional, and fair in enforcing the communicated policies that guide our program's objectives. With that responsibility, the head coach has the discretion and ultimate authority to determine if a team or department policy has been violated and impose related penalties. **Every student-athlete must agree to and accept the authority the head coach holds and be willing to abide by disciplinary decisions that are made by him/her.**" (Emphasis in original). The above provision indicates that the head coach may determine if a team or department policy was violated and impose related penalties, and that the student-athlete agrees to accept the coach's authority and abide by his "disciplinary decisions." But even though Coach Pellini enforced a sanction on Ma'lik, he did not do so in conjunction with any disciplinary decision, nor was there any violation by Ma'lik of a team or department policy. Thus, the sanction apparently was not imposed by the coach at all, but was instead imposed by Defendant, without cause or any process. The head coach merely was compelled by Defendant to effectuate it.

### E.  Defendant's Gender-Based Response to the Student Petitions

38.     As previously alleged, an online petition commenced by Katelyn Davis on August 5, 2017 demanded that Plaintiff be prohibited from playing football because of a sexual assault he had committed as a juvenile five years earlier, for which assault he had served twelve months in a juvenile detention facility. On August 6, 2017, a counter-petition was commenced online in support of permitting Ma'lik to play football. The petition stated,

EXHIBIT 1

This petition is to show support for Ma'lik Richmond, a current football player on the Youngstown State University football roster. Back in 2012 Ma'lik was involved in and found guilty in a sexual assault case while in high school. Ma'lik was convicted and has served his punishment and has since earned the right to attend Youngstown State and participate on the football team. Being that he has accepted his punishment and has served his time we are in full support of Youngstown State University giving this young man a chance to have an impact on society. We would like Ma'lik Richmond to remain on the Youngstown State Football team! Once our goal is reached we will present this to School President Jim Tressel and the YSU athletic department.

39.    The news media correctly reported that the dueling petitions were emblematic of a "heated debate" among YSU students as to whether Ma'lik should be barred from playing or instead be given a second chance. Thus, the views of the student body as to this issue were hardly monolithic. More important, however, they were mere opinions and were in no way grounds for Defendant to take deleterious action against Ma'lik.

40.    In subjecting Ma'lik to what the Handbook describes as a sanction, Defendant was persuaded by the demand of a female student, Katelyn Davis, and chose to appease Ms. Davis and those who espoused her views while ignoring the views of those who supported Ma'lik's right to play football. But more important, Defendant gave insufficient weight to the fact that Ma'lik was a student and student-athlete in good standing, choosing instead to unreasonably subject him to discipline due to a female student's insistence that he was a rapist who had not been sufficiently punished.

41.    In imposing the penalty without any rule violation by Plaintiff and without any form of due process being afforded to him, Defendant deferred without justification to the demand of a woman who identified herself in her petition as "the voice of the students of Youngstown State University," when in fact there was no single voice of the YSU students and no single view that Ma'lik should be penalized.

14

EXHIBIT 1

42.     In acting against Ma'lik, YSU elevated an informal rebuke by a female student to a disciplinary level complaint. Defendant acted with bias against Ma'lik, a male student in good standing, because a female student publicly criticized the university, President Tressel, and Coach Pellini for supporting a "rape culture" in which "athletes have constantly been given additional chances because they are athletes," who "can do no wrong," and "can get away with anything." The unstated but clear implication was that she was referring solely to male athletes.

43.     In taking unfair, unjust, and indefensible action against a male student who had not violated any rule or policy at YSU, Defendant was infected by an anti-male bias that has swept across America's universities and colleges and is only now being identified and challenged. This bias flows from years of criticism directed at colleges for purportedly being too lax in punishing sexual assault.

44.      Colleges and universities are relying on Title IX to crack down on alleged perpetrators of sexual assault. Unfortunately, this crackdown has resulted in a reduction of reasonableness and fairness in the treatment of those accused. It has led to problems such as *de facto* presumption of guilt on the part of accused male students, pursuant to which the accused students are required to prove they had consent while the accusers are not required to prove they were assaulted, and findings of guilt are being based on the very lowest standard of proof – preponderance of the evidence.

45.     On April 11, 2011, the U.S. Education Department's Office of Civil Rights sent a "Dear Colleague Letter" to colleges and universities. The Letter indicated that, in order to comply with Title IX, colleges and universities were required to have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. The Letter purported to provide guidance to schools regarding the unique issues that arise in sexual misconduct cases.  In

15

EXHIBIT 1

reality, however, the Letter has encouraged schools to operate sexual misconduct proceedings in a more victim-centered manner by, for example, affording both parties the right to appeal decisions (leading to a form of double jeopardy), encouraging schools to utilize the lowest standard of proof ("more likely than not") for the complainant, and rushing timelines for investigation and adjudication.

46.     The Dear Colleague Letter was a step in the increased enforcement of Title IX on college and university campuses. NPR, in an August 12, 2014 report titled *How Campus Sexual Assaults Came to Command New Attention*, described the Dear Colleague Letter as the government's "first warning shot."

47.     In May 2014, the federal Department of Education disclosed for the first time the names of colleges under investigation for possibly violating federal rules aimed at stopping sexual harassment. The Washington Post reported in March 2015 that the Office of Civil Rights was seeking to hire up to 200 more investigators. At that time, the federal government was investigating well over 100 schools for possible Title IX violations, including many of the top private and state universities in the country.

48.     In February 2014, Catherine E. Lhamon, the assistant secretary of education who headed the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools needed to make "radical" change. According to the publication "Chronicle of Higher Education," college presidents suggested afterwards that there were "crisp marching orders from Washington." (*Colleges Are Reminded of Federal Eye on Handling of Sexual-assault Cases,* Chronicle of Higher Education, February 11, 2014.)

49.     Universities and colleges now fear being investigated or sanctioned by the Department of Education Office of Civil Rights. The federal government has created a

EXHIBIT 1

significant amount of pressure on these institutions to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "colleges face increasing pressure from survivors and the federal government to improve the campus climate." (Source: *Presumed Guilty: College men accused of rape said the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014.) In the same article, the Chronicle noted that different standards were applied to men and women. "Under current interpretation of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

50.     Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." (Source: *How Campus Sexual Assault Came to Command New Attention*, NPR, August 12, 2014). In the same story, Anne Neal of the American Council of Trustees and Alumni was quoted as stating, "There is a certain hysteria in the air on this topic… . It's really a surreal situation, I think." Neal explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of the accused instead.

51.     In June 2014, Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX…" She further told the Committee, "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds – the ultimate penalty – is

EXHIBIT 1

a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education."

52.    Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "'I expect that that can't help but be true,' he says. 'Colleges and universities are getting very jittery about it.'" (Source: *Accused of Sexual Assaults on Campus Say System Works Against Them,* NPR, September 3, 2014.)

53.    Against this backdrop, in which colleges and universities have generally become hyper-sensitive, defensive, and deferential to female accusers, Ma'lik Richmond might have been at risk of being subjected to gender bias even if he had been formally accused of sexual misconduct and provided with some form of due process. However, Ma'lik -- who received no procedural due process whatever -- was punished in response to a complaint by a female *non-victim* who demanded that he be penalized for sexual misconduct occurring four years earlier, when he had been a juvenile and was well outside the physical and temporal jurisdiction of YSU.

54.    Defendant's actions were the result of unwarranted deference to female-led advocacy that amounted to little more than opinionated debate. In responding to the controversy instigated by Katelyn Davis, Defendant literally left no doubt that its actions were motivated by misplaced Title IX concerns that ironically resulted in gender-biased punitive actions against an innocent male student. A university covered by Title IX is not excused from liability for discrimination because the discriminatory motivation is a desire to avoid practical disadvantages that might result from unbiased action. A covered University that adopts, even temporarily, the policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, even if the motive for the

18

EXHIBIT 1

discrimination did not come from ingrained or permanent bias against that particular sex. (See, *Doe v. Columbia Unive*rsity, 831 F.3d 46 (2d Cir., 2016))

55.     The Statement issued by Defendant indicated that YSU "takes the matter of sexual assault very seriously and continues to educate everyone within the campus community about the impact and prevention of sexual assault," although no sexual assault had occurred. The Statement further noted that "the University is fully aware of the gravity of the situation and of petitions that are circulating on social media in protest and support of one of our students," although there was no situation of gravity beyond the fact that persons were debating a philosophical issue on social media concerning a topic about which universities have become (in the aforementioned words of Robert Dana, dean of students at the University of Maine) "very jittery." Most important, Defendant felt compelled to declare its commitment to Title IX in a non-Title IX circumstance, declaring:

> As a state university, YSU is fully committed to complying with Title IX of the Education Amendments of 1972 which prohibits gender discrimination in education programs and activities, including sexual assault. The University has increased its efforts in the past years to inform, educate and prevent sexual assault and to provide services to victims of sexual assault. YSU is committed to eradicating sexual assault and educating our students beyond the classroom in order to be productive members of society.

Thus, Defendant expressed its commitment to prohibiting gender discrimination in the form of sexual assault and providing services to victims of sexual assault by punishing -- without due process -- a male student who had *not* violated any YSU rule concerning sexual assault.

### F.  Defendant's Arbitrary Denial of Procedural Due Process

56.     A majority of case law interpreting whether the U.S. Constitution requires that procedural due process be afforded by a state university to a student who has been denied the right to participate in school athletics or extracurricular activities holds that such denial does not

EXHIBIT 1

implicate the Due Process Clause. However, a minority of courts hold that the opposite is true, and the United States Supreme Court has not taken a definitive position. Plaintiff contends that the majority view is incorrect and its reasoning is outdated in a society in which college and university athletic conferences serve as developmental leagues and feeders to professional sports associations. Plaintiff intends to pursue a definitive ruling constituting a change, modification or extension of the law.

57.     As is well-documented above, investigatory and adjudicative procedures at YSU are limited to matters involving violations of campus or student-athlete rules and policies. Due process, or at least a semblance thereof, generally is reserved for an accuser or victim who alleges that wrongdoing has occurred and for the person alleged to be the wrongdoer.

58.     Ma'lik Richmond was subjected to what the Handbook describes as a sanction. However, he was not given notice of the charges against him because there were none. He was not given notice of the sanction he faced because there were no charges. He was not given access to information that would be used against him during the "conduct" process because there was no process. He was not given the right to confront witnesses because there were no witnesses.

59.     YSU acted unilaterally and without any notice to Ma'lik or his guardians. Ma'lik was afforded no right of appeal.

60.     In summary, without any wrongdoing on his part, and without notice to him or input from him, he was removed from the varsity football active player roster, deprived of one year of NCAA eligibility, and required to either practice with the team without hope of playing for at least a year or to refuse to practice and quit the team. In the annals of collegiate sanctions meted out to a student or student-athlete, Ma'lik Richmond was subjected to the purest form of procedural due process denial one might imagine.

