IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NOAKES, | ) | Case No. 1:21-cv-01776 |
| | ) | |
| Plaintiff, | ) | The Honorable Judge Pamela A. Barker |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT CASE WESTERN** |
| CASE WESTERN RESERVE UNIVERSITY, | ) | **RESERVE UNIVERSITY'S ANSWER** |
| *et al.* | ) | **TO PLAINTIFF'S COMPLAINT** |
| | ) | |
| Defendants. | ) | |
| | ) | |

For its Answer to the Complaint filed by Plaintiff John Noakes ("Plaintiff"), Defendant

Case Western Reserve University ("CWRU" or "Defendant" or the "University"),[1] by and through

the undersigned counsel, admits, denies, and states as follows:

**INTRODUCTION**

1.      Plaintiff John Noakes brings this action for violation of the deliberate indifference

and anti-retaliation provisions of Title IX, as well as breach of contract.

**ANSWER: Paragraph 1 of the Complaint states legal conclusions to which no response is**

**required. To the extent this Court requires a response, Defendant states that the Complaint**

**purports to assert claims under Title IX of the Education Amendments Act of 1972, 20 U.S.C.**

**§§ 1681-1688 ("Title IX") and breach of contract, but Defendant denies that it engaged in**

---

[1] The Complaint improperly names "Case Western Reserve University School of Medicine" as a defendant. On October 8, 2021, Plaintiff dismissed Case Western Reserve University School of Medicine as a party to this action, and, therefore, no response on behalf of Case Western Reserve University School of Medicine is required or appropriate.

any acts or omissions that violate any federal, state, or local laws or regulations. Defendant denies the remaining allegations in paragraph 1 of the Complaint.

2.      This case arises out of the efforts of administrators at the Case Western Reserve University and Case Western Reserve University School of Medicine (collectively "CWRU") to retaliate against John Noakes after he was found "not responsible" for allegations of sexual misconduct against a fellow student, identified here as "Jane Roe."

**ANSWER:  Paragraph 2 of the Complaint states legal conclusions to which no response is required. To the extent this Court requires a response, Defendant states that, on or around November 7, 2020, a female student complainant, referred to as "Jane Roe" in Plaintiff's Complaint, reported to CWRU that, on October 20, 2020, Plaintiff sexually assaulted her (the "Sexual Assault Complaint"). Pursuant to its Interim Sexual Harassment Policy (the "Policy"), CWRU conducted an investigation into the Sexual Assault Complaint, convened a hearing panel, and, based on the evidence gathered during the investigation, found that Plaintiff did not violate the Policy. Further answering, Defendant states that the Complaint purports to assert a claim of retaliation, but Defendant denies that it engaged in any acts or omissions that violate any federal, state, or local laws or regulations. Defendant denies the remaining allegations in paragraph 2 of the Complaint.**

3.      Jane Roe had alleged that John Noakes had engaged in non-consensual sexual activity. The matter was reported to the CWRU Office of Equity, the office charged with enforcement of the University's non-discrimination and sexual harassment policies. CWRU investigated the matter and, following a hearing, John Noakes was cleared of all charges.

**ANSWER: Defendant states that, on or around November 7, 2020, Ms. Roe made the Sexual Assault Complaint. Upon learning of the Sexual Assault Complaint, CWRU's Office of**

Equity, the office responsible for enforcing the Policy[2] and CWRU's non-discrimination policy, conducted an investigation, convened a hearing panel, and, based on the evidence gathered during the investigation, found that Plaintiff did not violate the Policy. Defendant denies the remaining allegations in paragraph 3 of the Complaint.

4.     After John Noakes was cleared of the charges, CWRU officials – including the Title IX Coordinator and a Dean in the Medical school – who were unhappy with the outcome began a campaign of intimidation and harassment against John Noakes. This campaign culminated in threats from school administrators that John Noakes could be expelled if he continued to assert his own rights under Title IX or pursue retaliation complaints against administrators.

**ANSWER: Defendant denies the allegations in paragraph 4 of the Complaint.**

## PARTIES

5.     John Noakes is a medical student at Case Western Reserve University School of Medicine (the "School of Medicine").

    a.  Plaintiff is an Ohio resident with a residence in [REDACTED].

    b.  Plaintiff has paid a significant amount of money to CWRU in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

    c.  The disclosure of Plaintiff'[s] identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy,

---

[2] During the 2020-2021 academic year, CWRU maintained an Interim Sexual Harassment Policy, available at <https://case.edu/equity/sites/case.edu.title-ix/files/2020-08/Interim%20Sexual%20Harassment%20%20Policy.pdf>. Effective September 13, 2021, CWRU maintains a Sexual Harassment Policy, available at <https://case.edu/equity/sexual-harassment-title-ix/sexual-harassment-policy>.

including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

**ANSWER: Defendant states that Plaintiff enrolled as a first-year medical student at CWRU's School of Medicine for the 2020-2021 academic year. Defendant does not have information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 of the Complaint regarding Plaintiff's residency, expectations, and privacy concerns and therefore denies them.**

6.      Defendants Case Western Reserve University and Case Western Reserve University School of Medicine are private educational institutions.

   a.  Case Western Reserve University School of Medicine is a part of Case Western Reserve University and follows university-wide policies and procedure.

   b.  CWRU voluntarily participates in federal spending programs.

**ANSWER: Defendant states that it is a private university and that it operates a School of Medicine. Defendant further states that it receives various research and other grants. Defendant denies the remaining allegations in paragraph 6 of the Complaint.**

### JURISDICTION AND VENUE

7.      This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq*., and Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq*. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

**ANSWER: Paragraph 7 of the Complaint states legal conclusions to which no response is required. To the extent this Court requires a response, Defendant admits that jurisdiction is proper based on the allegations in the Complaint, but Defendant denies it engaged in any acts or omissions that violate any federal, state, or local laws or regulations. Defendant denies the remaining allegations in paragraph 7 of the Complaint.**

8.      This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any other claims in this case, as the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

**ANSWER: Paragraph 8 of the Complaint states legal conclusions to which no response is required. To the extent this Court requires a response, Defendant admits that jurisdiction is proper based on the allegations in the Complaint, but Defendant denies it engaged in any acts or omissions that violate any federal, state, or local laws or regulations. Defendant denies the remaining allegations in paragraph 8 of the Complaint.**

9.      This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

**ANSWER: Paragraph 9 of the Complaint states legal conclusions to which no response is required. To the extent this Court requires a response, Defendant admits that venue is proper based on the allegations in the Complaint, but Defendant denies it engaged in any acts or omissions that violate any federal, state, or local laws or regulations. Defendant denies the remaining allegations in paragraph 9 of the Complaint.**

10.    This case is one of many amidst a continuing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses. The response of colleges and universities to this problem arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*,

**ANSWER: Paragraph 10 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response by Defendant. To the extent this Court requires a response, Defendant states that the Complaint purports to assert a claim under Title IX, but Defendant denies that it engaged in any acts or omissions that violate any federal, state, or local laws or regulations. Defendant denies the remaining allegations in paragraph 10 of the Complaint.**

### THE RESPONSE OF CWRU TO PRESSURES TO CRACK DOWN ON SEXUAL MISCONDUCT

11.    CWRU has adopted various policies and procedures to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.

**ANSWER: Defendant states that the Policy outlines CWRU's grievance process and its procedures for addressing formal complaints of sexual harassment. Defendant denies the remaining allegations in paragraph 11 of the Complaint.**

12.    On April 11, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures in a manner that, while not completely ignoring due process concerns, shifted the focus more on victim advocacy.

**ANSWER: Paragraph 12 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response by Defendant. To the extent this Court requires a response, Defendant states that the "Dear Colleague Letter" speaks for itself. Defendant denies the remaining allegations in paragraph 12 of the Complaint.**

13.     The Obama administration, through OCR, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

    a.  The "Dear Colleague" letter was a step in the increased enforcement of Title IX on colleges and universities. NPR described the Dear Colleague Letter as the government's "first warning shot." Source: *How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014.

    b.  In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." Source: *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

    c.  Lhamon was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

**ANSWER: Paragraph 13 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response by Defendant. To the extent this Court requires a response, Defendant states that the news articles speak for themselves. Defendant denies the remaining allegations in paragraph 13 of the Complaint.**

14.     Colleges and Universities, including CWRU, were scared of being investigated or sanctioned by the Department of Education and/or of potential Title lawsuits by the Department of Justice.

  a.   The Federal government has created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

  b.   Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds."

Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014. In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendant instead.

c.  Other news reports suggested that the threat to withdraw federal funding from schools was credible. MSNBC reports:

> Speaking at a conference on campus sexual assault held at Dartmouth College, Assistant Secretary for Civil Rights at the Department of Education Catherine Lhamon said that despite the fact it has never been done before, she is prepared to cut off federal funding to schools that violate Title IX, the 1972 gender equity law.

> Calling that one enforcement mechanism part of a set of "very, very effective tools," Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

> In her 10-month tenure at the Department of Education, Lhamon has threatened to withdraw federal funding from four schools. "It's not surprising to me that we haven't gone to the last step," she said. "It means that so far the process has been working."

> Meredith Clark, Official to colleges: Fix sexual assault or lose funding, July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college#51832)

d.  The White House issued a report entitled "Not Alone" in April 2014, which includes a warning that if the OCR finds that a Title IX violation, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance

review of schools, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

e.  In June 2014, Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

f.  Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." Source: Some Accused Of Sexual Assault On Campus Say System Works Against Them, NPR, September 3, 2014.

g.  In 2015, the Office's director, Catherine Lhamon, told a national media publication that "[w]e don't treat rape and sexual assault as seriously as we should," citing data "about the rate of unwanted sexual activity experienced specifically by college women." Lhamon had also recently warned university administrators that they could lose all their federal funding if they did not heed the Office's mandates, and elsewhere cited "a need to push the country forward."

     h. In July 2016, then-Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. Source: Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault, Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

**ANSWER: Paragraph 14 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response by Defendant. To the extent this Court requires a response, Defendant states that the news articles and reports speak for themselves. Defendant denies the remaining allegations in paragraph 14 of the Complaint.**

     15. On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf )

     a. In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.

     b. OCR further said: "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental

**ANSWER: Paragraph 15 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response by Defendant. To the extent this Court requires a**

response, **Defendant states that the Department of Education letter speaks for itself. Defendant denies the remaining allegations in paragraph 15 of the Complaint.**

16.     On May 6, 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972. The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses. The Final Rule carried the force and effect of law as of August 14, 2020.

**ANSWER: Paragraph 16 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response by Defendant. To the extent this Court requires a response, Defendant states that the Final Rule speaks for itself. Defendant denies the remaining allegations in paragraph 16 of the Complaint.**

17.     The Biden Administration had indicated that it intends to initiate a new rulemaking in an effort to repeal the 2020 rules. During the presidential campaign, President Biden vowed to scrap the Trump administration's new regulation on campus sexual misconduct; in March 2021, the President signed an executive order directing Education Secretary Miguel Cardona to review and consider rewriting the regulation.

