```
                    1
 1       IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF OHIO
 3             CASE NO. 1:21-cv-1776-PAB
 4                       - - -
 5
 6  JOHN NOAKES,
 7  Plaintiff,
 8  -vs-
 9  CASE WESTERN RESERVE UNIVERSITY,
10  Defendant.
11
12                       - - -
13
14       Deposition of DARNELL PARKER, Ed.D., a
15  witness herein, via Zoom videoconferencing, taken by
16  the Plaintiff as upon cross-examination and pursuant
17  to the Federal Rules of Civil Procedure and Notice and
18  agreement of counsel as to time and place and
19  stipulations hereinafter set forth, on Wednesday,
20  November 24, 2021, at 2:03 p.m., before Pamela L.
21  Jackson, a Notary Public within and for the State of
22  Ohio.
23
24                       - - -
25
             Jackson-Whitney Reporting LLC
                    513.868.1919
```

```
                                                   2
 1                   I N D E X
 2  Witness:                                   Page:
 3  DARNELL PARKER, Ed.D.
 4
 5  Cross-Examination
    By Mr. Engel, Esq.                           5
 6
 7  Plaintiff's Exhibit No.:           Page Marked:
 8  33 ..............................................  11
      (Case Western Reserve University Interim Sexual
 9    Harassment Policy And Procedures For All
      Faculty, Students, Employees, And Third Parties)
10
...
25
             Jackson-Whitney Reporting LLC
                    513.868.1919
```

```
                                                   3
 1  APPEARANCES:
 2       For the Plaintiff:
 3           Joshua Adam Engel, Esq.
                of
 4           Engel & Martin, LLC
             4660 Duke Drive
 5           Suite 101
             Mason, OH  45040
 6           Phone: 513.445.9600
             engel@engelandmartin.com
 7
 8       For the Defendant:
 9           Amanda T. Quan, Esq.
                of
10           Ogletree, Deakins, Nash, Smoak &
             Stewart, P.C.
11           127 Public Square
             4100 Key Tower
12           Cleveland, OH  44114
             Phone: 216.241.6100
13           amanda.quan@ogletree.com
14
15                     - - -
...
25
             Jackson-Whitney Reporting LLC
                    513.868.1919
```

```
                                                   4
 1              S T I P U L A T I O N S
 2       It is stipulated by and between counsel
 3  for the respective parties that the deposition of
 4  DARNELL PARKER, Ed.D., a witness herein, called as
 5  upon cross-examination by the Plaintiff, may be taken
 6  at this time and place pursuant to the Federal Rules
 7  of Civil Procedure and Notice and agreement of counsel
 8  as to time and place of taking said deposition; that
 9  the deposition was recorded in stenotypy by the court
10  reporter, Pamela L. Jackson, and transcribed out of
11  the presence of the witness; and that said deposition
12  is to be submitted to the witness for his examination
13  and signature, and that signature may be affixed out
14  of the presence of the Notary Public.
15
16                     - - -
...
25
             Jackson-Whitney Reporting LLC
                    513.868.1919
```

6

```
 1                DARNELL PARKER, Ed.D.,
 2   of lawful age, a witness herein, being first duly
 3   sworn as hereinafter certified, was examined and
 4   deposed as follows:
 5                   CROSS-EXAMINATION
 6   BY MR. ENGEL:
 7        Q      Would you please state and spell
 8   your name?
 9        A      My name is Darnell Parker,
10   D-a-r-n-e-l-l, last name P-a-r-k-e-r.
11        Q      Where are you currently employed?
12        A      I am currently employed at
13   Wheaton College.
14        Q      And how long have you been employed
15   there?
16        A      Four months.
17        Q      Were you employed at Case Western
18   before that?
19        A      Yes.
20        Q      What were your job duties at
21   Case Western?
22        A      At Case Western Reserve University
23   I was the Senior Associate Vice President for Equity.
24        Q      And what did that job entail?
25        A      I oversaw the sexual harassment
```

```
 1   policy and regulations at the college as well as all
 2   other forms of discrimination and harassment.
 3        Q      How long did you hold that
 4   position?
 5        A      I held that position since -- I
 6   want to say 2020.  I could be wrong.  Well, that
 7   position, yes, since 2020.
 8        Q      Since you no longer work for
 9   Case Western is Ms. Quan and her law firm representing
10   you in this matter?
11        A      Excuse me.  Can you repeat that
12   again?
13        Q      Are you represented by Amanda and
14   her law firm?
15        A      Yes, I am.
16        Q      Okay.  So if we need to serve you
17   with any papers can we send it to -- to counsel?
18        A      That is correct.
19        Q      Okay.  If that relationship ends
20   will you let us know so that we will know how to get
21   in touch with you if we need to?
22        A      I will make sure I consult with
23   Ms. Quan.
24               MR. ENGEL:  And, Amanda, that's
25        okay with you?  You'll accept any service of
```

