2

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3               CASE NO. 1:21-cv-1776-PAB
 4                        - - -
 5
 6   JOHN NOAKES,
 7        Plaintiff,
 8   -vs-
 9   CASE WESTERN RESERVE UNIVERSITY,
10        Defendant.
11
12                        - - -
13
14          Deposition of STEVEN RICANATI, M.D., a
15   witness herein, via Zoom videoconferencing, taken by
16   the Plaintiff as upon cross-examination and pursuant
17   to the Federal Rules of Civil Procedure and Notice and
18   agreement of counsel as to time and place and
19   stipulations hereinafter set forth, on Wednesday,
20   November 24, 2021, at 9:37 a.m., before Pamela L.
21   Jackson, a Notary Public within and for the State of
22   Ohio.
23
24                        - - -
25
```

I N D E X

```
 1                      I N D E X
 2   Witness:                            Page:
 3   STEVEN RICANATI, M.D.
 4
 5   Cross-Examination
     By Mr. Engel, Esq.                    5
 6
 7   Plaintiff's Exhibit No.:        Page Marked:
 8   29 ..........................................  63
        (Email To Steven Ricanati From John Noakes
 9      Dated 4/19/21)
10   30 ..........................................  69
        (Email To Marjorie Greenfield From John Noakes
11      Dated 4/26/21)
12   31 ..........................................  77
        (Email To Jane Roe From Steven Ricanati Dated
13      5/26/21)
14   32 ..........................................  94
        (Email To Darnell Parker From Steven Ricanati
15      Dated 4/15/21)
16
17
18
19
20
21
22
23
24
25
```

3

```
 1   APPEARANCES:
 2        For the Plaintiff:
 3             Joshua Adam Engel, Esq.
                    of
 4             Engel & Martin, LLC
               4660 Duke Drive
 5             Suite 101
               Mason, OH  45040
 6             Phone: 513.445.9600
 7             engel@engelandmartin.com
 8        For the Defendant:
 9             Amanda T. Quan, Esq.
                    of
10             Ogletree, Deakins, Nash, Smoak &
               Stewart, P.C.
11             127 Public Square
               4100 Key Tower
12             Cleveland, OH  44114
               Phone: 216.241.6100
13             amanda.quan@ogletree.com
14
15        Also Present:
16             Michelle Arendt
17
18                        - - -
19
20
21
22
23
24
25
```

4

```
 1               S T I P U L A T I O N S
 2          It is stipulated by and between counsel
 3   for the respective parties that the deposition of
 4   STEVEN RICANATI, M.D., a witness herein, called as
 5   upon cross-examination by the Plaintiff, may be taken
 6   at this time and place pursuant to the Federal Rules
 7   of Civil Procedure and Notice and agreement of counsel
 8   as to time and place of taking said deposition; that
 9   the deposition was recorded in stenotypy by the court
10   reporter, Pamela L. Jackson, and transcribed out of
11   the presence of the witness; and that said deposition
12   is to be submitted to the witness for his examination
13   and signature, and that signature may be affixed out
14   of the presence of the Notary Public.
15
16                        - - -
17
18
19
20
21
22
23
24
25
```

6

```
 1              STEVEN RICANATI, M.D.,
 2  of lawful age, a witness herein, being first duly
 3  sworn as hereinafter certified, was examined and
 4  deposed as follows:
 5                  CROSS-EXAMINATION
 6  BY MR. ENGEL:
 7         Q       All right.  Would you please
 8  introduce yourself and spell your name?
 9         A       My name is Steven Ricanati, Steven
10  with a V, S-t-e-v-e-n, Ricanati, R-i-c-a-n-a-t-i.
11         Q       Where are you currently employed?
12         A       I am employed at
13  MetroHealth Medical Center.
14         Q       Okay.  And do you have a role with
15  the Case Western Medical School?
16         A       I do.
17         Q       What is your role there?
18         A       I'm the Associate Dean for students
19  at the School of Medicine and Dean of the Joseph Wearn
20  Society.
21         Q       What are the roles or what -- what
22  do you do as the -- as the Dean?
23         A       So I am in charge of the
24  Student Affairs at the School of Medicine.
25         Q       What -- What does that mean?
```

7

```
 1  memorized it word for word, but are you familiar with
 2  the Student Handbook?
 3         A       Yes.
 4         Q       Are you also familiar with the
 5  Case Western University Title IX policies and
 6  procedures?
 7         A       I have some familiarity with the
 8  Case Western Title IX policies and procedures, but I
 9  am not an expert in that.
10         Q       Have you received training of that
11  topic?
12         A       I have.
13         Q       Did that training include the
14  concept of mandatory reporters?
15         A       It did.
16         Q       Did it also include the topic of
17  retaliation?
18         A       It did.
19         Q       You would agree with me, wouldn't
20  you, that the Case Western policies prohibit
21  retaliation against students for participating in or
22  commenting on the Title IX process?
23         MS. QUAN:  Objection.  You can go
24      ahead and answer.  Sorry.  Unless I instruct
25      you not to answer, Steve, you can go ahead
```

6

```
 1         A       So Student Affairs is broken down
 2  into student services, so -- and our system that we
 3  call the Society Deans which is our advising system at
 4  the School of Medicine.
 5         Q       Do you serve as a Society Dean?
 6         A       I do.
 7         Q       Okay.  Do you also supervise other
 8  Society Deans?
 9         A       Yeah.  I think in a law firm
10  context maybe I'm the managing partner.
11         Q       So previously we had a similar
12  conversation with Dr. Greenfield and she serves as a
13  Society Dean?
14         A       She does.
15         Q       Do you supervise her in that role?
16         A       I do.
17         Q       Okay.  How long have you held this
18  position?
19         A       I have been the Associate Dean
20  since 2017.
21         Q       And as the Associate Dean are you
22  familiar with the policies and procedures of the
23  medical school?
24         A       Yes.
25         Q       Okay.  And obviously you haven't
```

8

```
 1      and answer.
 2              THE WITNESS:  Okay.
 3         A       Can you -- I'm sorry.  Rephrase
 4      your question.
 5              MR. ENGEL:  Sure.  Pam, could you
 6          repeat it, please?
 7              (Question on Page 7, Lines 19
 8               through 22, was read back by the
 9               reporter.)
10         A       So I -- I don't have -- I don't
11  have that policy in front of me so I can't speak to
12  the specifics, but in general Case Western Reserve has
13  a policy against retaliation.
14         Q       Okay.  So I'm asking you about your
15  understanding as you sit here today.  Is it your
16  understanding that students are permitted to criticize
17  the Title IX process?
18              MS. QUAN:  Objection.
19         A       The campus greatly defends free
20  speech of their students.  Students are allowed to
21  criticize.
22         Q       Are students also allowed to
23  participate and defend themselves in the Title IX
24  process?
25         A       I'm -- I'm not an expert in the
```

1   Title IX process.
2           Q       So is it permissible, if you know,
3   to take disciplinary action against a student for
4   criticizing or participating in the Title IX process?
5           MS. QUAN:  Objection.
6           A       I'm -- I'm sorry.  Could you
7   restate that?  I -- I didn't fully understand what you
8   asked.
9           MR. ENGEL:  And can you read it
10          back again, Pam, please?
11          (Question on Lines 2 through 4 was
12          read back by the reporter.)
13          A       I don't think I know the answer to
14  the question that you're asking.
15          Q       Do you know if the Title IX process
16  is confidential?
17          A       You know, I am not an expert on the
18  Title IX process and I -- I don't know that level of
19  detail.
20          Q       Okay.  Do you have any reason as
21  you sit here today to believe that any policies or
22  procedures at Case Western require students to keep
23  the Title IX process confidential?
24          MS. QUAN:  Objection.
25          A       I would expect it to be a

1   professional obligation for students to keep a
2   sensitive process among students to handle that with
3   discretion.
4           Q       So -- So is it an unprofessional
5   action in your view for a student to tell other
6   students that they have been accused of wrongdoing
7   through the Title IX process?
8           MS. QUAN:  Objection.
9           A       I think a student can tell their
10  peers what's happening in their life.
11          Q       Have you ever been in a deposition
12  before?
13          A       I have.
14          Q       How many times?
15          A       I can't recall an exact number.
16          Q       More -- More than a handful of
17  times?
18          A       No.
19          Q       What was the reason that you have
20  been in depositions?
21          A       It's been a long time.  I can't
22  recall specifics.  Medical malpractice -- I have been
23  a witness for medical malpractice.
24          Q       Okay.  Were you serving as an
25  expert witness, if you recall, or were you involved in

1   the actual claim?
2           A       I was not involved in the claim.  I
3   was serving as a witness.
4           Q       Have you ever been involved in a
5   deposition concerning your role as -- as a school
6   administrator?
7           A       I can't recall if I was actually
8   deposed.
9           Q       Were you named in a lawsuit as the
10  school administrator?
11          A       I don't believe so.
12          Q       Okay.
13          A       It's been a long time.  I can't
14  recall the specifics.
15          Q       All right.  Well, since it's been a
16  long time I -- I'm sure you had excellent preparation
17  from -- from your legal team here, but I like to go
18  over a couple of things with people before we get too
19  deep into the deposition.
20          The first thing I try to remind
21  people of -- And you have done a good job of it so
22  far -- is all your answers have to be out loud, so I'd
23  ask if -- if you understand that you need to please
24  avoid nodding your head, shaking your head, gesturing
25  with your hands.  All those normal human interactions

1   can't be taken down by the court reporter.  Do you
2   understand that?
3           A       Yes.
4           Q       We are participating in this
5   deposition by Zoom, and while that is a wonderful
6   technology occasionally it may be slow on us or lag
7   and so that may result in my occasionally speaking
8   over you.  I apologize in advance if I do that.  I'd
9   ask you to please commit that if you haven't had a
10  chance to answer a question let me know and -- and
11  we'll give that opportunity -- Do you understand that?
12          A       I understand.
13          Q       Okay.  I remind every witness that
14  you are not a hostage here, so if you need to take a
15  break at any time please let us know.  My only request
16  would be that if we are in -- in the middle of a line
17  of questions we wait until we finish that line of
18  questions and then we'll take a break; fair enough?
19          A       I understand.
20          Q       Okay.  Obviously I understand
21  you're a physician and -- and you have -- you have
22  patients too; don't you?
23          A       Yes.
24          Q       Okay.  So if there's an emergency
25  that happens for that reason obviously let us know and

14

```
1    we will accommodate that as well.
2                Finally as we discussed before we
3    went on the record the students in this case are
4    referred to as John Noakes -- The student who accused
5    the Plaintiff in this case of misconduct is referred
6    to as Jane Roe.  If I use those names do you know who
7    I'm referring to?
8        A        Could you just spell it out so I'm
9    not making assumptions?
10       Q        Sure.  N-o-a-k-e-s is the Plaintiff
11   in this case.
12       A        And that refers to the student
13   whose name is --
14       Q        The -- The -- The student who is --
15   is the reason we're here today.
16       A        Are we allowed to say that out
17   loud?
18                MR. ENGEL:  Well, that is -- Let's
19           go off the record here one second.
20                (Off-the-record discussion.)
21                MR. ENGEL:  Back on the record.
22                While we were off the record we
23           clarified the names of the students involved.
24   BY MR. ENGEL:
25       Q        Doctor, you understand that there
```

15

```
1                Does Case Western Reserve
2    University Medical School believe survivors?
3                MS. QUAN:  Objection.
4        A        Can you explain what you're asking?
5        Q        Well, you're aware that over the
6    past couple years the University and the medical
7    school have been criticized for the way it handles
8    allegations of sexual assault?
9                MS. QUAN:  Objection.
10       A        Case Western Reserve University
11   follows Title IX processes as outlined by federal law.
12       Q        And you're aware of criticism by
13   students at -- that the University has not been
14   sufficiently vigilant in enforcing those rules?
15                MS. QUAN:  Objection.
16       A        I have been made aware by students
17   that they are not happy with the state of Title IX in
18   this country.
19       Q        Well, more than this country.
20   You're aware that the students are not happy with the
21   way that Case Western Reserve University in particular
22   has dealt with this situation; aren't you?
23                MS. QUAN:  Objection.
24       A        Students have made me aware that
25   they are not happy with the Title IX laws.
```

```
1    are confidentially -- confidentiality issues involving
2    students?
3        A        Yes.
4        Q        Okay.  So in order to protect those
5    as we indicated we're going to try our best to refer
6    to the students involved as John Noakes and Jane Roe
7    and not use other students in the deposition.  Are you
8    comfortable doing that?
9        A        Yes.
10                MR. ENGEL:  Okay.  There is no
11           penalty if we mess up and -- and I think
12           there's an agreement between counsel that if
13           we do mess up which inevitably we will we
14           will just redact the name or replace it in
15           the transcript; is that correct, Amanda?
16                MS. QUAN:  Correct, that -- that
17           Pam would -- that we would get those names
18           redacted, yes.
19   BY MR. ENGEL:
20       Q        If -- If it becomes difficult at
21   any point, Doctor, will -- will you let us know?
22       A        Yes.
23       Q        All right.  Does Case Western
24   University -- or Case Western -- I'm sorry.  Start
25   over.
```

16

