1
```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3               CASE NO. 1:21-cv-1776-PAB
 4                       - - -
 5
 6   JOHN NOAKES,
 7   Plaintiff,
 8   -vs-
 9   CASE WESTERN RESERVE UNIVERSITY,
10   Defendant.
11
12                       - - -
13
14          Deposition of MARJORIE GREENFIELD, M.D., a
15   witness herein, via Zoom videoconferencing, taken by
16   the Plaintiff as upon cross-examination and pursuant
17   to the Federal Rules of Civil Procedure and Notice and
18   agreement of counsel as to time and place and
19   stipulations hereinafter set forth, on Monday,
20   November 22, 2021, at 12:05 p.m., before Pamela L.
21   Jackson, a Notary Public within and for the State of
22   Ohio.
23
24                       - - -
25
```

2
```
 1                    I N D E X
 2   Witness:                                        Page:
 3   MARJORIE GREENFIELD, M.D.
 4
 5   Cross-Examination
 6   By Mr. Engel, Esq.                                  6
 7   Plaintiff's Exhibit No.:              Page Marked:
```
```
 8   1 .....................................           16
 9       (John Noakes' GroupMe Post)
10   2 .....................................           35
11       (Post From CWRU Survivors Instagram Page)
11   3 .....................................           39
12       (Jane Roe's Instagram Post Dated 8/10/21)
13   4 .....................................           42
13       (Class Survey)
14   5 .....................................           47
15       (Petition To CWRU School Of Medicine)
16   6 .....................................           49
16       (Email To Darnell Parker From Jean Seneff Dated
17        4/20/21 With Attachment)
18   7 .....................................           54
18       (Email To Steven Ricanati From Molly Simmons
19        Dated 6/15/21)
20   8 .....................................           56
20       (Instagram Post Entitled "The Definition Of
21        D.A.R.V.O.")
22   9 .....................................           63
22       (Early Concerns #189-219)
23   10 ....................................           71
24       (Letter To Barbara R. Snyder, J.D., And Pamela
24        B. Davis, M.D., Ph.D., From Luben Montoya Dated
25        8/16/18)
```

3
```
 1   11 ....................................           79
 1       (Email From Molly Simmons Dated 4/21/21)
 2   12 ....................................           86
 3       (Text Messages Dated 5/6)
 4   13 ....................................           88
 5       (Text Messages Dated 5/25)
 6   14 ....................................           93
 6       (Email To Marjorie Greenfield, Etc., From Jane
 7        Roe Dated 5/25/11)
 8   15 ....................................          101
 9       (Email To Marjorie Greenfield from Michelle M.
 9        Dated 8/23/21)
10   16 ....................................          102
10       (Notice Of Referral To The Committee On Students
11        Dated 8/15/21)
12   17 ....................................          109
12       (Affidavit)
13   18 ....................................          114
14       (Email To Steven Ricanati From Marjorie
14        Greenfield Dated 4/21/21)
15   19 ....................................          115
16       (Email To Med School Administrative Notes Class
16        of 2022, Etc., From Molly Simmons Dated 4/16/21)
17   20 ....................................          116
18       (Declaration Of Dr. Steven Ricanati)
19   21 ....................................          122
19       (Email To John Noakes From Marjorie Greenfield
20        Dated 8/2/21)
21   22 ....................................          125
21       (Email To Marjorie Greenfield From Jill Azok
22        Dated 8/3/21)
23   23 ....................................          128
23       (Declaration Of Dr. Marjorie Greenfield)
24
25
```

4
```
 1   APPEARANCES:
 2       For the Plaintiff:
 3           Joshua Adam Engel, Esq.
 4           Molly Kindness, Esq.
 4               of
 5           Engel & Martin, LLC
 5           4660 Duke Drive
 6           Suite 101
 6           Mason, OH  45040
 7           Phone: 513.445.9600
 7           engel@engelandmartin.com
 8
 9       For the Defendant:
10           Amanda T. Quan, Esq.
11               of
11           Ogletree, Deakins, Nash, Smoak &
12           Stewart, P.C.
12           127 Public Square
13           4100 Key Tower
13           Cleveland, OH  44114
14           Phone: 216.241.6100
14           amanda.quan@ogletree.com
15
16                       - - -
17
18
19
20
21
22
23
24
25
```

6

1        S T I P U L A T I O N S

2        It is stipulated by and between counsel

3 for the respective parties that the deposition of

4 MARJORIE GREENFIELD, M.D., a witness herein, called as

5 upon cross-examination by the Plaintiff, may be taken

6 at this time and place pursuant to the Federal Rules

7 of Civil Procedure and Notice and agreement of counsel

8 as to time and place of taking said deposition; that

9 the deposition was recorded in stenotypy by the court

10 reporter, Pamela L. Jackson, and transcribed out of

11 the presence of the witness; and that said deposition

12 is to be submitted to the witness for her examination

13 and signature, and that signature may be affixed out

14 of the presence of the Notary Public.

15

16            - - -

17

18

19

20

21

22

23

24

25

---

6

1             MARJORIE GREENFIELD, M.D.

2 of lawful age, a witness herein, being first duly

3 sworn as hereinafter certified, was examined and

4 deposed as follows:

5            CROSS-EXAMINATION

6 BY MR. ENGEL:

7        Q       Would you please state and spell

8 your name?

9        A       Marjorie Greenfield,

10 M-a-r-j-o-r-i-e G-r-e-e-n-f-i-e-l-d.

11        Q       Where are you currently employed?

12        A       Case Western Reserve University and

13 University Hospitals in Cleveland.

14        Q       What is your position there?

15        A       At Case Western I'm an

16 Assistant Dean for Student Affairs and Dean of the

17 Geiger Society.  At University Hospitals I'm

18 Vice Chair of the Department For Faculty Development

19 and I have another role doing career development for

20 the hospital.

21        Q       How long have you held those

22 positions?

23        A       The Assistant Dean position is

24 since 2016, the other one probably about the same.

25        Q       What are the job duties of an

---

7

1 Assistant Dean?

2        A       So we -- the way we set things up

3 with the Assistant Dean for Student Affairs we each

4 have a percentage of the class and we follow those

5 students all the way through and we are advisors for

6 career, academics, and personal advising.

7        Q       Have you ever been in a deposition

8 before?

9        A       Yes.

10        Q       How many times?

11        A       Maybe three.

12        Q       And what were the nature of the

13 cases that led you to be deposed?

14        A       I'm an Obstetrician.  They were

15 obstetric cases.

16        Q       Were they -- Were you serving as an

17 expert witness or were these cases where you or one of

18 your colleagues was accused of malpractice?

19        A       No.  These were malpractice cases

20 that we were named.

21        Q       Okay.  And what I know of

22 obstetrics, I guess only three that's -- I got the

23 impression you guys spend half of your time in

24 depositions, so -- Well, that's good.

25            So you know -- I take it you

---

8

1 understand the drill of -- of a deposition and -- and

2 what we're doing here today?

3        A       Basically, yeah.

4        Q       I just have -- I -- I know you --

5 you have got great counsel and -- and I know they have

6 gone over everything with you.  I just have a couple

7 rules I like to go over with people about how I do

8 depositions:

9            The first rule is that I will do my

10 best to ask clear and concise questions, but I don't

11 always succeed in that task, so if you don't

12 understand anything please ask me to clarify the

13 question and I will do so; fair enough?

14        A       Okay.

15        Q       Next rule is, of course, all your

16 answers have to be out loud so that our court reporter

17 can -- can take them down.  So like you just did

18 before you nodded your head or shook your head, she

19 can't get those, so if you can -- Do you understand

20 that?

21        A       I understand.

22        Q       You are not a hostage here, so if

23 at any time you need to take a break please let us

24 know and -- and we will do so.  The only thing I ask

25 is if there is a question or a line of questions

10

1  pending we'll complete those questions and then you
2  can take a break; fair enough?
3      A       Okay.
4      Q       Okay.  Finally we are going to do
5  our best to protect the confidentiality of students,
6  so I'd ask that we not include student names in this
7  deposition unless absolutely necessary.  You
8  understand that?
9      A       Yes.
10     Q       Okay.  And so in this litigation we
11 refer to the -- the student who's the Plaintiff as an
12 individual by -- by the name of John Noakes,
13 N-o-a-k-e-s.  If I use that phrase "John Noakes" you
14 know who I'm referring to?
15     A       Yes, I do.
16     Q       Okay.  The same if I use the term
17 "Jane Roe" to -- to describe the student who made
18 allegations against John Noakes you understand who I'm
19 referring to?
20     A       Yes.
21     Q       Okay.  Do you have any other
22 questions before we begin?
23     A       Do I need to refer to the student
24 as John Noakes?
25     Q       If you could, yes.  That will save

1  us from having to redact the name from the transcript.
2  If -- If that becomes uncomfortable for you we can
3  always redact his name out of the transcript, but
4  sometimes some people can do it and sometimes some
5  people can't.  It's -- It's an individual thing and,
6  you know, if -- and if you make a mistake it's not a
7  big deal.  I think we have an agreement of counsel
8  that we can just redact the name or I think even if
9  you're okay with it, Amanda, Pam can just search and
10 replace even if necessary?
11          MS. QUAN:  Okay.  Perfect.  If that
12     makes it easier for Marjorie we can certainly
13     agree that we can just do a search and
14     replace.
15     Q       I -- I guess where that leaves us,
16 Doctor, if you're okay with it is we'll try our best,
17 but no one will be in trouble if they fail.
18     A       Okay.  I just -- I think it will
19 feel more like I'm telling the whole truth if I am not
20 using a fake name.
21     Q       Okay.  Well, I -- I -- we'll --
22 we'll try and see what we get; okay?
23          So you understand why -- why you're
24 here today; don't you?
25     A       I'm not sure that I totally

11

1  understand why I'm here today, no.
2      Q       Okay.  Well, are you aware if
3  anyone at Case Western ever encouraged John Noakes to
4  drop a Title IX complaint against Jane Roe?
5          MS. QUAN:  Objection.  And, sorry,
6      unless I instruct you not to answer --
7          THE WITNESS:  Okay.
8          MS. QUAN:  -- go ahead and -- go
9      ahead and answer.
10         And, let me just so that you know
11     we're in the same room, but I have muted
12     myself so we do not overlap, I guess.
13     A       So ask me the question again.  I'm
14 sorry.
15     Q       Sure.
16         Are you aware if anyone at
17 Case Western ever encouraged John Noakes to drop a
18 Title IX complaint against Jane Roe?
19     A       No.
20     Q       Are you aware if anyone at
21 Case Western ever encouraged John Noakes to drop a
22 Title IX retaliation complaint against Dr. Ricanati?
23         MS. QUAN:  Objection to the line of
24     questioning, but go ahead -- go ahead and
25     answer.

12

1      A       No.
2      Q       Are you aware if anyone at
3  Case Western ever encouraged John Noakes to drop a
4  Title IX retaliation complaint against Dr. Parker?
5      A       No.
6      Q       Did you ever encourage John Noakes
7  to drop a Title IX complaint against Jane Roe?
8      A       No.
9      Q       Did you ever encourage
10 John Noakes -- or let me -- let me rephrase that.
11         Did you ever discourage John Noakes
12 from pursuing a Title IX complaint against Jane Roe?
13     A       No.
14     Q       Did you ever discourage John Noakes
15 from pursuing a Title IX retaliation complaint against
16 Dr. Ricanati or Dr. Parker?
17     A       I don't think so.
18     Q       Did you ever encourage John Noakes
19 to take a leave of absence because other students in
20 his class did not want him to be there?
21         MS. QUAN:  Objection.
22     A       Yes, I encouraged him to take the
23 leave of absence, but, no, that wasn't really the
24 reason.
25     Q       And we'll get into it.

**14**

1    So the answer is, no, you did not
2  encourage John Noakes to take a leave of absence
3  because other students in his class did not want him
4  there?
5    A    Well, I did encourage him to take a
6  leave of absence, so I don't want to be misleading,
7  but --
8    Q    Again I appreciate that.
9    A    -- but, no, it wasn't for the
10  purpose of -- it wasn't because other students didn't
11  want him there.  I wasn't doing it for the other
12  students.
13    Q    Okay.  Now, are you familiar with
14  the Case Western policies regarding Title IX?
15    A    That's kind of a big question.  I
16  understand some of them.
17    Q    Okay.  Have you received training
18  on the school's Title IX policy?
19    A    I've been oriented to what my
20  responsibilities are if someone discloses something to
21  me.
22    Q    So do you -- Are you aware if the
23  Case Western policies prohibit retaliation against
24  students for participating in the Title IX process?
25    MS. QUAN:  Objection, but go ahead.

**14**

1    A    I'm aware of it now, but -- I am
2  aware of it now, yes.
3    Q    Okay.  So are you aware of the fact
4  that students are permitted to criticize the Title IX
5  process at Case Western?
6    A    Yes.
7    MS. QUAN:  Objection.
8    A    Yes.
9    Q    And that any actions taken against
10  them in response to that criticism is prohibited by
11  the school's policies?
12    MS. QUAN:  Objection.
13    A    I don't know that I knew that
14  directly.  I know it now.
15    Q    Okay.  Are you aware that the --
16  that students at Case Western are permitted to
17  participate in the Title IX process?
18    A    Yes.
19    Q    And are you aware that
20  Case Western's policies prohibit retaliation against
21  students as a result of their participation in the
22  Title IX process?
23    A    Yes.
24    Q    Are you aware that students are
25  permitted to defend themselves under Case Western's

**15**

1  policies in a Title IX process?
2    A    Yes.
3    Q    Okay.  And are you aware that
4  Case Western's policies prohibit any retaliation
5  against the students as a result of their defending
6  themselves in the Title IX process?
7    MS. QUAN:  Objection.
8    A    Again I understand that now.
9    Q    When -- When did you gain this
10  understanding?
11    A    I think as I was understanding more
12  things about the way the allegations were playing out.
13    Q    So can you give me a time frame
14  when -- when you learned that?
15    A    Within the last few months
16  probably.
17    Q    So within the last few months have
18  you gained an understanding that you may not have
19  acted in compliance with the school's Title IX
20  policies?
21    MS. QUAN:  Objection.
22    A    I don't think I was in -- not in
23  compliance with the policies.
24    Q    And there's -- there's a double
25  negative in there, so let me --

**16**

1    A    I believe -- I believe I was in
2  compliance with the policies.
3    Q    Okay.  So I'm going to show you on
4  the screen -- And I assume you have a screen in front
5  of you?
6    A    Yes, I do.
7    Q    Okay.  So if I show you a document
8  you'll be able to see it on the screen hopefully?
9    A    If Zoom works.
10    Q    Okay.  That's always the challenge.
11    All right.  So I am showing you
12  what we will mark as Exhibit 1.
13    MR. ENGEL:  Off the record.
14    (Off-the-record discussion.)
15    (Plaintiff's Exhibit 1 was marked
16    for identification.)
17    MR. ENGEL:  Let's go back on the
18    record.
19  BY MR. ENGEL:
20    Q    So what I'm showing you is a --
21  what I'll describe as a GroupMe post from John Noakes
22  on April 15th of 2021 at 4:38 p.m. and it has a
23  Bates No. 414 at the bottom.  Now, have you seen this
24  document?
25    A    Yes.

