IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
CASE NO. 1:21-cv-1776-PAB

- - -

JOHN NOAKES,
Plaintiff,
-vs-
CASE WESTERN RESERVE UNIVERSITY,
Defendant.

- - -

Deposition of LIA LOGIO, M.D., a witness herein, via Zoom videoconferencing, taken by the Plaintiff as upon cross-examination and pursuant to the Federal Rules of Civil Procedure and Notice and agreement of counsel as to time and place and stipulations hereinafter set forth, on Tuesday, November 23, 2021, at 12:07 p.m., before Pamela L. Jackson, a Notary Public within and for the State of Ohio.

- - -

I N D E X

Witness: Page:

LIA LOGIO, M.D.

Cross-Examination
By Mr. Engel, Esq. 5

Plaintiff's Exhibit No.: Page Marked:

24 ............................................ 10
(Declaration Of Dr. Lia Logio)

25 ............................................ 11
(Email To Lia Logio And Steven Ricanati From Jill Azok Dated 4/15/21)

26 ............................................ 84
(Email To Steven Ricanati From Student 2 Dated 8/16/21)

27 ............................................ 85
(Email To Steven Ricanati From Todd Otteson Dated 8/30/21)

28 ............................................ 86
(Email To Steven Ricanati From Undisclosed Person Dated 8/27/21)

APPEARANCES:

For the Plaintiff:

Joshua Adam Engel, Esq.
of
Engel & Martin, LLC
4660 Duke Drive
Suite 101
Mason, OH 45040
Phone: 513.445.9600
engel@engelandmartin.com

For the Defendant:

Amanda T. Quan, Esq.
of
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
127 Public Square
4100 Key Tower
Cleveland, OH 44114
Phone: 216.241.6100
amanda.quan@ogletree.com

Also Present:

Michelle Arendt

- - -

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition of LIA LOGIO, M.D., a witness herein, called as upon cross-examination by the Plaintiff, may be taken at this time and place pursuant to the Federal Rules of Civil Procedure and Notice and agreement of counsel as to time and place of taking said deposition; that the deposition was recorded in stenotypy by the court reporter, Pamela L. Jackson, and transcribed out of the presence of the witness; and that said deposition is to be submitted to the witness for her examination and signature, and that signature may be affixed out of the presence of the Notary Public.

- - -

LIA LOGIO, M.D.,

of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

CROSS-EXAMINATION

BY MR. ENGEL:

Q Okay. Would you please state and spell your name?

A Lia Logio, L-i-a L-o-g-i-o.

Q Okay. Where are you employed?

A Case Western Reserve University School of Medicine in Cleveland, Ohio.

Q What do you do there?

A The Vice Dean for Medical Education, the Director of the Center for Medical Education.

Q Okay. And can you repeat that because you -- you talk kind of quickly? I couldn't get it all and I suspect our court reporter couldn't get it all either.

A I serve as the Vice Dean for Medical Education as well as the Director for the Center for Medical Education.

Q How long have you held that position?

A Since July 1st of 2020.

Q And what are your general duties in that position?

A I am the Dean delegate around everything related to medical education.

Q Have you ever been in a deposition before?

A I have.

Q How many times?

A Two prior times.

Q What were the occasions that brought you into a deposition?

A One was a malpractice case and one was a case at Indiana University in my role as the Program Director.

Q And what did that case at Indiana University involve?

A The termination of a resident.

Q So because you have been in a deposition before you, I assume, know the basic drill here and you have got very talented counsel who I'm sure has prepared you well on this. I just have a couple rules I like to go over with everyone just so we're on the same page:

First rule is that, as you know,

all your answers have to be out loud, so nodding your head, shaking your head, anything like that, our talented court reporter can't take down, so is -- is it okay if you agree to, you know, speak all your answers out loud?

A Of course.

Q Next is that I will do my best to ask clear and concise questions, but I don't always succeed in that task, so if at any point you are unclear about my question please let me know and I will do my best to clarify it; fair enough?

A Okay. Yes.

Q The flip side to that is if you answer a question I'm going to assume you understood it clearly and -- and fully and -- and -- and that it was well -- well put; fair enough?

A Yes.

Q Okay. Zoom creates special difficulties for us doing these depositions. Sometimes there is a lag in the -- in the audio or the video, so if I speak over you I apologize. If -- If that happens or if you feel like you haven't had a chance to fully answer a question please, you know, just interrupt, wave your arms, do whatever is necessary to let us know and -- and we'll make sure

you have the chance to answer the question; okay?

A Yeah.

Q Otherwise in short of doing that we'll assume that you had the opportunity to answer every question I asked.

A Okay.

Q You are not a hostage here, so if at any point you need to take a break please let us know and -- and we will do so. The only thing I ask is that if there is a question pending or -- or we're in a -- a series of questions that we'll complete those questions and then we'll take the break; okay?

A Okay.

Q Finally in order for -- to -- to protect student privacy we refer to the Plaintiff in this case as John Noakes. The student who alleged to be the victim of activity from John Noakes is Jane Roe. If I use those names do you know who I'm referring to?

A I do.

Q And are you comfortable using those names in this deposition so that we don't have to redact information?

A To the best of my abilities, yes.

Q Yeah. And -- And we had a

discussion yesterday among counsel that you were not a part of that if you do slip or I slip or -- or anyone slips and we do have a name we do have an agreement that the court reporter will redact that information or substitute the name, Noakes, or Roe in there if necessary.

A Okay.

Q Okay. The same applies to any other students -- If -- If any of your answers require you to disclose a student name please don't do so and let us know and we will figure out the way to get around that, whether it involves redacting information or just identifying a person by initials or some other way; fair enough?

A Fair enough.

Q Okay. Any questions about this process before we begin?

A No.

Q Terrific.

So I'm going to mark as -- We'll keep these the same number -- as Exhibit 24 a deposition -- or an Affidavit you did in this case and I'll put it up on the screen for you.

(Plaintiff's Exhibit 24 was marked for identification.)

Q You're able to view your screen and view documents I place on the screen?

A I am.

Q Okay. I have marked as Exhibit 24 a document entitled "Declaration of Dr. Lia Logio" filed in this case as Document No. 18-2. Are you familiar with this document?

A I am.

Q Okay. And if I go to the last page there is that your signature there?

A It is.

Q And in signing this document you indicated that you believed everything here was -- was true and accurate?

A Correct.

Q So do you serve as a -- a Society Dean at the medical school?

A I do not.

Q Okay. What are Society Deans at the medical school?

MS. QUAN: Objection. Go ahead. Sorry. I -- I may object from time to time, but go ahead and answer unless I instruct you not to.

A Society Deans are Advisory Deans.

If you think of Harry Potter houses like Gryffindor and Slytherin, we divide our class into six academic societies to create a smaller learning community amongst the large class, and a Society Dean is the faculty lead of those groups of students.

Q So how many -- or how are -- how many Society Deans are there?

A Six.

Q And -- And how are students assigned to those Society Deans?

A I actually don't know the answer to that.

Q Are you aware of any situations where a Society Dean refused to serve in that advisory role for a student?

A No, I am not aware of a Society Dean refusing to serve a student.

Q Let me show you -- I'll skip ahead here -- a document that we'll mark as Exhibit 25 which is an April 15th message from Jill Azok to you. It has Bates No. 914 at the bottom.

A Yes.

(Plaintiff's Exhibit 25 was marked for identification.)

BY MR. ENGEL:

Q Are you able to see this document?

A I can see it.

Q Okay. And are you familiar with this document?

A I am.

Q And this appears to be a message from Dr. Azok requesting that she not serve as a Society Dean for John Noakes?

A My understanding after a conversation with Dr. Azok was that this was requested by the student, not by her.

Q So tell me about the conversation you had with Dr. Azok that led to this email?

MS. QUAN: Objection.

A The student indicated that he -- he felt uncomfortable with her. Her perception is that he confused her with someone else, a different faculty member, and tried to explain that to him, but he was quite persistent that she could no longer serve as his advisor. He felt uncomfortable with her in that role.

Q Did Dr. Azok express any reservations about serving as a Society Dean for John Noakes?

A Not that I recall.

Q Now, there are two other groups at the -- at Case Western that I wanted to ask you about. One is the Professional Working Group. What -- What is that?
A The Professional Working Group is a collection of faculty and coaches who serve as an objective review body for professionalism concerns.
Q How are people selected for that group?
A I don't know the answer to that.
Q Are you part of that group?
A I am not.
Q Do you know how often that group meets?
A I do not.
Q Are you familiar with how that group operates?
A I understand the basics of what they do.
Q And is that what you have described to me already or is there something else that you could describe about what they do?
A They review concerns and praises and identify strategies for helping every student succeed.

