IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JOHN NOAKES<br><br>Plaintiff<br><br>v.<br><br>CASE WESTERN RESERVE UNIVERSITY,<br><br>Defendant | Case No. 1:21-cv-1776-PAB<br><br>Judge: BARKER<br><br>REPLY TO RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION |

Plaintiff John Noakes respectfully submits this Reply to the Response by Defendant Case Western Reserve University ("CWRU") to Plaintiff's Motion for Preliminary Injunction. (Doc#2; Doc#18.) The Court permitted expedited discovery surrounding many of the issues before the Court in the Motion for Preliminary Injunction. (Doc#25.) This expedited discovery demonstrates that the reasons for discipline imposed on Plaintiff – that he violated "professionalism rules by posting a religious message on a class group text -- is clearly pretextual. Plaintiff's Reply will focus on the likelihood of success related to this issue; Plaintiff relies on his prior Memorandum to address the other preliminary injunction factors. To aid the Court, Plaintiff has prepared a chronology of significant events. (Attached as Exhibit.)

A. **The Issues Presented Here Are Distinct From The Issues Presented In The Court's Decision On The Motion For A Temporary Restraining Order**

The Court denied Plaintiff's Motion for a Temporary Restraining Order. (Doc#17.) The Motion for a TRO concerned a Title IX investigation by CWRU into whether John Noakes violated the school's sexual misconduct policy because a third party created a Tumblr about his matter.[1] The

---

[1] The Court also expressed concerns that Plaintiff had not submitted sufficient evidence in support of his claim about concerning a Tumblr. An Affidavit from the person who created the Tumblr states unequivocally that

1

Court concluded that Plaintiff had failed to demonstrate a substantial likelihood of success because "the mere commencement of a Title IX investigation" is insufficient to constitute an adverse action. (PageID#505.) The Court also concluded that Plaintiff had failed to demonstrate irreparable harm because "the [Title IX] investigation has not yet begun and no findings have been made." (PageID#510.) The issue here is different. This Motion involves sanctions imposed through the school's "professionalism" standards – including the "Professionalism Working Group" and the "Committee on Students" for Noakes GroupMe post described in ¶71 of the Complaint.

The PWG/COS already imposed sanctions on Noakes and, before this Motion was filed, was preparing to consider further "sanctions," up to and including dismissal from the school.[2] (Doc#29-29; Doc#29-31.) Unlike the preliminary investigation at issue for the TRO, Noakes has already been sanctioned by appearing before the COS, and, as he explains in his Affidavit, it is impossible for him to successfully complete the "coaching" necessary to avoid further sanctions. (Doc#29-5, ¶¶2-7.)

**B.      Standard for Retaliation Claims**

Title IX retaliation claims are analyzed using the same standards as Title VII retaliation claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F. 3d 668, 673 (6th Cir. 2013); *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2008). Accordingly, Title IX retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Fuller v. Mich. Dep't of Transp.*, 580 F. App'x 416, 423 (6th Cir. 2014); *Gordon v. Traverse City Area Pub. Schools*, 686 F.App'x 315, 319-320 (6th Cir. 2017). *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). A Plaintiff can show pretext, *i.e.* refute the legitimate, non-retaliatory reason offered by a defendant, by showing that the proffered reason: had no basis in fact; did not actually motivate the defendant's challenged conduct; or was insufficient to

---

Plaintiff had no role in the Tumblr. (Doc#29-6, ¶¶6-8.)

[2] CWRU's counsel agreed to postpone this and any other COS disciplinary proceedings until the Court has had a chance to rule on the Motion for a Preliminary Injunction.

2

warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003), citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).[3]

## C. Protected Activity

Defendant does not contest that Noakes engaged in protected activity.

## D. Adverse Action

Defendant focuses on the lack of severity of the adverse action. Def. Memo. at PageID#519-520. Defendant ignores, however, that the sanction imposed on John Noakes – coaching – is part of a process that could lead to dismissal. (Doc#29-5 ¶¶3-7.) Moreover, the facts establish that CWRU subjected Noakes to "heightened scrutiny"[4] by (i) subjecting him to the formal PWG/COS process for the minor offense of a GroupMe post that does not even mention Jane Roe; and (ii) disciplined him more harshly than similarly situated peers by subjecting him to the formal PWG/COS process while ignoring far worse online conduct by other students. (Doc#29-5, ¶8.)

