## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JOHN NOAKES, | Case No. 1:21-cv-01776-PAB |
| Plaintiff, | Judge:  BARKER |
| v. | |
| CASE WESTERN RESERVE UNIVERSITY, | AMENDED COMPLAINT |
| | and |
| Defendant | JURY DEMAND |

Pursuant to Fed. R. Civ. P. 15(a), Plaintiff John Noakes[1] respectfully submits this Amended Complaint.  Defendant has consented to the filing of this Amended Complaint.  (Rule 26 Report, Doc#37, PageID#1070; Order, Doc#39, PageID#1077).

## INTRODUCTION

1. Plaintiff brings this action for violation of Title IX.  The Title IX claims in this action are based on three theories: deliberate indifference; retaliation; and selective enforcement.

2. This case arises out of, *inter alia*, the efforts of administrators at the Case Western Reserve University and Case Western Reserve University School of Medicine (collectively "CWRU") to retaliate against John Noakes after he was found "not responsible" for allegations of sexual misconduct against a fellow student, identified here as "Jane Roe."

3. Jane Roe had alleged that John Noakes had sexually assaulted her.  She never filed a police complaint.  Instead, the matter was reported to the CWRU Office of Equity, the office charged

---

[1] The Court has previously granted Plaintiff leave to proceed anonymously.  (Order, Doc#14.) Plaintiff has chosen the pseudonym "John Noakes" instead of the more commonly used "John Doe" in order to avoid confusion with a prior case titled *Doe v. Case Western Reserve Univ.,* N.D. Ohio No. 1:17 CV 414.  The pseudonym "John Noakes" was used in English Law.  *See https://www.merriam-webster.com/dictionary/John-a-Nokes.*

with enforcement of CWRU's non-discrimination and sexual harassment policies.  CWRU investigated the matter and, following a hearing, John Noakes was cleared of all charges.

4.  After John Noakes was cleared of the charges, CWRU officials – including the Title IX Coordinator and a Dean in the Medical School – who were unhappy with the outcome began a campaign of intimidation and harassment against John Noakes.  Other students, with the tacit encouragement of Jane Roe and administrators, started an on-line campaign to expel John Noakes. Administrators told John Noakes that he could be expelled if he continued to assert his own rights under Title IX against these students or pursued retaliation complaints against administrators.

5.  The campaign of harassment and intimidation culminated in a second Title IX investigation of John Noakes because someone, unbeknownst to John Noakes, had posted information on-line critical of the CWRU disciplinary process.  Again, John Noakes was ultimately exonerated.  But, again, John Noakes was damaged by having to defend himself against spurious charges.

6.  Throughout this time, John Noakes was continuously subjected to retaliatory harassment by other medical students.  CWRU officials with knowledge of the retaliatory harassment failed to take action to preserve John Noakes' ability to complete his medical education in peace.

**PARTIES**

7.  John Noakes is a medical student at Case Western Reserve University School of Medicine (the "School of Medicine").

    a.  Plaintiff is an Ohio resident with a residence in [REDACTED].

    b.  Plaintiff has paid a significant amount of money to CWRU in the expectation of receiving an education and, if he successfully completes his classwork, a degree.

    c.  The disclosure of Plaintiff's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected

from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99.

8.  Defendant Case Western Reserve University is a private educational institution.

   a.  CWRU School of Medicine is a part of CWRU and follows university-wide policies and procedures

   b.  CWRU voluntarily participates in federal spending programs.

## JURISDICTION AND VENUE

9.  This case arises, in part, under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*, Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

10. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.  The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

**THE RESPONSE OF CWRU TO PRESSURES TO CRACK DOWN ON SEXUAL MISCONDUCT**

11. This case is one of many amidst a continuing national controversy about the responses of colleges and universities to alleged sexual assaults on campuses.   The response of colleges and universities to this problem arises, in part, under Title IX.

12. CWRU has adopted various policies and procedures to respond to allegations of sexual assault on campus in direct response to pressure from the U.S. Education Department's Office of Civil Rights ("OCR") related to the enforcement of Title IX.

13. On April 11, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities. The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and universities must

3

have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct. After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures in a manner that, while not completely ignoring due process concerns, shifted the focus more on victim advocacy.

14. The Obama administration, through OCR, pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

    a. The "Dear Colleague" letter was a step in the increased enforcement of Title IX on colleges and universities. NPR described the Dear Colleague Letter as the government's "first warning shot." Source: *How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014.

    b. In February 2014, Catherine E. Lhamon, the assistant secretary of education who heads the department's Office for Civil Rights, told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." Source: *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education, February 11, 2014.

    c. Lhamon was quoted in the LA Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." David G. Savage and Timothy M. Phelps, *How a little-known education office has forced far-reaching changes to campus sex assault investigations,* LA Times August 17, 2015.

15. Colleges and universities, including CWRU, were scared of being investigated or sanctioned by the Department of Education and/or of potential Title IX lawsuits by the Department of Justice.

    a. The Federal government created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt.

4

The Chronicle of Higher Education noted, "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." Source: *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014.  In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

b.  Lhamon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds." Source: *How Campus Sexual Assaults Came To Command New Attention*, NPR, August 12, 2014.  In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think."  She explained that schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead.

c.  Other news reports suggested that the threat to withdraw federal funding from schools was credible.  MSNBC reports:

> Speaking at a conference on campus sexual assault held at Dartmouth College, Assistant Secretary for Civil Rights at the Department of Education Catherine Lhamon said that despite the fact it has never been done before, she is prepared to cut off federal funding to schools that violate Title IX, the 1972 gender equity law.

> Calling that one enforcement mechanism part of a set of "very, very effective tools," Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."
>
> In her 10-month tenure at the Department of Education, Lhamon has threatened to withdraw federal funding from four schools. "It's not surprising to me that we haven't gone to the last step," she said. "It means that so far the process has been working."

Meredith Clark, *Official to colleges: Fix sexual assault or lose funding*, July 15, 2014

(available at: http://www.msnbc.com/msnbc/campus-sexual-assault-conference-dartmouth-college#51832)

d. The White House issued a report entitled "Not Alone" in April 2014, which includes a warning that if the OCR finds that a Title IX violation, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

e. In June 2014, Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee:

> If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

    f.   Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." Source: *Some Accused Of Sexual Assault On Campus Say System Works Against Them*, NPR, September 3, 2014.

    g.   In July 2016, then-Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. Source: *Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault*, Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

16.  On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for Civil Rights, U.S. Dep't of Educ. (September 22, 2017). (Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf )

    a.   In withdrawing the Dear Colleague Letter, OCR observed that prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.

    b.   OCR further said: "Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *Quoting Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual*

*Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

17. On May 6, 2020, the Department of Education released a Final Rule under Title IX of the Education Amendments of 1972.  The Final Rule, *inter alia*, prescribes a transparent grievance process that treats accused students as innocent until proven guilty, requires the school to state a standard of evidence, and requires the school to provide a hearing process where accused students may question adverse witnesses.  The Final Rule carried the force and effect of law as of August 14, 2020.

18. CWRU has been critical of the 2020 Regulations and has sought ways to not comply.  The CWRU Title IX page states, "Throughout their development, the new regulations have raised concerns across many in higher education, and our organizational representatives have been active in articulating them."  A statement linked to the CWRU Title IX webpage characterizes the regulations as "cruel" and "counter-productive."  (https://case.edu/equity/sexual-harassment-title-ix/information-2020-title-ix-regulations)

19. The Biden Administration has initiated a new rulemaking process in an effort to repeal portions of the 2020 rules.  During the presidential campaign, President Biden vowed to scrap the Trump administration's new regulation on campus sexual misconduct; in March 2021, President Biden signed an executive order directing Education Secretary Miguel Cardona to review and consider rewriting the regulation.  Lhamon has been re-installed in her prior office and new regulations that rolled back many of the procedural protections contained in the 2020 regulations have been proposed.

20. The 2020 Regulations remained in effect for the complaints against John Noakes described in this Complaint.

21. On information and belief, CWRU, like other schools nationwide, was scared of being investigated or sanctioned by the Department of Education for not taking seriously complaints of female students alleging sexual assault by male students.  Sanctions would include the loss of eligibility for all federal funding.  Upon information and belief, CWRU annually receives millions of dollars in government grants and contracts and CWRU students depend on federal financial aid.

22. In the year preceding the disciplinary actions against John Noakes, there was substantial criticism of CWRU, both in the student body and in the public media, accusing CWRU of not taking seriously complaints of female students alleging sexual assault by male students.  This has included adverse news coverage, campus meetings or protests, and enforcement actions concerning CWRU. This criticism specifically included criticism of the manner in which CWRU handled Title IX investigations.

23. In the summer of 2020, a group of CWRU students, "CWRU Survivors," established the @cwru.survivors Instagram page so students could anonymously share their experiences with sexual assault, violence, harassment, and discrimination on CWRU's campus, as well as experiences with the Title IX office. In a matter of days, there were over 600 posts.

    a. The Instagram page attracted national media attention, including coverage by NPR and CBS News.

    b. CWRU Survivors said in an open letter to the college posted on July 29, 2020, "A massive cultural change about how the CWRU community views consent, accountability, and respect for others is integral in combatting the prevalence of sexual violence at Case Western Reserve University."

    c. A September 11, 2020 editorial in the student newspaper, the Observer, criticized the changes in the Title IX regulations.  The editorial accused the Trump Administration of "promot[ing] sexism and violence on a nearly daily basis" and added, "Respect for women

9

surely does not exist in this administration."   The editorial suggested that, in response to the new Title IX regulations, "…it's time to go farther and stand in complete solidarity with survivors."

d.   A change.org petition created in the following weeks (https://www.change.org/p/case-western-reserve-university-hold-cwru-accountable) received hundreds of signatures for a statement that is highly critical of the CWRU response to allegations of sexual misconduct: "As an institution conceived to be a place of safety and refuge for survivors, Title IX has shown to be unhelpful, victim blaming, and made seemingly inaccessible to students and those who need it most."  The petition demanded that CWRU take action against those accused of misconduct regardless of the results of the investigatory and hearing process. The petition also demanded that CWRU release "a statement condemning the assaulters who have been accused, and that believing survivors, taking concrete action against the accused, and ensuring the culture on campus is drastically altered, is the school's priority. [sic]"

e.   A media report described the Instagram page as "waging war" on CWRU's Title IX response.



According to the Cleveland Scene, "In many cases, these posts also describe a profound lack of institutional support for survivors of assault, and university systems of reporting and discipline so ineffectual that they have exacerbated trauma." https://www.clevescene.com/scene-and-heard/archives/2020/08/26/an-instagram-account-is-waging-war-on-sexual-assault-at-case-western-reserve-university

24. In the Fall of 2020, partly in response to the Instagram page, a task force made up of volunteer undergraduate, graduate, and transfer students, along with advisors, lawyers, and CWRU alumni, met regularly to discuss sexual misconduct on CWRU's campus.  In a report to the Board of Trustees, the Task Force wrote, "The student body and alumni alike are calling for action. A massive culture change has already begun on our campus, and the University must ask itself one simple question: 'Will we be aiding in this change or standing by?'" (https://case.edu/provost/sites/case.edu.provost/files/2020-11/Sexual%20Misconduct_Draft.pdf)

   a. The Task Force was critical of the Title IX Process.  The presentation states, "one thing has been made clear: We are, unfortunately, not supporting nor educating the CWRU community enough in terms of sexual misconduct. Sexual assault survivors and the accused alike are subjected to an inconsistent, unfair, and problematic process in place to address allegations. A change must be made."

   b. The Task Force collected quotes from students that were critical of the Title IX process at CWRU:

11



c. The Task Force indicated a belief that "survivors often do not feel supported or understood by CWRU, citing inadequate resources, [and] unhelpful or unaccommodating staff and faculty…"

25. In Fall 2020, the CWRU Title IX coordinator sent out a message to all students.  A CWRU statement said that "Education and prevention programs certainly can help reduce the number [of sexual assaults] on campus, but more meaningful change requires earlier and deeper initiatives to engage and address these cultural issues [including long-standing societal attitudes towards women and members of underrepresented groups] on a broad[er] scale."