EXHIBIT 1

### G. Defendant's Failure to Abide by Promises and Representations

61.    When Ma'lik Richmond agreed to and did pay tuition to YSU and YSU accepted that tuition and admitted Ma'lik as a student, the parties entered into a contract, pursuant to which, among other things, Ma'lik expressly and impliedly agreed to be bound by and adhere to the rules, policies, and procedures governing the behavior of students and student-athletes and YSU agreed to be bound by and to fairly and reasonably enforce such rules, policies, and procedures.

62.    In enforcing against Ma'lik a penalty that the Handbook explicitly describes as a sanction, despite the fact that Ma'lik had engaged in no sanctionable conduct, YSU breached its contract with Ma'lik. In the Statement released to both the YSU community and the world-at-large, Defendant expressly described its obligation and admitted the fact that it breached that obligation, stating:

> Ma'lik Richmond earned a spot on the 105-man roster on August 2 as a walk-on and is not receiving an athletic scholarship. He continues to be in good standing on the YSU campus.
>
> YSU does not restrict any student's ability to take part in extracurricular activities as long as they are in good standing with the institution. YSU believes that extracurricular activities assist in a student's ability to succeed.
>
> For the Fall 2017 football season, Ma'lik will not be permitted to compete in any games, but will continue to be a part of the football program as a practice player, forfeiting a year of eligibility.

In the incredible statement above, YSU declares that Ma'lik "earned a spot on the 105-man roster." YSU further confirms that Ma'lik is "in good standing on the YSU campus" and advises that "YSU does not restrict any student's ability to take part in extracurricular activities *as long as they are in good standing with the institution*." Thus, YSU admits that because Ma'lik was in good standing, it should not have been free to "restrict Ma'lik's ability to take part in

EXHIBIT 1

extracurricular activities." Yet, YSU then confesses that it **has** restricted Ma'lik's ability to take part, announcing that he "will not be permitted to compete in any games," will be demoted to the position of "a practice player," and will be made to "forfeit[ ] a year of eligibility." Clearly, YSU has breached the contract between itself and Ma'lik Richmond. Moreover, the failure to provide Ma'lik with any notice or fair opportunity to be heard before subjecting him to a sanction or punishment is a breach of express and/or implied terms of that agreement.

63.     To the extent YSU might argue that it did not breach a written contract, it nonetheless cannot deny that it breached an oral contract.

64.     Before agreeing to attempt to play football for YSU as a walk-on, Ma'lik sought and received assurances from both Coach Pellini and President Tressel that despite his sexual misconduct as a juvenile, he would be permitted to play football if he earned a place on the team and remained in good standing as a student and student-athlete. Both Coach Pellini and President Tressel assured him this was so. They further indicated that since he had served his time, they believed he was entitled to play as long as he remained in good standing both academically and from a conduct perspective, regardless of whether or not members of the public objected. Coach Pellini represented that he would stand by Ma'lik no matter what.

65.     Ma'lik practiced with the team, succeeded in earning a position as a walk-on, and remained in good standing in all respects as a student and student-athlete. Thus, he performed his duties and obligations under the verbal agreement.

66.     YSU failed to keep its commitments under the verbal agreement and refused to allow Ma'lik to remain on the team as promised. YSU thus breached the agreement.

EXHIBIT 1

**H.  Plaintiff Will Suffer Immediate and Irreparable Harm Absent Injunctive Relief.**

67.    The Youngstown State University Penguins play an 11-game regular season schedule, with a possibility of additional post-season games. The regular season schedule is as follows:

Sep 2    @Pittsburgh
Sep 9    Robert Morris
Sep 16   Central Conn. St.
Sep 30   South Dakota St.
Oct 7     @South Dakota
Oct 14   N. Dakota St.
Oct 21   @N. Iowa
Oct 28   Illinois St.
Nov 4    @Indiana St.
Nov 11  @S. Illinois
Nov 18  Missouri St.

68.    Varsity football players have a limited period of NCAA amateur eligibility in their brief collegiate careers. Eligibility lost, in whole or part, is irreplaceable and the harm is irreparable. Varsity football players have the opportunity to play in only a small, finite number of games in their brief collegiate careers.  Each game missed by a healthy player is irreplaceable and the harm is irreparable. Varsity football players such as Ma'lik Richmond, who are potentially good enough to play at the highest level of their sport, have a very limited opportunity to demonstrate and hone their skills so as to engender interest by professional football teams. Every game in which Ma'lik is barred from playing causes him irreparable harm by diminishing the performance data upon which professional football teams rely in deciding which players to draft or sign as free agents.

69.    As a result of Defendant's wrongful actions as described above, Ma'lik already has lost the opportunity to play in two games and is at immediate risk of being barred from

23

EXHIBIT 1

playing in the upcoming game against Central Connecticut State on September 16, 2017, as well as additional games.

70.     Unless Defendant is immediately enjoined from enforcing its ban on Ma'lik's ability to participate on the active player roster pending adjudication of Plaintiff's claims, Ma'lik will miss the September 16, 2017 game and, with further delay, will miss additional games.

<p align="center">**CAUSES OF ACTION**</p>

<p align="center">**Count I**
**(Title IX: Erroneous Outcome and/or Selective Enforcement)**</p>

71.     Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

72.     Title IX provides, in relevant part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

73.     Title IX is enforceable through an implied right of action affording to an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

74.     YSU receives federal financial assistance in various forms.

75.     YSU's conduct, as described above, constituted discrimination against Plaintiff on the basis of his sex. Plaintiff alleges that YSU violated Title IX under both the "erroneous outcome" and "selective enforcement" standards. In imposing punishment on Plaintiff – to wit, excluding him from participation in and denying him the benefits of intercollegiate athletics – Defendant deferred to the informal complaint and expression of opinions by a female student that unless the university, President Tressel, and Coach Pellini punished Plaintiff for sexual misconduct in which he engaged as a 16-year old high school student, they would be supporting

<p align="center">24</p>

EXHIBIT 1

a "rape culture" on campus. Defendant's act of disciplining Plaintiff without cause and failing to provide him with a hearing or right of appeal violated Title IX.

76.     YSU has failed to remediate its discriminatory actions against Plaintiff.

77.     As a result of YSU's acts and omissions as described above, Plaintiff has suffered multiple forms of damage, including diminished earning capacity, lost career and business opportunities, litigation expenses including attorneys' fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and other compensatory damages, in an amount to be determined by a jury and the Court.

## Count II
### (42 U.S.C. §1983 -- Violation of Rights to Due Process)

78.     Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

79.     Defendant has acted under color of law in violating the plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

80.     The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law." The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

81.     Sec. 16, Article I, Ohio Constitution, guarantees that every person injured in his lands, goods, person or reputation shall have remedy by "due course of law."

82.     The Due Process Clauses of the Ohio and United States Constitutions are implicated by higher education disciplinary decisions. YSU has a constitutional obligation to provide a fundamentally fair and reliable hearing process. Plaintiff was entitled under the

EXHIBIT 1

constitutions of Ohio and the United States to the opportunity to be heard in a meaningful manner before being subjected to what was deemed a sanction under the Handbook.

83.    The Plaintiff's interests and the results of such a hearing are significant. Dismissal from the active playing roster of the Youngstown State Penguins football team and loss of a year of playing eligibility has deprived Plaintiff of an opportunity to participate in what YSU deems a function of his education process. It further has deprived him of the opportunity to improve and showcase his talent and to potentially earn a scholarship that would assist him in paying the costs of his education, and by diminishing his chances of being drafted by an NFL team and successfully pursuing an extremely lucrative career in professional football.

84.    Defendant has violated Plaintiff's due process rights by sanctioning him in the above-described manner without jurisdiction or cause and without any procedure by which he can be heard to oppose or appeal the sanction.

85.    As a direct and proximate result of the Defendant's violations of the Plaintiff's constitutional rights, Plaintiff has suffered severe and substantial damages. These damages include diminished earning capacity, lost career and business opportunities, litigation expenses including attorneys' fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

86.    Pursuant to 42 U.S.C. §1983, Defendant is liable to the Plaintiff for Plaintiff's damages, and Plaintiff is entitled to recover his attorneys fees and costs incurred in bringing this action.

EXHIBIT 1

**Count III**
**(Breach of Contract)**

87.     Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

88.     At all times relevant hereto, a contractual relationship, both express and implied, existed and continues to exist between Defendant and Plaintiff through the Code, the Handbook, and Plaintiff's payment of tuition.

89.     Defendant, in penalizing, sanctioning, or punishing students and student-athletes with respect to their conduct, was contractually required to act in accordance with the explicit conduct rules, regulations, and procedures set forth in the Code and the Handbook, and Plaintiff was required to both comply with and receive the protections of such rules, regulations, and procedures in the Code and Handbook.  Moreover, the contract impliedly afforded Plaintiff the right to be free of sanction or penalty by Defendant as long as he complied with requirements of the Code, the Handbook, and applicable laws and remained a student and student-athlete in good standing. Plaintiff, by Defendant's own public admission, was in good standing at all times material to this Complaint and he remains in good standing today.

90.     By removing Plaintiff from the varsity football active player roster, depriving him of one year of NCAA eligibility, and requiring him to either practice with the team without hope of playing for at least a year or to refuse to practice and quit the team, all without any cause or procedural recourse, Defendant has materially breached its contract with Plaintiff.

91.     As a direct and foreseeable consequence of Defendant's material breach, Plaintiff has sustained significant damages including, but not limited to, diminished earning capacity, lost career and business opportunities, litigation expenses including attorneys' fees, and other compensatory damages, in an amount to be determined by a jury and the Court.

27

EXHIBIT 1

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ma'lik Richmond seeks the following relief from the Court:

a)      A temporary restraining order and/or injunction prohibiting YSU during the pendency of this case from either (i) removing Plaintiff from the active player roster of its football team or (ii) forbidding Plaintiff to play in games, unless such actions result from legitimate coaching decisions based solely upon criteria the coach would apply in evaluating other members of the team in good standing;

b)      An award of attorneys' fees, expenses, and costs; and,

c)      Monetary damages in an amount to be proven at trial; and

d)      Any further relief that the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

*/s/ Susan C. Stone* _____
Susan C. Stone (0064445)
Kristina W. Supler (0080609)
McCARTHY, LEBIT, CRYSTAL
& LIFFMAN CO., L.P.A.
101 West Prospect Ave., Suite 1800
Cleveland, Ohio 44115-1088
(216) 696-1422
(216) 696-1210 (fax)
scs@mccarthylebit.com
kws@mccarthylebit.com

*Counsel for Plaintiff*

EXHIBIT 1

## VERIFICATION

I, Ma'lik Richmond, being duly sworn, state that I have reviewed the factual allegations

contained in this Verified Complaint.  All of the factual allegations in the Verified Complaint are

true and accurate to the best of my knowledge.

Sworn to before me and subscribed in my presence this _13_ day of September, 2017.