**ANSWER: Paragraph 17 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response by Defendant. To the extent this Court requires a response, Defendant states that the referenced executive order speaks for itself. Defendant denies the remaining allegations in paragraph 17 of the Complaint.**

18.     On information and belief, CWRU, like other schools nationwide, was scared of being investigated or sanctioned by the Department of Education for not taking seriously complaints of female students alleging sexual assault by male students. Sanctions would include

the loss of eligibility for all federal funding. Upon information and belief, CWRU annually receives millions of dollars in government grants and contracts, and students depend on federal financial aid.

**ANSWER: Defendant states that the Title IX regulations speak for themselves. Further responding, Defendant states that it receives various research and other grants. Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint regarding students' dependence upon federal financial aid and therefore denies them. Defendant denies the remaining allegations in paragraph 18 of the Complaint.**

19.     In the year preceding the disciplinary actions against John Noakes, there was substantial criticism of CWRU, both in the student body and in the public media, accusing CWRU of not taking seriously complaints of female students alleging sexual assault by male students. This has included adverse news coverage and, campus meetings or protests, and enforcement actions concerning CWRU. This criticism included criticism of the manner in which CWRU handled Title IX investigations.

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the vague allegations of criticism purportedly levied against CWRU in 2020 in paragraph 19 of the Complaint and therefore denies them. Defendant denies the remaining allegations in paragraph 19 of the Complaint.**

20.     In the summer of 2020, a group of CWRU students, "CWRU Survivors," established the @cwru.survivors Instagram page so students could anonymously share their experiences with sexual assault, violence, harassment and discrimination on CWRU's campus, as well as experiences with the Title IX office. In a matter of days, there were over 600 posts.

a. The Instagram page attracted national media attention, including coverage by NPR and CBS News. According to the Cleveland Scene, "In many cases, these posts also describe a profound lack of institutional support for survivors of assault, and university systems of reporting and discipline so ineffectual that they have exacerbated trauma."

b. CWRU Survivors said in an open letter to the college posted on July 29, 2020: "A massive cultural change about how the CWRU community views consent, accountability, and respect for others is integral in combatting the prevalence of sexual violence at Case Western Reserve University."

c. A September 11, 2020 editorial in the student newspaper, the Observer, criticized the changes in the Title IX regulations. The editorial accused the Trump Administration of "promot[ing] sexism and violence on a nearly daily basis" and added, "Respect for women surely does not exist in this administration." The editorial suggested that, in response to the new Title IX regulations, "...it's time to go farther and stand in complete solidarity with survivors."

d. A change.org petition created in the following weeks (https://www.change.org/p/case-western-reserve-university-hold-cwru-accountable) has received hundreds of signatures for a statement that is highly critical of the CWRU response to allegations of sexual misconduct: "As an institution conceived to be a place of safety and refuge for survivors, Title IX has shown to be unhelpful, victim blaming, and made seemingly inaccessible to students and those who need it most." In particular, the petition demanded that CWRU take action against those accused of

14

misconduct regardless of the results of the investigatory and hearing process. The petition demands that CWRU release "a statement condemning the assaulters who have been accused, and that believing survivors, taking concrete action against the accused, and ensuring the culture on campus is drastically altered, is the school's priority. [sic]"

**ANSWER: Defendant states that, upon information and belief, in the summer of 2020, the @cwru.survivors Instagram page was set up to "[s]hare experiences of sexual misconduct." Defendant further states that the posts contained on the @cwru.survivors Instagram page and the referenced news articles and change.org petition speak for themselves. Defendant denies the remaining allegations in paragraph 20 of the Complaint.**

21.     In the Fall of 2020, partly in response to the Instagram page, a task force made up of volunteer undergraduate, graduate, and transfer students, along with advisors, lawyers, and CWRU alumni, met regularly to discuss sexual misconduct on CWRU's campus. In a report to the Board of Trustees (https://case.edu/provost/sites/case.edu.provost/files/2020-11/Sexual%20Misconduct_Draft.pdf), the Task Force wrote, "The student body and alumni alike are calling for action. A massive culture change has already begun on our campus, and the University must ask itself one simple question: 'Will we be aiding in this change or standing by?'"

   a.  The Task Force was critical of the Title IX Process. The presentation states, "one thing has been made clear: We are, unfortunately, not supporting nor educating the CWRU community enough in terms of sexual misconduct. Sexual assault survivors and the accused alike are subjected to an inconsistent, unfair, and problematic process in place to address allegations. A change must be made."

      b.  The Task Force collected quotes from students that were critical of the Title IX process at CWRU: [page copied from Task Force Report]

      c.  The Task Force indicated a belief that "survivors often do not feel supported or understood by CWRU, citing inadequate resources, [and] unhelpful or unaccommodating staff and faculty..."

**ANSWER: Defendant states that, in or around the Fall of 2020, CWRU established a task force made up of volunteer undergraduate, graduate, and transfer students, who worked with CWRU advisors, administrators, lawyers, and alumni, to discuss sexual misconduct on CWRU's campus and steps to improve the situation on campus (the "Task Force"). Further responding, Defendant states that, in or around November 2020, the Task Force released a report titled "Be A Part Of The Change", available at https://case.edu/provost/sites/case.edu.provost/files/2020-11/Sexual%20Misconduct_Draft.pdf (the "Task Force Report"). Defendant states that the Task Force Report speaks for itself. Defendant denies the remaining allegations in paragraph 21 of the Complaint.**

22.    In Fall 2020, the CWRU Title IX coordinator sent out a message to all students. A CWRU statement said that "Education and prevention programs certainly can help reduce the number [of sexual assaults] on campus, but more meaningful change requires earlier and deeper initiatives to engage and address these cultural issues [including long-standing societal attitudes towards women and members of underrepresented groups] on a broad[er] scale."

**ANSWER: Defendant states that its campus newspaper article reporting the statement, available at https://observer.case.edu/editorial-title-ix-abandons-survivors-cwru-survivors-supports-them-what-about-cwru/, speaks for itself. Defendant denies the remaining allegations in paragraph 22 of the Complaint.**

23.     CWRU has been critical of the 2020 regulations. The CWRU web page includes this statement: "the new regulations have raised concerns across many in higher education, and our organizational representatives have been active in articulating them." (https://case.edu/equity/sexual-harassment-title-ix/information-2020-title-ix-regulations)

**ANSWER: Defendant states that its website speaks for itself. Defendant denies the remaining allegations in paragraph 23 of the Complaint.**

24.     The Medical School, in particular, has received scrutiny for the manner in which it handles allegations of sexual assault on campus. In 2018, the Office of Civil Rights for the Department of Health and Human Services completed an evaluation of the School of Medicine's compliance with Title IX. HHS reviewed the school's nondiscrimination policies and procedures, including its Sexual Misconduct Policy, Title IX grievance procedure, and the extent to which CWRU School of Medicine's Title IX Coordinator implements the School's Title IX compliance program. A copy of the April 2018 Letter is Attached as Exhibit A.

**ANSWER: Defendant states that the August 16, 2018 letter attached to the Complaint as Exhibit A speaks for itself. Defendant denies the remaining allegations in paragraph 24 of the Complaint.**

25.     CWRU's Title IX Coordinator leads CWRU's centralized Title IX Office and oversees all aspects of Title IX investigations and prevention and education programs university-wide, including investigating grievances involving the School of Medicine.

**ANSWER: Defendant states that it has a designated Title IX Coordinator to oversee all aspects of sexual harassment reports, investigations, and prevention and education programs at the University. Defendant denies the remaining allegations in paragraph 25 of the Complaint.**

26.     CWRU maintains a website which provides instructions for filing a Title IX complaint against any student at CWRU, including medical students. CWRU's Title IX

investigative procedures include interviews with the complainant, the respondent and witnesses, as well as reviewing relevant records such as phone records emails and social media. Following the investigation, a hearing panel determines whether a student is "responsible" or not responsible" for a violation of the school's policies.

**ANSWER: Defendant states that it maintains a website that contains a copy of the Policy. Defendant further states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 26 of the Complaint.**

27.    CWRU has adopted a "Interim Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties." This is referred to as the "Title IX Policy." (A copy of the Title IX Policy is attached as Exhibit B.)

**ANSWER: Defendant states that the document attached to the Complaint as Exhibit B appears to be a copy of the Policy that was in effect during the 2020-2021 academic year (effective August 14, 2020). Defendant further states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 27 of the Complaint.**

28.    The Title IX Policy prohibits all forms of sexual harassment, which is defined (page 17) to include, "the offenses of sexual harassment, sexual assault, domestic violence, dating violence, and stalking."

**ANSWER: Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 28 of the Complaint.**

29.    The Title IX Policy provides that CWRU will provide benefits and accommodations to students who allege that they are the victims of sexual misconduct. These benefits and accommodations would not available to students but for the fact that the students claimed to have been a victim of sexual misconduct, and are provided without regard to any

investigation. Interim measures can include "no contact" orders and changes in academic, employment or living arrangements.

**ANSWER: Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 29 of the Complaint.**

30.     The investigation and grievance process outlined in the Title IX Policy determines whether or not the Policy has been violated.

**ANSWER: Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 30 of the Complaint.**

31.     Upon receipt of a complaint, a pair of investigators with the Office for Equity will review cases in pairs, interview the Complainant, Respondent and witnesses, and gather relevant evidence. As part of the investigatory process, each interviewed party and witness is provided an opportunity to review and verify the Investigator's summary notes of the interview. Each party has the opportunity to suggest witnesses and questions they wish the Investigator(s) to ask of the other party and witnesses.

**ANSWER: Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 31 of the Complaint.**

32.     The Investigators gather, assess, and synthesize evidence, but make no conclusions, engage in no policy analysis, and render no recommendations as part of their report[.]

**ANSWER: Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 32 of the Complaint.**

33.     Prior to the conclusion of the investigation, the parties are provided access to a draft investigation report as well as an opportunity to inspect, review, and respond to all of the evidence obtained as part of the investigation.

**ANSWER:** **Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 33 of the Complaint.**

34.     The determination of whether a respondent has violated the CWRU Title IX Policy is made by a hearing panel. At the hearing, the Investigators present a summary of the final investigation report. The parties and witnesses may provide information. Each side may question the adverse party and witnesses either through an advisor or through the submission of written questions.

**ANSWER:** **Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 34 of the Complaint.**

35.     Each side is permitted to appeal the decision of the hearing panel on certain limited grounds.

**ANSWER:** **Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 35 of the Complaint.**

36.     Nothing in the Title IX Policy requires that student keep the process confidential. In fact, the opposite is true. CWRU [administrators] have acknowledged that students are free to disclose any information obtained in the investigative or administrative process. The CWRU Title IX Coordinator admitted that students would be free, for example, 'to print information about the outcome of hearings in an ad in the Plain Dealer.'