7

```
 1        anything that we need to send to him?
 2               MS. QUAN:  Yes.
 3               MR. ENGEL:  Thank you.
 4   BY MR. ENGEL:
 5        Q      Before we begin I -- I like to
 6   remind people of a couple different things:  First are
 7   you familiar with the matter that brings you here
 8   today?
 9        A      Can you be specific?
10        Q      Well, I try -- We try to avoid
11   putting student names in the record, so I just want to
12   make sure you understand the students that we're
13   talking about here today?
14        A      And again I ask you can you be
15   specific?
16               MR. ENGEL:  Let's go off the
17        record.
18               (Off-the-record discussion.)
19               MR. ENGEL:  Okay.  Let's go back on
20        the record.
21   BY MR. ENGEL:
22        Q      So we discussed off the record the
23   students involved.  As I indicated we try not to put
24   student names in the record, so if I refer to the male
25   student as John Noakes and the female student as
```

8

```
 1   Jane Roe you understand who we're talking about?
 2        A      That's correct.
 3        Q      Okay.  And are you comfortable
 4   using those names instead of the real names of the
 5   students?
 6        A      Yes.
 7        Q      Okay.  I tell everyone there's no
 8   punishment if you make a mistake or if I make a
 9   mistake.  We have got an agreement that we can just
10   change or redact the record if necessary.  Is that
11   okay with you?
12        A      That's okay with me.
13        Q      I will do my best -- Well, back up.
14               Have you ever been deposed before?
15        A      Yes.
16        Q      How many times?
17        A      Once.
18        Q      And what was the reason for that?
19        A      It had to do with something at
20   CWRU.
21        Q      What particularly did it have to
22   deal with?
23        A      It had to deal with a case that
24   occurred prior to my arrival at CWRU.
25        Q      What kind of case was it?
```

10

```
 1      A      Title IX, I believe.
 2      Q      Was it a case about the manner in
 3  which Case Western handled Title IX investigations?
 4      A      I don't remember.  It was a long
 5  time ago.
 6      Q      Okay.  What do you remember about
 7  the -- the case?
 8      A      Again I really don't remember.
 9      Q      Okay.  Having been in a deposition
10  before -- And I'm -- I'm sure you have been well
11  prepared by counsel -- you probably understand the
12  drill here.
13             A couple of things I like to go
14  over:  First is I will do my best to ask clear and
15  concise questions, but I don't always succeed in that
16  task, so I would ask you if you don't understand any
17  question I ask to please ask me to clarify and I will
18  do so.  Are you comfortable doing that?
19      A      Yes, sir.
20      Q      All your answers need to be verbal,
21  so those normal human reactions of shaking your head,
22  nodding your head, gesturing with your hands, can't be
23  picked up by our court reporter.  Are you comfortable
24  with making sure all your answers are verbal?
25      A      Yes.
```

```
 1      Q      We're conducting this deposition
 2  over Zoom which is a wonderful technology, but
 3  occasionally there is a delay in the Internet or
 4  something like that, and so it may be that we will
 5  talk over each other.  I will apologize in advance if
 6  I do so.  I'd ask that you let me know if you haven't
 7  had a chance to fully answer your questions and we
 8  will give you a chance to do so; okay?
 9      A      Thank you.
10      Q      Finally I tell everyone that this
11  is not a hostage situation, so if you feel that you
12  need to take a break at any time please let us know
13  and we will do our best to accommodate that.  The only
14  thing I would ask is that if there's a question
15  pending or a line of questions pending we finish that
16  up and then we'll take our break; fair enough?
17      A      Sounds cool.
18      Q      Do you have any questions before we
19  begin?
20      A      I do not.
21      Q      Okay.  So are you familiar with the
22  Case Western Title IX policies that were in effect in
23  April of 2021?
24      A      Yes.
25      Q      Did those policies prohibit
```

11

```
 1  retaliation against students involved in the Title IX
 2  process?
 3      A      The policy outlines what is
 4  prohibited by the University.
 5      Q      And so what is prohibited by the
 6  University in terms of retaliation, if you remember?
 7      A      I would have to see the policy.  I
 8  don't remember.
 9      Q      Okay.  Let's do this.  Let's mark
10  that as Exhibit 33.
11             (Plaintiff's Exhibit 33 was marked
12             for identification.)
13  BY MR. ENGEL:
14      Q      I'm showing you a document titled
15  "Interim Sexual Harassment Policy And Procedures For
16  All Faculty, Students, Employees, And Third Parties
17  Case Western Reserve University," and note this was
18  filed in this case as Document No. 1-3.
19             MS. QUAN:  Josh, I -- I don't --
20             MR. ENGEL:  You can't see it yet
21       because I haven't hit Share Screen.
22             MS. QUAN:  All right.
23             MR. ENGEL:  There we go.  Now you
24       should be able to see that document which I
25       just described.
```