```
1        Q        And more than the Title IX laws
2    they are unhappy with the manner in which Case Western
3    Reserve University itself has responded to it;
4    correct?
5                MS. QUAN:  Objection, asked and
6            answered, but go ahead again.
7        A        The students are -- have made me
8    aware that they are not happy with the law and
9    CWR's -- CWRU's process.
10       Q        Are you aware of an Instagram
11   account called CWRU Survivors?
12       A        I am aware of an Instagram account
13   called CWRU Survivors.
14       Q        What is your understanding of that
15   account?
16                MS. QUAN:  Objection.
17       A        Nationally students have created
18   these accounts at many universities in order to
19   express their feelings.
20       Q        Have any medical students posted on
21   the Instagram account?
22       A        Not to my --
23                MS. QUAN:  Objection.
24       A        -- knowledge.
25                MS. QUAN:  Sorry, Steve, just going
```

18

```
1           to remind you make sure you give me a little
2    bit of a pause so I can object if I need to.
3           THE WITNESS:  Thank you.
4    BY MR. ENGEL:
5      Q      Are you aware if Jane Roe in
6    particular posted on the Instagram account?
7      A      I'm not aware of a post by Jane Roe
8    to my knowledge.  I -- I can't recall.
9      Q      Okay.  Let me show you something
10   that we marked originally as Exhibit 2.  Are you able
11   to view my screen that I have shared with you?
12     A      Yeah.
13     Q      Okay.  So I'm handing you what we
14   have marked as Exhibit 2 previously which is a post on
15   that Instagram page from a medical student.  Have you
16   ever reviewed this post before?
17     A      Can you please scroll down?
18            And scroll down further.
19            Is this as far as it goes down?
20     Q      Yes.
21     A      And -- I'm -- I'm sorry -- what was
22   your question to me?
23     Q      Well, first have you seen this post
24   before?
25     A      I have read the substance of this,
```

Jackson-Whitney Reporting LLC
513.868.1919

```
1    but I was unaware that this was a posting on
2    CWRU Survivors.
3      Q      Are you aware that this is a post
4    from Jane Roe?
5      A      No.
6      Q      Did Jane Roe discuss this post with
7    you in November of 2020?
8      A      November of 2020 -- not that I can
9    recall.  I can't recall.
10     Q      Did you meet with Jane Roe in
11   November of 2020 to discuss her allegations that she
12   was the victim of sexual assault?
13     A      I can't recall.
14     Q      Did she tell you in November of
15   2020 that she was a survivor of sexual assault?
16     A      I can't recall.
17     Q      Did you believe her?
18     A      I can't recall meeting with her.
19     Q      Okay.  Do you recall in November of
20   2020 reporting to the school's Title IX Office
21   Jane Roe's report that she was a victim of sexual
22   assault?
23     A      I -- I'm not trying to be
24   disrespectful.  I just can't recall who initiated that
25   reporting.
```

Jackson-Whitney Reporting LLC
513.868.1919

19

```
1      Q      Well, do you recall when you
2    reported to the Title IX Office telling the Title IX
3    Office that this was "an incident posted to
4    Instagram"?
5      A      I -- I don't recall that.
6      Q      When you made that report to the
7    Title IX Office in November of 2020 were you
8    specifically referring to this Instagram post?
9             MS. QUAN:  Objection.
10     A      I don't mean to be disrespectful.
11   I just can't recall.
12     Q      Does this Instagram post disclose
13   the personal information of another person?
14            MS. QUAN:  Objection.
15     A      I cannot identify a student based
16   upon this post.
17     Q      If other students knew who was the
18   alleged perpetrator would this post be considered to
19   be disclosing another's personal private information?
20            MS. QUAN:  Objection.
21     A      I can't speculate how it would make
22   other people feel.
23     Q      I'm not asking you to speculate how it
24   would make other people feel.  I am saying if someone
25   knew who the other M1 referred to in this post was
```

Jackson-Whitney Reporting LLC
513.868.1919

20

```
1    would this be considered to be disclosing that
2    person's personal private information?
3             MS. QUAN:  Objection.
4      A      I don't know the answer to that.
5      Q      Would this post if someone knew who
6    the other M1 was be considered inflammatory or
7    accusatory?
8             MS. QUAN:  Objection.
9      A      I don't know the answer.
10     Q      Well, I mean it appears the alleged
11   specific misconduct by that other M1 -- And I should
12   say "M1", that means a first-year medical student?
13     A      M1 refers to a first-year medical
14   student.
15            So it appears to be accusing that
16   first-year medical student of sexual assault; doesn't
17   it?
18     A      The student alleges non-consensual
19   to, "Our sex was non-consensual."
20     Q      And -- And normal people refer to
21   that as sexual assault; right?
22            MS. QUAN:  Objection.
23     A      You know, I -- I think that's a
24   legal term that --
25     Q      Yeah, I am not asking you for a
```

Jackson-Whitney Reporting LLC
513.868.1919

22

```
 1   legal definition.  I am asking, you know, just a
 2   common understanding of the term.
 3        A        I think non -- or, "Sex was
 4   non-consensual," is clear.
 5        Q        So accusing someone of
 6   non-consensual sexual activity that's -- it's likely
 7   to damage their reputation; isn't it?
 8             MS. QUAN:  Objection.
 9        A        I -- I don't know the answer to
10   that.
11        Q        You don't know if accusing someone
12   of non-consensual sexual activity would damage their
13   reputation -- Really?
14             MS. QUAN:  Objection.
15        A        The student is making an allegation
16   that she was involved in a relationship with another
17   student where the sex was non-consensual.
18        Q        And she's accusing the other M1 of
19   engaging in non-consensual activity; right?
20             MS. QUAN:  Objection.
21        A        It says here that she was in a
22   relationship with another M1 and that their sex was
23   non-consensual.
24        Q        Does this Instagram post raise any
25   professionalism concerns?
```

23

```
 1        Q        No.  I am going to cut you off
 2   there.  I am not asking what students related to you.
 3   I am asking you in your opinion as the Dean of the
 4   medical school what is unprofessional about this post?
 5             MS. QUAN:  Objection.
 6        A        And I am not the Dean of the
 7   school.
 8        Q        I'm sorry.  Assistant Dean.  I'm
 9   sorry.
10             As Assistant Dean of the medical
11   school or Associate Dean -- What's your title again?
12        A        Associate Dean.
13        Q        As the Associate Dean of the
14   medical school who's been in that position for a
15   number of years what is unprofessional about
16   Exhibit 1?
17             MS. QUAN:  Objection.
18        A        Students related that this post had
19   an effect on the learning environment --
20        Q        So is the standard --
21        A        -- the professional learning
22   environment, of the School of Medicine.
23        Q        So is the standard for what is
24   unprofessional something that has a negative effect on
25   the learning environment of another student?  Is that
```

22

```
 1             MS. QUAN:  Objection.
 2        A        Can you please sort of explain what
 3   are you -- what are you asking?
 4        Q        The medical school has
 5   professionalism standards for students; right?
 6        A        The medical school has
 7   professionalism standards.  It's one of our core
 8   competencies.
 9        Q        And -- And so -- Well, for example,
10   let me show you Exhibit 1 which is the GroupMe post
11   from John Noakes.  John Noakes was accused of
12   unprofessional conduct by posting this; right?
13        A        We have a process at the School of
14   Medicine called Early Concerns and based upon this
15   post students chose to follow that process.
16        Q        Okay.  And that process meant --
17   Well, let me ask you then a blank question.  Looking
18   at Exhibit 1 is there anything unprofessional about
19   Exhibit 1 in your opinion?
20        A        I'm sorry.  What was Exhibit 1?
21        Q        The thing that's on your screen
22   right now, the GroupMe post from John Noakes.  What's
23   unprofessional about it?
24             MS. QUAN:  Objection.
25        A        Students related to me --
```

24

```
 1   the test?
 2             MS. QUAN:  Objection.
 3        A        So I don't sit on the
 4   Professionalism Working Group and this is not my area
 5   of expertise.  When an Early Concern is filed it goes
 6   to the Professionalism Working Group.
 7        Q        Okay.  I -- I understand all that.
 8   I am asking you your opinion as a Professor at the
 9   medical school is there anything in your view
10   unprofessional about this post?
11             MS. QUAN:  Objection, but go ahead.
12        A        This post -- Students related to me
13   that this post causes -- caused a lot of upset within
14   their class and the students chose to use the
15   processes to the School of Medicine to address this.
16             MR. ENGEL:  Pam, could you read my
17             question back so we can give the doctor
18             another chance to answer it, please?
19             (Question on Lines 7 through 10 was
20             read back by the reporter.)
21        A        Students related to me that this
22   post had a negative effect on the learning environment
23   and the way students viewed one another.
24        Q        So is the definition of an
25   unprofessional post something that has a -- causes
```

1  another student to complain that it has had a negative
2  effect on them?
3              MS. QUAN:  Objection.  Again he's
4      testified he's not on the PWC or --
5              MR. ENGEL:  I understand -- I
6      understand all that.  Your objection is
7      noted.  But he is a -- doctor here and he
8      can give his opinion for whatever it's worth.
9      A      And tell me again what was the --
10 Pam, could you read that back to me what --
11     Q      Let me -- Let me -- Let me ask the
12 question again.
13 BY MR. ENGEL:
14     Q      So is -- is your test to
15 determining whether Exhibit 1 is unprofessional merely
16 that some students complained about it?
17             MS. QUAN:  Objection.  Again
18     he's --
19     A      So when students identify something
20 that occurs in their community which they believe are
21 unprofessional my job is to -- inform them of the
22 processes at the School of Medicine that they can use
23 to address those concerns.
24     Q      Do you have an independent opinion
25 about whether Exhibit 1 is unprofessional or not?

1      A      I can't speculate.
2      Q      I'm not asking you to speculate.  I
3  am asking you if you have as you sit here today an
4  independent opinion aside from the fact that other
5  people have complained about it that this post is
6  unprofessional?
7      A      I don't have enough information to
8  interpret to make that determination.
9      Q      What other information would you
10 need?
11     A      I would need to speak with
12 John Noakes and try and understand their perspective.
13     Q      Is there anything else besides the
14 fact that other students might have complained about
15 this post that would lead you to have concerns that it
16 was unprofessional?
17             MS. QUAN:  Objection.
18     A      At the School of Medicine we have a
19 process for addressing these concerns.  It goes to the
20 Professionalism Working Group.  Then it's the job of
21 the Society Deans like myself to contact the students
22 and understand their perspective.
23     Q      But isn't it true that at times you
24 have attempted to define for the students what an
25 unprofessional social media post would be?

1              MS. QUAN:  Objection.
2      A      We have given the students
3  guidelines about social media posting.
4      Q      And, in fact, those guidelines --
5  Let me show you what we have marked in a previous
6  deposition as Exhibit 19 which is a May [sic] 16th,
7  2021, email from Molly Simmons to the medical school.
8  Did you write this email?
9      A      I was one of the authors.
10     Q      And in this email I read -- Am I
11 reading -- Let me back up.
12             Am I reading this email correctly
13 in that you were attempting to define for students
14 what are unprofessional electronic communications?
15             MS. QUAN:  Objection.
16     A      The email says, "The following are
17 unprofessional," and then it lists five items.
18     Q      The first thing I'll note you'd
19 agree with me that none of those five items are simply
20 that other people have felt it was negative; right?
21             MS. QUAN:  Objection.
22     A      If a student relates to me that
23 they believe a post is racist then we have a process
24 for addressing it.
25     Q      Do you have any concerns that that

1  process could be abused to accomplish other goals?
2              MS. QUAN:  Objection.
3      A      I can't speculate on that.
4      Q      Would it be appropriate for
5  students to coordinate a series of Early Concern
6  submissions in order to intimidate or bully another
7  student?
8              MS. QUAN:  Objection.
9      A      We have a process at the School of
10 Medicine that students are allowed to use that
11 process.
12     Q      Isn't it possible --
13     A      We don't restrict their access to
14 the process.
15     Q      Is it possible that students could
16 abuse that process for an improper purpose?
17             MS. QUAN:  Objection.
18     A      You're asking me to speculate on a
19 scenario.
20     Q      Yeah, I am.
21             Is it possible that -- Have you
22 ever considered the fact that students might abuse
23 that process for an improper purpose?
24             MS. QUAN:  Objection, but go ahead
25     if you can.

30