18

```
1       Q       And so first is it your
2  understanding that this was posted in a school GroupMe
3  chat?  Do you know what GroupMe is?
4       A       Yes, it's an internal chat that the
5  class has set up.
6       Q       And are you familiar with things
7  that are posted on this internal chat?
8       A       No.
9       Q       Do you know if this internal chat
10 is limited to just school issues?
11      A       I don't know.
12              MS. QUAN:  Sorry.  Objection.
13      Q       Is it considered inappropriate to
14 post things that are not school related on this
15 GroupMe chat?
16              MS. QUAN:  Objection.
17      A       I don't know.
18      Q       And just so we're clear this
19 GroupMe chat -- or this post by John Noakes that's
20 Exhibit 1, this is the reason that John Noakes was
21 brought before the Committee on Students?
22              MS. QUAN:  Objection.
23      A       Yes.
24      Q       Okay.
25      A       Well, I should -- It's not -- It
```

```
1  was not because of the post.  It was because of the
2  complaints made by student -- other students about the
3  post.
4       Q       Well, what's the difference there?
5       A       Well, we wouldn't have known about
6  the post and we don't really go out looking for -- you
7  know, looking, scrutinizing, things that our students
8  do, but when it's brought to our attention by another
9  student or by somebody else then it gets investigated.
10      Q       Okay.  And -- And I'm going to dig
11 into that process in a little bit, but for purposes of
12 my first line of questions at some point you became
13 aware of -- of this post; right?
14      A       Yes.
15      Q       Okay.  And then the -- You and
16 other members of the faculty, including the
17 Committee on Students, had to determine whether
18 John Noakes violated any rules by making this post?
19              MS. QUAN:  Objection.
20      A       No, that wasn't up to me to decide
21 if he violated any rules.
22      Q       Some human being at the school had
23 to decide if he violated the rules; right?
24              MS. QUAN:  Objection.
25      A       Professionalism Working Group and
```

19

```
1  then the Committee on Students would be the ones that
2  would be looking at that.  I'm not in either one of
3  those groups.
4       Q       So those two groups, they're the
5  ones with the power to impose discipline on students?
6       A       Yes.
7       Q       Okay.  And that discipline can
8  include sanctions up to and including dismissal from
9  the medical school?
10      A       Yes.
11      Q       In any event at some point you
12 became aware of this post by John Noakes; right?
13      A       Yes.
14      Q       And were you aware that John Noakes
15 was referring to a decision by the Title IX board when
16 he made this post?
17              MS. QUAN:  Objection.
18      A       Yes.
19      Q       What -- Do you believe that this
20 post raises any professionalism concerns?
21      A       Yes.
22      Q       What are those?
23      A       I think I was concerned when I saw
24 this that it was disrespectful of other students'
25 emotions.
```

20

```
1       Q       Anything else about this post that
2  raised professionalism concerns?
3       A       No.
4       Q       You'd agree with me this post
5  doesn't mention the name of any other students; right?
6       A       Correct.
7       Q       Okay.  It doesn't include any
8  confidential information about anyone else; does it?
9       A       No.
10      Q       Are you aware of any other social
11 media posts by John Noakes about this issue or
12 Title IX in general?
13      A       No.
14      Q       Are you aware of any other social
15 media posts by Jane Roe about this issue or Title IX
16 in general?
17      A       Not specifically, no.
18      Q       Do you believe there's anything in
19 this post that is racist, sexist, or ethnographic?
20      A       No.
21      Q       And I think I asked you this
22 question, so I apologize if I did.
23              Is there anything in this quote --
24 in this post that discloses the personal information
25 of another person?
```

21

```
1        A        No.
2        Q        Is there anything in this post
3   that -- that could be considered gloating over the
4   misfortune of others?
5                 MS. QUAN:  Objection.
6        A        Yes.
7        Q        Okay.  What -- What is that
8   misfortune?
9                 MS. QUAN:  Objection.
10       A        I think the timing of making a post
11  like this on a day when he was found not responsible
12  in the Title IX case, you know, connects this post to
13  that event and putting the 1-0 sounds like 1 win, no
14  losses, which I think is disrespectful of the other
15  people involved.
16       Q        So is any time someone is happy
17  about their win gloating about the misfortune of
18  others?
19                MS. QUAN:  Objection.
20       A        I think Title IX is a very
21  sensitive situation.  I think this case is very
22  sensitive.  I think emotions were high for a lot of
23  people and it showed a disregard or insensitivity, one
24  or the other, to the fact that this was a very
25  emotional situation.
```

22

```
1        Q        Do you believe that this language
2   was intended to bully or intimidate?
3                 MS. QUAN:  Objection.
4        A        I don't know.
5        Q        Do you believe there's anything in
6   this post that is inflammatory or accusatory?
7                 MS. QUAN:  Objection.
8        A        I think putting 1-0 is
9   inflammatory.
10       Q        And why is that?
11       A        Because in a sexual assault case
12  saying 1 win and no losses when you get exonerated is
13  inflammatory.
14       Q        Were any comments about a sexual
15  assault case considered to be inflammatory?
16                MS. QUAN:  Objection.
17       A        I don't know what you mean.
18       Q        What is your definition of
19  inflammatory?
20       A        It's when emotions are running high
21  and you kind of gloat about your success when someone
22  else in that situation may be experiencing emotional
23  distress.
24       Q        Is there any policy at the medical
25  school that requires the Title IX process be kept
```

23

```
1   confidential?
2                 MS. QUAN:  Objection.
3        A        I don't know.
4        Q        Is there any -- So as you sit here
5   today are you aware of any medical school policy that
6   requires students who are engaged in the Title IX
7   process to keep everything about that process
8   confidential?
9                 MS. QUAN:  Objection.
10       A        I have heard that, but I don't -- I
11  haven't seen a written policy.
12       Q        Are you aware of any policy in the
13  University in general that requires that students
14  engaged in the Title IX process keep that process
15  confidential?
16                MS. QUAN:  Objection.
17       A        Again I have heard that, but I
18  haven't seen a written policy.
19       Q        And so if there was a written
20  policy would it be in the -- the medical school
21  handbook?
22                MS. QUAN:  Objection.
23       A        I don't think that kind of policy
24  that specifically would be in the medical student
25  handbook.
```

24

```
1        Q        Okay.  So where would I find this
2   policy if it existed?
3                 MS. QUAN:  Objection.
4        A        I don't know.  I would check with
5   Legal.
6        Q        So if a student is accused of doing
7   something that they believe they didn't do and are
8   found not guilty how -- how are they supposed to
9   react?
10                MS. QUAN:  Objection.
11       A        I would expect they would be
12  relieved.
13       Q        Are they required to keep their
14  relief confidential?
15                MS. QUAN:  Objection.
16       A        I don't think there's rules about
17  keeping your relief confidential.
18       Q        And I believe your statement was
19  that this post was disrespectful of other students'
20  emotions.  Who were those other students you're
21  referring to?
22       A        Well, primarily the female student
23  in the Title IX case.
24       Q        Anyone else?
25       A        I think some of her friends were
```

1  very emotionally caught up also, so they were probably
2  upset by this as well.
3       Q       How would anyone other than
4  Jane Roe know what this post was about?
5            MS. QUAN:  Objection.
6       A       My understanding is there were some
7  witnesses called during the Title IX process, but also
8  I would imagine that the female student reached to her
9  friends for support.
10      Q       Okay.  Do you know if John --
11  John Noakes ever disclosed any information about the
12  Title IX process to other students at the school?
13      A       I don't know.
14      Q       Do you know if Jane Roe disclosed
15  information about the Title IX process to other
16  students at the school?
17      A       I don't know.
18      Q       So on the professionalism concern
19  raised in this post simply the fact that other
20  students were negatively impacted?
21            MS. QUAN:  Objection.
22      A       You know, as a professional school
23  we have -- we care about the professional development
24  of our students and so we are very -- try to be very
25  attune to students treating each other respectfully

1  and professionally and showing empathy, so it's not
2  just the fact that other students complained about it.
3  It's also what looks in the post like a lack of
4  empathy.
5       Q       When you say "showing empathy",
6  what -- what do you mean by that?
7       A       So, you know, when I talked to the
8  student about the post it didn't seem that he had any
9  thoughts about the fact that there were other people
10  involved who might be upset by this or be hurt by it.
11      Q       And is that lack of empathy
12  considered to be a professionalism violation?
13            MS. QUAN:  Objection.
14      A       I wouldn't use the word
15  "violation".  It's a professionalism concern.
16      Q       Let me see if I understand.  If a
17  student says something that is 100 percent true but
18  other students are hurt or upset by it does that raise
19  a professionalism concern?
20            MS. QUAN:  Objection.
21      A       I -- I would need to know the
22  specifics of what you're saying to be able to answer
23  that.
24      Q       Now, are you aware if other
25  students at Case Western disagreed with the April 15th

1  decision of the hearing panel?
2       A       I'm sorry.  Ask that again.
3       Q       Okay.  Well, let me -- let me set
4  the stage here.
5            You're aware this post was made
6  after a hearing panel found John Noakes not
7  responsible; right?
8       A       Yes.
9       Q       Okay.  Are you aware if any of the
10  students in his class disagreed with that decision?
11      A       I don't know specifically, but my
12  understanding now from reading the Early Concerns that
13  came in from this post is yes.
14      Q       In other words, you're -- you're
15  now aware that a number of students believed that he
16  was guilty even though the panel found otherwise?
17            MS. QUAN:  Objection.
18      A       Yes, I think that's true.
19      Q       Okay.  And I know sometimes the
20  school uses terms like "responsible" and "not
21  responsible".  You understand what I mean by saying
22  "guilty" in that context?
23      A       Yes.
24      Q       Are you aware if any faculty
25  members at Case Western disagreed with the outcome of

1  the hearing panel?
2       A       No.
3       Q       Are you aware -- aware of any
4  faculty members who believed that John Noakes was
5  guilty even though the panel found otherwise?
6            MS. QUAN:  Objection.
7       A       No.
8       Q       Do you believe that John Noakes was
9  guilty even though the panel found otherwise?
10            MS. QUAN:  Objection.
11      A       No.
12      Q       Are students at Case Western
13  considered to be innocent until proven guilty when
14  accused of sexual misconduct?
15            MS. QUAN:  Objection.
16      A       I think that the standard is more
17  likely than not, but, you know, I think in general
18  that people should be assumed to be innocent until
19  proven otherwise.
20      Q       Is that an important value that you
21  try to teach at -- at the medical school?
22            MS. QUAN:  Objection.
23      A       Innocent until proven guilty?  Is
24  that what you --
25      Q       Yeah.

30

```
1           A       I -- I am not sure that I know the
2    answer to that.
3           Q       What about is respect for a -- a
4    process an important value that you try to teach at
5    the medical school?
6                   MS. QUAN:  Objection.
7           A       Yes.
8           Q       So what have you done in -- in
9    respect to the John Noakes' case to remind students
10   about important values?
11                  MS. QUAN:  Objection.
12          A       That's not my job.
13          Q       Whose job is it?
14                  MS. QUAN:  Objection.
15          A       There's a variety of ways that we
16   might go about it, but my job was to be the
17   Society Dean for the student and to be his advisor.
18          Q       Would it be considered proper for
19   students to encourage other students to file
20   professionalism concerns about John Noakes because
21   they were unhappy with the outcome of the hearing
22   panel?
23                  MS. QUAN:  Objection.
24          A       I don't know that I can answer
25   that.
```

31

```
1           Q       Okay.  Are students required to
2    show empathy towards John Noakes?
3           A       That's an interesting question.  I
4    think -- That's an interesting question.  I am not
5    sure I can answer that.
6           Q       Well, certainly if you were accused
7    of something that you didn't do that would cause you
8    distress; right?
9           A       Yes.
10          Q       Okay.  So are other students
11   required to show empathy towards the distress that
12   John Noakes might be suffering as a result of being
13   accused of something that he didn't do?
14                  MS. QUAN:  Objection.
15          A       You know, we can't require students
16   to show empathy in all circumstances.  If somebody
17   wanted to make a report about a student not
18   demonstrating empathy then that would get evaluated by
19   the Professionalism Working Group.
20          Q       As the Society Dean are you
21   required to wait until you receive an Early Concern to
22   address professionalism issues?
23          A       Generally, yes.
24          Q       In other words, if you see a
25   student behaving unprofessionally are you allowed to
```

32

```
1    do anything about it?
2                   MS. QUAN:  Objection.
3           A       It's not my -- Yeah -- No, I --
4    We -- We don't make judgments -- The Society Deans
5    have a firewall about evaluating the students, so we
6    generally don't make judgments like that.
7           Q       So if you observe unprofessional
8    conduct by a student what do you do?
9                   MS. QUAN:  Objection.
10          A       I might -- It depends on the
11   circumstance.
12          Q       What -- What are your options at
13   that point?
14          A       I could talk to the student.  That
15   would be the most likely thing.
16          Q       What else could you do?
17          A       I wouldn't make a professionalism
18   complaint about my own student ever.
19          Q       What about another student?
20          A       I could put in a professionalism
21   complaint about that student if I thought it was
22   necessary.
23          Q       Would referring to another student
24   as a rapist or a sexual predator raise professionalism
25   concerns?
```

29

```
1           Q       Would it raise any professionalism
2    concerns if that occurred?
3           A       It depends on the situation.
4           Q       So what are those situational
5    factors then you would be looking for?
6           A       When I went through the
7    Early Concerns the ones for -- for me personally that
8    I took as meaningful were the ones that were
9    specifically about this post and it being
10   disrespectful and I did not take into account the ones
11   that said that the result of the hearing was not
12   accurate because I respect the process.
13          Q       Does the fact that students in
14   submitting their Early Concerns indicated a lack of
15   respect for the process raise professionalism concerns
16   about those students?
17                  MS. QUAN:  Objection.
18          A       I think emotions run very high in
19   cases like this and I think this post really pushed a
20   lot of people's buttons who might not have said
21   anything if he hadn't seemed to be gloating.
22          Q       You indicated that the post showed
23   a lack of empathy towards Jane Roe and others who
24   might be upset; right?
25          A       Yes.
```

34

1           MS. QUAN:  Objection.

2    A      Sure, yes.

3    Q      And in particular would referring
4 to John Noakes as a rapist or a sexual predator raise
5 professional concerns?

6           MS. QUAN:  Objection.

7    A      Yes.

8    Q      Okay.  Are you aware of any other
9 students at Case Western who referred to John Noakes
10 as a rapist or sexual predator?

11   A      No, I don't know.

12   Q      Are all the students at
13 Case Western subject to the same rules and
14 administrative processes?

15          MS. QUAN:  Objection.

16   A      Yes.

17   Q      Okay.  So the same rules apply to
18 Jane Roe as -- as John Noakes?

19          MS. QUAN:  Objection.

20   A      Yes, we try to be fair.

21   Q      Okay.  And the same rules apply to
22 other students in the medical class as John Noakes?

23   A      Yes.

24   Q      Okay.  And if there were
25 professionalism concerns they would be reviewed by the

35

1 BY MR. ENGEL:

2    Q      All right.  Let me show you what I
3 have marked Exhibit 2 which is an Instagram post and
4 this is Bates No. 85 at the bottom.  It appears to be
5 a -- There's no date on it -- an Instagram post at the
6 cwru.survivors' Instagram page.  Are you familiar with
7 this document?

8    A      No.

9    Q      Have you ever seen this before?

10   A      I don't think so.

11   Q      Well, if you could take a chance to
12 review it and let me know if this raises any
13 professionalism concerns?

14          MS. QUAN:  Objection.

15   A      Okay.  I'll read it.

16          Okay.  I read it.

17   Q      Okay.  Do you see any
18 professionalism concerns with this Instagram post?

19          MS. QUAN:  Objection.

20   A      You mean with posting it or with
21 the story of the perception of what happened?  I'm not
22 sure I understand your question.

23   Q      Well, do you believe that this post
24 is disrespectful of other students' emotions?

25   A      No.  I believe this is someone's

same Committee on Students and Professional Working

1 same Committee on Students and Professional Working
2 Group?

3    A      If there were professionalism
4 complaints.

5    Q      They would be reviewed by the same
6 people?

7    A      Yes, if there's a complaint that's
8 put in.

9    Q      And who -- who has the ability to
10 put in a complaint?

11          MS. QUAN:  Objection.

12   A      Most of the complaints come from
13 other students or faculty.

14   Q      So you as a faculty member have the
15 ability to put in a complaint if you observe
16 unprofessional conduct by another student?

17          MS. QUAN:  Objection, asked and
18          answered.

19   A      Yes, I'm allowed to put in a
20 professionalism complaint.

21   Q      And other faculty members are
22 allowed to do that as well?

23   A      Yes.

24          (Plaintiff's Exhibit 2 was marked
25          for identification.)

36

1 truth.

2    Q      So how is this Exhibit 2 -- Well,
3 how is Exhibit 1 not someone's truth?

4          MS. QUAN:  Objection.

5    A      I think there's a difference
6 between telling a story that's your experience and
7 writing a score.

8    Q      Would you say that Exhibit 2 is
9 accusatory?

10          MS. QUAN:  Objection.

11   A      Yes.

12   Q      Would you say it was inflammatory?

13          MS. QUAN:  Objection.

14   A      I don't know that I -- I don't know
15 if I would use the word "inflammatory".

16   Q      Does it change your answers at all
17 if I represent to you that this is a post from
18 Jane Roe about John Noakes?

19   A      It just makes me really sad.

20   Q      Why does it make you sad?

21   A      Because it -- it helps me
22 understand the mental state of the person who accused
23 him and I was trying very hard to stay away from
24 hearing the details of what happened.