Q How are matters brought before the Professional Working Group?
MS. QUAN: Objection.
A My understanding is that there's an Early Concern system where individuals who have a concern about professionalism behavior a medical student can submit these concerns and they go to the Professionalism Working Group.
Q Is there any other way that the Professional Working Group could review the conduct of a student?
MS. QUAN: Objection.
A My understanding is that information from reliable sources can be submitted -- Like it's not a closed system, so if a patient's family, for example, wrote me a letter and said they were concerned about a student's -- student's professionalism I could hand that in too as an Early Concern from a patient or patient's family. It's not like a closed system. I don't know if that answers your question.
Q Well, I think you have.
When you said you could submit it, do you mean you as a faculty member or you as your role as Administrator? Is there --

A Really anyone can submit one. If -- If something came in from a family member or a patient I would submit it on behalf of that patient or the family member. Staff members can submit it. Faculty can submit it. Students can submit it. Residents, fellows, nurses, can submit them.
Q So if any faculty observes conduct by a student that they believe could be unprofessional do they have the ability to submit that information to the Professional Working Group?
A They do.
Q Is there an expectation that faculty will submit information to the Professional Working Group if they observe unprofessional conduct by a student?
MS. QUAN: Objection.
A There is an expectation that we hold everyone, each other, accountable to professional behavior. There are multiple ways of doing that. So there is an expectation to hold each other accountable, yes.
Q Is -- Is it similar to -- Are you familiar with the term "mandatory reporting"?
A Yes.
Q Is -- Is there a mandatory

reporting type system in place at the medical school for professionalism concerns?
MS. QUAN: Objection.
A There is not that I know of.
Q Okay. Well, what is the expectation if a faculty member observes unprofessional conduct by a student? What -- What is the expectation that that faculty member will do?
MS. QUAN: Objection.
A It depends on the answer. Depending on the situation a faculty member could address it directly like in a clinical situation. A faculty member can report in the assessment of the student, can report it outside of the assessment of the student like an Early Concern, can send an email to someone, the Society Dean, myself, others, so there -- there is not a mandatory reporting, but there is an expectation that we hold everyone, including students, accountable.
Q I have seen the Professional Working Group sometimes abbreviated as PWG. Is that a common abbreviation you guys use?
A Yes. There's a lot of abbreviations here. It took me a long time to remember.

Q All right. Is the PWG able to impose discipline on a student?

A No.

MS. QUAN: Objection. Sorry. Slow down just a bit --

THE WITNESS: Okay.

MS. QUAN: -- so that I can object if I need to.

BY MR. ENGEL:

Q And -- And -- And just so we're on the same page when I mean discipline I mean some kind of punitive sanction.

A It is the culture of the medical school to try to have every student succeed and the Professionalism Working Group is designed, in fact, to coach students towards best performance and not disciplinary action.

Q So the Professionalism Working Group, they can't suspend or expel a student; can they?

MS. QUAN: Objection.

A No, I do not believe they can.

Q Okay. How do students feel about being brought before the Professionalism Working Group?

MS. QUAN: Objection.

A I have no idea how the students feel about it.

Q You know, are they fearful of being brought in front of the Professionalism Working Group?

MS. QUAN: Objection.

A I have no idea how they feel about it.

Q So if a student said that they are not likely to risk doing anything that might result in a review by the Professionalism Working Group are you able to agree or disagree with that statement?

A Can you --

MS. QUAN: Objection. Sorry.

A Can you say it again? I don't understand the question.

Q Sure.

If -- If a student were to say that they are not likely to risk doing anything that might result in a review by the Professionalism Working Group are you able to contradict that statement?

MS. QUAN: Objection.

A I'm not sure what you're asking me to agree to in that statement. I'm sorry.

Q Okay. I am not asking you to agree

or disagree to anything. I'm -- I'm just trying to -- I think before you said that you don't know -- you have no idea how the students feel about the Professionalism Working Group -- Did I -- Did I understand you right?

A Correct.

Q Okay. So to follow up on that point then if a student said that they are not likely to risk doing anything that might result in their review by the Professionalism Working Group I assume it's the same, you don't have an opinion about that?

MS. QUAN: Objection.

A I -- Students would avoid doing something to -- You're asking me that? Students would avoid doing something that would put them in front of the PWG -- Is that what you're asking me?

Q Well, that's -- Yeah, what's the answer to that question? I am not sure it's the same one, but I'll work through that.

A I think students want to succeed, so whatever that takes it's a professional identity formation process.

Q There's also this entity at Case Western called the Committee on Students or COS. What -- What is that group?

A The Committee on Students is the adjudicator of anything -- any single student's experience in the medical school related to their overall performance.

Q Is the Committee -- So how does the -- Well, let me back up.

How does a matter get from the PWG to the COS?

MS. QUAN: Objection.

A If the -- If a student refuses to participate in the coaching process or the coaching process and the PWG's review of the coaching process determines a failure of the coaching process issues can be referred to the Committee on Students.

Q Is the Committee on Students able to impose disciplinary sanctions?

A Yes, they are.

Q Okay. So the Committee on Students can force people to repeat a class, take a leave of absence, even dismiss them from the University?

A Committee on Students is the body that makes those recommendations, yes.

Q How do students feel about being called to appear in front of the Committee on Students?

MS. QUAN: Objection.
A It depends on what they're being called in front of the Committee on Students for.
Q Well, is it ever for a good reason?
MS. QUAN: Objection.
A At times it's for a change in their schedule to allow them to take a year off, not a bad thing.
Q Okay. But if in -- in -- in that case -- Well, let me mark this as an exhibit -- 26 I think we're up to.
This is an August -- Maybe I marked it already. I'm sorry. This is already -- I already marked this as Exhibit 16.
MS. QUAN: Sorry, Josh. Did you say "16"?
MR. ENGEL: I think that's right, yeah.
BY MR. ENGEL:
Q Okay. Yes, Exhibit 16 is an August 15th, 2021, letter that was entitled "Notice Of Referral To The Committee On Students" to John Noakes. Have you ever seen this document before?
A I have not.
Q Okay. Do you serve on the





Committee on Students?
A I am an ex officio member.
Q Okay. What does that mean?
A I have no vote.
Q Are you familiar with how that Committee operates?
A I am.
Q Does that Committee take any notes or minutes?
A Yes, I believe there are minutes.
Q And those -- do those minutes include all of the students who are reviewed by the Committee on Students and the reason for the review?
A Yes, I would imagine that's all included.
MS. QUAN: And, Lia, Josh is only asking what you know; okay? He's not asking you to speculate.
Q So Exhibit 16 indicates that the Committee was meeting to discuss John Noakes and may issue sanctions and then it lists the possible sanction there -- Did I read that correctly?
A Yes, that's what it says.
Q Does every student who appears before the Committee on Students receive this exact





same letter?
MS. QUAN: Objection.
A I do not know.
Q Do you know if a student who is appearing just to take a leave of absence or change their schedule would receive a letter saying that they might face dismissal?
MS. QUAN: Objection.
A I do not know what letter you refer.
Q So -- So how -- how would you expect the student to react when they receive a letter like this?
MS. QUAN: Objection.
A It's definitely a wake-up call for a student to receive such a letter.
Q It could be scary to receive a letter like this?
MS. QUAN: Objection.
A It certainly would get my attention if I were to.
Q And do you know if the Committee on Students or the Professionalism Working Group have a practice of reviewing investigations into allegations of sexual misconduct by students at Case Western?





MS. QUAN: Objection.
A I don't know exactly how to answer that question. I suppose if such conduct were raised to the attention through an Early Concern there would be an effort to refer the concern to the Title IX Office or Office of Equity here. I do not believe either of those bodies have jurisdiction over that since it is clearly a Title IX issue, and so, no, they would not process such a concern. They would refer it out.
Q And are you aware of any times when the Professionalism Working Group or the Committee on Students has reviewed a Title IX investigation after the process through the Office of Equity was completed?
MS. QUAN: Objection.
A I am not aware. Since I have been here I have not seen that.
Q Bear with me a second because this is a point of confusion here.
Let me show you Exhibit 10 which is a letter from the Department of Health & Human Services August 16th, 2018. Have you ever seen this document before?
A I have not.