But, more fundamentally, CWRU applies the wrong analysis. In the Title VII context, applicable to Title IX retaliation claims, the controlling standard is described in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The *Burlington N.,* Court held that to establish an adverse action in the retaliation context, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68. The Court

---

[3] Plaintiff only has to present sufficient evidence on any one of the forms of pretext. *Cf. Baseball at Trotwood, LLC v. Dayton Professional Baseball Club*, S.D.Ohio No. C-3-98-260, 2003 U.S. Dist. LEXIS 27460, at *199 (Sep. 2, 2003) ("If there is a sufficient evidentiary basis for finding that any of these three forms of pretext exists, then it is for the trier of fact to determine whether the defendant was truly motivated by race"), citing *Manzer v. Diamond Shamrock Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

[4] An adverse action may be found where an employer subjected an employee to "heightened scrutiny" by issuing formal reprimands for a minor offense while ignoring coworkers who did the same. *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir.2014) (finding adverse action where plaintiff was, *inter alia,* "singled out for violating policies that were selectively enforced against him); *Adamov v. U.S. Bank Nat'l Ass'n*, 681 F. App'x 473, 479 (6th Cir. 2017) (heightened scrutiny found where employers were "looking for a reason" to terminate an employee shortly after protected activity).

3

in *Burlington N.* did not require actual changes in terms, conditions, or privileges of employment. In other words, the standard for demonstrating a "materially adverse action" is viewed from the perspective of a reasonable employee.

CWRU argues that the PWG/COS sanctions actually imposed on Noakes "are not included in a medical student's academic transcript or permanent record" and, further, that the "vast majority" of PWG/COS proceedings "do not result in discipline, suspension, or expulsion." Def. Memo. at PageID#520. None of this is relevant. The relevant question under *Burlington N.* is whether, under these facts, the risk of discipline, suspension, or expulsion is sufficient to dissuade students from engaging in protected activity. *Burlington* Northern., 548 U.S. at 69, 126 S. Ct. at 2415. ("We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.") CWRU has not submitted any evidence about how *students* perceived the PWG/COS process. For that reason, the Affidavit of Dr. Daneshgari and the three medical students is conclusive. (Doc#2-2; Doc#2-3; Doc#2-4; Doc#2-5.) Focusing on the actual views of students – and not the perspective of the faculty who administer the system – properly takes into account the the perspective of a "reasonable" student, remembering that the goal of the anti-retaliation provision in Title IX is to prohibit actions that are likely to discourage students from engaging in protected actions. In this case, the <u>uncontested</u> evidence before the Court is that the threat of being forced to appear before the COS has a chilling effect and is likely to deter other CWRU students from complaining about the CWRU's Title IX process.[5] (Doc#29-5 ¶9.)

E.  **Causal Connection**

---

[5] The claims of the students that the threat of a process that could result in serious consequences is consistent with caselaw involving employment. *Cf. Broich v. Inc. Village of Southampton*, 462 Fed. App'x 39, 47 (2d Cir. 2012) ("[T]he initiation of disciplinary charges leading to an administrative hearing permitting 'suspension with pay and carr[ying] with it the threat of possible termination' constitutes adverse employment action"); *Short v. Springfield Terminal Ry. Co.*, D.Me. No. 2:16-CV-74, 2017 U.S. Dist. LEXIS 117551, at *7 fn 4 (July 26, 2017) ("A jury could still find a retaliatory motivation behind the decision to initiate the disciplinary process in the first place.").

CWRU argues, "[t]here is not evidence to support that the [PWG/COS] Proceedings… are in retaliation for" Noakes' protected activity. Def. Memo. at PageID#521. CWRU confuses the *prima facie* inquiry with the pretext inquiry, and further fails to address that the burden to establish a *prima facie* case is minimal. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.").