26. The Medical School, in particular, has received scrutiny for the manner in which it handles allegations of sexual assault on campus.  In 2018, the Office of Civil Rights for the Department of Health and Human Services completed an evaluation of the School of Medicine's compliance with Title IX.  HHS reviewed the school's nondiscrimination policies and procedures, including its Sexual Misconduct Policy, Title IX grievance procedure, and the extent to which CWRU School of Medicine's Title IX Coordinator implements the School's Title IX compliance program.  (A copy of the April 2018 Letter is filed as Doc#1-2.)

27. In fall 2021, @metoocwru on Instagram posted an email detailing that the Department of Justice, Office of Civil Rights, would be investigating the manner in which CWRU conducts the Title IX process. On or about December 30, 2021, the Department of Education formally opened an investigation.  An editorial in the student newspaper urged punitive action against the school:

> Rape culture and sexual misconduct have been happening for decades at universities across the United States, but it's horrendous to see how prominent it is at CWRU. The administration not only provides little to no support for complainants but actively have proven that they do not care about CWRU's community, including previously hiring a law school dean with knowledge of his prior sexual misconduct allegations. We now have hope of finally holding CWRU's administration responsible for its wrongdoings

*Editorial: The importance of the Department of Justice investigating CWRU*, Observer (November 5, 2021) (https://observer.case.edu/editorial-the-importance-of-the-department-of-justice-investigating-cwru/).

28. According to reports in the student newspaper, in late March and early April 2022, a federal investigative team interviewed students about their trauma and lack of support from CWRU in handling their cases.  (https://observer.case.edu/us-department-of-justice-interviews-students-on-cwru-title-ix-violations/).  The article states that students "hope[ ] the DOJ will hold CWRU accountable for its lack of support for students in responding to Title IX offenses" *Id.*  Another news article in the Cleveland media stated, "The potential violations at Case relate to the university's handling of sexual assault cases." *DOJ Investigators Were at CWRU Last Week to Probe*

*Potential      Title      IX      Violations*,      Cleveland      Scene,      (Apr      8,      2022)

(https://www.clevescene.com/news/doj-investigators-were-at-cwru-last-week-to-probe-

potential-title-ix-violations-38700164).  The articles further stated,

> Students who spoke with Scene said they believed the various campus offices where
> survivors could theoretically turn for help — the office of equity, the women's center,
> the Title IX office, the office of student affairs — were largely ineffectual. They upheld
> a system, they said, designed to protect predominantly male assaulters and to shield
> the university from reputational damage.

## THE CWRU TITLE IX PROCESS AND THE MEDICAL SCHOOL PROFESSIONALISM PROCESS

29. CWRU's Title IX Coordinator leads CWRU's centralized Title IX Office and oversees all aspects

    of Title IX investigations and prevention and education programs university-wide, including

    investigating grievances involving the School of Medicine.

30. CWRU maintains a website which provides instructions for filing a Title IX complaint against any

    student at CWRU, including medical students.  CWRU's Title IX investigative procedures include

    interviews with the complainant, the respondent and witnesses, as well as reviewing relevant

    records such as phone records emails and social media. Following the investigation, a hearing

    panel determines whether a student is "responsible" or not responsible" for a violation of the

    school's policies.

31. CWRU in August 2020 adopted a "Interim Sexual Harassment Policy and Procedures for All

    Faculty, Students, Employees, and Third Parties."  This is referred to as the "2020 Title IX Policy."

    (A copy of the Title IX Policy is filed as Doc#1-3.)

32. The 2020 Title IX Policy prohibited all forms of sexual harassment, which was defined (page 17)

    to include, "the offenses of sexual harassment, sexual assault, domestic violence, dating violence,

    and stalking."

14

33. The 2020 Title IX Policy provided that CWRU will provide benefits and accommodations to students who allege that they are the victims of sexual misconduct. These benefits and accommodations would not available to students but for the fact that the students claimed to have been a victim of sexual misconduct, and are provided without regard to any investigation. Interim measures can include "no contact" orders and changes in academic, employment or living arrangements.

34. The investigation and grievance process outlined in the 2020 Title IX Policy determined whether or not the Policy has been violated.

   a. Upon receipt of a complaint, a pair of investigators with the Office for Equity would review cases in pairs, interview the Complainant, Respondent, and witnesses, and gather relevant evidence. As part of the investigatory process, each interviewed party and witness is provided an opportunity to review and verify the Investigator's summary notes of the interview. Each party had the opportunity to suggest witnesses and questions they wish the Investigator(s) to ask of the other party and witnesses.

   b. The Investigators gathered, assessed, and synthesized evidence, but make no conclusions, engaged in no policy analysis, and rendered no recommendations as part of their report

   c. Prior to the conclusion of the investigation, the parties were provided access to a draft investigation report as well as an opportunity to inspect, review, and respond to all of the evidence obtained as part of the investigation.

35. The determination of whether a respondent had violated the 2020 CWRU Title IX Policy was made by a hearing panel. At the hearing, the Investigators presented a summary of the final investigation report. The parties and witnesses may provide information. Each side was permitted to question the adverse party and witnesses either through an advisor or through the submission of written questions.

15

36. Each side was permitted to appeal the decision of the hearing panel on certain limited grounds.

37. Nothing in the 2020 Title IX Policy required that student keep the process confidential.  The 2020 Title IX Policy did not state that students must keep all investigations and adjudications confidential.

38. The 2020 Title IX Policy did not prohibit students from discussing facts related to the investigation or adjudication of allegations of sexual misconduct with anyone.  In fact, the opposite is true. CWRU administrators have acknowledged that students are free to disclose any information obtained in the investigative or administrative process.  The CWRU Title IX Coordinator admitted that students would be free, for example, 'to print information about the outcome of hearings in an ad in the Plain Dealer.'

39. The 2020 Title IX Policy (page 22) had certain provisions designed to prevent retaliation against individuals who engage in "protected activity" related to the Title IX process.

   a.  Protected activity was defined by the 2020 Title IX Policy to include "participating in the grievance process."

   b.  The 2020 Title IX Policy required CWRU to "take all appropriate and available steps to protect individuals who fear that they may be subjected to retaliation."

   c.  The 2020 Title IX Policy prohibited "intimidating, threatening, coercing, harassing, or discriminating against any individual… because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy and procedure."

   d.  The 2020 Title IX Policy provided that "charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint of sex discrimination…" may constitute retaliation.

16

40. The 2020 Title IX Policy (page 12) also provided that students should be provided with supportive measures "to protect the safety of all parties or the university's educational environment, and/or deter harassment, discrimination, and/or retaliation."  The provision of supportive measures is mandatory, not optional:

    a.   The 2020 Title IX Policy provided that "CWRU *will offer and implement* appropriate and reasonable supportive measures to the parties upon notice of alleged sexual harassment, or retaliation."  (Emphasis supplied.)

    b.   The 2020 Title IX Policy provided, "The Title IX Coordinator or designee *promptly makes supportive measures available* to the parties upon receiving notice or a complaint."  (Emphasis supplied.)

41. CWRU adopted a Revised "Sexual Harassment Policy and Procedures for All Faculty, Students, Employees, and Third Parties" on September 13, 2021 (the "Revised Title IX Policy").  A copy of the Revised Title IX Policy is attached as an Exhibit to this Amended Complaint.

42. The Revised Title IX Policy contains a 'Statement of Rights."  This Statement indicates that students have the right to "an equitable investigation and resolution" and that students have the "right to a fundamentally fair resolution as defined in these Procedures."

43. The Revised Title IX Policy, like the Title IX Policy, does not state that students must keep all investigations and adjudications confidential.  The Revised Title IX Policy does not prohibit students from discussing facts related to the investigation or adjudication of allegations of sexual misconduct with anyone.

44. The Revised Title IX Policy (page 10) states that CWRU "will offer and implement appropriate and reasonable supportive measures for both Parties upon notice of alleged sexual harassment or retaliation."

17

45. CWRU also adopted revised procedures in a transparent attempt to avoid many of the federal regulations.  CWRU designates some complaints as "Process A" and some complaints as "Process B."  The Title IX Policy Explains:

> Process A… [applies] only to Formal Complaints making qualifying allegations of sexual harassment (including sexual assault, dating violence, domestic violence, and stalking, as defined above) involving students, staff, administrators or faculty members.

> "Process B" can apply to sexual harassment (including sexual assault, dating violence, domestic violence, and stalking, as defined above) when jurisdiction does not fall within Process A, as determined by the Title IX Coordinator

a. "Process B" contains fewer procedural protections for accused students as "Process A." Most notably, students are not permitted to question adverse witnesses through counsel, as is required by the federal regulations.

b. On information and belief, CWRU in practice has sought to narrowly define all alleged misconduct in order to apply the more restrictive procedures in "Process B."  For example, CWRU does not apply "Process A" to claims of retaliation, despite clear federal regulations.

   i. 34 C.F.R. 106.71 prohibits retaliation.  This regulation provides:  "Complaints alleging retaliation may be filed according to the grievance procedures for sex discrimination required to be adopted under § 106.8(c)."

   ii. 34 C.F.R. 106.8(c) requires the adoption of certain procedures.  This regulation provides: "A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part and a grievance process that complies with § 106.45 for formal complaints as defined in § 106.30."

18

iii. 34 CF.R. 106.45 contains certain procedural guarantees for students accused of misconduct.  Many of these guarantees are not provided to student who allege that they have been the victim of retaliation at CWRU.

46. The Revised Title IX Policy contains various time limitations.

    a. The Revised Title IX Policy provides that "allegations are acted upon promptly" and that "Complaints may take 60-75 business days to resolve."  The Revised Title IX Policy further provides that while there "may be exceptions and extenuating circumstances that can cause a resolution to take longer…  CWRU will avoid all undue delays within its control."  Significantly, if resolution is delayed, CWRU must "provide written notice… of the delay, the cause of the delay, and an estimate of the anticipated additional time that will be needed as a result of the delay."

    b. The Revised Title IX Policy indicates that under Process B CWRU "will make a good faith effort to complete investigations as promptly as circumstances permit, usually within 60 days…"

    c. The Revised Title IX Policy indicates that "Hearings will be held at minimum 10 days following the Notice of Hearing."

    d. The Revised Title IX Policy indicates that "The Chair of the Appeal Panel will render a decision in within five (5) business days, unless this period is extended for good reason by the Title IX Coordinator, who will notify the Parties."

47. The School of Medicine has a separate "Student Handbook."  (A copy of the Student Handbook Policy is filed as Doc#1-4.)

48. The Student Handbook (page 7) indicates that "The School of Medicine is obligated to follow federal guidelines (Title IX) for reporting sexual misconduct."  The Student Handbook (page 7)

19

further indicates that "If appropriate" reports of sexual harassment and misconduct are "redirected to University (i.e. Title IX)."

49. The Student Handbook (page 59) describes a Committee on Students ("COS"). The purpose of the COS is to review "the total performance of any student referred to it." The Student Handbook indicates that "Review of student performance within the curriculum may include… compliance with the university's Student Code of Conduct."