PAULA S. BALUT
Notary Public - State of Ohio
My Commission Expires Nov. 29, 2018

NOTARY PUBLIC

29

EXHIBIT 1

Richmond v. Youngstown State University, Not Reported in Fed. Supp. (2017)

2017 WL 6502833
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

Ma'lik RICHMOND, Plaintiff,

v.

YOUNGSTOWN STATE UNIVERSITY, Defendant.

CASE NO. 4:17CV1927
|
Signed 09/14/2017

**Attorneys and Law Firms**

Kristina Walter Supler, Robert T. Glickman, Susan C. Stone, McCarthy, Lebit, Crystal & Liffman, Cleveland, OH, for Plaintiff.

David L. Van Slyke, Christina L. Corl, Daniel J. Hurley, Plunkett & Cooney, Columbus, OH, for Defendant.

**MEMORANDUM OF OPINION
AND ORDER GRANTING TRO**

[Resolving ECF No. 3]

Benita Y. Pearson, United States District Judge

 *1  The within matter came on for hearing upon Plaintiff's Motion for Temporary Restraining Order (ECF No. 3).

After notice to the parties, the Court held a hearing on the motion. The Court has been advised, having reviewed the record, the parties' briefs and the applicable law. The Court has also considered the oral arguments of counsel.

Four factors are important in determining whether a temporary restraining order is appropriate: (1) the likelihood of the plaintiff's success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction.

PACCAR Inc. v. TeleScan Techs., L.L.C., 319 F.3d 243, 249 (6th Cir. 2003) (overruled on other grounds in KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111 (2004)); In re DeLorean Motor Co., 755 F.2d

1223, 1228 (6th Cir. 1985). The test is a flexible one and the factors are not prerequisites to be met, but must be balanced. In re DeLorean Motor Co., 755 F.2d at 1229. In balancing the four considerations applicable to temporary restraining order decisions, the Court holds that equitable relief is appropriate at this time.

1. At this early stage, it is not clear that Plaintiff will prevail on the merits of each claim. Plaintiff's Title IX claim is viable for reasons made known on the record, including its reference by Youngstown State University to explain the decision banning Plaintiff from playing football. The expedited discovery appears targeted to address this claim, and further develop its merits. The breach of an agreement or contract claim is viable as well. Therefore, it is likely, at this stage of the litigation, that Plaintiff's claims will succeed.

2. For the reasons stated on the record, that Plaintiff will suffer irreparable harm is patent. This is due, in part, to the public nature of being banned from playing football due to past behavior—non-YSU student related behavior—without notice, or process. Defendant's statement explaining its reasons for banning Plaintiff from playing repeats that Plaintiff was in "good standing" while acknowledging that he would forfeit a year of eligibility as a result of the ban. This forfeiture of eligibility is a harm that, while not dispositive, bodes in favor of granting the temporary restraining order.

3. To the extent there is harm to Defendant, that harm is self-inflicted. Any harm to the greater community is uncertain as public opinion, both in favor and against, banning Plaintiff has been made known.

4. The public has great interest in promoting respect for the law and the safety of our communities, including college campuses. Concomitantly, the public has great interest in its public institutions meeting reasonable expectations, and keeping promises that rise to the level of an agreement, and honoring its contracts.

For the reasons indicated on the record, Plaintiff's Motion for Temporary Restraining Order (ECF No. 3) is granted. In this case, Plaintiff was on the active roster and played football for Defendant this academic year. The status quo shall be maintained.

 *2  Accordingly, during the pendency of this case, Defendant is prohibited from either (i) removing Plaintiff from the active player roster of its football team or (ii) forbidding Plaintiff

EXHIBIT 1

to play in games, unless such actions result from legitimate coaching decisions based solely upon criteria the coach would apply in evaluating other members of the team.

Plaintiff's Motion for Preliminary Injunction (ECF No. 3) shall come on for hearing on September 28, 2017 at 2:00 p.m., in Courtroom 351, Thomas D. Lambros United States Court House, 125 Market Street, Youngstown, Ohio.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6502833

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE,<br>    C/O ENGEL AND MARTIN<br>    5181 NATORP BLVD., SUITE 210<br>    MASON, OH  45040 | Case No.  2:15-<br><br>cv 2830 |
| | VERIFIED COMPLAINT FOR |
| Plaintiffs, | DECLARATORY JUDGMENT,<br>INJUNCTIVE RELIEF, VIOLATION<br>OF CIVIL RIGHTS AND TITLE IX |
| v. | |
| | AND |
| THE OHIO STATE UNIVERSITY,<br>    205 BRICKER HALL,<br>    190 NORTH OVAL MALL,<br>    COLUMBUS, OH 43210-1357 | JURY DEMAND |
| JAVAUNE ADAMS-GASTON<br>    3034 OHIO UNION<br>    1739 NORTH HIGH STREET<br>    COLUMBUS, OHIO 43210-1230 | |
| MATTHEW B. PAGE<br>    550 LINCOLN TOWER<br>    1800 CANNON DRIVE<br>    COLUMBUS, OH 43210 | |
| Defendants | |

1

EXHIBIT 1

**INTRODUCTION**

1.  Plaintiff John Doe brings this action for a declaratory judgment, violation of Title IX, violation
    of civil rights under §1983, and injunctive relief

2.  This case arises out of the decision of The Ohio State University ("OSU") to impose disciplinary
    sanctions against John Doe in violation of the Plaintiff's constitutional, federal statutory, and
    contractual rights.

**PARTIES**

3.  Plaintiff John Doe is a joint degree M.D./M.B.A. student at the Ohio State University.

    a.  Doe is an Ohio resident with a residence at [OMITTED].  His driver's license and voter
        registration is from Ohio.  He has been living in Ohio for the sole purpose of attending
        OSU, but and was granted Ohio residency status in summer 2012 after serving 1 year
        living in Ohio as an enrolled medical student.

    b.  The disclosure of John Doe's identity will cause him irreparable harm as this case
        involves matters of the utmost personal intimacy, including education records protected
        from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C.
        § 1232g; 34  CFR Part 99.

    c.  Doe has completed all but one year of coursework at OSU.

4.  Defendant The Ohio State University ("OSU") is a public university created by the Ohio
    Legislature.

    a.  OSU is governed by a board of 20 trustees who are responsible for oversight of
        academic programs, budgets and general administration, and employment of faculty and
        staff.

2

EXHIBIT 1

    b.  OSU has a principal place of business in Columbus, Ohio.  The President's Office is

located at 205 Bricker Hall, 190 North Oval Mall,  Columbus, OH 43210-1357

5.  Defendant Javaune Adams-Gaston ("Adams-Gaston") is the Vice president for Student Life at

OSU.  She has a principal place of business at 3034 Ohio Union, 1739 North High Street,

Columbus, Ohio 43210-1230.

    a.  Defendant Adams-Gaston is sued in her official capacity for declaratory and

injunctive relief, and in his personal capacity for damages.

    b.  On information and belief, Adams-Gaston is acting under the policies, procedures,

and practices of OSU.

    c.  Defendant Adams-Gaston has responsibility for the administering and operating aspects

of the OSU Student Code of Conduct and Judicial System.

6.  Defendant Matthew Page is the Associate Director for Student Life at OSU.  He has a principal

place of business at 550 Lincoln Tower, 1800 Cannon Drive, Columbus, Oh 43210.

    a.  Defendant Page is sued in his official capacity for declaratory and injunctive relief, and

in his personal capacity for damages.

    b.  On information and belief, Page is acting under the policies, procedures, and practices

of OSU.

    c.  Defendant Page has responsibility for helping to enforce and manage the disciplinary

hearings under the Code of Student Conduct.

**JURISDICTION AND VENUE**

7.  This case arises, in part, under the laws of the United States, specifically United States,

specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq

3

EXHIBIT 1

and 42 U.S.C. § 1988.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

8.  The declaratory and injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

9.  This Court may exercise supplemental jurisdiction over the state law claims because such claims are so related to claims in the action within the original jurisdiction of the Court that they form part of the same case or controversy under Article III of the United States Constitution, pursuant to 28 U.S.C. § 1367.

10. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

<div align="center">

**FACTS**

</div>

**THE OHIO STATE SEXUAL MISCONDUCT POLICY**

11. After years of criticism for being too lax on campus sexual assault, colleges and universities are relying on Title IX to crackdown on alleged perpetrators.  Unfortunately, this crackdown has gone too far.  Problems include: accused students effectively are presumed guilty; instead of requiring accusers to prove they were assaulted, the accused students have to prove they had consent; and schools apply the very lowest standard of proof — preponderance of the evidence.

12. On April 11, 2011, the U.S. Education Department's Office of Civil Rights sent a  "Dear Colleague" to colleges and universities.

    a.  The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and Universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.

<div align="center">4</div>

EXHIBIT 1

    b.   Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing," and some, like Stanford, had applied the criminal standard, "beyond a reasonable doubt."

    c.   The Dear Colleague Letter states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

    d.   The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

    e.   The Dear Colleague Letter states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

    f.   After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

13. The Federal Government, through the Department of Education, Office of Civil Rights ("OCR"), has been pressuring colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

    a.   The Dear Colleague letter was a step in the increased enforcement of Title IX on college and universities. NPR described the Dear Colleague Letter as the government's "first warning shot."  Source:  *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.

    b.   The Washington Post reported in March 2015 that the Office of Civil Rights was seeking to hire up to 200 more investigators.

EXHIBIT 1

    c.  In May 2014, the federal Department of Education disclosed for the first time the names of colleges — 55 in all — under investigation for possibly violating federal rules aimed at stopping sexual harassment.

    d.  The Federal government is investigating at least 129 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago and many top state universities.  The Department has negotiated settlements with many schools, including Ohio State.

    e.  In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change.  According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington."  Source:  *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

    f.  Lhannon was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward."  David G. Savage and Timothy M. Phelps,  *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

14. Schools are scared of being investigated or sanctioned by the Department of Education OCR.

    a.  The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher

EXHIBIT 1

Education, September 1, 2014.  In the same article, the Chronicle noted that different standards were applied to men and women:  "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

b.  Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds."  Source:  *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.  In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think."  She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

c.  In June 2014, Lhannon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ."  She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

EXHIBIT 1

    d.  Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it."  Source:  *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

15. The Ohio State Code of Student Conduct was adopted on June 18, 2012.  A copy of the Code of Conduct is attached as Exhibit A.  The Code of Student Conduct defines "Sexual misconduct" as follows:

> Physical contact or other non-physical conduct of a sexual nature in the absence of clear, knowing and voluntary consent, including but not limited to:
> 1.  Non-consensual sexual intercourse, defined as any sexual penetration (anal, oral, or vaginal), however slight, with any body part or object by any person upon any person without consent.
> 2. Non-consensual sexual contact, defined as any intentional sexual touching, with any body part or object by any person upon any person without consent.
> 3. Sexual exploitation, defined as taking non-consensual, unjust or abusive sexual advantage of another. Examples include, but are not limited to, prostituting another student, non-consensual video or audio-taping of sexual activity, going beyond the boundaries of consent (such as knowingly allowing another to surreptitiously watch otherwise consensual sexual activity), engaging in non-consensual voyeurism, and
> 4.  Knowingly transmitting or exposing another person to a sexually transmitted infection (STI) without the knowledge of the person.