**ANSWER:** **Defendant states that the Policy speaks for itself. Defendant further states that, in connection with its investigation into the Sexual Assault Complaint, on January 11, 2021, it sent a notice of investigation and allegations to Plaintiff, which states, in relevant part, "*Confidentiality* – You have the right to discuss this matter with your advisor and others, but the institution will conduct this investigation confidentially, meaning that it will only share**

information as permitted or required by law. CWRU asks for your discretion in what you choose to share and hop that you will respect the private and sensitive nature of these allegations." **Defendant denies the remaining allegations in paragraph 36 of the Complaint.**

37.     The Title IX Policy (page 22) has certain provisions designed to prevent retaliation against individuals who engage in "protected activity" related to the Title IX process.

    a.   Protected activity is defined by the Title IX Policy to include "participating in the grievance process."

    b.   The Title IX Policy requires CWRU to "take all appropriate and available steps to protect individuals who fear that they may be subjected to retaliation."

    c.   The Title IX Policy prohibits "intimidating, threatening, coercing, harassing, or discriminating against any individual... because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure."

    d.   The Title IX Policy provides that "charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint of sex discrimination..." may constitute retaliation.

**ANSWER: Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 37 of the Complaint.**

38.     The Title IX Policy (page 12) also provides that students should be provided with supportive measures "to protect the safety of all parties or the university's educational

environment, and/or deter harassment, discrimination, and/or retaliation." The provision of supportive measures is mandatory, not optional:

      a. The Title IX Policy provides that "CWRU *will offer and implement* appropriate and reasonable supportive measures to the parties upon notice of alleged sexual harassment, or retaliation." (Emphasis supplied.)

      b. The Title IX Policy provides, "The Title IX Coordinator or designee *promptly makes supportive measures available* to the parties upon receiving notice or a complaint." (Emphasis supplied.)

**ANSWER: Defendant states that the Policy speaks for itself. Defendant denies the remaining allegations in paragraph 38 of the Complaint.**

39.    The School of Medicine has a separate "Student Handbook." (A copy of the Student Handbook Policy is attached as Exhibit C.)

**ANSWER: Defendant states that the document attached to the Complaint as Exhibit C appears to be a copy of the CWRU School of Medicine Student Handbook that was in effect during the 2020-2021 academic year (the "Student Handbook"). Defendant further states that the Student Handbook speaks for itself. Defendant denies the remaining allegations in paragraph 39 of the Complaint.**

40.    The Student Handbook (page 7) indicates that "The School of Medicine is obligated to follow federal guidelines (Title IX) for reporting sexual misconduct." The Student Handbook (page 7) further indicates that "If appropriate" reports of sexual harassment and misconduct are "redirected to University (i.e. Title IX)."

**ANSWER: Defendant states that the Student Handbook speaks for itself. Defendant denies the remaining allegations in paragraph 40 of the Complaint.**

41.     The Student Handbook (page 59) describes a Committee on Students ("COS"). The purpose of the COS is to review "the total performance of any student referred to it." The Student Handbook indicates that "Review of student performance within the curriculum may include... compliance with the university's Student Code of Conduct."

**ANSWER:** **Defendant states that the Student Handbook speaks for itself. Defendant denies the remaining allegations in paragraph 41 of the Complaint.**

42.     The COS reviews ["]the student's complete academic record and any information provided by the Society Dean and student." The COS may also "question the student on... Student Code of Conduct violations..." The COS may make determinations about "promotion and graduation, repetition of a portion of the curriculum, and any sanctions including dismissal from the School."

**ANSWER:** **Defendant states that the Student Handbook, which describes the Committee on Students (the "COS"), speaks for itself. Defendant denies the remaining allegations in paragraph 42 of the Complaint.**

43.     The Student Handbook (page 60-61) provides that students have the right to request an appeal hearing for reconsideration of a decision made by the COS.

**ANSWER:** **Defendant states that the Student Handbook speaks for itself. Defendant denies the remaining allegations in paragraph 43 of the Complaint.**

44.     The Student Handbook permits the student only to have a faculty advocate. "No other advisor or advocate, other than the CWRU faculty member designated by the student, is permitted to accompany the student to the Committee hearing."

**ANSWER:** **Defendant states that the Student Handbook speaks for itself. Defendant denies the remaining allegations in paragraph 44 of the Complaint.**

45.     The Student Handbook (page 61) provides that a student "may make one further appeal to the Dean of the School of Medicine only on the basis of the use of inappropriate procedures."

**ANSWER: Defendant states that the Student Handbook speaks for itself. Defendant denies the remaining allegations in paragraph 45 of the Complaint.**

46.     The COS process does not contain many of the procedural protections included in the Title IX Policy, including the ability to confront adverse witnesses and be accompanied by an advisor of the student's choice.

**ANSWER: Defendant states that the Student Handbook, which describes the COS process, speaks for itself. Defendant denies the remaining allegations in paragraph 46 of the Complaint.**

## THE DISCIPLINARY PROCEEDINGS AGAINST JOHN NOAKES

47.     Beginning in August/September 2020 John Noakes and Jane Roe began dating.

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 47 of the Complaint and therefore denies them.**

48.     Jane Roe alleges that John Noakes sexually assaulted her on October 20, 2020 (the "Incident"). Jane Roe alleged that John Noakes engaged in rough sex beyond her consent. John Noakes unequivocally denies Jane Roe's allegations and unequivocally denies any sexual misconduct (related to the Incident or otherwise).

**ANSWER: Defendant states that, on or around November 7, 2020, Ms. Roe made the Sexual Assault Complaint. Pursuant to the Policy, CWRU conducted an investigation into the Sexual Assault Complaint, which included interviews of Plaintiff. During the interviews of**

24

**Plaintiff, Plaintiff denied violating the Policy. Defendant denies the remaining allegations in paragraph 48 of the Complaint.**

49.     On October 22, 2020 – two days after the Incident – John Noakes and Jane Roe mutually decided to break up.

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 49 of the Complaint, and therefore denies them.**

50.     On October 23, 2020, Jane Roe asked John Noakes to re-start the relationship. She said that she made a mistake by breaking up. She texted him, "I just know you're right for me and I think I really really like you and I messed up and I dumped you just because you weren't into nutrition but that's not fair that's not a good reason. You're just so good for me other than that I'm just so f**ked up with my eating disorder and anxiety that I thought it was a good idea to push you away."

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 50 of the Complaint regarding Plaintiff's conversations and interactions with Ms. Roe, and therefore denies them. Further responding, Defendant states that, during its investigation into the Sexual Assault Complaint, Plaintiff provided copies of his text messages with Ms. Roe, which speak for themselves. Defendant denies the remaining allegations in paragraph 50 of the Complaint.**

51.     On October 24, 2020 – four days after the Incident – John Noakes and Jane Roe engaged in consensual sex.

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 51 of the Complaint, and therefore denies them.**

52. On October 25th, 2020 – five days after the Incident – John Noakes and Jane Roe exchanged text messages. In one text, Jane Roe writes, "Goodnight [John Noakes] <3. You mean so much to me..."

**ANSWER: Defendant states that, during its investigation into the Sexual Assault Complaint, Plaintiff provided copies of his text messages with Ms. Roe, which speak for themselves. Defendant denies the remaining allegations in paragraph 52 of the Complaint.**

53. On October 26, 2020 – six days after the Incident – John Noakes and Jane Roe had an argument about an unrelated matter. John Noakes suggests that they need to "take a break." Jane Roe responded by threatening John Noakes. She specifically stated that she would report him to the Title IX Office "for the lying the sex for everything it was all a lie." Jane Roe continued these threats the next day before apologizing for the "meltdowns" and attempts "to fix this."

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 53 of the Complaint regarding Plaintiff's conversations and interactions with Ms. Roe, and therefore denies them. Further responding, Defendant states that, during its investigation into the Sexual Assault Complaint, Plaintiff provided copies of his text messages with Ms. Roe, which speak for themselves. Defendant denies the remaining allegations in paragraph 53 of the Complaint.**

54. John Noakes asked Jane Roe to stop contacting him. Jane Roe continued to attempt to contact him and threatened to report him for "non-consensual sex."

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 54 of the Complaint regarding Plaintiff's conversations and interactions with Ms. Roe, and therefore denies them. Defendant denies the remaining allegations in paragraph 54 of the Complaint.**

55.     Jane Roe's threats were repeated during an argument between her and John Noakes on November 6, 2020. During that argument she threatened to file a report with the Title IX Office and claimed she is "a victim of rape." In the same conversation, she texted him about continuing the relationship: "my feelings never went away, yours just disappeared in a day. Just like everyone else's do."

**ANSWER: Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 55 of the Complaint regarding Plaintiff's conversations and interactions with Ms. Roe, and therefore denies them. Further responding, Defendant states that, during its investigation into the Sexual Assault Complaint, Plaintiff provided copies of his text messages with Ms. Roe, which speak for themselves. Defendant denies the remaining allegations in paragraph 55 of the Complaint.**

56.     On November 7, 2020 at 6:34 am John Noakes reported to the the [sic] Office of Equity that he is being threatened and harassed by Jane Roe. A few hours later, at 1:29 pm, Dr. Steven Ricanati reported to the Office of Equity that Jane Roe had been sexually assaulted by John Noakes.

**ANSWER: Defendant states that, on November 7, 2020 at 6:34 a.m., Plaintiff sent an email to the Office of Equity stating that Ms. Roe threatened to file the Sexual Assault Complaint. Defendant states that, on November 7, 2020 at 1:29 p.m., Dr. Steven Ricanati, Associate Dean for Student Affairs, sent an email to Darnell Parker, former Senior Associate Vice President for Equity and University Title IX/Section 504 Coordinator, with a copy of Ms. Roe's Sexual Assault Complaint. Defendant denies the remaining allegations in paragraph 56 of the Complaint.**

57. Dr. Steven Ricanati is the associate dean for student affairs for the School of Medicine.

    a. On information and belief, Jane Roe had indicated to Dr. Ricanati that she was the victim of sexual assault. Dr. Ricanati is a "mandatory reporter" and would be required to pass that information on to the Title IX Office.

    b. Dr. Ricanati refers to Jane Roe's report as an "incident posted to Instagram." On information and belief, he was referring to the Instagram page regarding CWRU's Title IX problems described *supra*.

**ANSWER: Defendant states that Dr. Ricanati is the Associate Dean for Student Affairs for the CWRU School of Medicine. Further responding, Defendant states that Ms. Roe submitted the Sexual Assault Complaint through the School of Medicine's online reporting system, and that, upon reviewing the Sexual Assault Complaint and in accordance with the Policy, Mr. Ricanati forwarded the submission to the Office of Equity. Defendant states that Dr. Ricanati's November 7, 2020 email speaks for itself. Defendant denies the remaining allegations in paragraph 57 of the Complaint.**

58. On November 11, 2020, Jane Roe indicated to the Title IX investigators that she did not want to move forward with a formal complaint, but simply wanted a no-contact directive.

**ANSWER: Defendant states that, on November 11, 2020, Title IX Investigators Daniel Nemeth-Neumann and Elizabeth McNeil met with Ms. Roe to review the Policy, process, and support measures. Defendant further states that, during that November 11, 2020 meeting, Ms. Roe stated that she was not ready to move forward with a formal complaint, but requested support measures, including a no contact directive. Defendant denies the remaining allegations in paragraph 58 of the Complaint.**

59.     On November 12, 2021, John Noakes indicated to the Title IX Office that he did not wish to proceed with an investigation against Jane Roe. However, John Noakes was clear that he may choose to move forward at a later date. John Noakes requested the imposition of a No Contact Directive.