12

```
 1  BY MR. ENGEL:
 2      Q      Are you able to do so?
 3      A      Yes.
 4      Q      Okay.  And is this the policy that
 5  was in effect at the -- at the time of April, 2021?
 6      A      I believe so.
 7      Q      If we turn to Page 22 there's a
 8  section on Retaliation.  Is that what you were
 9  referring to a couple moments ago?
10      A      I would like a chance to read it if
11  you don't mind.
12      Q      Take your time.  Let me know when
13  you're ready.
14             Are you ready?
15      A      Yes.
16      Q      Let me first -- first ask you about
17  protected activity by students.  Is participating in
18  the Title IX process protected activity?
19      A      It is --
20             MS. QUAN:  Objection.
21      A      -- yes.
22             MR. ENGEL:  Do you want to explain,
23       Amanda?
24             MS. QUAN:  I'm so sorry.  Darnell,
25       you can still continue to answer unless I
```

13

1         instruct you not to, and sorry for cutting
2         you off there.
3         A     No. I was going to ask can he
4 repeat the question? He was going in and out. I
5 apologize.
6             MR. ENGEL: Pam, can you read it
7         back, please.
8             (Question on Page 12, Lines 16
9             through 18, was read back by the
10            reporter.)
11 BY MR. ENGEL:
12         Q     All right. Let's start over.
13             Is participating in the Title IX
14 process considered to be protected activity?
15             MS. QUAN: Objection.
16         Q     You can answer.
17         A     What is written in the policy and
18 federal law would answer that question, so whatever is
19 written under federal law.
20         Q     I want to know your understanding.
21 What -- What is your understanding of the policy?
22         A     My understanding of the policy is
23 that the federal government wrote that if someone
24 participates in a protected activity under the
25 Title IX it is a protected activity.

Jackson-Whitney Reporting LLC
513.868.1919

14

1         Q     So if a student defends themselves
2 against allegations that they committed misconduct is
3 that considered to be protected activity?
4             MS. QUAN: Objection.
5         A     The individual needs to file a
6 complaint with the University and we will investigate
7 according to what's outlined in the Interim Sexual
8 Harassment Policy.
9             MR. ENGEL: Pam, can you please
10         read the question back and maybe Dr. Parker
11         can answer it this time?
12             (Question on Lines 1 through 3 was
13            read back by the reporter.)
14         A     Again --
15             MS. QUAN: Objection. Sorry.
16         A     Again if a student files a
17 complaint with the office we will look into it based
18 on what's outlined in the Interim Sexual Harassment
19 Policy.
20         Q     Your job is --
21         A     It's not our job to determine what
22 you're asking me in that question.
23         Q     Your job is to enforce this policy;
24 correct?
25         A     My job is to enforce any policy at

Jackson-Whitney Reporting LLC
513.868.1919

15

1 the University as an employee.
2         Q     And that includes specifically
3 Exhibit 33; right?
4         A     Is this Exhibit 33?
5         Q     This is Exhibit 33, yes.
6         A     That's correct.
7         Q     And particularly your job as --
8 You -- You were specifically -- Let me back up.
9             In particular you were hired to
10 enforce this policy; right?
11             MS. QUAN: Objection.
12         A     I was hired to be the Title IX
13 Coordinator for Case Western Reserve University.
14         Q     And as the Title IX Coordinator it
15 was your job to implement and enforce the Title IX
16 policy that we have marked as Exhibit 33; right?
17         A     That's correct.
18         Q     In order to do your job you had to
19 understand what this policy meant; correct?
20         A     Yes.
21         Q     So I'm asking you if a student
22 defends themselves against allegations of sexual
23 misconduct have they engaged in protected activity?
24             MS. QUAN: Objection.
25         A     And again, as I stated, if someone

Jackson-Whitney Reporting LLC
513.868.1919

16

1 brings a complaint to my office we will investigate it
2 according to this policy.
3             MR. ENGEL: Amanda, if this witness
4         is not -- It's late on a Wednesday afternoon
5         before the holiday. If the witness is not
6         going to answer the question we'll just go
7         get an order from the judge and we'll suspend
8         the deposition and -- and go forward.
9             I feel like the witness is being
10         nonresponsive and evasive, and I don't know
11         if you want to take a few minutes to talk to
12         him or how you want to handle this, but I'm
13         not going to spend -- I'm not going to spend
14         three hours on the night before a holiday
15         dealing with a witness who refuses to answer
16         simple questions.
17             MS. QUAN: Okay. I can certainly
18         talk to him, but I mean I think he has
19         answered the question. If you ask him under
20         the policy I think that's a different
21         question.
22             MR. ENGEL: I asked -- I am asking
23         under the policy and he keeps saying, "We'll
24         enforce the policy," but that's
25         nonresponsive. I'm asking him his