```
 1        A        I can't speculate.
 2        Q        Have you ever considered that the
 3   students may not be completely legitimate in their
 4   concerns?
 5             MS. QUAN:  Objection.
 6        A        It's not up to me to determine if
 7   their concerns are legitimate or not.  We have a
 8   process and that goes through the
 9   Professionalism Working Group and I am not on that
10   process.
11        Q        Do you -- So you don't have any
12   interest at all if -- if you learn that students might
13   be abusing that process for an improper purpose?
14             MS. QUAN:  Objection, misstating.
15        A        Do you want to restate your
16   question, please?
17             MR. ENGEL:  Pam, could you read it
18        back, please?
19             (Question on Lines 11 through 13
20             was read back by the reporter.)
21        A        It's up to the
22   Professionalism Working Group to determine if there's
23   been a misuse of the process as outlined by the
24   School of Medicine.
25        Q        So going back to Exhibit 1 do you
```

31

```
 1   when we come into court on December 22nd and if you
 2   come and testify in front of the judge you're not
 3   going to sit up there and say, "Oh, yeah, this post is
 4   really horrible, it's unprofessional, and John Noakes
 5   should have been punished for it" -- You're not going
 6   to come in and say that; are you?
 7        A        I don't have enough information at
 8   this time to determine whether this post is
 9   professional or unprofessional.
10        Q        So what other information might you
11   want to obtain between now and December 22nd?
12        A        I would have liked to speak with
13   Mr. Noakes and understand the context.
14        Q        Anything else?
15        A        I would have to think more about
16   that.  I don't have a binary answer.
17        Q        So going back to the standards you
18   described in your April 16th, 2021, email, looking at
19   Exhibit 1 this doesn't contain any racist, sexist, or
20   ethnographic information; does it?
21             MS. QUAN:  Objection.
22        A        I would have to rely on the
23   students who were in this group and received this
24   message to tell me what it means.
25        Q        Let me ask about those students.
```

32

```
 1   have any independent opinion about whether this post
 2   is improper and -- I'm sorry -- unprofessional?
 3        A        I don't have enough information to
 4   determine to have an opinion.
 5        Q        So let me ask a very lawyerly
 6   question here.
 7             Can you sit here today under oath
 8   and say in your professional opinion Exhibit 1 is
 9   unprofessional?
10             MS. QUAN:  Objection.
11        A        I do not have enough information to
12   determine if this is unprofessional.
13        Q        So the answer is, no, you cannot
14   say this is unprofessional?
15             MS. QUAN:  Objection.
16        A        I do not have enough information to
17   make a determination in this case.
18        Q        Again I'll ask a very lawyerly like
19   question.
20             That means you do not have enough
21   information to say that this post is unprofessional?
22        A        It means that I cannot make a
23   determination one way or the other with this limited
24   amount of information.
25        Q        Well, I just want to make sure that
```

32

```
 1   You're aware that a number of students at the medical
 2   school believed that John Noakes was guilty of sexual
 3   misconduct; aren't you?
 4             MS. QUAN:  Objection.
 5        A        Students related to me that they
 6   were unhappy with the outcome of the Title IX process.
 7        Q        And so let me ask you again.
 8   Looking at Exhibit 1 do you see anything in here that
 9   contains racist, sexist, or ethnographic references?
10             MS. QUAN:  Objection.
11             MR. ENGEL:  What's the objection,
12        Amanda?
13             MS. QUAN:  What's the objection --
14        Asked and answered and also he has responded.
15             MR. ENGEL:  I mean obviously --
16        Okay.  I don't think asked and answered is a
17        legitimate objection for a deposition, but
18        okay.  Fair enough.
19   BY MR. ENGEL:
20        Q        Go ahead, Doctor.
21        A        I was not the targeted audience for
22   this post, so without hearing the perspective of the
23   students who this was intended for I don't have enough
24   information to answer your question.
25        Q        Does this post disclose any
```

34

```
 1   personal information of another person?
 2        A        I have heard from students in the
 3   class that this post discloses information.
 4        Q        Okay.  So is that any different
 5   from what we marked as Exhibit 2, the Instagram post?
 6             MS. QUAN:  Objection.
 7        A        Can you repeat your question,
 8   please?
 9             MR. ENGEL:  Could you read it back,
10        please, Pam?
11             (Question on Lines 4 and 5 was read
12             back by the reporter.)
13        A        Students related to me that the
14   timing of the GroupMe post highlighted an event that
15   happened that same day.
16        Q        And, in fact, they were unhappy
17   with this; right?
18        A        I can't speculate as to their
19   emotions at the time.
20        Q        Well, you're aware that a number of
21   students at the medical school believed that
22   John Noakes is a rapist; right?
23             MS. QUAN:  Objection.
24        A        Students have related to me that
25   they don't feel safe with John Noakes in the learning
```

---

```
 1   environment.
 2        Q        It's because they believe he
 3   sexually assaulted Jane Roe; right?
 4             MS. QUAN:  Objection.
 5        A        Students have related that they
 6   were not satisfied -- not satisfied.  That's not the
 7   right word -- they were not content with the outcome
 8   of the Title IX process.
 9        Q        And, in fact, they wanted the
10   School of Medicine to expel John Noakes; isn't that
11   true?
12             MS. QUAN:  Objection.
13        A        I think you're speculating.
14        Q        Well, we don't have to speculate.
15   We know what they told you; right?
16        A        Can you explain?
17        Q        Well, you have read the
18   Early Concerns in this matter; haven't you?
19        A        So, Mr. Engel, I related to you
20   that I don't read Early Concerns unless they're
21   referred from the Professionalism Working Group.  The
22   Early Concerns go to the Professionalism Working Group
23   and they choose what to send to the Society Dean.
24        Q        Okay.  Do you serve on the
25   Committee on Students as well?
```

---

35

```
 1        A        I am an ex officio member of the
 2   Committee on Students.
 3        Q        So you're present during the
 4   meetings of the Committee on Students; right?
 5             MS. QUAN:  Objection.
 6        A        I am present during some
 7   meetings --
 8        Q        Were you present during --
 9        A        -- of the Committee on Students.
10        Q        Were you present during the
11   meetings where they discussed John Noakes?
12        A        No.
13        Q        So I'm showing you what we marked
14   as Exhibit 9 which is a list of the Early Concerns
15   that were submitted.  Have you ever reviewed these?
16        A        No.
17             MS. QUAN:  And -- And, Steve, I
18        think it's a longer document.  If you want to
19        make sure you kind of have a good
20        understanding as to what --
21             THE WITNESS:  I apologize.
22   BY MR. ENGEL:
23        Q        Yes.
24             Have you ever seen this document at
25   all?
```

---

36

```
 1        A        Let me just go through line by
 2   line.
 3             Hold on, please.
 4             Can you scroll down, please?
 5             Can you scroll down, please?
 6             Can you scroll down, please?
 7             Scroll down, please.
 8             Can you scroll down, please?
 9             Scroll down, please.
10             Scroll down, please.
11             And scroll down, please.
12             And scroll down, please.  Okay.
13        Q        Have you had a chance to review
14   Exhibit 9?
15        A        I have read the 31 student reports
16   in Exhibit 9.
17        Q        After having had a chance to review
18   Exhibit 9 do you have any concerns that students were
19   abusing the Early Concern process to achieve other
20   goals?
21             MS. QUAN:  Objection.
22        A        Once again I explained the process
23   as outlined in the Student Handbook.  When
24   Early Concerns are filed it goes to the
25   Professionalism Working Group and it is their job to
```

38

1  determine if the Early Concern process is being
2  utilized effectively or not effectively.
3       Q       Fair enough.  I am asking you your
4  opinion.
5            Do you as you sit here today as the
6  Associate Dean of the medical school have any concerns
7  that students were abusing the Early Concern process?
8       MS. QUAN:  Objection.
9       A       I'm not an expert on this process
10  and you're asking me to speak about something that I
11  don't feel an expert on.
12      Q       Well, you would agree with me that
13  a number of the Early Concerns express the opinions
14  that John Noakes was guilty of sexual assault; right?
15      MS. QUAN:  Objection.
16      A       Several of the students related in
17  their comments that they believed Mr. Noakes had
18  committed assault.
19      Q       Do you know why 29 of the 31
20  Early Concerns are submitted more than 10 days after
21  the alleged unprofessional comment from John Noakes?
22      A       So I see two reports on April 15th
23  which would have been the day of the post and then I
24  see another string, maybe six or seven, on the 25th
25  and I see another string of them on the 26th and the

Jackson-Whitney Reporting LLC
513.868.1919

39

1  inquiries.
2       Q       In educating students about the
3  process did you in any way encourage them to file
4  Early Concerns against John Noakes?
5       MS. QUAN:  Objection.
6       A       My job is to inform them of the
7  process of the School of Medicine and they choose to
8  use it or not.
9       Q       Did you -- In the course of
10  informing these students about the process did you
11  indicate to them that the Early Concern process would
12  permit the school to take actions against John Noakes?
13      MS. QUAN:  Objection.
14      A       I described the Early Concern
15  process as outlined in the Student Handbook.
16      Q       So tell me the exact words you used
17  to describe the process?
18      MS. QUAN:  Objection.
19      A       I can't recall the exact words that
20  I used.
21      Q       How many students did you meet
22  with?
23      A       What meeting are you referring to?
24      Q       Between April 15th and April 25th
25  how many students did you meet with to describe the

Jackson-Whitney Reporting LLC
513.868.1919

40

1  process?
2       A       So during that time period I
3  received a large amount of communication from the
4  Vice Dean, the other Society Deans, and students
5  directly and at all times my communication was that we
6  have a process at the School of Medicine and there's a
7  process at the University that's called Title IX
8  appeal and equity and the students can utilize the
9  processes that are available to address their
10  concerns.
11      Q       So what happened on or about
12  April 25th that caused all these students to all of a
13  sudden submit all these Early Concerns?
14      MS. QUAN:  Objection.
15      A       So I don't have that timing in
16  front of me, but I recall that I held a -- what we
17  call a Voices' class meeting at that time and that
18  would have been myself from the School of Medicine,
19  Shirley Mosley from the Dean of Students' office on
20  main campus, and Angela Clark-Taylor, Dr. Angela
21  Clark-Taylor, the head of the Flora Stone Mather
22  Center for Women at CWRU.
23      Q       I'm showing you what's been marked
24  as Exhibit 11 which is an April 21st email from
25  Molly Simmons to the school describing a meeting held

Jackson-Whitney Reporting LLC
513.868.1919

27th and the 28th.
2       MR. ENGEL:  Pam, could you read --
3       A       They seem to be spread out.
4       MR. ENGEL:  Pam, could you please
5  reread my question?
6       (Question on Page 37, Lines 19
7       through 21, was read back by the
8       reporter.)
9       A       I can't speculate.
10      Q       Do you know if anyone encouraged
11  students to submit Early Concerns?
12      A       I can tell you from my perspective
13  as a Society Dean that our job is to make sure that
14  students know the process and they choose how to
15  follow it.
16      Q       So did you encourage students to
17  submit Early Concerns against John Noakes?
18      A       I educated students about the
19  process.
20      Q       Who did you educate about the
21  process?
22      A       Any student that asked me.
23      Q       Did any students ask you about the
24  process right before April 25th, 2021?
25      A       I can't recall the timing of those

Jackson-Whitney Reporting LLC
513.868.1919

1   on April 26th via Zoom.  Is that what you're referring
2   to?
3        A      Yeah.
4        Q      Okay.  So if we know that meeting
5   occurred on April 26 that wouldn't explain why a bunch
6   of Early Concerns started flooding in at 5:28 p.m. on
7   April 25th; would it?
8        A      The meeting was held on the 26th,
9   so the concerns that occurred after would be
10  temporally related to the meeting.
11       Q      Do you know what happened on
12  April 25th that caused all of these Early Concerns to
13  start coming in?
14              MS. QUAN:  Objection.
15       A      So I -- I don't have that timeline
16  in front of me.  At some point in time I was asked to
17  join a meeting with the CSR, the elected student
18  government, to talk about their concerns.  I just
19  don't recall --
20       Q      Tell me everything you remember
21  about that meeting?
22       A      I received a phone call and was
23  asked to join a Zoom meeting of the elected student
24  government.
25       Q      Okay.  What happened during that

1   meeting?
2        A      They expressed -- As
3   representatives of their class they were voicing
4   concern over students about safety in the learning
5   environment.  A large number of students felt that
6   they didn't feel safe coming to class.
7        Q      And that is because they believed
8   John Noakes was a rapist?
9               MS. QUAN:  Objection.
10       A      I -- I can't speculate on their
11  motive.
12       Q      Well, one of the things you could
13  have told them was, "Hey, he's innocent until proven
14  guilty.  He was found not responsible by our process.
15  You need to respect that process" -- Did you tell them
16  that?
17              MS. QUAN:  Objection.
18       A      So Shirley Mosley and Dr. Angela
19  Clark-Taylor were the -- were the experts on the
20  Title IX process who were there at that meeting and
21  they did state that Mr. Noakes was found not at fault
22  and the process was still ongoing and if the students
23  had additional concerns or information they could
24  reach out to the Office of Equity.
25       Q      At any point did you indicate to

1   them that the medical school would take actions
2   against John Noakes?
3               MS. QUAN:  Objection.
4        A      I informed the students that we
5   have a process at the School of Medicine for hearing
6   professionalism concerns and that we need to follow
7   the process as outlined in the Student Handbook.
8        Q      Did you promise any results out of
9   that process?
10       A      So I am not involved in that
11  process.  I do not run it and I cannot make promises.
12       Q      Did you indicate to them that the
13  process would likely result in discipline against
14  John Noakes?
15       A      I informed them that we have a
16  process and the potential outcomes of the process
17  could be as stated in the Student Handbook coaching,
18  remediation, referral to Committee on Students.
19       Q      And the referral to the
20  Committee on Students, that would -- that -- that
21  could eventually lead to his dismissal from the
22  school?
23       A      By charter the Committee on
24  Students has a wide purview and can examine all
25  activities at the School of Medicine and entertain

1   things such as referring a student to coaching,
2   maintaining within the curriculum, to withdraw from
3   the curriculum.
4        Q      And by withdraw from the curriculum
5   you mean expelling them from the school?
6        A      Yeah, yeah.  The term they use, I
7   think, is withdraw.
8        Q      So, in other words, during this
9   meeting you had with the students you told them that
10  if they filed a bunch of Early Concerns it could
11  eventually lead to a process that would result in
12  John Noakes being removed from the school?
13              MS. QUAN:  Objection.
14       A      No.
15       Q      Well, how -- how -- how is my
16  characterization wrong?
17       A      I informed them of the process.
18       Q      Did you inform them that that
19  process could eventually lead to his removal from the
20  school?
21       A      I informed them of all potential
22  outcomes, including coaching, staying in the
23  curriculum, or referral to the Committee on Students.
24  The Committee on Students makes that determination.  I
25  do not.

46