25   Q      Well, does it change your approach

38

```
 1   if you know, for example, that -- Well, let me back
 2   up.
 3                   Did you ever review the Title IX
 4   investigation in this matter?
 5        A       No.
 6        Q       So were you aware that prior to the
 7   Title IX investigation of this -- this.  Back up.
 8                   Were you aware that during the
 9   Title IX investigation of this matter Jane Roe made
10   false statements to the investigators?
11               MS. QUAN:  Objection.
12        A       No.
13        Q       Were you aware that Jane Roe had
14   threatened to bring false charges against John Noakes?
15               MS. QUAN:  Objection.
16        A       No.
17        Q       Were you aware that she admitted to
18   threatening him in text messages before she filed the
19   Title IX complaint?
20               MS. QUAN:  Objection.
21        A       No.
22        Q       Were you aware that Jane Roe had
23   texted John Noakes during their breakup, "I'm going to
24   report you for the lying and the sex and for
25   everything.  It was all a lie"?
```

38

```
 1               MS. QUAN:  Objection.
 2        A       No.
 3        Q       Were you aware that she told
 4   John Noakes that she was sorry for what she put him
 5   through?
 6               MS. QUAN:  Objection.
 7        A       No.
 8        Q       Were you aware that she texted him
 9   once, "I'm so sorry.  You didn't deserve all the
10   emotions and drama"?
11               MS. QUAN:  Objection.
12        A       No.
13        Q       Were you aware that at one point
14   she texted him, "I'm sorry for making your life so
15   horrible"?
16               MS. QUAN:  Objection.  And
17           objection as to the line of questioning in
18           that Marjorie already testified she wasn't
19           aware of this.
20               MR. ENGEL:  Duly noted.
21   BY MR. ENGEL:
22        Q       Go ahead.
23        A       No.
24        Q       Were you aware that the
25   investigation discovered that Jane Roe continued to
```

39

```
 1   engage in sexual activity with John Noakes even after
 2   the sexual assault allegedly described in this
 3   Instagram post?
 4               MS. QUAN:  Objection.
 5        A       No.
 6        Q       So does that information change
 7   your response to what you see in the -- in Exhibit 2?
 8        A       No.
 9        Q       Do you know if any actions were
10   taken by the medical school in response to this
11   Instagram post?
12               MS. QUAN:  Objection.
13        A       I don't know.
14        Q       I'm going to show you now what
15   we'll mark as Exhibit 3 which is an August 10th, 2021,
16   Instagram post from Jane Roe, Bates No. 86.
17               (Plaintiff's Exhibit 3 was marked
18               for identification.)
19   BY MR. ENGEL:
20        Q       Have you ever seen this before?
21        A       No.
22        Q       Does this Instagram post raise any
23   professionalism concerns for you?
24               MS. QUAN:  Objection.
25        A       No.
```

40

```
 1        Q       It accuses John Noakes of -- of
 2   misconduct; doesn't it?
 3               MS. QUAN:  Objection.
 4        A       I don't really understand what it's
 5   about.
 6        Q       Well, it says she's being
 7   intimidated and harassed by a classmate; right?
 8        A       That's what she says here, yes.
 9        Q       Okay.  Is that an accusatory
10   statement?
11               MS. QUAN:  Objection.
12        A       Yes.
13        Q       Okay.  Does the fact that she's
14   making an accusatory statement about a classmate raise
15   any professionalism concerns?
16               MS. QUAN:  Objection.
17        A       No.  I think everybody has their
18   own truth.  I'm -- and I -- I am not in a position to
19   judge what -- what's behind this.
20        Q       So I'm trying to understand the
21   difference.  So -- So why are some people speaking
22   their own truth problematic and other people speaking
23   their own truth not problematic?
24               MS. QUAN:  Objection.  Go ahead.
25        A       I think if he had written in the
```

42

1  GroupMe post, "I'm so relieved," that's different than
2  putting a score.  I think putting a score is very --
3  It's -- It's different than talking about your
4  experience.  These are things that are -- This, what
5  she's writing here, is in the first person -- It's her
6  experience -- but putting a score is different than
7  that.  It's pretty -- It's a pretty aggressive thing
8  to write.
9          Q      So if instead of putting a score
10 John Noakes had written, "Jane Roe has continued to
11 intimidate and harass me," that would have been okay?
12                MS. QUAN:  Objection.
13         A      I think it would have been
14 ill-advised if he put that in the class GroupMe.
15         Q      So why is it ill-advised for
16 John Roe -- John Noakes to do that but not ill-advised
17 for Jane Roe to post what we have marked as Exhibit 3?
18         A      Well, this is --
19                MS. QUAN:  Objection.  Go ahead.
20         A      This isn't the class GroupMe.  This
21 is her personal page.  This isn't a message out to the
22 class.  This is her expressing herself.
23         Q      Do you know if other people in the
24 class would have seen this?
25                MS. QUAN:  Objection.

43

1                MR. ENGEL:  Yeah, I'll -- I'll give
2         you a -- a -- I'll send around after we're
3         done copies of all the exhibits.
4                MS. QUAN:  Okay.
5                MR. ENGEL:  So I -- I will do that
6         as soon as we're done with the deposition
7         here.
8  BY MR. ENGEL:
9          Q      But have you ever seen Exhibit 4?
10         A      No.
11         Q      And I'll represent to you that the
12 name redacted in the bottom two redactions is
13 John Noakes' name.  Why don't you take a moment to
14 review this and let me know if it raises any
15 professionalism concerns?
16         A      Yes.
17                MS. QUAN:  Sorry.  Objection.
18         Josh, is it a two-page document?  I just want
19         to make sure she was able --
20                MR. ENGEL:  Yeah, so let me know
21         when you need me to scroll.
22         A      Yeah, you can scroll.
23                Oh, what's this?  Oh, okay.
24         Q      Let me know when you're ready.
25         A      Yeah, I'm ready.

1          A      I don't know.
2          Q      Do you know -- Would you consider
3  this to be disrespectful of the emotions of other
4  students?
5                MS. QUAN:  Objection.
6          A      I think this comes from a place of
7  pain.
8          Q      Do you believe that Jane Roe gave
9  any thought to whether this post might hurt or upset
10 John Noakes?
11                MS. QUAN:  Objection.
12         A      I don't know.
13         Q      Do you know if this post was ever
14 reviewed by the Committee on Students or the
15 Professionalism Working Group?
16         A      I don't know.
17         Q      All right.  I am showing you what
18 we're marking as Exhibit 4 which is a document titled
19 "Class Survey" and it's -- I don't have Bates numbers
20 on this one.  This might be our own exhibit.
21                (Plaintiff's Exhibit 4 was marked
22                for identification.)
23                MS. QUAN:  Josh, I don't think we
24         have seen this before.  Can I get a copy by
25         any chance?

44

1          Q      Okay.  So does this document raise
2  any professionalism concerns?
3                MS. QUAN:  Objection.
4          A      Yes.
5          Q      What are those?
6          A      It was inappropriate for a person
7  to survey the class in this way about a student that
8  was involved in Title -- Well, just about any student.
9          Q      So do you know what actions were
10 taken as a result of those professionalism concerns?
11                MS. QUAN:  Objection.
12         A      I don't -- I know she -- I know
13 that they were told to take the survey down and I know
14 that it was dealt with as a professionalism issue, but
15 I don't know what the process or the outcome was.
16         Q      Okay.  And so do you know if it was
17 reviewed by the Professionalism Working Group?
18         A      I don't know.
19         Q      Do you know if it was reviewed by
20 the Committee on Students?
21         A      It was not reviewed by the
22 Committee on Students.
23         Q      So do you know if the student who
24 wrote this ever received a letter like John Noakes did
25 indicating that this document could lead to his

46

```
 1   dismissal from the University?
 2               MS. QUAN:  Objection.
 3        A       Generally those -- that -- those --
 4   those kinds of communications come from Committee on
 5   Students.  I don't think it -- it reached that level.
 6        Q       Do you know why it never reached
 7   that level?
 8               MS. QUAN:  Objection.
 9        A       I don't know for sure.  My
10   assumption -- I have an assumption that the
11   Professionalism Working Group didn't escalate it.
12               MS. QUAN:  Objection.  And -- And,
13         Marjorie, Josh is only asking you --
14         THE WITNESS:  Okay.  To what I
15         know.
16        A       Yes, I don't know.
17        Q       Yeah, your -- your -- your counsel
18   is correct.  I don't want you to assume.
19        A       Okay.
20        Q       But now -- But now I will.  So let
21   me be clear.
22               Do you know for a fact whether the
23   Professionalism Working Group reviewed this document
24   or not?
25        A       I do not know.
```

47

```
 1   upset with John Noakes when they really weren't?
 2               MS. QUAN:  Objection.
 3        A       I don't know that I can answer
 4   that.
 5        Q       Do you know if the student who
 6   created this Class Survey was required to undergo any
 7   professional coaching?
 8               MS. QUAN:  Objection.
 9        A       I don't know.
10        Q       I will show you what we will mark
11   as Exhibit 5 which has Bates No. 234 on it.
12               (Plaintiff's Exhibit 5 was marked
13                for identification.)
14         MR. ENGEL:  And, Amanda, I do see
15         there's a link to the Google docs here.  When
16         I send that to you I will -- later today I am
17         going to redact that link to the Google docs
18         because that could lead to if we file it
19         someone submitting it and being able to see
20         the names here.
21         MS. QUAN:  Thank you.  I'm so sorry
22         about that.  I -- I did not catch that.
23         MR. ENGEL:  No, no, no, that's not
24         your fault if it's -- It's not even -- It's
25         nobody's fault.  It's just that will happen
```

```
 1        Q       Who would know that?
 2        A       I -- I think Dr. Ricanati would
 3   know that.
 4        Q       So do you have any knowledge if the
 5   Professionalism Working Group reviewed it why they
 6   didn't escalate it?
 7               MS. QUAN:  Objection.
 8        A       No.  I don't even know whether they
 9   reviewed it.
10        Q       Now, on the second page we see an
11   invitation for people to submit Early Concerns about
12   John Noakes -- Am I characterizing that correctly?
13        A       Yes.
14        Q       Okay.  And so I -- I used to work
15   in politics and I -- I knew this term "astroturfing".
16   Have you ever heard that term?
17        Q       What term?
18        Q       Astroturfing.
19        A       No, I don't know what it is.
20        Q       Okay.  It's -- It's a deceptive
21   practice of presenting an orchestrated campaign in the
22   guise of unsolicited -- unsolicited comments.
23        A       Okay.
24        Q       So would this be considered an
25   effort to create the impression that students were
```

48

```
 1         sometimes if it's still an active document.
 2         I will have to check -- Regardless.
 3   BY MR. ENGEL:
 4        Q       So let me -- let me identify it
 5   again because I am not sure I did a good job.
 6               Exhibit 5 is a document entitled
 7   "Petition" which begins on Bates No. 234.  Have you
 8   ever seen this document before?
 9        A       No.
10        Q       So let me give you a chance to
11   review it and then I'm going to ask you the same
12   question about whether it raises any professionalism
13   concerns.  And let me know when you need me to scroll.
14        A       Okay.  I read it.
15        Q       And then I can scroll the second
16   page too so you have got a chance to see that as well.
17               Does the petition identified as
18   Exhibit 5 raise any professionalism concerns for you?
19               MS. QUAN:  Objection.
20        A       Yes.
21        Q       What are those concerns?
22        A       It's -- It's inappropriate to have
23   a petition like this coming from students.
24        Q       Do you know what actions were taken
25   to address those professionalism concerns?
```

50

```
 1              MS. QUAN:  Objection.
 2      A       No.
 3      Q       Do you know if the student who
 4  authored this petition was reviewed by the
 5  Professionalism Working Group?
 6              MS. QUAN:  Objection.
 7      A       I don't know.
 8      Q       Do you know if the student who
 9  authored this petition was reviewed by the
10  Committee on Students?
11              MS. QUAN:  Objection.
12      A       This was not reviewed by the
13  Committee on Students.
14      Q       Okay.  How do you know that?
15      A       Because I have been to all of the
16  Committee on Students' meetings and this wasn't
17  reviewed.
18      Q       Let me show you a document we will
19  mark as Exhibit 6 which is an email with an
20  attachment.  It looks like it begins on 4 --
21  April 20th, 2021, from Jean Seneff to Darnell Parker.
22  It begins on Bates No. 443 and ends on Bates No. 445.
23              (Plaintiff's Exhibit 6 was marked
24              for identification.)
25
```

51

```
 1  by the medical school to determine who posted this?
 2              MS. QUAN:  Objection.
 3      A       No.
 4      Q       Do you know if any actions were
 5  taken by the medical school to determine who posted
 6  this?
 7              MS. QUAN:  Objection.
 8      A       I didn't even know about this,
 9  no.
10      Q       Do you know if the
11  Professionalism Working Group ever reviewed this
12  document?
13      A       No.
14              MS. QUAN:  Objection.
15      Q       Do you know if the Committee on
16  Students ever reviewed this document?
17      A       The Committee on Students did not
18  review the document.
19      Q       And when I say "reviewed the
20  document", I guess the Committee on Students actually
21  review students, right, so it would be the human being
22  who wrote the document who would be reviewed?
23      A       Right.  I don't know who wrote the
24  document.
25      Q       Okay.  So just so my -- I asked a
```

52

```
 1  BY MR. ENGEL:
 2      Q       And -- And I'll -- I'll note to
 3  make it easier, Doctor, it doesn't appear that you
 4  were copied on any of the emails, so I just want to
 5  draw your attention to the document on the third page
 6  there.  Have you ever seen this document before?
 7      A       No.
 8      Q       Okay.  Were you aware that this
 9  document was taped on the door or window of a restroom
10  in the medical school?
11      A       No.
12      Q       Does this document raise any
13  professionalism concerns?
14              MS. QUAN:  Objection.
15      A       I'm not sure I can answer that.
16      Q       Why can't you answer that?
17      A       Well, yes, it's inappropriate --
18  Let's put it that way.
19      Q       It's inappropriate because it's
20  inflammatory?
21              MS. QUAN:  Objection.
22      A       It's inappropriate because it --
23  Yes, it's inflam -- it's accusatory and that's -- You
24  know, the bathroom wall is not the place for that.
25      Q       Do you know what actions were taken
```

52

```
 1  bad question before, so let me ask a better one.
 2      Q       Do you know if the Committee on
 3  Students ever reviewed the actions of the student who
 4  wrote this document?
 5              MS. QUAN:  Objection.
 6      A       I don't believe that the
 7  Committee on Students ever reviewed anything related
 8  to this document.
 9      Q       Now, the three documents I gave
10  you, would they have a negative effect on John Noakes?
11              MS. QUAN:  Objection.
12      A       Yes.
13      Q       Would you consider that to be
14  disrespectful of his emotions?
15      A       Yes.
16              MS. QUAN:  Objection.  Sorry.
17      A       Sorry.  Yes.
18              MS. QUAN:  Just let me object.
19              THE WITNESS:  Okay.  Sorry.
20      A       Yes.
21      Q       Are they likely to interfere with
22  his ability to complete his education?
23              MS. QUAN:  Objection.
24      A       I don't know that I can answer
25  that.
```

54

```
 1     Q        Did he ever complain about the
 2  atmosphere at the school interfering with his ability
 3  to complete his education?
 4           MS. QUAN:  Objection.
 5     A        He was concerned about the
 6  environment in the class.  He didn't specify it as
 7  interfering with his education.
 8     Q        What were his concerns about the
 9  environment in the class?
10     A        I think he was worried about what
11  it -- We -- We started talking -- We were talking
12  during the summer and he was worried about going back
13  into the class and what it was going to be like and he
14  was trying to gauge whether it felt like the whole
15  class was against him or whether this was a smaller
16  group of students, but he was apprehensive about being
17  in an environment where a lot of students thought he
18  had done something that he said he didn't do.
19     Q        And would this negatively affect
20  his ability to complete the program?
21           MS. QUAN:  Objection.
22     A        I think it depends on a lot of
23  factors including how he handles it.
24     Q        So let me show you what we'll mark
25  as Exhibit 7.
```

---

```
 1           (Plaintiff's Exhibit 7 was marked
 2           for identification.)
 3           MS. QUAN:  We have been going about
 4        an hour.  Maybe after this exhibit could we
 5        maybe take a brief break?
 6           MR. ENGEL:  Yeah.  If you don't
 7        mind I have got two more exhibits to go
 8        through and then we'll be at a really good
 9        time.
10           MS. QUAN:  Yeah, that makes sense.
11           MR. ENGEL:  If you don't mind.
12        Are you okay, Doctor?
13           THE WITNESS:  Yeah, that would be
14        fine.
15  BY MR. ENGEL:
16     Q        Okay.  So I want to show you an
17  email that was sent on June 15th, 2021, from
18  Molly Simmons to Steven Ricanati with Bates No. 828 at
19  the bottom.  Have you ever seen this document before?
20     A        No.
21     Q        Who is Molly Simmons?
22     A        She's the Administrative person for
23  Student Affairs.
24     Q        And who is Steven Ricanati?
25     A        He's the Associate Dean for
```

---

55

```
 1  Student Affairs.
 2     Q        Okay.  And so she said that -- in
 3  the paragraph here that, "There are several instances
 4  in the class groupme and a few in IQ of students
 5  publicly belittling or humiliating John Noakes."  Were
 6  you aware of that occurring?
 7     A        No.
 8           MS. QUAN:  Objection.  Sorry.
 9           THE WITNESS:  Sorry.
10           MS. QUAN:  No.  I'm sorry.
11     A        No.
12     Q        Are you aware of any situations
13  where students were openly ignoring him and excluding
14  him from groups?
15     A        No.
16     Q        Do you know what, if any, actions
17  the school took in response to the report described on
18  Exhibit 7?
19           MS. QUAN:  Objection.
20     A        No.
21     Q        Would the conduct described in
22  Exhibit 7 be considered unprofessional?
23           MS. QUAN:  Objection.
24     A        Yes.
25     Q        Do you know if any of the students
```

---

56

```
 1  who engaged in the conduct described in Exhibit 7 were
 2  reviewed by the Professionalism Working Group?
 3           MS. QUAN:  Objection.
 4     A        I don't know.
 5     Q        Do you know if any of the students
 6  described in Exhibit 7 were reviewed by the
 7  Committee on Students for this conduct?
 8           MS. QUAN:  Objection.
 9     A        They were not reviewed by the
10  Committee on Students.
11     Q        Do you know why they weren't
12  reviewed by the Committee on Students?
13           MS. QUAN:  Objection.
14     A        I don't know.
15     Q        Let me show you what we'll mark as
16  Exhibit 8, another post on Instagram.
17           (Plaintiff's Exhibit 8 was marked
18           for identification.)
19  BY MR. ENGEL:
20     Q        Have you ever seen this document
21  before?
22           MS. QUAN:  Objection.
23     A        No.
24     Q        And if this were in reference to
25  the situation between John Noakes and Jane Roe would
```

58

1  this raise any professionalism concerns?
2                MS. QUAN:  Objection.
3      A        Well, this is -- it looks like a
4  standard mnemonic about intimate partner violence, so
5  it's a standard mnemonic, I guess.
6      Q        So if this were presented in
7  respect to the conduct of the students during the
8  Title IX process would that raise any professionalism
9  concerns?
10                MS. QUAN:  Objection.  And, Josh, I
11        think I just realized -- Is this a two-page
12        document?
13                MR. ENGEL:  It is.
14                MS. QUAN:  Can we see the second?
15      A        Okay.
16      Q        The second page is where it came
17  from on Instagram.
18      A        I'm sorry.  What's the question?
19                MR. ENGEL:  Pam, could you repeat
20        the question, please?
21                (Question on Lines 6 through 9 as
22                read back by the reporter.)
23                MS. QUAN:  Objection.
24      A        This is a standard document.  I --
25  I don't know that I can say that.