MS. QUAN: And, Lia, if you need to look at the whole thing so you know how many pages and what it is Josh will certainly scroll through the whole thing.
MR. ENGEL: Yeah, I -- I will certainly scroll through it or -- or we can --
A Can you start at the beginning?
Q Sure. I'm -- I'm going -- I'm going to draw your attention to one thing, but you're certainly welcome to read the whole thing and let me know when you're ready and I'll tell you what I want to refer you to.
A I'm done.
Q What I'm going to refer you to is the paragraph entitled "Grievance Procedures and Enforcement". Let me ask you to review that.
A Okay. I have read that paragraph.
Q Is that paragraph consistent with your understanding of how allegations of sexual misconduct are handled at Case Western?
MS. QUAN: Objection.
A My reading of this is that the Title IX Office oversees the investigation Universitywide and they have 60 days to do it and that

there were several between 2014 and 2017. The resolution of those complaints were as follows and there was no indication of unfairness in the procedural mechanism, so, yes, that's my understanding.
Q So are you familiar with any policy or practice at Case Western where after the Office of Equity's process is complete the medical school will review the Title IX matter again for any professionalism concerns?
MS. QUAN: Objection.
A It was mentioned that the formal report is reviewed by the Chair of the Committee on Students once the matter is officially closed, but I don't know if that is, in fact, the practice or if that is a policy, so I do -- the answer is I do not know the answer to your question.
Q Okay. So I'm asking some very specific follow-up questions about that: Are you aware of any policy at the medical school which states that the Committee on Students or Professionalism Working Group will review a completed Title IX investigation?
MS. QUAN: Objection.
A I am not aware of such a policy,

but I would be happy to, you know -- I would refer to policy if that -- if I were asked that.
Q Okay. Well, you attached to your Affidavit filed in this case a copy of the Student Handbook, so I take it you're familiar with the Student Handbook?
A Yes. It's a large document, so define "familiar".
Q Right.
Well, I -- I assume you haven't memorized it; right?
So as we sit here today are you aware of any portion of the School of Medicine Handbook that indicates that the medical school will conduct an independent review of Title IX investigations?
MS. QUAN: Objection.
A No.
Q Are you aware as we sit here today of any other policy at Case Western indicating that the School of Medicine will conduct an independent review of Title IX investigations?
A No.
Q Are you aware of that ever happening in the past?

MS. QUAN: Objection.
A No.
Q And in particular Exhibit 10 described three Title IX complaints involving School of Medicine students between 2014 to 2017. Are you aware if the School of Medicine conducted an independent review of those investigations?
MS. QUAN: Objection.
A I'm not aware. It predates me by several years.
Q You're not aware of it happening since then, since you started at the school?
A I am not.
Q So if one of your colleagues were to say that, "After the Title IX case the report is passed back to the school for the school to determine a professionalism breach," can you say that's a true statement?
MS. QUAN: Objection.
A I don't know.
Q Do you know if the Professionalism Working Group or the Committee on Students ever reviewed the Title IX case involving John Noakes and Jane Roe?
MS. QUAN: Objection.

A They have not that I'm aware of.
Q Okay. So let me go back to Exhibit 16 and just to clarify a couple of things if the Committee on Students imposes sanctions does that become part of a student's permanent record?
MS. QUAN: Objection.
A It's an independent decision from the sanction itself. The sanction is voted on and then whether or not it's included in the permanent record is voted on separately.
Q But some of the sanctions, though, would -- would by definition be on the permanent record such as having to repeat a course, taking a leave of absence, or a dismissal; right?
A Correct.
Q Are those sanctions likely to detrimentally affect the ability of a student to get into a residency program?
MS. QUAN: Objection.
A It would certainly be a considering factor of a residency program.
Q And a negative considering factor or a positive considering factor?
A I don't know --
MS. QUAN: Objection.

A I don't know the response.
Q Well, I mean I am trying to imagine a world where a residency program would look at a student who had a disciplinary sanction from the Committee on Students and say, "Oh, that's great," you know, "That's a positive thing" -- How -- How -- How would that happen?
MS. QUAN: Objection.
A As a former Residency Program Director I can tell you some students learn tremendous amounts from failure and misstep and they impress afterwards.
Q So would the fact -- But then that -- that has to do with the student's explanation; right?
A The students respond, correct.
Q Is it fair to say students would prefer not to have any of these things on their record if they could avoid it?
MS. QUAN: Objection.
A I think that's fair to say.
Q Is it fair to say that students would prefer not to appear before the Committee on Students when there's a possibility of disciplinary action?

MS. QUAN: Objection.
A I think that's fair to say.
Q Have you reviewed the Title IX investigation of this matter?
MS. QUAN: Objection.
A Yes, I reviewed the summary report.
Q And when you reviewed that summary report did you identify any professionalism concerns?
A The Office of -- Let me think. The summary report mentioned a professionalism concern.
Q So are we -- Which -- There have been a number of Title IX investigations, but I'm -- I'm -- I guess I was referring to the original Title IX investigation by -- Let me back up. Let me ask these questions again.
You're aware that back in the fall of 2020 Jane Roe made allegations that John Doe [sic] committed sexual misconduct against her; right?
A I'm aware.
Q Okay. Have you reviewed the investigation report involving those allegations?
A Yes, I reviewed the summary report from the Office of Equity.
Q Okay. So in reviewing that report did you identify any professionalism concerns in the

conduct by John Noakes?
A No, not that I recall.
Q Okay. Did you identify any professionalism concerns in the conduct by Jane Roe?
A No, not that I recall.
Q Would making false statements to investigators be a professionalism concern?
MS. QUAN: Objection.
A Sorry. Could you repeat the question?
MR. ENGEL: Pam, can you please read it back?
(Question on Lines 6 and 7 was read back by the reporter.)
A False statements would be an integrity issue, yes. Integrity is part of professionalism.
Q If a student threatened to bring false charges against another student would that raise professionalism concerns?
MS. QUAN: Objection.
A False allegations would be an integrity issue and integrity is part of medical professionalism.
Q So were you aware that Jane Roe had

indicated to John Noakes that she was going to report him for the lying and the sex and everything, it was all a lie?

MS. QUAN: Objection.

A I -- I have no recollection -- I have no knowledge of what you're talking about.

Q Okay. Are you aware that she told him, "I'm so sorry. You didn't deserve all the emotions and drama"?

MS. QUAN: Objection.

A No, I was not aware of what you're speaking about.

Q Were you aware that she had told him, "I'm sorry for making your life so horrible"?

MS. QUAN: Objection.

A No, I am not aware of their interpersonal communications at all.

Q Were you aware that she was not truthful with the investigators about her interest in certain sexual activities?

MS. QUAN: Objection.

A Again I am not aware of those details.

Q Okay. Now that you're aware of those details does that raise professionalism concerns

for you about her conduct during that investigation?

MS. QUAN: Objection.

A Again false allegations are an integrity issue.

Q Okay. Are you going to take any steps to pursue whether Jane Roe committed any professionalism violations now that these have been brought to your attention?

MS. QUAN: Objection.

A My understanding is that the Title IX process is closed, so, no.

Q So I'm now going to show you what we have marked as Exhibit 1 which was an April 15th, 2021, GroupMe post from John Noakes. Are you familiar with this?

A I am.

Q First of all, what is your understanding about this -- this GroupMe that existed for the medical students?

A My understanding it's a student-driven way to connect the class to each other managed and run by the students.

Q Is it your understanding that the GroupMe chat was supposed to be limited to school issues?

MS. QUAN: Objection.

A I do not know the rules or regulations of it. It is not a school sanctioned product, program.

Q So if it's not a school sanctioned product or program why did the University get involved at all with anything posted on there?

A The students from the class submitted Early Concern cards and reported these other reports to Society Deans about the GroupMe activities.

Q So do professionalism concerns involve any activity of a student at the University in the medical school?

MS. QUAN: Objection.

A Yes, professionalism is a code of conduct both in the white coat and out of the white coat, yes.

Q So if a student goes home to, say Colorado, and gets into a fight at a bar that might raise professionalism concerns that the PWG and COS could look into?

MS. QUAN: Objection.

A If it were brought to our attention potentially.

Q When you say "brought to our

attention", that means that you became aware of it?

A Yes.

Q And -- And just so we're clear on -- on what happened here this post, Exhibit 1, is the reason that John Noakes was reviewed by the PWG?

A The Early Concerns regarding this post are what triggered a referral to PWG, yes.

Q And did the PWG limit its review of John Noakes to this post or did it engage in a more -- a broader review of his conduct?

MS. QUAN: Objection.

A I don't know. I am not on the PWG.

Q And is this also the same post that resulted in John Noakes being brought before the Committee on Students?

MS. QUAN: Objection.