CWRU is also wrong for two more specific reasons:

First, an inference of a causal relationship is permitted by the fact that CWRU faculty were aware that students were upset with the outcome of the Title IX hearing and perhaps shared that feeling. Shortly after learning about the result, Ricanati emailed Parker stating that Noakes had posted the result to the class GroupMe[6] "and students are furious."[7] (Doc#29-7.) Greenfield testified that a number of students believed that Noakes was guilty even though the panel found otherwise. (Doc#29-3 at 27.) Many students complained; some about the GroupMe Post and some about Noakes in general. A text exchange between a student and one administrator is typical: it does not mention to GroupMe post, and the administrator promised a response by the school:

> Student: … I was wondering if you'd be able to shed some light on what is going to happen to [John Noakes.] It sounds like he's here to stay which I know for a fact make many people ucomfortable and upset
>
> Administrator: Hi… I can assure you that the school is aware of this and is acting quickly…

---

[6] This is a lie by Ricanati. Noakes never posted a copy of the results and never used Jane Roe's name. Ricanati's deposition testimony is filled with such little fibs that should call his credibility into question. For example, Ricanati testified that the Medical School had an "internal policy" to review Title IX matters, but then he could not identify the policy. (Doc#29-2 at 58-59) Another time he said that he could not testify about an issue because "I don't have my notes in front of me" and then, a few moments later denied having any such notes. (Doc#29-2 at 47-48.)

[7] Ricanati, recall, was the source of the original report against Noakes. (Doc#1 ¶57.)

5

(Doc#29-10.) An email from a student sent that evening to Greenfield stated that the student was "appalled" not only about the GroupMe post, but "also in regard to the stories that came out several month ago" regarding Noakes. (Doc#29-8.) Another email from a student mentioned the GroupMe Post, but added, "I understand that [Noakes]… was involved in a sexual assault case earlier this year as the perpetrator of sexual violence."[8] (Doc#29-9.) Ricanati, when given a chance to deny that he promised Jane Rane shortly after John Noakes was exonerated that the Medical School would take additional actions against Noakes in response to her allegations, simply said, "I cannot recall."[9] (Doc#29-2 at 58.) This is curious. The Court should expect Ricanati to flatly deny what would be an obviously improper promise – his inability to remember any details of his conversation with Jane Roe suggests that what he does remember would not help CWRU's case. In fact, CWRU produced in discovery a lengthy email sent by Jane Roe to school administrators decrying the lack of action against Noakes on the very same day that his matter was evaluated by the PWG. The email from Jane Roe does not even mention the GroupMe Post but demands action because Noakes sexually assaulted her and the Title IX process did not result in his removal from the school.[10] (Doc#29-23.)

---

[8] A review of the "early concerns" also supports a causal relationship – several state that Noakes committed sexual misconduct despite the finding in his favor by the hearing panel. These early concerns state that Noakes should not have defended himself in the Title IX proceedings – a protected activity – but, instead, should have admitted responsibility and been punished. (*See* Doc#29-20 (Complaint No. 7: "After being accused of rape, undergoing a title IX hearing, and being deemed innocent, the student in question did not show remorse to the survivor in any form…. Title IX may have found him innocent, but I am first hand witness to the pain he has caused my classmate and friend…"; Complaint No. 11: "Lack of remorse for sexual assault proceedings."; Complaint No. 20: "[Noakes] sexually assaulted a fellow student. He felt zero remorse and instead chose to gaslight this student, turning the narrative onto her…").)

[9] "The statement 'I don't recall' is not the equivalent of a denial." *Robinson v. Pine Hills Mgt. Co.*, D.Colo. No. 19-cv-03219, 2021 U.S. Dist. LEXIS 2414, at *4 (Jan. 7, 2021).

[10] Ricanati responded to Jane Roe's Email (even though he was not supposed to be involved in these matters). He said, "I am sorry that this happened and I acknowledge the toll on your life and education." (Doc#29-24.) Note the language here; Ricanati inadvertently discloses his belief that Noakes is guilty by affirming the facts in her message. In contrast, he testified that his statements to Noakes about this matter focused on expressing empathy towards someone in a difficult process and did not affirm Noakes' views of the underlying facts. (Doc#29-2 at 73 (telling Noakes "I was sorry that he was going through this difficult experience"),)

Second, CWRU's arguments about the roles of various individuals or the impact of the PWG/COS process are not relevant at this step of the analysis; they go to the pretext step, *infra*. "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case." *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008), *quoting Wexler v. White's Fine Furniture*, 317 F.3d 564, 574 (6th Cir. 2003)). Regardless, the PWG/COS process started shortly after Noakes engaged in protected activity by successfully defending himself in a Title IX proceeding. For purposes of establishing a *prima facie* case, timing, *alone*, can provide sufficient evidence of causation under Sixth Circuit precedents. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation"); *Green v. Beaudry*, 6th Cir. No. 19-2027, 2020 U.S. App. LEXIS 10330, at *6 (Apr. 1, 2020) (unpublished) ("Temporal proximity between protected conduct and adverse action, alone" may be sufficient to satisfy *prima facie* retaliation case), *quoting Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004); *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (temporal proximity "is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case"); *Amos v. McNairy Cty.*, 622 F. App'x 529, 537 (6th Cir. 2015) ("this court has explicitly held that temporal proximity alone can establish causation.").