50. The School of Medicine has a "professionalism" process that starts when an individual – either a faculty member or a fellow student – submits an "Early Concern." The Early Concern is first reviewed by the Professionalism Working Group ("PWG") and, eventually, may be referred to the COS for disciplinary action.

51. On information and belief, the COS had not (prior to the events described in the Complaint involving Plaintiff) reviewed a Title IX investigation for separate disciplinary concerns. The medical school does not have any policy allowing for such a review.

52. The COS reviews the student's complete academic record and any information provided by the Society Dean and student." The COS may also "question the student on… Student Code of Conduct violations…" The COS may make determinations about "promotion and graduation, repetition of a portion of the curriculum, and any sanctions including dismissal from the School."

53. The Student Handbook (page 60-61) provides that students have the right to request an appeal hearing for reconsideration of a decision made by the COS.

54. The Student Handbook permits the student only to have a faculty advocate. "No other advisor or advocate, other than the CWRU faculty member designated by the student, is permitted to accompany the student to the Committee hearing."

55. The Student Handbook (page 61) provides that a student "may make one further appeal to the Dean of the School of Medicine only on the basis of the use of inappropriate procedures."

20

56. The COS process does not contain many of the procedural protections included in the Title IX Policy, including the ability to confront adverse witnesses and to be accompanied by an advisor of the student's choice.

**THE FIRST DISCIPLINARY PROCEEDINGS AGAINST JOHN NOAKES**

57. Beginning in August/September 2020 John Noakes and Jane Roe began dating.

58. Jane Roe alleges that John Noakes sexually assaulted her on October 20, 2020 (the "Incident"). Jane Roe alleged that John Noakes engaged in rough sex beyond her consent.  John Noakes unequivocally denies Jane Roe's allegations and unequivocally denies any sexual misconduct (related to the Incident or otherwise).

59. On October 22, 2020 – two days after the Incident – John Noakes and Jane Roe mutually decided to break up.

60. On October 23, 2020, Jane Roe asked John Noakes to re-start the relationship.  She said that she made a mistake by breaking up. She texted him, "I just know you're right for me and I think I really really like you and I messed up and I dumped you just because you weren't into nutrition but that's not fair that's not a good reason. You're just so good for me other than that I'm just so f**ked up with my eating disorder and anxiety that I thought it was a good idea to push you away."

61. On October 24, 2020 – four days after the Incident – John Noakes and Jane Roe engaged in consensual sex.

62. On October 25th, 2020 – five days after the Incident – John Noakes and Jane Roe exchanged text messages.  In one text, Jane Roe writes, "Goodnight [John Noakes] <3. You mean so much to me…"

63. On October 26, 2020 – six days after the Incident – John Noakes and Jane Roe had an argument about an unrelated matter.  John Noakes suggested that they need to "take a break."   Jane Roe responded by threatening John Noakes.  She specifically stated that she would report him to the

21

Title IX Office "for the lying the sex for everything it was all a lie."  Jane Roe continued these threats the next day before apologizing for the "meltdowns" and attempts "to fix this."

64. John Noakes asked Jane Roe to stop contacting him.  Jane Roe continued to attempt to contact him and threatened to report him for "non-consensual sex."

65. Jane Roe's threats were repeated during an argument between her and John Noakes on November 6, 2020.  During that argument she threatened to file a report with the Title IX Office and claimed she is "a victim of rape."  In the same conversation, she texted him about continuing the relationship: "my feelings never went away, yours just disappeared in a day. Just like everyone else's do."

66. On November 7, 2020 at 6:34 am John Noakes reported to the Office of Equity that he is being threatened and harassed by Jane Roe.

67. A few hours later, at 1:29 pm, Dr. Steven Ricanati reported to the Office of Equity that Jane Roe had been sexually assaulted by John Noakes.  Dr. Ricanati is the associate dean for student affairs for the School of Medicine.

   a.  On information and belief, Jane Roe had indicated to Dr. Ricanati that she was the victim of sexual assault.  Dr. Ricanati is a "mandatory reporter" and would be required to pass that information on to the Title IX Office.

   b.  Dr. Ricanati refers to Jane Roe's report as an "incident posted to Instagram."  On information and belief, he was referring to the Instagram page regarding CWRU's Title IX problems described *supra*.

68. On November 11, 2020, Jane Roe indicated to the Title IX investigators that she did not want to move forward with a formal complaint, but simply wanted a no-contact directive.

69. On November 12, 2020, John Noakes indicated to the Title IX Office that he did not wish to proceed with an investigation against Jane Roe.  However, John Noakes was clear that he may

22

choose to move forward at a later date.  John Noakes requested the imposition of a No Contact Directive.

70. On December 24, 2020, Jane Roe sent an email to the Office of Equity indicating that she now wished to move forward with a formal complaint.

71. On January 7, 2021, Jane Roe signed a formal complaint against John Noakes.

72. John Noakes was notified of the formal complaint on January 11, 2021.  The reason for the delay is unexplained.

73. The Title IX investigator indicated that the alleged sexual misconduct would not strictly fall under the Title IX Policy because, consistent with the federal regulations, it occurred off-campus. However, the investigation was conducted by the Office of Equity.  On information and belief, CWRU made the determination that the Title IX process did not apply as part of its broader effort to avoid many of the due process guarantees contained in the 2020 federal regulation.

74. On January 19, 2021, John Noakes was interviewed by the Title IX investigators.

75. On March 19, 2021, John Noakes was provided with a "Final Investigation Report."  This report included three additional pages of statements by Jane Roe.

76. On April 8, 2021, CWRU held a hearing.  At the hearing Jane Roe, John Noakes, and five witnesses were present.

77. The panel found John Noakes "not responsible" for violating the Title IX Policy.

78. On April 15, 2021 John Noakes was provided with a letter describing the outcome of the hearing. (A copy is attached to the Original Complaint.)  The Panel found that John Noakes's was "genuine and honest" and that the panel "had no reason to believe [John Noakes] was being deceptive or dishonest."  The Panel added, "[John Noakes] provided no reason for the Board to question his credibility."

79. Jane Roe appealed the decision.  Jane Roe argued that the panel "failed to take into account the trauma" she experienced because of the Incident and that the panel failed to recognize that John Noakes had "a reason to lie."  That appeal was denied.  Notably, the Appeal Panel remarked that the "Respondent's responses seemed genuine and honest [and] there was no reason to believe that [John Noakes was] being dishonest or deceptive or had a reason to lie."

**THE RETALIATION AGAINST JOHN NOAKES BY THE MEDICAL SCHOOL**

80. CWRU faculty and students were upset with the outcome of the Title IX hearing.   In particular, a number of students believed that John Noakes was guilty even though the panel found otherwise.  Faculty members at CWRU did nothing to discourage this belief.

81. Immediately after he learned of the result of the hearing panel, on April 15, 2021 at 4:38 pm, John Noakes posted on a GroupMe group chat used by the Medical School.  He posted, "All glory and honor to the Most High, who is my refuge and fortress. That's all, thanks."  John Noakes also changed his name to "[John Noakes] (1-0)."

   a.  John Noakes was immediately removed from the GroupMe chat group by another student who acted as a group moderator.  This had the effect of excluding John Noakes from class discussions and the vast majority of communication from class student representatives regarding curricular activities.

   b.  Other students responded with comments critical of John Noakes, including "God don't like ugly."

   c.  A copy of the GroupMe Chat set forth here:



82. Shortly after learning about the result, Dr. Ricanati emailed Parker stating that John Noakes had posted the result of the Title IX Process to the class GroupMe "and students are furious."

83. Many students complained to CWRU administrators; some about the GroupMe Post and some about John Noakes in general.

   a.  A text exchange between a student and one administrator is typical: even though it does not mention the GroupMe post, the administrator promised a response by the school:

      Student:  … I was wondering if you'd be able to shed some light on what is going to happen to [John Noakes.]  It sounds like he's here to stay which I know for a fact make many people uncomfortable and upset

Administrator: Hi… I can assure you that the school is aware of this and is acting quickly…

b. An email from a student sent that evening to another administrator stated that the student was "appalled" not only about the GroupMe post, but "also in regard to the stories that came out several month ago" regarding John Noakes.

c. Another email from a student mentioned the GroupMe Post, but added, "I understand that [John Noakes]… was involved in a sexual assault case earlier this year as the perpetrator of sexual violence."

d. Students' complaints criticized John Noakes for participating in the grievance process. These complaints criticized John Noakes for not accepting Jane Roe's version of events and, instead, defending himself in the Title IX process.

   i. One complaint said, "The student bragged about winning a sexual assault case blatantly in front of the entire class on GroupMe. He showed zero regard for public decency and his facts/his motives seem to be directed toward rubbing it in the face of his accusers."

   ii. Another complaint said, "Following the decision for an institutional sexual assault case in favor of this student, they posted in the class GroupMe in a retaliatory, bullying, and unprofessional manner…. Given that this statement was made after an institutional case was decided in his favor, I am concerned that he will act in an even more erratic and unprofessional way."

84. On April 15, 2021 at 6:43 pm, John Noakes received an email from Darnell Parker, the Senior Associate Vice President for Equity requesting an "urgent conversation" that evening.

a. John Noakes and his advisors participated in a Zoom call with Parker.

b. Parker was visibly upset with the outcome of the hearing panel.

26

    c.   Parker said that he had received "complaints" but would not disclose the sources or any other details.  On information and belief, Parker was acting after consulting with, and at the behest of, Dr. Ricanati.

    d.   Parker admitted that John Noakes had not violated any school rules or policies in his posts and that he was free to discuss the Title IX process with anyone.  He acknowledged during a deposition (page 28) that John Noakes was not required to keep the Title IX process confidential:

> Q  … is there anywhere in the Case Western policy that requires students to keep the Title IX process confidential?
> A No.

    e.   During the Zoom call, Parker sought to intimidate John Noakes.  Parker told John Noakes that he needed to "watch himself."  Parker then hung up on John Noakes and his attorneys.

85. On April 16, 2021 Dr. Ricanati and other administrators sent a whole-school email stating that, "your words have consequences."  He described various forms of unprofessional social media posts, including "gloating over the misfortune of others."  A copy of the email is set forth here:

---------- Forwarded message ----------
From: **Molly Simmons** <mag167@case.edu>
Date: Fri, Apr 16, 2021 at 6:54 PM
Subject: [medicaleducation] [som-admin-notes-classof24] Civil & Professional Communication Standards
To: Med School Administrative Notes Class of 2024 <som-admin-notes-classof24@case.edu>, Med School Administrative
Notes Class of 2023 <som-admin-notes-classof23@case.edu>, Med School Administrative Notes Class of 2022 <som-
admin-notes-classof22@case.edu>, Med School Administrative Notes Class of 2021 <som-admin-notes-
classof21@case.edu>, MSTP Students <mstp-students@case.edu>, CCF Lerner College of Medicine Class of 2021 <cclcm-
classof21@case.edu>, <cclcm-classof22@case.edu>, CCF Lerner College of Medicine Class of 2023 <cclcm-
classof23@case.edu>, CCF Lerner College of Medicine Class of 2024 <cclcm-classof24@case.edu>, CCF Lerner College of
Medicine Class of 2025 <cclcm-classof25@case.edu>


Re: Civility Always - including on electronic forums

Dear students,

The School of Medicine administration wants to affirm that electronic forms of communication must be used in a way
that respects others and builds community. Civil discourse is expected.