16. The Code of Student Conduct defines consent as:

> the act of knowingly and affirmatively agreeing to engage in a sexual activity. Consent must be voluntary. An individual cannot consent who is substantially impaired by any drug or intoxicant; or who has been compelled by force, threat of force, or deception; or who is unaware that the act is being committed; or whose ability to consent is impaired because of a mental or physical condition; or who is coerced by supervisory or disciplinary authority. Consent may be withdrawn at any time. Prior sexual activity or relationship does not, in and of itself, constitute consent.

17. OSU also has a "Sexual Misconduct, Sexual Harassment, and Relationship Violence" Policy (the "Sexual Misconduct Policy.") A copy of the Sexual Misconduct Policy is attached as Exhibit B. This policy was last revised on September 1, 2015.

    a.  On information and belief, the Sexual Misconduct Policy was revised in direct response to the pressure from the Department of Education.

EXHIBIT 1

b.  The Sexual Misconduct Policy defines sexual misconduct as "Conduct of a sexual nature or conduct based on sex or gender that is nonconsensual or has the effect of threatening, intimidating, or coercing a person. Includes sexual harassment, sexual violence, relationship violence, and stalking."  The Sexual Misconduct policy implicates Title IX by stating that "Sexual misconduct is a form of sex- and gender-based discrimination."

c.  The Sexual Misconduct Policy thus defines "sexual misconduct," as a form of sex discrimination prohibited by Title IX.  The Sexual Misconduct Policy defines sexual misconduct broadly to include sexual harassment, non-consensual sexual intercourse or sexual contact, and retaliatory harassment.

d.  The September 1, 2015 Sexual Misconduct Policy includes in the definition of consent the following:

> Consent cannot be given by an individual who one knows to be – or based on the circumstances should reasonably have known to be – substantially impaired (e.g., by alcohol or other drug use, unconsciousness or blackout, etc.).
> 1. Substantial impairment is a state when an individual cannot make rational, reasonable decisions because she/he lacks the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why, or how" of their sexual interaction).
> 2. This policy also covers individuals whose substantial impairment results from other physical or mental conditions including mental disability, sleep, involuntary physical restraint, or from the consumption of alcohol or other drugs.
> 3. Being impaired by alcohol or other drugs will never function as a defense for any behavior that violates this policy.

18. The Sexual Misconduct Policy provides that a student may receive accommodations, in the form of "interim measures" even "before the final outcome of an investigation."

a.  Such accommodations may be provided to a student who claims to be a victim of sexual misconduct even when there is no formal investigation and may continue past the duration of the investigation.

EXHIBIT 1

      b.  Accommodations available to a student who claims to the a victim of sexual misconduct includes:  "a. No contact order, b. Victim advocacy, c. Housing assistance/relocation, d. Counseling, e. Health services, f. Safety resources, g. Academic support, h. Change in work schedule/location, and i. Consideration of leave requests."

      c.  The Title IX coordinator has the responsibility to "coordinate the provision of interim measures."

      d.  The Sexual misconduct policy does not require that the accommodations provided to a student who claims to be a victim of sexual misconduct be disclosed to the accused student.

19. The Code of Conduct provides that "A student will only be found in violation if a preponderance of evidence supports the charges."

20. The Code of Conduct does not state that a student is innocent until proven guilty, or the equivalent.

21. The Code of Conduct requires OSU to conduct an investigation of all allegations of sexual misconduct prior to the initiation of student discipline.   The Sexual Misconduct Policy also provides that the OSU should conduct an investigation.  Notably, during this investigation a student does not have the right to be represented by an attorney.   Instead, the Sexual Misconduct Policy states that a student accused of misconduct "may have a support person of their choice present during any applicable investigation meeting, student hearing, or other disciplinary proceeding related to the investigation."   However, the "support person" may not act as an advocate for the student: "The role of the support person is only to be present; they will not be provided documentation or allowed to interject during the meeting."

EXHIBIT 1

22. The Sexual Misconduct Policy states that the entire investigative and hearing process should " take approximately 60 calendar days following receipt of the complaint." This process includes not only the investigation, but any hearing process.

23. A person found to have violated the Sexual Misconduct Policy or the Student Code of Conduct is subject to disciplinary action up to and including expulsion from the university.

24. OSU has taken a "victim centered approach" towards allegations of sexual misconduct which leads to bias in the system and an uneven adjudicatory process.  This approach focuses almost exclusively on the rights of victims and does not include any significant mention of the rights of the accused.  The OSU web page contains a brief FAQ for students who have been accused of misconduct, which does not include any substantive information on a student's procedural rights.   http://studentconduct.osu.edu/page.asp?id=4 In contrast, The OSU Title IX webpage has a long list of the rights of victims, but merely a summary of the rights of the accused.  *See* http://studentconduct.osu.edu/page.asp?id=50.  The page for victims is suggests that interim accommodations is a victim "right."

EXHIBIT 1

**Victim's Rights**

- The university will provide a timely and thorough investigation, and will treat the complainant with respect before, during, and after the student conduct process.
- The victim will be informed of the university's conduct process and possible outcomes. The university will also inform the victim of available counseling services, medical services, mental health services, and other campus and off campus resources for victims of sexual assault.
- Victims have the right to report a sexual assault to local law enforcement, which will not prevent university disciplinary action.
- Victims may request changes to academic and living situations after a sexual assault occurs. Student Conduct may be able to help facilitate such changes.
- Victims have the right to have one advisor throughout the student conduct process, including meetings and hearings. The advisor may not be a witness in the case. In meetings with Student Conduct or in a hearing, the advisor may not participate directly and may only communicate with the victim via whispering or writing notes.
- A victim has a right to a campus "no-contact order," which prohibits the accused student from having contact of any kind (including electronic contact or contact from third parties acting on the accused student's behalf) with you.
- The university will make reasonable efforts to protection confidentiality, within the parameters of FERPA (Family and Education Privacy Act of 1974) and the university conduct process.
- The victim is afforded the right to be updated on the investigation and be informed of the outcome of a hearing in writing.
- The victim has the right to have prior, irrelevant sexual behavior or history with other individuals excluded from a hearing. As a reminder, prior consensual behavior with the accused student does not indicate consent on subsequent occasions.
- Prior to a hearing, the victim is allowed to inform the hearing officer of relevant witnesses the victim wishes to include at the hearing and to what the witnesses plan to testify.
- Prior to a hearing, the victim may also meet with a hearing officer to discuss hearing procedures.
- During a hearing, the victim has the right to give opening and closing statements and ask questions of the accused student, via the hearing officer.

25. An OSU student accused of sexual misconduct is entitled to a hearing prior to the imposition of disciplinary sanctions. While the OSU process gives the appearance of due process, the ability of students to present a meaningful defense is limited in a number of significant ways:

    a. An accused student may have an "advisor" present during the hearing. This advisor may be an attorney. However, the role of the advisor is strictly limited. The advisor may only counsel the student and may not actively participate in the disciplinary process.

    b. An accused student may present witnesses and other evidence, although there is no provision to compel the attendance of witnesses. The accused and the alleged victim may also "invite character witnesses to submit written statements, ask questions of witnesses called by others, and will be notified of potential witnesses to be called."

EXHIBIT 1

c.  Cross examination of witnesses is strictly limited.  The Code of Conduct states that the hearing officer or board members may ask questions of any of the participants throughout the hearing. The Code of Conduct also provides that an accused student "will be given the opportunity to ask witnesses questions, although they may be directed through the hearing officer or panel chairperson."  In other words, direct confrontation of witnesses is not permitted.

d.  The OSU Code of Conduct states that cases are decided if the "preponderance of the evidence" ("more likely than not") indicates misconduct occurred. The OSU website states, "It is a much lower standard than the one used in criminal cases, which is the 'beyond a reasonable doubt' standard."

e.  The OSU Code of Conduct does not contain any rules or restrictions on the admissibility of evidence beyond a general restriction on the use of prior sexual conduct. This results in arbitrary rulings on the admissibility of evidence and the use of unreliable hearsay evidence with no opportunity to question the speaker.

**THE JULY, 2014 INCIDENT AND THE DISCIPLINARY PROCEEDINGS AGAINST JOHN DOE**

26. In July 2014 John Doe had sex with a female OSU medical student, Jane Roe.

a.  Jane Roe started medical school in 2013, while John Doe was completing part of his MBA program.

b.  In June 2014, John Doe met Jane Roe at a bar.  They texted back and forth in a flirtatious matter and agreed to meet up a few weeks later.

c.   On July 12, 2014 Jane Roe invited John Doe to join her at a bar. They did not drink any alcohol together during their encounter.  They made out at the bar and discussed sexual matters.  At closing time, they agreed to go back to John Doe's apartment to have sex.

13

EXHIBIT 1

    d. At John Doe's apartment, Jane Roe asked that they keep their relationship "discreet" so that their friends would not gossip.  She asked John Doe if he was "clean" (without any sexually transmitted diseases) and if he had a condom before they had sex.

    e. In the morning of July 13, 2014, Jane Roe requested to borrow John Doe's clothes and wore them home.  Jane Roe kissed John Doe goodbye  and made plans to meet up again later.

    f. Jane Roe texted John Doe on July 13, 2014 at 3:42pm in the afternoon, "Thanks again for taking me home last night!" Jane Roe stated she wanted to come by his home again to drop off his clothes that day.

    g. On July 14, 2014 Jane Roe invited John Doe out for happy hour.

    h. On July 15, 2014 Jane Roe stated that she had left some personal items at John Doe's apartment.  Jane Roe asked John Doe out to dinner at "this pho place that I wanna check out called Huong if you're interested" and offered to pick him up and drive him to dinner. The evening of July 15, 2014 Jane Roe and John Doe had drinks and dinner that evening at a restaurant, and Jane Roe invited John Doe to another restaurant where she bought him a drink.

    i. Following the July 15, 2014 date, Jane Roe returned home to another state and the relationship did not continue except for a few text messages and casual conversations.

27. On or about May 1, 2015 – more than nine months after they had consensual sex – Jane Roe filed a Title IX complaint against John Doe.

    a. Jane Roe told the OSU Title IX investigator that she did not remember what happened from when she left the bar to when she woke up naked in John Doe's bed.  She explicitly stated that she has "absolutely no memory" of this time.

EXHIBIT 1

b. Jane Roe did not provide any additional information to suggest that John Doe had engaged in any violation of the Sexual Misconduct Policy or the Code of Conduct.

c. Jane Roe told the investigator that she had shared a bottle of wine at dinner, and had a mixed drink and two shots of liquor at the friend's house before going out.  After dinner, she indicated that she had two drinks at the bar.