**ANSWER:** **Defendant states that, on November 12, 2020, Mr. Nemeth-Neumann communicated with Plaintiff via email and telephone to review the Policy, process, and support measures. Defendant further states that, during their November 12, 2020 discussions, Plaintiff stated that he did not wish to move forward with his complaint, but requested a support measure of a no contact directive. Defendant denies the remaining allegations in paragraph 59 of the Complaint.**

60.     On December 24, 2020, Jane Roe sent an email to the Office of Equity indicating that she now wished to move forward with a formal complaint. On January 7, 2021, Jane Roe signed a formal complaint against John Noakes.

**ANSWER: Defendant states that, on December 24, 2020, Ms. Roe sent an email to Mr. Nemeth-Neumann stating, "I am interested in starting the formal complaint process" and requesting information about the process. Further responding, Defendant states that, on or around January 7, 2021, Ms. Roe submitted her signed formal complaint. Defendant denies the remaining allegations in paragraph 60 of the Complaint.**

61.     John Noakes was notified of the formal complaint on January 11, 2021. The reason for the delay is unexplained.

**ANSWER: Defendant states that, in accordance with the Policy, it conducted an initial assessment in connection with the Sexual Assault Complaint. Further responding, Defendant**

states that, on January 11, 2021, CWRU sent Plaintiff a notice of investigation and allegations. Defendant denies the remaining allegations in paragraph 61 of the Complaint.

62. The Title IX investigator indicated that the alleged sexual misconduct would not strictly fall under the Title IX Policy because, consistent with the federal regulations, it occurred off-campus. However, the investigation was conducted by the Office of Equity. On information and belief, CWRU made the determination that the Title IX process did not apply in an effort to avoid many of the due process guarantees contained in the 2020 federal regulation.

**ANSWER: Defendant states that the Policy, which addresses two separate processes titled "Process A" and "Process B," speaks for itself. Further responding, Defendant states that, per the Policy, CWRU notified Plaintiff and Ms. Roe that, because the reported conduct did not occur in an educational program or activity controlled by the University, the Sexual Assault Complaint would proceed under Process B. Defendant denies the remaining allegations in paragraph 62 of the Complaint.**

63. On January 19, 2021, John Noakes was interviewed by the Title IX investigators. During that interview, he indicated that he was being excluded from educational opportunities because of the allegations and harassment from other students. John Noakes expressed similar concerns to Dr. Ricanati and other faculty members later that month. Dr. Ricanati told John Noakes that he should get therapy, and that to suggest that therapy is unnecessary is "medically uninformed" and "toxic masculinity."

**ANSWER: Defendant states that, as part of its investigation into the Sexual Assault Complaint, on January 19, 2021, Mr. Nemeth-Neumann and Ms. McNeil interviewed Plaintiff. Defendant denies the remaining allegations in paragraph 63 of the Complaint.**

64.    On February 8, 2021 John Noakes again informed the investigators that he was being harassed and retaliated against and requested interim supportive measures.

      a.    On information and belief, most of the medical school class and faculty was aware of Jane Roe's allegations against John Noakes. John Noakes generally did not discuss the matter. However, on information and belief, Jane Roe and her friends continued to disparage John Noakes and suggest that he had engaged in sexual misconduct.

      b.    John Noakes indicated to the CWRU investigators that the conduct of Jane Roe and her friends has resulted in his exclusion from the curriculum and that he is unable to participate fully in his education.

      c.    Faculty at the Medical School, with the knowledge of Dr. Ricanati, made efforts to ostracize John Noakes. For example, in February 2021 John Noakes was not to be paired with another medical student for ultrasound, as was the practice for every other medical student.

**ANSWER: Defendant states that, as part of its investigation into the Sexual Assault Complaint, on February 8, 2021, Mr. Nemeth-Neumann and Ms. McNeil interviewed Plaintiff. Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 64 of the Complaint regarding the awareness or knowledge of medical school students or faculty or statements allegedly made by Ms. Roe and her friends to others and therefore denies them. Defendant denies the remaining allegations in paragraph 64 of the Complaint.**

65.     On February 19, 2021, Jane Roe violated the no contact directive by attempting to FaceTime John Noakes. John Noakes immediately reported this violation to the Office of Equity. The Office of Equity decided that the contact was an "accident" and took no further action.

**ANSWER: Defendant states that, on or around February 19, 2021, Plaintiff reported to the Office of Equity that he had a missed FaceTime video call from Ms. Roe. Further responding, Defendant states that, when interviewed about the FaceTime attempt, Ms. Roe stated that she accidentally hit Plaintiff's contact in her phone and immediately ended the call when she realized she dialed Plaintiff. Defendant denies the remaining allegations in paragraph 65 of the Complaint.**

66.     On March 19, 2021, John Noakes was provided with a "Final Investigation Report." This report included three additional pages of statements by Jane Roe.

**ANSWER: Defendant states that, on or around March 19, 2021, CWRU provided Plaintiff and Ms. Roe with a copy of the final investigative report, including information gathered during its investigation. Defendant denies the remaining allegations in paragraph 66 of the Complaint.**

67.     On April 8, 2021 CWRU held a hearing. At the hearing Jane Roe, John Noakes, and five witnesses were present.

**ANSWER: Defendant states that, on April 8, 2021, the Office of Equity held a hearing in connection with the Sexual Assault Complaint, and that Plaintiff, Ms. Roe, and five witnesses participated at the hearing. Defendant denies the remaining allegations in paragraph 67 of the Complaint.**

68.     The panel found John Noakes "not responsible" for violating the Title IX Policy.

**ANSWER: Defendant states that, on April 15, 2021, CWRU sent Plaintiff a letter outlining the hearing panel's outcome and finding Plaintiff not responsible for violating the Policy. Defendant denies the remaining allegations in paragraph 68 of the Complaint.**

69.     On April 15, 2021 John Noakes was provided with a letter describing the outcome of the hearing. (A copy is attached as Exhibit D.) The Panel found that John Noakes's was "genuine and honest" and that the panel "had no reason to believe [John Noakes] was being deceptive or dishonest." The Panel added, "[John Noakes] provided to [sic] reason for the Board to question his credibility."

**ANSWER: Defendant states that, on April 15, 2021, CWRU sent Plaintiff a letter outlining the hearing panel's outcome and finding Plaintiff not responsible for violating the Policy. Defendant further states that no document marked as "Exhibit D" was attached to the Complaint. Further responding, Defendant states that the April 15, 2021 letter provides, in relevant part, that both Ms. Roe and Plaintiff's "responses seemed to be genuine and honest," that the hearing panel "had no reason to believe [either Ms. Roe or Plaintiff] was being deceptive or dishonest, and that both Ms. Roe and Plaintiff "provided no reason for the Board to question [either of their] credibility." Defendant denies the remaining allegations in paragraph 69 of the Complaint.**

70.     Jane Roe appealed the decision. Jane Roe argued that the panel "failed to take into account the trauma" she experienced because of the Incident and that the panel failed to recognize that John Noakes had "a reason to lie." That appeal was denied. Notably, the Appeal Panel remarked that the "Respondent's responses seemed genuine and honest [and] there was no reason to believe that [John Noakes was] being dishonest or deceptive or had a reason to lie."

**ANSWER: Defendant states that Ms. Roe appealed the hearing panel's outcome in connection with the Sexual Assault Complaint, asserting new evidence and bias. Further responding, Defendant states that, on May 12, 2021, the Office of Equity communicated to Ms. Roe and Plaintiff that the appeal panel determined, in relevant part, that "there was no reason to believe that the Complainant or Respondent were being dishonest or deceptive or had a reason to lie." Defendant denies the remaining allegations in paragraph 70 of the Complaint.**

## THE RETALIATION AGAINST JOHN NOAKES

71. Immediately after he learned of the result of the hearing panel, on April 15, 2021 at 4:38 pm, John Noakes posted on a GroupMe group chat used by the Medical School. He posted, "All glory and honor to the Most High, who is my refuge and fortress. That's all, thanks." John Noakes also changed his name to "[John Noakes] (1-0)."

      a. John Noakes was immediately removed from the GroupMe chat group by another student who acted as a group moderator. This had the effect of excluding John Noakes from class discussions and the vast majority of communication from class student representatives regarding curricular activities.

      b. Other students responded with comments critical of John Noakes, including "God don't like ugly."

      c. A copy of the GroupMe Chat set forth here: [image]

      a. [sic] Two students submitted complaints to the School of Medicine. Both complaints criticized John Noakes for participating in the grievance process

34

and constituting harassment against John Noakes because he had defended himself in the Title IX process.

d.  One complaint said, "The student bragged about winning a sexual assault case blatantly in front of the entire class on GroupMe. He showed zero regard for public decency and his facts/his motives seem to be directed toward rubbing it in the face of his accusers."

e.  Another complaint said, "Following the decision for an institutional sexual assault case in favor of this student, they posted in the class GroupMe in a retaliatory, bullying, and unprofessional manner.... Given that this statement was made after an institutional case was decided in his favor, I am concerned that he will act in an even more erratic and unprofessional way."

f.  Additional complaints – as many as 30 – followed. On information and belief, Jane Roe encouraged students to submit complaints about John Noakes. One of the complaints allegedly said, "It should not matter if [Jane Roe] could not prove it. I know something bad happened."

**ANSWER: Defendant states that it learned that, on April 15, 2021, Plaintiff: (1) posted the following message on a GroupMe chat to all CWRU first year medical students, including Ms. Roe: "All glory and honor to the Most High, who is my refuge and fortress. That's all, thanks"; and (2) changed his GroupMe handle from "[Plaintiff]" to "[Plaintiff (1-0)]." Defendant further states that its School of Medicine utilizes an Early Concerns Reporting process to allow any individual to report times when a medical student's actions suggest a lapse in professionalism. Further responding, Defendant states that, in April 2021, more than 30 first-year medical students submitted Early Concerns about Plaintiff. Defendant states**

that the Early Concerns submitted and GroupMe messages speak for themselves. Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 71 of the Complaint regarding Plaintiff's or Ms. Roe's conversations or interactions with other medical students and therefore denies them. Defendant denies the remaining allegations in paragraph 71 of the Complaint.

72.     At 6:43 pm, John Noakes received an email from Darnell Parker, the Senior Associate Vice President for Equity requesting an "urgent conversation" this evening.

    a.  John Noakes and his advisors participated in a Zoom call with Parker.

    b.  Parker was visibly upset with the outcome of the hearing panel.

    c.  Parker said that he had received "complaints" but would not disclose the sources. On information and belief, Parker was acting after consulting with, and at the behest of, Dr. Ricanati.

    d.  During the Zoom call, Parker sought to intimidate John Noakes. Parker admitted that John Noakes had not violated any school rules or policies in his posts and that he was free to discuss the Title IX process with anyone. Parker told John Noakes that he needed to "watch himself." Parker then hung up on John Noakes and his attorneys.