Jackson-Whitney Reporting LLC
513.868.1919

                                                                18

 1        understanding of the policy.
 2                 MS. QUAN:  Okay.
 3                 MR. ENGEL:  Why don't you talk to
 4        him -- Why don't you talk to him.  We'll go
 5        off the record.  Why don't you talk to him
 6        and we'll come back and see if we're able to
 7        continue this deposition or not; okay?
 8                 MS. QUAN:  All right.
 9                 MR. ENGEL:  All right.  We're off
10        the record.
11                 (Deposition stood in recess at
12                 2:19 p.m.)
13                 (Deposition reconvened at
14                 2:21 p.m.)
15   BY MR. ENGEL:
16        Q        Okay.  Sir, I am asking you about
17   your understanding of the Title IX policy at
18   Case Western while you were there -- Do you understand
19   that?
20        A        Yes, I do.
21        Q        Okay.  Is it your understanding of
22   the policy that a student engages in protected
23   activity if they defend themselves during a Title IX
24   investigation?
25        A        Can you -- Can you share with me

Jackson-Whitney Reporting LLC
513.868.1919

                                                                
 1   what you mean by "defend"?
 2        Q        Are you familiar with the term
 3   "defend", what it means?
 4        A        I am not familiar in the way you're
 5   using it.  I am really trying to answer --
 6        Q        It's a common --
 7        A        -- your question.
 8        Q        -- English definition.
 9        A        Can you repeat the question again?
10                 MR. ENGEL:  Pam, can you read it
11        back, please?
12                 (Question on Page 17, Lines 21
13                 through 24, was read back by the
14                 reporter.)
15        A        If you're asking me if a student
16   has the right to say what they want to say as a part
17   of a Title IX process then that is correct.
18        Q        Okay.  And is that considered to be
19   protected -- protected activity under Section N of the
20   Case Western Title IX policy?
21        A        Can you say that again?
22                 MR. ENGEL:  Pam, can you read it
23        back again, please?
24                 (Question on Lines 18 through 20
25                 was read back by the reporter.)

Jackson-Whitney Reporting LLC
513.868.1919

                                                                19

 1        A        Yes, unless it falls in the third
 2   paragraph which says it makes an attempt to make an
 3   adverse action by intimidating, threatening, coercing,
 4   harassing, or discriminating against any individual
 5   for the purpose of interfering with any right or
 6   privilege secured by our policy because the individual
 7   has made a report or complaint, testified, assisted,
 8   participated, or refused to participate in any manner
 9   in an investigation, proceeding, or hearing under this
10   policy and procedure.
11        Q        So are you saying that a person by
12   defending themselves against allegations they have
13   committed misconduct may be intimidating, threatening,
14   coercing, harassing another person?
15                 MS. QUAN:  Objection.
16        A        I am not saying that.
17        Q        Well, how would that work?  Give me
18   an example of a situation where a person who is
19   defending themselves against an allegation that they
20   committed misconduct is not engaging in protected
21   activity?
22                 MS. QUAN:  Objection.
23        A        Again people can say what they
24   freely will under the Title IX process, but for any
25   individual, whether it's the Complainant or

Jackson-Whitney Reporting LLC
513.868.1919

                                                                20

 1   Respondent, if the information causes an adverse
 2   action as outlined in this policy, even though it's
 3   protected activity as the policy states, it could be
 4   prohibited.
 5        Q        What is an adverse action?
 6        A        An adverse action is anything that
 7   interferes with the process of the individual from
 8   obtaining their education at the institution.
 9        Q        Are students allowed to criticize
10   the Case Western Title IX process?
11                 MS. QUAN:  Objection.
12        A        Yes.
13        Q        Is that considered to be protected
14   activity?
15                 THE WITNESS:  Excuse me for a
16        minute.  My apologies.
17                 MS. QUAN:  Bless you.
18                 THE WITNESS:  Sorry.  Allergies.
19        A        Can you repeat the question?
20                 MR. ENGEL:  Can you repeat it,
21        please, Pam?
22                 (Question on Lines 13 and 14 was
23                 read back by the reporter.)
24        A        Yes.
25        Q        Is it proper to discourage someone