```
 1        Q        Why wasn't John Noakes -- Looking
 2   at Exhibit 11 why wasn't John Noakes invited to this
 3   meeting on April 26th, 2021?
 4        A        Because the invitation went out
 5   specifically to students who reached out to
 6   Society Deans or administration because they felt that
 7   their concerns were not being heard.
 8        Q        So why wasn't John Noakes also
 9   included in this list?  It seems like it concerns him;
10   doesn't it?
11        A        The people that were invited were
12   the people that reached out to us to express that they
13   were not being heard.  I never received that kind of
14   contact from Mr. Noakes.
15        Q        You indicate at the bottom that
16   they were welcome to share this invitation with other
17   students who may be interested in attending too;
18   right?
19        A        That is correct.
20        Q        So the meeting wasn't just limited
21   to people who were expressing concern?
22        A        I left it up --
23             MS. QUAN:  Objection.
24        A        -- to this --
25             THE WITNESS:  Go ahead.  I
```

47

```
 1   student concerns.  Did the student concerns include
 2   concerns about John Noakes?
 3             MS. QUAN:  Objection.
 4        A        The students had concerns about the
 5   post to the GroupMe account and the effect that that
 6   had had on the learning environment.
 7        Q        Were any other student concerns
 8   besides the post of the GroupMe account discussed at
 9   this meeting?
10        A        They also expressed concern about
11   the Title IX process.
12        Q        So what is Agenda Item 3,
13   Potential Action Items -- What -- What were the action
14   items that were discussed during this meeting?
15        A        The action items -- So I don't have
16   my notes in front of me and I don't have a clear
17   recollection -- I don't have my notes in front of me.
18        Q        Do you as you sit here today have
19   any recollection -- Well, did -- did you take notes at
20   that meeting?
21        A        I honestly don't know.
22        Q        Well, you just indicated you would
23   have to look at your notes.  I'm trying to figure out
24   why you said that if you didn't have notes?
25        A        Yeah, I would just -- I would have
```

```
 1   apologize for jumping in.
 2             MS. QUAN:  No, my fault.  Sorry
 3        about that.
 4        Q        I wanted to make sure that we
 5   captured other students who we may have missed.  We
 6   did not invite specifically Jane Roe or John Noakes.
 7        Q        Now, at the time of this meeting --
 8   Well, back up.
 9             Did you participate in this
10   April 26th meeting?
11        A        Yes.
12        Q        And was John Noakes' situation
13   discussed?
14             MS. QUAN:  Objection.
15        A        John Noakes was not mentioned by
16   name.
17        Q        I think you indicated that the
18   people who expressed that -- who was sent this
19   invitation to were people who expressed concerns
20   specifically about John Noakes; right?
21        A        Mostly they were people that
22   expressed concern about the post.
23        Q        The post by John Noakes?
24        A        Correct.
25        Q        Okay.  So on the agenda were the
```

48

```
 1   to look at -- What I meant is I would have to look and
 2   see if I had notes.
 3        Q        As you sit here today do you have
 4   any recollection of the action items discussed at that
 5   meeting?
 6        A        My general sense is they were
 7   related to educating the students about the processes
 8   at the School of Medicine and at the University for
 9   addressing their concerns.
10        Q        So, in other words, students were
11   told they -- they could file an Early Concern against
12   John Noakes?
13        A        I educated them about the processes
14   at the School of Medicine as outlined in the
15   Student Handbook --
16        Q        And that's a process --
17        A        -- and the --
18        Q        -- that if they filed an
19   Early Concern could eventually lead to his removal
20   from the school?
21             MS. QUAN:  Sorry, Steve.  Were
22        you -- Were you adding more?  I couldn't
23        hear.  I think there was -- I think you both
24        were talking at the same time.
25             THE WITNESS:  I apologize, Josh.
```

50

BY MR. ENGEL:

Q     Let me ask a separate question.

At some point John Noakes had filed
a retaliation complaint against you; is that correct?

A     It was an allegation, I believe.

Q     Okay.  He filed an allegation that
you were retaliating against him under the Title IX
policy?

A     Yes.

Q     An allegation that you had violated
school rules?

A     I never saw the allegation.

Q     You were aware that it existed,
though; right?

A     Yes.

Q     Okay.  And you were aware it
existed when you participated in this meeting on
April 26th, 2021?

A     I'm not certain of the exact time.

Q     Were you aware that it existed when
you met with the elected student representatives that
you described a few minutes ago?

A     I -- I don't mean to be
disrespectful.  I just don't know the -- I don't have
the exact timing in front of me of when the Office of

---

Equity told me that there was an allegation.

MS. QUAN:  Josh, I think we have
been going for more than an hour.
Whenever -- At some point can we schedule in
a break?

MR. ENGEL:  Sure.

BY MR. ENGEL:

Q     So let me just follow up on this.
When -- When you learned that
John Noakes had filed a complaint against you did you
stop working or -- on any matters involve -- involving
him?

MS. QUAN:  Objection.

A     When the Office of Equity notified
me of the allegation I did not have any further
involvement with the Early Concern.  I did not reach
out to John Noakes and I did not attend the
Committee on Students' meetings that involved
Mr. Noakes.

Q     Did you discuss the John Noakes'
situation with any other medical students after
John Noakes filed his complaint against you?

A     So I don't have a clear idea of the
timeline, so I can't answer that correctly.

Q     Well, in -- in -- in other words, I

---

51

can imagine a situation where you would -- if -- if a
bunch of students approached you about the
John Noakes' situation you would say, "Hey, he's got a
complaint against me.  I am not going to get involved
at all" -- Is that what you did?

MS. QUAN:  Objection.

A     I can't recall an instance when the
students approached me after the time I had been
notified of his allegations.

Q     If I represent to you that
John Noakes filed a complaint on April 19th, 2021,
against you does that refresh your memory about when
that occurred?

A     Once again I -- I don't recall when
the Office of Equity notified me about the
allegations.

Q     So is it your belief then that you
would have been notified about the retaliation
complaint after April 26th of 2021?

A     It's possible.  I just don't have
the timeline in front of me.

Q     Well, if -- if you had been -- if
you had been informed before April 26th at 5:00 p.m.
that there was a retaliation complaint against you
would you have participated in that Zoom meeting

---

52

described on Exhibit 11?

MS. QUAN:  Objection.

A     I can't speculate.

Q     I am not asking you to speculate.
I am asking you what you did.
I mean as soon as you learned that
there was a retaliation complaint did you cease all
involvement in anything involving John -- John Noakes?

MS. QUAN:  Objection.

A     I am unclear when I was notified of
the allegation by the Office of Equity.

Q     So is it possible that you were
aware of the allegation that John Noakes had made
against you when you participated in that April 26th
meeting?

MS. QUAN:  Objection.  And, Steve,
did you finish your answer to the other
question?

THE WITNESS:  No, but -- I'm
sorry -- I lost my train of thought.

MR. ENGEL:  Okay.  Pam, can you
read my question back, please?

(Question on Lines 12 through 15
was read back by the reporter.)

MS. QUAN:  Objection.

54

```
 1        A        I can't speculate.
 2        Q        I am not asking you to speculate.
 3  I mean it's an easy question; right?  I mean if -- if
 4  -- if the answer is, "Of course not.  I never would
 5  have dreamed of participating in a meeting involving
 6  someone who filed a complaint against me," then it's
 7  an easy answer.
 8                 Can you sit here today and testify
 9  under oath that you were not aware of the allegations
10  from John Noakes when you participated in the
11  April 26th Zoom meeting?
12        MS. QUAN:  Objection.
13        A        I am unclear what the timeline is
14  of when I was notified by the Office of Equity about
15  the allegations against me.  The purpose of this
16  meeting was to inform students about the processes at
17  the School of Medicine and at the University, so in my
18  capacity as a Dean I am able to educate students about
19  processes.
20        Q        So it's also possible that you were
21  aware of John Noakes' retaliation complaint against
22  you when you met with the students that you described
23  earlier; right?
24        MS. QUAN:  Objection.
25        A        I can't speculate.
```

55

```
 1  the school's process.  Shortly after that a number of
 2  complaints start rolling in and initiate the process.
 3  Do I have that right?
 4        A        Could you repeat your question,
 5  please?  It was long.  It had several parts.
 6        MR. ENGEL:  Pam, can you read it
 7        back, please?
 8                 (Question on Page 54, Line 21,
 9                 through Page 55, Line 3, was read
10                 back by the reporter.)
11        A        So I don't have the date when I was
12  notified by the Office of Equity about the
13  allegations, so I cannot affirm your timeline.
14        Q        Can you testify --
15        A        I did -- Excuse me.
16        Q        Oh, I'm sorry.
17        A        I did educate the students about
18  the processes at the School of Medicine and the
19  University.
20        Q        Can you testify here today under
21  oath that as soon as you learned about the retaliation
22  complaint by John Noakes you ceased all involvement
23  with his matters?
24        MS. QUAN:  Objection again.
25        A        As stated previously I don't recall
```

54

```
 1        Q        Now, how do you respond to the
 2  suggestion that this is a very Mafia-like thing where
 3  you were essentially saying to the students, "Ah, it
 4  would be a shame if someone filed an Early Concern
 5  against John Noakes; wouldn't it"?
 6        MS. QUAN:  Objection.
 7        A        Are you saying Mafia because I'm
 8  Italian?
 9        Q        No, absolutely not.
10        A        I thought your question was
11  offensive.
12        MR. ENGEL:  Repeat my question
13        back, please, Pam.
14                 (Question on Lines 1 through 5 was
15                 read back by the reporter.)
16        A        The purpose of this meeting was to
17  inform the students of the processes at the School of
18  Medicine and at the University.  There were
19  representatives of the University and of the School of
20  Medicine.
21        Q        So here's the timeline as I see
22  it -- And correct me if I am wrong.
23                 April 19th John Noakes files a
24  complaint against you.  Sometime after that you meet
25  with a number of student representatives and describe
```

56

```
 1  the date that I was notified by the Office of Equity,
 2  so I cannot tell you how my behavior changed.
 3        MR. ENGEL:  Pam, can you read my
 4        question back, please, because I don't think
 5        it depends on the date, the actual date, you
 6        were notified?
 7                 (Question on Page, 55, Lines 20
 8                 through 23, was read back by the
 9                 reporter.)
10        MS. QUAN:  Same objection.
11        A        When I was notified by the
12  Office of Equity about the allegations I did not
13  contact Mr. Noakes after that.  I did not interface
14  with the Professionalism Working Group concerning the
15  Early Concern and I did not attend the Committee on
16  Students' meeting.
17        Q        Did you discuss John Noakes'
18  matters with any other students at Case Western after
19  you learned of his retaliation complaint against you?
20        MS. QUAN:  Objection.  And just
21        so we're clear --
22        Q        It's a yes or no question.
23        MS. QUAN:  Objection.  And just so
24        I'm clear are you including things like this
25        meeting related to processes as matters
```

58