59

1                MS. QUAN:  Yeah, that's okay.  How
2        long?
3                MR. ENGEL:  Yeah, off the record.
4                (Deposition stood in recess at
5                1:12 p.m.)
6                (Deposition reconvened at
7                1:24 p.m.)
8                MR. ENGEL:  All right.  Let's go
9        back on the record then.
10  BY MR. ENGEL:
11      Q        Doctor, when did you first learn
12  about the GroupMe post by John Noakes?
13      A        It was mid April.  I don't know the
14  exact date.
15      Q        And how soon after the post did you
16  learn about it?
17      A        Pretty soon, that day or the next
18  day, I think.
19      Q        Did you have any discussions right
20  after the post with other faculty members?
21      A        So I think it was right around the
22  time that we were transitioning to have me be the
23  student's Society Dean.
24      Q        And so why did you -- why did you
25  become the Society Dean for John Noakes?

60

1      Q        Okay.  And if it were in -- in
2  reference to John Noakes or Jane Roe would it be
3  considered inflammatory or accusatory?
4                MS. QUAN:  Objection.
5      A        I can't answer that.  I don't know.
6      Q        Could it be considered an attempt
7  to bully or intimidate someone involved in that
8  process?
9                MS. QUAN:  Objection.
10      A        I -- I can't answer that.  I don't
11  know.
12      Q        Do you know if the person who
13  authored this document was ever reviewed by the
14  Professionalism Working Group?
15                MS. QUAN:  Objection.
16      A        I don't even know what this is.
17      Q        Do you know if the person who
18  created this post was ever reviewed by the
19  Committee on Students?
20                MS. QUAN:  Objection.
21      A        It was not reviewed by the
22  Committee on Students.
23                MR. ENGEL:  All right.  Well, now
24        we have got a good time if you don't mind --
25        Amanda, if you're okay we'll take a break.

60

1      A        Because his Dean was Dr. Ricanati
2  and because he had a case against -- that Dr. Ricanati
3  was named in it wasn't appropriate for Dr. Ricanati to
4  continue to be his Dean.
5      Q        After -- So -- So it went from
6  Dr. Ricanati to you?
7      A        Yes.
8      Q        Okay.  Are you aware if any of the
9  other Society Deans refused to act as the Society Dean
10  for John Noakes?
11      A        I don't know.
12      Q        In particular are you aware if any
13  of the other Deans refused to act as a Society Dean
14  for John Noakes because of the accusations by
15  Jane Roe?
16                MS. QUAN:  Objection.
17      A        No.
18      Q        So when did you first discuss the
19  matter involving the GroupMe post with Dr. Ricanati?
20      A        I don't remember exactly.
21      Q        Did those conversations occur after
22  you had become the Society Dean for John Noakes?
23      A        It was part of the handoff that we
24  needed to do from the current Society Dean to me.
25      Q        Did you have any concern that

62

```
1   Dr. Ricanati was providing you information about
2   John Noakes after he had been named in a retaliation
3   complaint?
4               MS. QUAN:  Objection.
5        A      He was -- Dr. Ricanati was being --
6   seemed to me to be being very professional in the way
7   that he was talking about things and I needed to get a
8   handoff because, you know, the responsibilities of
9   being a Society Dean include personal, career, and
10  academic advising and you need to know where things
11  are at.
12       Q      Did Dr. Ricanati express to you any
13  information about the retaliation complaint against
14  him?
15       A      Only that it existed.
16       Q      Did he discuss with you his
17  concerns about the GroupMe post from John Noakes?
18              MS. QUAN:  Objection.
19       A      I don't remember.  I saw the post
20  myself and made my own conclusions about it.
21       Q      So did you have any substantive
22  discussions with Dr. Ricanati about the GroupMe post?
23       A      We had a discussion about how to
24  approach it because I had not been involved at all
25  with the case up until this point.  I -- You know, I
```

Jackson-Whitney Reporting LLC
513.868.1919

63

```
1   which is Bates No. 236.
2               (Plaintiff's Exhibit 9 was marked
3                for identification.)
4   BY MR. ENGEL:
5        Q      Have you seen this document before?
6        A      Yes.
7        Q      Who prepared this document?
8        A      I don't remember.
9        Q      Did you prepare this document?
10       A      No.
11       Q      All right.  This document appears
12  to be a summary of the Early Concerns submitted by
13  other students related to John Noakes -- Is that a
14  fair description?
15       A      That's my understanding.
16       Q      Okay.  And -- And just so we're
17  clear of what the professionalism concerns with the
18  GroupMe post were is -- is John Noakes required to
19  show remorse towards Jane Roe?
20              MS. QUAN:  Objection.
21       A      No.
22       Q      Is he required to show remorse for
23  his actions towards Jane Roe?
24              MS. QUAN:  Objection.
25       A      No.
```

Jackson-Whitney Reporting LLC
513.868.1919

64

```
1   didn't know John Noakes -- I'm sorry -- the student.
2   I wouldn't be able to pick him out of a group.  You
3   know, I had not had any conversations with him.  I
4   hadn't really been following what was going on in the
5   Title IX case, so I -- I needed some handoff and we --
6   and also Dr. Ricanati understands the policies for
7   Student Affairs better than I do -- He's been there a
8   long time -- and so I needed to understand what I
9   needed to do.
10       Q      At the time what was your
11  understanding of the relationship between Dr. Ricanati
12  and Jane Roe?
13              MS. QUAN:  Objection.
14       A      I had no information or
15  understanding -- you know, no information about that.
16       Q      Were you aware when you became
17  John Noakes' Society Dean that he had complained about
18  misconduct by Jane Roe to the Title IX Office?
19       A      No.
20       Q      Were you aware at the time you
21  became the Society Dean that John Doe [sic] had
22  complained about retaliation from Jane Roe?
23       A      No.
24       Q      So I'm going to show you what we'll
25  mark as Exhibit 9, a summary of the Early Concerns,
```

Jackson-Whitney Reporting LLC
513.868.1919

```
1        Q      Is he prohibited from discussing
2   the Title IX process publicly?
3               MS. QUAN:  Objection.
4        A      I don't know.
5        Q      Do you know if he's prohibited from
6   criticizing the Title IX process?
7               MS. QUAN:  Objection.
8        A      I don't know.
9        Q      Are you aware of anything that
10  prohibits John Noakes from discussing the facts of his
11  relationship with Jane Roe?
12       A      I don't know.
13       Q      So you say you don't know.  As you
14  sit here today are you aware of any Case Western
15  policies or procedures that prohibit John Noakes of
16  discussing the facts of his relationship with
17  Jane Roe?
18       A      I don't know.
19       Q      So I think "I don't know" doesn't
20  make sense as an answer to my question.
21       A      So I guess -- I guess the answer
22  is --
23       Q      It's a yes or no question.
24       A      I guess the answer is, no, I -- I
25  don't know of anything that prohibits him from
```

Jackson-Whitney Reporting LLC
513.868.1919

66

```
 1   discussing the relationship.
 2           Q        And so the same question about the
 3   other ones.  Are you familiar -- Are you aware of any
 4   policy that prohibits him from discussing the Title IX
 5   process?
 6                   MS. QUAN:  Objection.
 7           A        My understanding is that the
 8   students involved with the Title IX process are told
 9   during the process that they are not supposed to be
10   discussing it.
11           Q        Okay.  Are you aware of any
12   policies that exist at Case Western that codify that?
13                   MS. QUAN:  Objection.
14           A        No, I'm not aware.  I haven't seen
15   it.
16           Q        And just so we're clear you said
17   the concerns -- Well, let me ask it a different way.
18                   Is it true that students at
19   Case Western are encouraged to feel empathy for all of
20   their classmates?
21                   MS. QUAN:  Objection.
22           A        I would say they are expected to
23   feel empathy for their classmates, yes.
24           Q        Well, that would include empathy
25   for classmates who claim to be victims of sexual
```

Jackson-Whitney Reporting LLC
513.868.1919

67

```
 1           A        Yeah, I don't know.
 2           Q        Do you know if Case Western ever
 3   investigated who told all these 31 people what the
 4   GroupMe post was about?
 5                   MS. QUAN:  Objection.
 6           A        No, I don't know.
 7           Q        Are there any professionalism
 8   concerns -- And I'm sorry if I asked this before -- in
 9   calling a classmate a rapist?
10                   MS. QUAN:  Objection, asked and
11           answered.
12           A        I guess it depends on what that
13   person believes, but -- I guess it depends on what
14   that person believes.
15           Q        So were there any professionalism
16   concerns if Jane Roe was going around and told -- and
17   told all those 31 people who submitted Early Concerns
18   that John Noakes was a rapist?
19                   MS. QUAN:  Objection.
20           A        I don't know enough about the
21   situation to really be able to answer that.  You know,
22   each person in this -- One of the things that I had
23   talked to my student about was that each person
24   involved in this kind of has their own truth and it
25   really depends on her intention and -- and experience.
```

Jackson-Whitney Reporting LLC
513.868.1919

66

```
 1   assault?
 2           A        Yes.
 3           Q        And that would include empathy for
 4   someone who claims to have been falsely accused of
 5   sexual assault?
 6           A        Yes.
 7           Q        And so the lack of empathy in
 8   either of those situations would raise professionalism
 9   concerns?
10                   MS. QUAN:  Objection.
11           A        I think it depends on how it plays
12   out.
13           Q        What does that mean?
14           A        How they're expressing a lack of
15   empathy, who they're expressing it to, and whether
16   somebody formally complains about it.
17           Q        And do you know if Case Western
18   ever investigated how all of the students who filed
19   Early Concerns knew what the GroupMe post was about?
20                   MS. QUAN:  Objection.
21           A        I'm sorry.  Ask the question again.
22           Q        Yeah.
23                   I mean how -- how would all these
24   31 people know what the GroupMe post was even about?
25                   MS. QUAN:  Objection.
```

Jackson-Whitney Reporting LLC
513.868.1919

68

```
 1   I can't answer that otherwise.
 2           Q        When you reviewed Exhibit 9 did you
 3   have any concerns that students were using the
 4   Early Concern process as an alternative method to
 5   overturn what they believed was an incorrect Title IX
 6   decision?
 7                   MS. QUAN:  Objection.
 8           A        I don't know what motivated the
 9   students.
10           Q        Well, John Noakes' post was on
11   April 15th, 2021; right?
12           A        Yes, I believe so.
13           Q        Okay.  And it looks like other than
14   like 29 of the 31 Early Concerns were submitted over
15   10 days later -- Am I reading that correctly?
16           A        That's what I see here as well.
17           Q        Do you know why all of a sudden 10
18   days later 29 students decide they want to submit
19   Early Concerns?
20                   MS. QUAN:  Objection.
21           A        No.
22           Q        Does the 10-day delay suggest to
23   you that perhaps students weren't as traumatized by
24   John Noakes' post as -- as they claim to be?
25                   MS. QUAN:  Objection.
```

Jackson-Whitney Reporting LLC
513.868.1919

70

1      A       I can't speculate on what they were
2  thinking or feeling or why their timing was like that.
3      Q       Well, you have to evaluate whether
4  their concerns are legitimate; right?
5              MS. QUAN:  Objection.
6      A       I think the written content within
7  the Early Concerns is more important than the date
8  that they were submitted.
9      Q       In reviewing the early content --
10  the content of the concerns you had to evaluate the
11  credibility of that content; right?
12             MS. QUAN:  Objection.
13     A       I -- I've never seen 31
14  Early Concerns come in on one student for anything
15  before.  In looking through them there were some
16  themes that came out.  The one that we were looking at
17  was the theme of the GroupMe post.
18     Q       Well, one of the themes that came
19  out is a number of the students believed that
20  John Noakes was actually guilty of the sexual assault;
21  right?
22             MS. QUAN:  Objection.
23     A       Yes.
24     Q       Okay.  And they wanted him to face
25  discipline even though the Title IX process had found

1  him not responsible?
2              MS. QUAN:  Objection.
3      A       Yes, and my understanding is the
4  professional schools have the ability to do that to
5  hold a student to a different standard than Title IX.
6      Q       And so where -- where do I find
7  that?
8      A       It's in the process of the
9  Title IX -- in the Title IX process for the -- in the
10  professional schools.  At least it comes -- the
11  decision comes back to the school to see whether any
12  rules within the school are broken.
13     Q       If I looked at the school's
14  Title IX policy I'm going to see that somewhere;
15  right?
16             MS. QUAN:  Objection.
17     A       I don't know.  I haven't read it.
18  That was just my understanding of it.
19     Q       Okay.  Well, let me show you what
20  we'll mark as Exhibit 10 which is a letter that the
21  school sent to the Department of Health & Human
22  Services dated April 16th, 2018.  This was filed in
23  this case as Document No. 1-2.
24             (Plaintiff's Exhibit 10 was marked
25             for identification.)

71

1  BY MR. ENGEL:
2      Q       Have you ever seen this letter
3  before?
4              MS. QUAN:  August 16th.
5              MR. ENGEL:  August 16th.  I'm
6          sorry.  What did I say?  Let me -- Let me
7          start over.
8  BY MR. ENGEL:
9      Q       What -- What I have marked as
10  Exhibit 10 is an August 16, 2018, document or letter
11  from the Department of Health & Human Services to the
12  Case Western University.  Have you ever seen this
13  document before?
14     A       No.
15     Q       And in this document it appears
16  that there's a description of the grievance procedures
17  and enforcement that the medical school uses for
18  dealing with Title IX complaints -- Am I reading that
19  correctly?
20     A       That's what it looks like.
21     Q       Okay.  And if I read that correctly
22  I don't see anywhere in there that it says that after
23  Title IX is done with the process it will be sent back
24  to the professional schools.  Do you?
25             MS. QUAN:  Objection.

72

1      A       No.
2      Q       So where will I find codified this
3  process that the medical school will review Title IX
4  matters after Title IX is done with it?
5              MS. QUAN:  Objection.
6      A       I don't know.
7      Q       Will I find it in the medical
8  school's handbook?
9              MS. QUAN:  Objection.
10     A       It's not in the medical student
11  handbook, I don't think.
12     Q       And you believe it might be in the
13  Title IX policy for the University?
14     A       I don't know.  It was just my
15  understanding.
16     Q       Okay.  Does the
17  Professional Working Group take minutes?
18     A       I don't know.
19     Q       So if -- if, for example, the
20  Professional Working Group reviewed one of the
21  documents we reviewed earlier would there be some
22  minutes or something else indicating that review?
23     A       I don't know.  I have never been to
24  one of their meetings.
25     Q       The same as it appears that in this

74

1    letter it describes between 2014 to 2017 three
2    Title IX complaints filed by students against other
3    students -- Where -- Where would I find documents
4    showing that the medical school actually conducted its
5    own independent review of those matters?
6        A        I don't know.
7        Q        Do you know if any such documents
8    exist?
9        A        I don't know.
10       Q        Do you know if the medical school
11   reviewed the three Title IX complaints described in
12   this letter from HHS?
13       A        I'm trying to remember, but not
14   that I recall.
15       Q        All right.  Do you recall any other
16   Title IX matters that the medical school independently
17   reviewed?
18       A        No.
19       Q        So getting back to the
20   Early Concerns I think you said that you have never
21   before had 31 students submit Early Concerns against
22   another student?
23       A        Yes.
24       Q        Did that raise any concerns to you
25   that perhaps this was a coordinated activity?

1        MS. QUAN:  Objection.
2        A        It raised concerns to me that
3    emotions were running very high and that the classes
4    may be very polarized.
5        Q        Did you ever consider that the
6    Early Concern process was being used to bully and
7    intimidate John Noakes?
8        MS. QUAN:  Objection.
9        A        No.
10       Q        And you didn't even though a number
11   of the Early Concerns expressed of you that
12   John Noakes was guilty of sexual assault?
13       MS. QUAN:  Objection.
14       A        When I was reading them I kind of
15   put that to the side because that wasn't what we were
16   evaluating at the time.
17       Q        Looking back at it does it raise to
18   you concern the fact that there's a 10-day delay,
19   there's an extreme number of -- unprecedented number
20   of people and a 10-day delay that perhaps the
21   Early Concern process was being used to bully and
22   intimidate John Noakes?
23       MS. QUAN:  Objection.
24       A        No, that's not the way that I see
25   it.

75

1        Q        Okay.  Why don't you see it that
2    way?
3        A        Because I think emotions were very
4    heightened and people were expressing their distress
5    and --
6        Q        So do you believe -- Oh, I'm sorry.
7    I don't want to cut you off.
8        A        No, that's okay.  I'm done.
9        Q        Finish your answer.  I'm sorry.
10   It's hard with Zoom sometimes and my apologies.
11       A        No, I think I'm done.
12       Q        Is it your belief that all 31
13   people who submitted Early Concerns did so
14   independently?
15       MS. QUAN:  Objection.
16       A        I don't know.
17       Q        Is it your belief that it's just a
18   coincidence that between 5:28 p.m. on April 25th and
19   10:57 p.m. on April 26th that 26 people independently
20   submitted Early Concerns about John Noakes?
21       MS. QUAN:  Objection.
22       A        I would be speculating.  I don't
23   know.  I mean it sounds like there was communication
24   between them, but I don't know the situation.  I
25   wasn't there.