A It was John Noakes' refusal to participate in the PWG that triggered his referral to the Committee on Students --

Q And --

A -- not the post.

Q Okay. And -- And John Noakes, I think, indicated that he believed that the referral to the PWG was retaliatory?

A Is that a question or a statement,

sir?
Q It's a question.
A I don't know what he --
Q You would --
A I don't know what he believed.
Q You'd agree with me this post does not mention Jane Roe by name; right?
A Correct.
Q It doesn't mention the Title IX process at Case Western directly?
A Correct.
Q So what are the professionalism concerns that you believe exist with this post?
A The reports from the students were the interpretation of this post.
Q No. I'm asking you.
As you look at this post do you see any professionalism concerns?
A I do not.
Q Let me show you what we have marked then as Exhibit 2 -- Actually let me go ahead -- let's go ahead to Exhibit 4.
Exhibit 4 is a Class Survey that was created by a member of John Noakes' class and the redacted names towards the bottom are -- are

John Noakes. Have you seen this survey before?
A I have not seen this survey before.
Q Take your time to review it and then when you're done I am going to ask you if in your opinion does this survey raise any professionalism concerns?
A Can you scroll down, please?
I would say this is a misguided survey.
Q Does the creation and publication of this survey to other members of the class raise any professionalism concerns?
MS. QUAN: Objection.
A It raises concerns. Are they professionalism concerns, they're misguided. It's a misguided survey.
Q Why -- Why do you say it's misguided?
A It's -- It's somewhat slanderous to name a name.
Q Would -- Would you say that it -- it could be intended to bully or intimidate John Noakes?
MS. QUAN: Objection.
A I don't know about that. My -- My

sense is that our culture at Case Western School of Medicine is one of sort of co-production where the students sit on all of our committees, all of our design teams for our curriculum. They have a deep loud voice in what we do across the board. I think they have learned that we like data to make decisions and it's not just about one voice or, you know, hearsay, so to speak.
So again I'm using the word "misguided" somewhat intentionally in that it may have been misguided efforts to bring data toward -- to administration around something they felt strongly about.
Q Is the thing that they felt strongly about that they wanted John Noakes dismissed from the University?
MS. QUAN: Objection.
A Can you scroll back up? My sense is they just wanted to understand people's level of comfort or discomfort, concerns and comfort.
Q Well, let me show you what we have marked as Exhibit 5 which is a petition that was surveyed about John Noakes. Have you ever seen this document before?
A I have not ever seen this document.

Q And it indicates is it fair to say the highlight -- highlighted portion here if I can do it right, "We are calling for John Noakes' expulsion from the CWRU School of Medicine" -- So does that help clarify what the intention of the Class Survey on Exhibit 4 was?
MS. QUAN: And -- And just so we're clear Exhibit 5 that Josh put on quickly if you want to review it you -- you certainly can.
A I have never seen that before.
Q Well, take your time to review Exhibit 5 and then I'll ask you the same question, does Exhibit 5 raise any professionalism concerns for you?
A What's the question?
MS. QUAN: I'm sorry. Is there -- Is there -- I can't remember. Is there more beyond that, beyond what's shown, Josh?
Q Okay. So let me ask it as a question. We have taken a moment. We may have lost the thread here.
You have had a chance to review Exhibit 5?
A Yes, I have read it.

Q Okay. Does Exhibit 5 raise any professionalism concerns?

MS. QUAN: Objection.

A Again it's very misguided.

Q Well, I -- I'm trying to understand the difference between misguided and unprofessional. Can you explain that to me how you're using those words?

A Sure. I'll try. The tone of this petition is one of fear and lack of safety and its intent is -- The reason I say it's misguided because it's not really a lie. If you have fear you should address what's making you fearful versus -- There are ways to address the fear or whatever has been triggering about this to the people who are signing this petition or drafting this petition versus -- versus the be all end all of what they're demanding at the end which is the expulsion of John Noakes, so that's why I say it's misguided. It feels like there's a deep-seated problem and they're -- they're looking for the quick and easy way of eliminating the problem.

Professionalism is a -- It's a construct of integrity, honesty, competence, and altruism, putting others in front of themselves as

a -- as a physician, the medical professionalism, so it's hard for me to say that this petition is against integrity because it's how they feel more than -- I don't know that they're saying anything that's completely not factual from their frame of reference; right?

So integrity, honesty, competence, and altruism -- They're clearly not putting themselves above John Noakes, but maybe they're putting themselves above their other classmates who are feeling threatened or triggered by the events. Does -- Does that help you see the difference between misguided and professional?

Q Well, I mean do you feel you have explained that difference satisfactorily? This is your testimony, not mine.

A Sorry.

Q I just want to make sure you feel you have explained it satisfactorily because it's your testimony, not mine?

A They're both -- Yes, that's my explanation.

Q Okay. So I -- I started to ask this line of questions and I apologize if I'm repeating part of it, but does Exhibit 4 appear to

disclose any personal private information about another student?

MS. QUAN: Objection.

A Potentially the first line.

Q Does Exhibit 4 appear to include language that is meant to bully or intimidate?

MS. QUAN: Objection.

A I guess that's your -- that depends on your definition of bully and intimidate, "I have concerns," or, "I prefer not to be scheduled," so it's really about preference and concern.

Q Well, what is your definition of intimidating conduct?

MS. QUAN: Objection.

A Intimidating I would define as holding power over someone forcing them to do what I wanted. That's intimidating.

Q So would this meet that definition of intimidating?

MS. QUAN: Objection.

A I -- I don't see that with my definition, no, of intimidating. It's not forcing.

Q What is your definition of bullying?

MS. QUAN: Objection.

A Bullying is to make feel small of someone else.

Q So using that definition is Exhibit -- could Exhibit 4 be considered to include language that is meant to bully John Noakes?

MS. QUAN: Objection.

A It could be construed that way given the first sentence.

Q Does Exhibit 4 contain inflammatory or accusatory language?

MS. QUAN: Objection.

A Potentially.

Q And then if we turn to Exhibit 5 does Exhibit 5 disclose another's personal information?

MS. QUAN: Objection.

A It does.

Q Does Exhibit 5 include language that is meant to bully or intimidate John Noakes?

MS. QUAN: Objection.

A It does.

Q Does Exhibit 5 include inflammatory or accusatory statements?

MS. QUAN: Objection.

A Yes.

Q And I'm -- I'm not trying to be one of these lawyers who hides the ball here. I am going to show you what we have marked as Exhibit 19 which is an email that was sent to the school on Friday, April 16th, 2021. Do you remember when this email was sent?

A Yes.

Q Okay. Why was this email sent?

MS. QUAN: And, Lia, if you need to look through the whole thing --

A Yeah, could you scroll down so I can remember?

Whoa. You're going too fast.

Q As I say this is kind of the whole thing on the paper here.

A Okay.

MS. QUAN: Josh, while Lia is reading that we have been going about an hour. At some point, whatever -- whatever works for you we would want a break at some point.

MR. ENGEL: Yeah, probably another 5 or 10 minutes if that's okay. Is that okay with you, Doctor?

THE WITNESS: Sure.

MR. ENGEL: Okay.

A I recall.

Q Okay. Why was this email sent?

A It was sent in response to the multiple concerns and reports regarding electronic forms of communication.

Q Who wrote this email?

MS. QUAN: Objection.

A Most of our communications are sort of produced jointly, multiple inputs, the Dean, myself, Student Affairs, Curricular Affairs, sometimes even our PR liaison.

Q How long did you work on this email -- Well, were you part of the group -- Let me back up.

Were you part of the group working on this email?

A I was.

Q How long had you been working on it?

A I don't recall.

Q Do you recall when you started working on it?

A No.

Q Okay. Well, what -- what I'm

trying to get at is in Dr. Ricanati's Affidavit which we have marked as Exhibit 20 in Paragraph 7 he -- he -- he refers to this message and I'll ask you to read Paragraph 7 and then I'll ask you some questions about it.

A Yes, I recall now. So I mentioned that I was a Residency Program Director in a prior life. Social media in the health care delivery system there's a zero tolerance for anything related to disclosing information. I was surprised to learn there wasn't a social media policy and I had explored creating one with the Office of General Counsel probably mid winter and had to work out the differences between free speech and self-discovery of an undergraduate college versus the professionalism expectations of a medical school and the bridge to be in the health care delivery system with a zero tolerance policy, so that process had been ongoing to create a social media policy, but we worked to communicate a foreshadow, if you will, before the policy was officially approved, the expectations.

Q So would there be emails, memorandum, or other written correspondence documenting your work on this going back to early 2021?