**F.     Pretext**

Plaintiff acknowledges that CWRU has met its burden of offering an explanation for the PWG/COS disciplinary actions against Plaintiff. But CWRU offers only presents a conclusory statement that "Plaintiff cannot establish that he reasons for the [PWG/COS sanctions] are pretextual." Def. Memo.at PageID#524.

7

### a. The Claimed Misconduct Did Not Have A Basis In Fact

The GroupMe post does not violate any CWRU policies or rules. The Title IX Coordinator, Parker, testified that Noakes was not required to keep the results of the process confidential. (Doc#29-1 at 28.) Parker later was unable to state that the GroupMe post violated any school policies. (Doc#29-1 at 30-31.) Ricanati was asked numerous times whether he believed there was anything unprofessional about the GroupMe post; he refused to provide an answer; he stated instead that he could not "speculate" and did "not have enough information to determine if this is unprofessional." (Doc#29-2 at 22-30.) Logio initial testified:

> Q …As you look at this post do you see any professionalism concerns?
> A I do not.

(Doc#29-4. at 37.)[11] The best anyone could offer in depositions was that the post was "disrespectful of other students' emotions." (Doc#29-3 at 19.)

Instead of defending the decision, CWRU claims that the PGW/COS proceedings "were initiated because of Early Concerns… submitted by 30+ first year medical students." Def. Memo. at PageID#523. It's worth noting, here, the Ricanati would not actually provide the early concerns to Noakes so he could defend himself. (Doc#29-13.) Notably absent from CWRU's Memorandum or Affidavits is any independent statement that the sanctions imposed by the PWG/COS process were justified. Regardless, as shown below, a closer review of these Early Concerns reveals some strange things that suggest pre-text.

The Early Concern process was clearly being abused to accomplish what could not be accomplished through the Title IX process. Many of the Early Concerns are not merely directed at the GroupMe post, but also express a belief that Noakes was "guilty" of sexual misconduct and should

---

[11] Curiously, after a break, Logio changed her answer to focus on "gloating" by Noakes She stated, "The trouble I have with the post is that he, John Noakes, with his own name took lots of credit and gloated 1-0 against others, so, yes, he can be happy, but, no, he should not gloat." (Doc#29-4 at 56.)

8

be removed from the medical school.¹² Greenfield admitted in her deposition that this is what was going on:

> Q Well, one of the themes that came out [in the early concerns] is a number of the students believed that John Noakes was actually guilty of the sexual assault; right?
> A Yes.
> Q Okay. And they wanted him to face discipline even though the Title IX process had found him not responsible?
> A Yes….

(Doc#29-3 at 70.) Greenfield went on to state, "my understanding is the professional schools have the ability to do that to hold a student to a different standard than Title IX's." (*Id.*) This, discovery showed, is untrue. Logio testified that the PWG/COS had not in her memory reviewed a Title IX investigation and the school did not have any policy allowing for a review. (Doc#29-4 at 24, 27-28.) CWRU told DHS that the Title IX Office, not the PWG/COS, "oversees *all aspects* of Title IX investigations… including investigating grievances involving the CWRU School of Medicine." (Doc#1-2 (emphasis supplied).)