In this time of remote learning, we have become dependent on these tools to build connections with one another. We
seek to be explicit about the expectations in these forms of communications.

The following are unprofessional:

    1) Racist, sexist, ethnophobic references
    2) Disclosure of another person's private information
    3) Gloating over the misfortune of others
    4) Language that is meant to bully or intimidate
    5) Inflammatory or accusatory statements

We are sending this message to reiterate that your words have consequences. We must commit ourselves to civil
discussion and disagreement that is respectful and kind at all times.

These are expectations of our profession and of our school.

Sincerely,

1

86. On April 19, 2021, Dr. Ricanati called John Noakes.  Dr. Ricanati appeared to be upset about the outcome of the Title IX process and threatened John Noakes with institutional discipline for undisclosed inappropriate conduct.  Dr. Ricanati attempted to interrogate John Noakes about his GroupMe post but refused to tell John Noakes which, if any, rules were broken. Dr. Ricanati then abruptly hung up this phone call after John Noakes sought to conference in his advisor.  Dr. Ricanati stated that he was "not interested" in talking with John Noakes in the presence of an advisor.

87. After this phone call ended, Dr. Ricanati emailed John Noakes and requested a meeting that same day outside of the presence of an advisor.  In this email, Dr. Ricanati continued to threaten John

Noakes with disciplinary action, stating that "the [PWG/COS disciplinary] process will move forward without your initial input."

88. On April 19, 2021 John Noakes submitted a retaliation complaint against Dr. Ricanati and Dr. Parker with the Office of Equity.

    a.  John Noakes suggested that Dr. Ricanati should not be involved in his matter following the retaliation complaint.  He later asked for this as an interim measure under the Revised Title UX Policy.  John Noakes requested, but was not provided with, other interim supportive measures.  In particular, he requested that any PWG/COS disciplinary process put in motion by Dr. Ricanati be stayed pending the results of the retaliation investigation; this request was not granted.

    b.  Dr. Ricanati refused to remove himself from the situation but, instead, continued to play an active role in this matter.  When John Noakes sought to discuss the recusal issue with Dr. Ricanati, Dr. Ricanati told John Noakes to call the Office of General Counsel.

    c.  The retaliation complaint was forwarded to another Vice President and, ultimately, CWRU retained outside counsel to conduct an investigation.

89. On April 21, 2021, Dr. Ricanati informed John Noakes that Dr. Marjorie Dr. Greenfield, his subordinate, would be in touch about the disciplinary process.  Dr. Greenfield subsequently interrogated John Noakes about his GroupMe post.  She referenced the finding of the Title IX Panel and accused John Noakes of "purposefully misinterpreting why people are upset."

90. Dr. Greenfield was acting at the direction of Dr. Ricanati; for example, Dr. Ricanati wrote the first draft of an email to John Noakes.

91. In late April 2021, Dr. Ricanati and other administrators met with students who wished to see further actions taken against John Noakes.   During these meetings, Dr. Ricanati encouraged students to submit Early Concerns against John Noakes so that the Medical School could begin

the PWG/COS process.  Dr. Ricanati admitted in a deposition that he "educated" students about the PWG/COS process and explained to them that the PWG/COS process could lead to disciplinary action against John Noakes, up to and including his expulsion.

92. On April 21, 2021 Dr. Ricanati sent an email to a close friend of Jane Roe.

   a.  This student later shared the email with the entire medical school class, except John Noakes.  Dr. Ricanati referenced the Title IX case against John Noakes and encouraged the student to invite other students to a meeting to discuss various topics, including "the CWRU Title IX process" and "Identify[ing] potential action items." The "action items" referred to by Dr. Ricanati was the use of the PWG/COS process to discipline John Noakes.   John Noakes was not informed of the meeting by Dr. Ricanati or any other CWRU faculty.  A copy of the message is here:



b. On April 26, 2021 Dr. Ricanati and other CWRU administrators, including representatives of the Title IX Office, met with some students, to discuss the matter.   John Noakes was not present at this meeting.   During this meeting, Dr. Ricanati again tacitly encouraged students to file complaints against John Noakes.  He did this by again informing students that the School of Medicine has a process that could be utilized – the PWG/COS process – to impose discipline on John Noakes.

93. Between April 25, 2021 and April 28, 2021, following the suggestion of Dr. Ricanati, twenty-nine different students submitted early concerns addressing John Noakes.

94. The early concerns submitted between April 25, 2021 and April 28, 2021 were not limited to the GroupMe Post but, instead, often focused on a belief that John Noakes had assaulted Jane Roe.

a. Several of the Early Concerns complained that John Noakes committed sexual misconduct despite the finding in his favor by the hearing panel. These early concerns state that John Noakes should not have defended himself in the Title IX proceedings but, instead, should have admitted responsibility and been punished. These Early Concerns included statements such as "Title IX may have found him innocent, but I am first hand witness to the pain he has caused my classmate and friend…" Other Early Concerns accused John Noakes of showing a "Lack of remorse for sexual assault proceedings."

b. Many of the Early Concerns were not merely directed at the GroupMe post, but also expressed a belief that John Noakes was "guilty" of sexual misconduct and should be removed from the medical school. These Early Concerns included statements such as "I do not believe that any of us are safe with a sexual predator in our midst" and "He should not be allowed to continue as a medical student and become a physician."

c. The submission of the Early Concerns was a coordinated action by some students and friends of Jane Roe with the tacit encouragement and support of both Jane Roe and CWRU administrators.

95. On April 26, 2021, during an exchange of emails with Dr. Greenfield, John Noakes expressed concerns that the "PWG process… is retaliatory in nature" and declined to participate.

a. John Noakes was concerned that Dr. Ricanati was continuing to oversee the process. When Dr. Greenfield sent a copy of his message to Dr. Ricanati, John Noakes expressed "concern" with Dr. Ricanati's "ongoing involvement in this matter" due to his retaliation complaint. He was told by that "the medical school will proceed with the process without your active participation."

b. John Noakes attempted to participate in "coaching" recommended by the PWG. However, he soon discovered that completing the coaching was an impossible task. The

coaching was intended to focus on "empathy."  In particular, John Noakes was requested to show empathy towards Jane Roe even though he was completely innocent of the allegations Jane Roe made against him, had been found "not responsible" by a CWRU hearing panel, and was continuing to suffer harassment and retaliation from Jane Roe and other students.  The empathy he was supposed to demonstrate is consistent with some of the comments found in the early concerns submitted by students.

c.  The empathy towards Jane Roe that the coaching essentially required John Noakes to admit that he had sexually assaulted Jane Roe.  Aside from the fact that this would be a lie, John Noakes was fearful that if he told the coaches what they wanted to hear, this "admission" would be used against him to re-open the Title IX hearing or, even, cause him to face civil or criminal liability.

d.  On information and belief, the PWG coaching was intended to set John Noakes up to fail so that CWRU could justify imposing disciplinary sanctions on him even though he had been exonerated by the Title IX process.

96. On April 27, 2021 John Noakes was informed that his matter would be referred to the COS for disciplinary action, including possible dismissal.

97. Over the next several weeks, John Noakes objected to a number of CWRU officials that the COS process was retaliatory.  John Noakes requested that the COS process be stayed as an interim, supportive, measure while his retaliation complaints were investigated.  No action was taken.

a.  On April 27, 2021, John Noakes reached out to Shirley Mosley, Dean of Students, to halt the retaliatory activity. Shirley Mosley took note of this concern, but no action was taken.

b.  On April 28, 2021, John Noakes reached out to CWRU Vice President Robert Solomon. John Noakes was notified that Solomon was on vacation and that he would address John Noakes's request upon return. John Noakes never received a response.

33

    c.  On April 30, 2021, John Noakes reached out to Parker.  Parker replied that "all questions and concerns should be directed to [the external investigators]."  John Noakes proceeded to reach out to the investigators by email.  His requests were ignored.  During a subsequent interview related to the retaliation complaint against Dr. Parker and Dr. Ricanati, John Noakes requested that the investigators intervene to halt the COS process on an interim basis. No action was taken.

98. On May 6, 2021, John Noakes met with Dr. Greenfield.  During this meeting, Dr. Greenfield indicated that that she was acting at the direction of Dr. Ricanati, stating, "he's my boss."

    a.  Dr. Greenfield informed John Noakes that the School of Medicine will be conducting a review of John Noakes's Title IX decision to determine if any additional disciplinary sanctions need to be issued.

    b.  John Noakes attempted to conference in his advisor.  Dr. Greenfield informed John Noakes that she was barred from discussing this matter with his advisor because his advisor was an attorney.

    c.  Dr. Greenfield accused John Noakes of not having "empathy" in regard to his dispute with Jane Roe and his GroupMe post.  She told John Noakes that "if you can show insight into how other people may have been affected, and you can show empathy for other people, then [the COS] will not kick you out of school."  Dr. Greenfield acknowledged that the COS would not be reviewing his matter had there been no Title IX proceedings.

99. On May 13, 2021, John Noakes's matter appeared before the COS.

    a.  The committee engaged in in first-level factfinding to resolve a disputed, objective question about whether John Noakes intended the GroupMe Post to be hostile or intimidating.

b. The committee interrogated John Noakes and asked him how he expects to finish his medical school curriculum in light of the dispute with Jane Roe. The COS did not expel John Noakes. However, John Noakes was ordered to undergo empathy coaching and provide a letter from a behavioral therapist stating that he is receiving therapy.

100. On May 25, 2021 – the same date that John Noakes' matter was reviewed by the PWG, Jane Roe sent a lengthy email to school administrators decrying the lack of action against John Noakes. The email from Jane Roe does not even mention the GroupMe Post but demands action because John Noakes sexually assaulted her and the Title IX process did not result in his removal from the school. Dr. Ricanati responded to Jane Roe's email by affirming her underlying factual claims, stating, "I am sorry that this happened and I acknowledge the toll on your life and education."

101. Dr. Greenfield attempted to coerce and pressure John Noakes to take the next year off in order to accommodate the desires of Jane Roe. On July 28, 2021, Dr. Greenfield asked via email about his decision, stating, "once it is definite please let me know if it is OK to tell [Jane Roe]. She has been asking about her assignments this year." When John Noakes informed Dr. Greenfield that he did not wish to delay his education, Dr. Greenfield responded that, "It seemed like a great opportunity! … and would naturally separate you from [Jane Roe]. If people are advising not to do it because it seems like 'caving' or like admitting something, I would totally disagree. You have a terrific opportunity, AND we can't predict how inflamed the class is."

102. On August 19, 2021 the COS again had another meeting concerning John Noakes. John Noakes did not participate in this meeting. John Noakes was required to continue with "coaching for the remediation of professionalism lapses and present a new reflection at the November COS meeting."

103. During the summer of 2021, Parker left CWRU. He was replaced as CWRU Title IX Coordinator by Rachel Lutner.

35

104.    John Noakes filed this lawsuit on September 15, 2021.

105.    On September 10, 2020 Lutner informed John Noakes that Jane Roe's complaints against John Noakes related to the GroupMe post would not be pursued by the Title IX Office.

    a.  This decision was unduly delayed, especially considering that no investigation occurred and Parker had admitted during the Zoom conference that John Noakes had not violated any CWRU policies.

    b.  Lutner determined that the post did not violate any No Contact Directive in place at the time.  Lutner also determined that the GroupMe post did not constitute prohibited retaliation.

    c.  Lutner indicated that the matter would be referred to the Medical School for disciplinary action.  She wrote:

> Notwithstanding that the name change… neither violated the No Contact Directive nor the retaliation provisions of the Interim Sexual Harassment Policy, your conduct certainly could be interpreted as unprofessional and may violate other university professionalism requirements. Your conduct had the effect of violating your obligation to respect the confidentiality of the process, sharing private information with your class, and creating chatter about a manner which professionalism dictates you behave discreetly.