28. Jane Roe did not file a police report about the July 2014 sexual encounter.

29. On information and belief, Jane Roe made the accusation of sexual misconduct against John Doe only after she faced possible expulsion from OSU for poor grades.

a. Jane Roe made the accusation with the knowledge that OSU would provide her accommodations in terms of grades or the ability to repeat classes if she claimed to be a victim of sexual assault.  Jane Roe was aware of the OSU policy that such accommodations would be provided even prior to the completion of any investigation.

b. Jane Roe enrolled in medical school in August of 2013. The Ohio State University College of Medicine grants medical students up to 6 years to complete their medical degree.  After previously experiencing academic failure in the 2013-2014 school year, Jane Roe was given another opportunity to return.

c. On information and belief, Jane Roe entered into the "Pre-Entry" program the summer of 2014, sponsored by the Ohio State University College of Medicine. The Pre-Entry is "aimed at developing and enriching the academic knowledge base and skills of students prior to their entrance into medical school. The program allows students to become more competitive and successful in the medical school environment." http://medicine.osu.edu/students/diversity/programs/medpath/pages/index.aspx

d. Jane Roe began her first year of medical school for a second time in August 2014, only after taking the Pre-Entry classes.

15

EXHIBIT 1

    e.   In February of 2014, Jane Roe told her friends that she was leaving medical school.  This was shortly after she supposedly had to take a remediation test in January 2014; this announcement would be consistent with someone who had failed the remediation test.

    f.   On information and belief, including statements made by Jane Roe to other students, Jane Roe had failed multiple exams in the 2014-2015 school year.  In Mid-March 2015 Jane Roe was required to appear before the Academic Review Board again.

    g.   Typically the policy at the OSU College of Medicine is that two academic failures for the first year result in dismissal from the medical program. However, Jane Roe was allowed to return to begin her first year of medical school for a third time in August 2015 despite having two years of previous academic failures in multiple examinations.

30. On information and belief, OSU provided accommodations to Jane Roe after she claimed to have been a victim of sexual assault in the form of a significant deviation from the academic policies of the College of Medicine. These accommodations provided Jane Roe with a substantial incentive to fabricate and maintain the allegations against John Doe.

31. Two aspects of the statement by Jane Roe to the Title IX Office are indicative of a person who has fabricated and maintained the allegation against John Doe in order to obtain academic accommodations:

    a.   Jane Roe never actually directly accused John Doe of any misconduct – she merely stated that she could not recall what happened to her.  This allows her to allow other people to draw an inference of wrongdoing without her making any significant accusation that can later be disproved.

    b.   Jane Roes' statement to the Title IX office indicated that she did not wish to see John Doe's future harmed, suggesting that she is only interested in a benefit to her. She told

EXHIBIT 1

the Title IX Office, "I am not out to ruin [John Doe's] life or career, I just want him to know that what he did is wrong."

32. On or about May 1, 2015, OSU began an investigation into the allegations against John Doe. John Doe was not informed of this allegation for approximately two weeks.

    a.  John Doe was prejudiced in his ability to present information and evidence because of the large gap in time.

    b.  The investigator did nothing more than obtain witness statements.  Many of these statements were from friends of Jane Roe.  None of the witnesses had any firsthand knowledge of the alleged misconduct. For example: one of the witnesses was not even present at the bar that evening;  another witness did not even appear during the hearing to be cross examined; a third witness claimed that he had 8 drinks and does not remember speaking to John Doe.

    c.  The investigator did not attempt to obtain any extrinsic evidence, such as phone records or surveillance videos.  The investigator, instead, relied upon "screen shots" of text messages allegedly sent by Jane Roe without attempting to independently verify the authenticity of this evidence.

33. On July 15, 2015, OSU held a hearing to determine whether John Doe had violated the OSU Code of Conduct or Sexual Misconduct Policy.  This was 76 days after the investigation began - more than 60 days as required in the policy. The Hearing was nothing more than "kangaroo courts" that relied in substantial part on hearsay and the "investigation" conducted by the Title IX office.

**DUE PROCESS VIOLATIONS**

34. Shortly after the start of the Hearing, it was apparent that the Hearing Panel had reached a conclusion and was biased against John Doe.

**EXHIBIT 1**

35. At the hearing, John Doe could have his attorney present, but the attorney was not permitted to participate.  Instead, the attorney could only pass notes or whisper advice to John Doe.

36. At the hearing John Doe was effectively prohibited from cross-examining Jane Roe in any effective manner.  All questions had to be submitted to the panel members, who could choose to ask or not ask questions.  Some of the questions that were eventually submitted to John Doe were reworded.

37. John Doe sought to ask Jane Roe about what accommodations she had received as a result of her claim that she was a victim of sexual misconduct.  This information was crucial to John Doe's defense, as the credibility of Jane Roe was the center of this matter.

    a.  The chair of the hearing panel refused to allow these questions.

    b.  OSU did not provide John Doe with this information prior to the hearing, even though it was evidence that might tend to show his innocence of the allegations.

38. John Doe also sought to question her about her previous psychiatric history claims of depression and anxiety from the event. This information was crucial to John Doe's defense, as previous episodes of depression and anxiety not caused by post-traumatic stress disorder (PTSD) from this alleged incident would undermine the credibility of Jane Roe's claims. The chair of the hearing panel refused to allow these questions.

39. John Doe was not allowed to question her prescription drug use that evening. This information was crucial to John Doe's defense.  Had Jane Roe testified that she was taking anti-anxiety drugs, such as Xanax, for example, John Doe could have provided testimony, based on his training in Medical school, that such medications, may cause "en bloc blackouts" when taken with alcohol. A person who suffers such a "black out" may have memory loss, but would not have been impaired.  The chair of the hearing panel refused to allow these questions.

EXHIBIT 1

40. John Doe sought to question Jane Roe if she had a boyfriend at the time. Evidence about her current relationship status would be relevant to her credibility and motive to fabricate lack of consent to what essentially would have been "cheating." The chair of the hearing panel refused to allow many of these questions.

41. The Hearing Panel did not hear any substantial evidence that John Doe had committed any sexual misconduct.

    a. Jane Roe claimed to not have any memory of the events that occurred in John Doe's apartment; as a result, she could not say that he did anything wrong.

    b. John Doe testified before the hearing panel that Jane Roe consented to sexual activity.

    c. Instead of receiving direct evidence, the hearing panel heard from "witnesses" who either were not present during the time of the alleged misconduct or who had admitted to have been drinking.

    d. The hearing panel also was able to review "character" letters about Jane Roe. These letters included irrelevant and inflammatory statements such as the claim that Jane Roe was only acting in this matter to protect other young women from a similar fate.

42. At the hearing, John Doe sought to present evidence from an expert witness. The hearing officer was timely notified that this witness and evidence would be provided. The hearing panel refused to hear this evidence.

    a. The proposed expert was a pharmacology faculty member at OSU who conducts teaching and research involving measuring drugs in biological fluids. The expert has provided testimony previously in both civil and criminal cases in the area of forensic toxicology of alcohol and other drugs.

EXHIBIT 1

b. The proposed expert analyzed the statements of Jane Roe in order to determine if she was intoxicated based on a number of factors, including her age, build, and the amount she claimed to have consumed on the evening in question.

c. Had the expert been permitted to testify, he would have told the hearing panel the following:

> it is my opinion to a reasonable degree of scientific certainty that based upon [Jane Roe's] calculated blood-alcohol concentrations and the supporting eyewitness observations, [Jane Roe] was not alcohol impaired to the point where she was incapable of consenting to sexual intercourse and sexual contact at the time of the incident, or that she was incapable of saying "no" to [John Doe] if she did not want to have sexual intercourse or sexual contact with him. Further, it is more likely than not that she was aware of her choices and decisions that night as she was not substantially impaired by alcohol at the time of the events in question.

d. The expert would have also explained the hearing panel that no witnesses had provided statements suggesting that Jane Roe was intoxicated based on traditional and well recognized indicators:  "However, no one testified that [Jane Roe] exhibited signs of being disorientated, having staggering gait, or slurred speech."

43. Defendant Page made the decision to not permit John Doe's proposed expert witness to testify. In a July 9, 2015 email to John Doe, Page stated, "The University rules governing this process do not permit the statement from [the expert] to be included in the hearing packet or for him to testify in the hearing."

a. Page suggested that a student accused of misconduct could only present "factual and character" witnesses at a hearing.

b. Page stated that the expert could not testify because "he neither witnessed nor was present for any of the events underlying the complaint."  However, Page did not acknowledge that the OSU rules seem to permit significant hearsay evidence from witnesses who did not witness any of the events in question.

EXHIBIT 1

    c.   Page suggested that John Doe could tell the hearing panel that he had "consulted an expert who informed [John Doe] of the information."

44. John Doe was found responsible by the hearing panel.  He was informed of the decision on July 16, 2015 and that OSU intended to expel him.

45. John Doe appealed the decision of the hearing panel.  This appeal was denied on September 10, 2015 by Adams-Gaston.

46. On September 10, 2015, Adams-Gaston informed John Doe that he would be expelled from the Ohio State University.

**DISCIMINATORY CONDUCT**

47. The Code of Conduct and the Sexual Misconduct Policy are implemented, in part, by Adams-Gaston.   Adams-Gaston- is also responsible for the appeal process and made the final decision to expel John Doe after reviewing all of the information in this matter.

    a.   Adams Gaston oversees the operation of the Office of Student Life and its more than 30 departments. According to her bio on the OSU webpage, "In that capacity, she has broad leadership responsibility for nearly all the operations affecting students outside the classroom. She also represents the Office of Student Life within the university's senior administration and provides leadership on issues affecting students."

    b.   Adams-Gaston has previously made statements suggesting that she is biased in favor of those who claim to be victims of sexual assault.  In April 2015, Adams-Gaston attended a Survivor Gala held at the Ohio Union.  The Survivor Gala featured art created by sexual assault victims.   Adams-Gaston was interviewed by the Lantern, the OSU newspaper.  The article says:

        The gala had over 200 RSVPs, and attendees included Ohio State President Michael Drake and Javaune Adams-Gaston, vice president for Student Life. "When we think about all of the work that is done on behalf of those who are survivors, what we

EXHIBIT 1

know is it's a journey, and that journey takes multiple forms," Adams-Gaston said, *tears streaming down her cheeks.* "It's critical work to be done. Here at the Ohio State University our goal is to ensure everyone has an experience that makes the best of you."

Lantern, April 23, 2015 (available at http://thelantern.com/2015/04/ohio-state-sexual-assault-victims-find-catharsis-through-art/) (emphasis supplied).