**ANSWER: Defendant states that, upon information and belief, on the evening of April 15, 2021, Mr. Parker learned from Dr. Ricanati that several medical students were upset because of Plaintiff's GroupMe activities. Defendant further states that, upon information and belief, that same evening, Mr. Parker requested to and did meet virtually with Plaintiff and Plaintiff's counsel to discuss the concerns raised. Defendant states that, upon information and belief, during the Zoom meeting, Mr. Parker stated the GroupMe message did not**

violate the Policy and, after Plaintiff's counsel and Mr. Parker spoke over one another, Mr. Parker ended the Zoom meeting. Defendant denies the remaining allegations in paragraph 73 of the Complaint.

73. Following the panel decision, John Noakes continued to be the subject of harassment from other students as a result of his participation in the Title IX process which interfered with his education.

      a. One of Jane Roe's friends referred to John Noakes as "scum of the earth" while John Noakes was attempting to lead a group discussion.

      b. Students circulated a "petition" encouraging their classmates to refuse to work with John Noakes and demanding that "the School of Medicine ought to take clear and decisive action by expelling [John Noakes]." When John Noakes reported this to the School of Medicine, Dr. Ricanati spoke with one involved student but refused to take disciplinary action.

**ANSWER: Defendant states that, in April 2021, more than 30 first-year medical students submitted Early Concerns about Plaintiff. Defendant does not have information sufficient to form a belief as to the truth of the allegations in paragraph 73 of the Complaint regarding Plaintiff's conversations and interactions with other medical students and therefore denies them. Defendant denies the remaining allegations in paragraph 73 of the Complaint.**

74. On April 16, 2021 Dr. Ricanati and other administrators sent a whole-school email stating that, "your words have consequences." He stated that students could face discipline for "gloating over the misfortune of others."

**ANSWER: Defendant states that, in or around early 2021, several medical students were referred to the Professionalism Working Group due to social media posts, social media**

**activities, or electronic communications. Further responding, Defendant states that, on April 16, 2021, Molly Simmons, Administrative Director of the Office of Student Affairs for the School of Medicine, sent an email to all medical students on behalf of the medical school leadership team regarding professional and appropriate uses of electronic forms of communication (a copy of which is attached to ECF # 18-3 at PageID #660-1). Defendant further states that the April 16, 2021 email speaks for itself. Defendant denies the remaining allegations in paragraph 74 of the Complaint.**

75.     On April 19, 2021, Dr. Ricanati called John Noakes. Dr. Ricanati appeared to be upset about outcome the Title IX process and threatened John Noakes with institutional discipline for undisclosed inappropriate conduct. Dr. Ricanati attempted to interrogate John Noakes about his GroupMe post but refused to tell John Noakes which, if any, rules were broken. Dr. Ricanati then abruptly hung up this phone call after John Noakes sought to conference in his advisor. Dr. Ricanati stated that he was "not interested" in talking with John Noakes in the presence of an advisor.

**ANSWER: Defendant states that, in accordance with the Student Handbook and Early Concerns Reporting process, following the School of Medicine's receipt of Early Concerns related to Plaintiff's GroupMe activities, Dr. Ricanati called Plaintiff to discuss the Early Concerns Reporting process and invite Plaintiff to provide a response to the Early Concerns. Defendant denies the remaining allegations in paragraph 75 of the Complaint.**

76.     [Paragraph blank in Complaint.]

**ANSWER: Paragraph 76 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response. To the extent this Court requires a response, Defendant denies the allegations in paragraph 76 of the Complaint.**

77.     After this phone call ended, Dr. Ricanati emailed John Noakes and requested a meeting that same day outside of the presence of an advisor. In this email, Dr. Ricanati continued to threaten John Noakes with disciplinary action, stating that "the [disciplinary] process will move forward without your initial input".

**ANSWER: Defendant states that, in accordance with the Student Handbook and Early Concerns Reporting process, and based on Plaintiff's refusal to submit a response to the 30+ Early Concerns, on April 19, 2021 at 2:43 p.m., Dr. Ricanati sent an email to Plaintiff reiterating that he would like to discuss the matter with Plaintiff only and, should Plaintiff refuse to provide a response to the Early Concerns, per the Student Handbook, the Professional Working Group process would move forward without his input. Defendant denies the remaining allegations in paragraph 77 of the Complaint.**

78.     On April 19, 2021 John Noakes submitted a retaliation complaint against Dr. Ricanati and Dr. Parker with the Office of Equity.

a.  When John Noakes suggested that Dr. Ricanati should not be involved in his matter following the retaliation complaint, Dr. Ricanati refused to remove himself from the situation but, instead, told John Noakes to call the Office of General Counsel.

b.  The retaliation complaint was forwarded to another Vice President and, ultimately, CWRU retained outside counsel to conduct an investigation.

c.  John Noakes requested, but was not provided with, interim supportive measures. In particular, he requested that any disciplinary process put in motion by Dr. Ricanati be stayed pending the results of the retaliation investigation; this request was not granted.

**ANSWER:** Defendant states that, on April 19, 2021, Plaintiff submitted complaints with the Office of Equity alleging that Dr. Ricanati and Mr. Parker retaliated against him for participating in the investigation into the Sexual Assault Complaint (the "Retaliation Complaints"). Defendant further states that it retained external investigators to investigate the Retaliation Complaints. Further responding, Defendant denies that there is any disciplinary process put in motion by Dr. Ricanati. Defendant denies the remaining allegations in paragraph 78 of the Complaint.

79.     On April 21, 2021, Dr. Ricanati informed John Noakes that Dr. Marjorie Greenfield, his subordinate, would be in touch about the disciplinary process. Dr. Greenfield subsequently interrogated John Noakes about his GroupMe post. She referenced the finding of the Title IX Panel and accused John Noakes of "purposefully misinterpreting why people are upset."

**ANSWER:** Defendant states that, in April 2021, Dr. Marjorie Greenfield, Assistant Dean in the Office of Student Affairs, Dean of the Geiger Society, and Vice Chair of Faculty Development in the School of Medicine, began serving as Society Dean and advisor to Plaintiff. Defendant further states that, since April 2021, and in accordance with the Society Dean role outlined in the Student Handbook, Dr. Greenfield met with Plaintiff on several occasions to discuss his experience in medical school and to provide advice and guidance on personal, academic, and career matters. Defendant denies the remaining allegations in paragraph 79 of the Complaint.

80.     On April 21, 2021 Dr. Ricanati sent an email to a close friend of Jane Roe. This student later shared the email with the entire medical school class, except John Noakes. Dr. Ricanati referenced the Title IX case against John Noakes and encouraged the student to invite other students to a meeting to discuss various topics, including "the CWRU Title IX process" and

"Identify[ing] potential action items." John Noakes was not informed of the meeting by Dr. Ricanati or any other CWRU faculty. A copy of the message is here: [screenshot included]

**ANSWER: Defendant states that, in response an influx of questions and concerns from medical students about the Title IX process and gender-based harassment, students who asked about the Policy and process were invited to a joint listening session, coordinated by the Office of Equity, the Office of Medical Education, and the Office of General Counsel, and facilitated by Dr. Angela Clark-Taylor of the Flora Stone Mather Center for Women and Dr. Ricanati. Defendant further states that, upon information and belief, one of the students invited to the listening session forwarded the meeting information to other medical students. Defendant states that Dr. Ricanati's email speaks for itself. Defendant denies the remaining allegations in paragraph 80 of the Complaint.**

81.    On April 27, 2021 John Noakes was informed that his matter would be referred to the COS for disciplinary action, including possible dismissal. The previous day, John Noakes had complained to Dr. Greenfield that the actions of Parker and Ricanati may be retaliatory in nature and specifically objected that review by the COS appeared to be retaliatory. He was told by that "the medical school will proceed with the process without your active participation."

**ANSWER: Defendant states that, on several occasions, School of Medicine administrators explained the Early Concerns Reporting process to Plaintiff, as outlined in the Student Handbook. Defendant states that, in accordance with the Early Concerns Reporting process outlined in the Student Handbook, because Plaintiff refused to submit a response to the 30+ Early Concerns and, at least initially, refused coaching, the matter was referred to the Committee on Students. Defendant further states that, in April 2021, Plaintiff expressed to**

**Dr. Greenfield that he believed the Professionalism Working Group process was retaliatory. Defendant denies the remaining allegations in paragraph 81 of the Complaint.**

82. Over the next several weeks, John Noakes objected to a number of CWRU officials that the COS process was retaliatory. John Noakes requested that the COS process be stayed as an interim, supportive, measure while his retaliation complaints were investigated. No action was taken.

   a. On April 27, 2021, John Noakes reached out to Shirley Mosley, Dean of Students, to halt the retaliatory activity. Shirley Mosley took note of this concern, but no action was taken.

   b. On April 28, 2021, John Noakes reached out to CWRU Vice President Robert Solomon. John Noakes was notified that Solomon was on vacation and that he would address John Noakes's request upon return. John Noakes never received a response.

   c. On April 30, 2021, John Noakes reached out to Parker. Parker replied that "all questions and concerns should be directed to [the external investigators]." John Noakes proceeded to reach out to the investigators by email. His requests were ignored. During a subsequent interview related to the retaliation complaint against Dr. Parker and Dr. Ricanati, John Noakes requested that the investigators intervene to halt the COS process on an interim basis. No action was taken.

**ANSWER: Defendant states that Plaintiff communicated to several CWRU administrators that he believed the Professionalism Working Group process and/or Committee on Students proceedings were retaliatory. Defendant further states that it retained external investigators**

**to investigate the Retaliation Complaints. Further responding, Defendant states that, because the Professionalism Working Group process and Committee on Students proceedings were initiated based on Early Concerns submitted by 31 medical students, and because Dr. Ricanati and Mr. Parker were not involved in the Professionalism Working Group process and Committee on Students proceedings, CWRU did not stay or halt the proceedings. Defendant denies the remaining allegations in paragraph 82 of the Complaint.**

83.     On May 6, 2021, John Noakes met with Dr. Greenfield. During this meeting, Dr. Greenfield indicated that that she was acting at the direction of Dr. Ricanati, stating, "he's my boss".

    a.  Dr. Greenfield informed John Noakes that the School of Medicine will be conducting a review of John Noakes's Title IX decision to determine if any additional disciplinary sanctions need to be issued.

    b.  John Noakes attempted to conference in his advisor. Dr. Greenfield informed John Noakes that she was barred from discussing this matter with his advisor because his advisor was an attorney.

    c.  Dr. Greenfield accused John Noakes of not having "empathy" in regards to his dispute with Jane Roe and his GroupMe post. She told John Noakes that "if you can show insight into how other people may have been affected, and you can show empathy for other people, then [the COS] will not kick you out of school." Dr. Greenfield acknowledged that the COS would not be reviewing his matter had there been no Title IX proceedings.