Jackson-Whitney Reporting LLC
513.868.1919

```
                                              22
 1   from filing a Title IX complaint?
 2            MS. QUAN:  Objection.
 3       A    It is not.
 4       Q    Is it proper to encourage someone
 5   to drop a Title IX complaint?
 6            MS. QUAN:  Objection.
 7       A    Can you repeat that again?
 8            MR. ENGEL:  Can you repeat the
 9       question, please, Pam?
10            (Question on Lines 4 and 5 was read
11            back by the reporter.)
12       A    No.
13       Q    Would that be considered to be
14   retaliatory behavior?
15            MS. QUAN:  Objection.
16       A    I -- I can't say.
17       Q    Why do you say it's improper then?
18       A    Because the law states under the
19   Department of Education you shouldn't discourage
20   anyone from making a complaint or dropping a
21   complaint.
22       Q    So if someone said to a student,
23   "You need to not make your own Title IX report," would
24   that be proper?
25            MS. QUAN:  Objection.
```

```
 1       A    Can you be specific when you say
 2   "someone"?
 3       Q    Yeah.
 4            If someone said to John Noakes that
 5   he shouldn't file a Title IX complaint against
 6   Jane Roe would that have been proper?
 7            MS. QUAN:  Objection.
 8       A    Again it depends on who you are
 9   referring to telling the individual not to file a
10   complaint.
11       Q    If a faculty member says that he
12   should not file a complaint would that be considered
13   proper?
14            MS. QUAN:  Objection.
15       A    I would never advise a faculty
16   member to tell any individual that.
17       Q    Why not?
18       A    As I stated before, the federal --
19   the Department of Education has guidelines that we
20   must follow.
21       Q    I'm going to show you what we
22   marked as Exhibit 32, this email exchange between you
23   and Dr. Ricanati.  Do you remember Dr. Ricanati?
24       A    I do.
25       Q    Okay.  And I want to first let you
```

```
                                              23
 1   know -- I'm sorry -- direct your attention to your
 2   email at 4:20 p.m.  By the way, this is on Bates No.
 3   412.  You emailed Dr. Ricanati to let him know that
 4   both students received their outcome letters.  Why --
 5   Why did you send him that email?
 6       A    I sent him that email so that they
 7   can provide support for both students.
 8       Q    Okay.  Did you believe that some
 9   students would be upset by this outcome?
10       A    I wouldn't know.
11       Q    Do you have any reason to think
12   that other students at the medical school would be
13   upset by this outcome?
14       A    I wouldn't know.
15       Q    Is it fair to say that in the
16   months preceding this investigation Case Western
17   Reserve University had been criticized by students for
18   the manner in which it handled Title IX
19   investigations?
20            MS. QUAN:  Objection.
21       A    Yes.
22       Q    There was an Instagram group,
23   CWRU Survivors, for example.  Are you familiar with
24   that?
25       A    I am.
```

```
                                              24
 1       Q    Okay.  And what was the reaction of
 2   the University to this pressure on it?
 3            MS. QUAN:  Objection.
 4       A    I honestly don't remember.
 5       Q    Do you remember if Jane Roe had
 6   posted anything on the CWRU Survivors' Instagram page?
 7       A    I don't remember.
 8       Q    Do you remember if she had
 9   discussed this matter with Dr. Ricanati?
10            MS. QUAN:  Objection.
11       A    Again I don't remember.
12       Q    Do you remember if it was
13   Dr. Ricanati who originally made the report of the
14   allegations against John Noakes to the Equity Office?
15       A    If my memory serves me correctly
16   Mr. Noakes reported it to the office first.
17       Q    Okay.  And then after that
18   Dr. Ricanati reported it?
19       A    I don't remember, but maybe.  I --
20   I don't know.
21       Q    And then at some point there was a
22   decision made to investigate Jane Roe's allegations
23   before John Noakes; correct?
24       A    I -- I really can't remember that
25   far back.
```

26

```
 1         Q        Okay.  Do you remember if when
 2   Dr. Ricanati reported it to the Equity Office he
 3   specifically referenced the CWRU Survivors' Instagram
 4   page?
 5         A        Again I do not remember that far
 6   back.
 7         Q        So did you have any conversations
 8   before April 15th with anyone in the medical school
 9   about this matter?
10                  MS. QUAN:  Objection.
11         A        Could you be more specific when you
12   mean "contact"?
13         Q        Sure.
14                  Did you have any conversations with
15   any faculty at the medical school discussing the
16   John Noakes/Jane Roe investigation?
17         A        I did not have a discussion with
18   anyone in the medical school about the investigation.
19         Q        Did anyone indicate to you a
20   preference in the medical school for how the
21   investigation would turn out?
22         A        No.
23         Q        Are you aware of a policy at the
24   medical school to independently review all Title IX
25   investigations once the Office of Equity process is
```

Jackson-Whitney Reporting LLC
513.868.1919

```
 1   completed?
 2         A        I am aware of a professionalism
 3   policy that covers any aspect of the University.
 4         Q        Are you aware of a practice by the
 5   medical school of independently reviewing Title IX
 6   investigations after the equity process is completed?
 7         A        Again I can only speak to my
 8   process.  I know they have a professionalism policy
 9   that covers things at the University.
10         Q        So I'm -- I'm going to ask you a
11   very specific question.  I was told that there is an
12   internal policy of the Committee on Students at the
13   medical school to review all Title IX matters.  Do you
14   have any knowledge of that?
15         A        Again I am only aware of that -- of
16   that committee that reviews all issues that come up
17   with students.
18         Q        Do you know if they reviewed this
19   matter?
20         A        I actually do not.
21         Q        Do you know if they ever reviewed
22   any matters that you did?
23         A        I don't remember.
24         Q        Have you ever seen this policy?
25         A        I -- I honestly can't remember.
```