```
1    relating to John Noakes in -- in your
2    question?
3           MR. ENGEL:  Please don't coach the
4           witness.  Pam, can you repeat it back,
5           please?  It's a yes or no question.
6           (Question on Page 56, Lines 17
7           through 19, was read back by the
8           reporter.)
9           MS. QUAN:  Objection.
10   A      I cannot recall.
11   Q      Did you discuss the allegations --
12   I'm sorry.
13          Did you discuss the situation with
14   Jane Roe after April 15th of 2021?
15          MS. QUAN:  Objection.
16   A      I can't recall.
17          MR. ENGEL:  And I asked a bad
18          question, so let me narrow it down a little
19          bit, and as soon as I'm done with this we can
20          take a break if that's okay.
21   BY MR. ENGEL:
22   Q      Shortly after the Title IX decision
23   in favor of John Noakes was released did you discuss
24   this matter with Jane Roe?
25          MS. QUAN:  Objection.
```

```
1    A      I can't recall.
2    Q      Do you recall discussing this
3    matter with Jane Roe during April of 2021?
4           MS. QUAN:  Objection.
5    A      I can't recall.
6    Q      During April of 2021 did you
7    promise Jane Roe that the school would take additional
8    actions against John Noakes?
9    A      I cannot recall.
10   Q      During April of 2021 did you tell
11   Jane Roe that the school would independently review
12   the Title IX matter?
13   A      So there is an internal policy of
14   the Committee on Students that once the University has
15   a Title IX determination that the head of the
16   Committee on Students reviews the Title IX
17   documentation to determine if there were any
18   additional professionalism concerns at the School of
19   Medicine.
20   Q      Is this internal --
21   A      I just know this policy it's not
22   something that I'm part of, so --
23   Q      Is this internal policy that you
24   described in writing?
25          MS. QUAN:  Objection.
```

59

```
1    A      So this is not my area of
2    expertise.  You'd have to -- Yeah, it's not my area of
3    expertise.
4    Q      Doctor, you just testified under
5    oath unequivocally that there is an internal policy of
6    the Committee on Students to review Title IX matters.
7    I'm asking you is that policy in writing?
8    A      I don't know the answer.
9    Q      Okay.  Is that policy part of the
10   Student Handbook?
11   A      I don't know the answer.
12   Q      Is that policy part of the
13   Case Western Reserve University Title IX policy?
14          MS. QUAN:  Objection.
15   A      That's not my area of expertise.
16   Q      Do you know if this review has been
17   done in any other matters involving medical students
18   at Case Western?
19   A      Yes.
20   Q      Are there any notes or documents
21   that would have been created as a result of that
22   review?
23   A      I don't know.
24   Q      Were there any notes or documents
25   created as a result of the internal review done
```

60

```
1    involving John Noakes?
2    A      I don't know.
3    Q      Do you know if that internal review
4    involved potential misconduct or unprofessional
5    conduct by Jane Roe?
6    A      I don't know.
7           MS. QUAN:  Objection.
8           MR. ENGEL:  And, Amanda, I'd ask
9           that you please provide a copy of this
10          policy.
11          MS. QUAN:  I'm -- I'm sorry.  A
12          copy of what policy?
13          MR. ENGEL:  The policy that was
14          just described by Dr. Ricanati in his answer.
15          MS. QUAN:  If it is written I will
16          certainly provide a copy.
17          MR. ENGEL:  All right.  Now's a
18          good time to take our break.  I know we have
19          been going a while.  How long -- Let's go off
20          the record.
21          (Deposition stood in recess at
22          11:11 a.m.)
23          (Deposition reconvened at
24          11:31 a.m.)
25          MR. ENGEL:  All right.  Let's go
```

**62**

1    back on the record.

2   BY MR. ENGEL:

3    Q    Doctor, did you have a conversation

4   with John Noakes and his counsel on April 19th of

5   2021?

6    A    I don't have the date in front of

7   me, but I believe April 19th was the day that I

8   contacted Mr. Noakes about the Early Concern.  Is that

9   the discussion that you are referring to?

10    Q    I believe so, yes.

11    So tell me everything you remember

12   about that conversation?

13    A    So the process of the School of

14   Medicine is that when an Early Concern is filed it

15   goes to the Professionalism Working Group.  The

16   Professionalism Working Group gives it to the

17   Society Dean, the advisor for the student to contact

18   the student and get their student's perspective, and I

19   contacted Mr. Noakes to inform him that an

20   Early Concern had been filed and to get his

21   perspective.

22    Q    What did Mr. Noakes tell you?

23    A    He said, "Do I need a lawyer," and

24   I said, "That is," you know, "up to you," and I

25   said -- he said, "What is this about," and I said,

---

1   "This was an Early Concern filed about a GroupMe

2   post," and he said something like, "What post was it,"

3   and I read the post to him and then he said, "I think

4   I need a lawyer."

5    Q    Did you tell him that he was not

6   permitted to have a lawyer during the conversation?

7    A    I did not tell him.  As I stated, I

8   told him it was his choice.

9    Q    At some point during this

10   conversation did you or did John Noakes conference in

11   his attorney, Ms. Tamashasky?

12    A    Yes.

13    Q    What do you remember about

14   Ms. Tamashasky's conversation with you?

15    A    Mr. Noakes said, "I want to

16   introduce my counselor, Ms. Anne Tamashasky," and I

17   was confused because he said he was going to contact

18   his lawyer, so I asked her, "Are you a lawyer?"

19    Q    What happened next?

20    A    She started screaming at me about

21   Title IX and the Clery Act and why didn't I know all

22   these things.

23    Q    So is it your testimony that she

24   was screaming at you?

25    A    Yeah, literally.

---

**63**

1    Q    During this conversation were you

2   told by Mr. Noakes that he had filed a retaliation

3   complaint against you?

4    A    Well, the conversation once she

5   started screaming at me and talking about the

6   Clery Act and all these things I said, "I will not

7   tolerate your disrespect," and I discontinued the

8   conversation.

9    Q    At any point during this

10   conversation did either John Noakes or Ms. Tamashasky

11   inform you that a retaliation complaint had been filed

12   against you?

13    A    Not to my recollection.

14    Q    Okay.  So let me show you an email

15   from April 19th, 2021, at 3:39 p.m. which we'll mark

16   as Exhibit 29.  This has Bates No. -- It begins with

17   Bates No. 136.

18    (Plaintiff's Exhibit 29 was marked

19    for identification.)

20   BY MR. ENGEL:

21    Q    Sir, do you remember this email

22   exchange?

23    A    I do.

24    Q    Okay.  So first I notice at

25   3:14 p.m. John Noakes asks for a copy of the

---

**64**

1   Early Concern form.  Did you provide that with him --

2   or to him?

3    A    If you look at my email dated 3:33

4   I directed him to the Office of General Counsel for

5   assistance.

6    Q    So the answer is, no, you didn't

7   provide him a copy of the Early Concern form?

8    A    I provided him a pathway to get the

9   information that he requested.

10    Q    So that's a no?  You didn't provide

11   it to him.  I mean it's an easy question; right?  This

12   will go -- This will go quicker if you just answer the

13   questions.

14    So did you provide him with a copy

15   of the Early Concern form?

16    A    I provided him the appropriate path

17   to get a copy of the Early Concern form.

18    Q    So the answer is yes or no?

19    MS. QUAN:  Objection.

20    A    My answer stays as stated.

21    Q    Can you testify under oath today

22   that you provided him with a copy of the Early Concern

23   form?

24    A    I provided him with a mechanism for

25   him to get a copy of the Early Concern form.

66

```
1    Q       Did the General Counsel's office
2    have a copy of the Early Concern form?
3    A       I --
4    MS. QUAN:  Objection.
5    A       I can't speculate for the Office of
6    General Counsel.
7    Q       So how did you know he could get it
8    from the Office of General Counsel if they didn't even
9    have it?
10   A       I can't speculate.
11   Q       Well, you just told me you provided
12   him a path to get the form.  How do you know that that
13   was an effective path to get the form if
14   General Counsel's office didn't even have it?
15   MS. QUAN:  Objection.
16   A       It was my understanding that the
17   Office of General Counsel was monitoring this process
18   and had full access to all information involved.
19   Q       And how do you know that?
20   Were you able to hear my question?
21   I'm sorry.
22   A       Yeah, I heard your question.  I
23   don't -- I don't -- I don't have a clear answer.
24   Q       All right.  So now I see at
25   3:39 p.m. John Noakes emails you.  In part of his
```

Jackson-Whitney Reporting LLC
513.868.1919

67

```
1    email he says that, "Please confirm that you will no
2    longer be participating in this matter pending the
3    resolution and investigation of my Title IX
4    retaliation complaint."  Do you see that?
5    A       I do see that, yeah.
6    Q       Okay.  So what did you do when you
7    received -- What -- What did you do in response to
8    that email?
9    A       I forwarded everything to the
10   Office of Equity and Office of General Counsel.
11   Q       So is it a fair conclusion that as
12   of 3:39 p.m. on April 19th, 2021, you were aware that
13   John Noakes had a Title IX retaliation complaint
14   against you?
15   A       I was aware that he said he had
16   one, but I was not aware that one -- I was not
17   notified by the Office of Equity of the truth of that.
18   Q       What -- And what efforts did you
19   make to determine the truth of that statement?
20   A       I forwarded this information to the
21   Office of Equity.
22   Q       And did they respond to you?
23   A       I don't recall.
24   Q       So at least as of 3:39 p.m. on
25   April 19th it appears you were on notice that there
```

Jackson-Whitney Reporting LLC
513.868.1919

67

```
1    was a possibility of a Title IX retaliation complaint
2    against you by John Noakes; right?
3    A       I recall that he alleged that there
4    was a retaliation claim.
5    Q       So at that time did you cease
6    involvement with any issues involving John Noakes?
7    MS. QUAN:  Objection.
8    A       I don't recall the specific
9    timeline.
10   Q       Well, isn't it true that after
11   April 19th of 2021 you met with a number of students
12   and discussed the John Noakes' matter?
13   A       I just met with a number of
14   students to hear their concerns about a GroupMe post
15   and to educate them about the processes at the
16   School of Medicine and the University.
17   Q       And you participated in the
18   April 26th meeting; right?
19   A       Shirley Mosley from the Dean of
20   Students' office, Dr. Angela Clark-Taylor from the
21   Flora Stone Mather Center For Women, and myself were
22   present to help educate the students about the
23   processes available to them.
24   Q       And you communicated with his
25   Society Dean after April 19th about these matters;
```

Jackson-Whitney Reporting LLC
513.868.1919

68

```
1    right?
2    A       I don't recall.
3    MS. QUAN:  Objection.
4    Q       Isn't it true you actually drafted
5    an email that Dr. Greenfield would send to John Noakes
6    about this matter?
7    MS. QUAN:  Objection.
8    A       I don't recall.
9    (Court Reporter had technical
10   difficulty with machine and had to
11   go off the record.)
12   (Deposition stood in recess at
13   11:43 a.m.)
14   (Deposition reconvened at
15   11:45 a.m.)
16   BY MR. ENGEL:
17   Q       Okay.  Do you remember John Noakes
18   in April of 2021 expressing concerns that you were
19   continuing to be involved in his matters?
20   A       I do recall that Dr. Greenfield had
21   copied me on an email to Mr. Noakes and Mr. Noakes
22   requested that that stop.
23   Q       Okay.  So I'm showing you what
24   we'll mark as Exhibit 30 which is an April 26th, 2021,
25   email with Bates No. 852 at the beginning [sic].
```

Jackson-Whitney Reporting LLC
513.868.1919

70

```
1              (Plaintiff's Exhibit 30 was marked
2              for identification.)
3  BY MR. ENGEL:
4       Q        Is this the email you're referring
5  to?
6       A        He is acknowledging that I
7  advocated my involvement "in this situation via his
8  assignment of Dr. Greenfield as my interim
9  Society Dean", yes.  He is affirming that I did that.
10      Q        And he asked that you discontinue
11  your involvement in any of his matters; right?
12      A        I think she accidentally copied me
13  on an email --
14      Q        Okay.
15      A        -- but he did affirm in his note
16  that I have acted appropriately by affirming -- by
17  assigning Dr. Greenfield as my interim Society Dean,
18  so --
19      Q        Well, after April 26--
20      A        -- he acknowledged that.
21      Q        I'm sorry.  Were you done with your
22  answer?  I didn't mean to cut you off.
23      A        I acknowledge that he -- that I
24  have already abdicated my involvement in the situation
25  "via his assignment of Dr. Greenfield as my interim
```

71