76

1        Q        I mean I'm asking you.  I mean is
2    it your belief as you sit here today that this is all
3    just a coincidence?
4        MS. QUAN:  Objection, asked and
5            answered.
6        A        No, I don't think it's a
7    coincidence.
8        Q        Okay.  If it were the case that a
9    number of students coordinated an effort to submit
10   Early Concerns about John Noakes 10 days after the
11   alleged post would that create any professionalism
12   concerns for you?
13       MS. QUAN:  Objection.
14       A        No.
15       Q        Do you know what happened around
16   April 25th that all of a sudden made 29 additional
17   students submit Early Concerns?
18       A        No.
19       Q        Do you know if anyone at
20   Case Western promised these students that the school
21   would take action if a number of Early Concerns were
22   submitted?
23       MS. QUAN:  Objection.
24       A        No.
25       Q        Do you know if anyone at

78

1  Case Western ever implied that the school would
2  address the situation about John Noakes?
3            MS. QUAN:  Objection.
4        A     I don't know what you mean by "the
5  situation about John Noakes".
6        Q     The fact that John Noakes had been
7  found not responsible for sexual misconduct.
8            MS. QUAN:  Objection.
9        A     I don't understand your question.
10 I'm sorry.
11       Q     Do you know if anyone at
12 Case Western ever made promises to students that the
13 school would discipline John Noakes despite the fact
14 that he was found not responsible through the Title IX
15 process?
16       A     You mean --
17           MS. QUAN:  Objection.
18       A     You mean discipline him related to
19 the Title IX outcome?
20       Q     Yeah.
21       A     No.
22       Q     In other words, did anyone ever
23 say, "We know that Title IX got it wrong and we're
24 going to do something about it"?
25       A     No.

79

1  through a process and my job because there had been
2  complaints was to get the student's perspective and I
3  was trying to understand enough about what happened
4  and what my role needed to be in order to do my job
5  and that required a handoff.
6        Q     So did that handoff mean that
7  Dr. Ricanati would actually write your emails for you?
8            MS. QUAN:  Objection.
9        A     He does not write my emails for me.
10 He wrote the basis of the email that explained to me
11 what I needed to understand and -- and then I edited
12 it to make sure that I was expressing myself in the
13 way that I would normally express myself.
14           (Plaintiff's Exhibit 11 was
15            mismarked in this depo but actually
             is what is marked Exhibit 18.)
16 BY MR. ENGEL:
17       Q     So we have marked as Exhibit 11 an
18 April 21st email between you and Dr. Ricanati.  Is
19 that the handoff you're referring to?
20       A     Yes.
21       Q     And this is, by the -- Okay.  And
22 this, by the way, begins on Bates -- Bates No. 871.
23           MS. QUAN:  I'm sorry.  Make sure
24           that Josh has put a document in front of you
25           just to make sure that you know the whole

80

1        Q     Do you know specifically if
2  Dr. Ricanati ever told Jane Roe that that would
3  happen?
4            MS. QUAN:  Objection.
5        A     I never heard that.
6        Q     And just so we're clear you
7  consulted with Dr. Ricanati about what to say to
8  John Noakes even after John Noakes had filed a
9  retaliation complaint against him; right?
10           MS. QUAN:  Objection.
11       A     That was part of the handoff for
12 becoming his Dean, yes.
13       Q     Okay.  In fact, isn't it true that
14 he wrote the first draft of an email that you were
15 going to send to John Noakes about this matter?
16       A     Yes, and then I edited it.
17       Q     So do you believe it was
18 appropriate to have John -- I'm sorry -- Dr. Ricanati
19 writing a first draft of a memo about an issue of
20 which John Noakes had complained against him for
21 retaliation?
22           MS. QUAN:  Objection.
23       A     I needed to understand the
24 situation and what needed to be communicated in this
25 first communication because this was already going

80

1        thing.
2        A     Yes, if you could show me the -- if
3  you could show me all the way.
4        Q     Yeah.  So let me -- let me first
5  begin with it looks like on April 21st at 11:34 a.m.
6  Dr. Ricanati sent an email to you with the subject,
7  "Draft email to John Noakes" -- Do you remember
8  receiving that email?
9        A     Yeah, yes.
10       Q     Okay.  And this was a description
11 from Dr. Ricanati about what you should say to
12 John Noakes about the GroupMe post; right?
13           MS. QUAN:  Objection.
14       A     Yes.
15       Q     You were aware when you received
16 this email that John Noakes had filed a retaliation
17 complaint against Dr. Ricanati?
18       A     I was aware that Dr. Ricanati was
19 named in something that the student filed.  I didn't
20 really know the details of it at all.
21       Q     What did you do to learn about the
22 details?
23       A     I did not want to know about the
24 details.  I wanted to be able to be a good Dean for
25 this student without bringing in a lot of baggage.

82

```
1       Q       And you thought it was appropriate
2   to consult with Dr. Ricanati about this matter despite
3   the fact you didn't know exactly what John Noakes'
4   complaints about Dr. Ricanati were?
5               MS. QUAN:  Objection.
6       A       Dr. Ricanati in every interaction
7   that I had with him related to this was totally
8   professional.  He was not disparaging of the student.
9   He was doing his job and he was communicating with me
10  in a way that was totally professional as a handoff
11  and I needed to understand the situation.
12              The normal way that we would handle
13  this is that we would call the student in for a
14  meeting, but we were not sure the student would be
15  willing to meet with me, so we were trying to give him
16  the option of doing this by email.
17      Q       Okay.  Did you eventually speak
18  with John Noakes about the GroupMe post?
19      A       Yes.
20      Q       Tell me everything you remember
21  about that -- Well, when did that conversation take
22  place first?
23      A       I don't remember exactly.  Sorry.
24      Q       Okay.  Was it about May 6th?  Does
25  that sound about right?
```

84

```
1       A       It could have been.
2       Q       Tell me everything you remember
3   about that conversation?
4       A       So my recollection was this was
5   basically kind of the first conversation that I had
6   with him.  We had a Zoom meeting scheduled and he came
7   on to the Zoom and told me that his lawyer was coming
8   onto the Zoom as well.  I was under the -- I wasn't
9   sure whether it was policy not to have other people in
10  advising meetings, including lawyers, so I wasn't sure
11  what to do because I had never had a meeting with a
12  student where a lawyer was present before, so I texted
13  Dr. Ricanati who understands our rules and said, "Is
14  it" -- and asked him, "Is it policy that I -- that he
15  cannot have a lawyer in this conversation or is it up
16  to me basically," and Steve texted back that it was up
17  to me, so I felt that it might make the student feel
18  safer to have the lawyer there and to start the
19  conversation in that way, so that's my recollection of
20  the first conversation I had with him which I think
21  was related to the GroupMe post.
22      Q       So that -- So that lawyer was
23  Ms. Tamashasky?
24      A       Anne?
25      Q       Yes.
```

83

```
1       A       Yes.
2       Q       Okay.  And part of our -- our test
3   is you have to spell Tamashasky.  Anne will like that.
4               Was that a respectful conversation?
5       A       Yes.
6       Q       Okay.  Did Ms. Tamashasky raise her
7   voice at any point?
8       A       No.  She didn't say very much.
9       Q       And before you -- If I heard you
10  right before this conversation you consulted again
11  with Dr. Ricanati about what to do about something
12  involving John Noakes?
13      A       He's the one who understands the
14  rules for the Student Affairs Deans.  I don't have
15  anybody else to ask a quick question like that.
16      Q       Okay.  So that's a yes, you
17  involved Dr. Ricanati again?
18      A       Yes, I asked Dr. Ricanati.
19      Q       And at the time you asked
20  Dr. Ricanati you were aware that John Noakes had filed
21  a retaliation claim against him?
22      A       Again I knew there was some kind of
23  complaint that he was named in.  I didn't really know
24  the details of it.  I didn't want to know.
25      Q       Okay.  So that's a yes again?
```

84

```
1       A       Well, it's a yes that I knew there
2   was some kind of complaint filed against him.
3       Q       So did you discuss -- Tell me what
4   else you discussed about the GroupMe post?
5       A       So I was trying to -- My -- My
6   recollection is that I tried to get a sense of where
7   the student was emotionally at the first part of the
8   conversation, try to find out what he -- what was
9   behind posting this, like why he chose to do it and to
10  do it that way and what the 1-0 meant.  You know, I --
11  I -- I don't know for sure what happened.  I mean we
12  have had -- I have had many conversations with him and
13  I can't tell you for sure I know what happened in each
14  individual conversation, so this is my best
15  recollection, but I don't know which parts of this
16  conversation happened that day and which parts
17  happened on other days.
18              But we -- I tried to get a sense
19  from him of what was behind it.  He was talking a lot
20  of religious things -- religious things that he was
21  going through.  He said that he used to -- I don't --
22  Again I don't remember whether it was this
23  conversation or a different conversation where he said
24  he used to be an atheist and he had all these books
25  that -- philosophy books that he had read and that
```

86

1  since he had gone through this process that he had
2  become more religious, and he was talking -- he was
3  like so he just wanted to kind of celebrate his
4  finding of religion and that that's what the first
5  part of the GroupMe post was about.
6              He never really explained to me
7  what the 1-0 was.  Towards the end of the
8  conversation, you know, he was very -- I -- I don't
9  think he wanted to really -- I don't think he felt --
10  he didn't trust me or he didn't seem like he trusted
11  me and didn't really answer a lot of questions
12  directly when I asked him directly what he was
13  thinking or -- At the end of the conversation Anne
14  said to him, "I think she's really trying to help
15  you," and I think she was trying to encourage him to
16  talk to me about what he was experiencing.
17      Q      Did he express to you concerns that
18  he was being bullied and harassed by his classmates?
19      A      No, he didn't put it that way.
20      Q      How did he put it?
21      A      At that time it wasn't really -- it
22  was really we were focusing more on the GroupMe post
23  and -- and the kind of response that it got and we
24  weren't talking about anything else that was going on
25  in the class that I recall.

87

1  text messages provided by Dr. Ricanati.
2              Do you remember texting
3  Dr. Ricanati around the time of the meeting with
4  John Noakes on May 6th?
5      A      Yes.
6      Q      And I think you described that you
7  were texting him to get advice of what to do with the
8  lawyer on there?
9      A      Yes.
10      Q      You also indicated at the bottom,
11  "He is getting terrible advice."  What do you mean by
12  that?
13      A      I felt like having a lawyer at this
14  meeting was kind of making it different than a regular
15  advising meeting and, you know, I just wanted to be
16  able to be his advisor and have conversations with him
17  and I felt like it was sort of doing something to the
18  quality of our relationship that was not -- it was --
19  it was not ideal for having a good working
20  relationship together.
21      Q      So any particular advice you
22  believe he was getting that was bad advice?
23      A      No.  I think that had more to do
24  with just having lawyers at meetings that should be
25  less formal.

1      Q      At that point did you advise him
2  that he should not pursue his retaliation complaints
3  against Dr. Ricanati and Dr. Parker?
4          MS. QUAN:  Objection.
5      A      Not that I recall.
6      Q      Okay.  Do you recall during that
7  conversation telling him he should not pursue his
8  Title IX complaint against Jane Roe?
9          MS. QUAN:  Objection.
10      A      I didn't know that he had Title IX
11  complaints against Jane Roe.
12      Q      Did you give him advice that he
13  should take a year off?
14      A      I don't remember.  I did at some
15  point, but I don't remember.  I don't think it was
16  that -- It definitely wasn't at that meeting.
17      Q      Well let me show you what we'll
18  mark as Exhibit 12 which is some text messages on
19  May 6th.
20          (Plaintiff's Exhibit 12 was marked
21           for identification.)
22  BY MR. ENGEL:
23      Q      Okay.  So this appears to be a text
24  message sent -- It's got Bates No. -- I'm sorry.  If I
25  can read it maybe 3247 at the bottom.  I believe it's

88

1      Q      Now, shortly after this
2  conversation with John Noakes this matter was
3  presented to the Professionalism Working Group?
4      A      Is that a question?  I'm sorry.
5      Q      Yeah, it's a question.
6      A      I didn't understand the question.
7      Q      Oh, yeah.  It seemed like if I read
8  the timeline correctly John Noakes' matter was
9  presented to the Professionalism Working Group on or
10  about May 25th of this year?
11      A      Yeah, I don't know -- I don't know
12  when they took it up.
13      Q      Okay.  Well, let me show you some
14  text messages it looks like between -- which I'll mark
15  as Exhibit 13 -- messages from a Jill and it appears
16  these are from your phone with Bates No. -- starting
17  at 633.
18          (Plaintiff's Exhibit 13 was marked
19           for identification.)
20  BY MR. ENGEL:
21      Q      Who's Jill?
22      A      Jill Azok is one of the other
23  Society Deans.
24      Q      And so the first thing that you
25  wrote to Jill was, "Tony said if something came badly

90

```
1   out of this, he was going to start a movement to
2   defund the committee on students."  What does that
3   mean.
4        A       Tony is my husband and this was
5   about a different case.  This was not -- See how she
6   says, "for your other student"?  This was about
7   something unrelated to this case and I was being
8   silly.
9        Q       Okay.  And then it looks like Jill
10  said, "Professional Working Group did not go well for
11  your other student," and it refers to John Noakes;
12  right?
13       A       Yes.
14       Q       Okay.  So do you know what happened
15  at that meeting?
16       A       No.  I mean she told me -- I
17  learned eventually what happened, but I don't remember
18  specifically.  I think just that it was getting
19  referred to the Committee on Students.
20       Q       Okay.  What -- What do you -- What
21  were you told happened at that meeting?
22       A       I don't remember honestly.
23       Q       But I understand a result of that
24  meeting was that he was required to undergo coaching?
25       A       No.  I am trying to -- You know,
```

```
1   there have been so many different meetings and I don't
2   know specifically which one this is referring to.
3        Q       Okay.  Let me cut to the chase
4   on -- on part of this then and make it easier.
5        At some point John Noakes was
6   required to undergo something called coaching related
7   to his GroupMe post; right?
8        A       Correct.
9        Q       Okay.  What -- What is coaching?
10       A       Our approach to professionalism is
11  not a punitive approach, so when there's a
12  professionalism concern the approach we take is to
13  assign a coach who can help the student to gain
14  insight and to improve in their professionalism rather
15  than using a punitive model.
16       Q       Now, you say not a punitive model,
17  but the student is told that they could face
18  discipline up to and including dismissal from the
19  medical school; right?
20       MS. QUAN:  Objection.
21       A       That's true when it goes to
22  Committee on Students.  The coaching part of it is
23  done through Professionalism Working Group.
24       Q       Okay.  So what was the purpose of
25  the coaching assigned to John Noakes?
```

91

```
1        A       The purpose was for him to gain
2   more insight into other people's emotions and to gain
3   empathy.
4        Q       As part of the coaching was he
5   required to acknowledge that he did something wrong in
6   regards to Jane Roe?
7        MS. QUAN:  Objection.
8        A       You mean in terms of the Title IX
9   accusation?
10       Q       In terms of anything.
11       A       First off I don't know the answer
12  to what the coaching was going to require.
13       Q       So -- Okay.  Was he told as part of
14  his coaching that he was required to show greater
15  empathy to his accuser?
16       A       I don't know the --
17       MS. QUAN:  Objection.
18       THE WITNESS:  Okay.  Sorry.
19       A       I don't know the content of the
20  coaching.
21       Q       Do you know if he was required to
22  refrain or told he should refrain from criticizing the
23  Case Western Title IX process?
24       MS. QUAN:  Objection.
25       A       I -- No, I don't know that.
```

92

```
1        Q       Do you know if part of his coaching
2   he was told he should refrain from commenting on how
3   his case was handled?
4        MS. QUAN:  Objection.
5        A       No, I don't know.
6        Q       Do you know if anyone ever told
7   John Noakes that they were sorry for what happened to
8   him?
9        MS. QUAN:  Objection.
10       A       I don't -- I don't know the answer
11  to that.  When I was meeting with him I told him I was
12  sorry that he had gone through such a difficult
13  experience, but I don't know if that's what you're
14  asking.
15       Q       Do you know if anyone else
16  expressed those opinions to him?
17       A       I don't know.
18       MS. QUAN:  Objection.  Sorry.
19       A       I don't know.
20       MS. QUAN:  I'm sorry.
21       THE WITNESS:  Okay.  I'll try to
22       take a breath.
23  BY MR. ENGEL:
24       Q       Around this time, May 25th of 2020,
25  was any pressure being put on Case Western to
```

94

```
 1  discipline John Noakes?
 2              MS. QUAN:  Objection.
 3       A      I don't know.
 4       Q      And in particular was any pressure
 5  being placed on Case Western to discipline
 6  John Noakes -- on the medical school to discipline
 7  John Noakes for sexually assaulting Jane Roe?
 8              MS. QUAN:  Objection.
 9       A      Not that I know of.
10       Q      And in particular did you -- was
11  Jane Roe pressuring the medical school to discipline
12  John Noakes for sexually assaulting her?
13              MS. QUAN:  Objection.
14       A      I don't know.
15       Q      Well, let me show you what we'll
16  mark as Exhibit 14 which is a May 25th email from
17  Jane Roe to you and some others.  We have Bates No.
18  842 on that document.
19              (Plaintiff's Exhibit 14 was marked
20              for identification.)
21  BY MR. ENGEL:
22       Q      Do you remember receiving this
23  email?
24       A      Yes.
25       Q      And this email appears to address
```