MS. QUAN: Objection.

A Yes.

Q Who would -- Who would have received those emails?

A Probably just one, the Office of General Counsel and --

MS. QUAN: Lia, I'm going to instruct you not to testify as to any communication you had with the Office of General Counsel. The fact that you did is fine but not to -- not to disclose any of the communication.

Q Yeah, and I -- I just want to know was there -- without telling me the content of those communications were there communications with the Office of General Counsel specifically about the February -- I'm sorry -- the April 16th, 2021, email?

MS. QUAN: Objection. Just so I'm clear, Josh, are you asking her if she had communications with the Office of General Counsel about -- about the Early -- about what's shown in --

MR. ENGEL: Yeah, I asked a terrible question. Let me -- Let me rephrase it.

MS. QUAN: No. I'm sorry. I -- I apologize if I didn't understand it.

MR. ENGEL: No, no. I'll -- I'll -- Let me -- Let me start over.

BY MR. ENGEL:

Q If I understood right you started work on a policy in early 2021?

A I started exploring the fact that we didn't have a social media policy.

Q Okay. Were the communications about that with General Counsel without telling me the substance?

THE WITNESS: Do you want me to answer that?

MS. QUAN: You can answer as to whether or not you communicated with General Counsel but not the content of any communication.

A Yes.

Q Were there any communications with Dr. Ricanati about this issue going back to early 2021?

A I don't remember.

Q So the first sentence of Paragraph 7 Dr. Ricanati writes that, "In or around

early 2021, several medical students were referred to the Professionalism Working Group due to social media posts, social media activities, or electronic communications." Is that a true and accurate statement?

A Yes.

Q What were the -- How many students were referred to the PWG during that time period?

A I don't remember.

Q What was the nature of their social media posts or social media activities that resulted in their referral?

A I don't recall the specifics.

Q The next sentence he indicates he was working with you on the correspondence to the School of Medicine. Is that an accurate statement?

A Yes.

Q And in the next sentence it ends that after April -- after the GroupMe post you and he felt it was time to finalize and send the draft you had been working on. Is that an accurate statement?

A Yeah, that's my foreshadowing the final policy, correct.

Q Okay. So where would I find drafts of -- of -- the drafts that Dr. Ricanati is referring

to here?

MS. QUAN: Objection.

A We typically work by email and then finalize in person or by Zoom.

Q Did you have a conversation then with Dr. Ricanati about sending out posts on April 15th and April 16th of 2021?

A I -- I believe I did. There were a lot of conversations, though.

Q Okay. What do you remember as you sit here today about that conversation?

A Again not to be redundant but I was surprised there wasn't a social media policy. I began to explore creating a social media policy understanding the guidelines of what that could or should be and in the setting of the April event we foreshadowed that policy by email communication to the students.

Q And so just so we're clear looking at Exhibit 19 this email defines certain categories of conduct in electronic communications as unprofessional; right?

A Uh-huh, that's the word used.

Q That -- And that's the word you used; right?

MS. QUAN: Objection.

A That's the word we used, correct.

Q Did you -- Did you object to the use of that word?

A No.

Q Did you ask anyone to change that word?

A No.

Q So going back to Exhibit 4 you indicated a few minutes ago that Exhibit 4 may disclose another person's private information, may include language that is bullying, and included language that was inflammatory or accusatory.

A No, I didn't say that about this document. I said that about the other Exhibit 5 document.

Q Oh, I'm sorry. I thought you did say that this document was inflammatory or accusatory?

A I -- The accused word was in Exhibit 5.

Q Okay. Well, that is why I'm clarifying.

Let's just focus on Exhibit 5.

So now having had a chance to re-review Exhibit 19 and looking at Exhibit 5 does

Exhibit 5 raise any professionalism concerns?

MS. QUAN: Objection.

A The end does, yes.

Q Do you know if the PWG ever reviewed the conduct of the author of Exhibit 5?

MS. QUAN: Objection.

A I do not know.

Q Do you know --

A This is the first time seeing this.

Q Okay. Do you know if the Committee on Students ever reviewed the conduct of the author of Exhibit 5?

MS. QUAN: Objection.

A I sit on the Committee on Students, so, no, they did not.

MR. ENGEL: All right. Now's a good time to take a break if that's okay with you, Amanda?

MS. QUAN: Perfect.

MR. ENGEL: Okay with you, Doctor?

THE WITNESS: Sure.

MR. ENGEL: Okay. Let's go off the record.

(Deposition stood in recess at 1:26 p.m.)

(Deposition reconvened at 1:54 p.m.)

MR. ENGEL: Back on the record.

BY MR. ENGEL:

Q My understanding is, Doctor, you had something you wanted to clarify from your prior testimony?

A Yes. I wanted to be clear about when you oriented me to the post on the GroupMe I was focused on the actual post, language of the post, which you sort of pointed me to and I was not including the name change with the 1-0. I do find -- If you wanted me to include that in my reflection on the post I would say that the 1-0 was unprofessional.

Q Okay. So let me pull that up on the screen here.

Okay. So what is professional about -- unprofessional about the changing of the name to 1-0?

A 1-0 to me indicates a sports win and losing streak and it's not professional in the setting of --

Q How would anyone -- How would anyone who read this know what this was about?

MS. QUAN: Objection.

A My understanding of Title IX is that the individuals may share their own information with close friends and confidants and --

Q Okay.

A -- I suspect Jane -- My understanding is that Jane had shared some of the information with close friends and confidants.

Q So does this language violate any of the standards you set forth in your April 16th email, Exhibit 19?

MS. QUAN: Objection.

A Again when you say "language" you're speaking of the language of the post, but the changing of the name is, in fact, gloating. It's a win-to-loss ratio.

Q It sounds like it's gloating over his fortune; right?

A Yes.

Q Okay. And is John Noakes allowed to be happy that he won his case?

MS. QUAN: Objection.

A Certainly.

Q Is John Noakes allowed to express to others in the community that he's happy that he won his case?

MS. QUAN: Objection.

A Certainly.

Q Is John Noakes considered by Case Western innocent until proven guilty?

MS. QUAN: Objection.

A Certainly.

Q Is that an important value, innocent until proven guilty, that you teach students at the medical school?

MS. QUAN: Objection.

A I think that's an important value in life. Whether it's in the medical school curriculum I actually couldn't tell you.

Q Is it unprofessional of students to assume that someone is guilty if they haven't been proven guilty?

MS. QUAN: Objection.

A I don't equate professionalism with guilty -- innocent or proven guilty. The trouble I have with the post is that he, John Noakes, with his own name took lots of credit and gloated 1-0 against others, so, yes, he can be happy, but, no, he should not gloat.

Q And so as a result of this --

A And he clearly took credit for it

which is different than the survey which I hadn't seen before, the petition which I hadn't seen before, which I don't know where the source of those are, so they -- they are concerning to me, but no one has put their name across the top and saying, "This is my work. I want credit for this," versus John Noakes who is clearly taking credit for the 1-0.

Q So if the school was aware -- Do you know if the school was aware of who created Exhibit 5?

A I -- I never saw this until today.

Q Okay. If the school was now aware of who created Exhibit 5 would you expect them to take any action against that student?

MS. QUAN: Objection.

A I would want to know who did it and have a -- Yes, I would create an Early Concern on that.

Q The same with Exhibit 4, if you found out who did it would you want an Early Concern created about that?

MS. QUAN: Objection.

A Again I think this is misguided and, yes, I would -- I would submit an Early Concern on this.

Q Okay. So if I offline provide you with the name of the student who created Exhibit 4 and Exhibit 5 will we expect you then to submit an Early Concern?

MS. QUAN: Objection.

A Yes, if your -- you have authentic data on the source of those.

Q Sure. And I don't want to put them in the deposition, so we'll provide it offline to you.

But getting back then to Exhibit 1 a couple questions: First John Noakes was required to undergo counseling or coaching as a result of Exhibit 1; is that correct?

A As a result of the Early Concern cards, correct.

Q Okay. And -- Well, the Early Concern cards were about Exhibit 1; right?

A Correct.

Q Okay. So what was the nature of the coaching that he was required to undergo?

A I'm sorry. I'm not understanding. It was considered a professionalism concern, i.e., the gloating and score keeping and the coaching was intended to help him be the best version of himself away from unprofessional/gloating behavior.

Q So as part of that coaching is he required to demonstrate further or more empathy toward Jane Roe?

MS. QUAN: Objection.

A I don't know that that's the intended outcome. I think the intended outcome is that he authentically participate in coaching and reflect on his behavior and the effect of that behavior on others which is, in fact, empathy.