The timing is highly suspect. Twenty-nine of the 31 Early Concerns were submitted about ten days after the GroupMe post and all within a day or two of each other. Greenfield and Logio could not offer a reason why this occurred. (Doc#29-3 at 68-69; Doc#29-4 at 69.) It may all have been, as CWRU seems to suggest, a coincidence that all of these students decided to submit Early Concerns at that time. It is certainly unprecedented. (*See* Doc#29-3 at 70 ("I've never seen 31 Early Concerns come in on one student for anything before…").) And nobody at CWRU bothered to look for an explanation or whether this was an example of "brigading."¹³ (Doc#29-4 at 70 ("Q So what

---

¹² (*See e.g.* Doc#29-20 (Complaint#4 (accusing Noakes of "raping another student"); Complaint#9 ("I do not believe that any of us are safe with a sexual predator in our midst"); Complaint#10 ("sexual assault…"); Complaint#16 ("[Noakes] engaged in clear sexual misconduct…"); Complaint#22 ("He should not be allowed to continue as a medical student and become a physician"); Complaint#29 (describing concerns that pre-dated the GroupMe post because "I knew some of the details of the Title IX proceedings").)

¹³ "Brigading" is coordinated abusive engagement online and includes the type of "mass reporting" and "astroturfing" that seems to be going on here. *See* Tony Blair Institute for Global Change, *Social Media Futures: What Is Brigading? (10th March 2021)* (https://institute.global/policy/social-media-futures-what-brigading).

9

did you do to figure out why all of a sudden 10 days later 29 students are submitting Early Concerns against John Noakes? A I did nothing.").)  But this Court is not obligated to believe in coincidences[14] and Ricanati's testimony suggests an answer.  He first testified, like the other doctors, that he could not "speculate" about the reasons many of the early concerns were submitted at that time.  But he then slipped a bit; he testified that he perhaps played a more active role than he initially acknowledged:

> Q Do you know if anyone encouraged students to submit Early Concerns?
> A I can tell you from my perspective as a Society Dean that our job is to make sure that students know the process and they choose how to follow it.
> Q So did you encourage students to submit Early Concerns against John Noakes?
> A I educated students about the process.
> Q Who did you educate about the process?
> A Any student that asked me.

(Ricanati Depo. at 38.)  He could not quantify exactly how many students he spoke with, but it seems to be a substantial number.  He testified:

> Q Between April 15th and April 25th how many students did you meet with to describe the process?
> A So during that time period I received a large amount of communication from the Vice Dean, the other Society Deans, and students directly and at all times my communication was that we have a process at the School of Medicine…

(Ricanati Depo. at 40.)  He admitted being on a Zoom call with students, perhaps right before the early concerns started flooding in.  (Ricanati Depo. at 41.)  He also testified that one of the "action items" discussed at the April 26, 2021, Meeting was "educating the students" about the processes at the School of Medicine that could lead to the dismissal of Noakes.  (Ricanati Depo. at 48.)  Worst of all, he did all of this after Noakes had filed a retaliation complaint against him, so he was not supposed to be involved.  (Doc#29-12; Doc#29-16.)  In this way, Ricanati took the Henry II approach by

---

[14] *Bailey v. Baldwin Cty. Bd. of Edn.*, S.D.Ala. No. 14-0305, 2016 U.S. Dist. LEXIS 1441, at *47 (Jan. 6, 2016) ("In the words of Buffy the Vampire Slayer, however, 'there are two things I don't believe in: coincidences and leprechauns.'").

10

"educating" the students on what the school could do after they filed early concerns and hoped that they would take the hint. One court explains:

> This may be considered an example of the Henry II management style. The Plantagenet king is reported to have fulminated, "Will no one rid me of this troublesome priest?" Hearing that, four knights took it upon themselves to murder Thomas Becket on December 29, 1170. The quotation is a byword for what became known in the era of cold war espionage as "plausible deniability."

*Howe v. Magellan Health Servs.,* D.N.J. No. 11-2006, 2016 U.S. Dist. LEXIS 72704, at *45 fn. 12 (May 31, 2016).[15]

### b. The Threats By Greenfield

There is no question that Greenfield made the threatening statements to Noakes described in ¶96 of the Complaint. CWRU denies that these statements were made. Def. Memo. PageID#521. But the conversation is on tape and a transcript is submitted as an exhibit (the original recording may be presented at the hearing; audio is difficult to redact). (Doc#29-30.) Greenfield, in her deposition, generally did not deny making statements such as "you're digging yourself a hole" and "The only way that you are going to come out of this looking like you not causing problems" is to not pursue complaints. She testified that she "was trying to be pragmatic." (Doc#29-3 at 145.) Of course, this is what every victim of harassment is told to persuade against reporting unlawful conduct – don't be seen as a "troublemaker." It is inappropriate and against the law.[16] *See e.g Kohn v. Royall*, 59 F.R.D.