106.    On December 20, 2021, prior to a preliminary injunction hearing in this Court, John Noakes and CWRU entered into a Confidential Agreement that resulted in the termination of the COS proceedings.[2]

---

[2] This Confidential Agreement resolved the ongoing disciplinary matter, but was not a settlement of the claims in this Litigation.

**THE HARASSMENT OF NOAKES**

107.   Most of the medical school class and faculty was aware of Jane Roe's allegations against John Noakes.  John Noakes generally did not discuss the matter.  However, Jane Roe spoke to numerous people about her allegations and consistently disparaged John Noakes.

108.   During the late fall of 2020 and winter of 2021, on information and belief, Jane Roe encouraged the creation of a committee of medical students to organize methods to intimidate, embarrass, harass, and punish John Noakes for participating in a Title IX investigation.  Jane Roe and her friends continued to disparage John Noakes and suggest that he had engaged in sexual misconduct.  Faculty at the Medical School, with the knowledge of Dr. Ricanati, also made efforts to ostracize John Noakes.

109.   The retaliatory harassment against John Noakes included:

a.   John Noakes was excluded from study groups and class activities.  For example, in February 2021 John Noakes was not paired with another medical student for ultrasound, as was the practice for every other medical student.

b.   On February 19, 2021, Jane Roe violated the no contact directive by attempting to FaceTime John Noakes.  (John Noakes immediately reported this violation to the Office of Equity.  The Office of Equity decided that the contact was an "accident" and took no further action.)

c.   Jane Roe posted about the matter to the #cwrusurvivors Instagram account.

d.   One of Jane Roe's friends referred to John Noakes as "scum of the earth" while John Noakes was attempting to lead a group discussion.  On April 20, 2021 a note posted in restroom at Medical School:  "1st year Med Student [John Noakes] is a RAPIST!  Why is he still here?  Share and seek justice."

37

e.  On or about April 25, 2021 a Class Survey was circulated online.  This Class Survey mentioned John Noakes by name and indicated that it was "gauging levels of concern regarding gender-based violence…"  The survey suggested that John Noakes should not remain in the School of Medicine.  The Class Survey also included a link for students to submit "Early Concerns" about John Noakes.

f.  On or about May 5, 2021, Students circulated a Petition encouraging their classmates to refuse to work with John Noakes and demanding that "the School of Medicine ought to take clear and decisive action by expelling [John Noakes]."

g.  On August 9, 2021 Jane Roe walked into class several minutes late, walked up to John Noakes while he with his mother.  John Noakes' mother is a physician who has been welcome on campus previously.  Jane Roe then falsely stated on Twitter that John Noakes' mother was present to intimidate her.

h.  On various dates between August 25, 2021 and October 19, 2021 Jane Roe intentionally violated the "no contact" directives issued by CWRU.  On information and belief, Jane Roe took these actions, in part, as part of an effort to provoke a response from John Noakes in order to justify disciplinary action by the school.

i.  Jane Roe made posts to Instagram and other online social media sites designed to embarrass, harass, or punish John Noakes for engaging in protected activity.  These posts include posts that refer to John Noakes as a narcissist and sociopath.  Although the posts do not mention John Noakes by name, due to Jane Roe's numerous statements about John Noakes, the medical school community is aware that Jane Roe was referring to John Noakes.

110.  John Noakes also submitted complaints to CWRU that Jane Roe and other medical students had engaged in retaliatory conduct.

38

a. John Noakes specifically complained that following the April 15, 2021 decision Jane Roe and other students had engaged in a sustained pattern of conduct designed to embarrass, harass or punish John Noakes for engaging in protected activity.  The individual acts, which might, on their own or looked at individually, not constitute retaliation or harassment, together constitutes a deliberate pattern of conduct and retaliation.

b. John Noakes indicated to the CWRU investigators that the conduct of Jane Roe and her friends has resulted in his exclusion from the curriculum and that he is unable to participate fully in his education.   During his January 19, 2021 interview, John Noakes told the investigator that he was being excluded from educational opportunities because of the allegations and harassment from other students as a result of information shared by Jane Roe.

c. In January 2021, John Noakes expressed concerns to Dr. Ricanati and other faculty members that he was being excluded from educational opportunities because of the allegations and harassment from other students as a result of information shared by Jane Roe.  Dr. Ricanati told John Noakes that he should get therapy, and that to suggest that therapy is unnecessary is "medically uninformed" and "toxic masculinity."

d. On February 8, 2021 John Noakes again informed the investigators that he was being harassed and retaliated against and requested interim supportive measures.

111.   CWRU administrators declined to take any actions against the students who were harassing and bullying John Noakes.

a. Administrators at the Medical School knew that the Petition and Class Survey were inappropriate yet took no action.   Dr. Greenfield testified in a deposition, "It was inappropriate for a person to survey the class in this way about a student that was involved in Title -- Well, just about any student."   She also testified that the Petition raised

39

professionalism concerns: "It's inappropriate to have a petition like this coming from students."  Dr. Ricanati spoke with one involved student but refused to take disciplinary or other action to stop the harassment.

b.  On June 15, 2021, Dr. Ricanati received an email from another administrator.  This email included a complaint from a medical student stating that his/her classmates were "belittling or humiliating" John Noakes and "ignoring him and excluding him from groups."  Dr. Ricanati did not take any action in response to this information.



112.  On August 25, 2021, John Noakes was informed by Lutner that CWRU was imposing a new No Contact Directive, "at the request of [Jane Roe]."  CWRU imposed this, and other, No Contact Directives on John Noakes even though he had been cleared of all wrongdoing.  These No Contact Directives imposed onerous and punitive restrictions on John Noakes and interfered with his ability to participate fully in his education.  John Noakes's movement was restricted to the southwest sections of the medical school campus and all classrooms; he was only permitted to use the southwest stairwell.  John Noakes was also barred from posting on social media about his Title IX case.  Similar restrictions were placed on Jane Roe.

113.    On August 27, 2021, and August 30, 2021, Jane Roe again violated the No Contact Directive. John Noakes reported these violations and subsequently submitted evidence and photographs proving that Jane Roe was not complying with the No Contact Directive and suggested that she was deliberately attempting to provoke him.

    a.  On August 30, 2021, Lutner informed John Noakes that CWRU would not be taking any action regarding the violations that he reported.  Lutner decided to revoke the updates to the No Contact Directive, stating only that CWRU expected John Noakes and Jane Roe to "stay as far away from each other as possible."

    b.  Lutner informed John Noakes that Jane Roe had alleged that John Noakes had committed multiple violations.  These allegations were false and retaliatory.  John Noakes denied any violations and suggested that the allegations were false and retaliatory.  John Noakes requested details of the allegations so he could provide evidence that they were fabricated; Lutner refused to tell John Noakes the details of the alleged violations and failed to investigate whether Jane Roe's reports were, in fact, retaliatory and harassing.

114.    John Noakes complained to Lutner that, beginning in early August 2021, when school re-started, Jane Roe and her friends engaged in a pattern of harassing and intimidating behavior and that this conduct was interfering in his ability to complete his education.  He requested interim supportive measures.  Lutner informed John Noakes that CWRU would not be taking any action related to these alleged violations.   CWRU did not provide John Noakes with any interim supportive measures.

115.    John Noakes continued to recount the persistent violations, stalking, and intimidating behavior to his empathy coaches, who were CWRU employees subject to the school's mandatory reporting requirements.  John Noakes was so distraught by the situation that he was in tears.  He was informed that he should accept the situation and not expect the situation to change in the

41

next year.  John Noakes was told that CWRU would not help him but that, instead, he should instead "put his blinders on" while on campus.

116.    On September 1, 2021, John Noakes again met with Dr. Greenfield.  She informed them that she had been talking to Doe's empathy coaches and that she hears that "things are not going well."

 a. John Noakes recounted the persistent violations, stalking, and intimidating behavior by Jane Roe to Dr. Greenfield.  In response, Dr. Greenfield said that she feels sorry that John Noakes did not take a year off; she suggested that taking a year off was the "only solution."

 b. Dr. Greenfield stated that Title IX only makes things worse, and even though it is the "legal thing to do," John Noakes should not pursue Title IX complaints or consult lawyers.  Dr. Greenfield indicated that even though "this is unfair" to John Noakes, in the end Title IX "only creates a toxic environment."

 c. Greenfield warned that bad things could happen to John Noakes if he pursued his Title IX complaint against Jane Roe.

117.    CWRU administrators were aware that Jane Roe was likely behind much of the harassment of John Noakes.

 a. On May 15, 2021, Jane Roe was informed by a CWRU administrator that PWG/COS will not be dismissing John Noakes.  A text message in a group of administrators, including Dr. Ricanati and Dr. Greenfield, said, "She [Jane Roe] might spread the word.  Wanted you to know in case it becomes [a medical student] thing."

 b. Jane Roe continued to share information, including correspondence between her and the Office of Equity, with other students she knew or reasonably should have known would then use that information in a manner that was designed to embarrass, harass, or punish John Noakes for defending himself in the Title IX proceedings and complaining to the CWRU Office of Equity that she had subjected him to harassment.

c.  After learning of the existence of the harassment, including the Class Survey and Petition, Jane Roe continued to share information including correspondence between her and the Office of Equity, with someone she knew or reasonably should have known would then use that information in a manner that was designed to embarrass, harass, or punish John Noakes for defending himself in the Title IX proceedings and complaining to the CWRU Office of Equity that she had subjected him to harassment.  Further, such information was circulated in such a manner that was designed to embarrass, harass, or punish John Noakes for defending himself in the Title IX proceedings and complaining to the CWRU Office of Equity that she had subjected him to harassment.

d.  Jane Roe, after learning of the existence of the existence of the harassment, including the Class Survey and Petition, declined to take steps to stop other students from engaging in this conduct.

e.  After learning of the existence of the harassment, including the Class Survey and Petition, Jane Roe declined to identify the name of the person responsible for the harassment when the level of detail in the information indicated that the harassment was conducted by someone very close to her.

**THE SHAM INVESTIGATIONS OF JOHN NOAKES'S COMPLAINTS**

118.  On August 31, 2021, John Noakes emailed Lutner about the harassment from Jane Roe and retaliation from others.

a.  John Noakes indicated that he wished for CWRU to investigate his initial complaint against Jane Roe.

b.  John Noakes indicated that he wished for CWRU to investigate the pattern of harassment and intimidation by Jane Roe.

43

      c.   John Noakes indicated that he wished CWRU to investigate retaliation against him as a result of his participating in the Title IX process.

      d.   John Noakes indicated that he wanted interim supportive measures.

119.   On September 3, 2021, John Noakes and his advisor spoke with Lutner.  John Noakes indicated his desire to move forward with his original Title IX complaint against Jane Roe.  John Noakes provided Lutner with information indicating that Jane Roe had, *inter alia,* threatened to file a Title IX complaint against John Noakes after expressing frustration about the state of the relationship.  John Noakes further provided evidence to the Title IX Office that Jane Roe had harassed him by accusing him of rape and "gaslighting" and called him names like "liar," "horrible person," and "disgusting asshole."  Jane Roe admitted that she had posted to the #cwrusurvivors Instagram account, but then apologized for threatening to file a Title IX complaint against John Noakes.  Finally, John Noakes also provided evidence that he has asked Jane Roe to not threaten him and disparage him to his peers in the medical school.