48. As OSU's Title IX Coordinator, Brennan holds the primary responsibility for coordinating OSU's Title IX compliance efforts, including overseeing all complaints of noncompliance and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. This includes the enforcement of the Sexual Misconduct Policy.

    a. On September 11, 2014 OSU created a document titled, "Title IX Coordinator. Statement of Roles and Responsibilities." This document states that that Title IX Officer is expected to act as a fair and impartial finder of facts when investigating Title IX complaints.

    b. The Title IX coordinator "serves as consultant to any disciplinary hearing panel where sexual harassment has been determined to have occurred."

    c. However, the document also says that the Title IX coordinator is also supposed to provide alleged victims with information about their ability to obtain interim accommodations. In this role, the Title IX Coordinator is expected to act as an advocate for alleged victims of sexual misconduct.

49. Ohio State has been the subject of an investigation by the Department of Education. On May 1, 2014, the United States Department of Education named OSU as one of 55 colleges and universities in the United States "under investigation for possible violations of federal law over the handling of sexual violence and harassment complaints."

    a. On information and belief, in order to appease the Department of Education, OSU has been imposing significant discipline on male students and staff members in order to

EXHIBIT 1

appear to be tough on the issue of sexual misconduct on campus. OSU has been asked to provide records of all sexual misconduct investigations and adjudications since 2010 under Ohio's public records laws; OSU has not yet responded to this public records request.

b.  The most notable example occurred on July 2014 when OSU fired its marching band director, Jonathan Waters, after a school investigation that found "sexualized" culture among band members.  Shortly after the school fired Waters, Ohio State was removed from the list as a result of an agreement between the school and the Department of Education.

50. The Department of Education cited the firing of Waters as one of the reasons it stopped investigating the school and entered into a settlement agreement.

a.  On September 8, 2014, OSU and the Department of Education entered into a "Compliance Agreement."  A copy of the Agreement is attached as Exhibit C.  As part of this Agreement required OSU agreed to make changes to the manner in which it investigates and adjudicates allegations of sexual harassment and sexual assault on campus.

b.  "This agreement, and The Ohio State University's recent response to the culture within the marching band, set clear and vitally important expectations for a community-wide culture of prevention, support, and safety," said Assistant Secretary of Education for civil rights, Catherine E. Lhamon.  The Department of Education wrote in its September 11, 2014 letter addressed to the President of OSU:

During the course of this compliance review, the University conducted an investigation of alleged sexual harassment within its Marching Band and found that there was a sexually hostile environment for students in the Marching Band of which the University had notice and failed to adequately address. The University requested to resolve the review with a resolution agreement prior to the completion of OCR's investigation of all the issues in the review. As such, OCR is not making any further compliance

23

EXHIBIT 1

determinations under Title IX, including whether the University has complied with the Title IX requirements for the prompt and equitable resolution of sexual harassment and sexual violence complaints TPK in the implementation of its sexual harassment policies and procedures.

c.  A case involving the termination of Waters is pending before this Court. No. 2:14-cv-01704-JLG.

51. OSU, as part of the agreement with the Department of Education, agreed to revise its policies and procedures on sexual harassment and sexual assault.  As part of the agreement, OSU was required to take certain steps that had the effect of undermining the presumption of innocence and eliminating any burden of proof on those seeking to demonstrate misconduct by another student.  For example:  OSU was required to assure that the "Complainant's rights in the sexual harassment grievance process are . . . are equitable to the rights afforded the alleged perpetrator of the harassment."

a.  The agreement encourages students to bring allegations of sexual harassment and sexual assault by guaranteeing that a student will obtain accommodations without any significant inquiry into the veracity of the claims.  For example, the agreement states that OSU must explain to students about "the availability of interim measures (e.g., no contact order; change in academic or living situations as appropriate with minimum burden on the complainant; counseling; health and mental services; escort services; academic support; the ability to retake a course or withdraw without penalty) *before the final outcome of an investigation* (emphasis supplied)."

b.  The agreement codifies the dual and conflicting roles of the Title IX coordinator to investigate allegations of sexual harassment or sexual assault and also to "coordinate the provision of interim measures, and that complainants will not be required to arrange such measures by themselves. . . ."

EXHIBIT 1

    c.  The agreement does not contain any provisions to assure the due process rights of those accused of sexual harassment or sexual assault beyond the general ability to "identify witnesses and other evidence."

    d.  The agreement requires OSU to report to the Department of Education on "all Title IX complaints filed with the University that allege sexual harassment, including sexual violence or sexual assault, during the previous year, and the University's notice to the parties of the final outcome of the grievance."

52. OSU has discriminated against John Doe on the basis of gender.

    a.  OSU, as demonstrated by the Waters case, is heavily invested in protecting Female accusers even when there is no evidence of wrongdoing by males.  On information and belief, this has been done at OSU in order to appease the Department of Education.

    b.  John Doe was subjected to an investigation and discipline related to Jane Roe even though no evidence linked him to any misconduct in regards to her.  Jane Roe specifically stated that she did not remember the events of the evening, yet an investigation was aggressively pursued anyway.

    c.  This discrimination is intentional and is a substantial or motivating factor for OSU's actions in this case.

        i.  On information and belief, OSU, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

        ii.  On information and belief, OSU imposed sanctions on John Doe because it was afraid of further action from the Department of Education and/or a Title IX lawsuit from Jane Roe.

EXHIBIT 1

53.  OSU has a chauvinistic view of men as "predators" and women as the "guardians" of virtue. This is seen by the fact that both John Doe and Jane Roe had been drinking on the night in question, yet only John Doe was subjected to an investigation and discipline for having sexual conduct with an intoxicated person.

**IRREPARABLE HARM FACED BY DOE**

54. John Doe has almost completed his education at OSU. He was to graduate with both a medical (MD) and masters of business administration (MBA) degree in May 2016.

    a.  John Doe had 5 clerkships to complete at the Ohio State University College of Medicine and was on task to complete all his medical school requirements by November 13, 2015. Doe also had one semester of business school classes remaining to be taken in the spring semester of 2016.

    b.  John Doe was preparing to apply for medical residency in emergency medicine on September 15, 2015 but was removed from the Ohio State University on July 16, 2015. His appeal was denied on September 10, 2015. During this time he was unable to complete other requirements and unable to apply for medical residency training to continue his career.

55. John Doe faces a critical deadline on September 15, 2015.

    a.  John Doe must begin to apply for medical residency training on September 15, 2015. John Doe cannot submit his application if he has been dismissed from OSU.

    b.  It is critical that John Doe submit his residency training application September 15, 2015 deadline since interviews are given out on a first-come-first-served basis. Missing this date means he may not be granted interviews and will be unable to attain a residency spot for medical training as a practicing physician.

EXHIBIT 1

    c.  John Doe is unable to apply to a different medical school in time to enroll for the 2015-2016 school year.  At this time, it is unlikely that an American medical school will accept John Doe, in part because of the discipline imposed by OSU

56. The failure to comply with the 60-days guideline from the Department of Education threatens to cause irreparable harm to John Doe and was an action in bad faith by OSU.

    a.  Jane Roe reported the allegation on May 2, 2015.  According to Department of Education guidance and OSU policies, in the Dear Colleague Letter, the matter should have been completely resolved, including any hearings and appeals, on or before July 3, 2015.

    b.  The hearing in this matter did not take place until July 15, 2015.

    c.  The appeal took an additional seven weeks, and was not decided until September 10, 2015.

    d.  OSU acted in bad faith in delaying this matter.  OSU was aware of the harm being suffered by John Doe; OSU was informed of this by John Doe and John Doe's attorney. OSU refused requests to consider the appeal in a reasonable time frame.

    e.  As a result of OSU's delays in resolving the appeal, John Doe is now unable to complete his training and was ineligible to prepare his application for residency.

57. OSU took almost seven weeks to resolve John Doe's appeal of the decision of the Hearing Panel.  OSU never provided any justification for this undue delay. On August 26, 2015, John Doe sent an email to Adams-Gaston indicating that a timely decision was necessary because John Doe's last medical licensing exam was scheduled for August 31, 2015 in Chicago. Adams-Gaston did not respond to John Doe's email, but later an Assistant VP of Student Life, Doug Koyle, responded stating, "Because we take this case very seriously, we are being as thorough as

27

EXHIBIT 1

possible with our review.  It is unlikely that a final decision will be made before" August 31, 2015.

58.  On September 2, 2015, John Doe's Counsel sent an email to defendant Gaston-Adams informing OSU of the irreparable harm about to befall John Doe.

    a.  In this email she said:

> It will be six (6) weeks tomorrow since the filing of his appeal, so we are hoping that a decision will be forthcoming.  [John Doe]  has been very patient and has undergone a tremendous amount of stress throughout the pendency of this case.  His entire career has been put on hold and as you know, he was only four (4) short months away from completing medical school and business school.

> Of upmost concern is the rapidly approaching date for which [John Doe] is to apply for Residency.  This application process begins September 15, 2015 and is on a first come, first serve basis.  If he is able to continue with his schooling at OSU, then he must have his application, essays, letters of recommendation all submitted by September 15th.  This will require a significant amount of time and effort on his part, so we would appreciate a decision on his appeal as soon as possible, and hopefully by the end of this week.  Thank you for your time and attention to this serious matter.

    b.  Defendant Adams-Gaston did not respond to the September 2, 2015.

59.  John Doe did not receive a decision on his appeal until September 10, 2015.

    a.  John Doe had submitted a three page single-spaced appeal, accompanied by a two page, single-spaced, letter as an appeal to defendant Adam-Gaston. In this appeal, John Doe raised a number of procedural errors, including that the panel failed to permit the testimony of John Doe's expert witness.   John Doe also argued that the sanction imposed was grossly disproportionate to the violation that occurred and failed to take into account substantial mitigating evidence.

    b.  The response to the John Doe's three page single-spaced appeal, accompanied by a two page, single-spaced consisted of a simple one-page letter that did not address the substance of any of the appeal issues raised by John Doe.  The letter is set forth here:

EXHIBIT 1

I have received your appeal of the outcome of your disciplinary case.  The Code of Student Conduct requires that an appeal state the basis on which you are appealing. Your appeal is based on your claims that a procedural error resulted in material harm or prejudice to you, and that the sanction imposed is grossly disproportionate to the violation committed.

I have reviewed your appeal and all information in this case and have met with you. I have given your request careful consideration. I have determined that no procedural error resulting in material harm or prejudice to you occurred in this case, and therefore, I am upholding the finding of the Student Conduct Board. Additionally, I do not find the sanction disproportionate to the violations for which you were found responsible, and I am also upholding the sanction that resulted from this process.

If you have questions regarding your case, please contact the Student Conduct office, at (614) 292-0748.

Javaune Adams-Gaston, PhD
Vice President for Student Life

cc: Student Conduct

## COUNT I
## (DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES AND OHIO CONSTITUTIONS)

60. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

61. This Count is brought against all defendants.

62. The Fifth Amendment to the United States Constitution, made applicable to the State of Ohio by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

63. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

29

EXHIBIT 1

64. Section 16, Article I, Ohio Constitution, guarantees that every person injured in his lands, goods, person or reputation shall have remedy by "due course of law."