**ANSWER: Defendant states that, in accordance with the School of Medicine policies and procedures, it notified Plaintiff that, following the issuance of the hearing panel outcome**

43

determination, the School of Medicine would review the matter to determine whether any professionalism issues needed to be addressed. **Defendant denies the remaining allegations in paragraph 83 of the Complaint.**

84.     On May 13, 2021, John Noakes appeared before the COS. The committee interrogated John Noakes and asked him how he expects to finish his medical school curriculum in light of the dispute with Jane Roe. The COS did not expel John Noakes. However, John Noakes was ordered to undergo empathy coaching and provide a letter from a behavioral therapist stating that he is receiving therapy.

**ANSWER: Defendant states that, on May 13, 2021, Plaintiff attended the Committee on Students meeting to discuss the Early Concerns submitted regarding his GroupMe activities. Defendant further states that, at the Committee on Students meeting, Plaintiff stated that, although he initially refused coaching, he was willing to engage with the Professionalism Working Group in the coaching process, and he acknowledged that he caused emotional pain to other students. Further responding, Defendant states that, after considering the matter, the Committee on Students referred Plaintiff to the Professionalism Working Group for professionalism coaching, to specifically address empathy (and any other issues identified by the assigned coach). Defendant admits that the Committee on Students did not expel Plaintiff. Defendant denies the remaining allegations in paragraph 84 of the Complaint.**

85.     Dr. Greenfield attempted to coerce and pressure John Noakes to take the next year off in order to accommodate the desires of Jane Roe. On July 28, 2021, Dr. Greenfield asked via email about his decision, stating, "once it is definite please let me know if it is OK to tell [Jane Roe]. She has been asking about her assignments this year." When John Noakes informed Dr. Greenfield that he did not wish to delay his education, Dr. Greenfield responded that, "It seemed

like a great opportunity! ... and would naturally separate you from [Jane Roe]. If people are advising not to do it because it seems like 'caving' or like admitting something, I would totally disagree. You have a terrific opportunity, AND we can't predict how inflamed the class is."

**ANSWER: Defendant states that, during one of their meetings, Plaintiff told Dr. Greenfield that he received an offer to work at a start-up company for one year, and that he was considering taking a year off of medical school to pursue the opportunity. Defendant further states that, consistent with her role as his advisor, Dr. Greenfield provided Plaintiff with feedback and guidance when he asked about whether he would be able to take one year off of medical school. Defendant denies the remaining allegations in paragraph 85 of the Complaint.**

86.     On August 19, 2021 the COS again had a hearing concerning John Noakes. John Noakes did not participate in this meeting. John Noakes was required to continue with "coaching for the remediation of professionalism lapses and present a new reflection at the November COS meeting."

**ANSWER: Defendant states that, because Plaintiff refused to continue with the coaching sessions he previously agreed to, the matter was referred back to the Committee on Students. Defendant denies the remaining allegations in paragraph 86 of the Complaint.**

87.     During the summer of 2021, Parker left CWRU. He was replaced as CWRU Title IX Coordinator by Rachel Lutner.

**ANSWER: Defendant states that Mr. Parker voluntarily resigned from his position of Senior Associate Vice President for Equity and University Title IX Coordinator effective June 2, 2021. Defendant further states that it hired Rachel Lutner as Senior Associate Vice President**

**– Equity and University Title IX Coordinator in June 2021. Defendant denies the remaining allegations in paragraph 87 of the Complaint.**

88.     On August 25, 2021, John Noakes was informed by Lutner that CWRU was imposing a new No Contact Directive, "at the request of [Jane Roe]".

> a.  This new No Contact Directive imposed onerous and punitive restrictions on John Noakes and interfered with his ability to participate fully in his education. John Noakes's movement was restricted to the southwest sections of the medical school campus and all classrooms; he was only permitted to use the southwest stairwell. John Noakes was also barred from posting on social media about his Title IX case.
>
> b.  Similar restrictions were placed on Jane Roe.

**ANSWER: Defendant states that, following Ms. Roe's complaints that Plaintiff was retaliating against her for the Sexual Assault Complaint, Ms. Lutner issued a no contact directive to both Plaintiff and Ms. Roe. Defendant denies the remaining allegations in paragraph 88 of the Complaint.**

89.     On August 27, 2021, and August 30, 2021, John Noakes reported two violations of the No Contact Directive by Jane Roe. John Noakes subsequently submitted evidence and photographs proving that Jane Roe was not complying with the No Contact Directive and suggested that she was deliberately attempting to provoke him.

> a.  On August 30, 2021, Lutner informed John Noakes that CWRU would not be taking any action regarding the violations that he reported. Lutner decided to revoke the updates to the NCD, stating only that CWRU expected John Noakes and Jane Roe to "stay as far away from each other as possible."

b. Lutner informed John Noakes that Jane Roe had alleged that John Noakes had committed multiple violations. John Noakes denied any violations and suggested that the allegations were false and retaliatory. John Noakes requested details of the allegations so he could provide evidence that they were fabricated; Lutner refused to tell John Noakes the details of the alleged violations.

**ANSWER: Defendant states that, in or around August 2021, Plaintiff and Ms. Roe each complained to Ms. Lutner that the other violated the no contact directive in connection with their medical school activities. Defendant further states that, as both Plaintiff and Ms. Roe are current medical students permitted to engage in activities related to their medical school education, Ms. Lutner did not find either had violated the no contact directive. Defendant denies the remaining allegations in paragraph 89 of the Complaint.**

90.     Beginning in early August 2021, when school re-started, Jane Roe and her friends engaged in a pattern of harassing and intimidating behavior. John Noakes complained to Lutner about that this conduct was interfering in his ability to complete his education and requested interim supportive measures. Lutner informed John Noakes that CWRU would not be taking any action related to these alleged violations.

**ANSWER: Defendant states that, on or around September 7, 2021, Plaintiff complained to Ms. Lutner that Ms. Roe stalked and harassed Plaintiff in October and November 2020 (the "Stalking Complaint"). Defendant further states that, based on the Office of Equity's initial assessment of the Stalking Complaint, CWRU determined that the conduct alleged did not fall under the Policy and dismissed the Stalking Complaint. Defendant denies the remaining allegations in paragraph 90 of the Complaint.**

91.     John Noakes recounted the persistent violations, stalking, and intimidating behavior to his empathy coaches. John Noakes was so distraught by the situation that he was in tears. He was informed that he should accept the situation and not expect the situation to change in the next year. John Noakes was told that CWRU would not help him but that, instead, he should instead "put his blinders on" while on campus.

**ANSWER: Defendant does not have information sufficient to form a belief as to the allegations in paragraph 91 of the Complaint regarding Plaintiff's discussions with his empathy coaches, and therefore denies them. Defendant denies the remaining allegations in paragraph 91 of the Complaint.**

92.     On August 31, 2021, John Noakes emailed Lutner about the harassment from Jane Roe and retaliation from others.

    a.  John Noakes indicated that he wished for CWRU to investigate his initial complaint against Jane Roe.

    b.  John Noakes indicated that he wished for CWRU to investigate the pattern of harassment and intimidation by Jane Roe.

    c.  John Noakes indicated that he wished CWRU to investigate retaliation against him as a result of his participating in the Title IX process.

    d.  John Noakes indicated that he wanted interim supportive measures.

**ANSWER: Defendant states that, on or around September 7, 2021, Plaintiff submitted the Stalking Complaint. Defendant further states that, based on the Office of Equity's initial assessment of the Stalking Complaint, CWRU determined that the conduct alleged did not fall under the Policy and dismissed the Stalking Complaint. Defendant denies the remaining allegations in paragraph 92 of the Complaint.**

93.    On September 1, 2021, John Noakes again met with Dr. Greenfield. She informed them that she had been talking to Doe's empathy coaches and that she hears that "things are not going well."

      a.    John Noakes recounted the persistent violations, stalking, and intimidating behavior by Jane Roe to Dr. Greenfield. In response, Dr. Greenfield said that she feels sorry that John Noakes did not take a year off; she suggested that taking a year off was the "only solution."

      b.    Dr. Greenfield stated that Title IX only makes things worse, and even though it is the "legal thing to do," that John Noakes should not pursue Title IX or consult lawyers. Dr. Greenfield indicated that even though "this is unfair" to John Noakes, in the end Title IX "only creates a toxic environment." She warned that bad things could happen to John Noakes if he pursues his Title IX complaint against Jane Roe.

**ANSWER: Defendant states that, since April 2021, and in accordance with the Society Dean role outlined in the Student Handbook, Dr. Greenfield met with Plaintiff on several occasions to discuss his experience in medical school and to provide advice and guidance on personal, academic, and career matters. Defendant denies the remaining allegations in paragraph 93 of the Complaint.**

94.    On September 3, 2021, John Noakes and his advisor spoke with Lutner. John Noakes indicated his desire to move forward with his Title IX complaint against Jane Roe.

**ANSWER: Defendant states that, on September 3, 2021, Plaintiff and Plaintiff's counsel met with Ms. Lutner to discuss allegations related to the Stalking Complaint. Defendant denies the remaining allegations in paragraph 94 of the Complaint.**

95. On September 3, 2021, John Noakes received a copy of the report on his allegations of retaliation by Parker. The investigation was woefully incomplete and unduly delayed. The delay likely has caused memories to fade and evidence to disappear.

  a. The investigator focused exclusively on the Zoom conference between Parker, John Noakes, and John Noakes' advisors and did not investigate the broader pattern of retaliation.

  b. Even though the investigator believed that the Zoom conference was important (and it was), the investigators never interviewed all of the participants on the conference.

  c. The investigator failed to obtain evidence that would confirm or dispel Parker's claimed motivation. In particular, the investigator does not appear to have sought evidence related to communications between Parker and Ricanati that resulted in the decision to reach out to the John Noakes. Parker and Ricanati were not interviewed about any conversations and any electronic communications between the two on that evening was not requested.

  d. The investigator never verified whether any complaints from students actually existed or sought to determine whether any such complaints (if they did exist) may have been motivated by an improper retaliatory purpose.