Jackson-Whitney Reporting LLC
513.868.1919

27

```
 1   I'm trying to be honest.  I really don't remember.
 2         Q        So on April 15th of 2021 it appears
 3   Dr. Ricanati asked you to call him.  Did you do so?
 4         A        That's what the email says, yes.
 5         Q        Okay.  Tell me everything you
 6   remember about that conversation?
 7         A        I remember him just telling me that
 8   there was a message posted to the M1 GroupMe chat that
 9   students were upset about.
10         Q        How long was your conversation with
11   Dr. Ricanati?
12         A        I really don't remember.
13         Q        What else did he tell you about?
14         A        That's pretty much what he shared
15   with me that there was a post posted to the M1 GroupMe
16   chat and students were upset about it.
17         Q        Did he tell you what precisely the
18   students were upset about?
19         A        He told me -- He shared with me
20   that students were upset by the changing of the name
21   to 1-0.
22         Q        Did he indicate that he had been
23   speaking with Jane Roe?
24         A        I don't remember.
25         Q        Did he indicate that she was upset?
```

Jackson-Whitney Reporting LLC
513.868.1919

28

```
 1         A        I don't remember.
 2         Q        Did you review the post in the
 3   GroupMe chat from John Noakes?
 4         A        Yes.
 5         Q        And -- And just real quick is there
 6   anywhere in the Case Western policy that requires
 7   students to keep the Title IX process confidential?
 8         A        No.
 9         Q        You as a school representative are
10   required by FERPA to keep it confidential; right?
11         A        That would be correct.
12         Q        Okay.  Does that apply to students
13   as well?
14         A        Can -- Can you be more specific in
15   your question?
16         Q        Yeah.
17                  I mean does the FERPA policy at the
18   school restrict the ability of students to disclose
19   information?
20         A        I -- I still -- I'm sorry.  I still
21   don't understand your question.
22         Q        Yeah, I'm -- I'm -- I'm asking a
23   bad question.  I apologize.
24                  Am -- Am I right in understanding
25   that there's nothing -- no policy at Case Western that
```

Jackson-Whitney Reporting LLC
513.868.1919

29

```
 1   requires students to keep anything about the Title IX
 2   process confidential; is that correct?
 3        A      That is correct.
 4        Q      So if the students wanted to post
 5   on the Internet every piece of correspondence they got
 6   from the Title IX Office they're permitted to do that;
 7   aren't they?
 8               MS. QUAN:  Objection.
 9        A      They can.
10        Q      They could take out an ad in the
11   Plain Dealer and publish the decision letter from the
12   office and there wouldn't be any rule against that
13   either; would there?
14               MS. QUAN:  Objection.
15        A      They could, but we always tell
16   students to use their discretion to make sure that
17   we're protecting their privacy.
18        Q      Okay.  But if they want to disclose
19   information they can do that; right?
20               MS. QUAN:  Objection.
21        A      Federal law says they can.
22        Q      And if they have, you know,
23   information from their accuser that they got
24   independently of the investigation they could share
25   that with whoever they wanted to; couldn't they?
```

Jackson-Whitney Reporting LLC
513.868.1919

30

```
 1               MS. QUAN:  Objection.
 2        A      If they -- If they wanted to.
 3        Q      No rule prohibits them from doing
 4   that?
 5               MS. QUAN:  Objection.
 6        A      I think I answered that question
 7   already.
 8        Q      So I think you indicated you
 9   reviewed the GroupMe post from John Noakes?
10        A      That is correct.
11        Q      Okay.  And this is the post that
12   you see on your screen that we have marked as
13   Exhibit 1, Bates No. 414?
14        A      That's correct.
15        Q      And do you have any concerns that
16   this post violated a policy at Case Western?
17               MS. QUAN:  Objection.
18        A      My concern was just to make sure
19   that the student was aware that the concern was
20   brought to my attention.
21        Q      Okay.  Let me ask you a more
22   specific question.
23               As you reviewed that post on
24   April 15th, 2021, did you believe it violated the
25   Case Western Reserve University Title IX policy?
```