```
1              MS. QUAN:  Objection.  Sorry,
2              Steve.  Make sure -- Make sure you give me a
3              little bit of time to object if I need to.
4              Thank you.
5              THE WITNESS:  I'm sorry.
6  BY MR. ENGEL:
7       Q        I'm going to ask again a very
8  lawyerly question and I apologize if -- if normal
9  people might see this as redundant, but we -- we as
10  lawyers don't.
11              Can you testify here today under
12  oath that you did not discuss John Noakes' matter with
13  anyone who serves on the Professionalism Working Group
14  following April 26th of 2021?
15              MS. QUAN:  Objection.
16      A        I cannot recall.
17      Q        Can you testify under oath that you
18  have not discussed John Noakes' matter with anyone who
19  served on the Committee on Students following
20  April 26th of 2021?
21              MS. QUAN:  Objection.
22      A        I do not recall.
23      Q        So since you don't recall it's
24  possible that both those things occurred?
25              MS. QUAN:  Objection.
```

72

```
1  Society Dean" --
2       Q        Did you have any --
3       A        -- and I acknowledge that he says
4  that.
5       Q        Did you have any further
6  involvement in matters involving John Noakes --
7              MS. QUAN:  Objection.
8       Q        -- following April 26th of 2021?
9              MS. QUAN:  I'm sorry.  Objection.
10      A        I don't recall.
11      Q        Did you discuss John Noakes'
12  matters with anyone in the Professionalism Working
13  Group?
14              MS. QUAN:  Objection.
15      A        I don't recall.
16      Q        Did you discuss John Noakes' matter
17  with anyone in the Committee on Students?
18              MS. QUAN:  Objection.
19      A        I was not present at the
20  Committee on Students when he was discussed.
21      Q        That's not my question, though.
22              My question was did you discuss
23  John Noakes' matter with anyone who served on the
24  Committee on Students following April 26th of 2021?
25      A        I don't recall.
```

```
1       A        I can't speculate.
2       Q        I am not asking you to speculate.
3              In other words, you're not going to
4  come into court on December 22nd and deny that you
5  talked to anyone in the Professionalism Working Group
6  or the Committee on Students about John Noakes' matter
7  following April 26th of 2021; are you?
8              MS. QUAN:  Objection.
9       A        I do not recall.
10      Q        Did you talk to Jane Roe about
11  John Noakes' matter --
12              MS. QUAN:  Objection.
13      Q        -- following April 26th of 2021?
14      A        I can't recall.
15      Q        In particular in August of 2021
16  were you involved in any conversations during which
17  John Noakes was encouraged to take a year off of
18  school because of this matter?
19      A        So I'm -- I'm sorry.  Could you
20  rephrase the question?  Are you asking did I meet with
21  Mr. Noakes?
22              MR. ENGEL:  Can you repeat the
23              question, please, Pam?
24              (Question on Lines 15 through 18
25              was read back by the reporter.)
```

74

```
1         A      I never had a conversation with
2  Mr. Noakes about taking a year off from -- from school
3  concerning this matter.
4         Q      Did you have a conversation with
5  anyone else about whether John Noakes should take a
6  year off of school?
7         A      I was informed by Dr. Greenfield
8  that she had had discussions with Mr. Noakes about
9  extending his medical education to pursue an excellent
10 business opportunity.
11        Q      At any point following April 15th
12 of 2021 did you tell John Noakes that you were sorry
13 for what he had been through?
14        A      I can't recall.
15        Q      Do you ever remember telling
16 John Noakes, "I'm sorry that this has happened"?
17        A      When I met with Mr. Noakes and
18 Dr. Azok in January I did say I was sorry that he was
19 going through this difficult experience.
20        Q      Did you say that at any other time
21 to him?
22        A      I can't recall.
23        Q      I'm going to show you what we have
24 marked as Exhibit 14 which is a May 25th, 2021, email
25 from Jane Roe, Bates No. 842 at the bottom.  Do you
```

```
1  remember receiving this email?
2         A      Can you please scroll down?
3                Can you scroll all the way down,
4  please?
5         Q      I think that's the end of the
6  document.
7         A      I'm sorry.  What -- What was your
8  question, Mr. Engel?
9         Q      Very simple.  Do you remember
10 receiving this email.
11        A      I do.
12        Q      How did you respond to this email?
13        A      I can't recall.  I think I might
14 have left it to Dr. Logio to respond.  I can't recall
15 if I responded to her directly or let Dr. Logio speak
16 with the group.
17        Q      Before responding did you discuss
18 this matter with Dr. Logio?
19        A      I honestly can't remember if I
20 responded to the student directly or if I let
21 Dr. Logio do the response.
22        Q      Not the question I asked.  Let me
23 ask a better question.
24                Did you discuss this email with any
25 of the other people who were copied on it?
```

75

```
1         A      I believe that I did discuss it
2  with Dr. Logio.
3         Q      Tell me everything you remember
4  about that conversation?
5         A      I don't -- I don't remember a lot.
6  I think Dr. Logio was -- Dr. Logio and Dr. Otteson
7  were the people that were providing kind of the main
8  support for this student.  I honestly don't know her
9  very well.
10        Q      By the time you received this email
11 you were aware that John Noakes had a retaliation
12 complaint against you; right?
13        A      I don't know when the Office of
14 Equity notified me about it.  I do have that
15 information from the Office of Equity.  I'm sorry.  I
16 just don't have it.
17        Q      Do you recall if you told Dr. Logio
18 or Dr. Otteson or anyone else that you can't have any
19 involvement in this matter because of the retaliation
20 complaint?
21        A      I -- I don't recall that -- the
22 timing of it.  When I was notified by the Office of
23 Equity I made it clear to the Society Deans and
24 Dr. Logio that they needed to have -- that they needed
25 to take over involvement with this issue and interface
```

76

```
1  with the Office of Equity and General Counsel.
2         Q      So if you were aware on May 25th of
3  2021 of a -- that John Noakes had a retaliation
4  complaint against you you -- you'd agree it would have
5  been inappropriate for you to respond to this email
6  directly; right?
7                MS. QUAN:  Objection.
8         A      So once again I don't recall when
9  the Office of Equity informed me about this -- this
10 allegation.
11        Q      Whenever the Office -- Whenever
12 that day was that the Office of Equity informed you of
13 the retaliation allegation did you cease all
14 involvement in the John Noakes/Jane Roe matter.
15        A      I do not recall.
16        Q      Okay.  In fact, you responded to
17 Jane Noakes directly; didn't you?
18        A      I -- I don't recall.  If you want
19 to produce that we can look at that together.
20        Q      Oh, yeah, I'd be happy to.
21                So we'll mark as Exhibit 31 an
22 email that you sent back to Jane Roe on May 26th of
23 2021.
24                (Plaintiff's Exhibit 31 was marked
25                for identification.)
```

78

BY MR. ENGEL:

     Q        Does this refresh your recollection
that the next day you responded to Jane Roe's email?

     A        I was expressing empathy for her.

     Q        So the answer is, yes, you
responded to her email?

     A        I responded with an expression of
empathy.

     Q        So is it your testimony that on
May 26th, 2021, you were not aware of the retaliation
complaint against you?

     A        I don't have that information.  I
don't recall the timeline of when the Office of Equity
notified me.

     Q        Well, I'm -- I'll just -- Sir, with
all due respect I'm really confused on this point.
I'm trying to figure out if whenever the moment was
that you were informed of this retaliation complaint
against you you said, "I'm not going to get involved
in this anymore," or if after that point you continued
to have involvement in it.  Which is it?

          MS. QUAN:  Objection.

     A        I'm sorry you're frustrated.

     Q        I very frustrated because with
all due respect I think you're not answering my

---

question.

          I just want to know regardless of
the date it was that you found out that there is a
retaliation complaint against you on that date did you
cease all involvement in this issue or not, yes or no?

          MS. QUAN:  Objection.

     A        I'm sorry that you're frustrated.
I'm certain the Office of Equity can confirm the
actual date that I was notified.  If you produce that
we can look at a timeline together and I can be more
targeted in answering your question.

     Q        Okay.  But I'm not --

     A        Expressing -- Excuse me.
Expressing empathy for a student who is in distress is
part of the job of the Dean of Students.

     Q        But you didn't answer my question
again.  It's a simple question.

          Whenever that day was that the
Office of Equity -- And, believe me, sir, if I knew it
I would tell you, but it hasn't been produced or I
couldn't find it in discovery -- but whenever that day
was either you said to yourself, "I'm not going to be
involved in this anymore," or you continued to have
involvement, whether it's May 1st, May 15th.
June 1st, whatever it was.  Can you tell me if on the

---

79

day that you learned that there's a retaliation
complaint against you you ceased all involvement in
this matter or not?

          MS. QUAN:  Objection.

     A        When I was notified of the
allegations against me by the Office of Equity I
followed the guidance that they provided me at the
time.

     Q        What was that guidance?

     A        Excuse me.  Expressing empathy for
a student in distress is always permissible.

     Q        What specific guidance were you
given by the Office of Equity about your involvement
in this matter when they notified you of the
retaliation complaint?

          MS. QUAN:  Objection.

     A        They had very specific guidance and
that was that I was to make sure that he had a new
Society Dean.

     Q        Did they tell you --

     A        That's my recollection.

     Q        Did they tell you, "We're not going
to have any more involvement in this matter"?

          MS. QUAN:  Objection.

     A        I do not recall.

---

80

     Q        Do you remember speaking to
Jane Roe's father about this matter?

     A        I did.

     Q        Did that occur before or after you
were aware of the retaliation allegations against you?

     A        I don't recall.

     Q        Tell me everything you remember
about the conversation with Jane Roe's father?

     A        He called me and I returned his
phone call.

     Q        Okay.  When did that occur?

     A        I don't have the date.

     Q        What else do you remember from the
conversation you had with him?

     A        I remember that he -- I think his
daughter had been admitted to the hospital -- I think
I'm remembering this correctly -- and he was --

          MS. QUAN:  I'm going to --

     A        -- in distress.

          MS. QUAN:  I'm sorry, Josh.  This
portion, can we mark this confidential as
it's not -- I -- I believe it's going to have
some medical information about another
student.

          MR. ENGEL:  Yeah, I -- I don't -- I

82

1       don't need the details of the medical
2       information about the other student.
3  BY MR. ENGEL:
4       Q       Just tell me what --
5       A       So when parents have an ill child
6  they often reach out for support.
7       Q       What else do you remember from that
8  conversation?
9       A       That he was distressed and worried
10  about his child.
11      Q       Did he specifically ask the school
12  to take any actions against John Noakes?
13      A       I recall that he had specific
14  concerns about some interim agreement and I told him
15  that he needs to address those things with the
16  Office of Equity, I don't know anything about that.
17      Q       Do you remember anything else from
18  that conversation?
19      A       Just showed a lot of empathy for a
20  father who was clearly distressed about their ill
21  child.
22      Q       Did you ever discuss this matter
23  with an attorney for Jane Roe?
24      A       Not that -- I don't recall.
25      Q       Has Jane Roe or her attorney ever

---

82

1  threatened to sue Case Western?
2       A       Not to my knowledge.
3       Q       Has the school reached any kind of
4  financial or otherwise settlement with Jane Roe about
5  this matter?
6       A       Not to my knowledge.
7       Q       Do you know if Jane Roe has
8  received any accommodation as a result of her claim
9  that she's a victim of sexual assault beyond the
10  No Contact Order?
11      A       Not to my knowledge.
12      Q       Do you know if her grades were
13  changed at all?
14      A       I'm Student Affairs advising.  I
15  don't -- I am not curriculum or assessment.  I don't
16  write grades.
17      Q       I am just asking if you know?
18      A       That's not my area of expertise.
19      Q       I am just asking if you know?
20      A       Not to my knowledge.  I did grant
21  accommodations to John Noakes to delay several exams.
22  Early on he had the death of a relative and needed to
23  delay exams so he contacted me for that accommodation.
24  I believe he's had further accommodations to delay
25  exams.  I'm not aware of -- of Jane Roe getting

---

83

1  accommodations.
2       Q       Did you ever discuss the
3  retaliation complaint John Noakes had against you with
4  Dr. Greenfield?
5       A       I do not recall.  I don't -- I
6  don't recall.
7       Q       Did you ever ask Dr. Greenfield to
8  pressure John Noakes to drop his retaliation complaint
9  against you?
10      A       Say it again.  I'm sorry.  I
11  lost --
12      Q       Let me ask it a different way.
13      Did you ever discuss with
14  Dr. Greenfield the fact that John Noakes had filed a
15  Title IX complaint against Jane Roe?
16      A       I don't recall having that
17  discussion.
18      Q       Do you know if anyone ever
19  encouraged John Roe [sic] to drop or not pursue his
20  retaliation complaint against you?
21      A       You said "John Roe".
22      Q       I'm sorry.  John Noakes.
23      A       Can you restate the question with
24  the appropriate name, please?
25      Q       Do you know -- or did you ever

---

84

1  discuss with anyone -- Well, let me rephrase, ask it a
2  different way.
3       Do you know if anyone ever
4  encouraged John Noakes to drop or not pursue his
5  retaliation complaint against you?
6       A       I do not know of such a discussion.
7       Q       Do you know if John Noakes was ever
8  encouraged to drop or not pursue his retaliation --
9  I'm sorry -- his Title IX complaint against Jane Roe?
10      A       I'm -- I'm not aware of such a
11  discussion.
12      Q       Would it violate any policy or
13  procedure -- any policy at Case Western if John Noakes
14  was encouraged to drop or not pursue his retaliation
15  complaint against you?
16      MS. QUAN:  Objection.
17      A       I am not an expert on those
18  processes and Title IX intricacies.
19      Q       Do you know if it would violate any
20  policy if John Noakes were encouraged to drop or not
21  pursue his Title IX complaint against Jane Roe?
22      MS. QUAN:  Objection.
23      A       I can't speculate.  It's not my
24  area of expertise.
25      Q       Let me show you now what we have

86

1 marked as Exhibit 4 which is -- It doesn't have a
2 Bates number -- but it's a Class Survey that was done.
3 Have you ever seen this before?
4          A.      No.
5          Q.      Why don't you take a chance to
6 review it and then I'll ask you a couple questions
7 about it?  And I'll -- I'll represent to you that the
8 two blanks at the bottom of the page are the name of
9 John Noakes.
10         A.      Can you scroll down, please?
11                 And scroll further down, please.
12                 Is that the very bottom?
13         Q.      That is.
14         A.      Okay.  Yeah, I have read it.
15         Q.      Is it your testimony that you have
16 never seen this survey before?
17         A.      I don't recall seeing the actual
18 survey.  I recall seeing the results of this but not
19 the actual survey.
20         Q.      How did you learn about the results
21 of this?
22         A.      It was presented at the end of that
23 Voices' session that I had with the students.
24         Q.      Did you discuss this matter with
25 the students who circulated the survey?

1          A.      I -- I discussed the results that
2 were presented with the President of the student
3 government.
4          Q.      Do you remember telling the student
5 that circulated the survey it was inappropriate?
6          A.      I remember telling her that it was
7 not good leadership and it was not a good survey.
8          Q.      Did you tell -- Do you remember
9 meeting with Carol Rendon and Carrie Valdez?
10         A.      It's not -- Say the first name
11 again.
12         Q.      Carol Rendon and Carrie Valdez.
13         A.      I don't think it's Carol.  I think
14 it's -- That -- That name doesn't sound correct.  It's
15 Carrie Rendon and Carrie Valdez.  I think they're both
16 Carries.  Does that sound right?  I think you're --
17 you're talking about the lawyers for an external law
18 firm hired by Case to investigate the allegations of
19 retaliation; is that correct?
20         Q.      Yes.  We'll -- We'll just say
21 Ms. Rendon and Ms. Valdez.
22         A.      Okay.
23         Q.      Do you remember meeting with them
24 to discuss this matter?
25         A.      We had phone conversations.  Did we

87

1 meet -- We did not meet in person.  It's possible we
2 met over Zoom.
3          Q.      Do you remember telling them you
4 had a long conversation with the student who wrote
5 this survey and explained that he thought circulating
6 the survey was inappropriate?
7          A.      I had a long conversation with the
8 person who presented the data to me and told them that
9 it was poor leadership and that the survey and data
10 were of low -- low quality of evidence.
11         Q.      Before I forget I have a question
12 about the Early Concern process.  Are professors or
13 faculty of the school permitted to submit
14 Early Concerns?
15         A.      Yes --
16         Q.      Are you permitted --
17         A.      -- faculty and staff.
18         Q.      I'm sorry.
19                 Are you permitted to submit an
20 Early Concern?
21         A.      Permitted -- So the Society Deans,
22 the Liaison Committee on Medical Education, says that
23 there needs to be a separation between advising and
24 evaluating.  The Society Deans are advisors and
25 student advocates, so they don't typically submit

88

1 Early Concern forms --
2          Q.      Did you --
3          A.      -- because that's part of our
4 evaluation process of professionalism.
5          Q.      If you observe unprofessional
6 conduct by a student how would you bring that to the
7 attention of the Professionalism Working Group?
8          A.      So --
9                  MS. QUAN:  Objection.
10                 THE WITNESS:  I apologize.
11         A.      We would encourage the people that
12 are reporting the incident to utilize the processes at
13 the School of Medicine.
14         Q.      I'm asking you if you become aware
15 of unprofessional conduct by a student how would you
16 bring it to the attention of the
17 Professionalism Working Group?
18                 MS. QUAN:  Objection.
19         A.      So I'm -- I'm -- I'm sorry.  Could
20 you -- Could you -- It's a lot of speculation.
21 What's -- What's the scenario that you're --
22         Q.      Any.
23                 If you -- If you become aware of
24 what you believe is unprofessional conduct by a
25 student how would you bring it to the attention of the

90