---

95

```
 1  allegations that John Noakes sexually assaulted her;
 2  right?
 3       A      At the time I believe I didn't read
 4  it.
 5       Q      Why didn't you read it?
 6       A      Because I'm trying to stay very
 7  neutral and to support the student, my student, and I
 8  was trying to stay out of the back and forth he
 9  said/she said aspects of it.
10       Q      Do you know if other people read
11  this email?
12       A      I don't know.
13       Q      Okay.  Do you know if other people
14  responded to this email?
15       A      My understanding is someone
16  responded, but I don't remember who responded.
17       Q      But it appears this email appears
18  at the exact same day that John Noakes is being
19  reviewed by the Professionalism Working Group; is that
20  right?
21       A      I don't --
22              MS. QUAN:  Objection.
23       A      I don't know.
24       Q      Do you know if that was a
25  coincidence?
```

---

95

```
 1              MS. QUAN:  Objection.
 2       A      I don't even know that it was the
 3  same date.  I don't know.
 4       Q      Well, if we look at the date of
 5  this email it appears to be May 25th; right?
 6       A      Yes, I see that.
 7       Q      And if we look at your email with
 8  Dr. Azok, A-z-o-k; is that right?
 9       A      Yes.
10       Q      -- Dr. Azok that appears to be
11  May 25th?
12       A      Yes.
13       Q      So do you know what caused Jane Roe
14  on May 25th decide she's going to send an email to
15  various people at the medical school asking that
16  John Noakes be disciplined for sexually assaulting
17  her?
18              MS. QUAN:  Objection.
19       A      I really was staying out of this.
20  I'm not sure I can answer that.
21       Q      Well, you say you're staying out of
22  it.  Do you have a role to play to protect John Noakes
23  from harassment and intimidation from other students?
24              MS. QUAN:  Objection.
25       A      I don't know that as his Dean I
```

---

96

```
 1  have the power to do that other than to advise him.
 2       Q      What happened with -- So
 3  John Noakes eventually is sent before the Committee on
 4  Students; right?
 5       A      Yes.
 6       Q      Do you know when that occurred?
 7       A      No, I would have to go back in my
 8  records.
 9       Q      Okay.  Were you present for that
10  meeting?
11       A      Yes.
12       Q      Tell me everything you remember
13  from that meeting?
14       A      So the first time that he was
15  presented it was around the Group -- it was about the
16  GroupMe post.  At that meeting the Society Dean
17  generally presents the student's information initially
18  so you present their academic record and what your
19  understanding is of why the student is being presented
20  and then you -- so I did that.  I showed the GroupMe
21  post.
22              Normally the Early Concern is
23  shared.  Because there were so many I believe that
24  they were themed out so that just a couple of themes
25  were showing rather than going through all 31 of them.
```

98

1   And then he was allowed to submit a reflection about
2   his perceptions and so his reflection was also shown
3   at the Committee on Students' meeting.
4          Then at that point the Committee
5   discusses the situation and makes a decision of
6   whether they need to interview the student or not, and
7   I totally don't remember whether he was brought into
8   that meeting or not.
9          Q     What was the result of that
10  meeting?
11         A     The result of that meeting is that
12  they wanted him to get coaching around empathy and to
13  better -- so that he would have some insight into why
14  that GroupMe post was so inflammatory, and then it
15  would come back and be represented at Committee on
16  Students after the coaching for some follow-up.
17         Q     Did that occur?
18         A     When we had the next meeting I
19  think there was a disconnect between what the
20  Committee on Students expected and what the coaches
21  had done because the -- It took a while for them to be
22  able to find people who were willing to be coaches for
23  him, and then when we found the pair of coaches that
24  was going to work there was a little bit of a delay,
25  so I don't think they had met very many times when it

1   came back to Committee on Students.
2          The -- What the Committee on
3   Students wanted to know was did he show more insight
4   into why the GroupMe post was so ill-advised and I
5   think the coaches were presenting more about the
6   progress that they were trying -- were seeing
7   related -- or not seeing or seeing related to empathy,
8   but the Committee on Students really wanted more
9   specifically did he understand why the -- the GroupMe
10  post was -- was not a good idea, and so the
11  Committee on Students wasn't satisfied with the report
12  because they then wanted to hear another follow-up
13  later.
14         Q     Does the Committee on Students keep
15  minutes?
16         A     Yes.
17         Q     So there would be minutes
18  describing the conversations about John Noakes that
19  you just described?
20         A     The minutes are brief and I believe
21  they are protected.
22         Q     They exist; right?
23         A     That's my understanding -- Yes,
24  they exist.
25         Q     Okay.  They're protected by FERPA?

99

1          A     I'm not sure what they're protected
2   by.
3          Q     So you're not aware of any -- any
4   -- Well, tell me why you believe they're protected?
5          A     I have just been told that the
6   Committee on Students' meetings are not
7   discoverable -- That's all -- except for the
8   resolutions.
9          Q     Is there a lawyer present for those
10  meetings?
11         A     No.
12         Q     Now, around August of 2021 are you
13  aware of any pressure that was being placed on
14  Case Western Medical School to discipline John Noakes
15  to show that the school was taking allegations of
16  sexual assault seriously?
17         MS. QUAN:  Objection.
18         A     No.
19         Q     So were you aware, for example, if
20  Dr. Ricanati had received emails from students
21  complaining that John Noakes had not faced sufficient
22  discipline for his sexual assault of Jane Roe?
23         MS. QUAN:  Objection.
24         A     No, not that I recall.
25         Q     Do you know if the -- Is -- Is

100

1   Dr. Ricanati part of the Committee on Students?
2          A     All the Society Deans attend the
3   Committee on Students' meetings, but we are not voting
4   members.
5          Q     Okay.  Did Dr. Ricanati attend the
6   meeting discussing John Noakes?
7          A     I don't remember.
8          Q     Do you remember if he participated
9   in that meeting at all?
10         A     I don't remember.
11         Q     Why was it difficult to find people
12  who were willing to serve as his coaches?
13         A     I think -- I -- I don't know for
14  sure.  My understanding was that when the -- Usually
15  members of the Professionalism Working Group serve as
16  coaches and the person who would most likely serve as
17  a coach in this situation said that he was -- I think
18  he was having too strong a reaction to the GroupMe
19  post and felt that he couldn't coach him
20  non-judgmentally.  That's my understanding, but
21  that -- I -- I don't know the details of those
22  conversations.
23         Q     During the summer of this year did
24  you receive a phone call from anyone who was concerned
25  about John Noakes' well-being?

1        A       I received an email.

2        Q       Okay.  And who was that email from?

3        A       Someone named Michelle.

4        Q       And so I am going to show you what

5   we'll mark as Exhibit 15, an August 23rd email.

6                (Plaintiff's Exhibit 15 was marked

7                for identification.)

8   BY MR. ENGEL:

9        Q       This is an August 23rd email from a

10  person identified as Michelle M. to you with Bates No.

11  491.  Is that the email you're referring to?

12       A       Yes.

13       Q       Okay.  What did you do in response

14  to this email?

15       A       I can't remember whether I emailed

16  back or called her, but I ended up having a phone

17  conversation with her.

18       Q       Tell me what you remember about

19  that phone conversation?

20       A       I told her right off the bat I was

21  not going to give her any information.  I asked her

22  why she was contacting me and she said that she was --

23  I think she described it as a family friend of the

24  student and that she was worried about him and felt he

25  didn't have anybody supporting him at the school and

1   wanted to make sure that I was aware that she was

2   worried about him, and I took the call because I was

3   concerned that this might mean that he was suicidal

4   and I didn't want to ignore that, so that was

5   primarily what I was trying to sort out in the

6   conversation was did -- was she concerned that he was

7   suicidal, was there anything that he had said to her

8   that she was perceiving that made her think he was

9   acutely suicidal.

10       Q       Did you do anything else in

11  response to that email?

12       A       Not that I recall.

13       Q       Just so I'm closing the loop on

14  something else I'll show you what is an August 15,

15  2021, letter to John Noakes with Bates No. 497 at the

16  bottom that says "Notice Of Referral To The Committee

17  On Students".

18                (Plaintiff's Exhibit 16 was marked

19                for identification.)

20  BY MR. ENGEL:

21       Q       Are you familiar with this

22  document?

23       A       Yes.

24       Q       Okay.  And is this the document

25  describing the Committee on Students for John Noakes?

1        A       This looks like it was for the

2   second meeting.

3        Q       Okay.  And it indicates that the

4   Committee on Students can impose sanctions up to but

5   including dismissal from the school?

6        A       This is a form letter that we sent

7   for every student that's meeting with the Committee on

8   Students, yes.

9        Q       Okay.  And -- But it describes the

10  power of the Committee on Students; right?

11       A       Yes.

12       Q       Okay.  And so the ability to

13  require the student to repeat a class or take a leave

14  of absence or be dismissed from the school, that's a

15  bad thing for the student; right?

16                MS. QUAN:  Objection.

17       A       There -- There are potential

18  outcomes from Committee on Students that the student

19  would perceive as a bad outcome, yes.

20       Q       Reasonably perceived; right?  No

21  one wants to be kicked out of school, for example?

22       A       Correct.

23                MS. QUAN:  Josh, we have been going

24                for another hour, not to interrupt the flow,

25                but whenever you think it's possible we can

1                take a break.

2                MR. ENGEL:  Yeah, let's -- Why

3                don't we take a break now.  That's fine.

4                MS. QUAN:  I didn't --

5                MR. ENGEL:  Let's take another 10

6                minutes and then we'll come back and see what

7                we can do about making this the last break.

8                MS. QUAN:  I honestly wasn't trying

9                to make you stop if it's not a good time.

10               MR. ENGEL:  No, no.  I mean we're

11               here just on limited discovery for

12               preliminary injunction, so, you know, there's

13               no reason to take longer than we need to, so

14               let me -- I'm not going to promise, but I

15               will try to -- try to get it done after this

16               break.  Let's see what we can do.

17               MS. QUAN:  All right.

18               MR. ENGEL:  Off the record.

19               (Deposition stood in recess at

20               2:23 p.m.)

21               (Deposition reconvened at

22               2:37 p.m.)

23               MR. ENGEL:  Back on the record.

24  BY MR. ENGEL:

25       Q       So when we left we were talking

1  about the Committee on Students and I just want to
2  make sure I understand.  What is the difference
3  between the Professional Working Group and the
4  Committee on Students?
5          A       The Professionalism Working Group
6  hears the -- all the professionalism complaints that
7  come in which usually come in in the form of an
8  Early Concern and they kind of triage them.  If it's
9  something that can just be handled with coaching they
10  make a -- And that's the most common thing that ends
11  up coming up -- then they make the decision just to go
12  to coaching.
13              If it's something that they think
14  that the Committee on Students which is the body that
15  is the disciplinary body and also the body that
16  decides who gets to progress to the next year in med
17  school and who gets to graduate -- that if they feel
18  that it needs to be looked at by the Committee on
19  Students because either it's clearly kind of egregious
20  or it's just something where it's a little out of the
21  normal then they normally will send it on to the
22  Committee on Students.
23          Q       Do you know why John Noakes' matter
24  was escalated to the Committee on Students?
25          A       I think initially it was -- I think

1  initially it was felt to be so unusual that they
2  weren't sure what to make of it and also when they
3  looked to their group for coaches they could not
4  identify any coaches and so they were concerned that
5  they were going to need some more direction from the
6  Committee on Students in order to figure out how to
7  move forward.
8          Q       Do you know if the Committee on
9  Students or the Professional Working Group reviewed a
10  Title IX investigation for John Noakes?
11          A       I would think they would not, but I
12  don't -- No, I mean the Committee on Students
13  definitely did not.  That didn't come up.
14          Q       Okay.  Do you know if the
15  Professional Working Group did?
16          A       I don't know.  I don't go to those
17  meetings.
18          Q       Okay.  But, you know, as a
19  Society Dean might you become aware of it if they did?
20          MS. QUAN:  Objection.
21          A       Yeah, I might.  I don't know.
22          Q       Are there other ways that
23  professionalism concerns can be brought to the
24  Professionalism Working Group besides the filing of an
25  Early Concern?

1          MS. QUAN:  Objection.
2          A       Not that I know of.  I think that's
3  how all the concerns get there.
4          Q       Now, if the Committee on Students
5  issues sanctions against or discipline against a
6  student does that become part of a student's permanent
7  record?
8          MS. QUAN:  Objection.
9          A       It depends on what the sanction is.
10          Q       So it could?
11          A       Yes, it can.
12          Q       Okay.  And could the discipline
13  imposed by the Committee on Students make it harder
14  for a student to obtain a residency?
15          MS. QUAN:  Objection.
16          A       Yes.
17          Q       Could it cause issues with
18  licensing down the road?
19          MS. QUAN:  Objection.
20          A       I guess it depends on exactly what
21  it is.  I am not sure.
22          Q       How do -- How do students feel
23  about the Committee on Students?
24          MS. QUAN:  Objection.
25          Q       Do they like going there?

1          MS. QUAN:  Objection.
2          A       I think most students before they
3  go for the first time are very apprehensive about it,
4  but typically the Committee on Students is trying to
5  come up with a plan that is supportive and helpful to
6  the student.  That's the first line of kind of how
7  they try to approach things.
8              So most of the time once a student
9  has been brought to the Committee on Students they are
10  not upset about it and sometimes they feel that it was
11  a very supportive experience of trying to come up with
12  a plan that was going to be helpful to them.
13          Q       But before that students, I think
14  you said, try to avoid going to the Committee on
15  Students?
16          MS. QUAN:  Objection.
17          A       I think most students would prefer
18  not to go to the Committee on Students -- Let's put it
19  that way.
20          Q       I mean I -- I would think you'd
21  prefer not to go in front of a group that has the
22  power to kick you out of the school; right?
23          A       Right.  Most students would prefer
24  not to go in front of the Committee on Students, yes.
25          Q       Okay.  So let me show you a

110

1    document which we will mark as Exhibit 17 which is an
2    Affidavit from a student whose name has been redacted
3    and this is Document No. 2-3 in the case.
4               (Plaintiff's Exhibit 17 was marked
5                   for identification.)
6    BY MR. ENGEL:
7        Q       Have you ever seen this document
8    before?
9        A       It's not up on the screen.
10       Q       Oh, I'm sorry.
11               You can see it now; right?
12       A       Yes.
13       Q       Okay.  Have you ever seen this
14    document before?
15       A       No.
16       Q       Okay.  So let me ask you about a
17    couple of things the student says.  The student says
18    in Paragraph 4 -- I'm sorry -- in Paragraph 3 that she
19    is -- Is it a she or he?  Well, I won't say either.  I
20    won't use pronouns.  Let me rephrase.
21              The student says in Paragraph 3
22    that the student is "aware that CWRU officials were
23    unhappy with the outcome" of the Title IX matter.  Do
24    you have any reason to dispute that statement?
25              MS. QUAN:  Objection.

1       A       I have no reason to believe that
2    statement.
3       Q       So why do you think the student is
4    incorrect?
5       A       I -- In all the conversations that
6    I have ever had with all the different Society Deans
7    and people involved with all of this I have never had
8    anybody say that the outcome should have been
9    different.
10       Q       In Paragraph 5 the student says in
11    referring to the GroupMe post, "I have seen worse
12    things from students go by without any mention by the
13    COS."  Do you agree with that statement?
14              MS. QUAN:  Objection.
15       A       That that student has seen worse
16    things go -- I have no idea what that student's
17    referring to.
18       Q       The student then says, "Students at
19    the Medical School have expressed the belief that
20    John Noakes must be guilty.  The fact that he was
21    found 'not responsible' is proof that the Title IX
22    process is flawed."  Have you heard that from
23    students?
24       A       I haven't talked to students about
25    the outcome of this Title IX case.

111

1       Q       So do you have any reason to
2    disagree with what the student is saying here in
3    Paragraph 5?
4              MS. QUAN:  Objection.
5       A       I -- I can't comment on it.  I
6    don't know what the students were thinking.
7       Q       Okay.  The student goes on to say,
8    "Students have sought to exclude John Noakes from
9    group projects and circulated a petition seeking his
10    removal from the school."  Is that accurate?
11             MS. QUAN:  Objection.
12       A       The second part I believe is
13    accurate.  You showed me the petition.  The first part
14    I don't know whether it was that they were seeking to
15    exclude him from group projects or that they were
16    feeling afraid of him or anxious to be near him.
17       Q       Does it matter from a
18    professionalism standpoint?
19       A       Well --
20              MS. QUAN:  Objection.
21              THE WITNESS:  I'm sorry.
22       A       Like I said before, I think that
23    your intention does matter from a professionalism
24    standpoint.
25       Q       So are students not -- are students

112

1    required to work with John Noakes?
2              MS. QUAN:  Objection.
3       A       We ended up making a decision that
4    all the students unless they were directly involved in
5    the Title IX case were required to work with him,
6    were -- were not going to be removed from working with
7    him or prevented -- or protected from working with
8    him.
9       Q       Okay.  And the student says in
10    Paragraph 7, "Medical students are not willing to risk
11    a review by the Committee on Students."  Is that
12    consistent with your experience?
13       A       I -- I don't --
14              MS. QUAN:  Objection.
15       A       I don't -- I don't know what that
16    means.
17       Q       Do you believe that students are
18    afraid to go before the Committee on Students?
19              MS. QUAN:  Objection.
20       A       Yes.
21       Q       And then the student says, "The
22    threat of being forced to appear before the
23    Committee on Students is likely to deter other
24    Case Western students from complaining about the
25    Case Western Title IX process."  Do you agree or

114

1  disagree with that statement?