Q So would he be required to admit that he did something wrong as part of that coaching?

MS. QUAN: Objection.

A I think self-reflection requires some internal dialogue. I don't know if that answers your question, admit that he did something wrong --

Q Well, before --

A -- or --

Q I'm sorry -- I'm -- I'm sorry. I didn't mean to cut you off.

A Go ahead.

Q But before I think in response to one of my questions you talked about people speaking their truth?

A What -- What -- What are you referring to? I'm sorry.

Q I think when I was asking you about Exhibit 4, for example, you said that this was people speaking -- expressing their -- their true beliefs?

A I don't remember saying that.

Q Did I understand your testimony right?

A I don't recall saying anything about true belief. I said that some of this is about recording their concern or their preferences which is what the words on the survey actually say, "I am concerned," or, "My preference, I prefer."

Q What if John Noakes' preference was that he didn't do anything wrong and he was a victim of a harassment and smear campaign by Jane Roe -- Would he then be justified in expressing that opinion?

MS. QUAN: Objection.

A I am not sure that he's been suppressed to say anything that he's wanted to say, so I don't understand the question.

MR. ENGEL: Pam, can you repeat the question? I'm having a hard time hearing you.

THE REPORTER: Yeah, I'm having a little bit of trouble too.

MS. QUAN: And for some reason -- I

was going to say we're -- it's -- it's quieter on our end too, so let's just -- we'll -- we'll try to increase the volume.
Can you -- Can you hear us better now?
MR. ENGEL: Yes.
THE REPORTER: Yes.
MS. QUAN: Sorry about that.
MR. ENGEL: Pam, can you repeat the question?
(Question on Page 60, Lines 12 through 15, was read back by the reporter.)
MS. QUAN: Objection.
Q You can answer.
A I am really not sure what you're asking. Is he justified to express his opinion? He is expressing his opinion. I -- I -- I don't -- You're making it sound like someone's not letting him express his opinion.
Q If John Noakes had posted, "Jane Roe is a total liar. I'm glad I was found not responsible," would that have raised professionalism concerns?
MS. QUAN: Objection.

A Yes.
Q If he had posted, "I didn't do it," would that have raised professionalism concerns?
MS. QUAN: Objection.
A No, not to me.
MR. ENGEL: Again I'm -- I'm having -- Amanda, I'm having a hard time hearing on your end.
MS. QUAN: Still -- Still having difficulty hearing us?
MR. ENGEL: Yeah.
MS. QUAN: Could we go off the record for a second?
MR. ENGEL: Sure.
(Off-the-record discussion.)
MR. ENGEL: All right. Let's go back on the record here.
BY MR. ENGEL:
Q Is it fair to say that a lot of students at Case Western disagreed with the outcome of the Title IX panel in the case between John Noakes and Jane Roe?
MS. QUAN: Objection.
A I would say many students had an emotional reaction to the decision.

Q Wasn't it more than that? Isn't it true that a lot of students believed John Noakes was guilty and that the panel got it wrong?
MS. QUAN: Objection.
A I don't know what the students believed. I know --
Q Didn't --
A -- that they --
Q Well, I'm sorry. Didn't they tell you what they believed in their Early Concerns?
A I will tell you that they were triggered by the events and the conclusions and there were several students who came forward in multiple avenues and reports to express their sense of not feeling safe, wanting to walk out of the medical school curriculum. It was -- They had their own experiences that this was triggering for them. There was a lot of emotion.
Q And isn't it true that a lot of that emotion was based on the belief that John Noakes was guilty of sexually assaulting Jane Roe?
MS. QUAN: Objection.
A I -- I don't know honestly.
Q Well, you reviewed the Early Concerns in this case; right?

A I saw them at one point, yes.
Q Well, more than that; right? I mean I think I marked your Affidavit as an exhibit, right, and in your Affidavit you said --
A Uh-huh.
Q -- that more than 30 medical students submitted Early Concerns and then you described the content of those Early Concerns?
A Yes, I -- I reviewed them.
Q Okay. And so when you reviewed them you were -- you became aware that a lot of the students actually believed that John Noakes was guilty and wanted the school to take action because of that?
MS. QUAN: Objection.
A I might not have interpreted them the same way you did. Yes, there were a lot of emotions about the situation and the conclusion. Considerable effort was made to express the -- the due process of the Title IX complaint and its conclusions.
Q Well, so let's -- I mean I'm showing you what we marked before as Exhibit 9. These are the Early -- a summary of the Early Concerns; right?
A Uh-huh.
Q You reviewed Exhibit 9 before?

A I -- I have seen this before once, yes.

Q Okay. So we know, for example, if we look at student -- Early Concern No. -- Well, 4, for example, it says that John Noakes, you know, "has demonstrated threatening/intimidating behavior after raping another student. He was allowed to walk around campus, perform abdominal exams, participate in standardized patient interactions"; right?

A That student is assuming guilt, yes.

Q Yeah.

So I mean that's -- that's my point; right? Student 4 -- No. 4 seems to believe John Noakes is guilty?

A Several of them are inappropriate group chat views, public gloating of other's private information.

Q Okay. Let's focus on the question I asked; right?

A number of these Early Concerns were from students who believe that John Noakes was guilty; right?

MS. QUAN: Objection.

A No. 4 was, yes.

Q Okay. And then Number -- So No. 4 was.

Number -- Let's see, No. 8, for example, says John Noakes, "not be allowed to become a physician. We cannot let a person who sexually assaults a woman, a colleague, to continue in this path." So No. 8 is like that too; right?

MS. QUAN: Objection.

Q It's a question. You can go ahead and answer it.

A The assumption of guilt of a sexual assault is implied, yes.

Q Okay. And -- And more than the assumption of guilt, No. 8 wants you to kick John Noakes out of school because he was guilty of sexual assault?

MS. QUAN: Objection.

A No. 8 includes the fact that he took the opportunity to gloat is included, so, yes, the combination of those things are leading this person to make that conclusion.

Q Okay. Let's jump around a little bit. No. 20, "Student sexually assaulted a fellow student. He felt zero remorse and instead chose to gaslight this student and turn the narrative onto

her." Student 20 obviously believed John Noakes was guilty; right?

MS. QUAN: Objection.

Q And I don't need to go through those all; right? I mean there's a number of others that fall in that category too; right?

MS. QUAN: Objection.

A I'll take your word for it that 4 and 8 and 20 are involved in accusing --

Q Let's go through some others then.

No. 16 student, "Student engaged in" --

A I'm -- I'm --

Q -- "clear sexual misconduct with" --

A -- obliging you --

Q -- "a fellow student in our class."

A I'm obliging you, but you can go through more if you'd like to.

Q Well, so -- Okay. Did you have any concerns that the Early Concern process was being abused in order to pressure the University to over -- essentially overturn the Title IX decision and kick John Noakes out of school?

MS. QUAN: Objection.

A I did not believe the Early Concerns were being misused. I did not believe anyone would believe Early Concerns would overturn a Title IX decision, and I do not believe still that Early Concerns can be a mechanism to get a student expelled from school without cause.

Q Did anyone encourage the 31 students described in Exhibit 9 to submit Early Concerns?

MS. QUAN: Objection.

A Absolutely not.

Q Is it your belief that the 31 students who submitted Early Concerns were genuinely upset by John Noakes' post?

MS. QUAN: Objection.

A It is my belief that they were genuinely upset. We fielded several calls, several reports.

Q So if I look it appears that only 2 Early Concerns are submitted on -- shortly after John Noakes' post and then the rest, the other 29, were submitted more than 10 days afterwards. Do you know why there was that 10-day delay?

A I do not.

Q Do you know why it appears that

almost all of the posts were submitted in a 20 -- almost 24-hour period on April 25th and April 26th?

A I do not.

Q Do you believe it's just a coincidence that all of a sudden 10 days later 29 students decide to submit Early Concerns?

MS. QUAN: Objection.

A I do not have an explanation.

Q Does it raise any concerns for you that perhaps someone was encouraging students 10 days later to submit Early Concerns?

MS. QUAN: Objection.

A It doesn't raise concerns to me, no. I think these are challenging nuanced and emotionally charged events and -- and I know how much fear was occurring in amongst the students during this time.

Q So is it your belief that these events were so challenging and creating so much fear that 29 students waited 10 days to file a response and then all of a sudden a whole bunch of them file a response in a short period of time?

A It's not beyond the reasonable explanation. Medical school is hard with exams and very important events in the curriculum. I would have

to go back and look and see if there were distracting features like exams before they -- I don't -- I couldn't explain it to you, but, you know, if you have ever been in medical school there are pressing timely things that take priority.