---

[15] The Second Circuit recently observed that this approach ultimately fails: "Whatever degree of plausible deniability the King may have thought he had did not keep him from later regretting, and doing penance for, the resulting murder of Becket, and has not saved him from the verdict of history as to his responsibility for the act." *United States v. Gatto*, 986 F.3d 104, 141 fn 3 (2d Cir. 2021).

[16] Logio confirms this in her testimony that Greenfield's statements were wrong:

> Q Should a student who believes that they are suffering ongoing harassment be told to not report it?
> A No.
> Q Should a student who believed that they were undergoing ongoing harassment -- I'm sorry -- who was -- who was undergoing retaliation be told that they should not report it?
> A No.

(Doc#29-4 at 81.) Gretchen Carlson illustrated this dynamic in a Ted Talk: "When [people] come forward, they're still called liars and troublemakers and demeaned and trashed and demoted and blacklisted and fired.

515, 520 fn 10 (S.D.N.Y.1973) ("It is understandable and, in fact, predictable that fear of being labelled a troublemaker would deter most [persons] from sticking their necks out unnecessarily."); *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166, (D.C. Cir. 2010) (finding materially adverse action where plaintiff's supervisors branded her as a troublemaker).

This is strong indirect evidence of retaliatory intent even though Greenfield is not on the COS and, therefore, not the final decisionmaker. *Compare* Def. Memo. at PageID#522 (arguing that Greenfield and others "are not involved in… the Professionalism Proceedings"). True, statements by non-decisionmakers generally cannot suffice as evidence of unlawful intent. *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998), *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989). But "courts must consider any statements made by those who are meaningfully involved in the decision." *Barrow v. Terminix Internatl. Co., L.P.*, S.D.Ohio No. 3:07-cv-324, 2009 U.S. Dist. LEXIS 6433, at *29 (Jan. 29, 2009), *citing Wells v. New Cherokee Corp.*, 58 F.3d 233, 237 (6th Cir. 1995). And the Sixth Circuit has noted that "remarks of those who may have influenced the decision… may be relevant when the plaintiff challenges the motive behind that decision." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998). *See also Risch v. Royal Oak Police Dep't,* 581 F.3d 383, 393 (6th Cir. 2009) ("We have held that discriminatory remarks, even by a non-decisionmaker, can serve as probative evidence of pretext."). In this case, there is evidence Greenfield influenced the PWG/COS process. Greenfield was the first person to obtain information from Noakes about professionalism concerns. (Doc#29-16.)[17] Text messages show that she discussed the Noakes matter with a member of the PWG/COS. (Doc#29-22.) When asked about this conversation, she said, "there have been so many different

---

Reporting sexual harassment can be, in many cases, career-ending." (https://www.ted.com/talks/gretchen_carlson_how_we_can_end_sexual_harassment_at_work)

[17] The original draft of this email was prepared by Ricanati (even though he claims to have avoided involvement after learning of Noakes' retaliation complaint). This draft read, "Your responses will be made available to the PWG." (Doc #29-15.)

meetings…," suggesting that this was not an isolated conversation. (Doc#29-3 at 90.) Greenfield testified that she has "been to all of the Committee on Students' meetings" and was present when the COS discussed Noakes' matter. (Doc#29-3. at 49, 96.)

### c. CWRU Ignored Similar Conduct By Other Students

Pretext may be shown by the fact that other students were not similarly punished for similar misconduct. The Sixth Circuit has observed that in evaluating retaliation claims, courts may consider whether a plaintiff differently from similarly situated individuals. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516-517 (6th Cir. 2009). *Cf. Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012) (evidence of an employer's treatment of other employees is often relevant to an employer's motive).

While Noakes was subjected to the PWG/COS process, other students who engaged in comparable or wore conduct faced no discipline. (Doc#29-5 ¶¶8-11.) The clearest example is the Class Survey and Petition circulated by other CWRU students.[18] (Doc#29-17; Doc#29-18.) These posts are far more troublesome than Noakes' GroupMe post – they mention Noakes by name and accuse him of wrongdoing. The Court does not need to make an independent evaluation of which is worse – it is sufficient for pre-text purposes that CWRU's witnesses testified that the Class Survey and Petition raised professionalism concerns. Greenfield testified, "It was inappropriate for a person to survey the class in this way about a student that was involved in Title -- Well, just about any student." (Greenfield Depo. at 44.) Greenfield also testified that the Petition raised professionalism concerns: "It's inappropriate to have a petition like this coming from students." (Doc#29-3 at 48.) Logio testified that the Class Survey was "misguided" and "somewhat slanderous." (Doc#29-4 at 38.)