120.   On October 6, 2021 CWRU completed the investigation into John Noakes' claim of retaliation against Dr. Ricanati and Parker.  This investigation was a sham.

      a.   The so-called investigation took almost six months yet consisted only of a handful of basic interviews.  Unsurprisingly, Dr. Ricanati and Parker denied any misconduct.  The Investigator accepted these denials at face value and never tested those denials through follow-up interviews or reviews of contemporaneous written communications.

      b.   The investigation was woefully incomplete and unduly delayed.  The delay likely has caused memories to fade and evidence to disappear.

      c.   The investigator focused exclusively on the Zoom conference between Parker, John Noakes, and John Noakes' advisors and did not investigate the broader pattern of retaliation.  Worse… even though the investigator believed that the Zoom conference was

44

important (and it was), the investigators never interviewed all of the participants on the conference.  In particular, the investigator never sought to interview John Noakes' advisors.

d.  The investigator failed to obtain evidence that would confirm or dispel Parker's claimed motivation.  In particular, the investigator does not appear to have sought evidence related to communications between Parker and Dr. Ricanati that resulted in the decision to reach out to the John Noakes. Parker and Dr. Ricanati were not interviewed about any conversations and any electronic communications between the two on that evening was not requested.

e.  The investigator never verified whether any complaints from students actually existed or sought to determine whether any such complaints (if they did exist) may have been motivated by an improper retaliatory purpose.

f.  The investigator failed to verify other important information.  For example, there was mention of Early Concerns as providing legitimate motivations for actions, but the investigator did not initially review these materials to confirm that they, in fact, existed.

g.  The investigator failed to consider the role Jane Roe played; she was not interviewed and her communications with CWRU administrators were not reviewed.

121.  On November 8, 2021, the Office of Equity determined that no action would be taken on John Noakes' claim of retaliation against Dr. Ricanati and Parker.

a.  The Office of Equity generally accepted the version of facts offered by Dr. Ricanati and Parker without question.  The Office of Equity declined to schedule a hearing to resolve disputed factual matters.

b.  The Office of Equity determined that John Noakes had not suffered any adverse actions as a result of the conduct of Dr. Ricanati and Parker.  Notably, the letter focused on the

45

actual impact on John Noakes and failed to consider the appropriate legal standard, *i.e.* whether, under these facts, the action was sufficient to dissuade students like John Noakes from engaging in protected activity.

c. The Office of Equity's Letter included false statements about the Medical School's review of Title IX complaints.  The Letter states, "The undisputed facts learned in the investigation are that the Medical School's practice is to review Investigation Reports prepared pursuant to the [Sexual Misconduct Policy]…"  This, as described *supra*, is false; the Medical School has never previously conducted such a review and no policy permits such a review.

d. The Office of Equity's Letter included false statements about the Early Concerns submitted against John Noakes.  The Letter states that the Title IX Coordinator reviewed the Early Concerns and "concluded from the review that the Early Concerns exist [and] were prepared by medical students in response to" the GroupMe Post.  This, as described *supra*, is false; many of the Early Concerns expressed the view that John Noakes should be disciplined because the author believed he was guilty of sexual misconduct.

122. On September 10, 2021 Lutner informed John Noakes that CWRU would not be investigating or taking any action in response to his original complaints against Jane Roe.

a. Lutner claimed that Jane Roe's threats to file a Title IX complaint are not prohibited by the policy because she "subsequently filed a Title IX complaint which was sufficiently substantive to warrant an investigation and subsequent hearing."  Lutner also claimed that Jane Roe's pattern of conduct did "not constitute sexual harassment, which is the only kind of harassment prohibited by the Policy" because her communications "are based on the state of the relationship with you and her self-perception."

    b. Lutner claimed that Jane Roe's pattern of harassment in August 2021 was not harassment "based on sex" and did not make John Noakes fearful but failed to consider whether Jane Roe's conduct caused John Noakes mental distress or was retaliatory.

    c. John Noakes appealed this decision; his appeal was denied.

123. On November 29, 2021, John Noakes was informed that CWRU would be investigating his allegations that Jane Roe and other students had engaged in retaliatory conduct based on the Petition, Class survey and other related harassment.

124. The investigative process into the allegations that Jane Roe and other students had engaged in retaliatory conduct is not – as of the date of this Amended Complaint – complete. These investigations have taken far beyond the 60-75 business days indicated for the completion of the entire process described in the Revised Title IX Policy. On information and belief, CWRU did not act diligently to avoid all undue delays within its control and never provided John Noakes with the written notice of the reasons for an extension required by the Revised Title IX Policy.

125. John Noakes received a copy of a draft investigation report. The investigation so far has been biased, incomplete and designed to exonerate the accused students.

    a. The investigation was improperly limited in scope.

        i. The CWRU Office of Equity previously had found that students engaged in retaliatory conduct merely by sharing information from an investigation and hearing on Title IX complaints. However, the investigation failed to consider all instance where Jane Roe and other students had communicated information about the investigation, hearing, or underlying conduct in a manner that was designed to embarrass, harass, or punish John Noakes for participating in the Title IX process.

        ii. The CWRU Office of Equity had previously found that students engaged in retaliatory conduct if after learning of the existence of potentially retaliatory

47

actions, the student declined to take steps to stop the persons responsible. However, the investigation failed to consider all instances where Jane Roe and other students were informed of the existence of the petition, survey, early concerns, and other harassment but declined to take action to stop the person responsible.

    iii. The CWRU Office of Equity had previously found that students engaged in retaliatory conduct if after learning of the existence of potentially retaliatory actions, the student declined to identify the persons responsible, However, the investigation failed to consider whether after learning of the existence of the petition, survey and early concerns, Jane Roe declined to identify the name of the person responsible when the level of detail in the information indicated that the activity was by her or someone very close to her.

b. The investigation failed to seek significant and important evidence.

    i. The investigators failed to investigate the source of the information about John Noakes that then found its way to the petition and survey. The investigation also failed to include copies of the Early Concerns. On information and belief, the failure to include copies of the Early Concerns was part of an effort to minimize the misconduct of Jane Roe. Many of the Early Concerns expressed a belief that John Noakes was "guilty" of sexual misconduct and should be removed from the medical school based on information that could only have been provided by Jane Roe.

    ii. The investigators did not make a thorough search of electronic evidence in the possession and control of CWRU, such as emails from school accounts.

iii. One student who was interviewed initially provided testimony identifying the students responsible for drafting and circulating the Petition and Class Survey. The Student then sought to substantially alter her testimony. The investigators did not follow-up on the reason for the changed testimony or explore the possibility of improper tampering with the witness.

c. John Noakes had indicated that many Medical Students would only provide information if promised anonymity because of fears of retaliation. Even though the Title IX Office had, in other investigations, agreed to redact student names, the investigator initially refused to do so in this investigation.

d. On information and belief, the investigation was only initiated in order to create the appearance of fairness to help in this Litigation. The existence of the investigation may be a subsequent remedial measure that should not be considered in evaluating wither CWRU ignore John Noakes' complaints. *See* Evid. R. 407.

126. John Noakes has continued to be harassed and ostracized through the Spring and Summer of 2022. In June 2022, John Noakes began clinical rotations at the hospital. A close friend of Jane Roe, a fourth-year medical student was assigned to supervise John Noakes as "acting intern." This student treated John Noakes differently than other students. This student overloaded John Noakes' schedule so that he could not adequately prepare for presentations. This student referred to John Noakes as a "narcissist," disparaged John Noakes in front of faculty and other doctors as "not really interested in learning anything," discouraged him for asking from help from attending physicians and sought to sabotage his performance by giving him incorrect information about cases. John Noakes was also excluded from the sharing of study resources and other materials that this student made available to other students she supervised. This student's actions are likely to have a negative impact on the subjective grades given by residents.

49

## THE RETALIATORY TUMBLR INVESTIGATION

127.    In the summer of 2021, a friend of John Noakes, MM, created a Tumblr, or blog, intended to highlight the unfairness of the CWRU Title IX process.  MM is a resident of Canada; MM is not a student at CWRU.

128.    MM "met" John Noakes on a social media platform for students and others who have been falsely accused of sexual misconduct mostly by colleges and universities.  They became good friends and would often communicate either by phone or SnapChat.

129.    The Tumblr contains information about John Noakes' relationship with Jane Roe, including copies of text messages between John Noakes and Jane Roe.  John Noakes shared with MM the materials MM used in the Tumblr as part of their friendship.

130.    The Tumblr contains information about the investigation by CWRU into the allegations that John Noakes committed sexual misconduct.

131.    John Noakes did not create the Tumblr, direct MM to create the Tumblr, encourage MM to create the Tumblr, or take any steps to publicize the Tumblr.  In fact, John Noakes was not even aware of the Tumblr until many weeks after its creation.

132.    The Tumblr includes information about the relationship between John Noakes and Jane Roe and is critical of the CWRU Title IX process.  The Tumblr claims to be directed "To the students in [John Noakes'] class, whether you remained silent or participated in the distortion campaign." In a separate post, MM explains that "The medical school refused to accept the Title IX decision so they did an additional review of the investigation report of the title IX process."

133.    MM had previously attempted to raise some of the issues addressed in the Tumblr with CWRU officials.

    a.    In the spring of 2021, MM reached out to the Title IX Office to share concerns about John Noakes' health and well-being.  MM submitted a "Care Report" on CWRU website

and eventually spoke to spoke to Shirley Mosley, Associate Vice President for Student Affairs & Dean of Students.  MM told Mosley that John Noakes was the victim of retaliation and that he needed additional resources.  Mosley did not take any actions to support Noakes.

b. In the summer of 2021, MM spoke to Dr. Greenfield.  MM told Dr. Greenfield that John Noakes was the victim of retaliation, and that he needed additional resources.  Dr. Greenfield did not take any actions to support Noakes.

134. MM created the Tumblr, in part, to publicize her concern that the prior online criticism of CWRU not taking seriously complaints of female students alleging sexual assault by male students would lead the school to try to make an example out of John Noakes.  This concern was solidified when a student who involved with "MeTooCWRU" told MM, "I know [John Noakes] is guilty because everyone says so."  Shortly after that conversation with the CWRU student, MM decided to start the Tumblr to share information and evidence with other CWRU students.

135. MM had three purposes in creating the Tumblr:

a. MM hoped to open the minds of other medical students and students in #MeToo group. MM hoped that if they knew the actual facts, they would accept that John Noakes was "not guilty" and stop harassing and ostracizing him at school.

b. MM was frustrated at the fact that CWRU was not taking seriously the retaliation and harassment against John Noakes.  MM believed that John Noakes was being silenced and punished while others were allowed to cause him embarrassment and distress with impunity.

c. MM wanted to share her criticism of the CWRU Title IX process.  She hoped to point out the flaws in the system so that the school would respond in a different manner in the future.

136.   MM did not create the Tumblr to embarrass intimidate, threaten, coerce, or harass Jane Roe or cause her any mental distress.  In fact, MM went out of her way to make sure that Jane Roe could not be identified in the Tumblr.  MM redacted Jane Roe's name in all of the documents she posted.  She even changed Jane Roe' initials – the Tumblr refers to Jane Roe as "ATL" but those are not her real initials.

137.   MM linked to the Tumblr in an Instagram page.  People at the medical school started to follow MM and share the links.  MM received a number of direct messages with medical students.  One message, which likely was from Jane Roe, saying, "Stop trying to gaslight our entire class."   MM also received some anonymous comments supporting the page.

138.   On September 7, 2021 John Noakes spoke with Dr. Greenfield.

    a.   Dr. Greenfield wanted to discuss the Tumblr created by MM.  John Noakes had no specific knowledge of any Tumblr post (other than a brief and nondescript mention by another medical student) and initially thought Dr. Greenfield was referring to yet another petition from Jane Roe and her friends to have him removed from the school.

        i.   Dr. Greenfield did not provide any further information about the alleged Tumblr post (such as a link) nor did Dr. Greenfield explain how the posts would violate any CWRU rule or policy.  Dr. Greenfield told John Noakes that even if someone else was posting information online, it was his responsibility to "de-escalate" the situation.

        ii.   Dr. Greenfield threatened that John Noakes could get in trouble for the Tumblr, even if was done without his knowledge, suggesting that it was "yet another assault on [Jane Roe]."

52

b. During the phone call, John Noakes told Dr. Greenfield that he did not want to take a year off from his medical school studies. Dr. Greenfield responded to John Noakes, "the only way out of this for you… is… [to] step into a different class."

c. During the phone call, Dr. Greenfield tried to convince John Noakes to not pursue his Title IX Complaint against Jane Roe and threatened him with discipline if he did not comply.

   i. Dr. Greenfield told John Noakes, "you need to not make your own Title IX report… You need to just hunker down and do your own stuff if you're going to stay in the class."

   ii. Dr. Greenfield told John Noakes that in response to continued harassment from Jane Roe, he should "do the Martin Luther King approach, you know, just turn the other cheek."

d. During the phone call, Dr. Greenfield tried to convince John Noakes to not pursue his retaliation complaints.

   i. Dr. Greenfield told John Noakes that the retaliation complaints were "ill advised."

   ii. Dr. Greenfield told John Noakes, "Even if the unfairness of the situation is galling, I think what's going to be in your interest… to just say I'm just going to accept it as it is."

e. During the phone call, Dr. Greenfield threatened John Noakes with further disciplinary action if he continued with his Title IX complaints or continued to object to unfair and retaliatory treatment.

   i. Dr. Greenfield told John Noakes, "You're digging yourself a hole, honey."

ii.   Dr. Greenfield told John Noakes, "I can't protect you.  You know, you have to make a decision about how you're going to behave through this, and I think you are making some poor decisions…."

iii.  Dr. Greenfield told John Noakes that he needed to stop "looking like you're causing problems."  She added, "I know it doesn't feel fair.  I know you feel like you know that things aren't being done in a fair way, but I'm just talking from a practical sense."

139.   On September 8, 2021, John Noakes sent an email to Lutner.  In the email, John Noakes stated "I want to inform you that Dr. Greenfield, my society dean, has just called me and is attempting to coerce me into backing out of my Title IX complaint filed against [Jane Roe]."  John Noakes also requested more information about the alleged Tumblr post.  Lutner refused to provide more information about the Tumblr post or investigate the alleged intimidation and retaliation.

140.   On September 10, 202 Lutner sent an email to John Noakes about the Tumblr.  She acknowledged that the Tumblr was not from John Noakes, but from a "person who described him/herself as very close to you…" and suggested the Tumblr was from John Noakes' current girlfriend.  Lutner said that John Noakes must "investigate who might be responsible for these Tumblr posts and ask them to stop."  She threatened him with discipline if the author of the Tumblr (who, again, is not John Noakes) did not stop.  John Noakes responded, "I have no knowledge of who is making the Tumblr posts and have not directed anyone to make such posts. I am under no obligation to investigate the conduct of other people. Nor can I be held responsible for the conduct of others."

141.   On September 21, 2021 – less than a week after this lawsuit was filed – CWRU informed John Noakes that it would be initiating an investigation into the Tumblr matter.

54

    a.  CWRU staff have claimed that the decision to initiate the investigation into the Tumblr was made prior to filing of the Complaint in this case.

       i.  Records produced by CWRU suggest some inquires had been made prior to the filing of the lawsuit, but no formal investigation had started.

      ii.  CWRU has not explained why, if a decision to begin a formal investigation was made prior to the filing of this lawsuit, notice to John Noakes was not provided until approximately six days after this lawsuit was filed.

    b.  CWRU alleged that John Noakes had retaliated against Jane Roe by, *inter alia*, sharing "confidential information" from the Title IX hearing and Jane Roe's correspondence and threats.  CWRU also alleged that John Noakes was required to "cease sharing information including screenshots of your communications with [Jane Roe] in 2020 and correspondence between you and the Office for Equity in September 2021" and "take steps to stop the person who is posting information to the Tumblr Account…"

    c.  Notably, none of the actions described in the Notice provided to John Noakes are violations of any CWRU policy.  In fact, John Noakes had been told by Parker that he was free to share information about the Title IX process.

    d.  CWRU decided to pursue the allegations against John Noakes even though the Tumblr did not mention Jane Roe's name.  On information and belief, CWRU was motivated to pursue these allegations against John Noakes because the Tumblr was critical of the CWRU Title IX process.

142.  CWRU was in possession of information that John Noakes was not responsible for the Tumblr.

    a.  Prior to beginning an official investigation, CWRU attempted to track access to the website by CWRU students.  No evidence linking John Noakes to the Tumblr was found.

b. During the course of the investigation into the Tumblr, John Noakes provided CWRU with a signed affidavit from MM. This Affidavit established that John Noakes had no knowledge of the Tumblr prior to its publication, had no control over the Tumblr, and did not direct or encourage the author to create the Tumblr.

143. On December 1, 2021, John Noakes was informed that the Investigation into the Tumblr was complete and that the matter would be scheduled for a hearing.

144. The investigation had a number of significant flaws:

a. The investigation uncovered false and fraudulent statements by Jane Roe. Specifically, Jane Roe submitted fabricated documents falsely suggesting that her name was listed on the Tumblr. The investigators did not follow up on this information.

b. The investigators did not interview key witnesses.

c. The investigators did not permit MM to correct inaccuracies in the summary of her statement in the investigation report.

d. The investigators failed to consider evidence that the allegations were retaliatory. In particular the investigators failed to consider evidence that Jane Roe, other medical students, and CWRU administrators were disappointed in the outcome of the prior Title IX matter and have used this process and the medical school professionalism process to harass and intimidate John Noakes.

145. CWRU rushed the hearing process, scheduling the hearing for the last day of the semester as students would be studying for exams. John Noakes asked for a continuance of the hearing for multiple reasons; these requests were all denied by Lutner.

a. John Noakes was informed in the hearing notice that the hearing would be conducted in accordance with "Process B."

    b.  John Noakes was informed that during the hearing he could communicate with his advisor. The Hearing Notice states, "Since the hearing will be conducted by Zoom, if the advisor is not in the same room, you may mute your microphone and speak with your advisor by phone."

    c.  John Noakes was informed in the hearing notice that even though nothing in CWRU policies requires students to maintain confidentiality, the hearing could not be recorded; John Noakes would be permitted to listen to the "recording in a controlled environment determined by the Title IX Coordinator or designee."

146.    The Hearing Panel included individuals who had prior knowledge of or experience with any matter involving John Noakes and Jane Roe.  The chair of the Hearing Panel had served on the panel that heard Jane Roe's complaint against John Roe.  As a result, these panel members were exposed to character evidence and other allegations of misconduct against John Noakes.  In a subsequent email, the Title IX Coordinator indicated that decision-makers should have "no prior knowledge or experience with" the complainant or respondent – yet this rule was not followed for John Noakes.

147.    CWRU improperly designated the allegations as occurring under 'Process B.'  On information and belief, CWRU made this decision to limit the procedural protections available for John Noakes under federal regulations.  During the hearing, John Noakes was denied the right to have his attorney question adverse witnesses, as required by Federal Regulations. 34 CFR § 106.45(b)(6)(i) ("At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility.").

148.    A number of procedural irregularities occurred during the hearing:

a. The hearing panel relied on information from an Investigator who was not present at the hearing to testify or be cross-examined.

b. The Title IX coordinator and Panel Chair interrupted the hearing to interject many times, cut off questioning, and prevented John Noakes and his advisors from responding to statements.

c. The Panel Chair allowed Jane Roe's advisor to talk at length and read extensive sections of the investigation report without permitting responses.

d. The Panel Chair: took many unexplained breaks.

e. The Panel Chair ignored objections by John Noakes and his advisor.

f. The Panel Chair attempted to terminate cross-examination of Jane Roe less than halfway through John Noakes' questions.  John Noakes was permitted to continue some question after the Panel Chair received guidance from CWRU's counsel, but still refused to ask many of the questions John Noakes posed

g. The Panel Chair did not allow witnesses favorable to John Noakes to finish responses to questions on multiple occasions

h. The Panel Chair did not allow John Noakes to finish responses to questions on multiple occasions

i. The Panel Chair permitted Jane Roe to turn off her camera so that facial responses were not visible to the finder of facts.

j. The Panel Chair sought to rush the end of the hearing because she was "going out of town."

k. The Panel Chair allowed Jane Roe and her counsel to bring up settlement discussions between Respondent's advisors and CWRU attorneys in the pending litigation.  During these discussions, CWRU had indicated a wish to have the Tumblr taken down as a pre-

58

condition to any settlement.  John Noakes' counsel indicated a concern that if John Noakes made a request to the owner of the Tumblr, making such a request could be construed as him having control or influence over the account in pending disciplinary matters.  During the hearing, Jane Roe did just that, arguing that these settlement discussions were, in fact, evidence that John Noakes had control of the Tumblr account.  The panel chair compounded the error by permitting Jane Roe's counsel to repeat this improper statement and then cutting off John Noakes' advisor when he sought to correct the record.

149.    On January 28, 2022, John Noakes was informed that he had been found responsible for violating the Title IX Policy.  Many of the Panel's findings were based on John Noakes aharing "information, including correspondence between [himself] and the Office of Equity."  However, nothing in the Title IX policy makes this information confidential or prohibits a student from sharing this information.   Parker, the former Title IX Coordinator, explicitly acknowledged that the conduct found to be retaliatory by the Panel – the sharing of communications with the Office of Equity or another student – is **not** prohibited by any CWRU policy.  He testified at a deposition:

> Q … Am I right in understanding that there's nothing -- no policy at Case Western that requires students to keep anything about the Title IX process confidential; is that correct?
> A That is correct.
> Q So if the students wanted to post on the Internet every piece of correspondence they got from the Title IX Office they're permitted to do that; aren't they?
> A They can.
> * * *
> Q And if they have, you know, information from their accuser that they got independently of the investigation they could share that with whoever they wanted to; couldn't they?
> A If they -- If they wanted to.

150.    The Outcome letter revealed bias on the part of the hearing panel and the Title IX Office:

a.    In reaching a conclusion of responsibility, CWRU failed to consider that the Tumblr is protected activity.  The Tumblr does not mention Jane Roe by name but does contain information that is critical of the CWRU Title IX process.

b.   The Outcome letter relied on speculation without any basis in fact.  Most notably, the letter accused John Noakes of communicating with MM during the hearing.  This did not happen and the hearing Panel had zero evidence to suggest otherwise.   In fact, John Noakes was communicating with his counsel – conduct specifically permitted by the Revised Title IX Policy.

c.   The Outcome Letter failed to address the evidence that Jane Roe fabricated portions of the Tumblr in order to try to (falsely) claim that her name was mentioned.

d.   The outcome letter reached conclusions that were not supported by any evidence.  CWRU had a signed affidavit from MM establishing that John Noakes had no knowledge of the Tumblr prior to its publication, had no control over the Tumblr, and did not direct or encourage the author to create the Tumblr.  MM testified the same way at the hearing. The hearing panel did not receive any evidence to contradict this evidence.

151.   John Noakes submitted an appeal.

152.   CWRU deviated from the school's policies and procedures in handing the appeal.

a.   John Noakes had requested access to the audio/video of the hearing in order to prepare his appeal and respond to inquiries from the appeal panel.  John Noakes is entitled to access to this material under FERPA and various CWRU policies.  On February 25, 2022, the Title IX Coordinator told Noakes, "No copy of the hearing recording or any transcript, if made, is provided at this time as it is not necessary."  Later, John Noakes was permitted access to the recording, but his access was limited so that he could not keep a copy of significant portions or adequately discuss the matter with his advisor or counsel.

b.   The Title IX Coordinator hand-picked the members of the appeal panel.  She indicated in an email that "a number of individuals declined to participate for various reasons."  She

later refused to provide the basis for these reasons or the portions of the CWRU policies or procedures that permit appeal panel members to refuse to serve.

    c. On February 25, 2022, the Title IX Coordinator intervened in the process and requested that John Noakes provide additional information.  The Title IX Coordinator, in response to a request, refused to provide additional information to support this action.

    d. The Appeal process took significantly longer than the five days provided for in the Revised Title IX Policy.

153.  The appeal was granted on June 24, 2022.  The Appeals Panel determined that a preponderance of the evidence did not establish that John Noakes improperly shared information with the author of the Tumblr after learning of its existence.  The Appeals panel also determined that John Noakes' failure to identify to author of the Tumblr or take steps to stop the person posting information to the Tumblr violated any CWRU policy.

**DAMAGES**

154.  The COS proceedings against John Noakes damaged his academic and professional reputations and will affect his ability to match into a residency program.  John Noakes's damages include economic damages such as diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, and loss of reputation.  John Noakes also suffered humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other non-economic damages.

155.  The initiation of disciplinary proceedings related to the Tumblr Noakes damaged John Noakes' academic and professional reputations and may affect his ability to enroll at other institutions of higher education, match into a residency program, and to pursue a career.  John Noakes's damages include diminished earnings capacity, lost career and business opportunities,

expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages.

156.    The failure of CWRU and the Medical School to adequately respond to the harassment and retaliation from Jane Roe has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education, match into a residency program, and to pursue a career.  John Noakes's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, and other compensatory damages.

157.    The failure of CWRU and the Medical School to adequately respond to the harassment and retaliation from other medical students has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education, match into a residency program, and to pursue a career.  John Noakes's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, and other compensatory damages.

158.    The failure of CWRU and the Medical School to adequately respond to the retaliation against John Noakes from administrators and faculty has caused John Noakes to be denied the benefits of education at his chosen school, damaged his academic and professional reputations, and may affect his ability to enroll at other institutions of higher education, match into a residency program, and to pursue a career.  John Noakes's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, and other compensatory damages.

## COUNT I
## (VIOLATION OF TITLE IX – RETALIATION)

159.   Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

160.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

161.   Retaliation against a person because that person has complained of sex discrimination is a form of intentional sex discrimination encompassed by Title IX's private cause of action. When a funding recipient retaliates against a person because the person participates in the investigation of allegations of sexual misconduct, this constitutes intentional discrimination on the basis of sex in violation of Title IX.

162.   The Title IX regulations promulgated by the Department of Education provide that "No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing…"

163.   John Noakes engaged in protected activity in a number of ways:

   a.   John Noakes participated in various Title IX investigative and adjudicatory process.  Jane Roe had filed numerous sexual misconduct complaints against John Noakes.  John Noakes participated and provided evidence in the investigations and adjudication of Jane Roe complaints.

   b.   John Noakes submitted a complaint for retaliation with the Title IX Coordinator for the conduct of Dr. Ricanati and Parker in spring 2021.

   c.   John Noakes submitted a complaint of retaliation against Dr. Greenfield in fall 2021.

    d.  In Fall 2021, John Noakes requested that CWRU complete the investigation of his allegations against Jane Roe that had originally submitted in fall 2020.

    e.  John Noakes submitted a complaint that Jane Roe violated the terms of a No Contact Order.

    f.  John Noakes objected to various restrictions placed on his movements and activities as a result of complaints by Jane Roe.

    g.  John Noakes submitted complaints that he was subjected to harassment and retaliation by Jane Roe and other medical students.

    h.  John Noakes filed this lawsuit.

    i.  Even though John Noakes denies knowledge and responsibility for the Tumblr, to the extent that CWRU believes that John Noakes is responsible for the content of the Tumblr, the Tumblr is protected activity because it is critical of the manner in which CWRU handles Title IX matters.

164.   John Noakes has been subjected to and threatened with retaliation by peers.  CWRU was aware that other students engaged in retaliatory conduct that was sufficiently severe so as to dissuade a John Noakes and other medical students from engaging in protected activity.  CWRU condoned, tolerated, or encouraged the acts of retaliation, and responded so inadequately that the response manifests indifference or unreasonableness under the circumstances.

    a.  The conduct of other medical students included: removal of John Noakes from the GroupMe; the posting of flyers claiming John Noakes a rapist; the circulation of a survey and petition against John Noakes; the coordinated submission of "early concerns" alleging "unprofessional" conduct; and the exclusion of John Noakes from class discussions, groups, and other activities.

    b.  CWRU officials were aware of the retaliatory conduct but took no action.

    c.  CWRU officials tacitly encouraged the retaliatory conduct under the guise of merely "educating" students about the ability to submit early concerns designed to trigger disciplinary actions.

165.    John Noakes has been subjected to and threatened with diverse disciplinary or other adverse actions subsequent to or contemporaneous with the protected activity.  These adverse actions were designed to dissuade other students from defending themselves in a Title IX process, filing complaints, or criticizing the CWRU Title IX process.  The retaliatory conduct included:

    a.  John Noakes was compelled to appear before the PWG and COS.

    b.  John Noakes was singled out and subjected to heightened scrutiny through the PWG/COS process

    c.  John Noakes was subjected to No Contact Directives that imposed onerous and punitive restrictions on John Noakes and interfered with his ability to participate fully in his education.

    d.  John Noakes was threatened with investigation, or actually investigated for various patently frivolous and pretextual allegations of misconduct including the Tumblr investigation.

    e.  John Noakes was coerced to take a leave of absence from the school.

166.    The adverse actions against John Noakes are directly related to his participation in the Title IX process and were deigned to punish and intimidate John Noakes.

167.    The adverse actions against John Noakes are likely to have a chilling effect on the willingness of John Noakes and other students to publicly criticize the CWRU Title IX Process.  Students fear that if they criticize a CWRU decision on a Title IX matter, they will be charged with retaliation for disclosing "confidential" material.

168.    As a direct and proximate result of defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, and other compensatory damages, in an amount to be determined by a jury and the Court.

169.    CWRU is liable to John Noakes for his damages.

170.    Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## COUNT II
## (VIOLATION OF TITLE IX – DELIBERATE INDIFFERENCE)

171.    Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

172.    Title IX is enforceable through an implied private cause of action.

173.    John Noakes, as described *supra*, informed CWRU officials that he was the subject of discriminatory harassment and retaliation from Jane Roe.

   a.   The conduct of Jane Roe constitutes stalking, which is prohibited by the Title IX Policy.

   b.   The conduct of Jane Roe constitutes retaliation, which is prohibited by the Title IX Policy.

   c.   The conduct of Jane Roe included intentionally false and malicious allegations, which is prohibited by the Title IX Policy.

174.    John Noakes, as described *supra*, informed CWRU officials that he was the subject of discriminatory harassment and retaliation from other medical students.

   a.   The conduct of the other students constitutes retaliation, which is prohibited by the Title IX Policy.

   b.   The conduct of the other students constituted intentionally false and malicious allegations, which is prohibited by the Title IX Policy.

66

175. CWRU officials who have the authority to address the alleged discrimination and to institute corrective measures on John Noakes' behalf had actual knowledge of Jane Roe's conduct and failed to correct such behavior in a timely manner that amounts to deliberate indifference.

176. CWRU officials who have the authority to address the alleged discrimination and to institute corrective measures on John Noakes' behalf had actual knowledge of the conduct of other medical students and failed to correct such behavior in a timely manner that amounts to deliberate indifference.

177. CWRU officials who have the authority to address the alleged retaliation and to institute corrective measures on John Noakes' behalf had actual knowledge of the retaliation from Parker, Dr. Ricanati, and Dr. Greenfield and failed to correct such behavior in a timely manner that amounts to deliberate indifference.

178. CWRU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, CWRU and its agents demonstrated and acted on pervasive gender bias and stereotypes.

179. John Noakes has been deprived of access to educational opportunities at CWRU.

180. As a direct and proximate result of defendants' violations of John Noakes's rights under Title

181. IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, and other compensatory damages, in an amount to be determined by a jury and the Court.

182. CWRU is liable to John Noakes for his damages.

183. Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## COUNT III
## (VIOLATION OF TITLE IX – SELECTIVE ENFORCEMENT)

184.    Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

185.    The Department of Education regulations and guidance state that Title IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

186.    The decision to initiate enforcement proceedings against John Noakes in the Tumblr matter was motivated by gender bias.  Evidence supporting an inference of gender bias includes:

    a.    Procedural errors and delays in the investigative, adjudicative and appeal process for the Tumblr matter combined to make the hearing process unfair and suggest bias by the Title IX Office and the hearing panel.

    b.    Female students, (i) Jane Roe and (ii) other medical students, were in circumstances sufficiently similar to John Noakes's and were treated more favorably by CWRU.  In particular, CWRU received credible information that that Jane Roe and other medical students had engaged in similar conduct.  CWRU failed to take these claims seriously or conduct a full and fair investigation of John Noakes's claims against Jane Roe and the other students.

    c.    CWRU, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women. Throughout the pendency of the disciplinary proceedings against John Noakes, there was substantial criticism of CWRU, both in the student body and in the public media, accusing CWRU of not taking seriously complaints of female students alleging sexual assault by male students.  CWRU was under pressure from students and the community to combat vigorously sexual assault against women on and the severe potential punishment—loss of

all federal funds—if CWRU was found to not be in compliance with federal mandates yields a reasonable inference of sex discrimination.

d.  A general atmosphere at CWRU where those who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on CWRU from OCR, DOJ, student groups, and public opinion. During the appeal process from John Noakes, federal investigators were on campus to address claims that CWRU failed to take allegations of misconduct by male students seriously. The investigation and adjudication of the claims against John Noakes occurred at the time that CWRU officials were under pressure from students and federal officials to adopt a more aggressive approach to issues of sexual assault on campus and to "believe survivors."

187.  CWRU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct.

188.  Title IX is enforceable through an implied private cause of action.

189.  John Noakes has been deprived of access to educational opportunities at CWRU.

190.  As a direct and proximate result of defendants' violations of John Noakes's rights under Title IX, John Noakes has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

191.  CWRU is liable to John Noakes for his damages.

192.  Pursuant to 42 U.S.C. §1988, John Noakes is entitled to his attorney's fees incurred in bringing this action.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 58, Plaintiff demands a jury trial on any issue triable of right by a jury.

***Wherefore***, Plaintiff seeks the following relief from the Court:

- Judgment in favor of John Noakes on all counts.

- A Permanent Injunction prohibiting further retaliatory disciplinary proceedings in a manner that violates Title IX.

- An award of damages in an amount to be determined at trial; and

- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Anne Tamashasky (OH 0064393)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Courts ECF system this October 6, 2022 upon all counsel of record.

/s/ Joshua Engel
Joshua Engel