65. The Due Process Clauses of the Ohio and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the OSU Code of Student Conduct.

66. OSU has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

67. The Plaintiff is entitled under the Constitutions of Ohio and the United States to the opportunity to be heard in a meaningful manner at the hearing.

68. The Plaintiff's interests in the results of the hearing are significant.

   a. Dismissal from OSU denies the Plaintiff the benefits of education at OSU  to complete both his MD and MBA degrees

   b. Dismissal damages the Plaintiff's academic and professional reputation.

   c. Dismissal has severely affected the Plaintiff's ability to enroll at other institutions of higher education to complete his medical degree and to pursue a career as a practicing physician

69. The Defendants have violated the Plaintiff's due process rights in the following manner:

   a. OSU conducted a biased and incomplete investigation which was then provided to the Hearing Panel.

   b. OSU permitted the use of hearsay evidence at the Hearing without providing the Plaintiff with the opportunity to effectively cross-examine witnesses.

   c. The Plaintiff was not permitted to effectively cross-examine Jane Roe in regards to her psychiatric, academic, or relationship history, or drug use.

30

EXHIBIT 1

    d.  The Plaintiff was not permitted to effectively cross-examine adverse witnesses.  All questions had to be submitted through the Hearing Panel Chair, and no follow-up was possible.

    e.  The Plaintiff was denied the effective assistance of an attorney or other advisor.  An advisor was permitted to be present, but the advisor was not permitted to participate.

    f.  The Hearing Panel denied John Doe the opportunity to present crucial and significant information, including:

        i.  Information about accommodations received by Jane Roe

        ii.  Expert testimony that would refute the allegations made by Jane Roe.

70. The Plaintiff and the Defendants have a dispute about whether the OSU Code of Conduct and Sexual Misconduct Policy, as applied to John Doe, violates the Due Process Clause of the United States Constitutions and the Due Course of Law Clause of the Ohio Constitution.

71. The Plaintiff is entitled to a declaration that the OSU Code of Conduct and Sexual Misconduct Policy, as applied to John Doe, violates the Due Process Clause of the United States Constitutions and the Due Course of Law Clause of the Ohio Constitution.

72. Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees and costs incurred in bringing this action.

**COUNT II**
**(42 U.S.C. §1983  -- VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION)**

73. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

74. This count is brought against Adams-Gaston and Page in their individual capacities for damages.

75. The Defendants have acted under color of law in violating the Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitutions.

EXHIBIT 1

76. The Defendants have acted intentionally and with callous disregard for the Plaintiffs' clearly established constitutional rights.

77. As a direct and proximate result of the Defendants' violations of the Plaintiff's constitutional rights, he has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

78. Pursuant to 42 U.S.C. §1983, Defendants Adams-Gaston and Page are liable to the Plaintiff for his damages.

79. Pursuant to 42 U.S.C. §1988, the Plaintiff is entitled to his attorney's fees and costs incurred in bringing this action.

## COUNT III
## (DECLARATORY JUDGMENT -- TITLE IX)

80. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

81. This count is brought against OSU.

82. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

83. Defendant OSU is an education programs or activities operated by recipients of Federal financial assistance.

EXHIBIT 1

84. Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

85. OSU committed impermissible gender bias against the Plaintiffs in the investigation and adjudication of Jane Roe accusations.

86. The decision of the Hearing Panels was an erroneous outcome which was the direct result of a flawed and biased proceeding.

87. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include:

    a. A general atmosphere at OSU where those who lodge a complaint of sexual assault are immediately treated as "survivors."

    b. The failure of OSU to conduct full and fair investigations.

    c. The failure of the Hearing Panel to afford accused students the opportunity to present evidence in their defense and to effectively cross-examine their accusers under the auspices of "protecting" victims.

    d. The role of the Title IX Office as both an investigator and advocate for alleged victims.

88. OSU has a pattern of pattern and practice of discriminatory decision-making that tends to show the influence of gender on the investigative and discipline process. This is shown, in part, by the imposition of investigations and sanctions for sexual assault and sexual harassment under the Sexual Misconduct Policy predominantly against males such as Waters.

89. OSU applies "archaic assumptions" in reviewing allegations against male students.

90. The circumstances of the Investigatory process and the Hearings cast doubt on the accuracy of the outcome of the disciplinary proceeding.

EXHIBIT 1

91. The Plaintiff and OSU have a dispute about whether the OSU policies and practices for adjudicating allegations that students have committed sexual assault or sexual harassment in violation of the OSU Code of Conduct or the Sexual Misconduct Policy violates Title IX.

92. The Plaintiff is entitled to a declaration OSU policies and practices for adjudicating allegations that students have committed sexual assault or sexual harassment in violation of the OSU Code of Conduct or the Sexual Misconduct Policy violates Title IX.

93. Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees and costs incurred in bringing this action.

**COUNT IV**
**(TITLE IX)**

94. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

95. This count is brought against OSU.

96. As a direct and proximate result of the OSU's violations of the Plaintiff's rights under Title IX, the Plaintiff has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

97. OSU is liable to the Plaintiff for his damages.

98. Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees and costs incurred in bringing this action.

EXHIBIT 1

**COUNT V**
**(INJUNCTIVE RELIEF)**

99.  Plaintiffs repeat and incorporate all the allegations of this Complaint, as if fully set forth herein.

100.    This claim is brought against Adams-Gaston, Page, and Brennan in their official capacities for the injunctive relief sought for violations of constitutional rights, and against OSU for injunctive relief sought for claims under Title IX.

101.    The Defendants continued actions under the OSU Code of Student Conduct and Sexual Misconduct Policy against the Plaintiff violates the United States Constitution and the Ohio Constitution, and the Ohio Administrative Code.

102.    The Defendants continued actions under the OSU Code of Student Conduct and Sexual Misconduct Policy against the Plaintiff violates Title IX.

103.    The Defendants continued actions against the Plaintiff under the OSU Code of Student Conduct is causing substantial, immediate, and continuing damage to the Plaintiff.

104.    The Plaintiffs are entitled to an Injunction from this Court prohibiting the imposition of, or reporting of, any disciplinary actions under the OSU Code of Student Conduct and Sexual Misconduct Policy against the Plaintiff.

*Wherefore*, Plaintiff seeks the following relief from the Court:

- On Counts I and III, Judgment in favor of the Plaintiff declaring that the Defendants have violated the United States Constitution, the Ohio Constitution, the Ohio Administrative Code, and Title IX;
- On Counts II and IV, damages in an amount to be determined at trial;
- On Count V, an Injunction prohibiting the imposition of, or reporting of, any disciplinary actions against the Plaintiff to any 3rd party (other academic institutions).
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as provided for by 42 U.S.C. § 1988 and otherwise.

**EXHIBIT 1**

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.


         Respectfully submitted,


         _____/s/ Joshua Adam Engel_____
         Joshua Adam Engel (0075769)
         ENGEL AND MARTIN, LLC
         5181 Natorp Blvd., Suite 210
         Mason, OH 45040
         (513) 445-9600
         (513) 492-8989 (Fax)
         engel@engelandmartin.com

EXHIBIT 1

### VERIFICATION

I, ███████████ being duly sworn, state that I have reviewed the factual allegations contained in this Verified Complaint.  I am the John Doe described in the Complaint.  I believe that the disclosure of my identity will cause me irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34  CFR Part 99.  All of the factual allegations in the Verified Complaint are true and accurate to the best of my knowledge.

████████████████████

Subscribed and sworn before me this $14^{B}$ day of September 2015

_____
Notary Public

Darshak Patel
Notary Public
New Jersey
My Commission Expires August 1, 2018

**EXHIBIT 1**

2015 WL 6082606
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio, Eastern Division.

John DOE, Plaintiff,
v.
THE OHIO STATE UNIVERSITY, et al., Defendants.

Case No. 2:15-cv-2830
|
Filed 10/16/2015

**Attorneys and Law Firms**

Joshua A. Engel, Engel & Martin, LLC, Mason, OH, for
Plaintiff.

Christina Corl, Crabbe Brown & James, Michael Cannon
McPhillips, Reid T. Caryer, Ohio Attorney General's Office,
Columbus, OH, for Defendants.

**OPINION AND ORDER**

GREGORY L. FROST, District Judge

 **\*1**  This matter is before the Court for consideration of the
following filings: a motion for expedited discovery (ECF No.
4) filed by Plaintiff, John Doe; a memorandum in opposition
(ECF No. 13) filed by filed by Defendants, The Ohio State
University, Javaune Adams-Gaston, and Matthew Page ("the
OSU Defendants"); and a reply memorandum (ECF No. 16)
filed by John Doe. For the reasons that follow, the Court
**GRANTS** the motion for expedited discovery. (ECF No. 4.)

**I. Background**
John Doe is a former medical school student at The Ohio
State University who was enrolled in a joint M.D./M.B.A.
program. [1] He was scheduled to graduate in Spring 2016, but
in July 2015, John Doe came before the school's Conduct
Board to answer an allegation that he had engaged in sexual
conduct with a medical student, Jane Roe, without obtaining
her consent. [2]

Following the hearing, the school expelled John Doe. He
appealed, and after the school upheld his expulsion, John
Doe filed the instant action on September 15, 2015. In his

complaint, John Doe asserts the following claims: declaratory
judgment that the OSU Defendants violated his due process
rights (Count I); violation of 42 U.S.C. § 1983 (Count
II); declaratory judgment that the OSU Defendants violated
Title IX, 20 U.S.C. § 1681 *et seq.*, and its implementing
regulations, 34 C.F.R. Part 106 (Count III); violation of Title
IX (Count IV); and injunctive relief (Count V). [3]

In conjunction with the filing of his complaint, John Doe also
filed a combined motion for a temporary restraining order and
a preliminary injunction. (ECF No. 2.) Accompanying this
motion was a second motion that seeks an order compelling
expedited discovery to enable John Doe to prepare for a
preliminary injunction hearing. (ECF No. 4.) The parties have
completed briefing on the motion for expedited discovery,
which is ripe for disposition.

**II. Discussion**
In his motion, John Doe asks the Court to order expedited
discovery of a transcript of the hearing before the school
conduct board, a copy of the investigative file and the school's
internal correspondence regarding the investigation and
disciplinary proceedings, and redacted documents concerning
any sexual misconduct investigations from 2010 until the
present. Some of these requests are not in dispute.

 **\*2**  Pursuant to the oral instructions of this Court during
the September 22, 2015 telephone conference, the OSU
Defendants have already had the conduct board hearing
transcribed and have filed a copy of that transcript under seal.
The OSU Defendants do not expressly state that they then
provided a copy of that transcript to John Doe's counsel, but
their suggestion that the request for a transcript is now moot
suggests that they have done so. If the OSU Defendants have
not provided John Doe's counsel with the transcript, they must
do so immediately.

Also apparently not in dispute is the production of the
investigative file and internal correspondence regarding John
Doe's disciplinary proceedings. The briefing indicates that
counsel have conferred and that the OSU Defendants have
agreed to produce the relevant records "to the extent those
records are not subject to privilege or privacy laws." (ECF
No. 13, at Page ID # 182.) If any portion of the records are
not produced on an expedited basis for these or any other
reasons, the parties should contact the Court immediately for
a telephone status conference.

EXHIBIT 1

This leaves for discussion what is in dispute, specifically, the sexual misconduct investigation records from 2010 to the present. The OSU Defendants argue that the request for these records is too broad and that John Doe lacks good cause to obtain access to such records. The OSU Defendants also contend that production of such voluminous discovery outweighs any need John Doe has for seeking the discovery.

The OSU Defendants' arguments are largely without merit. Federal Rule of Civil Procedure 26(d) expressly recognizes the authority of a court to authorize discovery in advance of a Rule 26(f) conference. John Doe's Title IX claim alone presents good cause for such early discovery of at least the records of sexual misconduct proceedings from 2010 to the present, if not all of the discovery he seeks, and his due process claim presents good cause for early production of the discovery sought in regard to his own proceedings. Stated simply, if The Ohio State University has a pattern and practice that treats males unfairly in sexual misconduct investigations, then the school has a significant problem in this litigation. Determining whether such a problem exists necessitates looking at the data and the context surrounding that data. Given such inarguable relevance, the Court finds it remarkable that the OSU Defendants would argue that good cause is lacking.

This is not to say that John Doe has not potentially overreached. Part of today's inquiry involves examination of any prejudice to or any burden on the OSU Defendants that the requested records would present. Unfortunately, the OSU Defendants have offered no actual evidence suggesting any prejudice or any real burden. They assert that "overbroad and burdensome expedited discovery" would mean that they would face an "immense task" in retrieving, preparing, and producing the records, but the OSU Defendants offer no details to support their conclusory contentions. (ECF No. 13, at Page ID # 184.) In the absence of any evidence supporting the prejudice-and-burden argument, this Court declines to take the OSU Defendants' word for it and place limitations on discovery that may or may not be needed. Accordingly, the Court imposes no restrictions here on John Doe's right to expedited discovery of all sexual misconduct investigation records from 2010 to the present. This Court does so fully cognizant that the parties have requested—perhaps anticipating today's decision—an October 19, 2015 telephone status conference, which this Court has set for 12:30 p.m. At that time, the Court will impose any necessary limitations on the records to be produced or the manner of production involved if the parties cannot come to a satisfactory agreement in this regard.

**III. Conclusion**

***3** For the foregoing reasons, the Court **GRANTS** the motion for expedited discovery. (ECF No. 4.)

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2015 WL 6082606

## Footnotes

1 The Court previously ordered that the parties should refer to Plaintiff as "John Doe." (ECF No. 17.)

2 The Court previously entered an oral order that the parties should refer to the alleged victim as "Jane Roe."

3 The Court expresses no opinion here as to whether John Doe has incorrectly plead redundant claims or a form of relief as a separate claim. *See* *Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877, 899 (N.D. Ohio 2010) ("it is axiomatic that [plaintiff] cannot assert two separate counts alleging the exact same claims"); *Goryoka v. Quicken Loan, Inc.*, 519 F. App'x 926, 929 (6th Cir. 2013) (recognizing that a request for injunctive relief is a remedy and not a separate cause of action).

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

| | |
|---|---|
| JOHN DOE, | Case No. 5:20-cv-00145-DCR |
| Plaintiff, | Judge Danny C. Reeves |
| v. | |
| TRANSYLVANIA UNIVERSITY, | **MOTION FOR**<br>**EXPEDITED DISCOVERY** |
| Defendant. | |

The Plaintiff, John Doe ("Doe"), by and through his undersigned counsel, respectfully submits the following Motion for Expedited Discovery.  A memorandum in support of this Motion and a proposed order are attached.

Respectfully submitted,

*/s/ Kevin L. Murphy*
Kevin L. Murphy (KBA #50646)
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive, Suite 200
P.O. Box 17534
Fort Mitchell, KY  41017-0534
Telephone: (859) 578-3060
Fax: (859) 578-3061
KMurphy@MLJfirm.com
*Counsel for Plaintiff*

EXHIBIT 2

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on the following, who has agreed to accept service on behalf of the University, via email this 7th day of April, 2020:

Bryan H. Beauman
Sturgill, Turner, Barker & Moloney, PLLC
333 West Vine Street, Suite 1500
Lexington, KY 40507
BBeauman@sturgillturner.com

*/s/ Kevin L. Murphy*
Kevin L. Murphy

EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| JOHN DOE, | Case No. 5:20-cv-00145-DCR |
| Plaintiff, | Judge Danny C. Reeves |
| v. | |
| TRANSYLVANIA UNIVERSITY, | **MEMORANDUM IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY** |
| Defendant. | |

The Plaintiff, John Doe ("Doe"), by and through his undersigned counsel, respectfully submits the following Memorandum in Support of Motion for Expedited Discovery.

Currently pending before the Court is Doe's Emergency Motion for a Temporary Restraining Order, which asks the Court to restrain and prohibit the Defendant, Transylvania University (the "University"), from proceeding with a Title IX hearing that is currently scheduled to commence on April 15, 2020.  As the Court is well aware, pursuant to Fed. R. Civ. P. 65(b)(2), a restraining order is limited to a maximum duration of 14 days, unless otherwise extended by the Court.

The University denied Doe's request to postpone the hearing.  Thus, the University will continue its attempts to proceed with the April 15th hearing unless Doe can obtain an injunction. To that end, Doe needs to conduct discovery on an expedited basis in order to obtain the evidence necessary to put before the Court in the injunction hearing.

Under Fed. R. Civ. P. 26(d)(1), Doe is prohibited from seeking "discovery from any source until the parties have conferred as required by Rule 26(f), except…when authorized…by court order."  As the Court will see and hear in the Temporary Restraining Order and injunction hearing, the University has already violated Doe's due process rights in several ways.  He was thrown out

EXHIBIT 2

of his dorm residence without any hearing.  And the "investigation" has been seriously flawed.  In spite of bringing these and other mistakes to the University's attention, it has made it clear that they have no intention of remedying these mistakes.  Rather, the University wrongfully intends to proceed with a Title IX hearing as expeditiously as possible.  In addition, it plans to do so without affording Doe the opportunity to secure the evidence and testimony he needs to adequately defend himself.

There are a number of depositions and documents that Doe needs before an injunction hearing.  For instance, Doe will need, at a minimum, to take the deposition of his accuser to get answers to all of the questions that remain unanswered as a result of the University's faulty investigation.  Doe will also need to take the deposition of the two investigators who conducted the investigation to determine everything that did take place (and conversely, what did not take place).  Lastly, Doe will need to take the deposition of the Title IX coordinator and/or a 30(b) of the University to determine who oversaw the entire investigation (including the University's failure to conduct an investigation with respect to Doe's complaint).  Doe also needs a physical copy of the evidence in the University's possession, without redactions or time restraints on Doe's ability to access those materials.

"Expedited discovery may be granted upon a showing of good cause."  *Best v. Mobile Streams, Inc.*, No. 1:12-cv-564, 2012 WL 5996222, *1 (S.D. Ohio Nov. 30, 2012) (internal citation omitted).  "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party."  *Id.* (internal citation and quotations omitted).  Two of the considerations a court considers when determining whether good cause exists is whether the scope of the proposed discovery is narrowly tailored, and whether the expedited discovery would substantially contribute to moving the case forward.  *Id.*

EXHIBIT 2

(internal citations omitted).

The expedited discovery sought by Doe is certainly limited in scope.  He is seeking to take the depositions of four individuals, and is asking (although he never should have had to) for a physical copy of the evidence the University has compiled during its investigation, and any information that it may use against Doe at any Title IX hearing.  These are certainly narrow requests, and had the University conducted an appropriate investigation, Doe would not have to ask this Court to obtain the information, because if they acted properly, there would be no Title IX hearing against Doe.

Thus, Doe requests that the University be ordered to do as follows:  Answer the Complaint in 7 days; produce for deposition within 10 days all persons who took part in the investigation of Doe's accuser, as well as those who decided not to pursue Doe's Title IX charge against his accuser; produce the home address for the accused by April 7, 2020 so a subpoena can be issued for deposition; to produce by April 8, 2020 all documents relating to the investigation of the accusations against Doe; produce all the evidence the University plans to use at a Title IX hearing if one ever occurs; to produce all emails and other relevant documents that show not only the investigation, but the reasons why the University charged Doe.

Of course, if the University would agree to at the very least postpone the hearing until June, these deadlines could be extended.

Based on the foregoing, Doe respectfully requests that the Court expedite discovery in this matter for the purpose of taking depositions, and to obtain the above documents relating to this matter.

EXHIBIT 2

Respectfully submitted,

*/s/ Kevin L. Murphy*
Kevin L. Murphy (KBA #50646)
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive, Suite 200
P.O. Box 17534
Fort Mitchell, KY  41017-0534
Telephone: (859) 578-3060
Fax: (859) 578-3061
KMurphy@MLJfirm.com
*Counsel for Plaintiff*

4

EXHIBIT 2

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served on the following, who has agreed to accept service on behalf of the University, via email this 7th day of April, 2020:

Bryan H. Beauman
Sturgill, Turner, Barker & Moloney, PLLC
333 West Vine Street, Suite 1500
Lexington, KY 40507
BBeauman@sturgillturner.com

*/s/ Kevin L. Murphy*
Kevin L. Murphy

EXHIBIT 2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## LEXINGTON DIVISION

| | |
|---|---|
| JOHN DOE, | Case No. 5:20-cv-00145-DCR |
| Plaintiff, | Judge Danny C. Reeves |
| v. | |
| TRANSYLVANIA UNIVERSITY, | **ORDER** |
| Defendant. | |

Currently pending before the Court is Plaintiff's Motion for Expedited Discovery.  The Court having review the Motion, and the Court being sufficient advised,

**IT IS HEREBY ORDERED** that Plaintiff's Motion is granted.  Plaintiff is entitled to commence discovery immediately in order to take the deposition of the female student that has accused him of the conduct at issue, to take the deposition of the two investigators who conducted the Title IX investigation on behalf of the Defendant, and to take the deposition of Defendant's Title IX coordinator and/or a FRCP 30(b) deposition of the University.  Plaintiff is also entitled to the written discovery he requested in his Memorandum in Support of Motion for Expedited Discovery, including all documents relating to the investigation of the accusations against Doe, and produce all the evidence the University plans to use at a Title IX hearing if one ever occurs; to produce all emails and other relevant documents that show not only the investigation, but the reasons why the University charged Doe.

Of course, if the University would agree to at the very least postpone the hearing until June, these deadlines could be extended.

EXHIBIT 2