**<u>ANSWER:</u> Defendant states that, on or around September 15, 2021, the Office of Equity sent a copy of the investigation summary report regarding the Retaliation Complaint against Mr. Parker. Defendant denies the remaining allegations in paragraph 95 of the Complaint.**

96. On September 7, 2021 John Noakes spoke with Dr. Greenfield.

a. Dr. Greenfield wanted to discuss information an unidentified person has posted about Jane Roe on 'Tumblr,' a practically defunct microblogging website. John Noakes had no specific knowledge of any Tumblr post (other than a brief and nondescript mention by another medical student) and initially thought Dr. Greenfield was referring to yet another petition from Jane Roe and her friends to have him removed from the school.

    i. Dr. Greenfield did not provide any further information about the alleged Tumblr post (such as a link) nor did Dr. Greenfield explain how the posts would violate any CWRU rule or policy. Dr. Greenfield told John Noakes that even if someone else was posting information online, it was his responsibility to "de-escalate" the situation.

    ii. Dr. Greenfield threatened that John Noakes could get in trouble for the Tumblr post, even if was done without his knowledge, suggesting that it was "yet another assault on [Jane Roe]."

    iii. John Noakes was subsequently provided with a link to the Tumblr. The Tumblr does not mention Jane Roe by name; the Tumblr includes information about the relationship between John Noakes and Jane Roe and is critical of the CWRU Title IX process. The Tumblr claims to be directed "To the students in [John Noakes'] class, whether you remained silent or participated in the distortion campaign." In a separate post, the author explains that "The medical school refused to

51

accept the Title IX decision so they did an additional review of the investigation report of the title IX process."

b. During the phone call, John Noakes told Dr. Greenfield that he did not want to take a year off from his medical school studies. Dr. Greenfield responded to John Noakes, "the only way out of this for you... is... [to] step into a different class."

c. During the phone call, Dr. Greenfield tried to convince John Noakes to not pursue his Title IX Complaint against Jane Roe and threatened him with discipline if he did not comply.

    i. Dr. Greenfield told John Noakes, "you need to not make your own Title IX report... You need to just hunker down and do your own stuff if you're going to stay in the class."

    ii. Dr. Greenfield told John Noakes that in response to continued harassment from Jane Roe, he should "do the Martin Luther King approach, you know, just turn the other cheek."

d. During the phone call, Dr. Greenfield tried to convince John Noakes to not pursue his retaliation complaints.

    i. Dr. Greenfield told John Noakes that the retaliation complaints were "ill advised."

    ii. Dr. Greenfield told John Noakes, "Even if the unfairness of the situation is galling, I think what's going to be in your interest... to just say I'm just going to accept it as it is."

e.  During the phone call, Dr. Greenfield threatened John Noakes with further disciplinary action if he continued with his Title IX complaints or continued to object to unfair and retaliatory treatment.

    i.  Dr. Greenfield told John Noakes, "You're digging yourself a hole, honey."

    ii.  Dr. Greenfield told John Noakes, "I can't protect you. You know, you have to make a decision about how you're going to behave through this, and I think you are making some poor decisions...."

    iii.  Dr. Greenfield told John Noakes that he needed to stop "looking like you're causing problems." She added, "I know it doesn't feel fair. I know you feel like you know that things aren't being done in a fair way, but I'm just talking from a practical sense."

**ANSWER: Defendant states that, in September 2021, after learning of a Tumblr website containing posts about Ms. Roe, the Sexual Assault Complaint, the resulting investigation, and hearing panel outcome determination (the "Tumblr Posts"), a medical student submitted an Early Concern regarding professionalism related to the Tumblr Posts, alleging that Plaintiff was involved. In accordance with the Early Concerns Reporting process, Dr. Greenfield discussed the Early Concern with Plaintiff and invited Plaintiff to provide a response. Defendant denies the remaining allegations in paragraph 96 of the Complaint.**

97.  On September 8, 2021, John Noakes sent an email to Lutner. In the email, John Noakes stated "I want to inform you that Dr. Greenfield, my society dean, has just called me and is attempting to coerce me into backing out of my Title IX complaint filed against [Jane Roe]."

John Noakes also requested more information about the alleged Tumblr post. Lutner refused to investigate the Tumblr post.

**ANSWER: Defendant states that, on September 8, 2021, Plaintiff complained to Ms. Lutner that Dr. Greenfield called him in connection with the Tumblr Posts. Defendant denies the remaining allegations in paragraph 97 of the Complaint.**

98.    On September 10, 2020 Lutner sent an email to John Noakes about the Tumblr. She acknowledged that the Tumblr was not from John Noakes, but from a "person who described him/herself as very close to you…" and suggested the Tumblr was from Noakes' current girlfriend. Lutner said that John Noakes must "investigate who might be responsible for these Tumblr posts and ask them to stop." She threatened him with discipline if the author of the Tumblr (who, again, is not John Noakes) did not stop. John Noakes responded, "I have no knowledge of who is making the Tumblr posts and have not directed anyone to make such posts. I am under no obligation to investigate the conduct of other people. Nor can I be held responsible for the conduct of others."

**ANSWER: Defendant states that, on September 10, 2021, Ms. Lutner sent an email to Plaintiff asking Plaintiff to investigate who may be responsible for the Tumblr Posts and tell them to stop. Defendant further states that Plaintiff responded that he did not know who was making the Tumblr Posts. Defendant denies the remaining allegations in paragraph 98 of the Complaint.**

99.    On September 10, 2020 Lutner informed John Noakes that CWRU would not be investigating or taking any action in response to his complaints against Jane Roe.

    a.    Lutner claimed that Jane Roe's threats to file a Title IX complaint are not prohibited by the policy because she "subsequently filed a Title IX complaint which was sufficiently substantive to warrant an investigation

and subsequent hearing." Lutner also claimed that Jane Roe's pattern of conduct did "not constitute sexual harassment, which is the only kind of harassment prohibited by the Policy" because .... her communications "are based on the state of the relationship with you and her self-perception."

 b. Lutner claimed that Jane Roe's pattern of harassment in August 2021 was not harassment "based on sex" and did not make John Noakes fearful, but failed to consider whether Jane Roe's conduct caused John Doe mental distress or was retaliatory.

 c. John Noakes appealed this decision; no response has been received as of the date of the Complaint.

**ANSWER: Defendant states that, on September 10, 2021, the Office of Equity sent a letter to Plaintiff outlining its initial assessment of the Stalking Complaint. Defendant states that the September 10, 2021 letter speaks for itself. Further responding, Defendant states that, on September 13, 2021, Plaintiff appealed the initial assessment, which is still pending. Defendant denies the remaining allegations in paragraph 99 of the Complaint.**

 100. On September 10, 2020 Lutner also informed John Noakes that Jane Roe's complaints against John Noakes related to the Groupme post would not be pursued by the Title IX Office.

 a. This decision was unduly delayed, considering that no investigation occurred and Parker had admitted during the Zoom conference that John Doe had not violated any CWRU policies.

 b. Lutner determined that the post did not violate any No Contact Directive in place at the time.

    c.   Lutner determined that the Groupme post did not constitute prohibited retaliation.

    d.   Lutner indicated that the matter would be referred to the Medical School for disciplinary action. She wrote:

    e.   Notwithstanding that the name change... neither violated the No Contact Directive nor the retaliation provisions of the Interim Sexual Harassment Policy, your conduct certainly could be interpreted as unprofessional and may violate other university professionalism requirements. Your conduct had the effect of violating your obligation to respect the confidentiality of the process, sharing private information with your class, and creating chatter about a manner which professionalism dictates you behave discreetly.

**ANSWER: Defendant states that, on or around September 7, 2021, Ms. Roe filed a retaliation complaint against Plaintiff with the Office of Equity (the "Roe Retaliation Complaint"). Defendant further states that, on September 10, 2021, the Office of Equity sent a letter to Plaintiff outlining its determination regarding the Roe Retaliation Complaint, including a finding that there was insufficient evidence to find that Plaintiff violated the no contact directive and retaliated against Ms. Roe. Defendant states that the September 10, 2021 letter speaks for itself. Defendant denies the remaining allegations in paragraph 100 of the Complaint.**

101.    The failure of CWRU and the Medical School to adequately respond to the harassment from Jane Roe has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career. John Noakes's damages

include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages.

**ANSWER: Defendant denies the allegations in paragraph 101 of the Complaint.**

102.    The failure of CWRU and the Medical School to adequately respond to the retaliation against John Noakes has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education and to pursue a career. John Noakes's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages.

**ANSWER: Defendant denies the allegations in paragraph 102 of the Complaint.**

### COUNT I (VIOLATION OF TITLE IX – RETALIATION)

103.    Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

**ANSWER: In response to paragraph 103 of the Complaint, Defendant incorporates its admissions, denials, and statements in paragraphs 1 through 102 of this Answer.**

104.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

**ANSWER: Paragraph 104 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response. To the extent this Court requires a response,**

**Defendant states that Title IX speaks for itself. Defendant denies the remaining allegations in paragraph 104 of the Complaint.**

105. The Title IX regulations promulgated by the Department of Education provide that "No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing..."

**ANSWER: Paragraph 105 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response. To the extent this Court requires a response, Defendant states that Title IX speaks for itself. Defendant denies the remaining allegations in paragraph 105 of the Complaint.**

106. Retaliation against a person because that person has complained of sex discrimination is a form of intentional sex discrimination encompassed by Title IX's private cause of action. When a funding recipient retaliates against a person because the person participates in the investigation of allegations of sexual misconduct, this constitutes intentional discrimination on the basis of sex in violation of Title IX.

**ANSWER: Paragraph 106 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response. To the extent this Court requires a response, Defendant states that Title IX speaks for itself. Defendant denies the remaining allegations in paragraph 106 of the Complaint.**

107. John Noakes engaged in protected activity in a number of ways:

        a. John Noakes participated in various Title IX investigative and adjudicatory process. Jane Roe had filed numerous sexual misconduct

complaints against John Noakes. John Noakes participated and provided evidence in the investigations and adjudication of Jane Roe complaints.

b.  John Noakes submitted a complaint for retaliation with the Title IX Coordinator for the conduct of Ricanati and Parker in spring 2021.

c.  John Noakes submitted a complaint of retaliation against Greenfield in fall 2021.

d.  In Fall 2021, John Noakes requested that CWRU complete the investigation of his allegations against Jane Roe that had originally submitted in fall 2020.

e.  John Noakes submitted a complaint that Jane Roe violated the terms of a No Contact Order.

f.  John Noakes objected to various restrictions placed on his movements and activities as a result of complaints by Jane Roe.

**ANSWER: Paragraph 107 of the Complaint states legal conclusions to which no response is required. To the extent this Court requires a response, Defendant states that Plaintiff participated in the Office of Equity's investigations, including those involving the Sexual Assault Complaint and the Retaliation Complaints. Defendant denies the remaining allegations in paragraph 107 of the Complaint.**

108.  Despite the fact that the hearing panel exonerated John Noakes for claims that he violated the Title IX Policy, administrators at CWRU continue to treat John Noakes as 'guilty' and Jane Roe as a victim. Jane Roe's appeal was rejected, making the decision of the hearing panel final.

**ANSWER: Defendant states that the hearing panel found that Plaintiff did not violate the Policy, and that the appeals panel denied Ms. Roe's appeal of the determination. Defendant denies the remaining allegations in paragraph 108 of the Complaint.**

109.     John Noakes has been subjected to and threatened with diverse disciplinary or other adverse actions subsequent to or contemporaneous with the protected activity.

    a.  John Noakes was compelled to appear before the COS even though the COS process to review Title IX allegations is not described in the school's Title IX Procedure and, thus, constitutes clear procedural irregularities in CWRU's College's response to the allegations of sexual misconduct which will permit a plausible inference of sex discrimination.

    b.  John Noakes has been investigated for various patently frivolous and pretextual allegations of misconduct. Many of the allegations made against John Noakes, even if true, would not be violations of any CWRU rules or policies.

    c.  John Noakes was coerced to take a leave of absence from the school.

**ANSWER: Defendant denies the allegations in paragraph 109 of the Complaint.**

110.     The adverse actions against John Noakes are directly related to his participation in the Title IX process and was deigned to punish and intimidate John Noakes

**ANSWER: Defendant denies the allegations in paragraph 110 of the Complaint.**

111.     As a direct and proximate result of Defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and

emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

**ANSWER: Defendant denies the allegations in paragraph 111 of the Complaint.**

112. CWRU is liable to John Noakes for his damages.

**ANSWER: Defendant denies the allegations in paragraph 112 of the Complaint.**

113. Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

**ANSWER: Defendant denies the allegations in paragraph 113 of the Complaint.**

**COUNT II (VIOLATION OF TITLE IX- DELIBERATE INDIFFERENCE)**

114. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

**ANSWER: In response to paragraph 114 of the Complaint, Defendant incorporates its admissions, denials, and statements in paragraphs 1 through 113 of this Answer.**

115. Title IX is enforceable through an implied private cause of action.

**ANSWER: Paragraph 115 of the Complaint does not implicate Defendant and contains no factual allegations requiring a response. To the extent this Court requires a response, Defendant states that Title IX speaks for itself. Defendant denies the remaining allegations in paragraph 115 of the Complaint.**

116. John Noakes, as described *supra*, informed CWRU officials that he was the subject of discriminatory harassment from Jane Roe.

        a. The conduct of Jane Roe constitutes 'stalking,' which is prohibited by the Title IX Policy.

    b.   The conduct of Jane Roe constitutes retaliation, which is prohibited by the Title IX Policy.

    c.   The conduct of Jane Roe constituted intentionally false and malicious allegations, which is prohibited by the Title IX Policy.

**ANSWER: Defendant states that Plaintiff filed the Stalking Complaint. Defendant denies the remaining allegations in paragraph 116 of the Complaint.**

117.    John Noakes, as described *supra*, informed CWRU officials that he was the subject of retaliation from Parker, Ricanati, and Greenfield.

**ANSWER: Defendant states that Plaintiff filed the Retaliation Complaints. Defendant denies the remaining allegations in paragraph 117 of the Complaint.**

118.    CWRU officials who have the authority to address the alleged discrimination and to institute corrective measures on John Noakes' behalf had actual knowledge of Jane Roe's conduct and failed to correct such behavior in a timely manner that amounts to deliberate indifference.

**ANSWER: Defendant denies the allegations in paragraph 118 of the Complaint.**

119.    CWRU officials who have the authority to address the alleged retaliation and to institute corrective measures on John Noakes' behalf had actual knowledge of the retaliation and failed to correct such behavior in a timely manner that amounts to deliberate indifference.

**ANSWER: Defendant denies the allegations in paragraph 119 of the Complaint.**

120.    CWRU officials, including Dr. Ricanati and Parker, were disappointed in the result of the title IX process and believed that John Noakes was guilty. CWRU permitted John Noakes to be harassed by other students because he defended himself in the school process.

**ANSWER: Defendant denies the allegations in paragraph 120 of the Complaint.**

121.    As a direct and proximate result of Defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

**ANSWER: Defendant denies the allegations in paragraph 121 of the Complaint.**

122.    Particular circumstances suggest that gender bias was a motivating factor. These circumstances include:

    a.  Throughout the pendency of the disciplinary proceedings against John Noakes, the there was substantial criticism of CWRU, both in the student body and in the public media, accusing CWRU of not taking seriously complaints of female students alleging sexual assault by male students. CWRU was under pressure from students and the community to combat vigorously sexual assault against women on and the severe potential punishment—loss of all federal funds—if CWRU was found to not be in compliance with federal mandates yields a reasonable inference" of sex discrimination. Dr. Ricanati, in particular, referred to the Instagram page when he reported Jane Roe's claim to the Office of Equity.

    b.  A general atmosphere at the School of Medicine where those who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on CWRU from OCR, DOJ, student groups, and public opinion.

c. The adjudication of the claims against John Noakes occurred at the time that CWRU officials were under pressure from students to adopt a more aggressive approach to issues of sexual assault on campus and to "believe survivors."

**ANSWER: Defendant denies the allegations in paragraph 122 of the Complaint.**

123. CWRU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, CWRU and its agents demonstrated and acted on pervasive gender bias.

**ANSWER: Defendant denies the allegations in paragraph 123 of the Complaint.**

124. John Noakes has been deprived of access to educational opportunities at CWRU.

**ANSWER: Defendant denies the allegations in paragraph 124 of the Complaint.**

125. CWRU is liable to John Noakes for his damages.

**ANSWER: Defendant denies the allegations in paragraph 125 of the Complaint.**

126. Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

**ANSWER: Defendant denies the allegations in paragraph 126 of the Complaint.**

## COUNT III (BREACH OF CONTRACT)

127. Plaintiffs repeat and incorporate the allegations contained in ¶¶ 9-44 of this Complaint, as if fully set forth herein

**ANSWER: In response to paragraph 127 of the Complaint, Defendant incorporates its admissions, denials, and statements in paragraphs 1 through 126 of this Answer.**

128.    The relationship between John Noakes and CWRU is governed by a number of policies and the Student Handbook. By enrolling at CWRU, and paying his tuition and fees, and attending the school, John Noakes and CWRU had a relationship that may reasonably be construed as being contractual in nature. The terms of the contract between John Noakes and CWRU are generally found in the Student Handbook as well as various CWRU policies and procedures.

**ANSWER: Defendant states that, as a student of the School of Medicine, Plaintiff is subject to CWRU policies and procedures, including but not limited to the Policy and the Student Handbook. Defendant further states that the Policy and the Student Handbook speak for themselves. Defendant denies the remaining allegations in paragraph 128 of the Complaint.**

129.    The alleged breaches concern the following contractual provisions:

    a.  The CWRU Title IX Policy provisions concerning retaliation.

    b.  The Code of Conduct provisions concerning retaliation.

    c.  The Title IX policy requiring supporting measures.

**ANSWER: Paragraph 129 of the Complaint contains no factual allegations requiring a response by Defendant.  To the extent this Court requires a response, Defendant denies the allegations in paragraph 129 of the Complaint.**

130.    CWRU has breached these contracts by failing to investigate and respond to allegations of sexual harassment and retaliation and failing to provide supportive measures.

**ANSWER: Defendant denies the allegations in paragraph 130 of the Complaint.**

131.    CWRU has breached these contracts by continuing investigations and imposing restrictions on John Noakes that are clearly retaliatory and baseless.

**ANSWER: Defendant denies the allegations in paragraph 131 of the Complaint.**

132.    The contract between John Noakes and CWRU contains an implied covenant of good faith and fair dealing. This implied covenant prohibits CWRU from doing anything which will have the effect of destroying or injuring the right of John Noakes to receive the fruits of the contract.

**ANSWER: Paragraph 132 of the Complaint states legal conclusions to which no response is required. To the extent this Court requires a response, Defendant denies the allegations in paragraph 132 of the Complaint.**

133.    As a direct and proximate result of Defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

**ANSWER: Defendant denies the allegations in paragraph 133 of the Complaint.**

134.    CWRU is liable to John Noakes for his damages.

**ANSWER: Defendant denies the allegations in paragraph 134 of the Complaint.**

**135.    Defendant denies each and every allegation in the Complaint and prayer for relief not specifically admitted herein to be true.**

## AFFIRMATIVE DEFENSES

1.    Plaintiff's Complaint fails to state a claim upon which relief can be granted.

2.    Plaintiff's claims are barred, in whole or in part, because Defendant applied its business judgment, acted at all times in good faith, and had legitimate, non-discriminatory, non-retaliatory reasons for the actions taken with respect to Plaintiff.

3.　　Plaintiff's claims are barred, in whole or in part, because he failed to mitigate his damages, the existence of which Defendant denies.

4.　　Plaintiff is estopped by his own acts or omissions from bringing some or all of the claims in the Complaint.

5.　　Pursuant to the Policy, CWRU is currently in the process of conducting investigations into the Retaliation Complaints and the complaint about the Tumblr Posts, which investigations are ongoing.

6.　　CWRU has not yet completed its investigations, nor has it issued any findings related to the Retaliation Complaints and the complaint about the Tumblr Posts. Thus, Plaintiff lacks standing to bring this lawsuit and/or this matter is not yet ripe for adjudication.  *See, e.g., Doe v. The Ohio State Univ., et al.*, 136 F.Supp.3d 854 (S.D. Ohio 2016) (denying student's motion for temporary restraining order and preliminary injunction and finding the plaintiff's claims are not yet ripe where "there has been no… hearing, no decision, no sanction").

7.　　Because CWRU's investigations are ongoing, there has been no outcome of CWRU's ongoing investigations, and thus, there can be no erroneous outcome.

8.　　Plaintiff's gender had (and has) nothing to do with Defendant's actions in this matter.

9.　　Plaintiff's Title IX claims (Counts I and II) fail because the alleged procedural flaws were not motivated by gender bias.

10.　　Defendant did not abuse its discretion in administering CWRU's policies and procedures.

11.　　As a CWRU student, Plaintiff was (and is) only entitled to the process and procedures as outlined in the Policy.

12.     Defendant did not depart from accepted academic norms, and did not demonstrate a lack of professional judgment with respect to Plaintiff.

13.     Defendant at all times complied with its obligations under Title IX.

14.     Defendant at all times complied with the Policy.

15.     Defendant at all times complied with the Student Handbook.

16.     Defendant made no specific promises to Plaintiff, and thus, Defendant could not have breached any alleged promises.

17.     Defendant did not breach any duties allegedly owed to Plaintiff.

18.     Plaintiff's breach of contract (Count III) claim fail because CWRU did not abuse its discretion in administering its policies and procedures.

19.     Defendant is not subject to liability under Title IX because it is a private university that has an effective policy for reporting and redressing sexual harassment and other types of sex discrimination.

20.     Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to exhaust administrative remedies available to him.

21.     Because Plaintiff's Complaint fails to state a valid claim, Plaintiff is not entitled to the declaratory judgment or injunctive relief he seeks.

22.     To the extent Plaintiff is seeking compensatory damages, the availability of such damages is limited by R.C. § 2315.18.

23.     Plaintiff's claims are barred because Defendant did not proximately cause injury to Plaintiff.

24.     Defendant expressly reserves the right to assert and pursue additional defenses that may become known through discovery or otherwise.

WHEREFORE, Defendant demands that the claims against it raised in the Complaint be dismissed in their entirety with prejudice, that judgment be entered in Defendant's favor, and that it recover its costs and expenses, including reasonable attorney's fees, and such other and further relief to which Defendant may be entitled at law or in equity or as this Court deems just and appropriate.

Respectfully submitted,

/s/ *Amanda T. Quan*

John Gerak (0075431)
Amanda T. Quan (0086623)
Alexandria A. Gardella (0100000)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Key Tower
127 Public Square, Suite 4100
Cleveland, OH  44114
216-241-6100
216-357-4733 (FAX)
Email:  john.gerak@ogletree.com
          amanda.quan@ogletree.com
          alexandra.gardella@ogletree.com

*Attorneys for Defendant Case Western Reserve University*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27th, 2021, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system, including the following:

Joshua Adam Engel
Anne Tamashasky
Engel and Martin, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
engel@engelandmartin.com

*Attorneys for Plaintiff*

*/s/ Amanda T. Quan*
*One of the Attorneys for Defendant Case Western Reserve University*

48648843.6