Jackson-Whitney Reporting LLC
513.868.1919

31

```
 1        A      Again I had no opinion at that
 2   time.
 3        Q      Did you make a decision to call
 4   John Noakes?
 5        A      Yes.  I'm pretty sure you were
 6   copied on that email.
 7        Q      Okay.  Well, I'm asking you why did
 8   you want to have a conversation with him?
 9        A      I wanted to have a conversation
10   with him to let him know that I received concerns that
11   students were upset at the School of Medicine.
12        Q      And did you engage in that
13   conversation with him over Zoom?
14        A      I engaged in that conversation with
15   you and his other advisor.
16        Q      And him too; right?
17        A      No.  Actually Mr. Noakes turned off
18   his camera while he was in the car and he stated that
19   his advisors would be speaking for him.
20        Q      Okay.  But he was on the call
21   still, though; wasn't he?
22        A      I can't say if he was or not.  He
23   turned off his camera.
24        Q      Okay.  But he didn't log out of the
25   Zoom call?
```

Jackson-Whitney Reporting LLC
513.868.1919

32

```
 1        A      I -- I -- I don't know.
 2        Q      So -- And do you remember during
 3   that conversation being asked specifically what policy
 4   at Case Western this post violated?
 5        A      I do.
 6        Q      And do you remember what your
 7   answer was?
 8        A      Yes.  I said to you and his advisor
 9   that I was not calling to say there was a policy
10   violation.  I was just calling to let him know that
11   concern was brought to my attention.
12        Q      What else do you remember from the
13   conversation?
14        A      I remember at that point you and
15   the advisor started asking me questions and telling me
16   I'm violating Mr. Noakes' religious rights when I
17   actually said I was not, I had no concern with what he
18   wrote in the post.
19        Q      What else do you remember from that
20   conversation?
21        A      At that point I do remember you and
22   the other advisor who was a female continuing to speak
23   over me.  At that point in time you specifically said
24   you wanted to file a complaint against me and the
25   Office of Equity for retaliation against Mr. Noakes.
```

Jackson-Whitney Reporting LLC
513.868.1919

33

1  Q    What did you do next?
2  A    At that point I said, "Okay," and
3  then at that point in time you and the advisor kept
4  yelling at me, "No. I want to know what you're going
5  to do right now. I want this retaliation complaint
6  filed." At that point I said, "I will let my
7  supervisor know," and I ended the call because both
8  you and the advisor were pretty much raising your
9  voices at me.
10 Q    And so was a retaliation complaint
11 eventually filed?
12 A    Yes, there was.
13 Q    What's the process when a
14 retaliation complaint is filed?
15 A    Once a retaliation complaint is
16 filed with my office I would assign investigators to
17 review it, but since the complaint was against me I
18 recused myself from the process.
19 Q    Was the complaint also filed
20 against Dr. Ricanati?
21 A    I -- I -- I don't know. I don't
22 remember.
23 Q    What is the process in the office
24 for notifying people that a complaint has been filed
25 against them?

Jackson-Whitney Reporting LLC
513.868.1919

34

1  A    We send the notice out to let them
2  know that there is a complaint filed and help
3  understand their rights and let them know who the
4  investigators will be looking into the matter.
5  Q    How soon is that notice usually
6  sent out?
7  A    It depends on the situation.
8  Q    Did you discuss your phone call
9  with Mr. Noakes and his advisors with anyone at the
10 medical school?
11 A    I don't remember.
12 Q    In particular did you call
13 Dr. Ricanati and describe to him what happened during
14 the phone call?
15 A    I -- I really don't remember.
16 Q    So it's possible you did?
17      MS. QUAN: Objection.
18 A    Again I don't remember that far
19 back.
20 Q    Did you ever tell Dr. Ricanati that
21 a retaliation complaint had been filed against you and
22 him?
23 A    Again I -- I really don't remember
24 that far back.
25 Q    Do you know if Dr. Ricanati was

Jackson-Whitney Reporting LLC
513.868.1919

35

1  informed of the retaliation complaint that had been
2  filed against him?
3  A    At that point I was recused.
4  Q    How long does it usually take to
5  notify people that complaints have been filed against
6  them?
7       MS. QUAN: Objection.
8  A    Again as I stated it depends on the
9  situation.
10 Q    Well, I mean is it usually months,
11 days, weeks?
12 A    We try to respond as quickly as
13 possible.
14 Q    So let me show you what we marked
15 as Exhibit 4 which was a Class Survey that was
16 circulated about John Noakes. Have you ever seen this
17 document before?
18 A    No.
19 Q    Do you know if any -- anyone ever
20 brought this document to the attention of the
21 Title IX Office?
22 A    Not to my knowledge.
23 Q    Let me show you Exhibit 5, a
24 petition circulated about John Noakes. Did you ever
25 see this document?

Jackson-Whitney Reporting LLC
513.868.1919

36

1  A    No.
2  Q    Do you know if anyone ever brought
3  this to your attention?
4  A    No.
5  Q    If a student is threatened with
6  potential discipline from the school for filing a
7  Title IX complaint would that be considered
8  retaliation?
9       MS. QUAN: Objection.
10 A    Can you be more specific?
11 Q    Sure.
12      If a student is told that they
13 would be reviewed for possible sanctions by their
14 school if they continued with a Title IX complaint
15 could that be considered retaliatory?
16      MS. QUAN: Objection.
17 A    Again I can't answer that. It
18 depends on the details that are provided.
19      THE WITNESS: I'm sorry. Can I get
20      a drink of water real quick?
21      MR. ENGEL: Oh, yeah, yeah. Do you
22      need to take a couple minutes?
23      THE WITNESS: Yes. Thank you.
24      MR. ENGEL: Okay. We'll take five
25      minutes. Off the record.

Jackson-Whitney Reporting LLC
513.868.1919

37

```
 1              (Deposition stood in recess at
 2         2:48 p.m.)
 3              (Deposition reconvened at
 4         2:51 p.m.)
 5   BY MR. ENGEL:
 6       Q      All right.  Are students who are
 7   accused of misconduct, sexual misconduct, at
 8   Case Western innocent until proven guilty?
 9              MS. QUAN:  Objection.
10       A      That's correct.
11       Q      Are students at Case Western
12   University expected to have respect for the outcomes
13   of the investigatory and adjudicatory process?
14              MS. QUAN:  Objection.
15       A      I can't speculate on that.
16       Q      Is respect for the process an
17   important value?
18              MS. QUAN:  Objection.
19       A      Respect for any process is of
20   value.
21       Q      Would it be appropriate for anyone
22   to encourage students to file complaints against
23   John Noakes because they were unhappy with the outcome
24   of the equity process?
25       A      A student can file a complaint at
```

Jackson-Whitney Reporting LLC
513.868.1919

38

```
 1   their own wishes.  I do not -- We do not control who,
 2   when, and why they file a complaint.
 3       Q      Can complaints be retaliatory?
 4              MS. QUAN:  Objection.
 5       A      It's outlined in the Interim Sexual
 6   Harassment Policy we investigate all complaints.  We
 7   do not automatically determine if something is done
 8   retaliatory.
 9       Q      But it is possible that a complaint
10   could be retaliatory; right?
11              MS. QUAN:  Objection.
12       A      If an investigation is done and
13   that's the outcome, then, yes.
14       Q      And could encouraging students to
15   file complaints -- a series of complaints be
16   considered retaliatory?
17              MS. QUAN:  Objection.
18       A      Can you be a little bit more
19   specific on that?
20       Q      Sure.
21              Well, let me be real specific.  Let
22   me give you a situation.  Suppose I was unhappy with
23   the outcome of the process against John Noakes and I
24   believed John Noakes was really guilty; okay?  Would
25   it be appropriate for me to encourage a bunch of my
```

Jackson-Whitney Reporting LLC
513.868.1919

39

```
 1   friends to file professionalism complaints against him
 2   in order to overturn that decision?
 3              MS. QUAN:  Objection.
 4       A      I still don't get your question.
 5       Q      That's fine.
 6       A      I'm sorry.
 7       Q      No, you're fine.  I asked a bad
 8   question.  I'm not sure you're able to answer it
 9   anyway.
10              Are you familiar with the medical
11   school's professionalism process?
12       A      As I stated prior I'm aware that
13   they have a professionalism process.
14              MR. ENGEL:  All right.  I have no
15         other questions for this witness.  I
16         appreciate your taking the time.
17              MS. QUAN:  I have no questions,
18         Pam.  We will read.
19
20              _____
21                   DARNELL PARKER, Ed.D.
22         (DEPOSITION CONCLUDED AT 2:54 P.M.)
23
24                       - - -
25
```

Jackson-Whitney Reporting LLC
513.868.1919

40

```
 1                C E R T I F I C A T E
 2   STATE OF OHIO     :
                               SS:
 3   COUNTY OF BUTLER  :
 4        I, Pamela L. Jackson, a duly qualified and
 5   commissioned notary public in and for the State of
 6   Ohio, do hereby certify that prior to the giving of
 7   his deposition, the within named DARNELL PARKER,
 8   Ed.D., was by me first duly sworn to testify to the
 9   truth, the whole truth, and nothing but the truth;
10   that the foregoing pages constitute a true and correct
11   transcript of testimony given at said time and place
12   by said deponent; that said deposition was taken by me
13   in stenotypy and transcribed under my supervision;
14   that I am neither a relative of nor attorney for any
15   of the parties to this litigation, nor relative of nor
16   employee of any of their counsel, have no interest
17   whatsoever in the result of this litigation, and am
18   not, nor is the court reporting firm for which I am
19   affiliated, under a contract as defined in Civil Rule
20   28(D).
21              IN WITNESS WHEREOF, I hereunto set my
22   hand and official seal of office at Hamilton, Ohio,
23   this 3rd day of December, 2021.
24   Commission Expires:       /s/Pamela L. Jackson
     11/17/2023                   Pamela L. Jackson
25
```

Jackson-Whitney Reporting LLC
513.868.1919