```
1   Professionalism Working Group?
2          A       So I would have the faculty member,
3   the staff, or the fellow student who observed the
4   information -- I would have them submit an
5   Early Concern form so that it goes to the Committee on
6   Students.
7          Q       What if you observed the -- the
8   unprofessional conduct yourself?
9          A       So if I were that student's
10  Advisory Dean I would -- their Society Dean then I
11  would request one of the other Society Deans or
12  another faculty member outside of Student Affairs to
13  evaluate the situation and make a referral if
14  appropriate.
15         Q       Looking at this Class Survey do you
16  believe it contains anything that could be
17  unprofessional conduct?
18                 MS. QUAN:  Objection.
19         A       So this survey was presented to
20  me -- The data from the survey were presented to me by
21  the elected leaders of the class and I thought that it
22  was poor leadership and poor -- The survey was written
23  very poorly.  The data was very poor.
24         Q       So was your concern with this
25  survey merely that the data was poor and not that it
```

91

```
1          A       I met with the leader, the elected
2   leader, of the student government and explained my
3   concerns.
4          Q       Was an Early Concern process
5   started against the students who wrote this survey?
6          A       I did not file an Early Concern.
7          Q       Do you know if one was filed?
8          A       Once again I am not involved with
9   that process.  The Early Concerns go to the
10  Professionalism Working Group.
11         Q       But you didn't file one; right?
12         A       Correct.
13         Q       Okay.  And you didn't ask one of
14  the other Society Deans to file one either?
15         A       Correct.
16         Q       Let me show you what we have marked
17  as Exhibit 5 which is a petition that was surveyed --
18  or -- I'm sorry -- circulated about John Noakes.  Have
19  you ever seen this before?
20         A       I don't recall ever seeing -- Well,
21  let me finish reading it.
22                 Can you scroll down, please?
23                 I don't -- I don't recall ever
24  seeing this.
25         Q       Having had a chance to review it
```

92

```
1   might be bullying or intimidating towards John Noakes?
2                 MS. QUAN:  Objection.
3          A       My concern was that this was not
4   good leadership, that the survey was written poorly
5   and the conclusions that they were drawing from the
6   data were not valid.
7          Q       Do you believe that this
8   Class Survey is meant to bully or intimidate
9   John Noakes?
10                 MS. QUAN:  Objection.
11         A       The leadership of the student
12  government felt that the administration needed to hear
13  from the students who elected them and were trying to
14  represent those students utilizing this tool.
15         Q       Is this tool -- or is this survey
16  unprofessional conduct as you defined it in your
17  April 16th, 2021, email?
18                 MS. QUAN:  Objection.
19         A       I think it is an example of -- of
20  leadership that was not good and inadequate
21  scholarship use of data.
22         Q       Did the medical school take any
23  actions to try to -- or any actions against the
24  students who were responsible for the survey?
25                 MS. QUAN:  Objection.
```

92

```
1   this appears to be a petition asking that the medical
2   school expel John Noakes; right?
3          A       I -- I can read what it says, "We,
4   the undersigned, are calling for the expulsion of MS1
5   John Noakes from the class of 2024."
6          Q       Do you believe that this petition
7   had the effect of bullying or intimidating
8   John Noakes?
9                  MS. QUAN:  Objection.
10         A       I -- I can't speculate how it made
11  him feel.
12         Q       Do you believe that this petition
13  was inflammatory or accusatory towards John Noakes?
14                 MS. QUAN:  Objection.
15         A       I can't speculate his -- how he
16  felt.
17         Q       I'm not asking you how he felt.  I
18  mean looking at it does this appear to be inflammatory
19  or accusatory?
20                 MS. QUAN:  Objection.
21         A       I mean it says in Item No. 1,
22  "John Noakes has been accused."
23         Q       So that's a yes?
24         A       I'm just stating what it says.
25         Q       Well, do you believe -- Is this
```

94

1  electronic communication inflammatory or accusatory as
2  you use that term in your April 16th, 2021, email?
3            MS. QUAN:  Objection.
4        A      This is the first that I'm seeing
5  this.  I would -- I would have to think about it and
6  study it.  I -- I don't feel like I can give you a
7  firm answer from looking at a document for, you
8  know --
9        Q      What other --
10       A      -- a few seconds.
11       Q      -- information would you want to
12 review about it?
13       A      I just would have to think about
14 it.
15       Q      How long do you need?  We can take
16 our time.
17       A      I --
18       Q      I mean here's where I'm confused.
19 I mean John Noakes posts Exhibit 1 at 4:38 p.m.;
20 right?  That's the time; right?
21       A      It says "4:38 p.m."
22       Q      And a short time later you had a
23 call with Darnell Parker about this matter; didn't
24 you?
25       A      I don't recall the timing.

1        Q      It was the same day; right?
2        A      I can't recall.
3        Q      Well, let me show you what we'll
4  mark as Exhibit 32 which is an April 15th, 2021, email
5  from you to Darnell Parker, Bates No. 412 at the
6  bottom.
7            (Plaintiff's Exhibit 32 was marked
8            for identification.)
9  BY MR. ENGEL:
10       Q      Do you remember sending that email?
11       A      It looks like an email that I sent,
12 yes.
13       Q      So it didn't take you very long
14 after John Noakes posted that email for you to start
15 taking action through the Office of Equity in
16 responding to his email; right -- or his post?  I'm
17 sorry.
18       A      There was no action.  This was a
19 phone call with Darnell.
20       Q      Well, here's -- here's where I'm
21 confused:  As I look at this petition and I compare it
22 to John Noakes' post and this petition mentions
23 John Noakes by name whereas his post doesn't mention
24 anyone else by name; right?
25       A      His does mention John Noakes by

95

1  name.
2        Q      Okay.  And John Noakes in his post
3  didn't mention Jane Roe by name; did he?
4        A      I did not see Jane Roe's name in
5  the GroupMe post.
6        Q      In fact, in the GroupMe post if you
7  didn't know that John Noakes had been accused of
8  sexual misconduct you would have no idea what he was
9  posting about; right?
10           MS. QUAN:  Objection.
11       A      I -- I can't speculate.
12       Q      Well, I mean -- Why -- I mean why
13 -- I am not asking you to speculate.
14           Do you see anything in Exhibit 1
15 that discloses that he was accused of sexual
16 misconduct?
17       A      What I heard from the students was
18 it has to do with context and timing, not just words.
19 Words alone don't explain -- give the full richness of
20 this.
21       Q      So I'm trying to figure out why are
22 you taking all these actions against John Noakes as a
23 result of this GroupMe post, but you didn't take any
24 actions at all as a result of Exhibit 4 and Exhibit 5?
25           MS. QUAN:  Objection.

96

1        A      With all due respect, Josh, I just
2  told you this is the first time seeing this and now
3  you're saying that I was -- didn't take action on
4  something that I never saw.
5        Q      You were aware --
6        A      I don't understand.
7        Q      You -- You just told us before you
8  were aware of this Class Survey; right?
9        A      I saw the results of the
10 Class Survey.  I was not aware of this petition.
11       Q      Okay.  So now that you're aware of
12 this petition what actions are you going to take?
13       A      Anyone who received this petition,
14 including Mr. Noakes, would have had the ability to
15 file an Early Concern and use the process at the
16 School of Medicine.
17       Q      You have that ability too; don't
18 you -- Right?  I mean you told us before you did.
19           So now that you're aware of this do
20 you intend to file an Early Concern against the
21 student who authored that?
22           MS. QUAN:  Objection.
23       A      I think the appropriate course
24 would be to reach out to John Noakes, understand how
25 this made him feel, and empower Mr. Noakes to utilize

98

1  the processes at the School of Medicine to address his
2  concerns.
3       Q       So the answer is, no, you do not
4  intend to file an Early Concern against the student
5  who wrote this petition and who circulated this
6  survey?
7            MS. QUAN:  Objection.
8       A       I think as you stated earlier you
9  wanted me removed from anything to do with this
10 student at the time that this petition was circulated,
11 so you wanted me removed from any processes associated
12 with him --
13      Q       Well, you were --
14      A       -- and now you're asking me to
15 insert myself?  Please clarify.
16      Q       Well, which is it?  I mean if you
17 have said that you completely removed yourself from
18 the process then that's great, but I don't think you
19 have.  I think you have continued to be involved in
20 this process all the way through August and September;
21 isn't that true?
22            MS. QUAN:  Objection.
23      Q       Isn't it true that in the past few
24 months you have had numerous discussions with people
25 about the No Contact Order between John Noakes and

---

99

1  the Professionalism Working Group?
2       A       I don't recall.
3       Q       Did you take any actions to make
4  sure that John Noakes was not publicly belittled or
5  humiliated?
6       A       In -- In relationship to this?
7       Q       Well, let's ask it two ways, sir.
8  First in relationship to this and second at all?
9       A       Mr. Engel, you -- you just affirmed
10 that Mr. Noakes was very clear that he didn't want me
11 contacting him or involved in this affair, but then
12 you're -- then you're belittling me for not acting.
13      Q       I am not belittling you.  I am just
14 asking --
15      A       I don't understand.
16      Q       I am just asking what you did, sir.
17 I am asking -- If the answer is, no, you didn't take
18 any action, then, great, that's the answer.  Just tell
19 me the answer.
20      A       I followed the --
21      Q       Did you take any action in response
22 to receiving this June 15th, 2021, email to prevent
23 students from publicly belittling or humiliating
24 John Noakes, yes or no, and then you can tell me why?
25      A       I instructed Molly Simmons to refer

---

Jane Roe?

1  Jane Roe?
2       A       I have referred all questions to do
3  with the No Contact Order to the Office of Equity.
4  When people bring those concerns to me I refer them to
5  where they need to go.
6       Q       You haven't engaged in any
7  substantive discussions about that at all?
8            MS. QUAN:  Objection.
9       A       When people bring those attentions
10 to my concern [sic] I refer them to the Office of
11 Equity.
12      Q       Let me show you what we marked as
13 Exhibit 7.  This is a June 15th, 2021, email from
14 Molly Simmons to you, Bates No. 828 at the bottom, and
15 it indicates that there is a report that students were
16 publicly belittling and humiliating John Noakes.  What
17 did you do when you received the June 15th, 2021,
18 email?
19      A       So the mistreatment reports are
20 reports of faculty or staff mistreating students, so
21 this report was inappropriately filed with the
22 Mistreatment Working Group, so it was inappropriate
23 and I -- I imagine I said, "This doesn't belong here.
24 Refer it to the Professionalism Working Group."
25      Q       Do you know if it got referred to

---

100

1  this report to the appropriate place.  That's what I
2  did.
3       Q       And did you follow up to make sure
4  it was actually referred there?
5       A       I don't recall.
6       Q       So if the Professionalism Working
7  Group takes notes or minutes there should be some
8  indication that they reviewed this matter; right?
9       A       I don't know.  I have never been in
10 the Professionalism Working Group meeting.  I don't
11 know the processes.
12      Q       Do you even know if it was actually
13 referred to the Professionalism Working Group?
14      A       I don't know.
15      Q       Is John Noakes required to show
16 empathy towards his accuser?
17            MS. QUAN:  Objection.
18      A       I think one of the key attributes
19 of a physician is to be able to show empathy to other
20 human beings, even ones you may not like.
21      Q       Have you ever told Jane Roe that
22 she's supposed to show empathy towards John Noakes?
23      A       I don't recall ever instructing
24 either John Noakes or Jane Roe on empathy.
25      Q       Would you expect Jane Roe to show

1    empathy towards John Noakes?

2                    MS. QUAN:  Objection.

3            A        I would expect any student to show

4    empathy towards another student.

5            Q        Are you aware of any examples where

6    medical students have not shown empathy towards

7    John Noakes?

8                    MS. QUAN:  Objection.

9            A        Am I aware of any instances where

10   another student did not show empathy towards

11   John Noakes -- Did I catch that right?

12           Q        Yeah.

13           A        Yes.

14           Q        What did you do in response to

15   that?

16           A        I referred it to the Office of

17   Equity.

18           Q        So going back to Exhibit 1 --

19   Well -- I'm sorry -- Exhibit 32 you asked

20   Darnell Parker to call you about John Noakes' GroupMe

21   post.  Did he call you?

22           A        He did.

23           Q        Tell me everything you remember

24   about that conversation?

25           A        What I wanted to know was this part

Jackson-Whitney Reporting LLC
513.868.1919

---

of the ongoing Title IX process and, if so, did he and

the Office of Equity want to take this over or was

this part of a different process and should we follow

the internal processes of the School of Medicine.

5            Q        And what did Darnell Parker tell

6    you?

7            A        He said to follow your processes

8    that you have at the School of Medicine.

9            Q        Were there any -- What else do you

10   remember from that conversation?

11           A        That's it.

12           Q        I'm sorry?

13           A        That's all I recall.

14           Q        Did you speak to Jane Roe before

15   you spoke to Dr. Parker?

16           A        Honestly I'm not certain that I

17   have ever spoken to Jane Roe.  I think our sole

18   contact has been over email and it's been brief.  I

19   have had much more contact with Mr. Noakes than I have

20   Ms. Roe.

21           Q        Did Dr. Parker tell you that

22   John Noakes' GroupMe post did not violate any Title IX

23   rules?

24           A        He told me it was not part of the

25   Title IX process.

Jackson-Whitney Reporting LLC
513.868.1919

---

1            Q        Did you ask Dr. Parker to call

2    John Noakes?

3            A        No.

4            Q        Were you aware that he was going to

5    call John Noakes?

6            A        I believe he told me he was going

7    to speak with him.

8            Q        Do you remember anything else of

9    that conversation?

10           A        No.

11           Q        Are you familiar with the

12   Committee on Students' process?

13           A        Yes.

14           Q        Okay.  And I think we indicated the

15   Committee on Students is empowered to impose sanctions

16   up to and including dismissal from the school?

17           A        Yes.  And I want to point out that

18   the Society Deans are ex officio non-voting members of

19   the Committee on Students.

20           Q        I understand.  I am just asking

21   about the general powers.

22                    You're familiar with the powers of

23   that committee, though; right?

24           A        Yes.

25           Q        And -- And so that -- Are -- Are

Jackson-Whitney Reporting LLC
513.868.1919

---

1    students -- How do students feel about the

2    Committee on Students?

3                    MS. QUAN:  Objection.

4            A        That I can't speculate how other

5    people feel.

6            Q        Well, have you ever spoken to a --

7    a student before they were supposed to appear before

8    the Committee on Students?

9            A        The -- The reasons for appearing in

10   front of the Committee on Students are myriad.

11   Therefore, the students' responses are as well.

12           Q        Let me show you, for example, we

13   marked as Exhibit 16 an August 15th, 2021, letter,

14   Bates No. 497, that was sent to John Noakes.  Have you

15   ever seen letters like this before?

16           A        Yes.

17           Q        This is a standard --

18           A        I'm sorry.  Let me read -- Let me

19   just read the whole thing.

20                    And can you scroll down, please?

21                    Yeah.

22           Q        I -- I have been told this is a

23   fairly standard form letter.  Is that your

24   understanding?

25           A        Yes.

Jackson-Whitney Reporting LLC
513.868.1919

106

```
 1    Q      Have you spoken to any students
 2  after they have received a letter similar to
 3  Exhibit 16?
 4    A      Yes.
 5    Q      And have the students been
 6  concerned when they receive this letter?
 7    A      Once again the reasons that
 8  students come to the Committee on Students are many
 9  and their response to this request for appearance
10  depends on the reason they're asked to appear and
11  usually this letter is -- is given to the students
12  after a discussion with their trusted Advisor and
13  Dean.
14    Q      Has a student ever -- Maybe I'm --
15  I'm making this too complicated.
16           Has a student ever received a
17  letter saying they have to appear before the
18  Committee on Students, they could face dismissal, and
19  they went to you and said, "Hey, Dr. Ricanati, great
20  news.  I got a letter saying I could be dismissed by
21  the Committee on Students from school" -- Does that
22  happen?
23    A      So once again the reason students
24  come to the Committee on Students can inspire joy and
25  then some may inspire anxiety.  So, for instance, a
```

```
 1  student could be coming to the Committee on Students
 2  to request extension for a year in order to do a
 3  highly prestigious research or business opportunity.
 4  This would be something that they would anticipate and
 5  the outcome of the meeting could be quite joyous.
 6    Q      Okay.  But that student wouldn't --
 7  wouldn't get a letter like Exhibit 16 then; right?
 8    A      Yes, they would.
 9    Q      And -- And --
10    A      The only thing that would change
11  would be the second sentence you see, "On Thursday,
12  the 19th, you are being brought to the Committee on
13  Students for the following reason:"  It might say,
14  "Request of a one-year extension."  Everything else
15  would be the same.
16    Q      So -- So --
17    A      As you stated this is a form
18  letter.
19    Q      So -- So students who are going to
20  appear before the Committee on Students because they
21  want to take a year off to pursue a prestigious
22  fellowship receive a letter saying that the committee
23  may issue sanctions?
24    A      This is a form letter.  All
25  students appearing in front of it get the same letter
```

107

```
 1  except for that sentence up top where this one says,
 2  "Update on progress to the Committee on Students," it
 3  will just say the reason.
 4    Q      So is it your testimony that a -- a
 5  student who's coming to the Committee on Students for
 6  a good reason such as you described receives this
 7  exact same letter including the phrase that they could
 8  be issued sanctions?
 9    A      Yes, except the second sentence.
10  It's not exactly the same.  The reason changes.
11    Q      What are the situations on which a
12  letter may cause anxiety among the students?
13           MS. QUAN:  Objection.
14    A      I can't speculate how an individual
15  student would feel.
16    Q      Well, have you -- have you
17  discussed the letters like this with students who were
18  feeling anxious?
19    A      Yes.
20    Q      In some situations are students
21  scared about appearing before the Committee on
22  Students?
23           MS. QUAN:  Objection.
24    A      I can't speculate how they would
25  feel.
```

108

```
 1    Q      Would the threat of sanctions up to
 2  and including dismissal be a cause of anxiety for
 3  students?
 4           MS. QUAN:  Objection.
 5    A      I can't speculate how an individual
 6  student would feel.  I think as you --
 7    Q      So if a student --
 8    A      -- well stated -- Excuse me.  I
 9  think as you well stated this is a form letter and the
10  only thing that changes is the reason.  All students
11  appearing get the same letter.
12    Q      So if a student were to say that
13  they're not likely to risk doing anything that might
14  result by a Committee on Students you have no reason
15  to disagree with that then; right?
16           MS. QUAN:  Objection.
17    A      I don't understand your question.
18  Could you please rephrase?
19    Q      That's fine.  We got enough.
20           MS. QUAN:  Josh, at some point do
21       we want to take a break?
22           MR. ENGEL:  I think -- I think I'm
23       about done.
24           MS. QUAN:  Okay.  Sorry.
25           MR. ENGEL:  I think I am done.
```

```
 1          Yes, that's all the questions I
 2    have for now.  Thank you very much, sir.  I
 3    don't know if your counsel will have any
 4    questions, but I'll turn it over to her.
 5          MS. QUAN:  No questions.  Pam, we
 6    will read.
 7          MR. ENGEL:  Let's go off the
 8    record.
 9
10          _____
                  STEVEN RICANATI, M.D.
11
12    (DEPOSITION CONCLUDED AT 12:50 P.M.)
13
14               - - -
15
16
17
18
19
20
21
22
23
24
25
```

```
 1               C E R T I F I C A T E
 2    STATE OF OHIO       :
                          :  SS:
 3    COUNTY OF BUTLER    :
 4          I, Pamela L. Jackson, a duly qualified and
 5    commissioned notary public in and for the State of
 6    Ohio, do hereby certify that prior to the giving of
 7    his deposition, the within named STEVEN RICANATI,
 8    M.D., was by me first duly sworn to testify to the
 9    truth, the whole truth, and nothing but the truth;
10    that the foregoing pages constitute a true and correct
11    transcript of testimony given at said time and place
12    by said deponent; that said deposition was taken by me
13    in stenotypy and transcribed under my supervision;
14    that I am neither a relative of nor attorney for any
15    of the parties to this litigation, nor relative of nor
16    employee of any of their counsel, have no interest
17    whatsoever in the result of this litigation, and am
18    not, nor is the court reporting firm for which I am
19    affiliated, under a contract as defined in Civil Rule
20    28(D).
21          IN WITNESS WHEREOF, I hereunto set my
22    hand and official seal of office at Hamilton, Ohio,
23    this 3rd day of December, 2021.
24    Commission Expires:         /s/Pamela L. Jackson
      11/17/2023                 _____
25                                  Pamela L. Jackson
```