2           MS. QUAN:  Objection.

3        A     I disagree.  I -- I don't

4  understand what -- what complaining about the Title IX

5  process has to do with going in front of the

6  Committee on Students.

7        Q     Is the threat of being compelled

8  to -- Well, let me ask about the last sentence.  They

9  write, "Few students are likely to risk doing anything

10 that might result in the review by the Committee on

11 Students."  Do you agree with that?

12           MS. QUAN:  Objection.

13        A     This doesn't make any sense to me

14 because complaining about something doesn't bring you

15 up as the student being evaluated in front of the

16 Committee on Students, so this paragraph doesn't make

17 any sense to me.

18        Q     If it did, if -- if a student were

19 being reviewed by the Committee on Students for

20 complaining about a Title IX process or defending

21 themselves of the Title IX process might that have a

22 deterrent effect on them?

23           MS. QUAN:  Objection.

24        A     That's like totally speculation.

25 I -- I -- I don't -- It's incomprehensible to me what

---

1  you're asking.

2        Q     Were you involved in the listening

3  session that occurred about April 21st of 2021

4  regarding this matter?

5        A     What was the listening session?

6        Q     Well, let me show you then what

7  we'll mark as Exhibit 18, an email dated April 21st,

8  2021, from Molly Simmons with Bates No. 232 at the

9  bottom and the email signed by Dr. Ricanati and

10 Dr. Clark-Taylor.

11           (Plaintiff's Exhibit 18 was marked

12            for identification.)

13 BY MR. ENGEL:

14        Q     Have you ever seen this email

15 before?

16        A     Not that I recall.

17        Q     Okay.  It says there was a meeting

18 held on Monday, April 26th, at 5:00 p.m. via Zoom.

19 Did you participate in that meeting?

20        A     No, I don't think so.

21        Q     Do you have any knowledge about

22 what occurred at that meeting?

23        A     No.  I was really trying to just be

24 oriented towards the student and not be involved in

25 the rest of the drama.

---

115

1           (Plaintiff's Exhibit 19 was marked

2            for identification.)

3  BY MR. ENGEL:

4        Q     And then let me show you what's

5  marked 19 which is an April 16, 2021, email to the

6  medical school from Molly Simmons and with Bates No.

7  134 on it.  Have you ever seen this email before?

8        A     I think so.

9        Q     Do you know why this email was

10 sent?

11        A     I think that the Student Affairs'

12 office was trying to establish expectations related to

13 social media including GroupMe.

14        Q     Was this email sent directly in

15 response to the post from John Noakes?

16           MS. QUAN:  Objection.

17        A     It -- It definitely came out of

18 those conversations.

19        Q     Okay.  Were you aware of any

20 conversations prior to April 15, 2021, about social

21 media and electronic forms of communication?

22           MS. QUAN:  Objection.

23        A     I think there is information on

24 that in their orientation, but I don't know the exact

25 content of it.

---

116

1        Q     In other words, it's been

2  represented to us that there were a lot of discussions

3  going on about sending an email like this before April

4  of 2021.  Were you a part of any of those

5  conversations?

6        A     Of sending -- I'm sorry.  Say that

7  again.

8        Q     Sending an email to the school.

9        A     You mean to the students?

10        Q     To the students, yeah.

11        A     Before -- I think this email went

12 out to try to provide better guidance about what is

13 expected, but I think that during orientation they

14 were given an overview of what's appropriate and not

15 appropriate in social media.

16        Q     And so let me -- Let's mark as

17 Exhibit 20 an Affidavit of Dr. Ricanati and this is

18 filed in the Court as Document No. 18-3.

19           (Plaintiff's Exhibit 20 was marked

20            for identification.)

21 BY MR. ENGEL:

22        Q     Have you ever seen this document

23 before?

24        A     No.

25        Q     And he says in Paragraph 7 that,

118

1  "In or around early 2021, several medical students
2  were referred to the Professionalism Working Group due
3  to social media posts, social media activities, or
4  electronic communications."  Do you have any knowledge
5  of that?
6         A      I don't remember.
7         Q      Do you remember if any of those
8  students were referred to the Committee on Students?
9         A      I don't -- I don't know what this
10 is about and I don't remember.
11        Q      Okay.  So can you confirm anything
12 in that first sentence of Paragraph 7 by Dr. Ricanati?
13        A      I just don't remember.
14        Q      So I'm going to ask a very lawyerly
15 question.
16               Do you have any knowledge of
17 students being referred to the Professionalism Working
18 Group through the social media posts, social media
19 activities, or electronic communications in early
20 2021?
21               MS. QUAN:  Objection.
22        A      No.
23        Q      Were you aware that Dr. Ricanati
24 and Dr. Logio were working on a correspondence of the
25 School of Medicine regarding professional and

1  appropriate uses of electronic forms of communication?
2         A      They don't -- They could well be,
3  but I don't know that I would know about it and I
4  don't remember.
5         Q      Okay.  So you personally have no
6  knowledge of that?
7         A      Correct, or no memory of it --
8  Let's put it that way.
9         Q      So looking back at that April 16th,
10 2021, email there's examples of unprofessional
11 comments in there; right?
12        A      Yes.
13        Q      Okay.  And at the beginning of this
14 deposition we discussed a number of other posts such
15 as the survey or the petition that seemed to violate
16 those rules; right?
17        A      I don't know whether they -- I
18 would have to really look at them again and look at
19 this list.
20        Q      Okay.  Well, let me ask a different
21 question.
22               Are you aware of any students at
23 the medical school being referred to the
24 Professional Working Group or the Committee on
25 Students for violating the standards described in this

119

1  April 16th, 2021, email?
2         A      It could totally have happened but
3  not that I remember.
4         Q      Okay.  So do -- do you have any
5  personal knowledge of that happening?
6         A      I don't remember any story of that.
7  It seems vaguely familiar, but I can't say enough
8  about it to be able to say a definitive yes or no.
9         Q      So during the summer of 2021 did
10 you encourage John Noakes to take a year off?
11        A      Yes.
12        Q      Why did you do that?
13        A      He came to me with an opportunity
14 that sounded really great working for a start-up and
15 really being involved in the ground floor.  He seemed
16 very excited about it and it seemed to me to be a
17 win-win because I felt like there was so much
18 potential for conflict with this class that being able
19 to have a year to then come back into the class behind
20 it might be a lot less distracting and allow him to
21 get more out of it.
22        Q      Would the potential for conflict
23 with his class be John Noakes' fault?
24               MS. QUAN:  Objection.
25        A      I don't know the answer to that.  I

120

1  think it goes both ways.  I think emotions were
2  running very high.
3         Q      Okay.  What obligation did the --
4  or does the medical school have to tamp down those
5  emotions on the part of people who think John Noakes
6  shouldn't be in the class?
7                MS. QUAN:  Objection.
8         A      I don't know -- I don't know that I
9  can answer that.  I -- I don't feel that I was
10 personally responsible for that.
11        Q      Okay.  Did you make any efforts to
12 tamp down those emotions from other people?
13               MS. QUAN:  Objection.
14        A      The efforts that I made was through
15 talking to my student about strategies he could take
16 to not get into so much conflict.
17        Q      And do you have any conversations
18 with any of your other students about avoiding those
19 conflicts?
20               MS. QUAN:  Objection.
21        A      Not that I recall.
22        Q      In other words, it appears that you
23 put all the onus on John Noakes to lower the
24 temperature and none of the onus on anyone else -- Is
25 that a fair statement?

1   A       It's not my responsibility --
2           MS. QUAN:  Objection.
3           THE WITNESS:  Sorry.
4           MS. QUAN:  Go ahead.
5   A       It's not my responsibility to do
6   things related to the class or the environment in the
7   class.  My responsibility was to be a good advisor for
8   this student.
9   Q       And whose responsibility would that
10  be?
11          MS. QUAN:  Objection.
12  A       I think it depends on the
13  circumstances, but I'm hoping that all of us were
14  advising our students to try not to escalate things.
15  Q       Did you advise any of your other
16  students to not escalate things with John Noakes?
17  A       I don't --
18          MS. QUAN:  Objection.
19  A       I don't know that any of my other
20  students were escalating things.
21  Q       Okay.  Were any of your other
22  students part of the 31 students who submitted
23  Early Concerns about John Noakes?
24          MS. QUAN:  Objection.
25  A       I don't know.

1   Q       Did you have any discussions -- Do
2   you know if any other Society Deans had discussions
3   with students about their obligations to not escalate
4   things with John Noakes?
5   A       I don't --
6           MS. QUAN:  Objection.
7   A       I don't know.
8   Q       So let me show you an email that
9   you sent on August 2nd of 2021, Bates No. 805 at the
10  bottom, and you sent it to John Noakes.  We'll mark
11  that as Exhibit 21.
12          (Plaintiff's Exhibit 21 was marked
13          for identification.)
14  BY MR. ENGEL:
15  Q       Do you remember sending this email?
16  A       Yes.
17  Q       Why did you send this email?
18  A       I was really disappointed that
19  after having the conversation about what an incredible
20  opportunity this seemed to be both for him in terms of
21  the business venture and also in terms of being able
22  to switch classes I was really disappointed that he
23  seemed to change the plans without -- and -- and --
24  and, you know, he said that it was -- that he had
25  talked to his parents, but prior to that he had told

1   me that he had a really complicated relationship with
2   his parents and that they weren't very -- and that he
3   had like lived separately from them when he was in
4   high school and that it was a complicated
5   relationship, and so I was surprised to suddenly have
6   his parents kind of involved in the situation and I
7   felt like they had given him bad advice.
8   Q       Do -- Do you know his parents?
9   A       No.
10  Q       Okay.  Do you know like his mother
11  is a physician, I believe -- Are you familiar with
12  that?
13  A       I know that now.  I didn't -- I
14  mean I didn't know this -- that at the time, but I
15  know that now.
16  Q       And you indicated then that it
17  would -- part of the reason he should take a year off
18  was it would buy time for your class to cool off and
19  separate you from Jane Roe.  Why -- Why was that
20  appropriate?
21  A       I just felt like because emotions
22  were so high and the class was kind of polarized that
23  it was going to be -- you know, it's very hard to
24  legislate culture, you know, where there's an -- an
25  emotional environment in the class and a lot of buzz

1   and a lot of the things that students do are very team
2   based and I just felt like it was going to be a
3   difficult environment for him and that going into the
4   next class down would allow him to be with a class
5   that didn't have all of -- you know, all of this drama
6   or heightened emotions about -- toward him and that he
7   could probably have a better experience with that
8   class.
9   Q       Are you aware of any efforts made
10  by any faculty at Case Western Medical School to
11  encourage the other members of his class to cool off
12  as you put it?
13          MS. QUAN:  Objection.
14  A       I don't know the answer to that.
15  Q       Well, I'm asking you a specific
16  question.
17          Do you have any knowledge of any
18  efforts made by other faculty members to lower the
19  temperature involving John Noakes?
20          MS. QUAN:  Objection.
21  A       Yes, I think there were
22  conversations with other students about not getting so
23  involved in all of this and to try to just leave him
24  alone and go about their business.
25  Q       Okay.  Tell me what you know about

1  those conversations?

2      A      Well, for one example I know when

3  that survey came out that it was -- that the person

4  who presented the results of it was told it needed to

5  come down.  You know, I don't know about individual

6  other conversations, but my recollection is that

7  everybody of the Society Deans was kind of in

8  agreement that the best outcome is going to be if

9  everybody would cool down.  I don't know exactly what

10  steps people took.

11      Q      And then let me show you what we

12  will mark as Exhibit 22, an August 3rd email chain

13  between you and it looks like Dr. Azok and

14  Dr. Ricanati and others with Bates No. 601 at the

15  bottom.

16              (Plaintiff's Exhibit 22 was marked

17              for identification.)

18  BY MR. ENGEL:

19      Q      Do you remember this email

20  exchange?

21      A      Yes.

22      Q      Okay.  And then on August 3rd it

23  looked like you wrote to the group, "I tried to

24  re-convince him, but I think he has decided.  UGH."

25  Why did you write that?

1      A      You know, "re-convince" may not be

2  the right word, but I was so disappointed that it

3  seemed like such a great option to have this job that

4  he was excited about that would allow him to be in

5  with a different class.  I just felt like having these

6  kinds of heightened emotions in your class was going

7  to be very hard for him to get the most out of it and

8  I was really disappointed that he decided not to take

9  that opportunity.

10      Q      Did John Noakes express any concern

11  that it was unfair to allow other people in his class

12  to dictate his educational progress?

13      A      You know, I don't -- It's not

14  really a matter of -- I -- I was being very pragmatic,

15  I think, at that point.  It's -- Like I said, you

16  can't really legislate subtle emotional reactions of

17  other people to you and it just sounded like it was

18  not going to be a nice environment for him to be in,

19  and I -- you know, you can talk to the class, you can

20  do things, you know, but I just -- I didn't see it --

21  that it was likely going to be a good environment, so

22  I was worried -- I was worried about it for him, but

23  he wanted to stay in the class and it's not up to me,

24  so, you know -- and, like I said, he made the

25  decision, you know.  I can -- I can try to give him

1  different perspectives on it and encourage him, but

2  it's his decision.

3      Q      Well, I'm -- I'm confused because

4  in reviewing the Case Western policy I have seen other

5  efforts to regulate emotional responses of students to

6  other students.

7              For -- For example, if a student

8  said, "I have emotional response and I don't like to

9  work with African-American students," you wouldn't

10  tolerate that; would you?

11              MS. QUAN:  Objection.

12      A      No.

13      Q      And -- And the school's actually

14  legislated against that; right?

15      A      Yeah, but that doesn't make it a

16  perfect environment for all the African-American

17  students.

18      Q      So when you said -- If an

19  African-American student was in a class with a bunch

20  of skinheads who didn't like black people would you

21  say to that African-American student, "Why don't you

22  just take a year off and," you know, "next year you'll

23  probably have a different group that may not be as

24  racist"?

25      A      I don't think that's --

1              MS. QUAN:  Objection.

2      A      I don't think that's a parallel

3  situation.

4      Q      Why not?

5      A      Because I think it -- it was a

6  two-way street how things went in this class for my

7  student.  I -- You know, I think that the GroupMe post

8  was something that was like escalating the -- the

9  conflict and, you know, I -- I think that that's just

10  a -- a different situation.  I just think it's a

11  different situation.

12      Q      I think you said in response to

13  your August 3rd, 2021, email that "re-convince" was

14  not the right word.  What -- What's the right word?

15      A      Encourage.

16              MR. ENGEL:  That was Exhibit 22;

17      right?

18              THE REPORTER:  Yes.

19  BY MR. ENGEL:

20      Q      All right.  Let's mark as

21  Exhibit 23 your Affidavit.

22              (Plaintiff's Exhibit 23 was marked

23              for identification.)

24  BY MR. ENGEL:

25      Q      Exhibit 23 is titled "Declaration

130

1  Of Dr. Marjorie Greenfield" and there is -- I believe
2  it's filed as Document No. -- I can't read that --
3  18-4 of this case.  Do you remember signing this
4  Affidavit?
5        A        Yes.
6        Q        Okay.  And if we look at the last
7  page that's your signature?
8        A        Yes, that is my signature.
9        Q        And you believe everything in here
10  is true and accurate?
11       A        Except I think I might still have
12  the year that I started as Society Dean wrong.  I
13  think it might be 2016.
14       Q        Okay.  I don't think -- I think we
15  all agree that doesn't make a material difference in
16  this case.
17       A        Can I read it -- through it,
18  please?
19       Q        Sure.  Take your time.  Let me know
20  when you want me to scroll.
21       A        Can you go to the next page,
22  please?
23                Yes -- Yes, those are all accurate.
24       Q        Okay.  Nothing in there you want to
25  correct?

131

1  Committee on Students has the ability to impose
2  disciplinary action; right?
3        A        Correct.  Society Deans will refer
4  their own students to Committee on Students.
5        Q        And Paragraph 11 says you never
6  threatened him with disciplinary action or
7  disciplinary proceedings if he filed a Title IX
8  complaint with the Office of Equity?
9        A        Correct.  I would never do that.
10       Q        Okay.  Paragraph 12 says you never
11  told him bad things would happen if he engaged with
12  the Office of Equity or otherwise participated in the
13  Office of Equity investigations or proceedings?
14       A        Right, yes.
15       Q        Okay.  So you had a number of
16  meetings with him in September of this year about the
17  matters we have been talking about; right?
18       A        I was meeting with him regularly,
19  yes.
20       Q        Okay.  So do you recall a meeting
21  with him on September 1st of this year?
22       A        I don't remember them by date.  I
23  could look in my calendar perhaps, but I don't
24  remember meetings by date.
25       Q        Okay.  Well, do you recall a

1        A        No.
2        Q        Okay.  So referring to
3  Paragraph 9 first where you said, "I never tried to
4  force him," meaning John Noakes, "into taking a year
5  off of medical school to accommodate Ms. Roe or for
6  any other reason," is that accurate?
7        A        Correct.
8        Q        Okay.  But you -- I think your
9  testimony is you did try to force -- or try to
10  encourage him to take a year off?
11       A        I definitely tried to encourage him
12  to take a year off.
13       Q        Okay.  And one of your emails
14  indicated you tried to convince him to take a year
15  off?
16       A        I would say I tried to convince him
17  to take a year off.  It was his decision, but I tried
18  to convince him.
19       Q        Paragraph 10 says you never
20  threatened him with disciplinary action or
21  disciplinary proceedings if he didn't follow your
22  advice?
23       A        No.  It was always his decision and
24  he always knew that.
25       Q        Okay.  And just so we're clear the

132

1  meeting when you told him that you had been talking
2  with his empathy coaches and that things were not
3  going well?
4        A        No.
5        Q        Do you remember John Noakes during
6  this meeting in early September telling you that there
7  was consistent violations of the No Contact Order,
8  stalking, and intimidating behavior by Jane Roe?
9        A        The No Contact -- Yes to the first,
10  the No Contact Order.  Stalking and intimidating
11  behavior, I don't think it was framed that way to me.
12       Q        Did you tell John Noakes that you
13  felt sorry that he was not going to take a year off?
14       A        Probably.
15       Q        Did you tell him that taking a year
16  off was his only solution?
17                MS. QUAN:  Objection.
18       A        No, I wouldn't frame it that way.
19       Q        Did you, in fact, use those words
20  that it was his only solution?
21       A        No.  I might have said that it was
22  the only solution that I could see from my vantage
23  point in my experience that -- that was likely to
24  de-escalate things, but I would never say that was his
25  only solution.  It's his choice what he does.

1    Q        Did you tell John Noakes during
2  this meeting that Title IX only makes things worse
3  even though it's "the legal thing to do"?
4            MS. QUAN:  Objection.
5    A        I don't remember.
6    Q        Did you tell him that he should not
7  pursue his Title IX matter or consult lawyers about
8  his Title IX rights?
9    A        I advised him to try to de-escalate
10  things in his class and not keep getting engaged with
11  the other student and escalating things.
12    Q        So in doing so did you tell him he
13  shouldn't pursue any Title IX complaints?
14    A        No, I don't think so.
15    Q        Did you, in fact, tell him during
16  that meeting that even though, "This is unfair," in
17  the end Title IX "only creates a toxic environment"?
18            MS. QUAN:  Objection.
19    A        I don't remember saying it that way
20  and I don't think that I would.
21    Q        So is it your testimony you didn't
22  tell him that a Title IX complaint "only creates a
23  toxic environment"?
24    A        I don't know what you mean by a
25  Title IX complaint.

---

1    Q        Well, you were aware that
2  John Noakes was going to pursue a complaint with
3  Title IX against Jane Roe for harassment and
4  intimidating behavior; right?
5    A        Yes -- Well, I didn't know that --
6  I -- I knew that he wanted to put in some kind of
7  complaint.  I didn't know how that would go -- where
8  that would go.
9    Q        You're aware he wanted to pursue
10  it, though; right?
11    A        I was aware he wanted to pursue it.
12    Q        And during this conversation on
13  September 1st when he said he wanted to pursue it
14  isn't it true that you told him even though it's
15  unfair in the end pursuing the Title IX complaint only
16  creates a toxic environment?
17    A        I don't remember what words I used,
18  but I think that I felt that this back and forth and
19  back and forth with each of them making complaints
20  about each other was only going to escalate the
21  situation.
22    Q        Did you warn John Noakes that he
23  would face consequences if he decided to pursue his
24  Title IX complaint against Jane Roe?
25    A        Absolutely not.

---

1    Q        And then you're aware that a few
2  days later on September 3rd he told the Title IX
3  office he wanted to move forward with the Title IX
4  complaint against Jane Roe?
5    A        I did not know that.
6    Q        Okay.  Are you aware of that now?
7    A        Now that you said it.
8    Q        Okay.  And then shortly after that
9  do you remember having a phone call with John Noakes
10  on September 7th of 2021?
11    A        Again I don't remember the date.
12  You will have to tell me the content.
13    Q        Okay.  Well, this conversation
14  began with a discussion of the Tumblr that someone
15  else had created about Jane Roe and John Noakes?
16    A        Oh, that sounds vaguely familiar,
17  yes.
18    Q        Okay.  And you expressed some
19  concerns about the Tumblr?
20    A        Yes.
21    Q        Okay.  Do you remember telling
22  John Noakes that even if someone else was posting the
23  information online it was his responsibility to
24  de-escalate the situation?
25    A        No, I wouldn't say it that way, but

---

1  I might have said that anything he can do to
2  de-escalate the situation would be a good idea.
3            MS. QUAN:  And, Marjorie, I want
4        you to answer only what you recall.
5            THE WITNESS:  Uh-huh.
6  BY MR. ENGEL:
7    Q        Do you remember telling him that
8  the Tumblr was "another assault on Jane Roe"?
9    A        I did not say it that way.  I said
10  she might have perceived it as another assault.
11    Q        Do you remember saying, "I'm trying
12  to think of ways out of what seems like an escalating
13  situation that is, you know -- This Tumblr thing is
14  sort of yet another assault on Jane Roe"?
15    A        I don't remember saying it in those
16  words.
17    Q        Do you deny saying that?
18    A        I don't recall saying it that way.
19    Q        Do you know what you meant by the
20  phrase "another assault on Jane Roe"?
21            MS. QUAN:  Objection.
22    A        I don't think I would say "another
23  assault".  I would say, "She may perceive it as
24  another assault."
25    Q        So do you -- do you deny saying

1   that the Tumblr was "another assault on Jane Roe"?

2           MS. QUAN:  Objection, asked and

3   answered, but go ahead again.

4        A     I don't recall saying it that way

5   and I don't think I would.

6        Q     Okay.  Have you reviewed that

7   Tumblr?

8        A     Have I looked at it lately?

9        Q     Have you looked at it at all?

10       A     I saw it once.

11       Q     Okay.  And you're aware it doesn't

12   have Jane Roe's name in it at all; right?

13       A     I don't remember.

14       Q     Do you remember seeing Jane Roe's

15   name in it?

16       A     I totally don't remember.  I just

17   remember that it looked like it had information from

18   the -- related to the Title IX case.

19       Q     Do you remember asking John Noakes

20   what his plan was for de-escalating the situation with

21   Jane Roe?

22       A     I don't recall asking that.

23       Q     Okay.  Do you recall telling him

24   that he needed to de-escalate and it's hard to

25   de-escalate when someone's aggravating you?

---

1       A     That sounds like something I would

2   say, but I don't recall saying it.

3       Q     Do you remember telling him, "You

4   need to not make your own Title IX reports"?

5       A     I don't remember saying that, no.

6       Q     Do you deny saying it?

7       A     I don't think I said that.

8       Q     Do you remember saying, "You need

9   to not keep sending pictures and texts of things that

10   she's doing to Title IX"?

11       A     I don't remember saying that

12   specifically.  I remember saying to him that all of

13   this continued engagement is likely to make things

14   worse.

15       Q     Do you remember telling him, "You

16   need to just hunker down and do your own stuff if

17   you're going to stay in the class"?

18       A     That sounds -- Yeah, I would -- I

19   think I said that.

20       Q     What did you mean by that?

21       A     If he was going to stay with the

22   class and not take the year off that my advice to him

23   as his advisor was to focus on his school work and to

24   try to disengage from all of the drama.

25       Q     Do you remember saying that right

---

1   after you said, "You need to not make your own

2   Title IX reports"?

3           MS. QUAN:  Objection.

4       A     I don't remember saying, "Don't

5   make your own Title IX reports."  I remember saying,

6   "I think that he shouldn't keep engaging on this and

7   sending -- trying to," you know" -- "trying to report

8   every little thing," because I felt that it was just

9   escalating the situation, that they were both making

10   all these reports on each other and that it wasn't

11   going to create a good environment for him.  I think

12   that I was trying to be very programmatic about trying

13   to get him through the rest of medical school.

14       Q     Do you remember telling him he had

15   to "do the Martin Luther King approach"?

16       A     Yes, I do remember saying that.

17       Q     What did you mean by that?

18       A     I meant that sometimes you just

19   need to not be so reactive, take the high road.

20       Q     Do you remember telling him that it

21   was ill-advised to be initiating any complaints with

22   the Title IX Office about Jane Roe?

23       A     I don't remember for sure, but it

24   sounds right.

25       Q     Do you remember telling him that

---

1   the unfairness of the situation is galling?

2       A     No, I don't remember saying that.

3       Q     Do you remember telling him that he

4   needs to just "put his blinders on and just get

5   through your day and try to disengage in this whole

6   process as much as you can"?

7       A     That sounds right.

8       Q     After learning that he had filed

9   the complaint or pursued the complaint against

10   Jane Roe with Title IX do you remember telling him,

11   "You're digging yourself a hole, honey"?

12       A     I don't even remember that he had

13   put a complaint in with Title IX, but it was more a

14   generic putting in complaints about each other.  I

15   actually thought they might have been Early Concerns

16   and I did feel like this was continuing to escalate to

17   keep making reports -- for both of them to keep making

18   reports about each other all the time, but my -- I

19   thought that that was an Early Concern.  I didn't know

20   that that was a Title IX complaint.

21       Q     What did you mean by, "You're

22   digging yourself a hole"?

23       A     I just felt that the more he kept

24   engaging with the other student the more they were

25   both kind of staying connected to each other and the

1  more it was continuing to polarize the class and that
2  her friends who were supporting her were getting more
3  emotionally involved in the situation and that the --
4  the back and forth and back and forth with each of
5  them making complaints about the other one I couldn't
6  see an end to it that was going to be a good
7  environment for him to be successful in medical
8  school.
9         Q         He has a right to submit complaints
10  to Title IX; doesn't he?
11        A         He has every right to submit
12  complaints.
13        Q         And it would be a violation of
14  Case Western policies for him to face any discipline
15  as a result of him submitting complaints to Title IX?
16        A         Correct.  I agree.  This was just
17  my advice --
18        Q         When you --
19        A         This was my advice as his Dean.
20        Q         When -- When you said, "You're
21  digging yourself a hole," were you giving him advice
22  that he could create more discipline for himself by
23  submitting complaints to Title IX?
24        MS. QUAN:  I'm sorry.  I don't understand your
25        A         I'm sorry.  I don't understand your

1  question.
2         Q         I'm sorry.  It's a bad question.
3  Let me ask another one.
4         Q         Did you tell John Noakes that you
5  "can't protect him"?
6         A         I do remember saying that.
7         Q         What did you mean by that?
8         A         I felt that I was giving him my
9  best advice for finding -- navigating his way out of a
10  very difficult situation and I was not -- I am failing
11  to see other ways out of it just from my vantage
12  point, my experience, my expertise.
13        I was, you know -- When I first
14  decided not to do the extension, the leave of absence,
15  and decided to go back to the class I was hopeful that
16  things would just die down, that they would stay away
17  from each other, and then I was very concerned by this
18  point that things were escalating, the class was --
19  was -- emotions were getting more and more intense,
20  that -- that things were kind of escalating, that he
21  was continuing to engage and she was continuing to
22  engage, and I was having a very hard time seeing how
23  he was going to have kind of a normal medical student
24  experience and get the most out of medical school.
25        Q         Do you know if anyone was having a

1  similar conversation with Jane Roe?
2         A         I don't know.
3         Q         Do you know if anyone was telling
4  Jane Roe that she had to take the Martin Luther King
5  approach?
6         A         I don't know.  I know there was
7  some discussion with her about potentially taking a
8  year off and then she decided not to.
9         Q         Do you remember telling
10  John Noakes, "The only way you're going to come out of
11  this looking like you're not causing problems to other
12  people, harming other people, is to stop reacting"?
13        A         I don't remember word for word that
14  I said that, but I might have.
15        Q         Would you have made those same
16  comments to someone who claimed to be a victim of
17  sexual harassment?
18        MS. QUAN:  Objection.
19        A         I don't know.
20        Q         And if a female student came to you
21  and said they were the victim of sexual harassment
22  would you say, "You need to stop causing problems"?
23        MS. QUAN:  Objection.
24        A         No.  If a female student came to me
25  and said she was a victim of sexual harassment I would

1  make a Title IX report because I'm a mandated
2  reporter.
3         Q         John Noakes was complaining to you
4  that he was the victim of harassment and intimidation;
5  right?
6         A         He didn't --
7         MS. QUAN:  Objection.
8         A         He didn't -- He didn't frame it as
9  harassment and intimidation.
10        Q         Well, he told you specifically he
11  wanted to file a Title IX complaint; right?
12        A         He wanted to file a complaint for
13  her coming up to him in the classroom the day that his
14  mother had joined him in the classroom.  That's the
15  only thing that I recall and I didn't know what kind
16  of complaint that was.  I think at the time I thought
17  he was making an Early Concern.
18        Q         Well, he also told you -- I mean
19  you were also aware that he was subject to harassment
20  and intimidation by other members of the class; right?
21        A         Again I -- I wasn't framing it as
22  intimidation.  I was framing it in -- in my mind it
23  was the emotions in the class were very heightened.
24  People were very polarized and -- people were very
25  polarized and that's -- that was the way that I was

146

1  seeing it was that emotions were very high on both
2  sides.
3       Q       Well, you see the problem; right?
4  You see that John Noakes is complaining that he's been
5  subject to harassment and intimidation.  He said, "I
6  want to complain about it," and you say, "Stop causing
7  problems."  How is that not problematic?
8            MS. QUAN:  Objection.
9       A       I think I was trying to be
10  pragmatic about thinking about how to -- You know, the
11  Title IX case was over.  The decision had been made.
12  He was found not responsible.  This was the fallout of
13  a combination of the result which he doesn't have
14  control over -- It was a good result for him -- and
15  his GroupMe post which inflamed the situation, and the
16  way that I was seeing it all the way through was that
17  he was contributing to some of the escalation, so I
18  felt that the best thing for him to do was to try to
19  not contribute to the escalation and that was the
20  advice I was giving him from my vantage point as his
21  advisor.
22       Q       Are you aware during this time
23  period, September, 2021 -- At any point during
24  September, 2021, are you aware of any actions taken by
25  Case Western to stop other students from harassing or

147

1            MS. QUAN:  Objection.
2       A       I am just trying to think of what
3  else that I did that might be considered supporting
4  him.  I tried to help him see that emotions were high
5  so that he might have a way to reframe some of the
6  things he was experiencing, and I think the biggest
7  thing that I did that was good advice for him was
8  advising him to -- to take this opportunity and to go
9  to the next class.
10            MR. ENGEL:  All right.  That is all
11  I have.  So thank you for your time.  I don't
12  know if Amanda wanted to ask any questions or
13  not.  It's her opportunity to.
14            MS. QUAN:  Not at this time.
15            MR. ENGEL:  All right.  Well, we
16  will conclude this deposition.  And do you
17  want to talk about -- Does she want to read
18  and sign or --
19            MS. QUAN:  Yes, we will read.
20            MR. ENGEL:  Okay.  Let's go off the
21  record here.
22
23
24  _____
            MARJORIE GREENFIELD, M.D.
25
       (DEPOSITION CONCLUDED AT 3:35 P.M.)

1  intimidating or bullying John Noakes?
2            MS. QUAN:  Objection.
3       A       There were actions taken like
4  students being told, "No, you can't request to not be
5  in his group.  We all have to work together," things
6  like that where they -- they were trying to just again
7  kind of get things back to normal, but -- and I -- but
8  I don't know whether there were other things.
9            Again I was really trying to stay
10  out of the stuff going on in the class so that I
11  wouldn't be -- thinking too much from their
12  perspective.  I wanted to really stay with thinking
13  from my student's perspective and trying to support
14  him.
15       Q       So what specific actions other than
16  telling him to turn the other cheek like Martin Luther
17  King did you take to support John Noakes?
18            MS. QUAN:  Objection.
19       A       I encouraged him to take this
20  wonderful opportunity that he had to take a year off,
21  do this interesting job, and join the next class.  I
22  really felt that that was probably the best way for
23  him to navigate this.
24       Q       Did you do anything else to provide
25  support for him?

148

1            C E R T I F I C A T E
2  STATE OF OHIO    :
                     :  SS:
3  COUNTY OF BUTLER  :
4       I, Pamela L. Jackson, a duly qualified and
5  commissioned notary public in and for the State of
6  Ohio, do hereby certify that prior to the giving of
7  her deposition, the within named MARJORIE GREENFIELD,
8  M.D., was by me first duly sworn to testify to the
9  truth, the whole truth, and nothing but the truth;
10  that the foregoing pages constitute a true and correct
11  transcript of testimony given at said time and place
12  by said deponent; that said deposition was taken by me
13  in stenotypy and transcribed under my supervision;
14  that I am neither a relative of nor attorney for any
15  of the parties to this litigation, nor relative of nor
16  employee of any of their counsel, have no interest
17  whatsoever in the result of this litigation, and am
18  not, nor is the court reporting firm for which I am
19  affiliated, under a contract as defined in Civil Rule
20  28(D).
21            IN WITNESS WHEREOF, I hereunto set my
22  hand and official seal of office at Hamilton, Ohio,
23  this 3rd day of December, 2021.
24  Commission Expires:        /s/Pamela L. Jackson
   11/17/2023                    Pamela L. Jackson
25