Q I mean that's one explanation, right, that there's something -- that something was distracting all these students for 10 days; right -- Is that what you're saying?

A I'm saying it's -- it's possible, yes.

Q So what did you do to figure out why all of a sudden 10 days later 29 students are submitting Early Concerns against John Noakes?

MS. QUAN: Objection.

A I did nothing.

Q And is it fair to say that a number of these Early Concerns that were submitted 10 days later express disagreement with the fact that John Noakes was not found guilty and kicked out of the medical school?

MS. QUAN: Objection.

A I do not receive the Early Concerns. They are received by a neutral staff member who sanitizes and anonymizes them prior to

submitting them to the Professionalism Working Group, so I would have no knowledge until this information was provided for me after the fact about the time and date of the submissions.

Q Well, now that you know that there is a 10-day delay, that a number of the submissions expressed a view that John Noakes was actually guilty, does this raise any concerns in your mind about the credibility of these Early Concerns?

MS. QUAN: Objection.

A No, it does not.

Q Was it a concern in your mind that someone was encouraging students to file these Early Concerns for an alternative reason?

MS. QUAN: Objection.

A No, that does not raise concern for me.

Q Did -- Do you have any reason to believe -- Well, I will show you what we marked as Exhibit 11. This is an email sent on April 21st by Molly Simmons setting up a meeting on April 26th. Did you have any role in drafting this email?

A I did not.

Q Did you appear at this meeting?

A I did not.

Q Do you know why this meeting was set up?

A Yes.

Q Why was this meeting set up?

A This meeting was set up to address the emotion and concerns amongst the first-year medical school class regarding the Title IX conclusions.

Q And just so we're clear you said about the Title IX conclusions. You mean that a number of students were upset with how the Title IX process had turned out?

MS. QUAN: Objection.

A The meeting was intended to explain the due process of Title IX.

Q And was it -- As part of the meeting was there an intention to explain to students that as professionals they need to respect the process that the school has set up?

A I wasn't at the meeting, but, yes, that was part of the intent.

Q Do you believe that meeting was successful given the nature of the Early Concerns that were submitted a couple days later?

A Again I was not at the meeting.

Q What steps did the medical school take to tell students that they needed to respect the process?
MS. QUAN: Objection.
A This meeting.
Q I'm sorry. I didn't hear your answer?
A This meeting.
Q Anything else?
A Not that I recall.
Q Are you aware of any other attempts to bully, intimidate, or ostracize John Noakes?
MS. QUAN: Objection.
A I am not.
Q I will show you what we have marked as Exhibit 7 which is a June 15th email from Molly Simmons to Dr. Ricanati. Have you ever seen this email before?
A I have not.
Q Okay. And in this email she reports that, "There have been several instances in the class groupme and a few in IQ of students publicly belittling or humiliating John Noakes" -- Did I read that correctly?
A I'm sorry. Is the below the line

from Molly or from someone else?
Q The redacted portion you mean?
A No, no. There's a line above the, "There have been several issues." Is that from Molly or is that forwarded from some other source?
Q I have no idea. You tell me.
A I have no idea. This is the first time I'm seeing this.
Q Well, so let me -- let me ask a couple questions there.
First what is IQ?
A It's the small group inquiry learning groups.
Q Are you aware of any instances in the class GroupMe or in the IQ of students belittling or humiliating John Noakes?
A I am not aware besides pointing out this email to me.
Q Okay. Are you aware of any actions that the University took to stop students from publicly belittling or humiliating John Noakes?
MS. QUAN: Objection.
A I didn't know it was happening. I didn't take any steps to stop it, no.
Q Would it be a professionalism

violation for students to encourage other students to file Early Concerns against John Noakes?
MS. QUAN: Objection.
A Would it be a professionalism concern -- The -- The Early Concerns are the mechanism to raise concerns about another student, so other students encouraging others to use the formal channels is not a professionalism issue.
Q Would referring to another student as a rapist or sexual predator raise professionalism concerns?
MS. QUAN: Objection.
A Yes.
Q Do you know what actions were taken in regards to the students in Exhibit 9 who referred to John Noakes as a rapist or sexual predator or other accusatory language?
MS. QUAN: Objection.
A I do not know.
Q Do you know if any action was taken against any students for that?
A I do not know.
Q Are you aware of any student who has been brought before the PWG in regards to making accusatory or inflammatory statements about

John Noakes?
A I do not know.
Q Are you aware of any students who have been brought before the Committee on Students in regards to making inflammatory or accusatory statements against John Noakes?
A As someone who participates on the Committee on Students I have not seen that been brought to the Committee on Students.
Q Are you aware of any students who were brought before the PWG for lack of empathy towards John Noakes?
MS. QUAN: Objection.
A I am not.
Q Are you aware of any students who have been brought before the Committee on Students for lack of empathy towards John Noakes?
A I am not aware that any student has been brought to the COS.
Q Okay. Do you know if Jane Roe has been required to engage in professional counseling in regards to some of her posts online?
MS. QUAN: Objection.
A I do not know.
Q I will show you what we marked as

Exhibit 6 which is an email April 20th, 2021, and it attached what is most important a document that was posted at the medical school. Were you aware of this document being posted?

A I was aware of it when it was found in the bathroom.

Q Okay. What actions did the school take to find out who was the person who posted this?

A We explored video cameras and people in the vicinity to find out who had been in that bathroom.

Q What did you discover?

A We had no -- We had no information to go on about who posted it.

Q So what actions did the school take to protect John Noakes against further harassment of this type?

MS. QUAN: Objection.

A We took the sign down immediately and destroyed it.

Q What else did you do?

A We had the meeting about the Title IX process.

Q During that meeting were people told that they should show empathy towards

John Noakes?

A I was not at the meeting. I do not know.

Q Are you aware that John Noakes has complained about misconduct by Jane Roe?

A Yes.

Q What actions has the school taken to address John Noakes' complaints?

MS. QUAN: Objection.

A His complaints have all been filed with the Office of Equity outside of my jurisdiction.

Q Did any of his concerns raise issues of professionalism about Jane Roe?

MS. QUAN: Objection.

A Again the Office of Equity is its own process and outside of my jurisdiction.

Q Has the PWG or COS ever reviewed any concerns about misconduct or retaliation by Jane Roe?

MS. QUAN: Objection.

A I do not know about the PWG and, no, to the Committee on Students.

Q Have any faculty members at Case Western promised students that action would be taken against John Noakes?

MS. QUAN: Objection.

A I don't know. There's over 5,000 faculty here.

Q Are you aware of anybody who said that?

A No.

Q Has someone ever told John Noakes that they were sorry for what happened to him?

MS. QUAN: Objection.

A I don't know.

Q Let me show you what we marked as Exhibit 14 which is a May 25th, 2021, email from Jane Roe. Do you remember receiving this email?

A I do.

Q Do you know why Jane Roe sent this email on this day?

MS. QUAN: Objection.

A I do not know why she sent it on this day.

Q Are you aware that this email was sent on the same day that John Noakes was required to appear before the Committee on Students?

A I was not aware.

Q Do you believe that's just a coincidence?

A I have no idea.

Q Is it fair to say in this email John -- Jane Roe is asking you as a medical school to take further actions against John Noakes?

MS. QUAN: Objection.

A I think she's venting her spleen as we say.

Q And so what did you do after receiving this email?

A I believe her Society Dean responded with an empathic response.

Q Do you know if Jane Roe was told she should just hunker down and do her own stuff if she wanted to stay in the class?

A I do not know.

Q Would that have been an appropriate response?

MS. QUAN: Objection.

A Would that have been an appropriate response -- It's a response. I'm not sure what you're asking.

Q Well, here she is -- She's claiming she's a victim; right?

A Correct.

Q Okay. And would it be an

appropriate empathetic response for someone at the school to say, "You just need to hunker down and ignore what happened"?

A Again I'm stuck on your word "appropriate". I -- I think it's not an unreasonable piece of advice to focus on your future and let the past heal to accomplish your career goals.

Q If a student is claiming that they are the victim of ongoing harassment should they be told to just ignore it?

MS. QUAN: Objection.

A I think ongoing harassment should be reported and managed.

Q Should a student who believes that they are suffering ongoing harassment be told to not report it?

A No.

Q Should a student who believed that they were undergoing ongoing harassment -- I'm sorry -- who was -- who was undergoing retaliation be told that they should not report it?

A No.

Q Should a student who believed that they were undergoing harassment and/or retaliation be told to stop looking like you're causing problems?

MS. QUAN: Objection to this line of questioning.

A Can you repeat the question?

MR. ENGEL: Can you read it back, please, Pam?

(Question on Page 81, Lines 23 through 25, was read back by the reporter.)

A It's -- It's hard to answer that question out of context. I think there are strategies of laying low, so it's hard to answer.

Q Well, let me give you some context. If a student came to you and said, "I am being harassed by a professor," would you tell that student not to file a Title IX complaint?

MS. QUAN: Objection.

A As I answered before any ongoing harassment should be reported and managed.

Q Is it against Case Western policy to discourage a student from filing a Title IX complaint?

MS. QUAN: Objection.

A I don't know of such policy.

Q So you believe it is permissible at Case Western to discourage a student from filing a

Title IX complaint?

MS. QUAN: Objection.

A You asked about policy?

Q Do you believe Case Western's policies permit someone to discourage a student from filing a Title IX complaint?

MS. QUAN: Objection, misstating.

A I believe Case Western's policy encouraged faculty to encourage students to report mistreatment and harassment period.

Q Do you know if Jane Roe was ever discouraged from filing complaints of harassment or retaliation?

A I do not know.

Q Do you know if Jane Roe was ever told whether in response to the May 25th email or otherwise that she needed to stop looking like she was causing problems?

A I do not know.

Q Are you aware if in August or September of 2021 Case Western was under pressure to discipline John Noakes to show students that it took allegations of sexual assault seriously?

MS. QUAN: Objection.

A I know that to be false.

Q How do you know that to be false?

A Because I would know as the Vice Dean, I believe.

Q Well, let me show you an email which we'll mark as Exhibit 26 which is an August 16th, 2021, email to Dr. Ricanati from a student.

(Plaintiff's Exhibit 26 was marked for identification.)

BY MR. ENGEL:

Q Have you ever seen this email before?

A I have not.

MS. QUAN: I'm sorry, Josh. What are the Bates -- What's the Bates for this one?

MR. ENGEL: Bates No. 768.

MS. QUAN: Thank you.

BY MR. ENGEL:

Q Is it fair to say that this is an email asking that John Noakes be removed from a small group?

A Okay.

Q So this is a -- appears to be some request back in August that the school take action

against John Noakes?
A I don't interpret it that way.
Q Do you know if the school's received emails from Jane Roe's father complaining about the way this situation has been handled?
A I do not know.
Q So let me show you what we'll mark as Exhibit 27, the August 30th, 2021, email from Todd Otteson -- Did I pronounce it right?
A Otteson.
Q Otteson.
-- to Steve Ricanati.
(Plaintiff's Exhibit 27 was marked for identification.)
BY MR. ENGEL:
Q Have you ever seen this email before?
A I have not.
Q And it describes a message from Jane Roe's dad complaining about her and John Noakes; is that right?
A That's what it looks like. It's uncomfortable that she had to step out. You know, it looks like it's a clarification about the Do Not Contact Order.

Q I will show you what we'll mark as --
MR. ENGEL: Oh, and, by the way, in case I didn't say it Exhibit 27 has Bates No. 717 at the bottom.
BY MR. ENGEL:
Q I'll show you what we'll mark as Exhibit 28, an August 27th email from an undisclosed person to Dr. Ricanati on August 27th, 2021, Bates No. 943 at the bottom.
(Plaintiff's Exhibit 28 was marked for identification.)
BY MR. ENGEL:
Q Have you ever seen this email?
A No.
Q And again it appears that this email is also expressing concerns about the situation between John Noakes and Jane Roe?
MS. QUAN: Objection.
Q There's a question there.
A I am still reading it.
Q Okay.
A What's the question? Sorry.
Q So were you aware that the school had been receiving emails or messages from Jane Roe's

father about the situation with John Noakes?
A I was not aware.
Q Do you know if the school ever reached a financial settlement with Jane Roe regarding the matter with John Noakes?
MS. QUAN: Objection.
A I have no knowledge.
Q Do you know if the school has received correspondence from an attorney representing Jane Roe about the manner in which it handled the situation with John Noakes?
MS. QUAN: Objection.
A I have no knowledge.
Q Is John Noakes subject to the same rules as other students at Case Western?
MS. QUAN: Objection.
A Yes.
Q Is the PWG who would review conduct by John Noakes the same as the PWG that would review conduct by other students?
MS. QUAN: Objection.
A Yes.
Q In particular is the PWG that would review conduct of John Noakes the same as -- that would review conduct for Jane Roe?

MS. QUAN: Objection.
A Yes.
Q Is the PWG that would review conduct of John Noakes the same as the PWG that would review conduct by the students who authored the petition and survey that we discussed earlier today?
MS. QUAN: Objection.
A Yes.
Q Do you know if John Noakes was ever pressured to take a year off of school?
A I do not know.
Q Do you know if he was ever told that it was his obligation to de-escalate the situation with Jane Roe?
MS. QUAN: Objection.
A I have no knowledge of that.
Q Do you know if he was ever told that he needs to not make his own Title IX reports?
MS. QUAN: Objection.
A I have no knowledge of that.
Q Do you know if he was told that if he continued with Title IX complaints against Jane Roe or Dr. Ricanati he was digging himself a hole?
MS. QUAN: Objection.
A I have no knowledge of that.

Q If you learned that a faculty member at Case Western had made such statements to him what would you do?
MS. QUAN: Objection.
A I would explore where the truth lies between perception and reality.
Q What do you mean by that?
A Perception and reality should be overlapping, but everyone has their own purview. It's like what part of the elephant they're focused on. So I would explore where the truth is and what was said and why and what the intent was.
Q What if it were proven to you beyond a doubt that those statements were made to John Noakes, what would you do then?
MS. QUAN: Objection.
A I would develop a remediation plan for the faculty member.
Q What would that remediation plan include?
MS. QUAN: Objection.
A I would personalize it so I couldn't say, but I would do some professional coaching.

Q All right. Give me one moment. I think -- Are you -- Do you know if a student who is accused of sexual misconduct at Case Western is -- is required to keep that process confidential?
MS. QUAN: Objection.
A My understanding is that individuals involved in Title IX or sexual misconduct complaints are encouraged to keep the proceedings confidential, but they are allowed to share their experience with close friends and colleagues. That's my understanding.
Q Okay. And where -- where would I find that if I wanted to know for sure?
A I ask the Office of Equity.
Q So it would be in the Title IX policy then?
MS. QUAN: Objection.
A I ask the Director of the Office of Equity. I do not know if it sits in one of their policies.
Q Do you know if there's any policy at Case Western that prohibits students from criticizing the Title IX process?
A I do not know.
Q Do you know if there's anything --

or any policy at Case Western that prohibits students from discussing the underlying facts of an allegation of sexual misconduct?
A I am struggling with your word of "facts". If it weren't my own information it wouldn't be fact, right, so is that what you're asking, my personal factual information?
Q Well, I mean am I -- Let me ask a different question.
Is there anything at Case Western, policy, procedure, the like, that prohibits a student from discussing the nature of their former relationships?
MS. QUAN: Objection.
A I don't know. I would have to review the Title IX policies in more detail.
Q Are faculty members who have never served on the COS or PWG familiar with the process --
MS. QUAN: Objection.
Q -- they go through?
MS. QUAN: Objection.
A The process the Committees go through, the groups go through?
Q Yes.
A There is an orientation to both.

Q Are these secret processes?
MS. QUAN: Objection.
A Which process is -- No, nothing is secret. They're confidential. They're not secret.
MR. ENGEL: All right. I have nothing further. I want to thank you very much for your time.
Counsel may have questions for you or she may not. That's up to her. But I'll turn the floor over to her, Amanda, so thank you very much. I appreciate it.
THE WITNESS: Thank you.
MS. QUAN: Thanks, Josh. I have no questions. And, Pam, we will read.
MR. ENGEL: All right. We're off the record then.

__________________________________
LIA LOGIO, M.D.

(DEPOSITION CONCLUDED AT 2:59 P.M.)

- - -

C E R T I F I C A T E

STATE OF OHIO :
SS:
COUNTY OF BUTLER :

I, Pamela L. Jackson, a duly qualified and commissioned notary public in and for the State of Ohio, do hereby certify that prior to the giving of her deposition, the within named LIA LOGIO, M.D., was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by me in stenotypy and transcribed under my supervision; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, have no interest whatsoever in the result of this litigation, and am not, nor is the court reporting firm for which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Hamilton, Ohio, this 3rd day of December, 2021.

Commission Expires: 11/17/2023

/s/Pamela L. Jackson
Pamela L. Jackson