CWRU did not initiate the PWG/COS process for the students responsible for the Class

---

[18] CWRU also took no official action in response to inflammatory poster referring to Noakes as a "rapist." (Doc#29-14; Doc#29-5 ¶10.)

Survey or Petition even though Ricanati and others were aware of the authors of these documents.[19] (Doc#29-3 at 44-45, 48-49.) But they should have. After reviewing the redacted documents, Logio testified that if she were informed of the names of the students who created the Class Survey and Petition, she would submit an early concern and initiate the PWG/COS process:

> Q … If the school was now aware of who created [the Petition] would you expect them to take any action against that student?
> A I would want to know who did it and have a -- Yes, I would create an Early Concern on that.
> Q The same with [the Class Survey], if you found out who did it would you want an Early Concern created about that?
> A Again I think this is misguided and, yes, I would -- I would submit an Early Concern on this.

(Doc#29-4 at 57 (objections omitted).)

### E. CWRU's Claim That It Was Only "Responding" To Concerns From Other Students Does Not Defeat A Pretext Claim

CWRU cannot hide behind the claim that the PWG/COS are passive entities that merely reacted to "early concerns" filed by other students. *Compare* Def. Memo. at PageID#523 (arguing that the "Professionalism Proceedings were initiated because of Early Concerns…"). The Sixth Circuit has held that "[i[n appropriate circumstances," retaliation claims may be premised on the actions of co-workers or peers. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008). Liability for retaliatory conduct may be found if an employer (or educational institution for Title IX purposes): (i) is aware that co-workers' or peers' retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from engaging in protected activity; and the employer (or educational institution for Title IX purposes; and (ii) condones, tolerates, or encourages the acts of retaliation, or responds

---

[19] The student who created the Class Survey and Petition met with Ricanati and discussed the matter. Ricanati did not address professionalism issues; he told them only that "it was poor leadership and that the survey and data were of low -- low quality of evidence." (Doc#29-2 at 87.) This comment is also consistent with the Henry II inference, *supra* – Ricanati was perhaps hoping that the students would present him with data to support further action against Noakes

so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Id.* at 347.

In this case, there can be little doubt that the actions of other students in Noakes' class are "adverse actions." The simple act of removing Noakes from the GroupMe limited his ability to access course materials and information. The circulation of a survey and petition against Noakes likewise served to limit his ability to participate in class activities. (Doc#29-5 ¶10.) The "early concerns" submitted by students were not a spontaneous response to perceived "unprofessional" conduct but were submitted over ten days later as a part of a concerted efforts by classmates to remove Noakes from the class. (Doc#29-20.) CWRU was aware of the survey and the petition but took no action. (Doc#29-4 at 75-76; Doc#29-5 ¶11.) Even worse, on June 15, 2021 Dr. Ricanati received an email stating that "there have been several instances… of students publicly belittling or humiliating [Noakes] as well as instances of opening [sic] ignoring him and excluding him from groups." (Doc#29-25.) Instead of taking steps to assist Noakes, CWRU pressured him to take a year off. Greenfield wrote to Noakes suggesting he take a year off because "we can't predict how inflamed the class still is." ( (Doc#29-26.) She responded to his decision to remain in school despite her efforts to "convince him" otherwise with "UGH." (Doc#29-27.)

## CONCLUSION

Plaintiff's Motion for a Preliminary Injunction should be granted.

                                        Respectfully submitted,

                                         /s/ Joshua Engel
                                        Joshua Adam Engel (OH 0075769)
                                        Anne Tamashasky (OH 0064393)
                                        ENGEL AND MARTIN, LLC
                                        4660 Duke Drive, Ste 101
                                        Mason, OH 45040
                                        (513) 445-9600
                                        (513) 492-8989 (Fax)
                                        engel@engelandmartin.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Courts ECF system this December 7, 2021 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel